IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ALBERT JEROME LOCKWOOD,  )
    AIS#134376,             )
                         )
    PETITIONER,        )
                         )
VS.                   )   CIVIL ACTION NO.
                         )   2:07-cv-0715-WKW
RALPH HOOKS,  WARDEN, et al.,  )
                         )
    RESPONDENTS.     )

## RESPONDENTS' ANSWER TO COURT'S
## ORDER TO SHOW CAUSE

Come now Respondents, by and through the Attorney General of the State of

Alabama, and file their response to this Court's Order to Show Cause dated August

21, 2007, ordering the Respondents to file a response to the Petition for Writ of

Habeas Corpus filed by the Petitioner, Albert Jerome Lockwood. In response,

Respondents file the following answer, memorandum brief, and exhibits.

## PROCEDURAL HISTORY

1.    On February 24, 2004, Lockwood was found guilty by a jury of

attempted murder and was sentenced to life imprisonment without the possibility

of parole. State's Exhibit A (C. 4) In an unpublished memorandum issued on

September 24, 2004, the Alabama Court of Criminal Appeals affirmed

Lockwood's conviction and, on October 15, 2004, overruled his application for

rehearing.  State's Exhibits D - F.

     2.    Lockwood filed a petition for post-conviction relief pursuant to Rule

32 of the Alabama Rules of Criminal Procedure on January 28, 2005, arguing that

he was denied effective assistance of trial counsel for failing to preserve for

appellate review the claims that (1) the trial court erred by denying his motion to

suppress the transcript of his statement to law enforcement because law

enforcement acted in bad faith; (2) the trial court erred in allowing the transcript of

his statement into evidence because he was denied his right to remain silent and his

right to an attorney during questioning; and (3) the trial court erred by instructing

the jury on evidence of flight after other oral instructions but before the jury retired

to deliberate and by failing to instruct the jury that it could disregard his statement

to police and had the option of finding him not guilty of any crime.  State's Exhibit

H (C. 5-25)  The trial court denied Lockwood's petition on March 28, 2005, using

its own recollection of the proceedings to determine that Lockwood's ineffective

assistance claims were without merit.  State's Exhibit H (C. 31-32)  On December

2, 2005, the Court of Criminal Appeals dismissed Lockwood's appeal of the denial

of his Rule 32 petition, holding that the trial court's order purporting to deny his

petition was void because Lockwood had not paid the filing fee or been granted in

forma pauperis status and that Lockwood's Rule 32 petition and in forma pauperis

application remained pending. State's Exhibit H (C. 41) On June 12, 2006, the

trial court granted Lockwood's request to proceed in forma pauperis. State's

Exhibit H (C. 60) The trial court summarily dismissed Lockwood's petition,

issuing a written order on November 10, 2006. State's Exhibit H (CS. 4-5) In an

unpublished memorandum issued on April 20, 2007, the Court of Criminal

Appeals affirmed the denial of Lockwood's Rule 32 petition, finding that

Lockwood failed to show that his trial counsel was ineffective under <u>Strickland v.</u>

<u>Washington,</u> 466 U.S. 668 (1984). State's Exhibit K. The Court of Criminal

Appeals denied Lockwood's application for rehearing on March 16, 2007. State's

Exhibits L and M. The Alabama Supreme Court denied Lockwood's petition for

writ of certiorari and issued its certificate of judgment on July 13, 2007. State's

Exhibits N and O.


## LOCKWOOD'S FEDERAL HABEAS CLAIM

3. On August 2, 2007, Lockwood filed a writ of habeas corpus petition,

arguing that:

> (1) he was denied his Sixth Amendment right to effective assistance
> of counsel when trial counsel failed to object to the trial court's
> allowing into evidence a transcript of a statement he made to police
> when the evidence should have been suppressed because law
> enforcement acted in bad faith;

(2)  he was denied his Sixth Amendment right to effective assistance of counsel when trial counsel failed to object to the trial court's allowing the transcript into evidence after his rights to remain silent and to request an attorney had been violated; and

(3)  he was denied his Sixth Amendment right to effective assistance of counsel when trial counsel failed to object to the trial court's instructing the jury on evidence of flight after finishing the other oral instructions but before the jury retired to deliberate and to the trial court's failure to instruct the jury that it could disregard his statement to police and could find him not guilty of any crime.

Petition for Writ of Habeas Corpus, pp. 7-8.

4.  On August 21, 2007, this Court entered an order requiring Respondents to show cause why Lockwood's habeas corpus petition should not be granted, giving the Respondents 20 days from the date of service on the Attorney General in which to respond.  On  September 10, 2007, this Court granted the Respondents a 28-day enlargement in which to file its response.

## ANSWER TO THE PETITION

5.  Lockwood's federal habeas corpus petition is timely under the one-year statute of limitation provision of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

6.  Lockwood's federal habeas corpus petition is due to be denied because his claims are without merit.

4

7. Respondents deny Lockwood is in custody in violation of the laws or constitution of the United States. Lockwood's conviction and sentence were validly and constitutionally obtained.

## MEMORANDUM BRIEF IN SUPPORT OF ANSWER

8. Lockwood's claims that his trial counsel was ineffective should be denied because he has failed to show that the state courts resolved these claims in a manner contrary to or involving an unreasonable application of federal law as established by United States Supreme Court precedent, or that the state courts made any unreasonable determinations of facts in light of the evidence. Title 28 U.S.C. Section 2254(d) provides the standard under which a federal habeas court should review a state court's application of federal law:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Supreme Court stated in <u>Wiggins v. Smith</u>, 539 U.S. 510, 520-21 (2003):

> In order for a federal court to find a state court's application of our precedent "unreasonable," the state court's decision must have been more than incorrect or erroneous. <u>See</u> <u>Lockyer</u>, supra, at ----, 123 S.Ct. 1166 (slip op., at 11). The state court's application must have been "objectively unreasonable." <u>See</u> <u>Williams v. Taylor</u>, supra, at 409, 120 S.Ct. 1495.

According to U.S.C. § 2254(e)(1), "In a proceeding instituted by application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."

Under <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984), to show that his trial counsel was ineffective, Lockwood had the burden of showing both that counsel's performance was deficient and that such deficiency prejudiced his case, depriving him of a fair trial. To establish such prejudice, Lockwood had to show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.

Both the trial court and the Court of Criminal Appeals properly found that Lockwood failed to carry his burden of pleading his ineffective assistance of counsel claims under <u>Strickland</u>. State's Exhibit H (CS. 4-5); State's Exhibit K, pp. 5-6. According to Lockwood, his trial counsel was ineffective for failing to object to the admission into evidence of a transcript of his statement to police when

the statement was not properly admitted because he was denied his right to remain

silent and to request an attorney. Petition, p.8; State's Exhibit H (C. 16-22) As the

Court of Criminal Appeals held in Lockwood's direct appeal, however, the

admission of the transcript into evidence was entirely proper. State's Exhibit D,

pp. 2-4; See Battle v. State, 645 So. 2d 344, 346 (Ala. Crim. App. 1994) (quoting

Hawkins v. State, 443 So.2d 1312, 1314-15 (Ala. Crim. App. 1983) ("Where the

tape-recorded statement or conversation is missing or unavailable, '[a] typewritten

transcript of [the recording] is admissible where the officer who listened to the

conversation at the time of the recording testifies that the transcript accurately

reflect[s] the conversation.) Although he has consistently raised the bare claim that

the police acted in "bad faith," Lockwood has failed to allege any facts supporting

such a conclusion. State's Exhibit D, pp. 2-4. Furthermore, D.J. Belcher, the

officer who taped Lockwood's statement, testified without contradiction that the

audiotape in question was accidentally misplaced and could not be located after a

diligent search. State's Exhibit A (R. 151) Officer Belcher reviewed the transcript

while listening to the tape and confirmed that the transcript accurately reflected the

conversation. State's Exhibit A (R. 149-152) Indeed, Officer Belcher used the

same procedures as did Chief Hudson in Battle which the Court of Criminal

Appeals found sufficient to satisfy the "reliable representation standard" set out in

Ex parte Fuller, 620 So. 2d 675, 678 (Ala. 1993). Battle, 645 So. 2d at 347. The

Court of Criminal Appeals further held in <u>Battle,</u> 645 So. 2d at 346, that the transcript was admissible even "where the tape recording was inaudible in places." Therefore, the mere fact that it indicated that there were inaudible "gaps" in the audiotape did not render the transcript inadmissible. Accordingly, because the transcript was properly admitted, Lockwood's trial attorney was not ineffective for failing to object to its admission into evidence.

Lockwood next claims that his trial attorney was ineffective for failing to object to the admission of his statement into evidence after his right to remain silent and to request an attorney had been denied. Petition, p. 7; State's Exhibit H (C. 17-22) He has failed to adequately plead sufficient facts, however, indicating how his statement was involuntary or how the admission of his statement prejudiced his case. Officer Belcher testified without contradiction that, although Lockwood invoked his right to remain silent at one point after which Officer Belcher turned off the tape, the questioning was resumed *at Lockwood's behest.* State's Exhibit A (R. 171) Not only was there no evidence at trial that Lockwood was coerced into resuming the interrogation, the only circumstance articulated in his Rule 32 petition showing any such coercion is Lockwood's assertion that "sitting a custodial suspect in a Detective's Office for two hours during which time the custodial suspect is alleged to have demanded an attorney, is in no uncertain terms a coercion of the custodial suspect." State's Exhibit H (C. 21) This "claim"

is lifted verbatim from Lockwood's initial brief on direct appeal, where it appears to have been a recount of the facts in <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981), rather than any account of what happened while Lockwood was being questioned. State's Exhibit B, p. 26. Indeed, the record is completely devoid of any indication that Lockwood ever requested an attorney in or around the time he was being questioned. State's Exhibit A (R. 142-175; CS. 15-110) Because Lockwood has failed to allege any facts showing that his trial attorney was aware or should have been aware that he was "alleged to have demanded an attorney," he has failed to sufficiently allege that his trial counsel's failure to challenge the admission of his statement on such grounds constituted deficient performance.

Lockwood further claims that his trial counsel was ineffective for failing to object to the trial court's jury instructions concerning evidence of flight. Because the Court of Criminal Appeals has held that evidence of flight is admissible to show consciousness of guilt, the instruction was proper under Alabama law. <u>See</u> <u>Centobie v. State</u>, 861 So.2d 1111, 1122-23 (Ala. Crim. App. 2001) (evidence of escape admissible to show attempt to avoid prosecution). Lockwood's main concern, however, appears not to be with the substance of the instruction, but rather with its timing. According to Lockwood, "[t]he instruction to the jury on flight was deliberately requested by the State as a last effort to ring a bell in the jury's mind and as a means to subliminally suggest to the jury that they should

convict the Petitioner because he was alleged to have fled the scene of the alleged crime." State's Exhibit H (C. 23) This argument appears to be similar to the claim addressed by the Court of Criminal Appeals in Smith v. State, CR-97-1258, 2000 WL 1868419, at *62 (Ala. Crim. App. Dec. 22, 2000), *rev'd on other grounds*, Ex parte Smith, 2003 WL 1145475 (Ala. Mar 14, 2003), in which Smith argued that "the order in which the trial court gave its instructions prevented the jury from considering his defenses of intoxication." The Court of Criminal Appeals held that the trial court's instruction was proper, insisting that the instruction in question could not be read in isolation and must be read in the context of the instructions as a whole. Id. The court also stated that the jury must be presumed to have not only followed the trial court's instructions, but to have considered the "entire charge." Id. Under these principles, it must be presumed that the trial court's flight instruction did not cause the jury to give undue weight to the evidence of flight in this case. Furthermore, it should be noted that the flight instruction was given before the jury retired for deliberations. State's Exhibit A (R1. 50)[1] Because Rule 22.2 of the Alabama Rules of Criminal Procedure gives the trial court discretion to give the jury additional instructions after it has already retired to deliberate, the trial court clearly has discretion to give additional instructions immediately before deliberations – a juncture at which such additional instruction would be less likely

---

[1]The transcript of the conclusion of Lockwood's trial, which was transcribed by a different court reporter than the rest of the trial, is designated by "R1".

to cause the jury to place undue emphasis on certain evidence. Because Lockwood has failed to allege how he was prejudiced by the substance or timing of the flight instruction, he failed to sufficiently plead facts that would show his trial counsel's ineffectiveness for failing to object to the flight instruction.

Lockwood finally claims that his trial attorney was ineffective for failing to request proper reasonable doubt and acquittal instructions. Petition, p. 7; State's Exhibit H (C. 22-25) This claim is contradicted by the record, however, which shows that the trial court instructed the jury on reasonable doubt and on its duty to find Lockwood not guilty if it did not believe that the State had proven each element of each crime. State's Exhibit A (R1. 40, 47-48) Lockwood failed to allege in his Rule 32 petition specifically how these instructions were insufficient or the substance of any other possible instructions. State's Exhibit H (C. 23-25) Accordingly, he has failed to sufficiently plead facts showing that his trial counsel was ineffective for failing to raise any objection to the trial court's instructions or failure to give reasonable doubt or acquittal instructions.

## CONCLUSION

Based upon the foregoing authorities and facts, Lockwood's federal habeas corpus petition should be dismissed with prejudice.

Respectfully submitted,

Troy King (KIN047)
Attorney General
By:


s/John M. Porter
John M. Porter (ASB5818-P77J)
Assistant Attorney General

## EXHIBITS

Exhibit A  - Record and transcript on direct appeal in <u>Lockwood v. State</u>, CR-03-1253 (Montgomery County Circuit Court, CC-03-957).

Exhibit B  - Initial Brief of the Appellant in <u>Lockwood v. State</u>, CR-03-1253 (Montgomery County Circuit Court, CC-03-957).

Exhibit C  - Brief of the Appellee in <u>Lockwood v. State</u>, CR-03-1253 (Montgomery County Circuit Court, CC-03-957).

Exhibit D  - Court of Criminal Appeals decision in <u>Lockwood v. State</u>, CR-03-1253 (Ala. Crim. App. Sep. 24, 2004)(unpublished memorandum)

Exhibit E  - Application for Rehearing and supporting brief in CR-03-1253.

Exhibit F  - Court of Criminal Appeals's Order overruling Lockwood's application for rehearing in CR-03-1253).

Exhibit G  - Court of Criminal Appeals's order in CR-03-1253 issuing certificate of judgment.

Exhibit H  - Record and transcript of Lockwood's Rule 32 proceedings in <u>Lockwood v. State</u>, CR-06-562 (Montgomery County Circuit Court, CC-03-957.60).

Exhibit I  - Initial Brief of the Appellant in <u>Lockwood v. State</u>, CR-06-562 (Montgomery County Circuit Court, CC-03-957.60).

Exhibit J  - Brief of the Appellee in <u>Lockwood v. State</u>, CR-06-562 (Montgomery County Circuit Court, CC-03-957.60).

Exhibit K    -  Court of Criminal Appeals decision in <u>Lockwood v. State</u>, CR-06-562 (Ala. Crim. App. Apr. 20, 2007)(unpublished memorandum)

Exhibit L    -  Application for Rehearing in CR-06-562.

Exhibit M    -  Court of Criminal Appeals's Order overruling Lockwood's application for rehearing in CR-06-562).

Exhibit N    -  Petition for writ of certiorari in Supreme Court of Alabama Case No. 1061192.

Exhibit O    -  Supreme Court of Alabama order denying Petition for Writ of Certiorari and issuing certificate of judgment in Case  No. 1061192.

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of October, 2007, I electronically filed

the foregoing (including all exhibits) with the Clerk of the Court using the

CM/ECF system and I hereby certify that I have mailed by United States Postal

Service the document (including all exhibits) to the following non-CM/ECF

participants:  Albert Jerome Lockwood, AIS #134376, K-22-2A, St. Clair

Correctional Facility, 1000 St. Clair Road, Springville, Alabama  36146-5582.

Respectfully submitted,

s/John M. Porter
John M. Porter(ASB5818-P77J)
Office of the Attorney General
Alabama State House
11 South Union
Montgomery, AL  36130-0152
Telephone: (334) 242-7300
Fax: (334) 242-2848
E-Mail: JPorter@ago.state.al.us

325764/112408-001

# VOLUME 1 OF 4

COURT OF CRIMINAL APPEALS NO. CR-03-1253

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

## CIRCUIT COURT OF Montgomery COUNTY, ALABAMA

CIRCUIT COURT NO. CC 03-957

CIRCUIT JUDGE McCooey

Type of Conviction / Order Appealed From: Attempted Murder

Sentence Imposed: Life w/out Parole

Defendant Indigent: ☒ YES ☐ NO

Albert Lockwood

**NAME OF APPELLANT**

Tom Azar            263-5363
(Appellant's Attorney)        (Telephone No.)
609 S. McDonough St.
(Address)
Montgomery    AL.    36104
(City)        (State)    (Zip Code)

V.

## STATE OF ALABAMA

**NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

# INDEX
## CLERK'S RECORD

CASE ACTION SUMMARY...................................................................... 1-5

JURY VERDICT.................................................................................. 6

AFFIDAVIT....................................................................................... 7

TRANSCRIPT FROM DISTRICT TO CIRCUIT COURT........................... 8

INDICTMENT..................................................................................... 9-10

NOTICE OF APPEARANCE.................................................................. 11

MOTION FOR DISCOVERY – GRANTED............................................ 12-16

NOTICE OF DISCOVERY TO DEFENDANT, INTENT TO USE PRIOR
CONVICTIONS, INTENT TO INVOKE SENTENCING ENHANCEMENTS,
INTENT TO OFFER PROOF BY A CERTIFICATE OF ANALYSIS AND
MOTION FOR DISCOVERY BY THE STATE........................................ 17-18

JURY STRIKE LIST............................................................................ 19-20

JURY INSTRUCTIONS........................................................................ 21-33

DEFENDANT'S REQUESTED JURY INSTRUCTIONS............................. 34-35

CRIME VICTIMS COMPENSATION CLAIM.......................................... 36

CONVICTION REPORT....................................................................... 37

MOTION TO SET ASIDE VERDICT OR, IN THE ALTERNATIVE MOTION
FOR NEW TRIAL............................................................................... 38-41

NOTICE OF APPEAL.......................................................................... 42

CERTIFICATE OF APPEAL................................................................. 43

COURT ORDERED MONIES................................................................ 44

PETITION FOR TRANSCRIPT & APPOINTMENT OF COUNSE.............. 45-46

ORDER AUTHORIZING PREPARATION & FILING OF TRANSCRIPT &
APPOINTING COUNSEL ON APPEAL.................................................. 47-48

MOTION FO RAMENDED RESTITUTION............................................. 49-52

EXHIBITS......................................................................................... 53-66

CERTIFICATE OF COMPLETION........................................................ 67

```
CRC372              ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2003 000957.00
PER: REG                    CASE ACTION SUMMARY
AGE:   1                   CIRCUIT  CRIMINAL            RUN DATE: 07/16/2003
===============================================================================
      HE CIRCUIT COURT OF MONTGOMERY                             JUDGE: TSM

TATE  OF  ALABAMA              VS      LOCKWOOD ALBERT JEROME
                                       RT 1 BOX 178
ASE: CC 2003 000957.00
                                       UNION SPRINGS , AL  00000 0000

OB: 08/24/1962        SEX: M  RACE: B  HT: 5 05   WT: 159   HR:       EYES:
EN: 419980499  ALIAS NAMES: MARTIN JEROME
-------------------------------------------------------------------------------
HARGE01: ATTEMPT - MURDER    CODE01: MURDA LIT: ATTEMPT - MURD TYP: F #: 001
FFENSE DATE: 04/11/2003               AGENCY/OFFICER: 0030100

ATE WAR/CAP ISS:                      DATE ARRESTED: 05/27/2003
ATE     INDICTED: 07/11/2003          DATE     FILED: 07/16/2003
ATE    RELEASED:                      DATE   HEARING:
OND       AMOUNT:         $.00             SURETIES:

ATE 1:          DESC:                  TIME: 0000
ATE 2: 07/29/2003  DESC: ARRG          TIME: 0200 P

RACKING NOS: GJ 2003 070296 00  /                    /
   DEF/ATY: Tole, Vick                 TYPE:                        TYPE:

                          00000                                  00000
ROSECUTOR:                                                      Feb 23
                                                               Oct 27
===============================================================================
TH CSE: GJ200307029600 CHK/TICKET NO: 2003F-604       GRAND JURY: 296
 T REPORTER: _____  SID NO:     000753726
 TATUS: JAIL                DEMAND:                           OPER: REG
===============================================================================
ATE         ACTIONS, JUDGEMENTS, AND NOTES
```

| Date | Actions, Judgements, and Notes |
|---|---|
| 7-29-03 | Court appt'd Vick Tole atty. Def W/A and plea not guilty. Court set status for Sept. 18 at 9:00 and trial for Oct. 27 at 9:00a |
| 9-11-03 | Notice of Appearance |
| 9-11-03 | Motion For Discovery |
| 9/15/03 | Notice of discovery to dg... Motion for discovery by the State |
| 9-18-03 | Status - Case will be a trial on Oct. 27 at 9:00 a-h |
| 9-23-03 | Order signed 9-17-03 Granting Motion For Discovery |
| 27-03 | Court set trial for Feb. 23 at 9:00 a |

2

| State of Alabama<br>Unified Judicial System<br><br>Rev. 8/01 | **CASE ACTION SUMMARY**<br>**CONTINUATION** | Case Number<br><br>CC - 03-957 |
|---|---|---|

Style:

**STATE OF ALABAMA v.** _____ ALBERT LOCKWOOD _____

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| | |
| 2/24/04 | ORDERED, comes now a jury of W. Steven Wallace, and 11 others, |
| | who being impaneled and sworn according to law, upon their oaths do say: |
| | We, the Jury, find the defendant guilty of Attempted Murder; and we, the Jury, find |
| | the defendant not guilty of Assault in the second degree; and we, the Jury, find the |
| | defendant not guilty of Assault in the third degree. |
| | It is ORDERED, in accordance with the verdict of the Jury: |
| | The defendant is adjudged guilty of Attempted Murder and sentencing is scheduled for |
| | March 18, 2004 at 8:00 a.m.   It is further Ordered that the defendant is adjudged not |
| | guilty of Assault in the second degree and the defendant is adjudged not guilty of |
| | Assault in the third degree. |
| | DONE and ORDERED this the 24th day of February, 2004. |
| | |
| | |
| | _____<br>TRACY S. McCOOEY<br>CIRCUIT JUDGE |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| State of Alabama | CASE ACTION SUMMARY (CONTINUATION) | Case Number |
|---|---|---|
| Unified Judicial System | SENTENCING ORDER | CC - *03-457* |

STATE OF ALABAMA v. *Albert J. Crockwax*  Page No. _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|

*3-K-07*

*Recd*
*3-23-04*
*Comp*

### Sentencing Order

The defendant and counsel, and counsel for the State of Alabama appeared in open court for the defendant to be sentenced on his/her conviction of

*att. Murder*

### Habitual Felony Offender

The defendant has been given reasonable notice that the State intended to move the Court to sentence the the defendant under the provisions of — 13A-5-9 and 10, *Code of Alabama. 1975.*
The State's motion to sentence the defendant pursuant to the Habitual Felony Offender Act is — __X__ granted; _____ denied. The Court finds the defendant has __X__ prior convictions:

*3 points*

### Sentence

_____ The defendant waived a sentencing hearing.
_____ The Court conducted a sentencing hearing.
_____ A pre-sentence report was requested by the defendant and considered by the Court.
_____ The defendant waived a pre-sentence investigation and report.
_____ The Court asked the defendant if he/she had anything to say why the sentence of law should not be imposed against him/her, and: __X__ the defendant having had his/her say; _____ the defendant had nothing to say, it is ORDERED as follows:
_____ The defendant is sentenced to the custody of the Commissioner of the Department of Corrections for a period of: _____ year(s), and _____ month(s), _____ day(s);
          _____ his/her life; __X__ his/her life without parole.
_____ The defendant is sentenced to the custody of the Sheriff of Montgomery County, Alabama, for a period of: _____ year(s), _____ month(s), _____ day(s).
_____ The defendant is sentenced to the custody of the Warden of the Montgomery City Jail for a period of: _____ year(s), _____ month(s), _____ days(s).
_____ The defendant is fined the sum of $_____.
_____ The defendant is fined the sum of $_____ for the Mandatory Drug Demand Reduction Assessment Act Fine.
_____ Defendant's Driver's License is suspended for a period of _____.
_____ Y.O.A.
_____ Frank Lee Youth Center is recommended.
_____ The counts in this sentence shall run concurrent with the sentence(s) imposed *by* _____.
_____ The defendant shall pay restitution in the amount of $ *2,917*
_____ The defendant shall pay the costs of this case.
_____ The defendant shall pay the Alabama Crime Victims Compensation Commission, the sum of $ *60*
_____ The defendant shall pay $100.00 fine to the Department of Forensic Sciences.
_____ One-half of all monies earned by the defendant while in the Department of Corrections shall be withheld to pay Court-Ordered monies.
_____ The defendant shall reimburse the State of Alabama the costs of his/her appointed counsel in the amount of $ _____.
_____ The payment of Court-ordered monies shall be a condition of parole, early release, S.I.R., or work release.
_____ The defendant was advised of his/her rights of appeal.

CR0369  A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2003 000957.00
JUDGE ID:  TSM

E OF ALABAMA                    VS    LOCKWOOD ALBERT JEROME

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 4/29/04 | Notice Of Appeal w/out Fams |
| 5/04/04 | Cert. Of Appl. To Crim Appls, AG, DA, Def Atty w/ Fams & Crt Reporters |
| 4/14/04 | Motion To Set Aside Verdict or, In The Alternative Motion For New Trial |
| 4/27/04 | Order Setting 05/11/04 For Oral Arguments |
| 4/29/04 | Petition For Transcript & Appt. Of Counsel |
| 5/04/04 | Order Authorizing Preparation & Filing Of Transcript & Appt. Of Counsel On Appeal  (Hon Azar) |
| 5/10/04 | Fams Filed |
| 05/25/04 | Order To Remand To Trial Court To Determine Status Of Post Trial Motions |

5

| State of Alabama<br>Unified Judicial System<br><br>Rev. 8/01 | CASE ACTION SUMMARY<br>CONTINUATION | Case Number<br>CC - 03-957 |
|---|---|---|

Style:

**STATE OF ALABAMA** v. _Albert Rockwood_

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 6-17-04 | Court orders that $961^{14}$ of restitution, go to the crime victims compensation. Court set hearing on motion for New Trial for July 1st at 8:00 — |
| 7-1-04 | Motion for a new trial heard in Court. Motion denied — |

**STATE OF ALABAMA**
**UNIFIED JUDICIAL SYSTEM**

**IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA**

**STATE OF ALABAMA  v.  ALBERT LOCKWOOD**

**CC-03-957**

---

**JURY VERDICT**

✓     We, the Jury, find the Defendant guilty of Attempted Murder.

O R

_____   We, the Jury, find the Defendant not guilty of Attempted Murder.

**A N D**

_____   We, the Jury, find the Defendant guilty of Assault in the second degree.

O R

✓     We, the Jury, find the Defendant not guilty of Assault in the second degree.

**A N D**

_____   We, the Jury, find the Defendant guilty of Assault in the third degree.

O R

✓     We, the Jury, find the Defendant not guilty of Assault in the third degree.

W, STEVEN WALLACE
_____
Name of Foreperson (please print)

_____
Foreperson's Signature

Date filed: _____

By: _____
                   Clerk of Circuit Court

Case # 03-008889                                              Warrant # 2003F-604

# AFFIDAVIT
## DISTRICT COURT OF MONTGOMERY ALABAMA

**INSTRUCTIONS:** Complete the following information on OFFENSE/OFFENDER

**Offense:** *Attempted Murder*

**Defendant's Name:** *Albert Lockwood, B/M*          **D.O.B.** *08/24/1962*

**Defendant's SSN:** *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*     **Height:** *5-05*     **Weight:** *159*

**Defendant's Address:** *Rt 1 Box 178  Union Springs Al*

**Date & Time of Offense:** *04/11/2003   2310 Hours*

**Place of Occurrence:** *2720 E. Gunter Park Dr.*

**Person or Property Attacked:** *Christopher McKinnes, B/M*

**How Attacked:** *Shot with .25 cal handgun in head*

**Damage Done or Property Attacked:** _____

**Value of Property:** _____

**Details of Offense:**

*On listed date and time the defendant chased the victim with a handgun discharged one round at the victim. The defendant caught him and forced the victim to the ground and fired two rounds at the victim's head striking him one time in the head. The victim has known the defendant for approximately five years and has positively identified him via picture.*

This offense did occur in the City of Montgomery, Montgomery County, and is in violation of Title *13A-4-2* against the peace and dignity of the State of Alabama.

I make this affidavit for the purpose of securing a warrant against the said **Albert Lockwood, B/M** _____ . I understand that I am instituting a criminal proceeding and cannot drop this case. I further understand that if any of the facts are untrue, I may, in addition to any other punishment provided by law, be taxed with court costs in this proceeding.

Sworn to and subscribed before me
this *12* day of *April* 20 *03* .

_____
**Complainant**

_____
Judge - Clerk - Magistrate

**WITNESSES:** (Name, Address, Telephone Number)

1) *Christopher McKinnes*     *1490 Old County 42 Union Springs*   *(334)474-3025*

2) *Karla Parker*     *1490 Old County 42 Union Springs*   *(334)474-3025*

3) *Detective J.L. Davis*     *320 N. Ripley St. Montg, Al*     *(334)241-2844*

TSM

CASE: DC 2003 001470.00
JID: LUCIE MCLEMORE

---

THE STATE OF ALABAMA     VS     LOCKWOOD ALBERT JEROME
9629 HWY 223
RT 1 BOX 178
UNION SPRINGS    AL 00000-0000

CHARGE: ATTEMPT - MURDE

PROSECUTOR: BAILEY DARYL DONALD     DEF ATTY: KLOESS BRANCH D SR
DEF ATTY:

_____ WARRANT ISSUED AND DELIVERED TO SHERIFF.

05/27/2003 WARRANT EXECUTED BY ARRESTING THE DEFENDANT AND COMMITTING HIM
TO JAIL (OR RELEASING HIM ON BOND).

_____ BOND    $30,000.00 APPROVED AND FILED. SURETIES.

_____ DEFENDANT TRIED, CONVICTED AND FINED     0.00 DOLLARS
AND THE COST OF THE PROSECUTION.

06/27/2003 ON PRELIMINARY EXAMINATION, DEFENDANT BOUND OVER TO AWAIT THE
ACTION OF THE GRAND JURY AND BOND FIXED AT    $30,000.00.

_____ DEFENDANT APPEALED TO THE PRESENT TERM OF THE CIRCUIT COURT AND
BOND FIXED AT $ _____.

_____ BOND APPROVED AND FILED; SURETIES:

_____ NO PRELIMINARY REQUESTED, CASE TRANSFERRED TO D.A.

BILL OF COST

| | |
|---|---|
| DOCKET FEE | 0.00 |
| PRELIMINARY HEARING | 0.00 |
| WITNESS SUBPOENA | 0.00 |
| TOTAL | 0.00 |

CERTIFICATE TO TRANSCRIPT

TO THE CLERK AND THE CIRCUIT COURT:
   I HEREBY CERTIFY THAT THE FOREGOING IS A FULL, COMPLETE AND EXACT
TRANSCRIPT FROM MY DOCKET OF THE JUDGMENT AND PROCEEDINGS IN THE ABOVE
CLAUSE, AND I HEREWITH SEND TO THE CIRCUIT COURT ALL THE ORIGINAL AND
OTHER PAPERS PERTAINING TO THE SAID CAUSE.

DATE ISSUED: 07/09/2003    MELISSA RITTENDUR     BY_____
CLERK

NOTE:

WITNESS FOR STATE:
     W001   CHRISTOPHER MCKINNES
     W002   KARLA PARKER
     W003   J L DAVIS

JUL 2003
Filed
Melissa Rittenour
Circuit Clerk

PERATOR:BIM
REPARED:07/09/2003

GJ NO. ____0296____

**THE STATE OF ALABAMA**

Albert LNockwood
B/M HT:5'5 WT:159 DOB:08/24/62

Rt.1 Box 178

I.D. NO. ____00753726____    ARREST DATE ____05/27/03____

FOR

ATT MURDER

A TRUE BILL

*Mary & Moore*

Foreperson of Grand Jury

**BAIL IN THIS CASE IS FIXED AT**

$ _____    NO BOND

*Charles Price*

Judge of Circuit Court of Montgomery County

CC NO. _____    TSM

Bailey
WJ
TB

---

Presented in open Court by the Foreperson of

the Montgomery County Grand Jury in the pres-

ence of ____15____ other members of

the Grand Jury and filed this ____11th____ day of ____3____

____July____, ____03____.

*Melissa Rittenour*

Clerk of the Circuit Court of Montgomery County

**WITNESSES**

1  D. J. Belcher
   Wk:MPD

2  Lt. Bullard
   Wk:MPD

3  J.L. Davis
   Wk:MPD

4  K. L. Johnson
   Wk:MPD

5  M. McCord
   Wk:MPD

6  Christopher McKinney
   1490 Old Co Rd 42 Union Springs

7  G. Naquin
   Wk:Simcala Inc Mt Meigs
   Wk:MPD

8  Karla Parker
   1490 Old Co Rd 42 Union Springs

# THE STATE OF ALABAMA

## MONTGOMERY COUNTY

Circuit Court of Montgomery County, _____ July _____ Term, A.D. **2003**

The Grand Jury of said County charge that, before the finding of this indictment,

ALBERT LOCKWOOD, alias
ALBERT J. LOCKWOOD, alias
ALBERT JEROME LOCKWOOD, alias
JEROME MARTIN,

whose name is otherwise unknown to the Grand Jury, did with the intent to

cause the death of another person (Section 13A-6-2 of the Code of Alabama),

did attempt to cause the death of Christopher McKinnes by hitting and/or

shooting him with a gun, in violation of Section 13A-4-2 of the Code of

Alabama,

against the peace and dignity of the State of Alabama.

_Ellen Brooks_
District Attorney, Fifteenth Judicial Circuit of Alabama

# IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, ALABAMA
## CRIMINAL DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CC 03-957 TSM |
| | ) | |
| ALBERT LOCKWOOD | ) | |
| **Defendant.** | ) | |

## NOTICE OF APPEARANCE

**COMES NOW**, Vicky U. Toles, and hereby enters a notice of appearance on

behalf of the Defendant, Albert Lockwood.

Respectfully submitted this the ___11th___ day of September, 2003.

ATTORNEY FOR DEFENDANT:

_____
VICKY U. TOLES (UND 014)


TOLES & WILLIAMS, LLP
400 S. Union Street, Ste. 270
Montgomery, AL 36104
(334) 832-9915
(334) 832-9917 Fax

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing motion upon the
Honorable Darryl Bailey, Deputy District Attorney for Montgomery County, by placing a
copy of the same in the appropriate courthouse box on this the ___11th___ day of
September, 2003.

_____
VICKY U. TOLES (UND 014)

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, ALABAMA**
**CRIMINAL DIVISION**

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CC 03-957 TSM |
| | ) | |
| ALBERT LOCKWOOD | ) | |
| Defendant. | ) | |

**MOTION FOR DISCOVERY**

**COMES NOW**, the Defendant in the above-styled cause and submits the following discovery to the State.

1. Any and all statements, confessions or admissions made by the Defendant, whether written or oral, subsequently reduced to writing or summarized in any agent or officer reports, notes or copies thereof, including the notes of such officers. United States v. Severdiga, 790 F.2d 1556 (11th Cir. 1986).

2. Any and all documents, instruments, forms or statements of any kind signed or purported to have been signed by the Defendant.

3. Any statements made by the Defendant which were recorded prior to or after the indictment.

4. The substance of any oral statement made by the Defendant which the State intends to offer into evidence at trial, whether before or after arrest in response to interrogation by any person then known to the Defendant to be a State agent.

5. The name, title and address of the individual to whom the statement was made, and the name and address of any other individual present at the time the statement was made.

6.  Exact copies of any tape recordings, documents and affidavits requested and/or authorizing the interception of the conversations, the date the recording was made, and the identity of all persons whose voices were intercepted.

7.  All statements made by the Defendant to third parties, including investigative agents whose identities were unknown to the Defendant. See United States v. Caldwell, 543 F.2d 1333 (D.C. Cir. 1975); United States v. Thevis, 84 F.R.D. 47, 55-56 (N.D. Ga. 1979).

8.  Any and all tangible items seized by any law enforcement authority from the person of the defendant or any defendant which the state will allege any defendant owned or had an interest in and copies of any and all warrants that the State will claim that led to such seizure, including affidavits and inventories of items seized.

9.  The criminal record, including arrest reports but not limited to perjury and false statements, of each State witness. Moore v. Kemp, 40 Crim. L. Rep. 2370 (11th Cir. 1987).

10.  Any and all photographs allegedly depicting the Defendant in connection with this case.

11.  Any and all evidence of transactions or conduct of the Defendant which are not the subject matter of this Indictment, but which the State might offer as evidence on the question of intent, motive, opportunity, preparation, plan, knowledge, identity, absence of mistake or accident, or similar legal ground.

12.  Any and all statements of any potential State witness or co-defendant which are inconsistent, in whole or in part, with any of the statements made by the same witness

or statements made by any other witness. Mills v. Scully, 653 F. Supp. 885 (S.D. N.Y. 1987). Dennis v. United States, 384 U.S. 855, 873-874 (1966).

13. Any and all reports of any scientific and/or physical examinations and tests, and which are within the possession, custody or control of the State or its agents and which are material to the preparation to the defense of this case or intended for use by the State as evidence at the trial.

14. The names, addresses, current telephone numbers and criminal records of any informants, special employees or special investigators, used in the investigation of this case, or persons hired, directed, requested and/or paid by the State to investigate or obtain information in any manner whatsoever in the investigation of this case.

15. The existence and substance, the manner of execution of fulfillment, of any promises, agreements, understanding and arrangements, either verbal or written, expressed or implied between the State and any prosecution witness, or his attorney or representative.

16. If conversations of any Defendant were subject to surveillance, but were not electronically recorded, please provide any handwritten notes or memoranda, stating the date of the conversation. With regard to any surveillance, whether by electronics, physical or otherwise, state whether or not such surveillance was consensual and, if so, if it was a result of any promise or inducement on the part of the State or local agency.

17. A copy of all original notes and memoranda made by any and all investigating agents of the State or any state law enforcement agency with relation to this case.

18.   Reports of any and all photographic identification displays conducted in investigation of this matter, and any reports or memoranda of results, and copies of any photographs taken of the procedures.

19.   Any and all material known to the government, or which may become known or which through due diligence may be learned from the investigating officers or the witnesses or the persons having knowledge of this case, which is exculpatory or favorable material.

20.   Disclose whether the State knows or has any reason to believe a material witness will be unavailable for trial <u>See United States v. Mendez-Rodreguez</u>, 450 F.2d 1 (9th Cir. 1971).

In addition, the Defendant requests the District Attorney, pursuant to Rule 16 of the *Alabama Rules of Criminal* Procedure, provide the defendant all evidence generally required by <u>Brady v. Maryland</u>, 372 U.S. 83 (1963); <u>Giglio v. United States</u>, 405 150 (1972); <u>United States v. Agurs</u>, 427 U.S. 97 (1976); and <u>United States v. Bagley</u>, 437 U.S 365, 105 S.Ct. 3375 (1975).

Respectfully submitted this the 11th day of September, 2003.


ATTORNEY FOR DEFENDANT:


_____
VICKY U. TOLES  (UND 014)


TOLES & WILLIAMS, LLP
400 S. Union Street, Ste. 270
Montgomery, AL  36104
(334) 832-9915
(334 832-9917 FAX

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing motion upon the Honorable Darryl Bailey, Deputy District Attorney for Montgomery County, by placing a copy of the same in the appropriate courthouse box on this the ___11th___ day of September, 2003.

VICKY U. TOLES (UND 014)

**IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT**
**MONTGOMERY COUNTY, ALABAMA**

STATE OF ALABAMA,          )
     Plaintiff,          )
                         )
V                          )          CC NO. 03-0957-TSM
                         )
ALBERT LOCKWOOD,           )
     Defendant.          )

**NOTICE OF**
**DISCOVERY TO DEFENDANT,**
**INTENT TO USE PRIOR CONVICTIONS,**
**INTENT TO INVOKE SENTENCING ENHANCEMENTS,**
**INTENT TO OFFER PROOF BY A CERTIFICATE OF ANALYSIS, and**
**MOTION FOR DISCOVERY BY THE STATE**

     **COMES NOW** the State of Alabama, by and through its District Attorney for the Fifteenth Judicial Circuit, Eleanor I. Brooks, and gives notice as to the following:

[ ✓ ] 1.    Pursuant to Rule 16.1, A.R.Cr.P., and as otherwise required by law, all available discovery has been provided or made available to the Defendant's counsel of record.  Physical evidence, photographs, video tapes of crime scene and/or statements of Defendant in any, are in the custody of the investigating law enforcement agency or the Alabama Department of Forensic Sciences.  Arrangements for copies of photographs and/or video tapes or inspections of physical evidence may be made by contacting the undersigned.

     The State has furnished a copy of the discovery to Defense Counsel.  This material is page numbered sequentially from 000001 to _146_.  (Pages ————————— have not been provided as they are either work product and/or NCIC, which cannot be provided pursuant to state law, unless ordered by the Court.)  The State of Alabama considers this discovery material to have been received **in its entirety** by Defense Counsel unless promptly notified in writing of any discrepancies.

[ ✓ ] 2.    The State intends to use at trial any and all prior convictions, crimes, wrongs, or acts of the Defendant for those uses permitted by Rules 404(b) and 609 of the A.R.E., and as otherwise allowed by law.  The State is presently aware of, and intends to use, the following:

_Burglary 3° 1983 Montgomery_          _TOP III 1987 Montgomery_
_Probation Violation 1983 Montgomery_   _TOP II 1988 Montgomery_
_Assault III 1983 Montgomery_          _Robbery I 1988 Montgomery_
_TOP II 1983 Montgomery_               _TOP II 1989 Montgomery_
_Att. Murder 1987 Montgomery_          _Escape 1990 Montgomery_

State vs. Albert Lockwood          1
Notice of Discovery
_09/5/03_
Page _1_ of _2_

[✓] 3.    The State intends to invoke all sentencing enhancements required or permitted by law, including, the Habitual Felony Offender Act based on any applicable felony convictions, known and/or any convictions which may subsequently be discovered and/or disclosed. And, if applicable, the following:

(✓)    Enhancement for use of firearm or deadly weapon.   Minimum term of imprisonment of _20_ years.

(___)    Five Year Enhancement for Sale of Drugs within three (3) miles of a school, 13A-12-250.

(___)    Five Year Enhancement for Sale of Drugs within three (3) miles of housing project, 13A-12-270.

(___)    $1,000.00 Fine, 13A-12-281.

(___)    $2,000.00 Fine, 13A-12-281.

(___)    Suspension of Driver's License, 13A-12-290.

(___)    Five Year Enhancement for Possession of Firearm, 13A-12-231(13).

[___] 4.    Pursuant to Sections 12-21-300 through 303, Code of Alabama, written notice is hereby given of the State's intent to offer proof by a certificate of analysis in lieu of direct testimony. The certificate of analysis is from the Alabama Department of Forensic Sciences and is included in the provided discovery material.

[✓] 5.    Pursuant to rules 16.2 and 16.4(c), A.R.Cr.P., and as otherwise required by law, the State requests a copy of all discovery to which it is entitled and hereby moves this Honorable Court for an order granting same to the State.

Respectfully submitted, this ___15___ day of September 2003.

ELEANOR I. BROOKS
District Attorney

by: _Daryl D Bailey_____
DARYL D. BAILEY
Chief Deputy District Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above and foregoing was served upon the Honorable Vicky U. Toles, Counsel for the Defendant, by hand delivery; or by placing same in the appropriate Courthouse Box; or by posting same in the United States mail, postage prepaid and properly addressed to said Counsel; on this the ___15___ day of September 2003.

by: _Daryl D Bailey_____
DARYL D. BAILEY
Chief Deputy District Attorney

State vs. Albert Lockwood                    2
Notice of Discovery
09 / 15 / 03
Page _2_ of _2_

19

JUDGE: McCooey
COURT REPORTER: V. Clark
PANELS: 17, 18, 19 & 20
DATE: 2/23/04

CASE CC 03-957    CHARGE: Att. y Murder
State of Alabama vs Albert Lockwood
ATTY: S. Green/D. Bailey    ATTY: Toles/McClelland

| | PLANTIFF | DEFENDANT | | | |
|----|----------|-----------|---|---|---|
| 1 | 406 | 416 | | | |
| 2 | 400 | 399 | | | |
| 3 | 427 | 442 | | | |
| 4 | 417 | 449 | | | |
| 5 | 384 | 441 | | | |
| 6 | 428 | ALT 424 | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |

```
**********************
No. Jur.   No. Stk.
**********************
  12          0
  14          1
  16          2
  18          3
  20          4
  22          5
  24          6
  26          7
  28          8
  30          9
  32         10
  34         11
  36         12
  38         13
  40         14
  42         15
**********************
```

Mon
Tues

*State v. Albert Lockwood* CC-03-957
J. McCoou   Feb. 23, 2004

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| (0380) | 058641 TAKACS EDNA C | 09/25/1937 | F | W | 01 ✓ACTIVE |
| 17 | (0382) | 049260 TALLEY RENARD L | 07/24/1978 | M | B | 01 ✓ACTIVE |
| ~~0384~~ | ~~064092 TATUM LANCE E~~ S-5 | 02/15/1965 | F | W | 01 ✓ACTIVE |
| (0397) | 066820 TUCKER SHERRY H | 07/16/1968 | F | W | 01 ✓ACTIVE |
| (0398) | 052682 TURMAN NANCY J | 06/24/1957 | F | W | 01 ✓ACTIVE |
| ~~0399~~ | ~~038345 TYLER MARK A~~ D-2 | 02/13/1954 | M | W | 01 ✓ACTIVE |
| ~~0400~~ | ~~029264 VINCENT SHERRY R~~ S-2 | 08/02/1956 | F | W | 01 ✓ACTIVE |
| 18 | (0404) | 016221 WALLACE WILLIAM S | 04/21/1957 | M | W | 01 ✓ACTIVE |
| ~~0406~~ | ~~042541 WARE MICHAEL L~~ S-1 | 05/13/1959 | M | B | 01 ✓ACTIVE |
| (0407) | 030823 WARING LAURA U | 09/22/1972 | F | W | 01 ✓ACTIVE |
| (0415) | 076942 WEBB DEBORAH C | 10/07/1952 | F | B | 01 ✓ACTIVE |
| ~~0416~~ | ~~098361 WEBB STEADMAN J~~ D-1 | 02/09/1952 | M | W | 01 ✓ACTIVE |
| ~~0417~~ | ~~000836 WEBB YOLANDA Y~~ S-4 | 03/10/1972 | F | B | 01 ✓ACTIVE |

ALT
19

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| (0424) | 037566 JAMES-WHITE ELVESTA N | 02/23/1949 | F | B | 01 ✓ACTIVE |
| ~~0427~~ | ~~011667 WIBLE ELIZABETH C~~ S-3 | 09/01/1966 | F | W | 01 ✓ACTIVE |
| ~~0428~~ | ~~048783 WILLIAMS CAROL M~~ S-6 | 04/14/1974 | F | B | 01 ✓ACTIVE |
| (0430) | 038635 WILLIAMS FREDDIE J | 09/13/1956 | M | B | 01 ✓ACTIVE |
| (0433) | 015849 WILLIAMS JOAN G | 12/01/1935 | F | W | 01 ✓ACTIVE |
| ~~0438~~ | ~~026020 WILSON~~ excused | 01/22/1980 | F | B | 01 ✓ACTIVE |
| (0439) | 080804 WILSON LORETTA | 02/07/1957 | F | B | 01 ✓ACTIVE |
| ~~0441~~ | ~~069546 WILSON MARY C~~ D-5 | 07/26/1933 | F | W | 01 ✓ACTIVE |

20

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ~~0442~~ | ~~069157 WILSON WILLIE~~ D-3 | 04/26/1960 | M | B | 01 ✓ACTIVE |
| (0444) | 003585 WRIGHT BRIAN A | 12/20/1979 | M | W | 01 ✓ACTIVE |
| (0447) | 002646 ZIGLAR ANTHONY R | 08/20/1959 | M | W | 01 ✓ACTIVE |
| ~~0449~~ | ~~051603 ZIPPAY CAROL L~~ D-4 | 07/24/1937 | F | W | 01 ✓ACTIVE |

* * * P R O G R A M   T O T A L S * * *

RECORDS WRITTEN:   139

## BURDEN OF PROOF
## REASONABLE DOUBT

The Court charges the jury that before they can convict Defendant, the evidence must be so strong as to convince each juror of his guilt, beyond a reasonable doubt, and if after considering all the evidence a single juror has a reasonable doubt of Defendant's guilt, arising out of the evidence, a conflict in the evidence, or the lack of evidence in this case, you cannot find the Defendant guilty.


Given _____          Refused _____



**BURDEN OF PROOF**
**REASONABLE DOUBT**

After considering all the evidence, if you have a reasonable doubt as to the

Defendant's guilt arising out of any part of the evidence, then you should find him not guilty.

Given _____          Refused _____

23

## BURDEN OF PROOF
## REASONABLE DOUBT

If the State has failed to prove beyond a reasonable doubt every material ingredient of

the offense charged, you must find the Defendant not guilty.


Given _____          Refused _____

**BURDEN OF PROOF**
**REASONABLE DOUBT**

A reasonable doubt may arise not only from the evidence produced, but also from a lack of evidence. The burden is upon the State to prove the defendant guilty beyond a reasonable doubt of every essential element of the crime charged. The defendant has the right to rely upon evidence brought out on cross-examination of witnesses for the State and upon evidence presented on his behalf. But the burden of proof never shifts to a defendant, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Upon consideration of all the evidence, or lack of evidence, if you have a reasonable doubt about the defendant's guilt, arising out of any part of the evidence or lack of evidence, you must find the defendant not guilty.

If the jury views the evidence in the case as reasonably permitting either of two conclusions – one of innocence, the other of guilty – the jury should of course adopt the conclusion of innocence.


Given _____          Refused _____

25

## ACQUITTAL

If the probability of the Defendant's innocence arises from the evidence, or

lack of evidence, or a conflict in the evidence, then that is reason entitling the Defendant to

an acquittal.

Given _____          Refusal _____

## CREDIBILTY OF WITNESSES

Now, in saying that you must consider all of the evidence, I do not mean you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. Also, the number of witnesses testifying concerning any particular dispute is not controlling. You may decide that the testimony of a smaller number of witnesses concerning any fact in dispute is more believable than the testimony of a larger number of witnesses to the contrary.

In the deciding whether you believe or do not believe any witnesses suggest that you ask yourself a few questions: Did the person impress you as one who was telling the truth? Did he or she have any particular reason not to tell the truth? Did he or she have a personal interest in the outcome of the case? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to observe accurately the things he or she testified about? Did he or she appear to understand the questions clearly and answer them directly?

Given _____        Refused _____



## SUSPICION
## SPECULATION
## CONJECTURE

If you believe the evidence in this case did nothing more than create a suspicion, a

possibility, speculation, or a guess that the defendant is guilty of a criminal act he is charged

with, then that is an insufficient basis for conviction.  Circumstances merely causing a

suspicion of guilty are insufficient to justify a conviction of crime, and you must find him not

guilty.


Given _____        Refused _____

**28**

## PRESUMPTION OF INNOCENCE

In coming before you upon his plea of not guilty, the defendant is presumed to be innocent of the charges against him.  This presumption of innocence remains with him throughout every stage of the trial and during your deliberation of the verdict, and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that he is guilty.

The presumption of innocence of the defendant is evidence in the case which must be considered with all the evidence in the case and is not to be disregarded by you.  The presumption of innocence alone is sufficient to find the defendant not guilty, unless you are satisfied beyond a reasonable doubt of the defendant's guilt from all the evidence in the case.


Given _____          Refused _____

**29**

### STATE'S REQUESTED CHARGE NUMBER ____1____

I charge you, members of the jury, that flight from the scene can be inferred by you as a guilty state of mind.  <u>Jones v. State</u>, 541 So.2d 1052 (Ala. 1989)

GIVEN_____REFUSED_____


_____

CIRCUIT JUDGE

**30**

## INTENTIONALLY

A person acts intentionally with respect to a result or to a conduct when his or her

purposes is to cause that result or to engage in that conduct.

Given _____        Refused _____

31

## PRIOR BAD ACTS

Evidence of prior bad acts does not prove that the defendant is guilty of the crime charged.

Given _____                    Refused _____

**MERE PRESENCE**

The mere presence of a person at the time and place of a crime is not sufficient to

justify his conviction for the commission of the crime. *Lollar v. State, 398 So. 2d (Ala. Crim.*

*App. 1981).*


Given _____     Refused _____

**INDICTMENT**
**PRESUMPTION OF INNOCENCE**
**FAILURE TO TESTIFY**

The indictment against any defendant is not evidence of guilt. The defendant is presumed by the law to be innocent. The law does not require a defendant to prove his innocence or produce any evidence at all; and if a defendant elects not to testify, you should not consider that in any way during your deliberations. The State has the burden of proving a defendant guilty beyond a reasonable doubt, and if fails to do so you must find the defendant not guilty.

Given _____        Refused _____

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: CC-03-957 |
| | ) | |
| ALBERT LOCKWOOD, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S REQUESTED JURY INSTRUCTIONS

COMES NOW, the Defendant, Albert Lockwood, and hereby requests that the jury be instructed as follows:

Respectfully submitted this the _24th_ day of February, 2004.

_Vicky U. Soles_

VICKY U. TOLES (TOL 014)
ATTORNEY FOR DEFENDANT

TOLES & WILLIAMS, LLP
1015 S. McDonough Street
Montgomery, AL 36104
334-832-9915
334-832-9917 fax

## CERTICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on Ellen Brooks, Deputy District Attorney, by hand delivery on this the _24th_ day of February, 2004.

_Vicky U. Soles_

VICKY U. TOLES (TOL 014)

**35**

## ASSAULT THIRD DEGREE
### RECKLESSNESS
### §13A-6-22(a)(2)

A person commits the offense of assault in the third degree if he recklessly causes physical injury to another person.

To convict, the State must prove beyond a reasonable doubt each of the following elements of assault in the third degree:

(1)    That the defendant caused physical injury to another person, namely Christopher McKinnes;

(2)    That in doing so, the defendant acted recklessly.

"Physical injury" means impairment of physical condition or substantial pain.

A person acts "recklessly" with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregard a substantial and unjustifiable risk that the result will occur or that circumstances exist. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

If you find from the evidence that the State has proved beyond a reasonable doubt each of the elements of the offense of assault in the third degree, as charged, then you should find the Defendant guilty of assault in the third degree.

If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of assault in the third degree, then you can not find the Defendant guilty of assault in the third degree.

Given _____        Refused _____

36




# ALABAMA CRIME VICTIMS COMPENSATION COMMISSION

P. O. Box 1548

RSA Union Building, 100 N. Union Street, Suite 770
Montgomery, AL 36102-1548

Martin A. Ramsay
Executive Director

Commissioners
Miriam Shehane
Barbara Brown
Chief Rick Singleton

March 26, 2004

Circuit Clerk of Montgomery County
Montgomery County Courthouse
P O Box 1667
Montgomery, AL 36102-1667

| | |
|---|---|
| ACVCC Claim #: | 2004-00241 |
| Claimant: | Christopher McKinnes |
| Victim: | Christopher McKinnes |
| | 535 Parker Street |
| | Union Springs, AL 36089 |

Defendant:   Albert Lockwood
Court Case #:   CC2003-000957

Dear Clerk:

The above referenced claim for compensation has been approved by this Commission. Below is a summary of payments issued. Please include this as part of the defendant's file so restitution may be made to this Commission for reimbursement in this amount.

| Payee | Category | Check # | Date Paid | Amount |
|---|---|---|---|---|
| Christopher McKinnes | Lost Wages | 45286 | 02/10/2004 | $864.00 |
| Haynes Ambulance | Medical Related Expense | 45506 | 03/09/2004 | $122.74 |
| | | | Total This Payment: | $986.74 |
| | | | Total Paid: | $986.74 |

**Please Note:** The Commission is subrogated by law, to the rights of the claimant for the collection of restitution. Therefor, if payments of restitution are made to the claimant by your office, please notify us in writing.

Thank you for your cooperation in this matter.

Sincerely,

Colette Gray

Colette Gray
Restitution/Recovery

Melissa Rittenour
Circuit Clerk
FILED
MAR 2004

*Meeting the Critical Needs of Crime Victims*

(334) 242-4007, 1-800-541-9388, Fax (334) 353-1401

31

ACR359

ALABAMA JUDICIAL DATA CENTER
MONTGOMERY COUNTY
TRANSCRIPT OF RECORD
CONVICTION REPORT

CC 2003 000957.00 01
TRACEY S MCCOOEY

```
--------------------------------------------------------------------
| CIRCUIT COURT OF MONTGOMERY COUNTY        COURT ORI: 003045 J     |
|------------------------------------------------------------------|
| STATE OF ALABAMA    VS.             DC NO: GJ 2003 070296.00      |
| LOCKWOOD ALBERT JEROME   ALIAS: MARTIN JEROME G J:   296          |
| RT 1 BOX 178             ALIAS:            SSN:   419980499       |
| UNION SPRINGS   AL 00000                   SID:   000753726       |
|                                            AIS:   000134376       |
|------------------------------------------------------------------|
| DOB: 08/24/1962  SEX: M  HT: 5 05  WT: 159 HAIR: BLK   EYE: BRO   |
| RACE: ( )W (X)B ( )O  COMPLEXION: _____ AGE: ____ FEATURES: _____ |
|------------------------------------------------------------------|
| DATE OFFENSE: 04/11/2003  ARREST DATE: 05/27/2003 ARREST ORI: 0030100 |
|------------------------------------------------------------------|
| CHARGES @ CONV    CITES       CT CL COURT ACTION        CA DATE  |
| ATTEMPT - MURDER  13A-004-002 01 A  CONVICTED          02/24/2004|
|                                00                      00/00/0000|
|                                00                      00/00/0000|
|------------------------------------------------------------------|
| JUDGE: TRACEY S MCCOOEY        PROSECUTOR:                        |
|------------------------------------------------------------------|
| PROBATION APPLIED  GRANTED  DATE     REARRESTED DATE  REVOKED  DATE |
| ( )Y ( )N _____  ( )Y( )N _____  ( )Y( )N _____  ( )Y( )N _____ |
|------------------------------------------------------------------|
| 15-18-8, CODE OF ALA 1975   IMPOSED  SUSPENDED  TOTAL  JAIL CREDIT |
| ( )Y (X)N  CONFINEMENT: 00 00 000  00 00 000  00 00 000  00 00 297 |
|            PROBATION  : 00 00 000             00 00 000            |
| DATE SENTENCED: 03/18/2004   SENTENCE BEGINS: 03/18/2004          |
|------------------------------------------------------------------|
| PROVISIONS             COSTS/RESTITUTION       DUE       ORDERED  |
|                                                                  |
|   PENITENTIARY         RESTITUTION          $2917.71    $2917.71  |
|   LIFE WO PAROL        ATTORNEY FEE            $0.00       $0.00  |
|   HABITUAL OFDR        CRIME VICTIMS         $50.00      $50.00  |
|                        COST                 $375.00     $375.00  |
|                        FINE                   $0.00       $0.00  |
|                        MUNICIPAL FEES         $0.00       $0.00  |
|                        DRUG FEES              $0.00       $0.00  |
|                        ADDTL DEFENDANT        $0.00       $0.00  |
|                        DA FEES                $0.00       $0.00  |
|                        COLLECTION ACCT        $0.00       $0.00  |
|                        JAIL FEES              $0.00       $0.00  |
|                                                                  |
|                        TOTAL              $3342.71    $3342.71  |
|------------------------------------------------------------------|
| APPEAL DATE      SUSPENDED      AFFIRMED        REARREST          |
| ( )Y ( )N _____  ( )Y( )N _____ ( )Y( )N _____  ( )Y( )N _____ |
|------------------------------------------------------------------|
| REMARKS:                    THIS IS TO CERTIFY THAT THE          |
|                             ABOVE INFORMATION WAS EXTRACTED       |
|                             FROM OFFICIAL COURT RECORDS           |
|                             AND IS TRUE AND CORRECT.              |
| 50% OF MONIES TO THE CLERK.                                      |
|                                                                  |
|                                                                  |
|                             MELISSA RITTENOUR(CC)                |
|                                                                  |
|                             04/13/2004                           |
--------------------------------------------------------------------
```

OPERATOR: REG
PREPARED: 04/13/2004

**38**

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, ALABAMA
CRIMINAL DIVISION**

| | |
|---|---|
| STATE OF ALABAMA | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   CC 03-957-TSM |
| | ) |
| ALBERT LOCKWOOD, | ) |
| | ) |
|     Defendant. | ) |

APR 2004
Filed
Melissa Rittenour
Circuit Clerk

**MOTION TO SET ASIDE VERDICT OR, IN THE ALTERNATIVE
MOTION FOR NEW TRIAL**

    **COMES NOW** the defendant, Albert Lockwood, by and through his undersigned

attorney, and pursuant to Rule 20.3 Alabama Rules of Criminal Procedure, respectfully

moves this Honorable Court to set aside jury's verdict rendered in the above-referenced

case on February 24, 2004. In the alternative, defendant moves this Court for a new trial

pursuant to Rule 24.1 of the Alabama Rules of Criminal Procedure. In support of said

motions, defendant states as follows:

    1.      Prior to trial on February 23, 2004, defendant argued in support of his oral

          motion to suppress the tape statement taken from him after he had

          requested an attorney at the Montgomery Police Department on or about

          05/27/03.

    2.      This Honorable Court denied defendant's oral motion to suppress his

          taped statement prior to the commencement of the trial and at the

          conclusion of the evidence and held that the evidence would be admitted.

    3.      Defendant's taped statement was taken in violation of his Miranda rights

          and U. S. Constitution, Amendment VI. Miranda vs. Arizona, 384 U. S.

cc: B. White, Dist. Atty. Off.
Y. Tolen

.27/04
oral arguments shall be conducted TSM
May 11, 2004 @ 9:00 a.m.

RECEIVED
5-3-04
CIRCUIT COURT CLERK

436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant requested to speak with an attorney but was not allowed to speak with one. Instead, the police officer continued to question the defendant. In fact, another officer started questioning the defendant after he had invoked his right to counsel. During the oral suppression hearing, a request was made for the taped statement but defendant was informed that the tape was lost. The Defendant did not have an opportunity to listen to the tape to explain where on the tape he requested an attorney.

4.    In support of Defendant's Motion to Suppress, defendant cites Ex Parte Cothren, 705 So.2d 861 (Ala.1997), Ex Parte Comer 591 So.2d 17.

5.    In Weiss v. U. S., 510 U. S. 163, 177, 127 L.Ed. 2d. 1, 114 S. Ct. 752, (1994), the court states "... a fair trial in a fair tribunal is a basic requirement of due process. A necessary component of a fair trial is an impartial judge. Id. The Court looks to the totality of the circumstances to determine if Defendant has been denied a fair trial. Fisher vs. State, 587 So.2d 1029 (Ala.Crim.App. 1991). In the case at bar, the following took place and so offended established notions of due process as to deprive defendant of a constitutionally fair trial:

a.    The Court did not keep a neutral atmosphere in the courtroom. During cross-examination of the State's witnesses, the court failed to correct the witness to answer the defendant's questions. The Defense attorney had to ask the court to instruct the state's witness

to answer the questions. This attitude by the court deprived the defendant of a constitutionally fair trial.

b.    Furthermore, the order of the jury instructions denied defendant a constitutionally fair trial. At the conclusion of the jury instructions, the State approached the bench concerning a charge on flight that had been omitted by the court. After the brief discussion with the State, the Court instructed the jury, in essence, guilt can be inferred by flight. The timing, appearance and manner of this jury instruction created the appearance of impropriety and contributed to the denial of defendant's constitutionally fair trial.

c.    In addition, the Court's failure to answer the jury's question concerning the charge of attempted murder during deliberation and prior to their verdict being rendered contributed to the denial of defendant's constitutionally fair trial.

WHEREFORE, THE PREMISES CONSIDERED, the defendant prays this Court will set aside the jury's verdict or, in the alternative, grant a new trial along with any other relief the Court deems appropriate.

**ORAL ARGUMENT REQUESTED**

Respectfully submitted,

*Vicky L. Sole*

VICKY L. TOLES  (UND 014)
Attorney for Defendant

OF COUNSEL:
TOLES & WILLIAMS, LLP
1015 S. McDonough Street
Montgomery, AL  36104
(334) 832-9915
(334 832-9917 FAX

## CERTIFICATE OF SERVICE

    I hereby certify that I have served a copy of the foregoing motion upon the Honorable Eleanor Brooks, District Attorney for Montgomery County, by placing a copy of the same in the appropriate courthouse box on this the 14th day of April, 2004.

Vicky U. Toles

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, ALABAMA
### CRIMINAL DIVISION

| | |
|---|---|
| STATE OF ALABAMA )<br>)<br>    Plaintiff, )<br>v. )<br>)<br>ALBERT LOCKWOOD, )<br>)<br>    Defendant. ) | CASE NO: CC -2003-957-TSM |

### NOTICE OF APPEAL

**COMES NOW**, Albert Lockwood, by and through his attorney of record, Vicky

U. Toles, and hereby respectfully notices his appeal to the Alabama Court of Criminal

Appeals.

Respectfully submitted this the 29th day of April, 2004.



ATTORNEY FOR DEFENDANT:

_Vicky U. Toles_
VICKY U. TOLES (UND 014)

TOLES & WILLIAMS, LLP
1015 S. McDonough Street
Montgomery, AL 36104
(334) 832-9915
(334) 832-9917 fax

### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing motion upon
Ellen Brooks, District Attorney, by placing a copy of the same in the appropriate
courthouse box on this the 29th day of April, 2004.

_Vicky U. Toles_
VICKY U. TOLES (UND 014)

43

ACR371

ALABAMA JUDICIAL DATA CENTER
NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
BY THE TRIAL COURT CLERK
IN THE CIRCUIT COURT OF MONTGOMERY COUNTY
STATE OF ALABAMA VS LOCKWOOD ALBERT JEROME    JUDGE: TRACEY S MCCOOEY

APPEAL DATE: 04/29/2004

INDIGENCY STATUS:
GRANTED INDIGENCY STATUS AT TRIAL COURT:    __X__ YES    _____ NO
APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:    _____ YES    __X__ NO
INDIGENT STATUS REVOKED ON APPEAL:    _____ YES    __X__ NO
INDIGENT STATUS GRANTED ON APPEAL:    __X__ YES    _____ NO

DEATH PENALTY: NO

APPEAL TYPE: STATE CONVICTION

THIS IS AN APPEAL FROM A CONVICTION.

DATE OF CONVICTION: 02/24/2004    DATE OF SENTENCE: 03/18/2004

YOUTHFUL OFFENDER STATUS: DENIED

CO/CASE NUMBER: 03/CC 2003 000957.00
CODE: MURDA   CONVICTION: ATTEMPT - MURDER    ACTION: CONVICTED
    STATUTE: 13A-004-002

SENTENCE:    CONF: 00 YRS 00 MOS 000 DAYS
SENTENCE:    PROB: 00 YRS 00 MOS 000 DAYS    LIFE: NO    LIFEWO: YES

| POST-JUDGMENT MOTIONS FILED: | DT FILED | DT DENIED | CON BY AGREE |
|---|---|---|---|
| ___ MOTION FOR NEW TRIAL | _____ | _____ | _____ |
| ___ MOTION FOR JUDG. OF ACQUIT | _____ | _____ | _____ |
| ___ MOTION TO W/D GUILTY PLEA | _____ | _____ | _____ |
| ___ MOTION FOR ATTY TO W/DRAW | _____ | _____ | _____ |
| ___ OTHER _____ | _____ | _____ | _____ |

COURT REPORTER(S):    CLARK, VICKI H.
ADDRESS:    C/O HON. TRACI S. MCCOOEY
    MONTGOMERY    ,   AL    36104

APPELLATE COUNSEL #1:    TOLES VICKY UNDERWOOD
ADDRESS:    P. O. BOX 501

    MONTGOMERY    ,   AL    36101
PHONE NUMBER:    334-832-9915

APPELLATE COUNSEL #2:    _____
ADDRESS:    _____
    _____
    _____
PHONE NUMBER:    _____

APPELLANT (PRO SE):    LOCKWOOD ALBERT JEROME
ADDRESS:    RT 1 BOX 178
    UNION SPRINGS ,   AL    000000000
AIS #:    000134376

APPELLEE (IF CITY APPEAL):    _____
ADDRESS:    _____
    _____
    _____

I CERTIFY THAT THE INFORMATION PROVIDED    OPERATOR: DBH
ABOVE IS ACCURATE TO THE BEST OF MY    PREPARED 05/03/2004
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO
THIS ACTION ON THIS 3rd DAY OF May, 2004    CIRCUIT COURT CLERK

44

**IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT**
**MONTGOMERY COUNTY, ALABAMA**

STATE OF ALABAMA,                    )
    Plaintiff,                       )
                                     )    CC No. _03-0957-TSM_
v.                                   )
                                     )    DA No. _0128-656_
_Albert Lockwood_         ,          )
    Defendant.                       )

## COURT ORDERED MONIES

This cause coming to be heard on the _18th_ day of _March_____, 20_04_, in the presence of the District Attorney, Defendant, and Defense Attorney, the Court finds as follows:.

(1)  The Defendant owes the following:

A. Court Costs  $ _375.00_      D. Attorney Fees  $___∅___      F. DDRA  $___∅___

B. Fines  $___∅___              E. ACVCCA  $ _50.00_            G. FSTF  $___∅___

C. Restitution  $ _2917.71_                                     TOTAL $ _3336.71_
                                                                       _3342.71_

(2)  The victim is **(See Back)**.

3.  The Co-Defendant is :
_"None"_____

Therefore, it is **ORDERED** as follows:

(1)  The Defendant shall pay court ordered monies in the amounts indicated above, plus an administrative fee of $1.00 with each restitution installment payment, with credit for any restitution amount actually paid by any Co-Defendant.

(2)  _____  The full amount shall be paid in FULL by _____.
     _____  The full amount shall be paid in INSTALLMENTS commencing on _____
     in the amount of $_____ per _____ month _____ week _____ two weeks, until paid in full.
     _____  The full amount shall be paid under an Income Withholding Order.

(3)  Paying these monies shall be a condition of probation, parole, work release, SIR, or any other release program.

(4)  The Alabama Department of Corrections, the Alabama Board of Pardons and Paroles and/or other agency having lawful custody of the Defendant shall collect from any and all sources of money at the rate of _50_% and forward payments to the Circuit Clerk.

(5)  Monies shall be paid to the Circuit Clerk, Montgomery County Courthouse, 251 South Lawrence Street, Post Office Box 1667, Montgomery, Alabama 36102-1667.

(6)  The Court retains jurisdiction of this Defendant and this matter until all monies ordered herein are paid.

(7)  If money is over 90 days delinquent and the case is turned over to the District Attorney's Office for collection, a 30% mandatory fee will be added to the outstanding balance.

Done this _____ day of _____ _April_____, 20_04_.

_____
Circuit Judge

cc: _Daryl D. Bailey_, Deputy District Attorney
    _Vicky Toles_, Defense Attorney

RECEIVED
_4-23-04_
CIRCUIT COURT CLERK

(Over For Victim Information)                    Revised 04/01

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, ALABAMA
CRIMINAL DIVISION**

STATE OF ALABAMA

    Plaintiff,

v.

ALBERT LOCKWOOD,

    Defendant.

CASE NO: CC -2003-957-TSM



## PETITION FOR TRANSCRIPT AND APPOINTMENT OF COUNSEL

    **COMES NOW**, Vicky U. Toles, appointed attorney for Albert Lockwood, and files this petition in writing saying that Defendant, Albert Lockwood, desires to take an appeal and that the offense for which the Defendant was convicted is attempted murder. The Defendant was found guilty, and the sentence and punishment therefore was life without the possibility of parole.

    The Defendant desires to appeal from the judgment of conviction and he is without funds and has no reasonable way to procure the same to pay the court reporter the lawful fees for transcribing the evidence and other proceedings had at trial and sentencing of the said cause, or pay the Clerk of the Court for preparing the transcript, or to pay an attorney for an appeal.

    WHEREFORE, your Defendant prays that your Honor will enter such orders as may be necessary to have the record and transcript prepared for the taking of appeal from the Circuit Court of Montgomery County, Alabama, to the Court of Criminal Appeals as provided for by law, and to appoint a licensed practicing attorney other than the undersigned to represent Appellant on appeal.

    Respectfully submitted this the 29th day of April, 2004.

46

ATTORNEY FOR DEFENDANT:

_Vicky U. Sole_
VICKY U. TOLES (UND 014)

**OF COUNSEL:**
TOLES & WILLIAMS, LLP
1015 S. McDonough Street
Montgomery, AL  36104
(334) 832-9915
(334) 832-9917 fax

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing motion upon Ellen Brooks, District Attorney, by placing a copy of the same in the appropriate courthouse box and on Albert Lockwood, at the Montgomery County Jail, P. O. Box 4599, Montgomery, Alabama, 36103 on this the 29th day of April, 2004.

_Vicky U. Sole_
VICKY U. TOLES (UND 014)

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, ALABAMA
### CRIMINAL DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO: CC -2003-957-TSM |
| | ) | |
| ALBERT LOCKWOOD, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER AUTHORIZING PREPARATION AND FILING
### OF TRANSCRIPT AND APPOINTING COUNSEL ON APPEAL

This matter is presented to the Court upon the Petition filed by Appellant seeking to have this Court authorize the preparation and filing of a transcript of the proceeding in this cause, and seeking to have this Court appoint counsel to represent the Appellant in this appeal.

The Court is informed the Appellant is without funds to prosecute this appeal or to pay for a transcript for the testimony in this cause and that Appellant is without sufficient funds and has no reasonable way of procuring same to pay or to employ competent legal counsel to represent Appellant and prosecute said appeal.

It is , therefore, **ORDERED** that the clerk of this Court provide Appellant with a copy of the record of the proceedings in the above-style cause.





5-7-04 Copy to Crim Appeals

48

It is further **ORDERED** that_____, a licensed

and practicing attorney, be appointed to represent the Appellant in the prosecute of this

appeal.

       **DONE** and **ORDERED** this_____day of_____, 2004.

TRACEY S. McCOOEY
CIRCUIT JUDGE

cc: Hon. Vicky U. TOLES
    Hon. Scott Green, Deputy District Attorney
    Albert Lockwood
    Thomas Azar, Esq.



**49**

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,        *
    Plaintiff,        *
                *
v.        *        CC No. 03-957 TSM
                *
ALBERT LOCKWOOD,        *
    Defendant.        *

## MOTION FOR AMENDED RESTITUTION

COMES NOW the State of Alabama by and through its District Attorney

for the Fifteenth Judicial Circuit, Eleanor I. Brooks, and moves the court to

amend its previous restitution order entered herein to order the Circuit Clerk for

Montgomery County to add the sum of $961.14 for monies paid as restitution in

the captioned case by the Alabama Crime Victims Compensation Commission as

reimbursement for funds paid by the Commission to the Victim, Christopher

McKinnes, per the attached affidavit.

Respectfully submitted this _17_ day of May, 2004.

ELEANOR I. BROOKS
DISTRICT ATTORNEY

By: _Daryl Bailey_____
Daryl Bailey (BAI037)
Deputy District Attorney

6/1/04. A Hearing shall be
conducted on June 17, 2004 @
8:00 a.m. Def's presence at
said hearing is waived. _TSM_

cc: _D. Bailey_ Dist. Atty. Off. ✓
_V. Toles_ ✓



## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion has been served upon the Honorable Vicky Toles, attorney for the Defendant, by hand delivery on this the __17__ day of May, 2004.

ELEANOR I. BROOKS
DISTRICT ATTORNEY

By: _____
Daryl Bailey (BAI037)
Deputy District Attorney

51

March 25, 2004

Defendant:          Albert Lockwood
Case Number(s):     CC2003-000957
Victim:             Christopher  McKinnes
ACVCC #:            2004-00241

Payment(s) Issued To:

| Payee | Category | Date Paid | Amount |
|-------|----------|-----------|--------|
| Christopher  McKinnes | Lost Wages | 02/10/2004 | $864.00 |
| Haynes Ambulance | Medical Related Expense | 03/09/2004 | $122.74 |

Total this Payment:    $122.74
Total Paid:            $986.74     overlap v.
                       -25.60  was already
                       _____  ordered
                        961.14

**RESTITUTION AFFIDAVIT**

IN THE CIRCUIT Court of Montgomery COUNTY

STATE OF ALABAMA V. Albert Lockwood

---

Pursuant to Section 15-23-14, <u>Code of Alabama, 1975,</u> as Amended which provides that the Alabama Crime Victims Compensation Commission shall be subrogated to all the rights of a claimant who is entitled to restitution from a criminal defendant and subrogated to all the rights and remedies of such claimant for the collection of restitution to the extent that compensation was awarded, I, the Executive Director for the Alabama Crime Victims Compensation Commission, <u>hereby request the Court to enter an Order of Restitution to the Alabama Crime Victims Compensation Commission</u> in an amount equal to the loss or damage of the victim/claimant which have been compensated by the Alabama Crime Victims Compensation Commission.  This is separate and apart from other restitution requests made by the victim/claimant except those claims of loss or damage paid by the Commission and noted herein.

LOSS OR DAMAGE COMPENSATED BY THE ALABAMA CRIME VICTIMS COMPENSATION COMMISSION:

Total this Payment                        $122.74
TOTAL                                          $986.74

Please see attached sheet for an itemized account of payments made to date.

To the best of my ability, I certify that this is a true and correct statement.


*Martin A. Ramsay* (signature)


Martin A. Ramsay
Executive Director
Alabama Crime Victims Compensation Commission
P.O. Box 1548
Montgomery, AL 36102-1548
(334) 242-4007


Sworn to and subscribed before me on

this __25th__ day of __March__, __2004__

_____
Notary Public

**53**

```
 1              IN THE FIFTEENTH JUDICIAL CIRCUIT

 2             IN AND FOR MONTGOMERY COUNTY

 3                 MONTGOMERY, ALABAMA

 4

 5      STATE OF ALABAMA,          )

 6                 Plaintiff,      )

 7      VS.                        )   CC NO.  03-1019

 8      WILLIAM BURKE, SR.         )

 9                 Defendant.  )

10      _____/

11      INDEX TO REPORTER'S TRANSCRIPT ON APPEAL

12      EXHIBITS                             ADMITTED

13      SX 1 - (Handwritten Note)              102

14      SX 2 - (Photograph)                    111

15      SX 3 - (Photo Lineup)                  113

16      SX 4 - (Photo Lineup)                  116

17      SX 5 - (Photograph)                    111

18      SX 6 - (Photograph)                    111

19      SX 7 - (Photograph)                    111

20      SX 8 - (Photograph)                    111

21      SX 9 - (Photograph)                    111

22      SX 10 - (Photograph)                   111

23      SX 11 - (Photograph)                   111

24      SX 12 - (Miranda Rights Form)          108

25      SX 13 - (Audio Tape)                   124
```

54



STATE'S
EXHIBIT







56



STATE'S
EXHIBIT

W.S. Police Department Photo Line-up

Case #











have identified picture # ___ as the suspect on _____ (Date)

Signature: _____



58

STATE'S EXHIBIT



59





60













63





64

STATE'S EXHIBIT



STATE'S EXHIBIT

City of Montgomery, Alabama
Department of Police

65

WILLIAM BURKE AGE 30 ED. HIGH SCHOOL GRAD
_____
NAME

320 N. RIPLEY ST. PAB
_____
PLACE

4/23/03
_____
DATE

1548 HOURS
_____
TIME

ROBBERY 3ED DEGREE
_____
CHARGE

Before asking you any questions, I must explain to you that you can remain silent, that anything you say can be used against you in court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the Court will appoint one before we question you. If you want to answer questions now, You can do so, but you can stop at any time.

_____
OFFICER

I fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.

_____

WITNESSE:

_____

_____

66



DB/E2844

15.5

1806-

233681
B-2

**STATE'S EXHIBIT**

13

DATE OF THE TAPE

4/23/03

NUMBER OF SUPPLEMENTS OR OTHER MATERIAL ON TAPE

Tape Statements William Burke

TIME TAPE TURNED INTO SHIFT COMMANDER

Donnell Ook

OFFICER (S) NAME

| State of Alabama | CERTIFICATE OF COMPLETION AND TRANSMITTAL OF RECORD ON APPEAL BY TRIAL CLERK | Appellate Case Number |
|---|---|---|
| Form ARAP-14    Rev. 11/91 | | |

TO: THE CLERK OF
    THE COURT OF CRIMINAL APPEALS OF ALABAMA

DATE OF
NOTICE OF APPEAL: 04 | 29 | 04

APPELLANT

*Albert Lockwood*

v.   STATE OF ALABAMA

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this __6th__ day of __July__, 2004.

_Melissa Pittman_
Circuit Clerk

# VOLUME 2 OF 4

COURT OF CRIMINAL APPEALS NO._____

## APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF Montgomery COUNTY, ALABAMA

CIRCUIT COURT NO.  CC 03-957

CIRCUIT JUDGE  McCooey

Type of Conviction / Order Appealed From:  Attempted Murder

Sentence Imposed:  Life w/out Parole

Defendant Indigent:  ☒ YES   ☐ NO

Albert Lockwood
NAME OF APPELLANT

Tom Azar                    263-5363
(Appellant's Attorney)                    (Telephone No.)
609 S. McDonough St.
(Address)
Montgomery        AL.        36104
(City)        (State)        (Zip Code)

V.

STATE OF ALABAMA_____

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

NAME OF APPELLEE

_____

_____

(For Court of Criminal Appeals Use Only)

1

1     IN THE FIFTEENTH JUDICIAL CIRCUIT
      IN AND FOR MONTGOMERY COUNTY
2            MONTGOMERY, ALABAMA

3

4     ALBERT JEROME LOCKWOOD,

5            APPELLANT,

      vs.                      CRIMINAL ACTION
6                              CASE NO. CC-03-957

7     STATE OF ALABAMA,

8            APPELLEE.

9

10    _____/

11       INDEX TO REPORTER'S TRANSCRIPT ON APPEAL

12

13    TRIAL PROCEEDINGS (Vicki Clark)   .   .   Page 5

      SENTENCING  .   .   .   .   .   .   .   .   Page 250
14

15            *   *   *   *   *   *   *   *   *   *

16

17

18

19

20

21

22

23

24

25

Vicki H. Clark
Official Court Reporter
(334) 832-1365

2

IN THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR MONTGOMERY COUNTY
MONTGOMERY, ALABAMA


STATE OF ALABAMA,

        PLAINTIFF,

vs.                   CRIMINAL ACTION
                        CASE NO. CC-03-957

ALBERT JEROME LOCKWOOD,

        DEFENDANT.


_____/


COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS
FEBRUARY 24, 2004

MONTGOMERY COUNTY COURTHOUSE
COURTROOM 3-B


BEFORE:  THE HONORABLE TRACY S. McCOOEY
          CIRCUIT JUDGE


APPEARANCES

ON BEHALF OF THE STATE:
DARYL BAILEY, ESQUIRE
SCOTT GREEN, ESQUIRE
DEPUTY DISTRICT ATTORNEY
FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY, ALABAMA

ON BEHALF OF THE DEFENDANT:
VICKY TOLES, ESQUIRE
TRINA WILLIAMS, ESQUIRE
MONTGOMERY, ALABAMA

## INDEX

(The following exhibits were retained by Dub Harris, Official Court Reporter:)

| EXHIBITS | ADMITTED |
|---|---|
| SX 1-8 - (Photographs) | 117 |
| SX 9-11 - (Shell casings, live rounds) | 122 |
| SX 12 - (Photograph) | 117 |
| SX 13 - (Rights form) | 148 |
| SX 14 - (Statement) | 160 |
| SX 15 - (McKinnes Medical Records) | 203 |
| DX 1 - (Photograph) | 87 |
| DX 2 - (Statement) | 126 |
| DX 3 - (Photograph) | 101 |
| DX 4 - (McKinnes Statement) | 206 |

## EXAMINATIONS

CARLA PARKER                                                PAGE
Direct Examination by Mr. Green . . . . 53
Cross Examination by Ms. Toles . . . . 69
Redirect Examination by Mr. Green . . . 109

SERGEANT J. L. DAVIS                                        PAGE
Direct Examination by Mr. Green . . . . 113
Cross Examination by Mr. McClelland. . . 125
Redirect Examination by Mr. Green . . . 140

OFFICER D. J. BELCHER                                       PAGE
Direct Examination by Mr. Bailey . . . 142
Cross Examination by Ms. Williams . . . 160
Redirect Examination by Mr. Bailey . . . 174

CHRISTOPHER McKINNES                                        PAGE
Direct Examination by Mr. Bailey . . . 175
Cross Examination by Ms. Williams . . . 204

4

DR. GARRISON                                    PAGE
Direct Examination by Ms. Toles .   .   .   . 239

(THE CONTINUATION OF THE TRIAL PROCEEDINGS WERE
 REPORTED BY DUB HARRIS, OFFICIAL COURT REPORTER)

SENTENCING  .   .   .   .   .   .   .   .   . 250

CERTIFICATE OF REPORTER .   .   .   .   .   . 277

* * * * * * * * * *

5

<u>PROCEEDINGS</u>

1

2          (The following proceedings were held

3             in the presence and hearing of the

4             jury venire:)

5      THE COURT:  Okay.  Y'all can have a seat.

6  Good morning.  I'm Judge McCooey, and we're going

7  to be selecting a jury this morning in a criminal

8  case, specifically, the case of State of Alabama

9  versus Albert Jerome Lockwood.

10          Mr. Lockwood has been indicted for the

11  offense of attempted murder.  Of course, the

12  indictment is no evidence against him.  That's

13  just the vehicle that gets us here today so that

14  we can try this case.

15          Before we get started, I'm going to take

16  roll.  When I call your name, if you could please

17  stand, tell us your occupation.  If you are one

18  of those lucky retired people that I hope plays

19  golf every day like I want to, but I've got about

20  thirty more years to go -- I don't think we have

21  good golf weather this week.  Anyway, tell us

22  what you're retired from.  And if you are

23  married, please tell us what your spouse does.

24          (At which time the roll of the venire

25             was called.)

1          THE COURT:  Okay.  Let me introduce you to

2     the lawyers this morning.  The State of Alabama

3     this morning is represented by Mr. Daryl Bailey

4     who is the Chief Deputy District Attorney.  Is

5     that right, Daryl?

6          MR. BAILEY:  Yes, ma'am.

7          THE COURT:  He's second in charge.  I forget

8     the title.  And then Scott Green who is an

9     Assistant District Attorney.  They'll be

10    representing the State.  And they have seated

11    with them the victim, Mr. Chris McKinnes, who is

12    seated here.  Thank you.

13          The defense is represented by Ms. Vicky

14    Toles who is an attorney here in Montgomery with

15    the law firm -- is it Williams and Toles, Vicky,

16    or Toles and Williams?

17          MS. TOLES:  Toles and Williams.

18          THE COURT:  Toles and Williams.  I didn't

19    know whose name came first.  And she's with that

20    firm.  Thank you, Ms. Toles.  And she has helping

21    her Mr. Rick McClelland, and he is an attorney

22    with Dickey and McClelland who -- is that right?

23          MR. McCLELLAND:  Yes, ma'am.

24          THE COURT:  Your name comes second.  Lawyers

25    get mad if you don't get their names right.  And

1    he's with that law firm here in Montgomery.  And

2    the defendant is seated here, Mr. Lockwood, with

3    his attorneys.

4         Now, I know y'all have filled out those

5    jury questionnaires which we very much

6    appreciate.  These lawyers have looked at those.

7    They're not going to repeat questions that you've

8    already answered; however, I'm sure they're going

9    to have some additional questions to make sure

10   you would be well suited to sit on this jury.

11        When a question is asked, if it applies

12   to you, would you please stand, state your name

13   first, and then give your answer, because my

14   court reporter has got to get this down for the

15   Record.

16        Okay.  Mr. Bailey and Mr. Green, do

17   y'all have any questions for this venire?

18        MR. BAILEY:  Yes.  Thank you, Your Honor.

19   Good morning.  First of all, I want to again say

20   my name is Daryl Bailey, and I am the Chief

21   Assistant District Attorney for Montgomery

22   County.  And along with Scott Green, who is a

23   Deputy District Attorney from Montgomery County,

24   we are trying this case here today.  We both work

25   for Ellen Brooks who is the District Attorney for

1    Montgomery County.

2            I want to start by saying that if any of

3    the questions that I ask to you, you're

4    uncomfortable answering -- sometimes that might

5    be the case, and you don't want to answer in

6    front of the group.  If you will please just stay

7    behind once the judge dismisses you and just

8    approach her and we'll take whatever you have to

9    say in private so that you don't have to say it

10   in front of the whole group just in case a

11   question comes up or if there's something that

12   you have that you want to ask that I have not

13   asked you.

14           The first question that I want to ask

15   is, as a group of people, are any of you or would

16   any of you have to be one hundred percent certain

17   that a person, a person that's charged with a

18   crime, was guilty before you would vote to

19   convict?

20           Let me rephrase that question and ask it

21   again.  Would any of you, if you were selected as

22   a juror, have to be one hundred percent certain

23   that a person committed a crime before you voted

24   to convict that person?

25           I see some of you shaking your head.  I

1    know that's kind of a deep question, and I see a

2    couple of hands being raised.  Anybody else?  I

3    see this gentleman here is nodding his head, and

4    you've raised your hand.  Is there anybody else

5    aside from those two?

6         PROSPECTIVE JUROR:  Can you rephrase the

7    question?

8         MR. BAILEY:  Sure.  Absolutely.  Would any

9    -- would you as a juror, if you were selected as

10   a juror to sit over here, would you have to be

11   one hundred percent certain that a person

12   committed a crime before you would vote to

13   convict that person?

14         Okay.  I see a lot of hands raised.  Let

15   me follow that up with another question because

16   that's fair, and I appreciate your honesty.  And

17   I know that question sounds a little difficult,

18   but let me follow it up with something else.

19         In the State of Alabama as it is across

20   the United States, the burden of proof that is

21   held to the State of Alabama, held to the

22   prosecution, to the State, the prosecutors, is

23   the same all across the United States.  And it's

24   the highest burden that we have in our country,

25   and it's the burden of beyond a reasonable doubt.

1    The government, the courts, do not hold us to the

2    burden of a hundred percent certainty or beyond

3    all doubt.  In order for someone to be convinced

4    beyond all doubt, you would've almost had to been

5    a witness -- well, you would've had to have been

6    a witness to the event to be convinced beyond all

7    doubt.  And that's the reason that the courts and

8    the legislatures have made the burden on the

9    State of Alabama, on the prosecutors, beyond a

10   reasonable doubt, a doubt for which you can base

11   a reason.  Again, there's no way that you could

12   be a hundred percent certain.

13        And that was kind of a trick question,

14   but I follow it up to ask you this.  Does anyone

15   disagree with the law as it is?  And that's

16   beyond a reasonable doubt.  Because -- and it's

17   your right as an American, if you think that law

18   is unfair, that it should be beyond all doubt,

19   that you couldn't convict someone unless you saw

20   it, you know, that's your right as an American to

21   believe that.  Does anyone believe that beyond a

22   reasonable doubt is not fair, that it should be

23   held to a higher standard?  Anybody?

24        So I take it by your silence and you're

25   still contemplating that -- I take it by your

1    silence that everybody is okay with the burden

2    that is on the State of Alabama in this case and

3    any other criminal case that we bring, which is

4    beyond a reasonable doubt.  Is everybody okay

5    with that?

6         Does anybody have any type of religious

7    convictions that would prevent you from voting to

8    convict someone?  A lot of people take very

9    literally the Bible when it says do not judge a

10   person, and a lot of people believe and there are

11   religious beliefs that the only judge is God and

12   that you as a person should not judge someone.

13   And, again, that's your right as an American.

14   But that's something we need to know.  Does

15   anyone believe that they could not serve as a

16   juror because of their religious convictions and

17   believe that they should not judge someone?  Is

18   everybody okay with that?

19        A similar question, but -- are there any

20   other personal beliefs or any other beliefs aside

21   from religious beliefs that would prevent you

22   from convicting someone?  You don't like the way

23   the judicial system is set up.  You just don't

24   like prosecutors or you don't like judges or

25   whatever.  Any other personal beliefs that would

1    prevent you from voting to convict somebody or

2    sitting on a jury and listening to the evidence?

3         And I imagine that I'm going to get a

4    lot of response on my next question as I did on

5    my first question.  I hope this question is a

6    little easier to understand.  And I'm going to

7    follow it up again with another question.

8         Do any of you watch regularly on a

9    regular basis court-depicted dramas on TV such as

10   CSI, Law and Order, Judge Judy?  I'm not going to

11   ask what you watch.  I see a lot of you nodding

12   your head in affirmance of that.  And that's

13   fine.  My follow-up to that is do all of you

14   understand that those shows are written in

15   Hollywood and that all the laws or some of the

16   laws that are depicted on those shows are not

17   necessarily the laws as they are in the State of

18   Alabama?  Does everybody understand that the only

19   law that you're to consider in this case and in

20   any other case that you sit on -- you can do

21   whatever you want when you're watching Judge Judy

22   -- that the only law that you're to consider is

23   what the judge tells you in this case?  Is

24   everybody okay with that?

25        PROSPECTIVE JUROR:  Yes.

1     MR. BAILEY:  Some of the things that they do

2     on CSI, quite frankly, they make up.  Does

3     everybody understand that?

4         PROSPECTIVE JUROR:  Yes.

5         MR. BAILEY:  Okay.  Do any of you have any

6     type of ill will -- or that's probably not the

7     best word, but any type of negative feelings

8     towards law enforcement, towards the Montgomery

9     Police Department, the sheriff's department, ABI,

10    any law enforcement agency?  I always say maybe

11    you got a speeding ticket which you don't think

12    you deserved.  That happens from time to time.

13    Does anybody have any type of negative feelings

14    towards any law enforcement?

15         I want to ask you about a particular law

16    that we have in the State of Alabama and that

17    being the law of attempted murder.  The law in

18    the State of Alabama says that, first of all, an

19    attempt is obviously a crime that did not

20    complete its commission, did not go through

21    completion.  And the law says that an attempt is

22    any overt act that's made to try to complete that

23    act, any act done to try to complete it.

24         In the State of Alabama the Legislature

25    and the Courts have defined attempted murder as

1    trying to kill someone as many of you probably

2    realize from the title.  The law also says that

3    the only thing that you consider when you're

4    considering attempted murder is the intent of the

5    person who has committed the crime.  What I'm

6    meaning by that is that in order to prove a

7    charge of attempted murder, you don't have to

8    show that a person was injured in any way.  In

9    other words, if I had a gun and I was shooting

10   towards you or a knife I was throwing towards you

11   and I missed and I had the intent to kill you and

12   you're unharmed in any way, I could still be

13   convicted of attempted murder.

14            I say that to say or to ask do any of

15   you have a problem with that law as it is

16   written, that you can be convicted of attempted

17   murder even though the person had no injuries

18   whatsoever?  Is everybody okay with looking at

19   the intent of the person who was committing the

20   act?

21            I see some of you may be in deep thought

22   because that, again, is kind of a confusing

23   question.  But does everybody understand that

24   question?  Anybody have a problem with the law as

25   it is written?

1           My final question to you -- and I know

2     you're glad -- is do any of you have any reason

3     -- and this may be one of those questions where

4     you'd like to stay afterwards, and I certainly

5     understand.

6           Do any of you have any reasons that you

7     cannot serve on this jury?  I know some of you

8     are worried about your businesses and --

9           THE COURT:  And this case, ladies and

10    gentlemen, is going to be concluded tomorrow

11    afternoon.  It's going to be about a two-day case

12    just for planning purposes.

13          MR. BAILEY:  But if anybody has any reasons

14    that they think they cannot serve, please let us

15    know.  I say that because sometimes we'll select

16    a jury and they'll say, oh, I forgot to tell you

17    I'm going to Hawaii on vacation tomorrow.  That

18    really messes us up.  So any reason whatsoever

19    that you feel that you cannot serve -- and I

20    don't see anybody raising their hand, so I'm

21    going to just ask if you'll stay behind and let

22    us know what that reason might be if that applies

23    to you.  Thank you.

24          THE COURT:  Mr. Bailey, did you ask them

25    about any of y'all's witnesses?

1      MR. BAILEY:  I can.

2      THE COURT:  Yes, if you can ask them if they

3  know any of them, please.

4      MR. BAILEY:  As the judge has already

5  introduced to you, Christopher McKinnes who is

6  the victim in this case, do any of you know him?

7      And I'm going to read off the rest of

8  our potential witnesses, and if any of you

9  recognize these, you can just again let the judge

10  know.

11      We have Sergeant Jeff Davis who is with

12  the Montgomery Police Department.  We have Carla

13  Parker.  We have Lieutenant Bullard who is also

14  with the Montgomery Police Department.  Guy

15  Naquin with the Montgomery Police Department.

16  D. J. Belcher with the Montgomery Police

17  Department.  M. McCord with the Montgomery Police

18  Department.  K. L. Johnson with the Montgomery

19  Police Department.  Dr. Norman Garrison who is an

20  ER physician at Jackson Hospital.  Joe Saloom

21  with the Department of Forensic Sciences.  Kathy

22  Richert also with the Department of Forensic

23  Sciences.  John Bowman with the Montgomery Police

24  Department.  I think there's --

25      PROSPECTIVE JUROR:  Lieutenant Bullard, did

1    you say?  What is his first name?

2        MR. BAILEY:  To be honest with you, I don't

3    know.  I can find out for you.  A lot of times

4    they just go by their last names.

5        PROSPECTIVE JUROR:  If it's Perry Wayne

6    Bullard, then I have represented him in a case.

7    I thought I should say that.

8        THE COURT:  And if that's who it ends up

9    being, Ms. Wible, if you're selected for this

10   jury, could you set aside the fact that you have

11   represented that person and be fair and impartial

12   to both sides?

13       PROSPECTIVE JUROR:  I believe I could.

14       THE COURT:  Okay.  Thank you.  All right.

15   And, Daryl, just one last thing.

16       MR. BAILEY:  Yes, ma'am.

17       THE COURT:  Would you please just tell them

18   about the alleged facts to make sure nobody has

19   heard about this case.

20       MR. BAILEY:  Absolutely.  Ladies and

21   gentlemen, this offense is alleged to have

22   occurred on April 11th of 2003 at approximately

23   -- sometime in the late hours of the night.  And

24   it's alleged to have happened at 2720 Gunter Park

25   Drive in Montgomery, and it is alleged that the

18

 1    defendant in this case shot at the victim who is

 2    seated here with a firearm.  And that was all at,

 3    I believe, the business of Simcala on Gunter Park

 4    Drive.

 5         THE COURT:  Has anybody heard anything about

 6    this case?

 7              Okay.  Thank you, Mr. Bailey.

 8              All right.  Ms. Toles, Mr. McClelland,

 9    any questions y'all have for this venire?

10         MS. TOLES:  Yes, Your Honor.  Once again, my

11    name is Vicky Toles, and I do represent Mr. --

12    the defendant in this case, Mr. Lockwood.  And I

13    apologize.  I'm going crazy.  I've got several

14    cases going through my head at one time this

15    morning, so y'all just bear with me for just one

16    moment.  Mr. Lockwood in this case.  And I

17    represent Mr. Lockwood.

18              My partner is Trina Williams, and at

19    some point she will be coming into this case.  So

20    if there are any of you who know her or may know

21    anything that would prevent you all from sitting

22    on the jury, she will be coming in to actually

23    sit in on this trial as well.

24              And Mr. McClelland, he's been kind

25    enough to come in and step in to help out some in

1    this case as well.

2          There are a few questions that I have

3    got to ask.  One of them would be if any of you

4    are any relationship to anybody who actually

5    works for the Montgomery Police Department?  Any

6    of you family members, very, very close friends?

7          PROSPECTIVE JUROR:  My daughter is a cadet

8    with the police department.

9          MS. TOLES:  And --

10         PROSPECTIVE JUROR:  My cousin's cousin is.

11         MS. TOLES:  Anybody else with the police

12    department?

13          Would the fact that your daughter is a

14    cadet there, would that prevent you from being

15    fair and impartial?

16         PROSPECTIVE JUROR:  No.

17         MS. TOLES:  Thank you.  What about -- I'm

18    also looking for anybody who has -- and I think I

19    may have seen somebody with ABI or some

20    information on somebody who may have had a family

21    member who had worked with the ABI on the jury

22    panel.

23          Okay.  For any of you -- anyone who has

24    possibly had a family member or a very close

25    friend or friends who was possibly murdered by a

```
 1        gun weapon or a weapon or something of that

 2        nature?

 3             PROSPECTIVE JUROR:  My sister.

 4             MS. TOLES:  And, sir, would that prevent you

 5        from --

 6             PROSPECTIVE JUROR:  No.

 7             THE COURT:  Can you tell us your name, sir?

 8             PROSPECTIVE JUROR:  Willie Wilson.

 9             THE COURT:  Thank you, Mr. Wilson.

10             MS. TOLES:  I saw your hand go up.

11             PROSPECTIVE JUROR:  My cousin, I -- well, I

12        was actually in the same house when he got

13        killed.

14             MS. TOLES:  And would that prevent you from

15        being fair and impartial in this case?

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  And what was your name again,

18        ma'am?

19             PROSPECTIVE JUROR:  Inez Wilson.

20             THE COURT:  Thank you, ma'am.

21             MS. TOLES:  Did I see a hand?

22             PROSPECTIVE JUROR:  My sister-in-law and her

23        son was murdered.

24             MS. TOLES:  And would that prevent you from

25        being fair and impartial?  And I missed your
```

1    name.

2         PROSPECTIVE JUROR:  Elvesta White-James.

3         THE COURT:  White-James.  Now I've got it

4    because they had it backwards.

5         MS. TOLES:  And I saw another hand.

6         PROSPECTIVE JUROR:  Freddie Williams.  My

7    uncle.

8         MS. TOLES:  Mr. Williams, would that prevent

9    you from --

10        PROSPECTIVE JUROR:  No.

11        MS. TOLES:  Anybody else?  Any other hands

12   go up?  Did I miss anybody on the . . .

13             There will be some testimony that people

14   will have to listen to.  Anybody in here have any

15   hearing problems or reading problems or anything

16   that would prevent you from actually having to

17   listen to the evidence as it goes forth today?

18             Anyone else here who would have any --

19   who has made an opinion already from the few

20   facts that you've heard from the DA's office as

21   to Mr. Lockwood's guilt or innocence at this

22   point?

23             And everybody here would be able to have

24   a fair mind and listen to the testimony as it

25   goes forth from the jury standpoint from the box?

22

```
 1                    Thank you.

 2           THE COURT:  Ms. Toles, did you have any

 3    witnesses that you need to ask them about?

 4           MS. TOLES:  Yes.  I need to see if

 5    Mr. Lockwood, if any of you would possibly know

 6    Mr. Lockwood by any chance.  And Ms. Fannie Mae

 7    Lockwood may also be a witness in this case.

 8    Sir?

 9           PROSPECTIVE JUROR:  I think -- I'm not real

10    sure, but I think that Mr. Lockwood may have been

11    employed at the company that I'm now employed at.

12           MS. TOLES:  Is that Sylvest?

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  And what was your name, sir?

15           PROSPECTIVE JUROR:  Michael Ware.

16           MS. TOLES:  Michael Ware.

17           THE COURT:  Thank you.

18           MS. TOLES:  Mr. Ware, would that in any way

19    prevent you from being fair and impartial?

20           PROSPECTIVE JUROR:  No, ma'am.

21           MS. TOLES:  Anybody else who may know

22    Mr. Lockwood or his wife and his mother-in-law?

23                    Thank you.

24           THE COURT:  Okay.  Anything else?

25           MS. TOLES:  No, Your Honor.
```

1          THE COURT:  Any follow-up, gentlemen?

2          MR. BAILEY:  No, ma'am.

3          THE COURT:  Okay.  Ladies and gentlemen,

4     what we're going to do, I'm going to let these

5     lawyers select their jury, and I don't want y'all

6     to have to sit here.  I'm going to need everyone

7     to be back in the jury assembly room at 1:30.

8          I know you've not heard much about this

9     case, but it is so important that what you have

10    heard, you don't discuss it with each other or

11    with anyone else.  We've got to make sure that

12    the twelve people we select can be fair and

13    impartial to both sides.

14          If anybody has a problem with being here

15    this afternoon or all day tomorrow, if you'll

16    just stay behind and talk to me about that.

17    Everybody else, you can go.  Again, let's be back

18    in the jury assembly room at 1:30.  Thank you.

19    Enjoy your lunch.

20              (At which time the jury venire was

21               excused except for the following:)

22          THE COURT:  Okay.  Tell me your name.

23          PROSPECTIVE JUROR:  Laura Waring.

24          THE COURT:  Okay.  Did you have a problem

25    with being here?

24

```
 1              PROSPECTIVE JUROR:  Not really.  I mean, I

 2    have two small children, so it's going to be a

 3    little difficult.  But I can probably work it

 4    out.

 5              THE COURT:  Okay.  You have to get them from

 6    school?

 7              PROSPECTIVE JUROR:  Uh-huh.

 8              THE COURT:  What time do you usually pick

 9    them up?

10              PROSPECTIVE JUROR:  Well, at noon.  But I

11    have somebody that can pick them up, so it's not

12    going to be difficult.  It's just --

13              THE COURT:  Just inconvenient.

14              PROSPECTIVE JUROR:  Yes.

15              THE COURT:  As long as you like break for

16    lunch and you can go get them, you'll be fine?

17              PROSPECTIVE JUROR:  Right.

18              THE COURT:  Okay.  Thank you for sharing

19    that with us.

20              PROSPECTIVE JUROR:  Sure.

21              MR. BAILEY:  Judge, you have one more.

22              THE COURT:  Hey, Ms. Wilson.  How are you?

23              PROSPECTIVE JUROR:  Fine.  I have the same

24    problem, but I don't have anyone else to look

25    after my kids.  And I just got here today because
```

1     my mom took off for me to come.

2          THE COURT:  Okay.  So you need to be home

3     with your children?

4          PROSPECTIVE JUROR:  Uh-huh.

5          THE COURT:  How many children do you have?

6          PROSPECTIVE JUROR:  Two boys.

7          THE COURT:  Okay.  What I'm going to do,

8     Ms. Wilson, I'm going to go ahead and excuse you

9     from this jury today.  What I would advise you to

10    do, Ms. Wilson, is go down and talk to Mr.

11    Merrill and tell him I excused you because of

12    your kids, and he might excuse you for the whole

13    week.  But I'm just excusing you from my jury.

14         PROSPECTIVE JUROR:  Okay.

15         THE COURT:  Okay.

16         PROSPECTIVE JUROR:  You said talk with who?

17         THE COURT:  Mr. Merrill, the court

18    administrator.

19         PROSPECTIVE JUROR:  Okay.

20         THE COURT:  Thank you, ma'am.

21              (The following proceedings were held

22              outside the presence and hearing of

23              the jury venire:)

24         THE COURT:  Okay.  Do we have any challenges

25    for cause from either side?

1       MR. BAILEY:  No.

2       THE COURT:  Vicky, do you guys have anybody?

3       MS. TOLES:  Your Honor, I don't think that I

4   saw anybody.

5       THE COURT:  Okay.

6               (At which time a jury was struck,

7                   and the following proceedings were

8                   held outside the presence and hearing

9                   of the jury:)

10       THE COURT:  Go ahead.

11       MS. TOLES:  Your Honor, the first one is on

12   the -- we've got an oral motion in limine for the

13   evidence that he had some prior charges in 1983

14   and 1987 or '88, whatever they are.  But, anyway,

15   they're remote charges at this point as far as

16   trial purposes going.  We'd ask the DA's office

17   not be allowed to get into any of that evidence

18   whatsoever, Your Honor.  Concerning the statement

19   that Mr. Lockwood gave, we would ask that -- we

20   attempted to try and get the audiotaped version

21   of the statement, haven't been able to be

22   provided that.  The DA's office said that it was

23   lost or whatever.  We'd ask that that statement

24   be suppressed, Your Honor, because we --

25   Mr. Lockwood tells me he asked for an attorney on

1    three separate occasions and they would not grant

2    him one.  So we'd ask that unless they had an

3    audiotape so that I can review the audiotaped

4    statement that his statement not come in if

5    they're attempting to.

6        THE COURT:  Well, let's take them

7    separately.  What about the priors?

8        MR. BAILEY:  Judge, he has a couple of

9    priors that are within the ten years.  As the

10   Court knows, the case law says that you count the

11   sentence as well within the ten years.  For

12   instance, if he was sentenced in 1990, but got

13   fifteen years, you calculate it at the end of the

14   fifteen years regardless of whether it was

15   suspended time or not.  And he does have some

16   priors that are eligible for -- or are within the

17   ten years.  And if I could, I'll just read off

18   what we've got.

19       THE COURT:  Yes.  Tell me what you guys are

20   using.

21       MR. BAILEY:  I'll just tell you what we've

22   got.  Then we'll go back.

23       THE COURT:  Okay.

24       MR. BAILEY:  He's got a 1981 conviction for

25   theft of property in the third degree, which

1    looks like he got -- anyway, the maximum he could

2    have got on that was a year, and it looks like he

3    might have got that suspended.  So that's one.

4            And then he's got a 1982 conviction for

5    burglary in the third degree which he got

6    thirteen months on.  He has got a theft of

7    property in the second degree in 1983 which he

8    got three years on.  He's got attempted murder

9    which was reduced down to an assault three in

10    1987 in which he was given a probation sentence

11    of two years on.  He's got an attempted theft

12    second from 1988 that he got one year on.  Okay.

13    He's got a theft of property in the second degree

14    in 1988 which he got ten years on.  He's got a

15    theft of property in the second degree, a 1989

16    conviction for that, which he got fifteen years

17    on.  He has an escape in the first degree which

18    was amended to escape in the second degree which

19    he got fifteen years on.  And that's all we have.

20            THE COURT:  All right.  The only one I'm

21    going to let y'all use, I'll let you use just

22    those last two.  The other ones --

23            MS. TOLES:  And, Your Honor, we've got a

24    question on those.  The ten-year one that they

25    claim, Your Honor, Mr. Lockwood said that wasn't

1  his, so we'd need to look at the certified.

2      MR. BAILEY:  I've got it right here.

3      THE COURT:  It's out.  The only one -- the

4  escape and then that last theft that he got

5  fifteen years, I'll let him use those two.

6  That's it.  The rest of them, I will not.  But

7  you can use those two.

8      MR. BAILEY:  Okay.

9      THE COURT:  Have you guys got which ones

10 they can use?

11     MS. TOLES:  Your Honor, the one that was '89

12 for the fifteen years --

13     THE COURT:  The fifteen-year sentence on the

14 theft and the escape, those are the only two that

15 I'm going to let them use.  The rest of them are

16 out.  They're time-barred.

17         What about this statement, gentlemen?

18     MR. BAILEY:  Okay.  Judge, Ms. Toles was

19 correct that there was an audiotaped statement

20 that was taken from the defendant by Detective

21 Belcher.

22     THE COURT:  Right.

23     MR. BAILEY:  And that statement, the audio

24 portion of it has been lost.  The Montgomery

25 Police Department cannot find -- they have looked

1    and looked and looked and looked, and they cannot

2    find the audio statement.

3         That statement was transcribed, and

4    after -- basically after the tape was done, it

5    was sent to the transcription department in which

6    it was transcribed and typed out as normal.

7         THE COURT:  And which detective took it?

8         MR. BAILEY:  It was Detective Belcher.

9         THE COURT:  And I assume he's going to be

10   here --

11        MR. BAILEY:  Yes, ma'am.

12        THE COURT:  -- to testify?

13        MR. BAILEY:  And what he will testify to is

14   that they have looked for the statement and that

15   it's lost; they cannot find it.  We do have case

16   law right on point which says that as long as the

17   detective can say that he reviewed the audiotape

18   and compared it with the transcript, the

19   transcript comes in and goes to the jury.

20        THE COURT:  And I was going to let it in.

21   Ms. Toles, I was just going to tell you that's

22   just something to cross-examine him on.  You

23   know, you can pick on him about that he lost it.

24   But it's coming in.

25        MS. TOLES:  The only problem I had with the

1    tape was that when you're reading through the

2    audio statement, there's noticeable gaps there.

3    And that was the problem and we just needed to

4    put it on the Record concerning the taped

5    statement.

6        THE COURT:  And you can cross-examine the

7    detective on that, but it's coming in.

8        Okay.  What else do y'all have?

9        MS. TOLES:  Your Honor, this morning was the

10   first time that we heard anything concerning Joe

11   Saloom and somebody else coming from the

12   Department of Forensic Sciences.  We would object

13   to that.  They had nothing to do with this case

14   whatsoever, Your Honor.  There was a doctor who

15   actually performed the emergency room visit on

16   Mr. McKinnes, and at this point we're asking that

17   they be barred from allowing this witness to come

18   in at the last minute with no knowledge to us

19   concerning it.

20       MR. BAILEY:  First of all, Judge, they did

21   not do any reports or analysis in this case.

22   What we intend to use them for, if anything, is

23   for rebuttal testimony to any testimony that

24   might be brought out by the defense.

25       THE COURT:  So you're not going to use them

32

```
 1        in your case in chief?

 2             MR. BAILEY:  No, ma'am.

 3             THE COURT:  All right.  Are y'all ready?

 4             MR. BAILEY:  Judge, I think it's important

 5        if you'll allow me for a second that we put on

 6        the Record just in case for any Rule 32 purposes

 7        or any other purposes in case the defendant is

 8        convicted that the State of Alabama and the

 9        defense have talked this morning, and the State

10        of Alabama did offer to reduce the charge to the

11        defendant with an assault second.  And I believe

12        the judge said that you would give him a

13        fifteen-year split to serve three-year sentence

14        on that.  He is facing an automatic life sentence

15        if convicted on this charge, and I think it's

16        important that to note that he has rejected that

17        offer.

18             THE COURT:  That's correct.  And,

19        Mr. Lockwood, you have rejected that offer; is

20        that correct, sir?

21             THE DEFENDANT:  Yes, ma'am.

22             THE COURT:  All right.  Are y'all ready?

23             MR. BAILEY:  We're ready.

24             THE COURT:  Okay.

25             MS. TOLES:  Your Honor, we'd ask that the
```

1    Rule be invoked.  I don't know if Ms. Parker is

2    still in the courtroom, but if she is, we'd ask

3    that she --

4        MR. BAILEY:  We'd concur.

5            (The following proceedings were held

6            in the presence and hearing of the

7            jury:)

8        THE COURT:  Okay.  Ladies and gentlemen, if

9    I could get everyone just to raise their right

10   hand for me, I've got to swear you in.

11           (At which time the jury was duly sworn

12           by the Court.)

13       THE COURT:  Okay.  Thank you.  It's nice to

14   see everyone back.  I apologize for us getting

15   started late.  My dad is a retired colonel, and

16   he absolutely hates court because he said you

17   never start when you say and you never finish

18   when you say.  He says y'all are just completely

19   unorganized.  We wouldn't have that in the

20   military.  I said, well, dad, it doesn't work

21   like the military because I'm dealing with real

22   people with all kinds of things going on, and we

23   don't know what's ever going to happen.  So,

24   anyway, I apologize.  We had something else

25   happening that didn't have anything to do with

1    this case.  But that's just how court works.

2              But it's nice to see everyone back.  I

3    hope you enjoyed your lunch.  Before we get

4    started, I'm going to tell y'all about what we're

5    going to be doing this afternoon and tomorrow on

6    this case.

7              The first thing the lawyers are going to

8    do is they're going to give you their opening

9    statements or their opening arguments.  In their

10   opening statements they are going to tell you

11   what they think their respective cases are going

12   to show, in other words, what their witnesses are

13   going to testify to, what any and all exhibits

14   are going to show.  It is important to remember

15   that what these lawyers say in their opening

16   statements is not evidence in this case.  The

17   evidence is what you're going to hear when they

18   put on their respective cases.

19             Now, the State of Alabama will go first

20   because they have the burden of proof.  They have

21   to prove the defendant's guilt beyond a

22   reasonable doubt.

23             Now, let's talk about what is evidence

24   in this case.  As you sit there right now, you

25   already have one piece of evidence, and that is

1    the fact that Mr. Lockwood sits there presumed to

2    be innocent and he is cloaked with that

3    presumption of innocence as long as and until and

4    only if the State of Alabama proves his guilt

5    beyond a reasonable doubt.

6         Your second piece of evidence.  I'm sure

7    there are going to be witnesses who are going to

8    come in here, raise their right hand, swear to

9    tell you the truth, and it's your job as the jury

10   to decide what is the truth.  I tell juries the

11   way you do that is you use your common sense.

12   How do you tell in every-day life whether or not

13   someone is telling you the truth?  You examine

14   their demeanor.  Were they candid?  Were they

15   forthright?  You ask yourself what opportunity

16   did they have to see or hear what they told me,

17   what interest or bias did they have in what they

18   told me.  All of those things, I want you to use

19   when listening to these witnesses testify.

20        Your third piece of evidence is any and

21   all exhibits that this Court introduces into

22   evidence, and those will go back with you at the

23   conclusion of the trial so that you can examine

24   them more closely.

25        Now, as I said, the State of Alabama has

1    the burden of proof, so they go first.  Then the

2    defense will follow with any case that they wish

3    to present.

4         At the conclusion of their respective

5    cases, they will again stand up and address you

6    in closing arguments and tell you what they think

7    their cases have shown, what their witnesses have

8    testified to, what the exhibits have shown.  It

9    is important to remember that closing arguments,

10   just like opening arguments, what they say is not

11   evidence in this case.

12        During the course of this trial, one of

13   these lawyers might jump up and make an

14   objection.  If he or she does that, they are not

15   trying to be difficult or to be an

16   obstructionist.  They're just doing their jobs as

17   officers of the Court.  It's my job as the judge

18   to rule on those objections.  If I sustain an

19   objection, that means you do not hear the answer

20   to that question.  If I overrule an objection,

21   that means you do hear the answer to that

22   question.

23        They may also have times that they have

24   to come up here and talk to me outside of your

25   presence.  Again, if they do that, they're not

1     trying to be sneaky or to hide anything.  They're

2     doing what's required under the law.

3           At the conclusion of this case, it will

4     be my job as the judge to instruct you on the law

5     in this case.  I will give you the law as it is

6     in Alabama.  You will take back the facts as you

7     have found them to be, apply them to the law, and

8     come up with a true and just verdict in this

9     case.

10           I try to take a break every hour because

11     I know people need to use the restroom or get

12     something to drink or just stand up and stretch.

13     But if anyone has a problem before we take a

14     break, if you'll just raise your hand and get my

15     attention, I will be happy to stop earlier.

16           Today, we'll be stopping at 4:30, so

17     that's what time we're going to stop today just

18     to kind of let you know.  So we're going to try

19     to keep going here.  The other thing I tell

20     juries is I'll be up here doing other work.

21     Every judge in this courthouse has hundreds and

22     hundreds of cases.  I tell juries that because

23     they tend to stare at the judge sometimes and

24     think, well, gosh, she's not even listening to

25     the case.  I mean, what's she doing up there?

38

1    Well, I've got to do my work, and I've got to

2    listen to the case.  But, remember, I'm not the

3    fact finder.  It's up to you, the jury, to decide

4    what the truth is in this case.  So y'all are the

5    ones who have got to pay attention and listen to

6    this evidence.

7         Okay.  Mr. Bailey and Mr. Green, we're

8    ready for your opening statement.

9    MR. BAILEY:  Thank you, Your Honor.  Good

10   afternoon.  April the 11th of 2003 is a day

11   that's going to be forever emblazoned in

12   Christopher McKinnes' head.  It was a day that he

13   was hunted down, chased, and shot at several

14   times, made to lay on the ground and beg for his

15   life as this defendant, Albert Lockwood, stood

16   over him armed with a handgun.

17        This case did not begin on April 11th of

18   2003, ladies and gentlemen.  It actually started

19   before that.  Christopher McKinnes and Albert

20   Lockwood had something in common.  They were both

21   involved, dating, seeing a person by the name of

22   Carla Parker, and you will find throughout the

23   course of this trial, ladies and gentlemen,

24   that --

25        THE COURT:  Just a second.

1      MS. TOLES:  We need to have the witnesses --

2      THE COURT:  If we have -- we've got the Rule

3  invoked.  If I've got anybody in here who is

4  going to be a witness in this case, you're going

5  to need to either wait in the witness room or out

6  in the hallway, anybody in here who is going to

7  be a witness.

8      MR. BAILEY:  All of our witnesses are

9  outside, Judge.  I'm assuming these are defense

10  witnesses.

11      THE COURT:  Is that correct?

12      MS. TOLES:  Yes.

13      THE COURT:  All right.  Thank you, ladies.

14  Okay.  Excuse me, Mr. Bailey.  Go ahead.

15      MR. BAILEY:  As I was saying, ladies and

16  gentlemen, they had something in common, the

17  victim and Mr. Lockwood, and that was they were

18  involved with Ms. Carla Parker.  What you will

19  find out during the course of this testimony is

20  they may not have known about each other until we

21  get to April the 11th.

22      Christopher McKinnes will tell you that

23  he found out on actually the day before that

24  Carla Parker, who he had a child with, a

25  six-year-old son, was seeing Mr. Lockwood.  Of

1      course, Mr. McKinnes will tell you that upset

2      him; he wasn't happy about that.  He didn't

3      realize that she was seeing someone else.

4             He will also tell you that on the day

5      before this incident occurred, April the 10th,

6      that Mr. Lockwood and Carla Parker came over to

7      his house that he shared with Ms. Parker.  And he

8      will tell you that there was an incident, that he

9      was -- once he found out that they were dating

10     each other, he was taking Ms. Parker's clothes

11     and he was throwing them outside.  And he will

12     also tell you that there became a physical

13     altercation between him and Mr. Lockwood that

14     day.

15             He will also tell you that on that same

16     day that him and Mr. Lockwood had some words and

17     that Mr. Lockwood physically attacked him and

18     also attacked his car.  Later that day, he -- and

19     this happened in Bullock County.  And later that

20     day, he went to the Bullock County sheriff's

21     office and signed warrants against Mr. Lockwood

22     for assault, which is physically attacking him,

23     and for criminal mischief for attacking his car.

24             He will tell you that the next day he

25     had his son that him and Ms. Parker shared and

1      that he was taking his son by to see Ms. Parker.

2      Ms. Parker worked at Steris Corporation in

3      Montgomery.  And I don't know if you guys are

4      familiar with where Steris Corporation is, but

5      it's located in the Gunter Park industrial

6      complex.

7              She was a security guard.  She was

8      employed by Steris Corporation as a security

9      guard.  And as you drive up to the Steris

10     Corporation, there is a long driveway which leads

11     up to the plant.  At the beginning of the

12     driveway, there is a guard shack.  It's a pretty

13     small area, and it basically contains -- there's

14     some lights there and some cameras and things

15     like that for inside of the business, and there's

16     a bathroom that's in this complex as well.

17             And she was working there by herself,

18     and Mr. McKinnes comes by with the child.  And

19     they had made this arrangement.  This wasn't a

20     surprise visit or anything like that.

21             As they were sitting in there talking,

22     at one point they decide that they're going to go

23     into the Steris Corporation and get something to

24     eat, get something to drink, and then come back

25     to the guard shack.  During the time that Mr.

1    McKinnes and his son are at the guard shack and

2    even prior to them coming, Ms. Parker had been

3    receiving phone calls from Albert Lockwood.  And

4    she told Mr. Lockwood, she said, listen,

5    Christopher McKinnes is coming by.  He's going to

6    be bringing by my son.  I don't want you coming

7    by here.  I don't want any trouble.  I'm at work.

8    I don't need any trouble here at my job.

9         Mr. Lockwood was wanting to come by the

10   guard shack because he had left his cell phone

11   with -- I believe he had left it in Ms. Parker's

12   car and he wanted to get that back from her.  So

13   he was wanting to come sometime that night to get

14   his cell phone.

15        She will tell you that he was constantly

16   calling and she kept telling him, hey,

17   Christopher is coming by, stay away until he

18   leaves, and then you can come by and get your

19   cell phone.

20        The last time that she will tell you

21   about that he called, she will tell you that she

22   told Mr. Lockwood he's here, leave me alone, do

23   not come by; I don't want any trouble, the same

24   things that she had told him over and over.

25        The late hours of that night, you will

1    learn from Mr. McKinnes and also Ms. Parker that

2    they were in the bathroom of this guard shack

3    when Mr. McKinnes observed the defendant walk

4    into the guard shack, come running into the guard

5    shack.   Mr. McKinnes saw that the defendant was

6    armed with a weapon and immediately began to

7    scream, Carla, he's got a gun; Carla, he's got a

8    gun.

9              From that point, things started

10   happening very quickly.   Ms. Parker will tell you

11   that she immediately was concerned about the

12   safety of her son.   She grabbed her son.   She

13   tried to get in the middle of her son and the

14   defendant.   She will tell you right away she

15   didn't see the defendant have a gun, that she

16   heard a lot of hollering and a lot of cursing

17   coming from the defendant.   And she's repeatedly

18   telling him get out of here; this is my job; I

19   can't have this happening at my workplace, leave

20   it alone, do not do this here.

21             Christopher McKinnes will tell you that

22   his wife was repeatedly threatened during this

23   time frame.   The defendant was telling him in

24   choice words I'm going to kill you, I'm going to

25   kill you.

1          He immediately -- he will tell you that

2     he immediately grabbed his son and they ran out

3     of the guard shack trying to go to the car.  His

4     son got away and was able to make it to the car.

5     But before that, as they were running, they will

6     tell you that gun fire started firing

7     immediately, bullets not hitting him, but they

8     were going and blazing by him.

9          The son is able to get into the car,

10    which I believe is kind of parked across the

11    street from the guard shack.  Christopher was not

12    so lucky.  He's running and he's tackled or

13    tripped up somehow or another by the defendant,

14    Mr. Lockwood, in this case.  And he will tell you

15    that he looks up and he sees the defendant has a

16    gun, and the defendant is ordering him to lay on

17    the ground and open his mouth.  And the victim

18    will tell you that the whole time that this is

19    going on, he's being kicked in the side and being

20    hit with the gun and being basically pistol

21    whipped with the gun.

22         And you will see pictures of where he

23    has abrasions on his face.  He has a busted lip.

24    He has a swollen eye from where he was hit with

25    the gun.

45

1        He will tell you that he refused to open

2    his mouth as the defendant was ordering him to.

3    And he had heard previously these gunshots, and,

4    obviously, he was in fear of his life, and from

5    what he's going to testify to you, the defendant

6    kept repeatedly telling him that he was going to

7    kill him.

8        He will tell you that one of the last

9    things he remembers happening is the defendant

10    placed a gun on top of his head and he hears

11    gunshots.  The next thing he knows, the defendant

12    has run off.  He gets up, and he's bleeding.

13        You're going to hear testimony of

14    whether or not the victim was actually shot with

15    the gun.  There's no dispute that he was

16    immediately taken to the hospital via ambulance,

17    and there's also no dispute that you'll see

18    pictures that he had marks on his head which were

19    assumed by the police to be an entrance wound and

20    an exit wound on the top of his head and on the

21    side of his head.  He wasn't seriously injured.

22    He was treated and released from the hospital,

23    although he will tell you he still suffers from

24    his headaches and things of that nature to this

25    day.

1          Mr. McKinnes and Ms. Parker, neither one

2     of them are going to be able to get up on this

3     stand today and tell you that he was shot in the

4     head.  They don't know that.  And you may

5     actually hear testimony from the doctor who says

6     that there's absolutely no evidence of any metal

7     fragments or anything like that that were found

8     in his head.

9          But as we talked about in voir dire and

10    as you will hear from the testimony, that doesn't

11    matter.  The charge that the defendant has been

12    brought into this courtroom today on is a crime

13    of attempted murder.

14         And I'm going to read to you real quick

15    exactly what the defendant is charged with.  Way

16    before you guys met here today, another group of

17    people met at a different time called a grand

18    jury.  And the judge is going to tell you that

19    you are not to consider the indictment in this

20    case, the weight of an indictment.  You're to put

21    that out of your mind.  It's just simply a

22    vehicle by which this case is brought to you

23    today.  And that grand jury returned an

24    indictment that I'm going to read to you at this

25    time.  It says, the State of Alabama, Montgomery

1    County, the Circuit Court of Montgomery County,

2    July Term, A.D. 2003.  The grand jury of said

3    county charge that, before the finding of this

4    indictment, Albert Lockwood, alias Albert J.

5    Lockwood, alias Albert Jerome Lockwood, alias

6    Jerome Martin, whose name is otherwise unknown to

7    the grand jury, did with intent to cause the

8    death of another person, Section 13A-6-2 of the

9    Code of Alabama, which is the statute for murder,

10   did attempt to cause the death of Christopher

11   McKinnes by hitting and/or shooting him with a

12   gun in violation of Section 13A-4-2 of the Code

13   of Alabama against the peace and the dignity of

14   the State of Alabama.  And those are very

15   important words that I want you to remember

16   throughout the course of this trial, against the

17   peace and the dignity of the State of Alabama,

18   because that is one of the reasons that you're

19   seated here today.  And that is signed Eleanor I.

20   Brooks, District Attorney of Montgomery County.

21          Ladies and gentlemen, that's what the

22   State's evidence in this case is going to show

23   you.  At the end of this case I'm going to get

24   another opportunity to stand up before you after

25   you've heard all the evidence, and I'm going to

1    ask you to find this defendant guilty of the

2    crime of attempted murder.  I'm going to ask you

3    to find that he went there that day and acted

4    with that -- at that moment with the intent to

5    kill Christopher McKinnes.  And, obviously, the

6    reason he's not charged with murder is because he

7    didn't complete the act.  Thank you.

8         THE COURT:  Thank you, Mr. Bailey.

9    Ms. Toles.

10        MS. TOLES:  Good afternoon, ladies and

11   gentlemen.  I just want to take a moment on

12   behalf of Mr. Lockwood to say thank you all for

13   taking time out of your busy schedule.  We

14   recognize that you're all so busy and have got a

15   lot of other things going on, but this process

16   wouldn't be possible without having people like

17   you present to help us out and make sure that we

18   are fair to each and every defendant that comes

19   through this courthouse.

20        We just wanted to have a few moments to

21   go back and say a few things that -- as to what

22   we expect that the evidence will show.  There's

23   no doubt about it, as you listen to the testimony

24   and you get a chance to see and hear some of the

25   things, Mr. Lockwood will not be a person for

1    those persons who believe that marriage is one of

2    those sacred things that nobody has any reason

3    that they should be outside of their marriage.

4    You won't like him once you have an opportunity

5    to hear that type of testimony because there's

6    going to be some testimony coming forth that he

7    and Ms. Parker had a relationship going on and

8    that Mr. Lockwood is married at this time.  He

9    was married at that time.  So you won't like him

10   as a person.  But as you're going through,

11   sifting through the evidence, I want you to ask

12   yourself, morally, he may be wrong, but is he

13   still guilty of an attempted murder charge.  He

14   may be wrong morally for sleeping around on his

15   wife, but I think you'll find that there's

16   something totally different when you start

17   looking at all of the evidence that comes forth

18   from this stand here on this afternoon and

19   tomorrow concerning what actually happened out

20   there on the scene.

21        Now, there was some statements made by

22   the District Attorney's office that at some point

23   that something happened on the day before the

24   11th which would have been the 10th of April,

25   2003; that they were at Mr. Parker's residence

50

1    and at Mr. McKinnes' residence at that point.

2    And you'll hear some testimony that, sure enough,

3    an incident did occur; that Ms. Parker was

4    attempting to tell Mr. McKinnes that she didn't

5    want to have anything else to do with him; that

6    she was -- that their relationship was over and

7    that at that point he had gone -- gotten all

8    upset about everything and he was really having a

9    fit, and, sure enough, there was a struggle that

10   began.  Then at some point then on the next day

11   Mr. Lockwood would have ended up over at

12   Ms. Parker's workplace, over at Steris.  And

13   they'll -- you'll hear testimony that will

14   confirm that Mr. Lockwood was there actually out

15   on the scene.  You'll hear evidence coming from

16   the doctors here today who are going to say there

17   is no way that he was shot in the head, that

18   there were no bullet fragments; there was no

19   metal fragments; there was nothing there, and

20   based on the tests that they done, that they

21   actually performed at the hospital during the

22   fifty-five minutes to an hour that he was at the

23   emergency room, that there was no way that he was

24   shot in the head.

25            You heard Mr. Bailey say -- make the

1    statement that he expected the evidence to show

2    that they placed -- that a gun was placed on top

3    of his head and he heard a gunshot.  Now, it's

4    one thing to have a gun pulled, but if you hear a

5    gunshot going from the backside, I would assume

6    that the gun would've had to have been fired and

7    he would've had -- this close range, he would've

8    had to been hit at that point by the gunshot.

9         At that point -- that's when I want you

10   all to let your reasonable minds, what you bring

11   to this today, not what somebody else tells you.

12   You ask yourself is it reasonable that these

13   things could have happened here.  Is it

14   reasonable?

15        As you're listening to the testimony as

16   it goes forth and you're hearing people talk

17   about gunshots and shots being fired, ask

18   yourself when Ms. Parker takes the stand and says

19   that she was trying to get between two men, who

20   you would have been protecting, whether you'd

21   have been trying to grab your child and get your

22   child out of the way.  Regardless of

23   what happened to your -- to your job or to them,

24   who would you have gone to protect in the first

25   place?  Would you rather have allowed your child

1    to get in there, in the line of fire?  Those are

2    the things.  We're asking you to just use your

3    reasoning.  You listen to the evidence and you

4    sift through it today.

5           Like I said, you're not going to like

6    him as a person morally, but you have to ask

7    yourself the question do I convict him morally or

8    do I look at what the law says.  And Mr. Bailey

9    has already told you what the attempted murder

10   charge states.  We submit that, yeah, they had a

11   fight out there and they tussled on two separate

12   days, but there was never a gun out there.  They

13   said they have shell casings.  No gun was ever

14   found anywhere out there.  Shell casings can be

15   seen anywhere up and down Montgomery as you're

16   walking through.

17           We just ask you to use your

18   reasonableness and listen to the testimony as it

19   goes forth and come back with a verdict of not

20   guilty for the defendant in this case.

21           THE COURT:  Thank you, Ms. Toles.  All

22   right.  Gentlemen, your first witness.

23           MR. GREEN:  Judge, the State is going to

24   call Carla Parker.

25                   CARLA PARKER,

53

```
 1        a witness, after having first been duly sworn to

 2        speak the truth, the whole truth, and nothing but

 3        the truth, took the stand and testified as

 4        follows:
```

**DIRECT EXAMINATION**

**BY MR. GREEN:**

```
 7   Q.   Can you tell us your name, please, ma'am?

 8   A.   Carla Parker.

 9   Q.   All right.  Ms. Parker, can you tell us how

10        you're employed?

11   A.   I do home health.

12   Q.   All right.  Ms. Parker, I'm going to take you

13        back to April 11th of last year.  Do you recall

14        that day?

15   A.   Yes, sir.

16   Q.   How were you employed then?

17   A.   I worked for DSI Security Company.

18   Q.   Okay.  And what were your duties for DSI?

19   A.   I worked at a place called Steris in Gunter Park.

20        My duties was to answer the phone, to log in and

21        out trucks, and to page the people inside the

22        plant.

23   Q.   Okay.  So were you kind of like the front line of

24        people that they saw?

25   A.   Yes, sir.
```

54

```
 1    Q.    All right.  And tell us -- if you didn't already,
 2          tell the ladies and gentlemen of the jury where
 3          that is.
 4    A.    It's in Gunter Park in Montgomery.
 5    Q.    And that's here in Montgomery County?
 6    A.    Yes, sir.
 7    Q.    Okay.  Now, I asked you about the 11th of April.
 8          Let me actually take you back to the day before
 9          that, April 10th.  Do you recall that day?
10    A.    Yes, sir.
11    Q.    Okay.  Did anything unusual happen that day?
12    A.    It was a Thursday, and Chris and Lock had got
13          into a little altercation at my house.
14    Q.    Okay.  Now, when you say Chris and Lock, who are
15          you talking about?
16    A.    Albert Lockwood.
17    Q.    All right.  Albert Lockwood is Lock?
18    A.    Yes, sir.
19    Q.    And is he the defendant in this case?
20    A.    Yes, sir.
21    Q.    All right.  This is him?
22    A.    Yes, sir.
23    Q.    Okay.  Now, who is Chris?  That's this guy?
24    A.    Yes.
25    Q.    The victim in this case?
```

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | Okay.  Now, tell us about that. |
| 3 | A. | I thought Chris had to work that day, and Lock |
| 4 | | and I had rode to Troy to take a movie back to |
| 5 | | the Movie Gallery.  I told Lock -- I said, Lock, |
| 6 | | Chris didn't have to work today.  He said, well, |
| 7 | | Carla, what are you going to do, because I done |
| 8 | | told my wife that I was going back on the plant |
| 9 | | route.  I said, well, I don't know.  And then so |
| 10 | | when I said that -- |
| 11 | Q. | All right.  Ms. Parker, let me stop you.  I'm |
| 12 | | sorry.  Were you involved with Mr. McKinnes in |
| 13 | | some way? |
| 14 | A. | Yes, sir. |
| 15 | Q. | All right.  Tell the ladies and gentlemen of the |
| 16 | | jury about that real quick. |
| 17 | A. | Chris was my boyfriend. |
| 18 | Q. | For how long? |
| 19 | A. | For ten years. |
| 20 | Q. | Okay.  And do you two have any kids together? |
| 21 | A. | Yes.  We have a little boy. |
| 22 | Q. | Okay.  And what's his name? |
| 23 | A. | Taqueris. |
| 24 | Q. | All right.  And how old is he? |
| 25 | A. | He's seven. |

56

| 1 | Q. | I'm sorry? |
|---|----|------------|
| 2 | A. | He's seven. |
| 3 | Q. | Okay.  Now, let's go back to the 10th.  You said |
| 4 |    | that you had -- you were with Mr. Lockwood; is |
| 5 |    | that right? |
| 6 | A. | Yes, sir. |
| 7 | Q. | And you were under the impression that Chris |
| 8 |    | McKinnes was working? |
| 9 | A. | Yes, sir. |
| 10 | Q. | All right.  Tell us what happened next. |
| 11 | A. | Lock and I had rode to Troy to Movie Gallery to |
| 12 |   | take a tape back.  And I said, Lock, Chris ain't |
| 13 |   | got to work today.  He said, well, Carla, what |
| 14 |   | are you going to do, because I done told my wife |
| 15 |   | that I was going back to work, going back on his |
| 16 |   | plant truck, and I done said good-bye to my |
| 17 |   | little boy.  And so I didn't say anything, and |
| 18 |   | Lock hit me in the face.  And so I started |
| 19 |   | crying.  I said, Lock, please don't hit me no |
| 20 |   | more.  And so he said, well, you're going to have |
| 21 |   | to do something. |
| 22 |   | So we pulled up to the phone booth, and |
| 23 |   | I called Chris at home, but he wasn't at home. |
| 24 |   | And so we came back to Union Springs.  When I got |
| 25 |   | to my mama's house, I called Chris.  I said, |

```
 1              Chris, I said, I don't want to talk to you

 2              anymore.  He said why.  I said, I just don't -- I

 3              just don't want to talk to you no more.  And so

 4              that was me and -- then Chris say, well, you

 5              ain't never going to see your baby again.  I

 6              said, Chris, please, please, please, like that.

 7              And so when I hung the phone up, well, I just

 8              started crying.  And my brother said, what's

 9              wrong, Carla?  I said, Chris is fixing to take

10              Taqueris from me.  He said, come on, Carla, let's

11              go get your baby, because Chris ain't going to

12              take him from you.

13    Q.        This was Lock that said this?

14    A.        No.  My brother.

15    Q.        Your brother.  Okay.

16    A.        He said, Chris can't take him from you like that.

17              And he said, y'all need to stop -- cut that

18              foolishness stuff out.  And so me, my brother,

19              and Lock, we got in the car.

20    Q.        Okay.

21    A.        We came to town -- we came to town because we

22              thought Chris was at town, but he wasn't at town.

23              He was at the house.  So we went back --

24    Q.        When you say the house --

25    A.        At my house.
```

58

```
 1    Q.    -- whose house are you talking about?

 2    A.    The one we lived.

 3    Q.    Okay.  Where you and Chris and Taqueris all lived

 4          together?

 5    A.    Yes, sir.

 6    Q.    Okay.  So you ended up there?

 7    A.    Yes, sir.

 8    Q.    Okay.  What happened then?

 9    A.    Chris was throwing clothes out the back door, my

10          clothes out the back door.  And so before we --

11          by the time -- he was throwing clothes out the

12          back door.

13    Q.    So Chris was --

14    A.    Taking the clothes --

15    Q.    Your clothes were normally inside where you keep

16          them?

17    A.    Yes, sir.

18    Q.    And he was tossing them out in the yard or what?

19    A.    Out the back door in the yard.

20    Q.    Okay.

21    A.    And so Chris saw Lock come around the house, and

22          Chris tried to close the door.  Before he closed

23          the door, Lock snatched the door out of his hand

24          and went in and got Taqueris and gave Taqueris to

25          my brother Tim, and Tim brought Taqueris to the
```

| | | |
|---|---|---|
| 1 | | car. |
| 2 | Q. | Okay. |
| 3 | A. | And Lock and Chris got to fighting in the |
| 4 | | backyard. |
| 5 | Q. | Okay. |
| 6 | A. | And then I -- I think Chris was on the phone with |
| 7 | | his grandmama.  And I was hollering, y'all stop. |
| 8 | | They got to fighting, and I said, y'all stop, |
| 9 | | y'all stop, y'all please stop, y'all please stop. |
| 10 | | THE REPORTER:  You need to slow down. |
| 11 | Q. | She's got to take everything down that you say, |
| 12 | | so make sure you kind of talk clear. |
| 13 | | All right.  What happened after that? |
| 14 | A. | After that, me and my brother and my little -- me |
| 15 | | and my brother and my little boy and Lock, we |
| 16 | | went to my mama's house, and I stayed there for |
| 17 | | like, say, two or three hours. |
| 18 | Q. | Okay.  Did you ever go back home? |
| 19 | A. | Later that night. |
| 20 | Q. | What happened then? |
| 21 | A. | Later that night, I was -- we went back home.  I |
| 22 | | told my little boy to put his shoes and stuff on, |
| 23 | | get his coat and put his stuff on so we could go |
| 24 | | home. |
| 25 | | We went home.  I was fixing to start |

60

```
 1              cleaning up, and Chris came.

 2    Q.    What happened when Chris came back?  Who was with

 3          you when --

 4    A.    Lock was with me.  Lock was with me.

 5    Q.    Okay.

 6    A.    And Chris came.  I said, Chris, just leave

 7          because I don't want nobody to get hurt.  I said,

 8          go on and let me handle this.  He said, no,

 9          Carla, I'm not going anywhere.  If he stays, I'm

10          going to stay.

11    Q.    And, in fact, did Chris stay?

12    A.    Chris stayed.

13    Q.    All right.  What about the defendant?

14    A.    He left.

15    Q.    Okay.  And was there any altercation?

16    A.    No, sir.

17    Q.    Okay.  Now, let me take you back to the next day.

18          This is the 11th.  Did you work that day?

19    A.    Yes, I did.

20    Q.    Do you recall what time you worked?

21    A.    I had -- at the time I had two jobs.

22    Q.    Did you work at Steris that day?

23    A.    Yes, sir.

24    Q.    Do you recall what time you worked -- you went to

25          Steris?
```

61

```
 1    A.    I had to be to work at four o'clock, so I got

 2          there about 3:55.

 3    Q.    Okay.  Did you come into contact with

 4          Mr. McKinnes that day while you were at work?

 5    A.    He called me on the phone and told me he was

 6          fixing to bring Taqueris to me.

 7    Q.    Now, is this on the phone like in the guard shack

 8          or --

 9    A.    Yes, sir.

10    Q.    Okay.  So that was kind of like your office; is

11          that right?

12    A.    Yes, sir.

13    Q.    Okay.  And tell the ladies and gentlemen just

14          very briefly how that was laid out?

15    A.    In the front, it's the desk and the phone and the

16          door.  And then we had a bathroom in the back

17          with a door.

18    Q.    Okay.  And you could take and give calls on the

19          phone in the front; is that correct?

20    A.    Yes, sir.

21    Q.    Okay.  So you got a call from Mr. McKinnes while

22          you were in the guard shack; is that right?

23    A.    Yes, sir.

24    Q.    What was that about?

25    A.    About Taqueris, my little boy.
```

62

| | | |
|---|---|---|
| 1 | Q. | Okay. |
| 2 | A. | He said, I'm fixing to get ready to bring |
| 3 | | Taqueris to you.  I said, okay, Chris, bring him |
| 4 | | on. |
| 5 | Q. | All right. |
| 6 | A. | And then the phone rung again.  It was Lock.  He |
| 7 | | said, I'm on my way out there to pick up my |
| 8 | | phone.  I said, no, don't come because Chris is |
| 9 | | on his way here with my baby.  I said, just call |
| 10 | | me back.  So he -- the phone was constantly |
| 11 | | ringing.  It was people paging, you know, people |
| 12 | | inside the plant calling for me to page people. |
| 13 | | So about -- |
| 14 | Q. | Ms. Parker, are you kind of the first line -- |
| 15 | | like if I were to call up Steris -- |
| 16 | A. | Yes, sir. |
| 17 | Q. | -- would I get the person who took your job? |
| 18 | A. | Yes, sir. |
| 19 | Q. | Okay.  So you got numerous calls in between |
| 20 | | these? |
| 21 | A. | Yes, sir. |
| 22 | Q. | Okay.  What happened next? |
| 23 | A. | Then about -- I'd say about 11:15 the phone rung |
| 24 | | again.  It was Lock. |
| 25 | Q. | All right. |

63

| | | |
|---|---|---|
| 1 | A. | He said, I'm on my way out there.  I said, no, |
| 2 | | Lock.  Chris is still here with my baby.  I said, |
| 3 | | please -- |
| 4 | Q. | I'm sorry to keep interrupting.  Let me back you |
| 5 | | up just a second. |
| 6 | | So Chris came on with your son? |
| 7 | A. | Uh-huh. |
| 8 | Q. | And what happened then?  Did the three of y'all |
| 9 | | hang out together or what? |
| 10 | A. | No.  Chris left, and he went to Wal-Mart to get |
| 11 | | some toothache medicine. |
| 12 | Q. | Okay. |
| 13 | A. | But he left Taqueris with me. |
| 14 | Q. | All right. |
| 15 | A. | Then Chris came back. |
| 16 | Q. | And roughly how long was he gone? |
| 17 | A. | About a good thirty minutes. |
| 18 | Q. | Okay.  So Chris had come and gone, and you were |
| 19 | | there with Chris and Taqueris? |
| 20 | A. | Just -- when Chris left, just me and Taqueris was |
| 21 | | there. |
| 22 | Q. | Okay.  And is that when the defendant called? |
| 23 | A. | He came -- he called me after Chris got back. |
| 24 | Q. | Okay.  Okay.  Got it.  Got it.  All right.  Go |
| 25 | | on. |

```
 1   A.   Then he said -- he called me.  He said, I'm on my

 2        way out there.  It was about 11:15.  I said, no,

 3        Lock, don't come out here because Chris is out

 4        here, and I don't want nobody to get hurt; this

 5        is my job.

 6   Q.   Okay.

 7   A.   He say -- then about that time, Chris came to the

 8        guard shack, and I just hung the phone up.  Then

 9        it was me, Taqueris, and Chris.  Chris was

10        standing in the door of the bathroom, and me and

11        Taqueris was cleaning up the bathroom because

12        Taqueris had his little rubber gloves on helping

13        me clean up the bathroom.  About eleven -- I

14        think it was around 11:30, because he was getting

15        ready to get off work, Chris said, Carla, he's

16        got a gun; he's got a gun; he's got a gun.  I

17        say, a gun?  He say, yeah, a gun.  Then about

18        that time Chris had ran to the door to try to

19        lock the door and Lock snatched the door out of

20        his hand.

21   Q.   All right.  That's the defendant?

22   A.   Uh-huh.

23   Q.   Okay.

24   A.   And Chris ran back in the bathroom.  Lock was on

25        this side of me.  I was in the middle, and Chris
```

```
 1              and Taqueris was behind me.  I said, Lock, will

 2              you just please just leave because this is my

 3              job, and my baby is out here, and I don't want

 4              nobody to get hurt.

 5     Q.       Okay.

 6     A.       Lock said, no, because this motherfucker is

 7              fixing to get up out of here.  He said, get up

 8              out of here, motherfucker.  I said, Lock, please

 9              stop, please stop; will you please just stop.  I

10              said, my baby is out here, and this is my job.

11              Chris say, I'll leave.  So on the way out the

12              door -- Taqueris and Chris had run to the door.

13              On the way out of the door, Lock shot the gun,

14              and the bullet went right between Taqueris and

15              Chris.

16     Q.       Okay.  Now, when the defendant came up and

17              actually made entry into the guard shack,

18              did you see whether or not he had a gun?

19     A.       He had a gun.

20     Q.       Okay.  So Mr. McKinnes and Taqueris took off

21              and --

22     A.       Running to the car.

23     Q.       -- shots were fired out?

24     A.       And a fire was -- he fired the gun.

25     Q.       What happened then?
```

| | | |
|---|---|---|
| 1 | A. | Taqueris made it to the car. |
| 2 | Q. | Okay. |
| 3 | A. | He locked the door, and he laid the seat back. |
| 4 | Q. | All right. |
| 5 | A. | But Chris didn't make it to the car.  Chris took |
| 6 | | off up the hill toward the plant. |
| 7 | Q. | All right. |
| 8 | A. | And while he was running, Lock was just shooting |
| 9 | | the gun, just shooting it.  I was hollering, |
| 10 | | Lock, please don't hurt him, please don't hurt |
| 11 | | him, please don't shoot him.  And about that time |
| 12 | | Lock -- I think Lock had catched him and Chris |
| 13 | | had fell.  He said, get on your knees, |
| 14 | | motherfucker, because I'm fixing to kill you. |
| 15 | | And then at that time, I said, Lock, please |
| 16 | | please, please, please just stop, please just |
| 17 | | stop.  He had hit Chris, and Chris just fell. |
| 18 | Q. | Okay. |
| 19 | A. | And he had just started kicking Chris, just |
| 20 | | kicking Chris, just kicking Chris, just beating |
| 21 | | him, like talk your big shit now, motherfucker, |
| 22 | | talk your shit now, motherfucker. |
| 23 | Q. | All right.  What happened then? |
| 24 | A. | And then when I was -- I was trying to make Lock |
| 25 | | stop, and then Lock laid the gun on Chris' head. |

67

```
 1          He was fixing to -- he pulled the trigger, and I
 2          pushed his hand, and the bullet grazed his scalp.
 3          And then about that time, he was -- the gun got
 4          jammed.
 5    Q.    Okay.
 6    A.    And he was trying to pull it, but it was jammed.
 7          And the guy came up he was with and said, man,
 8          what the fuck you -- what the fuck going on, what
 9          the fuck have you done?  Bring your ass on here.
10          What the fuck is wrong with you?
11    Q.    Let me stop you there for just a second.  You
12          said the guy he was with.  Who was this guy?
13    A.    I had never seen him before in my life.  It was
14          the first time ever seeing him.
15    Q.    Have you seen him since?
16    A.    No, sir.
17    Q.    Okay.  So did you see him drive up or anything?
18    A.    No, sir.
19    Q.    So the first time and only time you've ever seen
20          him was that exact instant?
21    A.    Yes, sir.
22    Q.    Okay.  What happened then?
23    A.    And then Lock ran to the car, and they backed up
24          all the way to Rheem.  And that was the last --
25          that was the last time I've seen Lock.
```

| 1 | Q. | Okay. And you haven't seen Lock since then? |
|---|---|---|
| 2 | A. | No, sir. |
| 3 | Q. | Okay. Tell me what happened next. |
| 4 | A. | And then Chris said, Carla, look what has |
| 5 | | happened; look what you done did. I said, oh, |
| 6 | | Lord. Then I went to call the police, and I |
| 7 | | picked the phone up, and I dropped it. The phone |
| 8 | | fell out of my hand. And then when I did dial |
| 9 | | the number that Matt had gave me for police, I |
| 10 | | couldn't get nobody. I got a recording. And so |
| 11 | | I had -- I dialed nine, and then I dialed 411 |
| 12 | | because I don't know the police station in |
| 13 | | Montgomery. And they gave me -- they connected |
| 14 | | me to the police station, and I told them what |
| 15 | | had happened. |
| 16 | Q. | And did the police actually arrive? |
| 17 | A. | Yes, sir. |
| 18 | Q. | And did you give a statement to the police? |
| 19 | A. | Yes, sir. |
| 20 | | MR. GREEN: Okay. Your Honor, that's all |
| 21 | | the questions we have of this witness. |
| 22 | | THE COURT: Okay. Ms. Toles, any questions |
| 23 | | you have for Ms. Parker? |
| 24 | | MS. TOLES: Yes, ma'am, I sure do. |
| 25 | | THE COURT: All right. |

CROSS EXAMINATION

**BY MS. TOLES:**

1
2
3    Q.    Ms. Parker, you said that you worked for -- what

4          was the name of the company back in April of

5          2003; which company did you work for?

6    A.    Steris.

7    Q.    And what were your duties there at Steris?

8    A.    My duties at Steris was to answer the phone, page

9          people, log in trucks, and check for bags.

10   Q.    As a part of those duties, Ms. Parker, were you

11         allowed to have visitors on your job?

12   A.    Yes, ma'am.

13   Q.    Your company didn't have a problem with you

14         having visitors there?

15   A.    No, ma'am.

16   Q.    Who was your supervisor there at your job?

17   A.    My supervisor -- my acting supervisor was Melvin

18         Paramour, but my supervisor in the office was

19         Mattie Boyd.

20   Q.    Does Steris have any policies concerning you

21         having visitors on their premises?

22   A.    No, ma'am.

23   Q.    How long had you and Mr. Lockwood been dating?

24   A.    About a couple of months.

25   Q.    Was that an off-and-on relationship that you

70

| | | |
|---|---|---|
| 1 | | all -- had you all started several years back? |
| 2 | A. | No, ma'am.  I'd known him -- I'd been knowing him |
| 3 | | a long time. |
| 4 | Q. | So it was several months that you all had been |
| 5 | | dating? |
| 6 | A. | Yes, ma'am. |
| 7 | Q. | Were you aware that Mr. Lockwood was married? |
| 8 | A. | Yes, ma'am. |
| 9 | Q. | Had you made Mr. Lockwood aware of the fact that |
| 10 | | you were actually seeing someone at that time? |
| 11 | A. | He knew it. |
| 12 | Q. | Did you tell him? |
| 13 | A. | He knew it. |
| 14 | Q. | He knew because you told him? |
| 15 | A. | Yes, ma'am. |
| 16 | Q. | Now, Ms. Parker, you go and you tell Mr. -- you |
| 17 | | all are there on the 10th together.  You tell Mr. |
| 18 | | -- the victim in this case, Mr. McKinnes, you |
| 19 | | tell him that you don't want to see him anymore. |
| 20 | | Can you tell us why you decided to tell him you |
| 21 | | didn't want to see him anymore? |
| 22 | A. | I just told him. |
| 23 | Q. | Was there a reason why? |
| 24 | A. | No, ma'am. |
| 25 | Q. | Were you all having problems? |

| | | |
|---|---|---|
| 1 | A. | Yes, ma'am. |
| 2 | Q. | Was that the reason why you told him you didn't |
| 3 | | want to see him? |
| 4 | A. | Yes, ma'am. |
| 5 | Q. | Were you telling him that because you were going |
| 6 | | to -- your plans were to get with Mr. Lockwood |
| 7 | | and have a relationship with him? |
| 8 | A. | No, ma'am. |
| 9 | Q. | How many times had Mr. McKinnes told you that he |
| 10 | | was going to take your child? |
| 11 | A. | Several times. |
| 12 | Q. | It's true every time he gets mad at you, he |
| 13 | | threatens he's going to take your child? |
| 14 | A. | No, ma'am, that's not true. |
| 15 | Q. | Not true? |
| 16 | A. | No, ma'am. |
| 17 | Q. | On more than one occasion, though, he's told you |
| 18 | | he's going to take your child? |
| 19 | A. | No, ma'am. |
| 20 | Q. | He's only told you one time that he was going to |
| 21 | | take your child? |
| 22 | A. | Yes, ma'am. |
| 23 | Q. | Were you afraid that he was actually going to |
| 24 | | take your child on this particular occasion? |
| 25 | A. | Yes, ma'am. |

72

```
 1    Q.    On this day on -- on the day of the incident back

 2          on that Thursday when you all were in Union

 3          Springs, is there a reason why you would have

 4          taken Mr. Lockwood over to your home on that day?

 5          What was your reason for taking Mr. Lockwood to

 6          your home?

 7    A.    He rode over there with me to help me clean up.

 8    Q.    And you knew that you and Mr. McKinnes was still

 9          together at that point?

10    A.    We wasn't together at that point because we was

11          in an argument.

12    Q.    So you would take another man to your house --

13          did Mr. McKinnes live with you at that house?

14    A.    Yes, ma'am.

15    Q.    And you would take another man to your home

16          knowing that you were just in an argument with

17          the one that you lived with?

18    A.    No, ma'am.

19    Q.    But you did on this particular occasion?

20    A.    It was just -- it was an argument.  We was broken

21          up.

22    Q.    So do you normally take other men to your house

23          when you break up with your boyfriend?

24    A.    No, ma'am.

25    Q.    But on this particular occasion, you just decided
```

```
 1          to take Mr. Lockwood over there?
 2    A.    Yes, to help clean up.
 3    Q.    Okay.  When Mr. Lockwood gets there, you said
 4          that they get into a fight at some point,
 5          Mr. Lockwood and Mr. McKinnes get into a fight at
 6          that point?
 7    A.    Uh-huh.
 8    Q.    And when you were -- when they get into the
 9          fight, what -- tell me what happens after that.
10          After they get into the fight and they get the
11          fight broken up, what happens after that?
12    A.    We left.
13    Q.    You and who left?
14    A.    Me, my brother, Taqueris, and Lock.
15    Q.    Okay.  And, now, when you all left, tell me what
16          happened after that.
17    A.    I went to my mama's house and stayed about two
18          hours.
19    Q.    Did you stay there long?
20    A.    My brother was there.
21    Q.    Did Mr. Lockwood stay there with you?
22    A.    No, ma'am.
23    Q.    At some point did Mr. Lockwood come back to where
24          you were?
25    A.    Yes, ma'am.
```

```
 1    Q.    And when he got back there, did you all stay

 2          there the rest of the evening or did you all go

 3          back to your home residence?

 4    A.    Back to my home residence.

 5    Q.    Did Mr. Lockwood go with you?

 6    A.    Yes, ma'am.

 7    Q.    Okay.  When Mr. Lockwood got back -- when you and

 8          Mr. Lockwood went back, you took the children

 9          with you at that point?

10    A.    Yes, ma'am.

11    Q.    Okay.  When you all got back there, was

12          Mr. McKinnes there --

13    A.    No, ma'am.

14    Q.    -- when you got there?

15                Okay.  Once you all got back there, he

16          wasn't there.  At some point did he return?

17    A.    Yes, ma'am.

18    Q.    Can you tell us what happened when he got back

19          there?

20    A.    When he got back there, I told Chris to just go

21          ahead on and leave; I didn't want nothing --

22          nobody to get hurt.  I didn't want nothing to

23          happen.  So he wouldn't leave.  I got my kids and

24          I left.

25    Q.    All right.  Once you got your kids and you left,
```

```
 1              what happened after that?

 2      A.      I went to my mama's house.  I dropped my kids

 3              off.  Then I went back home, and I was there with

 4              Lock.  Chris wasn't there.  Then Chris came back

 5              again, and Chris was arguing, but Lock wasn't

 6              saying anything.  Lock was in the bedroom.  I was

 7              in my little girl's room with Chris.  We was back

 8              there talking.  I said, Chris, please just go

 9              ahead on and leave because I don't want nothing

10              to happen; I don't want no one to get hurt.  I

11              said, please just leave.  So Chris wouldn't

12              leave.  2:15 to 2:45, Lock left.  I got up.  I

13              closed the door.  I put my bed back together, and

14              I got -- I laid across the bed.

15      Q.      Why would you ask -- was Mr. McKinnes living

16              there with you and paying bills at your house and

17              all of that kind of stuff?

18      A.      Yes, ma'am.

19      Q.      Why would you ask him to leave instead of asking

20              this man that you know has a wife to leave?

21      A.      At the end, I told both of them to leave.

22      Q.      At what point did you have this conversation that

23              you told both of them to leave?

24      A.      When we was standing in the living room, Lock was

25              on this side and Chris was on this side.  I said,
```

| 1  |     | both of y'all just get out. |
|----|-----|------------------------------|
| 2  | Q.  | At any point did Mr. Lockwood threaten anybody or |
| 3  |     | say anything to anybody while he was in your home |
| 4  |     | at that point? |
| 5  | A.  | Not that I can recall. |
| 6  | Q.  | So he wasn't threatening anybody? |
| 7  | A.  | Not that I can recall. |
| 8  | Q.  | Okay.  Did you ever hear him say anything back to |
| 9  |     | Mr. McKinnes at any point? |
| 10 | A.  | No, ma'am. |
| 11 | Q.  | Has there been an occasion where you've allowed |
| 12 |     | Mr. Lockwood to drive your vehicle? |
| 13 | A.  | Yes. |
| 14 | Q.  | Anyone ever mention that information to |
| 15 |     | Mr. McKinnes that they had seen Mr. Lockwood in |
| 16 |     | your vehicle before? |
| 17 | A.  | Not that I know of. |
| 18 | Q.  | Did Mr. McKinnes ever come to you and inquire |
| 19 |     | about what was going on between you and |
| 20 |     | Mr. Lockwood? |
| 21 | A.  | He didn't know until the day they got in the |
| 22 |     | fight. |
| 23 | Q.  | As far as you know, that was the first day he |
| 24 |     | found out? |
| 25 | A.  | Yes, ma'am. |

1    Q.    Okay.  How many people in your family know

2          Mr. Lockwood?

3              MR. GREEN:  Judge, I'm going to object to

4          what somebody else knows.

5              THE COURT:  Sustained.  Ask her something

6          else.

7              MS. TOLES:  Yes, Your Honor.

8    Q.    Ms. Parker, let me go on a little bit farther,

9          and we're going to go into the incident that

10         occurred on April the 11th.  I think you've

11         already testified that this actually occurred

12         over at Steris, at the Steris -- on the Steris

13         grounds?

14   A.    Yes, ma'am.

15   Q.    Is that correct?

16   A.    Yes, ma'am.

17   Q.    Okay.  What -- on the 11th, you said that when

18         you got there -- or when Mr. McKinnes got there,

19         can you tell us why -- you said that Mr. McKinnes

20         came from Bullock County?

21   A.    Yes, ma'am.

22   Q.    And you all had made arrangements that you were

23         going to take the child or you were going to get

24         the child?  He was bringing the child to you at

25         that point?

78

```
 1    A.    Yes, ma'am.

 2    Q.    What were your hours?

 3    A.    From 4:00 to 12:00.

 4    Q.    You worked from 4:00 to 12:00.  He was going to

 5          get there and he was going to bring the child to

 6          you?

 7    A.    Yes, ma'am.

 8    Q.    Okay.  And when he brought the child out to you

 9          on that particular day, can you tell us why -- if

10          you know, why he passed all the stores in Bullock

11          County --

12                MR. GREEN:  I'm going to object.  There's no

13          possible way she could know this, and any answer

14          she would know would be hearsay.

15                THE COURT:  Sustained.

16    Q.    Ms. Parker, at some point Mr. McKinnes comes

17          there and he actually leaves the child with you

18          at that point?

19    A.    Yes, ma'am.

20    Q.    And then once the child -- how long is he gone in

21          between the time that he drops the child off and

22          then he leaves?

23    A.    About thirty minutes.

24    Q.    About thirty minutes.  When he gets back, is that

25          when he actually comes into the building at that
```

```
 1          point?
 2    A.    Yes, ma'am.
 3    Q.    And once he gets into the building, you all are
 4          having a conversation.  What is the conversation
 5          concerning?
 6    A.    Us.
 7    Q.    Is he still -- at that point is he still trying
 8          to get you to stay -- to get back with him or to
 9          stay with him at that point?
10    A.    To stay with him.
11    Q.    Is there any reason why you decided not to stay
12          with him at that point?
13    A.    No, ma'am.
14    Q.    Okay.  So you just decided you were not going to
15          be with him?  It was nothing that Mr. Lockwood
16          had done that had -- that made you say you were
17          not going to be with him?
18    A.    No, ma'am.
19    Q.    All right.  When you actually -- so once
20          Mr. McKinnes gets there, how long is he there
21          when he gets there?
22    A.    He is -- when we first got there, he came and
23          dropped Taqueris off, about -- I'd say about
24          fifteen minutes.  Then he left and came back.
25    Q.    When he got back, do you remember approximately
```

80

1          what time it was when he got back?

2     A.   No, ma'am.

3     Q.   What time would you say it was when all of this

4          -- this would have transpired, when all of this

5          transaction took place?

6     A.   Since it was close to the time for them to get

7          off work, about 11:30.  Because on Friday night,

8          they get off work early.

9     Q.   Okay.  Now, you say that Mr. -- you had --

10         Mr. Lockwood had called you on the telephone?

11    A.   Yes, ma'am.

12    Q.   Had you and Mr. Lockwood had some arrangements

13         that you were going to meet him at some point

14         later that evening?

15    A.   No, ma'am.

16    Q.   What was the arrangement concerning the cell

17         phone?

18    A.   When he called me and told me that he was coming

19         to pick up the cell phone, I told him to wait

20         because Chris was out here.  There was no

21         arrangement.

22    Q.   Did you tell Mr. McKinnes who was on the

23         telephone?

24    A.   No, ma'am.

25    Q.   Did he inquire who was on the telephone?

| | | |
|---|---|---|
| 1 | A. | No, ma'am. |
| 2 | Q. | Did Mr. Lockwood call back while Mr. McKinnes was |
| 3 | | there? |
| 4 | A. | Yes, ma'am.  But Chris was in the car. |
| 5 | Q. | So he didn't see the -- hear the second |
| 6 | | telephone? |
| 7 | A. | No, ma'am. |
| 8 | Q. | Did he call back a third time after that? |
| 9 | A. | No, ma'am. |
| 10 | Q. | So he only called two times during that evening |
| 11 | | -- during the evening? |
| 12 | A. | Yes, ma'am. |
| 13 | Q. | Now, when he -- when Mr. Lockwood came out on the |
| 14 | | scene, tell us what happened from that point. |
| 15 | | When he actually gets out on the scene, tell us |
| 16 | | what happened. |
| 17 | A. | He came in the bathroom where we were.  He had a |
| 18 | | gun.  He said, this motherfucker is fixing to get |
| 19 | | up out of here now.  I said, Lock, please, |
| 20 | | please, because my baby is out here and this is |
| 21 | | my job; please just leave.  He said, no, this |
| 22 | | motherfucker is going to leave.  And Chris said, |
| 23 | | I'll leave.  And Chris and Taqueris ran to the |
| 24 | | car.  Lock shot the gun between them, and the |
| 25 | | bullet -- the gun went -- Lock shot the gun while |

```
 1              they was going out the door.
 2    Q.        Now, let me ask you how big are -- is this
 3              bathroom that we're talking about that all of you
 4              supposedly were in at this time?  First of all,
 5              tell me who all was in the bathroom.
 6    A.        Myself, Chris, Taqueris, and Lock.
 7    Q.        Were all of you in the restroom at the same time
 8              or were you and the child in the restroom alone?
 9    A.        All of us was in the bathroom at the same time.
10              Lock was standing in the door.  Chris and
11              Taqueris was standing on this side of me closer
12              to the commode.
13    Q.        You said that you saw a gun.  What type of gun
14              did you see?
15    A.        I don't know anything about guns, ma'am.
16    Q.        What did you see?  Tell me what you saw.
17    A.        I saw a gun.
18    Q.        If you don't know anything about a gun, tell --
19              describe the gun that you saw.
20    A.        It was little.
21    Q.        What did it look like?
22    A.        I don't know anything about guns.  I don't know
23              if it was a .22 or .45.  I don't know.
24    Q.        I'm just telling you to describe to me -- I'm not
25              asking you to tell what the name of the gun was
```

| | | |
|---|---|---|
| 1 | | or anything like that.  I'm telling you to |
| 2 | | describe the weapon to me.  I want you to |
| 3 | | describe the gun that you saw.  Was it black with |
| 4 | | a brown handle?  Was it black -- what did the gun |
| 5 | | look like?  Was it in his hand so you couldn't |
| 6 | | see -- I want you to explain to me what type of |
| 7 | | gun or what is it that you saw.  If you say it |
| 8 | | was a gun, then -- |
| 9 | A. | I saw the end of a gun.  I didn't see the part he |
| 10 | | had in his hand.  I know it was a gun. |
| 11 | Q. | What -- you said you saw the end of the gun? |
| 12 | A. | Yes, ma'am. |
| 13 | Q. | What part of the gun did you see? |
| 14 | A. | The part the bullet come out of. |
| 15 | Q. | Okay.  What color was it? |
| 16 | A. | It was black. |
| 17 | Q. | Okay.  The gun was black.  Did you see -- did it |
| 18 | | look like it was outside of Mr. Lockwood's hand? |
| 19 | | Was it a long way away from his hand?  Was it -- |
| 20 | | you could barely see it -- |
| 21 | A. | He had it like this (demonstrating). |
| 22 | Q. | So you see a black gun there.  Is there a |
| 23 | | telephone in there somewhere? |
| 24 | A. | Yes, ma'am. |
| 25 | Q. | And did you make a phone call at that point? |

```
 1    A.    No, ma'am.  Because I was trying to stop them.

 2    Q.    Okay.  What are your procedures out there on your

 3          job when you get an incident like that?  You all

 4          didn't have any procedures that you were to

 5          follow?

 6    A.    No, ma'am.

 7    Q.    You didn't think that if you saw somebody out

 8          there with a gun out on the premises that you

 9          needed to call the police at that point?

10    A.    That was my first time -- this was my first time

11          ever something like that happened to me, so . . .

12    Q.    Okay.  So you didn't call the police.  All of you

13          were standing in the restroom.  Who is closest to

14          the door?

15    A.    Mr. Lockwood.

16    Q.    How does Mr. -- tell us how -- if Mr. Lockwood is

17          the closest one, how many entrances are there to

18          the door?

19    A.    One.

20    Q.    Was Mr. Lockwood standing in that doorway?

21    A.    Yes, ma'am.

22    Q.    Tell us how Mr. Lockwood managed -- how

23          Mr. McKinnes managed to get past Mr. Lockwood

24          then.

25    A.    He came around me, and I was trying to hold Lock
```

|    |    |    |
|----|----|----|
| 1  |    | back.  And he said, get up out of here now, |
| 2  |    | motherfucker. |
| 3  | Q. | So you got -- how big are we talking about, the |
| 4  |    | size of this bathroom? |
| 5  | A. | I don't know how big. |
| 6  | Q. | Would it be from here to where I am here for the |
| 7  |    | size of the restroom? |
| 8  | A. | It's not that big. |
| 9  | Q. | It's not that big.  Is the restroom located |
| 10 |    | inside of the guard shack? |
| 11 | A. | Yes, ma'am.  They added it on. |
| 12 | Q. | Would it be from here to here? |
| 13 | A. | I don't know how big it is. |
| 14 | Q. | Okay.  What all is inside of the restroom? |
| 15 | A. | A commode and a sink. |
| 16 | Q. | Ms. Parker, I'm going to show you what's been |
| 17 |    | marked as Defendant's Exhibit Number 1 and ask |
| 18 |    | you if you recognize this? |
| 19 | A. | This is Steris.  This is my guard shack. |
| 20 | Q. | That's the guard shack? |
| 21 | A. | Yes, ma'am. |
| 22 | Q. | Now -- and you're saying that the guard shack is |
| 23 |    | actually located inside of the -- the restroom is |
| 24 |    | actually located inside of the guard shack? |
| 25 | A. | Yes, ma'am. |

| | | |
|---|---|---|
| 1 | Q. | Okay.  Now, when you all -- when you were in |
| 2 | | there, how big would you -- do you have any idea |
| 3 | | how big that is? |
| 4 | A. | No. |
| 5 | Q. | Okay.  When you all were in the -- does that |
| 6 | | picture accurately reflect or represent what the |
| 7 | | guard shack looked like on the day -- back on |
| 8 | | April the 11th, 2003? |
| 9 | A. | The cone wasn't -- the cone wasn't in the |
| 10 | | bathroom.  They were sitting right there on the |
| 11 | | floor, because I moved them out of the bathroom. |
| 12 | | I sat them on the floor right beside the door. |
| 13 | | That's the air conditioner.  That's the heater |
| 14 | | and that's the air conditioner.  The cones, I sit |
| 15 | | them right there.  Or sometimes they'll be right |
| 16 | | here aside the door. |
| 17 | Q. | So other than the -- |
| 18 | A. | So I moved them. |
| 19 | Q. | -- the orange cones -- |
| 20 | A. | Uh-huh. |
| 21 | Q. | -- the picture actually reflects what was there? |
| 22 | A. | This is -- this is it. |
| 23 | | MS. TOLES:  Okay.  At this time, Your Honor, |
| 24 | | the defendant would move to enter into evidence |
| 25 | | this first picture here as Defendant's Exhibit |

87

1          Number 1.

2                    THE COURT:  Any objection?

3                    MR. GREEN:  No objection.

4                    THE COURT:  It's admitted.

5                         (At which time Defendant's Exhibit

6                          Number 1 was admitted into

7                          evidence.)

8     (BY MS. TOLES:)

9     Q.    Now, from there, tell me where the restroom is.

10    A.    This is it right here.

11    Q.    Okay.  And is this the only doorway into and out

12          of?

13    A.    Yes, ma'am.

14    Q.    Now, with the restroom being back there, tell me

15          how is it that Mr. -- what did you do to prevent

16          Mr. Lockwood from getting at Mr. McKinnes at that

17          point?

18    A.    I was standing in between them.  And I -- I was

19          holding my hand.  I said, Lock, please don't

20          bother him, don't bother him; please just let him

21          go.  And after I said that, Chris said, I'll go.

22          When Chris came out, Lock was standing right here

23          in this corner and I was standing right here in

24          the doorway.  And Chris came out, and him and

25          Taqueris ran to the car.

| 1 | Q. | Now, Ms. Parker, you're saying that you've never |
| 2 | | been faced with an incident like that before? |
| 3 | A. | No, ma'am. |
| 4 | Q. | So somebody is standing there with a gun in your |
| 5 | | presence? |
| 6 | A. | (Witness nods head.) |
| 7 | Q. | And you're still standing there being composed, |
| 8 | | trying to stop them from fighting? |
| 9 | A. | Yes, ma'am.  I was scared though. |
| 10 | Q. | Where was your child at this point? |
| 11 | A. | This -- when he was in the bathroom? |
| 12 | Q. | Yes. |
| 13 | A. | He was on the other side of the commode in the |
| 14 | | corner. |
| 15 | Q. | At any point did you close the doorway so that |
| 16 | | your child wouldn't be subjected to any of that |
| 17 | | that -- any of that what was going on? |
| 18 | A. | Everybody was in the bathroom because he was |
| 19 | | helping me clean the bathroom up. |
| 20 | Q. | Tell me -- so you're pretty close?  How close |
| 21 | | would you say to you -- that you are to |
| 22 | | Mr. Lockwood and the gun? |
| 23 | A. | I would like say from here to right here. |
| 24 | Q. | So you got a good look at the gun then? |
| 25 | A. | I told you he had the gun in his hand, and the |

| | | |
|---|---|---|
| 1 | | only thing I saw was the end of the gun, the part |
| 2 | | that the bullet come out of. |
| 3 | Q. | So you're saying that it -- that the gun -- his |
| 4 | | hand covered up everything except for the round |
| 5 | | part? |
| 6 | A. | Yes, ma'am. |
| 7 | Q. | And you -- so you -- and you see the gun that's |
| 8 | | going -- what other -- was there anything else, |
| 9 | | anything else that you could identify about the |
| 10 | | gun? |
| 11 | A. | No, ma'am. |
| 12 | Q. | Okay. Once Mr. McKinnes gets out of the -- |
| 13 | | around Mr. Lockwood with the gun supposedly in |
| 14 | | his hand, tell us what you do next. At that |
| 15 | | point, do they all leave outside of the -- |
| 16 | A. | When Chris and Taqueris came, I got out. Lock |
| 17 | | broke out behind me. He pushed me to the side |
| 18 | | and broke out behind me and started shooting as |
| 19 | | he was going out the door. |
| 20 | Q. | So he's shooting at the -- you've managed to let |
| 21 | | your child go out of the door? |
| 22 | A. | He was going to the car, yes, ma'am. |
| 23 | Q. | Was there a reason why you allowed your child to |
| 24 | | go out the door to the car in the line of harm's |
| 25 | | way? |

| 1 | A. | Because he was going back home with his daddy. |
|---|---|---|
| 2 | Q. | Now, at that point you realized that Mr. Lockwood |
| 3 | | -- according to your testimony, that Mr. Lockwood |
| 4 | | was out to get Mr. McKinnes? |
| 5 | A. | At that time, yes. |
| 6 | Q. | And you still allowed your child to go to the |
| 7 | | car, to get in the car with him? |
| 8 | A. | Because if I knew he got in that car, Chris was |
| 9 | | not going to let nothing happen to him.  He was |
| 10 | | safer in the car. |
| 11 | Q. | With Mr. -- as your testimony says, with |
| 12 | | Mr. Lockwood shooting bullets at him, he was |
| 13 | | safer in the car? |
| 14 | A. | (No response.) |
| 15 | Q. | Let me ask you, when you were with the -- when |
| 16 | | you went down to the police department, do you |
| 17 | | remember giving a statement to the police |
| 18 | | department after this whole incident took place? |
| 19 | A. | Yes, ma'am. |
| 20 | Q. | Okay.  Do you recall talking with the officers |
| 21 | | concerning that they asked you if you saw a gun |
| 22 | | in Mr. Lockwood's hand? |
| 23 | A. | Yes, ma'am. |
| 24 | Q. | Do you recall telling them that you didn't see |
| 25 | | one in his hand at that point? |

```
 1   A.    I don't recall.

 2   Q.    Let me show you what's going to be marked as

 3         Defendant's Exhibit Number 2.

 4              MR. GREEN:  You're going to have to lay a

 5         better predicate than from that.

 6   Q.    Ms. Parker, I'm going to show you what's going to

 7         be marked as Defendant's Exhibit Number 2 and ask

 8         you if you recognize this.

 9   A.    (Witness reviews document.)  I recognize it.

10   Q.    Ma'am?

11   A.    Yes, ma'am.

12   Q.    Okay.  What is that?

13   A.    A statement.

14   Q.    Would that have been the statement that you gave

15         to the police department back on April the 11th,

16         2003, after this incident occurred?

17   A.    Yes, ma'am.

18   Q.    Okay.  Does that statement fairly and -- have you

19         had a chance to review that statement prior to

20         today?

21   A.    (Witness nods head.)

22   Q.    Does that statement accurately reflect what you

23         told the officers on the day in question?

24   A.    Yes, ma'am.

25   Q.    Okay.  At some point during the statement on page
```

1         -- approximately Page 108 about five of the

2         little questions and answers down, do you see

3         where the officer asked you did you see a weapon

4         in his hand?

5    A.    Yes, ma'am.

6    Q.    What was your response?

7    A.    We were all in the bathroom.

8    Q.    What was your response that you gave to the

9         officer on --

10    A.    At this time we were all in the bathroom.  I

11         don't know.  I didn't --

12    Q.    Would you read it one more time for us?

13    A.    At the time we were all in the bathroom, I

14         didn't.

15    Q.    So, here, you were telling the officer that you

16         didn't see a weapon when you were in the

17         bathroom; is that correct?

18    A.    That's right.

19    Q.    But now you want to tell us almost a year later

20         that you did see a weapon at that point while

21         y'all were in the bathroom?

22    A.    (No response.)

23    Q.    Now, you say that when your child ran out the

24         door, which way did your child go?

25    A.    He ran out to the car.

93

| | | |
|---|---|---|
| 1 | Q. | Where was the car located? |
| 2 | A. | Parked across from the guard shack. |
| 3 | Q. | Parked across the -- from the guard shack? |
| 4 | A. | Yes, ma'am. |
| 5 | Q. | When you say across from the guard shack, are we |
| 6 | | saying across the street? |
| 7 | A. | No, ma'am.  Across from the guard shack, not |
| 8 | | across the street. |
| 9 | Q. | Let me make sure I've got a clear understanding |
| 10 | | of exactly where you're saying that this all |
| 11 | | happened at. |
| 12 | | The exhibit with the guard shack, |
| 13 | | Exhibit Number 1, from that picture, can you |
| 14 | | tell where the -- |
| 15 | A. | This is the guard shack, and this is the road. |
| 16 | | That's -- on the other side of this road is a |
| 17 | | little place where we can park our cars, and he |
| 18 | | was parked across from the guard shack. |
| 19 | Q. | Okay.  So when your child came out of the door, |
| 20 | | he came -- would have come straight out of that |
| 21 | | door there?  Did he come straight across to the |
| 22 | | car? |
| 23 | A. | Yes, ma'am. |
| 24 | Q. | Okay.  So he come straight across to the car. |
| 25 | | Where does Mr. McKinnes go at that point? |

| | | |
|---|---|---|
| 1 | A. | When Lock started shooting, he tried to get in |
| 2 | | the car. But Lock was shooting at him, so he |
| 3 | | went up -- he ran up the hill. |
| 4 | Q. | Did you get a chance to see these bullets -- I |
| 5 | | mean, how many shots did he fire at that point? |
| 6 | A. | At that point he had shot one time when he was |
| 7 | | going out the door. When Taqueris was running, |
| 8 | | he shot twice. |
| 9 | Q. | So he shot one time when he was coming -- going |
| 10 | | out the door? |
| 11 | A. | Yes, ma'am. |
| 12 | Q. | Where did that bullet land? Did you see where |
| 13 | | that bullet landed? |
| 14 | A. | No, ma'am. |
| 15 | Q. | Did you all check Mr. McKinnes' car to see -- |
| 16 | | because would his car have been directly in the |
| 17 | | path of the bullets? |
| 18 | A. | It was parked in front of the guard shack. |
| 19 | Q. | Straight from where the door was? |
| 20 | A. | Yes, ma'am. |
| 21 | Q. | Where Mr. Lockwood would have been coming out of |
| 22 | | the door? |
| 23 | A. | Yes, ma'am. |
| 24 | Q. | Did you check -- was your car parked over there? |
| 25 | A. | No, ma'am. My car was parked here. |

95

| | | |
|---|---|---|
| 1 | Q. | Okay.  How many other cars were out there? |
| 2 | A. | Just that one car. |
| 3 | Q. | Just Mr. McKinnes' car? |
| 4 | A. | Yes, ma'am. |
| 5 | Q. | Did you all see bullets over there? |
| 6 | A. | I didn't look.  The detective did. |
| 7 | Q. | Okay.  So, to your knowledge, there was no |
| 8 | | bullets found in that area? |
| 9 | A. | Not to my knowledge. |
| 10 | Q. | All right.  Now, when you all got -- so your |
| 11 | | child gets out and Mr. McKinnes runs up the hill? |
| 12 | A. | Uh-huh. |
| 13 | Q. | Where up the hill -- how far up the hill does he |
| 14 | | run to? |
| 15 | A. | About -- I don't know how far he ran.  He ran -- |
| 16 | | he ran like to almost to the top of -- halfway |
| 17 | | the hill, because on top of the hill is the |
| 18 | | plant.  You have to go up a hill, and he ran |
| 19 | | almost half into the hill. |
| 20 | Q. | Would it have been to the back door? |
| 21 | A. | Yeah, you could say that. |
| 22 | Q. | You say he would've gotten that far? |
| 23 | A. | Yes, ma'am. |
| 24 | Q. | Okay.  Describe for me what was going on with -- |
| 25 | | you said that he fired two more times at him. |

96

```
 1            Tell me what -- in your words what happened then.

 2    A.     When he fired twice up the hill, I was screaming,

 3            Lock, please stop, please stop.  And then by that

 4            time he had caught up to Chris and Chris fell.

 5            Then he told Chris to get up and get on his

 6            knees.

 7    Q.     Okay.  But I want to know what was Mr. Lockwood

 8            doing.  You said that he was halfway --

 9    A.     He was running --

10    Q.     -- out the door --

11    A.     -- and shooting.

12    Q.     So he was running and shooting?

13    A.     Yes, ma'am.

14    Q.     Did you see which way the bullets were going at

15            that point?

16    A.     No, ma'am.

17    Q.     Do you know whether or not they were going in

18            Mr. McKinnes' direction?

19    A.     He was pointing at him.  He was shooting at him.

20    Q.     Where were you standing at at that point?

21    A.     I was running behind Lock asking him to stop.

22    Q.     At any point did you have an opportunity that you

23            could have gone to the -- to make a phone call?

24    A.     I was trying to stop them.

25    Q.     You'd never been involved with a gun incident
```

97

|    |      |                                                         |
|----|------|---------------------------------------------------------|
| 1  |      | before?                                                 |
| 2  | A.   | No, ma'am.                                               |
| 3  | Q.   | You're scared to death or, at least, you're             |
| 4  |      | scared out there, and you don't think to call the       |
| 5  |      | police at that point?                                   |
| 6  | A.   | No, ma'am. I wasn't -- I wasn't thinking. I was         |
| 7  |      | just trying to make them stop.                          |
| 8  | Q.   | Okay. And bullets are flying out there, and you         |
| 9  |      | just decide to keep running behind them to try          |
| 10 |      | and make them stop?                                     |
| 11 | A.   | Yes, ma'am.                                             |
| 12 | Q.   | Okay. All right. When you get to the -- during          |
| 13 |      | that time, Ms. Parker, did anyone else come             |
| 14 |      | around the guard shack?                                 |
| 15 | A.   | No, ma'am, not while that was happening, no,            |
| 16 |      | ma'am.                                                  |
| 17 | Q.   | Not while it was happening?                             |
| 18 | A.   | No, ma'am.                                              |
| 19 | Q.   | Now, so he knocks -- he -- what did -- which word       |
| 20 |      | did you use? Did he knock him down to the ground        |
| 21 |      | or --                                                   |
| 22 | A.   | He cagged (sic) him.                                    |
| 23 | Q.   | He cagged him. Okay. So he cags him, and he             |
| 24 |      | falls to the ground. I think earlier you                |
| 25 |      | testified that somehow or another you were              |

Vicki H. Clark
Official Court Reporter
(334) 832-1365

|    |      |                                                                    |
|----|------|--------------------------------------------------------------------|
| 1  |      | involved in it, that you pushed somebody's hand                    |
| 2  |      | or something?                                                      |
| 3  | A.   | Lock had the gun on Chris' head, and I was                         |
| 4  |      | begging Lock not to shoot him.  When he fired the                 |
| 5  |      | gun, I pushed his hand.  And his hand went up in                  |
| 6  |      | the air, but the gun did go off because I saw the                 |
| 7  |      | fire from the bullet hit the ground.  The bullet                  |
| 8  |      | hit the ground and I saw the fire.                                |
| 9  | Q.   | Now, where did he have the gun to his head at?  I                 |
| 10 |      | guess I should ask that.  Where was he pointing                   |
| 11 |      | the gun at?                                                        |
| 12 | A.   | (Indicating.)                                                      |
| 13 | Q.   | On the side of his head or where?                                 |
| 14 | A.   | Right here (indicating).                                           |
| 15 | Q.   | Okay.  At that point was -- Mr. McKinnes, was he                  |
| 16 |      | on his knees at that point?  Was he laid out                      |
| 17 |      | straight --                                                        |
| 18 | A.   | He -- he was laying down on the ground.                           |
| 19 | Q.   | He was laying down?                                                |
| 20 | A.   | Yes, ma'am.  Because Lock had kicked him and                      |
| 21 |      | kicked him.  He just hit him, and Chris fell, and                 |
| 22 |      | Lock would just kick him.                                          |
| 23 | Q.   | All right.  So you're out there now and they're                   |
| 24 |      | out there fighting or -- and Mr. McKinnes is on                   |
| 25 |      | the ground.  But you think enough to interfere at                 |

```
 1              that point to try and push his hand from -- were

 2              you concerned with your own safety at that point?

 3    A.        No, ma'am.

 4    Q.        So you didn't care if you got hurt out there on

 5              the scene?

 6    A.        No, ma'am.

 7    Q.        Where he put the bullet in -- supposedly put the

 8              bullet up to his head or put the gun to his head,

 9              was he shot at that point?

10    A.        He was bleeding.

11    Q.        Do you know whether or not he was shot at that

12              point?

13    A.        Yes, ma'am.

14    Q.        So he had shot him at that point?

15    A.        Yes, ma'am.

16    Q.        And this was the same bullet that you pushed his

17              hand and the bullet hits the ground -- he's

18              already on the ground, and then the bullet hits

19              the ground from there.  Were you all on gravel at

20              that point?  I guess I need to get you to show me

21              exactly where you were at this point.

22                   From the picture looking at Defendant's

23              Exhibit 1, where were you located at that time?

24              Where were they -- can you tell me from that

25              picture where they were?
```

100

```
 1    A.    Up here (indicating).

 2    Q.    You had gone up the hill?

 3    A.    (Witness nods head.)

 4    Q.    There's a yellow line there going up the --

 5    A.    This is the side --

 6    Q.    Does that yellow line -- that's the side of --

 7    A.    The side.

 8    Q.    So that's not a middle lane line that --

 9    A.    It's -- it's a one-way.  You can go in, but, like

10          I say, when the traffic is flowing, you have to

11          go -- you know, it's two sides to the street.

12          It's a line in the middle of the road.  This is

13          one side and this is another side.  We was on the

14          opposite side of the road, but we wasn't in the

15          road.  We was actually on the side.

16    Q.    So you would have been up on this side of the

17          guard shack.  You were actually inside the fence

18          at that point?

19    A.    Yes, ma'am.  The guard shack is located inside

20          the fence.

21    Q.    I'm going to show you what we're going to mark as

22          Defendant's Exhibit Number 3 for identification

23          purposes and ask you if you recognize this.  Do

24          you recognize that picture?

25    A.    This is Steris with the gate closed.
```

101

```
 1   Q.    Okay.  And can you see from that about up where

 2         you all would have been at on the -- during the

 3         time of this incident?

 4   A.    (Indicating.)

 5   Q.    Okay.  Is there a yellow line up there at that

 6         point in the road?  Is there another yellow line

 7         on that -- in that point of the road?

 8   A.    On this side of the road, there's a yellow line

 9         going all the way down.  But we was over -- over

10         in the grass.

11   Q.    So you all were in the grass?

12   A.    Uh-huh.

13   Q.    Okay.  Now --

14               MS. TOLES:  And, Your Honor, we're going to

15         move that this picture be admitted into evidence.

16               THE COURT:  Any objection?

17               MR. GREEN:  No objection.

18               THE COURT:  It's admitted.

19                   (At which time Defendant's Exhibit

20                    Number 3 was admitted into

21                    evidence.)

22         (BY MS. TOLES:)

23   Q.    Now, Ms. Parker, when you -- you said that you

24         all were not near a yellow line, that you all

25         were actually over in the grass at that point?
```

Vicki H. Clark
Official Court Reporter
(334) 832-1365

102

| | | |
|---|---|---|
| 1 | A. | We were about that far from the yellow line. |
| 2 | Q. | So you were pretty close to the yellow line at |
| 3 | | that point? |
| 4 | A. | Uh-huh. |
| 5 | Q. | All right.  Now, when you got -- is that where |
| 6 | | the incident took place where the gunshot would |
| 7 | | have gone off? |
| 8 | A. | Yes, ma'am. |
| 9 | Q. | All right.  So what was going on -- you saw -- at |
| 10 | | that point did you see the bullet laying on the |
| 11 | | ground after this was all over? |
| 12 | A. | No, ma'am. |
| 13 | Q. | Did you take the police back up there and say |
| 14 | | this is where all of this took place at? |
| 15 | A. | No, ma'am, because they had me in the back of the |
| 16 | | car. |
| 17 | Q. | Were you in handcuffs at that point? |
| 18 | A. | No, ma'am. |
| 19 | Q. | Okay.  Now, when you -- so all of this is taking |
| 20 | | place and you've got the -- you've gone out there |
| 21 | | and put yourself in harm's way to try and prevent |
| 22 | | this from happening.  What occurs after that? |
| 23 | A. | After that, a guy shows up -- after all that |
| 24 | | happened, the guy shows up.  He parked -- he |
| 25 | | pulled right down here at the end of the road, |

Vicki H. Clark
Official Court Reporter
(334) 832-1365

103

```
1        and he was hollering what the fuck are you doing;

2        what the fuck are you doing, get the fuck out of

3        here.  And Lock and the guy -- the guy had a baby

4        on his hip and then ran back to the car and

5        backed up all the way to Rheem.

6   Q.   Was the guy out there the whole time?

7   A.   No, ma'am, I don't think so.

8   Q.   Did you get a look at the guy?

9   A.   He was wearing blue jeans and a green shirt.

10       That was my first time ever seeing him.  I don't

11       know who he is.

12  Q.   And was that what Mr. Lockwood was wearing as

13       well, blue jeans and a green shirt?

14  A.   No.  He was wearing blue jeans and a black shirt.

15  Q.   Where else did you -- you said that the -- how

16       many gunshots did you actually hear out there?

17  A.   Four.

18  Q.   And are you positive that there was -- that

19       nobody else was out there on the scene at that

20       point?

21  A.   I'm positive.

22  Q.   Did you hear the car come up at all with the --

23       that you alleged that Mr. -- Mr. Lockwood got

24       into after this was all over?  Did you hear the

25       car?
```

104

```
 1    A.    No, ma'am.

 2    Q.    Can you describe the car?

 3    A.    It was a dark green car, four-door.

 4    Q.    Dark green car, four-door?

 5    A.    Yes, ma'am.  Because it was parked up under the

 6          light.

 7    Q.    When you were getting your training as a DSI

 8          security officer, at any point were you trained

 9          to call the emergency personnel if something were

10          to go wrong while you at Steris?

11    A.    No, ma'am.  I was just given a number to call if

12          something ever happened.

13    Q.    What was that number that you were given?

14    A.    I don't know it by heart.

15    Q.    Have you ever heard or have you -- you don't know

16          what it means to call 911 for a police emergency?

17          Nobody has ever told you to call 911 in case you

18          have a police emergency?

19    A.    No, ma'am.

20    Q.    How old are you?

21    A.    I'm thirty-four.

22    Q.    At any point could you tell -- could you tell

23          which hand Mr. Lockwood supposedly had this gun

24          in?

25    A.    I can't recall.
```

105

| 1  | Q. | You can't recall? |
|---|---|---|
| 2  | A. | No. |
| 3  | Q. | Where was -- you said that Mr. McKinnes was on |
| 4  |    | the ground. Was he on his stomach at that point |
| 5  |    | or was he on his back at that point? |
| 6  | A. | He was just laying on the ground. |
| 7  | Q. | Was he on his stomach or was he on his back? |
| 8  | A. | He was like, say, halfway on his stomach and |
| 9  |    | halfway on his side. |
| 10 | Q. | Okay. Where were you standing and where was |
| 11 |    | Mr. Lockwood standing? |
| 12 | A. | I was standing like, say, behind Chris telling |
| 13 |    | him not to shoot him. And Lock was saying, oh, |
| 14 |    | Chris, he's got a gun in his hand. |
| 15 | Q. | At that point was he bent down on one knee over |
| 16 |    | him? Was he -- |
| 17 | A. | He was just standing over him. |
| 18 | Q. | Standing over him with the gun? |
| 19 | A. | Bent over him. |
| 20 | Q. | With the gun over near his -- which side of the |
| 21 |    | head was he -- did he have the gun near? |
| 22 | A. | This side. I think it was this side. |
| 23 | Q. | Left side, right side? |
| 24 | A. | The left side. I think it was the left side. |
| 25 | Q. | So he has a gun over his left -- where were you |

1       standing at that point that you were able to

2       deflect his hand?

3  A.    I was standing behind -- when Chris was laying on

4       the ground, I was standing behind him halfway

5       over him begging Lock not to shoot him.  And when

6       he put the gun to his head, the gun went off, and

7       I pushed the.  I pushed his hand.

8  Q.    You pushed his hand before or after the gun went

9       off?

10  A.    When he pulled it, I pushed his hand.

11  Q.    Is it possible that you -- you're the reason why

12       the trigger went off?

13  A.    No, ma'am.  I didn't have my hand on the gun at

14       all.

15  Q.    Ms. Parker, on the night that you gave the

16       statement, you said that the car that he

17       supposedly rode off in was green.  Was the car

18       green or black; do you know?

19  A.    It was dark.  It was a dark -- I think it was a

20       dark green car.

21  Q.    Ms. Parker, after -- at the end of your

22       statement, on Page 115 of your statement -- do

23       you need to go back to your statement and look at

24       Page 115 or do you remember?  At the end of your

25       statement the officer asked you was there

107

```
 1           anything else.  Do you recall what you said to
 2           him at that point?
 3   A.      Yes, ma'am.
 4   Q.      What did you say to him?
 5   A.      This was not a setup.
 6   Q.      Why would you say to a police officer when he
 7           asked you if there was anything else, why would
 8           you say it's not a setup?
 9   A.      Because Chris was in the hall at that time
10           hollering it's a setup; it's a setup; it was a
11           setup.  I said it was not a setup.
12   Q.      So Mr. McKinnes thought that you and Mr. Lockwood
13           were in this together?
14   A.      Yes, ma'am.
15   Q.      Mr. McKinnes was the same person who thought that
16           -- well, you thought that Mr. McKinnes was
17           possibly trying to get away with your child at
18           this point as well?
19   A.      Yes, ma'am.
20   Q.      And he thought that now you were trying to -- you
21           had set him up to -- what was he saying?  Was he
22           saying that you had told Mr. Lockwood to come out
23           there and take it -- to get him at that point?
24   A.      I don't know.
25   Q.      You don't know.  You just knew that he thought it
```

```
 1              was a setup between the two of you?

 2    A.        Yes, ma'am.

 3    Q.        Isn't it true that you would come in here today

 4              and tell this jury just about anything so that

 5              nobody thought that you were involved in this,

 6              what Mr. McKinnes thought was a setup?

 7    A.        No, ma'am.

 8    Q.        Isn't it true that there was -- the reason --

 9              what you're doing now is you're trying to cover

10              yourself?

11    A.        No, ma'am.

12    Q.        When Mr. Lockwood -- you had an opportunity to

13              not have anything else to do with Mr. Lockwood,

14              but, instead, you told Mr. McKinnes you wanted

15              nothing else to do with him?  And then when

16              Mr. McKinnes said that he was going to take your

17              child, it was okay for Mr. Lockwood to get back

18              involved -- to come into the picture?  Isn't that

19              correct?  It was okay for him to be in the

20              picture when you thought your child was going to

21              be taken?

22    A.        No, ma'am.

23    Q.        Pretty much, it is true that you'll do whatever

24              you need to do to protect Ms. Parker at whatever

25              cost it costs anybody; right?
```

109

```
 1    A.    No, ma'am.

 2    Q.    Ms. Parker, you're just trying to -- you're going

 3          along with what Mr. McKinnes says so that you

 4          won't have to end up serving some time on this

 5          charge?

 6    A.    No, ma'am.

 7                MS. TOLES:  Thank you.  Nothing further.

 8                THE COURT:  Scott, have you just got a few?

 9                MR. GREEN:  Just a few, Judge.

10                THE COURT:  Because it is 4:30.

11                      REDIRECT EXAMINATION

12    BY MR. GREEN:

13    Q.    Ms. Parker, do I recall you mentioning a gun

14          jamming, the gun jamming?

15    A.    Yes --

16                MS. TOLES:  Object, Your Honor.  I don't

17          think there was any testimony about a gun jamming

18          at any point.  She hasn't testified about that.

19                MR. GREEN:  I believe there was, Your Honor.

20                THE COURT:  You can ask her.

21    Q.    Did the defendant do anything to correct this

22          jam?

23    A.    He was trying to pull it back.

24    Q.    Okay.  Now, Ms. Parker, Ms. Toles asked you about

25          your statement.
```

```
 1              MR. GREEN:  Your Honor, may I approach the
 2         witness?
 3              THE COURT:  Sure.
 4    Q.   She asked you -- let's see if I can get it out.
 5         On page -- it looks like Page 17 of your
 6         statement, she asked you did you see the weapon
 7         in his hand.  Do you recall Ms. Toles asking you
 8         that?
 9    A.   Yes, ma'am -- yes, sir.
10    Q.   Okay.  Well, she stopped there, and the next
11         question Detective Davis asked you, so when he
12         got in the bathroom, what was he doing then.
13         Would you read your answer to Detective Davis?
14    A.   He was telling Chris to get the -- to get out, to
15         come on out, to come on out, come on out,
16         motherfucker, come on out.  I said, please,
17         please, please leave; this is my job; please,
18         Lock, please leave; this is my job.
19    Q.   Go ahead.
20    A.   Like that and then he got out in the -- in the
21         area of the desk where he pushed -- he pulled out
22         the gun.
23    Q.   Okay.  And then Detective Davis asked you who
24         pulled the gun and what was your answer to that?
25    A.   Lock.
```

1   Q.   And he said Lock, and you said what?

2   A.   Uh-huh.

3   Q.   All right.  And Detective Davis asked you from

4        where, and what did you tell him?

5   A.   I guess from behind his back.

6   Q.   And Detective Davis asked you what color was it,

7        and what did you say?

8   A.   Black.

9   Q.   He said black, and you said what?

10  A.   Uh-huh.

11  Q.   All right.  Detective Davis asked you, small,

12       big, and what was your answer to that?

13  A.   It was -- I think it was a small.  I don't know

14       too much about guns.

15            MR. GREEN:  Okay.  Judge, that's all the

16       questions I have.

17            THE COURT:  Anything else, Ms. Toles?

18            MS. TOLES:  No, Your Honor, nothing else at

19       this time.

20            THE COURT:  Okay.  Thank you, Ms. Parker.

21       You can step down.

22                 Does anyone need to recall Ms. Parker?

23            MS. TOLES:  Your Honor, we would reserve the

24       right to recall her.

25            THE COURT:  Okay.  All right.  Ladies and

1    gentlemen, we're going to stop here for the day.

2    I'm going to need everyone to be back in the jury

3    assembly room at 8:30 in the morning.

4    　　　Remember, this evening, please do not

5    discuss the case with spouses, children, friends.

6    It's so important that the only evidence you

7    consider is what you're hearing in this courtroom

8    and the only time y'all can talk about it is when

9    you're back there together as a jury.  So please

10   do not discuss anything about the case.  Y'all

11   drive careful.  It's bad weather out there.  And

12   I will see y'all at 8:30, and we'll have coffee

13   for y'all in the morning if anybody would like

14   that.  Thank you.

15   　　　　　(The foregoing proceedings adjourned

16   　　　　　　on February 23, 2004, and resumed

17   　　　　　　on February 24, 2004, as follows:)

18   　　　　　(The following proceedings were held

19   　　　　　　in the presence and hearing of the

20   　　　　　　jury:)

21   　　　THE COURT:  Okay.  Thank you.  Y'all can

22   have a seat.  Good morning.  It's nice to see

23   everybody back.  It's another rainy morning.  As

24   long as it doesn't rain on weekends, we're okay.

25   I don't care if it rains during the week because

113

| | | |
|---|---|---|
| 1 | | I can't play golf anyway.  Just do not rain on |
| 2 | | Saturday and Sunday. |
| 3 | | Anyway, it's nice to see y'all.  I think |
| 4 | | we're ready to get started back.  Mr. Bailey and |
| 5 | | Mr. Green, we're ready for your next witness. |
| 6 | | MR. GREEN:  Thank you, Your Honor.  We're |
| 7 | | going to call Sergeant Davis from the Montgomery |
| 8 | | Police Department. |
| 9 | | THE COURT:  All right. |
| 10 | | SERGEANT J. L. DAVIS, |
| 11 | | a witness, after having first been duly sworn to |
| 12 | | speak the truth, the whole truth, and nothing but |
| 13 | | the truth, took the stand and testified as |
| 14 | | follows: |
| 15 | | DIRECT EXAMINATION |
| 16 | | BY MR. GREEN: |
| 17 | Q. | Can you tell us your name, please, sir? |
| 18 | A. | Sergeant J. L. Davis. |
| 19 | Q. | All right.  And, Sergeant Davis, tell us how |
| 20 | | you're employed. |
| 21 | A. | I'm sorry? |
| 22 | Q. | Tell us how you're employed. |
| 23 | A. | I work with the Montgomery Police Department. |
| 24 | Q. | All right.  And what are your current duties? |
| 25 | A. | Currently, I'm a patrol supervisor. |

| 1 | Q. | Okay.  And if I can take you back to April, |
| 2 | | around the 10th, of last year, can you tell us |
| 3 | | what your duties were then? |
| 4 | A. | I was a detective in robbery/homicide. |
| 5 | Q. | And, in fact, are you the case agent in this |
| 6 | | case? |
| 7 | A. | Yes. |
| 8 | Q. | Okay.  Tell us what your duties are as the case |
| 9 | | agent. |
| 10 | A. | I'm responsible for -- if we're able to initially |
| 11 | | respond to the scene of any major crime like a |
| 12 | | homicide, attempted murders, robberies and such, |
| 13 | | and then once we get there, we actually maintain |
| 14 | | the scene, gather evidence, and put a case file |
| 15 | | together. |
| 16 | Q. | And were you able to visit the scene of the crime |
| 17 | | on this occasion? |
| 18 | A. | Yes, I was. |
| 19 | Q. | Can you tell us about the scene? |
| 20 | A. | The scene was at Steris -- I think it's called -- |
| 21 | | pronounced Steris in Gunter Industrial Park in |
| 22 | | northern Montgomery. |
| 23 | Q. | And what did you see when you got there? |
| 24 | A. | When I got on the scene, the patrol units, two |
| 25 | | third-shift units, were already on the scene. |

115

|   |   |   |
|---|---|---|
| 1 |  | And there was a little guard shack when you get |
| 2 |  | to the opening that's surrounded by a fenced-in |
| 3 |  | area, which is barbed wire.  There's a little |
| 4 |  | guard shack off to the left when you first pull |
| 5 |  | in.  It's got double -- it's two lanes to enter |
| 6 |  | the business.  When I got there, the patrol units |
| 7 |  | had already been there and secured the scene.  I |
| 8 |  | was told by the patrol units that the victim had |
| 9 |  | been transported to the hospital in an ambulance. |
| 10 | Q. | Okay.  And the victim in this case was |
| 11 |  | Mr. McKinnes? |
| 12 | A. | Yes, Christopher McKinnes. |
| 13 | Q. | Did you have a chance to speak with him? |
| 14 | A. | No.  Later in the day, I did. |
| 15 | Q. | What did you do at the scene? |
| 16 | A. | At -- when I arrived on the scene, I spoke with |
| 17 |  | the patrol officers, found out what I could, what |
| 18 |  | information I could.  And then I briefly walked |
| 19 |  | over the scene to -- to see what we had.  Then I |
| 20 |  | photographed the scene. |
| 21 | Q. | All right.  Did you collect any evidence at the |
| 22 |  | scene? |
| 23 | A. | Yes, I did. |
| 24 | Q. | Can you tell us what that was? |
| 25 | A. | I collected two shell casings and one live round. |

116

| | | |
|---|---|---|
| 1 | Q. | Okay.  Was that all that you collected? |
| 2 | A. | I believe so.  Let me make sure.  I believe |
| 3 | | that's all I collected. |
| 4 | | Yes.  I took photographs, and I |
| 5 | | collected three shells -- I'm sorry, two shell |
| 6 | | casings, one live round, and that was it. |
| 7 | Q. | Okay.  Detective -- |
| 8 | | MR. GREEN:  Judge, can I approach? |
| 9 | | THE COURT:  Yes. |
| 10 | Q. | -- I'm going to show you what I've got marked |
| 11 | | State's Exhibits 1 through 8 as well as State's |
| 12 | | Exhibit 12.  If you could, I'd like for you to |
| 13 | | tell me whether you recognize those. |
| 14 | A. | These are the photos that I took. |
| 15 | Q. | Of the scene? |
| 16 | A. | Of the scene and the victim. |
| 17 | Q. | Okay.  And you actually took those photographs? |
| 18 | A. | Yes. |
| 19 | Q. | And when you took the photographs of the scene, |
| 20 | | that was out there that night; is that correct? |
| 21 | A. | That's correct. |
| 22 | Q. | Okay.  And when did you take the photographs of |
| 23 | | the victim? |
| 24 | A. | At headquarters later in the evening. |
| 25 | Q. | But that same evening? |

117

```
 1    A.    Yes.

 2    Q.    Okay.  Are those photographs -- as you look at

 3          them today, do they fairly and accurately

 4          represent the way both the scene as well as the

 5          victim's condition was that night?

 6    A.    Yes.

 7                MR. GREEN:  Judge, at this time we'd offer

 8          State's Exhibits 1 through 8 as well as State's

 9          Exhibit 12.

10                THE COURT:  Any objection?

11                MS. WILLIAMS:  No, Your Honor.

12                THE COURT:  All right.  They're all

13          admitted.

14                      (At which time State's Exhibit

15                       Numbers 1, 2, 3, 4, 5, 6, 7, 8, and

16                       12 were admitted into evidence.)

17          (BY MR. GREEN:)

18    Q.    All right.  Sergeant Davis, tell us what you've

19          got there.  Let's start with State's Exhibit 1.

20          Can you tell me what that's a photograph of?

21    A.    Yes.  These aren't in order.  All right.  The

22          first -- let me --I want to explain something

23          first.  The camera that we use in the detective

24          division -- we have two shifts.  We have a first

25          shift and a second shift and, I'm sorry, third
```

1    shift.  And at this time I was on late call, what

2    they call late call.

3  Q.  Okay.

4  A.  We don't have access to our crime scene bureau

5    that late in the evening, and we usually process

6    our own scenes.  We have a digital camera which

7    doesn't have a very bright flash on it, and we

8    don't have immediate access to the photographs

9    once we take them.  They're actually downloaded

10   at crime scene bureau at a later date.

11 Q.  But that is the photographs --

12 A.  Yes.  This is a -- it's a dark photograph, but

13   this is a photograph that I took.

14 Q.  Tell us what that's a photograph of.

15 A.  It's a photograph of the entrance of the plant

16   Steris.  It shows the guard shack.  And I can --

17   I can see two cones that I actually placed where

18   I located the shell casings and a live round.

19 Q.  All right.  And the cones were placed there by

20   yourself or --

21 A.  I believe one of the cones was placed by the

22   guard -- or one of the patrol units, and then I

23   placed one of the cones once a live round was

24   located.

25 Q.  What about the next picture?  What does that show

119

| | | |
|---|---|---|
| 1 | | us? |
| 2 | A. | Number 2 is -- that is, I believe, the victim's |
| 3 | | vehicle parked across the street. |
| 4 | Q. | Okay.  And what does Number 3 show us? |
| 5 | A. | Number 3 is a picture of the live round that I |
| 6 | | collected. |
| 7 | Q. | And how about Number 4? |
| 8 | A. | That is a shell casing, one of the shell casings. |
| 9 | Q. | Okay.  What about five? |
| 10 | A. | Number 5 is a picture of the guard shack. |
| 11 | Q. | And what does it show? |
| 12 | A. | It shows the entrance to the guard shack and the |
| 13 | | location of the -- the area of one of the shell |
| 14 | | casings where one of the shell casings was. |
| 15 | Q. | Okay.  What about the next picture?  I believe |
| 16 | | we're on six, if I'm not mistaken. |
| 17 | A. | Yes.  Number 6 is a picture of a spent shell |
| 18 | | casing. |
| 19 | Q. | What about Number 7? |
| 20 | A. | Number 7 is a picture of the victim's head with |
| 21 | | the two wounds. |
| 22 | Q. | All right.  And you've got several pictures of |
| 23 | | the victim.  What part of the victim's head is -- |
| 24 | A. | The top, the top area of the head. |
| 25 | Q. | Okay.  And what does that picture show? |

Vicki H. Clark
Official Court Reporter
(334) 832-1365

120

| | | |
|---|---|---|
| 1 | A. | It shows two wounds. |
| 2 | Q. | Okay.  How about Number 8? |
| 3 | A. | And Number 8 is a picture of the victim. |
| 4 | Q. | Okay.  And what does it show? |
| 5 | A. | It shows just a face, his face shot.  It's a |
| 6 | | picture of him. |
| 7 | Q. | Does it display any injuries that you can see? |
| 8 | A. | Not in this picture.  Well, actually, it shows |
| 9 | | swelling on the left side of his face, and his |
| 10 | | lip right there is swollen. |
| 11 | Q. | And how about Number 12? |
| 12 | A. | It shows a wound to the left side of the victim's |
| 13 | | head. |
| 14 | Q. | I'm going to show you what I've got marked as |
| 15 | | State's Exhibits 9, 10, and 11.  Can you tell us |
| 16 | | whether you recognize those? |
| 17 | A. | All right.  As they're marked, as I -- as I |
| 18 | | documented in my case file, J-1 is a shell casing |
| 19 | | that was located by the guard shack. |
| 20 | Q. | Okay. |
| 21 | A. | J-2 is the live round found up the road to the |
| 22 | | right. |
| 23 | Q. | Okay. |
| 24 | A. | And J-3 is a shell casing found approximately |
| 25 | | thirty paces up to the left from the guard shack |

```
 1              towards Steris.

 2     Q.       And can you break those out and tell us what's

 3              inside of them?

 4     A.       All right.  J-2 is a -- I believe that's a .25

 5              caliber.  I don't recall what caliber it was.

 6              It's a live round.

 7     Q.       Can you explain to the ladies and gentlemen of

 8              the jury what a live round is?

 9     A.       It's an unfired bullet.

10     Q.       Okay.

11     A.       And J-1 is a spent shell casing of the same type

12              caliber.

13     Q.       Okay.  And can you differentiate to the ladies

14              and gentlemen of the jury what the difference is

15              between a live round and a spent shell casing?

16     A.       It's -- this one is a fired bullet.  It's been

17              fired from a handgun.

18     Q.       And is that just the hull or, I mean, is --

19     A.       That's the jacket -- that's the jacket that

20              actually contains the black powder and the round.

21     Q.       Okay.

22     A.       And J-3 is also another spent shell casing.

23     Q.       Okay.  And, Detective, are these items of

24              evidence that you've got before us today, are

25              they the same or substantially the same as they
```

122

```
 1              were the night you found them?

 2    A.     Yes.

 3                  MR. GREEN:  Judge, at this time we would

 4           offer State's 9, 10, and 11 into evidence.

 5                  THE COURT:  Any objection on any of those?

 6                  MS. WILLIAMS:  No, Your Honor.

 7                  THE COURT:  All right.  They're all

 8           admitted.

 9                      (At which time State's Exhibit

10                      Numbers 9, 10, and 11 were admitted

11                      into evidence.)

12           (BY MR. GREEN:)

13    Q.     Detective, tell us, once again, where you found

14           these items.

15    A.     Can I put them back in the envelopes?

16    Q.     Yes, absolutely, because, you know, I'm not going

17           to get them back in there.

18    A.     All right.  J-1, which is a shell casing, was

19           located right by the guard shack, right outside

20           the guard shack door.  J-2, which is a live

21           round, I wrote down it was on the -- it was

22           further up the road -- let me look at it real

23           quick because I got -- I paced it off.

24    Q.     Okay.

25    A.     Okay.  It was approximately ten paces towards
```

123

| | | |
|---|---|---|
| 1 | | Steris away from the guard shack, and it was on |
| 2 | | the opposite side of the road on the yellow |
| 3 | | painted lines where I located the live, unspent |
| 4 | | shell, round. |
| 5 | Q. | What about the final, the third shell casing -- |
| 6 | | the second shell casing? |
| 7 | A. | Okay.  And the third one was located, I recall, |
| 8 | | was thirty paces up to the left toward Steris |
| 9 | | from the live round. |
| 10 | Q. | Okay.  Did -- I believe you told us later that |
| 11 | | night you had occasion to speak with the victim |
| 12 | | in this case; is that correct? |
| 13 | A. | That's correct. |
| 14 | Q. | And what was -- how did that go?  What was the |
| 15 | | nature of that? |
| 16 | A. | It was to determine what caused his injuries and |
| 17 | | what led up to the events where he was injured. |
| 18 | Q. | Did you see any injuries on him? |
| 19 | A. | Yes, I did. |
| 20 | Q. | And are those the ones that are depicted in the |
| 21 | | photographs? |
| 22 | A. | Yes.  I photographed him as soon as he got to |
| 23 | | headquarters from the hospital. |
| 24 | Q. | Okay.  And did he tell you what had happened? |
| 25 | A. | Yes, he did. |

```
 1    Q.    What did he say had happened?

 2    A.    He said that he had brought his son up to the

 3          guard shack that evening --

 4    Q.    Okay.

 5    A.    -- to see Ms. Parker.  And Ms. Parker had left to

 6          get some -- I think something for a toothache.

 7          And Ms. Parker, when she had left, apparently,

 8          Mr. -- this is what the victim had advised me,

 9          was that Mr. Lockwood had been calling Ms. Parker

10          on the telephone.

11    Q.    Okay.

12    A.    Mr. McKinnes -- can I look over something real

13          quick?  I notated in my case file what he said

14          exactly, and I want to make sure I get it right.

15    Q.    Sure, sure.

16    A.    (Witness reviews file.)

17    Q.    Detective, I guess my real question is going to

18          be this.  Did the victim give you the facts that

19          went down at the scene that night?

20    A.    Yes.  Detective Thompkins is the one that

21          primarily took a voluntary statement from

22          Mr. McKinnes.

23    Q.    Okay.

24    A.    But I also spoke to him, too.

25    Q.    Did the evidence that you collected at the scene,
```

125

1      did that correlate with what the victim was

2      telling you?

3  A.    Yes.  The evidence I collected coincided with the

4      story that Mr. McKinnes told us.

5  Q.    All right.  And all of this took place in

6      Montgomery County?

7  A.    Yes, it did.

8          MR. GREEN:  Judge, that's all the questions

9      I have.

10        THE COURT:  Ms. Toles, any questions you

11      have for Sergeant Davis?

12        MR. GREEN:  Judge, can I publish the

13      exhibits to the jury?

14        THE COURT:  Sure.  And, Judge, if I didn't

15      do this already -- and I think I have -- we'd

16      move to admit Exhibits 1 through 12 into

17      evidence.  I believe I've already done that.

18        THE COURT:  They're already in.

19      Mr. McClelland, are you going to ask Sergeant

20      Davis some questions?

21        MR. McCLELLAND:  Yes.

22        THE COURT:  Okay.  Go ahead.

23                CROSS EXAMINATION

24  BY MR. McCLELLAND:

25  Q.    How are you doing, Sergeant?

126

```
 1    A.     Fine.

 2               MR. McCLELLAND:  Your Honor, I'm going to

 3         give them just a minute to review the scene.

 4               THE COURT:  Okay.

 5               MR. McCLELLAND:  Your Honor, this was

 6         Defendant's Exhibit 2 yesterday, and I just want

 7         to make sure it's admitted.

 8               THE COURT:  Yes.  Y'all never moved to admit

 9         two.

10               MR. McCLELLAND:  I'd move to admit it, Your

11         Honor.

12               THE COURT:  Do y'all have any objection?

13               MR. BAILEY:  I'm sorry?  Which one was that,

14         Your Honor?

15               MR. McCLELLAND:  This was the statement --

16               THE COURT:  This is from yesterday, two.

17         They never moved to admit it.  I admitted one and

18         three.

19               MR. BAILEY:  No objection, Your Honor.

20               THE COURT:  All right.  The statement is

21         admitted.

22                         (At which time Defendant's Exhibit

23                          Number 2 was admitted into

24                          evidence.)

25               MR. McCLELLAND:  Have all of y'all had a
```

127

```
 1              chance to look at the pictures?

 2              (BY MR. McCLELLAND:)

 3    Q.        Sergeant Davis, what time did you get the call?

 4    A.        Approximately 2335, about 11:30 at night.

 5    Q.        About 11:30 at night?

 6    A.        Yes.

 7    Q.        And there were already units on the scene when

 8              you got there?

 9    A.        Yes.

10    Q.        And you got there about 11:50; is that correct?

11    A.        Yes, 11:50.

12    Q.        And how many units were on the scene?

13    A.        I believe two patrol units.

14    Q.        Two patrol units?

15    A.        Yes, Brooks and Jones.

16    Q.        And when they -- tell the jury, please, when they

17              get to a scene, do they take an initial report?

18              Do they secure -- how do they secure the scene?

19              What do they do?

20    A.        They usually separate any witnesses.  Depending

21              on the location of the crime scene, they'll put

22              yellow tape around it, if it's appropriate, and

23              separate witnesses.

24    Q.        Okay.  Do they investigate the scene, the crime

25              scene?
```

| | | |
|---|---|---|
| 1 | A. | Not generally, no. |
| 2 | Q. | Not generally? |
| 3 | A. | Yes. |
| 4 | Q. | Okay.  That was your job then? |
| 5 | A. | That's correct. |
| 6 | Q. | I noticed in one of the pictures -- and I believe |
| 7 | | it's -- let me -- this is Defendant's Exhibit 1 |
| 8 | | that we had yesterday.  Is this a picture that |
| 9 | | you took? |
| 10 | A. | Yes, it is. |
| 11 | Q. | The red cone that's by the guard shack, is that |
| 12 | | the one you placed there? |
| 13 | A. | No, it's not. |
| 14 | Q. | So someone else would have placed that there? |
| 15 | A. | Yes.  The patrol officer did. |
| 16 | Q. | Which one did that? |
| 17 | A. | I don't remember.  I don't recall which one. |
| 18 | Q. | But, anyway, he did that because he obviously |
| 19 | | observed the shell casing -- |
| 20 | A. | That's correct. |
| 21 | Q. | -- that close to the guard shack; is that |
| 22 | | correct? |
| 23 | A. | I would assume that's -- that's -- |
| 24 | Q. | I'm going to show the jury here.  The red cone |
| 25 | | here, this would be where a shell casing was |

```
 1          found?

 2              MR. GREEN:  Judge, I'm going to object to

 3          him pointing out different things on --

 4              MR. McCLELLAND:  I'm just pointing out what

 5          they've already stated, Your Honor.

 6              MR. GREEN:  That's counsel testifying.

 7              THE COURT:  Just ask him a question,

 8      Mr. McClelland.

 9              MR. McCLELLAND:  Yes, ma'am.

10          (BY MR. McCLELLAND:)

11      Q.  So the question would be that's where you found

12          the shell casing; correct?

13      A.  Where the patrol officer marked it.

14      Q.  Okay.  Thank you.  And how many other shell

15          casings did you find that night?

16      A.  One more shell casing and one live round.

17      Q.  So the other shell casing, was it marked already

18          before you got there?

19      A.  No.  I located that one.

20      Q.  You located that one?

21      A.  Yes.

22      Q.  And that was the one, I think you stated, was

23          thirty paces --

24      A.  Yes.

25      Q.  -- up the road?
```

| | | |
|---|---|---|
| 1 | A. | Up towards the business. |
| 2 | Q. | Okay.  If -- I'm not familiar with the business, |
| 3 | | so if the guard shack is here facing the entrance |
| 4 | | coming in, this is up behind it on a hill? |
| 5 | A. | Okay.  The road access off of Gunter Drive, the |
| 6 | | guard shack was on the left side of the road, and |
| 7 | | the business is further up the same road kind of |
| 8 | | off to the left. |
| 9 | Q. | Okay.  And thirty paces is approximately how |
| 10 | | many -- |
| 11 | A. | My steps.  Just the average steps that I take. |
| 12 | Q. | Okay.  Now, the vehicle, the victim's vehicle -- |
| 13 | A. | That's correct. |
| 14 | Q. | -- where was it located at this time? |
| 15 | A. | It was parked on the other side of Gunter Road. |
| 16 | | The side of the business is on, it was on the |
| 17 | | opposite side of the road from Gunter -- from |
| 18 | | Gunter Park Drive. |
| 19 | Q. | In relevance to the guard shack, where is it at? |
| 20 | A. | Can I see the picture real quick again?  Let me |
| 21 | | see if I can remember exactly where it is. |
| 22 | | (Witness reviews photographs.) |
| 23 | | It's -- it's not on the same side of the |
| 24 | | road as the guard shack.  It was in the grass. |
| 25 | | It was parked in the grass on the other side of |

Vicki H. Clark
Official Court Reporter
(334) 832-1365

131

```
 1              industrial park.  I don't exactly recall what

 2              exact position it was parked in.  It was just in

 3              the position that I photographed it on the other

 4              side of the road.

 5    Q.        Okay.  So if you run out of the guard shack, if

 6              you run out of the door of the guard shack,

 7              you're not looking at the car?

 8    A.        No, no.  She would've had to have turned -- from

 9              that picture, she would've had to turn right to

10              go to the car, the vehicle, left to go to the

11              business.

12    Q.        Okay.  And the second shell casing you found that

13              night was back completely the opposite direction?

14    A.        It was towards Steris, opposite of the car.

15    Q.        Okay.  And I think you said you found a live

16              round.  Where did you find that one at?

17    A.        The live round was on the opposite side of the

18              entrance of this road, this -- which is a private

19              drive into the business.  It was on this side on

20              the yellow line.

21    Q.        So if you come out of the door, then it would be

22              across the street?

23    A.        Yes.  It was across the street further up the

24              road.

25    Q.        From your observations that night, from what you
```

132

| | | |
|---|---|---|
| 1 | | observed, where would the victim had been laying |
| 2 | | on the ground when the defendant allegedly shot |
| 3 | | at him? |
| 4 | A. | That's not in this photograph. |
| 5 | Q. | Is there a photograph? |
| 6 | A. | Well, that was the overall photograph that I |
| 7 | | earlier took, and at that time that night I |
| 8 | | thought it was accurately depicted.  But it -- |
| 9 | | the flash wasn't bright enough to brighten the |
| 10 | | whole area.  And the view finder on the camera |
| 11 | | that we have is so small, we're not able to |
| 12 | | determine if it -- the whole broad picture.  And |
| 13 | | once it was -- okay.  In this picture right here, |
| 14 | | it's kind of hard for me to show.  But this is |
| 15 | | the entrance.  And I know you can't see it from |
| 16 | | there because it's hard for me to see, too.  But |
| 17 | | the entrance to the business is right here. |
| 18 | | There is an access road for cars about thirty |
| 19 | | paces from the guard shack, approximately thirty |
| 20 | | paces from the guard shack, that goes that way. |
| 21 | | And the last shell casing I found was |
| 22 | | approximately five feet before that entrance. |
| 23 | Q. | Okay.  So they were separated? |
| 24 | A. | Yes. |
| 25 | Q. | The shells were not close together?  They were -- |

133

|     |     |                                                          |
|-----|-----|----------------------------------------------------------|
| 1   | A.  | No.  They were separate.                                 |
| 2   | Q.  | -- one by the guard shack, one --                        |
| 3   | A.  | The live round --                                        |
| 4   | Q.  | -- thirty paces --                                       |
| 5   | A.  | Yes.                                                     |
| 6   | Q.  | -- up the road, and then ten paces out the other         |
| 7   |     | way is a live round?                                     |
| 8   | A.  | Okay.  Now, one shell casing outside the guard           |
| 9   |     | shack.                                                   |
| 10  | Q.  | Right.                                                   |
| 11  | A.  | On the other side of the entrance, the private           |
| 12  |     | drive, on the yellow -- the yellow line that runs        |
| 13  |     | alongside the road was a live round, and that was        |
| 14  |     | about ten paces.  And then thirty paces up from          |
| 15  |     | that on the opposite side of the road was another        |
| 16  |     | shell casing.                                            |
| 17  | Q.  | So if I understand this correctly, you didn't            |
| 18  |     | find any two shell casings or live rounds or             |
| 19  |     | anything together?                                       |
| 20  | A.  | No.                                                      |
| 21  | Q.  | They were all spread apart?                              |
| 22  | A.  | They were all spread apart.                              |
| 23  | Q.  | In your report that you have in front of you, I          |
| 24  |     | think you said that the victim stated and the            |
| 25  |     | witness that there was two shots fired at him            |

1          while --

2                    MR. GREEN:  Your Honor, I'm going to object

3          to what the witnesses and the victims say.

4                    THE COURT:  Make sure you just ask him a

5          question, Mr. McClelland, about what he knows.

6                    MR. McCLELLAND:  Yes, ma'am.

7      Q.  When you questioned the victim, what were you

8          told about --

9                    MR. GREEN:  Judge, I'm going to object.

10         Once again, the -- both the victim and the

11         witness are here.  The witness testified

12         yesterday.  These questions --

13                   MS. TOLES:  Your Honor, for the Record, the

14         State did it the entire time.  He told him

15         exactly what the victim said to him concerning

16         it.  And that's the same thing he's asking him

17         now is what was told to him when they were

18         doing --

19                   MR. McCLELLAND:  I'm just going through

20         what's in his report, Your Honor, and what

21         they've already --

22                   THE COURT:  He can answer.  I mean, you can

23         answer what's in your report if you've got it,

24         Sergeant Davis.

25         (BY MR. McCLELLAND:)

135

| | | |
|---|---|---|
| 1 | Q. | Please answer the question. |
| 2 | A. | I'm sorry.  That he had initially shot at him |
| 3 | | outside the gate once, chased him down the road, |
| 4 | | caught him, pistol whipped him with the gun, |
| 5 | | forced him on his knees and then to the ground |
| 6 | | and told him he was going to kill him and fired |
| 7 | | two more shots. |
| 8 | Q. | Two more shots? |
| 9 | A. | Towards his head, yes. |
| 10 | Q. | And I think you stated it was a semi-automatic |
| 11 | | .25? |
| 12 | A. | I assumed it was.  I don't know for a fact. |
| 13 | Q. | You're familiar with automatics? |
| 14 | A. | Yes, I am. |
| 15 | Q. | Would you explain to the jury when you fire a |
| 16 | | round out of an automatic what happens to the |
| 17 | | shell casing? |
| 18 | A. | It is ejected from the weapon, and it can go |
| 19 | | anywhere. |
| 20 | Q. | Okay.  And usually in your experience when you |
| 21 | | work a shooting, you find the casings fall pretty |
| 22 | | much in a common area after they're ejected? |
| 23 | A. | No. |
| 24 | Q. | You don't.  Okay.  You find them spread all over |
| 25 | | the place? |

136

```
 1    A.    I've found them in my shirt when I've fired at

 2          the firing range.  When we test-fire, they pop

 3          everywhere.  They go anywhere.

 4    Q.    I understand that.  But, I mean, they're not

 5          going to go --

 6    A.    There's not a random pattern when they are

 7          ejected from a firearm.

 8    Q.    There's not?

 9    A.    No.

10    Q.    So one can go ten paces one way and thirty paces

11          the other way?

12    A.    Well, you know, I'm not going to say that a shell

13          casing can pop thirty feet away, but it can be

14          kicked away from a scene.  A vehicle can come.

15          It can be caught up on somebody's shoe.  It could

16          be easily moved.

17    Q.    So the scene can be changed?

18    A.    Yes, it can be.

19    Q.    Okay.  I'm going to look at the -- which one did

20          you mark as the live round?

21    A.    J-2, I believe.  Yes, J-2 is the live round.

22    Q.    And, again, like you said, a live round is one

23          that's not been fired; is that correct?

24    A.    That's correct.

25    Q.    Sergeant Davis, when you were on the scene, did
```

137

```
 1            you -- did you -- you found the live round.  You

 2            found the spent casings.  Did you canvas a big

 3            area looking for more?

 4    A.      As best as I could, yes.

 5    Q.      As best as you could.  Was it -- how well was it

 6            lit out there?

 7    A.      I recall using my flashlight to conduct the

 8            search, which is a very bright light.

 9    Q.      So it's powerful -- it's more powerful than what

10            you just buy?

11    A.      Yeah.  It's a rechargeable Mag light with a --

12            it's not a standard Mag light that you can get

13            like in Wal-Mart.  It's something we buy at a

14            police equipment store.

15    Q.      Okay.  So you feel like that you were able to

16            search the area pretty thoroughly?

17    A.      No.  I searched it as thoroughly as I can with

18            what I had.

19    Q.      Okay.  So then the next day, naturally, you went

20            back out there and looked for more evidence;

21            correct?

22    A.      During the day, no, I didn't.  I didn't return to

23            the scene.

24    Q.      Okay.  So as far as you know, that's all -- all

25            the evidence that was out there is what you found
```

138

| 1 | | that night? |
|---|---|---|
| 2 | A. | Yes. |
| 3 | Q. | I just have a couple of more questions. |
| 4 | A. | Yes. |
| 5 | Q. | During the time you were there at the scene, did |
| 6 | | anyone from Steris or the company come down and |
| 7 | | talk to you? |
| 8 | A. | No, I don't -- no. |
| 9 | Q. | Did anyone show up at the scene from Steris? |
| 10 | A. | I don't ever recall -- I never spoke to any |
| 11 | | employees from Steris other than the security |
| 12 | | guard. |
| 13 | Q. | Did anybody from the security company come out |
| 14 | | there? |
| 15 | A. | I don't recall -- I don't -- I don't recall. |
| 16 | Q. | Okay.  You also stated that you had two officers |
| 17 | | on the scene? |
| 18 | A. | Yes. |
| 19 | Q. | You stated when you got there, the victim was |
| 20 | | already gone to the hospital? |
| 21 | A. | That's correct. |
| 22 | Q. | Where was the witness? |
| 23 | A. | She was in the back of a patrol car. |
| 24 | Q. | She was in the back of a patrol car? |
| 25 | A. | Yes. |

139

| | | |
|---|---|---|
| 1 | Q. | The victim was gone.  Who else was on the scene? |
| 2 | A. | I think her son was there.  And I think -- |
| 3 | Q. | Did you see him? |
| 4 | A. | No, I didn't see him until police headquarters. |
| 5 | | I don't recall where he was, though, but I know |
| 6 | | he was -- that the officers had told me he was |
| 7 | | there. |
| 8 | Q. | The officers told you? |
| 9 | A. | Yes. |
| 10 | Q. | But you didn't see him? |
| 11 | A. | Not on the scene, no. |
| 12 | Q. | So all you observed then was the witness in |
| 13 | | the back seat, your officers, and nobody else |
| 14 | | from Steris came down or you haven't had any |
| 15 | | contact -- |
| 16 | A. | I can't testify that anybody from Steris came |
| 17 | | down.  My primary focus was the crime scene, not |
| 18 | | the employees at Steris. |
| 19 | Q. | So you wouldn't have taken statements from -- |
| 20 | A. | If there was witnesses, yes, I would have taken a |
| 21 | | statement. |
| 22 | Q. | Okay. |
| 23 | A. | I ascertained if there were any other witnesses, |
| 24 | | and the officers advised that the only witness |
| 25 | | was Ms. Parker.  And she was in the vehicle. |

1    Q.    But there wasn't any other witnesses?

2    A.    As far as I know, no.

3    Q.    And I have one more question.

4    A.    Yes.

5    Q.    Did you find a gun at the scene?

6    A.    No.

7    Q.    Nowhere?

8    A.    No.

9         MR. McCLELLAND:  Okay.  Thank you.

10        THE COURT:  Any more questions, Mr. Green?

11        MR. GREEN:  Just a couple, Judge.

12        THE COURT:  Okay.

13                    **REDIRECT EXAMINATION**

14    **BY MR. GREEN:**

15   Q.    Sergeant Davis, how does a -- how would you get a

16         live round out of a handgun?

17   A.    Eject it with the ejector -- the ejector on a

18         semi-automatic would be one way.

19   Q.    Would that be done manually by hand?

20   A.    Yes.

21   Q.    Okay.  And, Detective, you recovered two shell

22         casings as well as one live round; is that

23         correct?

24   A.    That's correct.

25   Q.    Were they all three of the same caliber?

1   A.    Yes.

2         MR. GREEN:  That's all the questions I have.

3         THE COURT:  Anything further,

4   Mr. McClelland?

5         MR. McCLELLAND:  No, ma'am.

6         THE COURT:  Okay.  May Sergeant Davis be

7   excused?

8         MR. GREEN:  Yes.

9         THE COURT:  Does anyone need to recall

10  Sergeant Davis?

11        MS. TOLES:  He may be excused, Your Honor.

12        THE COURT:  All right.  Thank you, Sergeant

13  Davis.

14        THE WITNESS:  Thank you.

15        THE COURT:  Have a nice day.

16        Okay.  Ladies and gentlemen, what we're

17  going to do is we are going to take a five-minute

18  break.  I've just got a few hearings I've got to

19  do real quick with some other lawyers.

20        Remember, when you're on break, please,

21  don't discuss the case with each other or with

22  anyone else.  And I'll see everyone back in five

23  minutes.  Thank you.

24        (Brief recess was held.)

25        (The following proceedings were held

Vicki H. Clark
Official Court Reporter
(334) 832-1365

```
 1                    in the presence and hearing of the
 2                    jury:)
 3          THE COURT:  Thank you.  Y'all can have a
 4    seat.  All right.  We are ready to get started.
 5    Mr. Bailey, y'all's next witness.
 6          MR. BAILEY:  Yes, Your Honor.  It will be
 7    D. J. Belcher from the Montgomery Police
 8    Department.
 9          MS. WILLIAMS:  May we have a side bar before
10    he calls Mr. Belcher?
11          THE COURT:  Sure.
12                  (An off-the-Record discussion was
13                   held at the bench outside the hearing
14                   of the court reporter and jury.)
15          THE COURT:  All right.  Is this Detective
16    Belcher?
17          MR. BAILEY:  It's Officer Belcher.
18          THE COURT:  Officer.  Okay.
19               OFFICER D. J. BELCHER,
20    a witness, after having first been duly sworn to
21    speak the truth, the whole truth, and nothing but
22    the truth, took the stand and testified as
23    follows:
24               DIRECT EXAMINATION
25    BY MR. BAILEY:
```

Vicki H. Clark
Official Court Reporter
(334) 832-1365

1    Q.    Can you please introduce yourself to the ladies

2          and gentlemen of the jury?

3    A.    I'm Officer Belcher with the Montgomery Police

4          Department.

5    Q.    And you're employed with the Montgomery Police

6          Department.  What are your duties?

7    A.    I'm -- right now, I'm a patrol officer.

8    Q.    I just want to direct your attention back to the

9          11th day of April of last year.  Did you have an

10         opportunity to investigate a case involving a

11         suspect by the name of Albert Lockwood?

12   A.    That's correct.  I did.

13   Q.    Were you assigned some duties in that particular

14         case?

15   A.    Yes, sir.  I was assigned to investigate a case

16         that was ongoing.  I also had to go pick him up

17         from Union Springs that day.

18   Q.    And did you -- at some point in time did you come

19         into contact with Albert Lockwood?

20   A.    I did.

21   Q.    And did you have an opportunity to have a

22         conversation with Mr. Lockwood?

23   A.    That's correct.  I did.

24   Q.    Prior to having a conversation -- and, first of

25         all, where was that at?

144

| | | |
|---|---|---|
| 1 | A. | That was going to be at the Montgomery Police |
| 2 | | Department in the detective division upstairs. |
| 3 | Q. | Prior to having a conversation with Mr. Lockwood |
| 4 | | -- and let me back up one more second and ask you |
| 5 | | is that person in the courtroom today? |
| 6 | A. | He is. |
| 7 | Q. | Can you please point him out for the jury? |
| 8 | A. | It's the guy right there in the blue, all blue. |
| 9 | | MR. BAILEY:  Let the Record reflect that he |
| 10 | | has pointed to the defendant in this case, Albert |
| 11 | | Lockwood. |
| 12 | Q. | Prior to having that conversation with the |
| 13 | | defendant, did you advise him of his |
| 14 | | constitutional rights? |
| 15 | A. | I did, sir. |
| 16 | Q. | I want to show you what I have previously marked |
| 17 | | as State's Exhibit Number 13 and ask you if you |
| 18 | | can identify this particular document? |
| 19 | A. | I can. |
| 20 | Q. | And what is that document, please, sir? |
| 21 | A. | This is a rights form. |
| 22 | Q. | And, if you would, I'd like to go over this form. |
| 23 | | If you could tell us -- starting from the top, |
| 24 | | there appears to be some blanks here.  Can you |
| 25 | | tell us what this information is? |

145

```
 1    A.    Yes.  The blanks is going to be -- the first one

 2          is going to be his name, Mr. Albert Lockwood's

 3          name.  The second one is education, twelfth

 4          grade.  The place is robbery/homicide division.

 5          That's where it took place at, the investigation.

 6          The date and the time was 5/27/03.  And, also, it

 7          has the time beside it when my taped confession

 8          started, which is 1234 hours.  The charge is also

 9          on here, which is attempted murder.

10    Q.    And let me ask you about the blanks that you have

11          just gone over.  The first few blanks, the name,

12          education, place -- well, as far as the name and

13          education, where did you get that information

14          from?

15    A.    I got that from Mr. Albert Lockwood.

16    Q.    And the rest of the information, you supplied?

17    A.    That's correct, sir.

18    Q.    There appears to be underneath that information

19          that you just went over a paragraph containing

20          some language.  Do you know what that is?

21    A.    Yes, sir.

22    Q.    What is that?

23    A.    This is the rights form explaining what this

24          paper is all about, about the rights that the

25          victim has or the person has that will be signing
```

146

```
 1              the paper.

 2     Q.       And did you read those particular rights to this

 3              defendant?

 4     A.       I did, sir.

 5     Q.       And can you tell us what they say?

 6     A.       It says, before asking you any questions, I must

 7              explain that you can remain silent.  Anything you

 8              say can be used against you in court.  You may

 9              talk to a lawyer first, and you have the right to

10              the advice and presence of having a lawyer even

11              though you can't afford to hire one.  If you

12              can't afford to hire a lawyer and want to have

13              one present during interrogation, the Court will

14              appoint one for you before we question you.  If

15              you want to answer questions now, you can do so,

16              but you can stop at any time.

17     Q.       And there appears underneath that paragraph to be

18              a signature.  Can you tell us who's that?

19     A.       That signature is my signature.

20     Q.       And what does that signature indicate?

21     A.       Detective D. J. Belcher and my ID number.

22     Q.       And by you signing on that particular line, what

23              does that indicate?

24     A.       That indicates that I have read the statement in

25              front of him and that I have also notarized this
```

```
 1              form.

 2      Q.      Okay.  And it appears -- underneath the signature

 3              which you have identified as yours, there appears

 4              to be another paragraph.  Do you know what that

 5              is?

 6      A.      Yes.  This is a paragraph simply stating that

 7              whomever signs -- whomever I'm reading the paper

 8              to, if they sign it, they agree to the terms or

 9              that they will -- yeah, agree to the terms, to

10              what the paper is saying, to the ongoing

11              statement I have just read.

12      Q.      Okay.  Is that often called a waiver portion?

13      A.      That's correct.

14      Q.      Okay.  And can you read that for the ladies and

15              gentlemen?

16      A.      It says, I fully understand the foregoing

17              statement and do willingly agree to answer

18              questions.  I understand and know what I am

19              doing.  No promise or threats have been made to

20              me by anyone, and no pressure of any kind has

21              been made against me by anyone.

22      Q.      And there appears underneath that paragraph to be

23              a signature; is that correct?

24      A.      That's correct.

25      Q.      And whose signature is that?
```

148

| | | |
|---|---|---|
| 1 | A. | Mr. Albert Lockwood. |
| 2 | Q. | And did he sign that in your presence? |
| 3 | A. | Yes, sir. |
| 4 | Q. | And did you give him the opportunity to read that |
| 5 | | particular document or did you read it to him? |
| 6 | A. | I read it to him, and he had an opportunity to |
| 7 | | read it hisself to make sure that he understands. |
| 8 | Q. | And his signature there indicates what? |
| 9 | A. | That he understands. |
| 10 | Q. | Okay. |
| 11 | A. | That he understands and he will answer questions. |
| 12 | | MR. BAILEY: Your Honor, at this time we |
| 13 | | would move to admit State's Exhibit Number 13. |
| 14 | | THE COURT: Any objection? |
| 15 | | MS. WILLIAMS: No objection. |
| 16 | | THE COURT: It's admitted. |
| 17 | | (At which time State's Exhibit |
| 18 | | Number 13 was admitted into |
| 19 | | evidence.) |
| 20 | | (BY MR. BAILEY:) |
| 21 | Q. | At that particular time after advising him of |
| 22 | | those rights and him signing that particular |
| 23 | | document and you signing that document as well, |
| 24 | | did you have a conversation with Mr. Lockwood? |
| 25 | A. | Yes, sir. |

```
 1   Q.    Okay.  Was that conversation recorded in any
 2         fashion?
 3   A.    Yes, sir.
 4   Q.    And how was it recorded?
 5   A.    By tape recorder, sir.
 6   Q.    At the completion of the recording of his
 7         statement that he gave to you, what did you do
 8         with the audio cassette?
 9   A.    The audio cassette is then -- when we get through
10         doing a taped statement, it is put in an envelope
11         and sent down to word processing or data
12         processing where we have people that are down
13         there that's trained to transcribe.  They listen
14         to the tape and they type everything out.
15   Q.    Do you receive a copy of that transcription?
16   A.    Yes, sir.
17   Q.    And did you also receive -- or do you also
18         receive the audiotape back?
19   A.    That's correct.
20   Q.    And what do you do at that point once you receive
21         the transcription and the audiotape?
22   A.    When you receive the transcription, you have
23         to go over it and see if there's any mistakes, if
24         the transcription made any mistakes.  So what you
25         do, you listen to the tape and read along with
```

150

```
 1              it, read along with the paragraph or the

 2              statement that you got back, and you look for

 3              mistakes and correct them.

 4       Q.     Did you do that in this particular case?

 5       A.     That's correct.

 6       Q.     So you reviewed the audiotape and compared it

 7              with the transcription to determine if there were

 8              any errors; is that correct?

 9       A.     That's correct.

10       Q.     After that review, after you reviewed the

11              transcript and the audiotape, what did you do

12              with those items?

13       A.     After I -- I put them in a box, and we put them

14              -- the tape and the transcript was placed in a

15              box.

16       Q.     Okay.  And I assume that you were -- well, what

17              was your intent?  Who were you trying to turn

18              that item over to?

19       A.     I was trying to turn it over to which is now

20              Sergeant Jeff Davis.

21       Q.     Do you know if he ever received that audiotape?

22       A.     My understanding, Mr. Jeff Davis received the --

23              what I have here in front of me, the transcribed,

24              but not the audiotape.

25       Q.     Have you been able to locate that audiotape?
```

151

```
 1   A.   No, sir.  We've looked very diligently.  I've
 2        looked everywhere basically and just haven't been
 3        able to find the tape.
 4   Q.   Is it lost at this point?
 5   A.   At this point, it is.
 6   Q.   But you do have the transcription?
 7   A.   Yes, sir.
 8   Q.   And I want to show you what has been marked as
 9        State's Exhibit Number 14, and I'm going to ask
10        you if you can identify this particular document.
11   A.   (Witness reviews document.)
12   Q.   I'm going to show you what's been marked as
13        State's Exhibit Number 14 and ask you if you can
14        identify this particular document.
15   A.   Yes, sir.  This is a transcription from the
16        audiotape.
17   Q.   And if I could approach one more time, it appears
18        at the left -- the bottom left corner, there
19        appears to be a signature on that.  Can you tell
20        me what that is?
21   A.   Yes.  This is a space down here below saying that
22        when you sign down here, it means that you have
23        read and you have looked over the whole thing and
24        you're saying that you agree to -- agree that the
25        audio and that the statement coincide with each
```

152

```
 1              other.

 2     Q.     And did you sign every page of that document?

 3     A.     Yes, sir, I did.

 4     Q.     Are any of these other blanks that I see, are

 5            they used by you guys?

 6     A.     No, sir.

 7     Q.     Okay.  And is that an accurate transcription of

 8            the conversation that you had with Mr. Lockwood

 9            on that day?

10     A.     That's correct, sir.

11     Q.     I want to ask you just a few brief questions

12            about that.  And I'm going to be referring -- to

13            make it easier on you, because I know there are

14            several numbers on that particular document, I'm

15            going to be referring to the actual page numbers

16            of your transcription that you have documented

17            instead of the other one.

18                   On Page 2 of that document, looking at

19            the bottom, did you ask Mr. Lockwood about the

20            facts of the offense as you knew them to be of

21            this particular case?

22     A.     Yes, sir.

23     Q.     And can you read to the ladies and gentlemen of

24            the jury the question that you asked Mr.

25            Lockwood?  And I'm specifically referring to the
```

153

1          last question on that Page 2.

2    A.    Okay.  It says -- the question was that I asked,

3          okay, all right, before we start, could you --

4          and then I want to take you back to the date of

5          4/11/03 at the time of 11:00 -- at the time of

6          11:00, 11:10.  It's going to be on the address of

7          499 County Road 42, Union Springs, Alabama --

8          correction.  It's going to take place on 2720

9          East Gunter Park Drive.  And it's got, all right,

10         do you know what I'm talking about?  Then the

11         answer has down here from the tape, it was

12         inaudible, so I put down inaudible.  It says --

13   Q.    And did you follow up with another question?

14   A.    Yes, sir.

15   Q.    And what was that question?

16   A.    The question was, you -- you don't know what I'm

17         talking about?  And then his answer was, what I'm

18         saying, what's supposed to been took place.

19   Q.    Did you ask another question in response to that?

20   A.    That's correct.

21   Q.    Okay.

22   A.    The question that I asked was that's -- that's

23         what I want to talk -- that's what I want you to

24         tell me about.  I want -- I want you to tell me

25         about the time you went over there on Northern

154

1    Boulevard.  And the answer that he gave was

2    Northern Boulevard.  The question goes again from

3    me, yes, yes, yes, sir.  And then, once again,

4    his answer was inaudible from the tape, so I put

5    down inaudible.

6              The question after that that I asked was

7    to Northern Boulevard at Gunter Park to talk to

8    Ms. Carla Parker.  Do you know her?  And then his

9    answer was, yes, I do.  The question that I then

10   asked was, okay, I want to tell -- I want you to

11   tell me about the time, what happened when you

12   went.  And then the answer from him was, I wasn't

13   there.

14   Q.   And did you ask him again another question?

15   A.   Yes, sir.  The question that I asked was, you

16        weren't -- you wasn't there?  The answer was, no,

17        sir.

18   Q.   Okay.  I want to now direct you, if you could, to

19        Page 11 of that particular document that you

20        have.

21   A.   From the top, it says --

22   Q.   Now, I'm going to ask you about the very last

23        question on that particular document.  Did you

24        ask him about the plant on Gunter Park Drive?

25   A.   That's correct.

155

```
 1    Q.    Can you please read to us your question to the --

 2    A.    The question, it says, okay, so, now, you was

 3          never at the plant?  You was never at the plant

 4          or on Gunter Park East Drive?  The answer that he

 5          responded with was when.

 6    Q.    And your next question?

 7    A.    The question that I asked, on the date of 4 --

 8          it's going to be on a Friday.  It took place

 9          Friday, 4/11/03.  The answer:  On Friday.  The

10          question again that I asked was, on a Friday,

11          and, yes, sir, yes, sir.  And then the answer

12          that he responded with, uh-huh.  The question

13          again was -- that I asked was Friday.  The

14          answer, no.  The question that I asked again,

15          4/11/03.  Answer:  Uh-huh.  The question again

16          that I asked was at 23 -- you never was, and then

17          the answer that he gave was, huh-uh, it wasn't

18          me.  Question:  Okay.  So it wasn't you?  Answer:

19          It wasn't me.  The question that I asked:  So it

20          was somebody that looked like you?  Answer:  I

21          don't know how you can put that any -- I don't

22          know how.  You can put that any way you want to,

23          Detective.  It wasn't me.  It wasn't me.  The

24          question that I asked was, it wasn't you?  The

25          answer that he gave, it wasn't.  You can pick --
```

Vicki H. Clark
Official Court Reporter
(334) 832-1365

156

```
 1            you can put it on somebody that looked like me

 2            for this and that, but it wasn't me.

 3     Q.     Okay.  I want to now direct your attention

 4            further on into the document.  If you'll look at

 5            Page 24 of the document.

 6     A.     Okay.

 7     Q.     And the second question you asked him, did you

 8            ask him again if he was present at that Gunter

 9            Park Drive address on that day?

10     A.     That's correct.

11     Q.     What was your question?

12     A.     My question was, he wasn't there?  The answer:  I

13            wasn't there.  The question that I asked:  Where

14            were you at?  Answer:  I wasn't there.  Question:

15            Where were you at?  Answer:  I wasn't there.

16            Question:  Oh, see how you can -- correction, see

17            how you can -- that's -- and then, again, it's a

18            blank line because it's an inaudible from the

19            cassette.  I can't tell you.  Answer:  I wasn't

20            there.  Question:  Where were you at?  Answer:

21            Man, I was working, man.  The question from me:

22            Working there?  Answer:  Out of town.  Question:

23            You was working out of town?  Answer:  I was

24            working out of town.

25     Q.     Okay.  Detective, I'm going to ask you about
```

157

1        another particular point in this document.  And

2        let me just review with you the first pages that

3        we have gone over.  And you're on Page 27 at this

4        point -- or I've gone through Page 27.

5              Has he denied being present at the

6        events that you've questioned him about?

7    A.   That's correct.

8    Q.   At some point in time did he change his story and

9        admit to being present at this incident?

10   A.   That's correct, he did.

11   Q.   I want to direct your attention to Page 28 of

12       that document, if we could.

13   A.   Page 28?

14   Q.   Yes, sir, Page 28.  And I'm going to ask you

15       about the second question right after the big

16       paragraph there.

17   A.   The question that I asked:  Tell me about what --

18       that incident.  Answer:  Well, I was going to

19       talk to Mrs. Parker.  Question:  Uh-huh.  Answer:

20       Okay.  That was there, and we got -- we got into

21       a confrontation, and we started -- and we started

22       -- we started fighting.  The question that I

23       asked:  Started fighting?  Answer:  Yes.  Me and

24       -- me and him started fighting.  Question:  Okay.

25       And who is he?  A:  Chris McKinnes.

158

| | | |
|---|---|---|
| 1 | Q. | Okay.  And I want you to go to the next page |
| 2 | | which will be Page 29, and if you'll look at the |
| 3 | | fifth question on that page.  Just to point you |
| 4 | | in the right direction, I believe you asked the |
| 5 | | question, what was the reason, is how it starts. |
| 6 | | If you could read that question and continue. |
| 7 | A. | Okay.  The question I asked:  What was the reason |
| 8 | | that you came -- that you came?  Answer:  To get |
| 9 | | my clothes because I was fixing to get ready to |
| 10 | | go back out of town.  She had my clothes in her |
| 11 | | car.  Question:  I then asked, okay, who brung |
| 12 | | them to you?  Answer:  A friend.  He lives in |
| 13 | | Riverside.  Question:  And you don't know his |
| 14 | | name?  Answer:  No. |
| 15 | Q. | Let me ask you this.  This person that you're |
| 16 | | asking him about that brought him over there, did |
| 17 | | you also ask him if he knew the address of that |
| 18 | | person? |
| 19 | A. | That's correct. |
| 20 | Q. | And I believe that you asked that question at the |
| 21 | | bottom of that page, and what was your question? |
| 22 | A. | The question was no.  No address was the answer |
| 23 | | that he gave me, and I asked him did he know any |
| 24 | | address. |
| 25 | Q. | He said no address? |

159

1    A.    Uh-huh.

2    Q.    Now I want to direct you to Page 31 of that

3          statement.  If you'll go to the fourth question,

4          it starts off with did you hit him in the head.

5    A.    Okay.  The question that I asked:  Did you hit

6          him in the head a couple of times?  Answer:  Yes,

7          I hit him.  I hit him.

8    Q.    Did you also ask him if there were any weapons

9          involved in this?

10   A.    That's correct.

11   Q.    And I believe a couple of questions down, you

12         asked him that question.  If you could read that

13         and the answer.

14   A.    Okay.  The question:  Do you know weapons were

15         used?  Answer:  No weapons was used at all.

16         Question:  And did you see his little son there

17         -- was there?  No, sir, I didn't see his son.

18   Q.    Okay.  I want to now direct you to Page 38 of the

19         statement.  Excuse me, Officer.  I think I meant

20         to say 37, Page 37.  I'm going to ask you about

21         the very last question, and then if you could

22         continue from there on that page, it starts out

23         why did your friend.

24   A.    The question:  Why did your friend leave you?

25         Answer:  Who?  Question:  The one that brought

160

1        you over there.  Answer:  Like I said, he didn't

2        know what I was -- he did not know what I -- what

3        I was going to do.

4  Q.   Okay.  And, again, Officer, this statement that

5        you have taken from the defendant, which the jury

6        will have an opportunity to read in its entirety

7        later, coincided with the audio statement?

8  A.   That's correct.

9           MR. BAILEY:  Judge, that's all the questions

10       I have.  If I haven't already done it, I would

11       move to admit that particular statement.

12          THE COURT:  And is there any objection to

13       admitting State's Exhibit 14?

14          MS. WILLIAMS:  No, Your Honor.

15          THE COURT:  All right.  It's admitted.

16             (At which time State's Exhibit

17             Number 14 was admitted into

18             evidence.)

19          THE COURT:  All right.  Ms. Williams, any

20       questions you have for Officer Belcher?

21          MS. WILLIAMS:  Yes, Your Honor.

22          THE COURT:  Okay.

23                 **CROSS EXAMINATION**

24  **BY MS. WILLIAMS:**

25  Q.   Officer Belcher, you have in front of you State's

161

```
 1              Exhibit Number 13; is that correct?

 2    A.        14.  Exhibit 14, the one I just got through

 3              reading?

 4    Q.        Okay.  Can you please identify that to the jury

 5              again, please?

 6    A.        It's going to be the rights form.

 7    Q.        Okay.  And did you read the entire form to

 8              Mr. Lockwood?

 9    A.        Yes, ma'am.

10    Q.        Okay.  And I think you've testified earlier that

11              you signed the form and Mr. Lockwood signed the

12              form?

13    A.        That's correct.

14    Q.        Okay.  At the top of the page, you testified

15              earlier that there's a name, education, place,

16              and date and time stamp --

17    A.        That's correct.

18    Q.        -- as well as a charge?

19    A.        That's correct.

20    Q.        Okay.  Everything up there appears to be

21              typewritten; is that correct?

22    A.        That's correct.

23    Q.        Okay.  Is there anything that's not typewritten

24              at the top part of this?

25    A.        The time that the tape started.
```

162

```
 1   Q.   Okay.  And can you tell us who wrote that in?

 2   A.   I did.

 3   Q.   You did?

 4   A.   Officer Belcher.

 5   Q.   Okay.  Now, you read the entire form to

 6        Mr. Lockwood; is that correct?

 7   A.   That's correct.

 8   Q.   You read it out loud?

 9   A.   Yes, ma'am.

10   Q.   And then you signed and Mr. Lockwood, in turn,

11        signed after you; is that correct?

12   A.   After he got through explaining to me that he

13        understood everything and read it hisself, he

14        did.

15   Q.   Okay.  So what time did the statement begin?

16   A.   12:34.  12:34.

17   Q.   Okay.  And is that the time you started the tape?

18   A.   Yes, ma'am.

19   Q.   Okay.  Now, you testified earlier that before

20        beginning to ask Mr. Lockwood any questions, you

21        told him he had a right to an attorney?

22   A.   That's correct.

23   Q.   Okay.  Did you tell him that on two separate

24        occasions?  Did you tell him that when you read

25        this document to him and did you also tell him
```

163

```
 1              that when you began the statement?

 2    A.        Re -- could you ask the question again, please?

 3    Q.        You testified that you read this document to

 4              Mr. Lockwood?

 5    A.        That's correct.

 6    Q.        Is that correct?  And on this document I believe

 7              you testified earlier that he had a right to an

 8              attorney?

 9    A.        That's correct.

10    Q.        And he could stop at any time; is that correct?

11    A.        That's correct.

12    Q.        And once you began the statement, did you advise

13              him of those rights again?

14    A.        I didn't have to, ma'am.  This is like the first

15              -- the first thing we do before we ask any

16              questions.

17    Q.        Okay.  So this was done once the tape started?

18    A.        This was done before the tape.

19    Q.        Okay.  Well, let me direct your attention to the

20              statement that you took from Mr. Lockwood; okay?

21              And let me direct your attention to Page 2 of the

22              statement.

23    A.        All right.

24    Q.        Question Number 2, can you read that to us as

25              well as the answer?
```

164

1    A.    On Page 2, Question Number 2?

2    Q.    Yes, sir.

3    A.    Okay.  Question:  You may talk to a lawyer first,

4          and you have the right to the advice and presence

5          of a lawyer even though you cannot -- you can't

6          afford to hire one.  Answer:  Understood.  Okay.

7          If you can't afford -- if you can't afford one,

8          if you can't afford to hire a lawyer and want to

9          have one present during the interrogation, the

10         Court will appoint one before we question you.

11         And it says do you understand, and the answer is

12         I understand.  Further?

13   Q.    Can you read the next question for us, please?

14   A.    Okay.  Question:  Okay.  If you want to answer

15         the questions now, you can do so, but you can

16         stop at any time.  Do you understand?  And the

17         answer is, I understand.  Okay.

18   Q.    Okay.  That's enough.  Now, Detective -- Officer

19         Belcher, how long have you been with the police

20         department?

21   A.    Seven years, ma'am.

22   Q.    Seven years?

23   A.    Yes, ma'am.

24   Q.    So whenever you're questioning anyone, they can

25         stop at any time to say that they want an

1   attorney?

2 A. Yes, ma'am.

3 Q. Is that correct?  And at that point can you

4   continue to ask them questions?

5 A. When they say that they want an attorney, then

6   that's it.

7 Q. Let me direct your attention to Page 18 of the

8   statement that you took from Mr. Lockwood and if

9   you could start reading from the third question.

10 A. The third question?

11 Q. Yes, sir.

12 A. Okay.  Page 18, the third question, it starts

13   with me.  How do you know him?  Answer:  This is

14   the part when -- question:  How do you know him?

15   Answer:  When you read me that, you said I can --

16   question:  How do you know him?  Answer:  Stop

17   answering -- stop answering questions anytime.

18   Question:  Then I said, how do you know him?

19   Answer:  Right.  Right was the answer that he

20   gave me.  Question:  How do you know him?

21   Answer:   Right.

22 Q. Okay.  You can stop right there for me.  Now, I

23   think you testified earlier when Mr. Bailey was

24   asking you some questions that Mr. Lockwood was

25   not very cooperative with you in the beginning,

166

```
1              was he?

2      A.      That's correct.

3      Q.      Okay.  Is that a sign of refusal to answer

4              questions if someone is not cooperative?

5      A.      That's one of the signs.

6      Q.      That's one of the signs?

7      A.      Uh-huh.

8      Q.      And you've just read to us -- was Mr. Lockwood

9              telling you that he wanted to stop at this

10             particular point?

11     A.      When he's saying that he's wanting to stop, you

12             can keep asking questions.  When he asks for a

13             lawyer, that's when you have to shut everything

14             down.  You can't ask any questions or do anything

15             else but get his lawyer.

16     Q.      Okay.  So what you're telling us today is that

17             there are magic words that he has to use to stop

18             questioning?  Stop does not mean stop?

19     A.      It says right here in the statement, before

20             asking you any questions, I must explain to you

21             you can remain silent.  Anything you say can be

22             used against you in court.  You may talk to a

23             lawyer first and have the right to the advice and

24             presence of a lawyer.  Even though you can't

25             afford one, the Court will hire one.
```

167

```
 1              What is that saying is that when you say
 2         that you want a lawyer, that's saying for you to
 3         stop questioning.
 4    Q.   Okay.  And I think you just read to us a second
 5         ago -- let me direct your attention back to Page
 6         2 of the statement.
 7    A.   Yes, ma'am.
 8    Q.   Question Number 4 on Page 2, can you read that to
 9         us once again, please?
10    A.   Okay.  If you want to answer questions now, you
11         can do so.  You can stop at any time.  Do you
12         understand?  I understand.
13    Q.   Okay.  So you've advised Mr. Lockwood at this
14         point that he can stop answering questions at any
15         time; is that correct?
16    A.   Yes, ma'am.  By reading the rest of the
17         questions, it's also -- the statement is the same
18         thing this is saying.  I mean, putting it
19         together, if he asks for a lawyer, then you stop.
20    Q.   So you -- can you or can you not stop at any
21         time?
22    A.   You can stop at any time when you ask for a
23         lawyer.  That's a stop.  That's a stop.
24    Q.   Okay.  Let me direct your attention over to Page
25         27 of the statement.  And can you please --
```

168

```
 1            there's a break in the page.  Tell us what

 2            happens here, please.

 3    A.      Okay.  When the tape was continued at that point

 4            in time during the investigation, he didn't want

 5            to say anything, refused to answer any more

 6            questions.  So at that time it was just dead

 7            silence.  So then, again, at one point he said,

 8            again, when the tape started back up -- at 1455

 9            hours on that same day is when he wouldn't

10            cooperate --

11    Q.      Let me stop you there for a second.  What

12            happened in between the time from 1259 to 1455

13            which would change his mind to start answering

14            questions again?

15    A.      Usually, one of our tactics that we do is we just

16            let the person sit in there and think about what

17            they've got to go through and what's going on.

18            And that usually starts having an effect on them

19            when they can sit there and judge and see what's

20            going on through their minds and what's going to

21            happen to them.

22    Q.      Okay.

23    A.      And so that time -- during that time frame --

24            and, also, another detective by the name which is

25            mentioned in the statement, Detective Crisler,
```

169

```
 1              was in there, and we also found out other

 2              information.

 3    Q.        Okay.  Let me stop you right there for a second.

 4              Now, after someone has told you that they do not

 5              longer wish to continue with the questioning, you

 6              let them -- let it sit in and soak in for a

 7              while, and then you come back and ask more

 8              questions after their rights have been revoked --

 9              has been invoked?

10    A.        That is correct.  That's correct on that to the

11              extent of when you ask for a lawyer, then you

12              can't say anything else to them.

13    Q.        Let me ask you, Officer Belcher, isn't that in

14              direct contradiction to what you've actually told

15              Mr. Lockwood and what you read to him on the

16              rights form as well as what you told him before

17              you began to read the statement?

18    A.        It says right here, if you can't afford to hire a

19              lawyer and want to have one present during

20              interrogation, the Court will appoint one for

21              you.  This whole paper is geared -- this whole

22              paper is geared to asking you or telling you that

23              if you want a lawyer, you could get a lawyer.  As

24              soon as he said lawyer, that would cut

25              everything.
```

170

| | | |
|---|---|---|
| 1 | Q. | So stop doesn't necessarily mean stop; is that |
| 2 | | what you -- is that your testimony today? |
| 3 | A. | Yes, ma'am. |
| 4 | Q. | You testified a second ago that once you began |
| 5 | | questioning Mr. Lockwood again that it was not |
| 6 | | just you this time, but you had another officer |
| 7 | | with you at this time? |
| 8 | A. | That's correct. |
| 9 | Q. | Okay.  And why did the other officer accompany |
| 10 | | you at this time? |
| 11 | A. | The other officer accompanied me at this time to |
| 12 | | bring -- like two heads are better than one, what |
| 13 | | I might not be seeing that he might be able to |
| 14 | | see. |
| 15 | Q. | So -- |
| 16 | A. | Go ahead. |
| 17 | Q. | That's it?  Okay.  Now, in between this break |
| 18 | | from 1259 to 1455, did you and Officer Crisler |
| 19 | | have any contact with Mr. Lockwood? |
| 20 | A. | Contact as if -- because he was in the office |
| 21 | | with us.  What do you mean by contact?  Explain |
| 22 | | what you mean by contact. |
| 23 | Q. | Are you saying that during the break Mr. Lockwood |
| 24 | | was sitting there in front of you and Officer |
| 25 | | Crisler? |

| | | |
|---|---|---|
| 1 | A. | If this was my desk right here, Mr. Lockwood |
| 2 | | would have been right here and Officer Crisler |
| 3 | | would have been off to the side. |
| 4 | Q. | Okay.  So from 1259 to 1455, you were sitting |
| 5 | | there, Mr. Lockwood was sitting there, and |
| 6 | | Officer Crisler was sitting there until you -- |
| 7 | A. | That's -- that's correct. |
| 8 | Q. | -- until you began to start asking questions? |
| 9 | A. | Until he started wanting to talk again. |
| 10 | Q. | So it's your testimony today that nothing was |
| 11 | | said to coerce Mr. Lockwood to resume questions, |
| 12 | | to answer questions again? |
| 13 | A. | Nothing out of an ordinary question.  That's |
| 14 | | right here on the statement. |
| 15 | Q. | Now, Officer Belcher, let me ask you, did you do |
| 16 | | any investigations on this case at all other than |
| 17 | | take Mr. Lockwood's statement? |
| 18 | A. | No, ma'am, I didn't talk to anyone else. |
| 19 | Q. | You didn't talk to any other witnesses, no |
| 20 | | investigations whatsoever? |
| 21 | A. | No, ma'am. |
| 22 | Q. | Okay.  Mr. Bailey asked you earlier about a |
| 23 | | recording, the tape? |
| 24 | A. | That's correct. |
| 25 | Q. | And I believe you testified that the tape was |

| 1 | | lost; you can't find it? |
|---|---|---|
| 2 | A. | That's correct. |
| 3 | Q. | Okay.  And I believe you also testified that your |
| 4 | | normal evidence procedures would be to impound |
| 5 | | the tape; is that correct? |
| 6 | A. | I did not testify to that, did I? |
| 7 | Q. | Okay.  What are your procedures whenever you have |
| 8 | | a tape? |
| 9 | A. | Whenever you have a tape, when you get through |
| 10 | | correcting or doing things, you do go down there |
| 11 | | and you put it in impound.  And the other |
| 12 | | officers can pick it up.  That's the answer to -- |
| 13 | | to your question. |
| 14 | Q. | Okay.  Is there some type of log that the |
| 15 | | officers would have to sign in order to receive |
| 16 | | the tape? |
| 17 | A. | To get the tape from them? |
| 18 | Q. | From impound, yes. |
| 19 | A. | That's correct.  They would just go down there |
| 20 | | and log the date you go down there and check the |
| 21 | | tape out and sign it out on the log, that's |
| 22 | | correct. |
| 23 | Q. | Do you have a copy of that impound log today? |
| 24 | A. | No, ma'am. |
| 25 | Q. | Have you seen that impound log? |

173

| | | |
|---|---|---|
| 1 | A. | No, ma'am. |
| 2 | Q. | Have you looked for an impound log? |
| 3 | A. | The impound -- it's not even down there in |
| 4 | | impound.  From what I told the lawyers, that it |
| 5 | | was put in a box.  And that's the other thing. |
| 6 | | The only ones that goes up there are detectives. |
| 7 | | It was not impounded. |
| 8 | Q. | Now, Officer Belcher, you testified a second ago |
| 9 | | that you actually went over and picked |
| 10 | | Mr. Lockwood up from Union Springs? |
| 11 | A. | That's correct, me and another detective. |
| 12 | Q. | Who was the detective that was with you? |
| 13 | A. | Naquin, Guy Naquin. |
| 14 | Q. | And how did you receive notice that Mr. Lockwood |
| 15 | | was over in Union Springs? |
| 16 | A. | Union -- I received notice by my sergeant, which |
| 17 | | is Sergeant Morgan. |
| 18 | Q. | Okay.  Do you know -- did Mr. Lockwood turn |
| 19 | | himself in over in Union Springs or did they pick |
| 20 | | him up? |
| 21 | A. | That's what I've heard. |
| 22 | Q. | What did you -- |
| 23 | A. | That's what I -- what you just said. |
| 24 | Q. | He turned himself in? |
| 25 | A. | He turned himself in. |

1        MS. WILLIAMS:  Nothing further.

2        THE COURT:  Any more questions?

3        MR. BAILEY:  Just one more question.

4               **REDIRECT EXAMINATION**

5    **BY MR. BAILEY:**

6    Q.   Do you have the date that he turned himself in?

7       It would have been the same date you took his

8       statement?

9    A.   That's correct.

10   Q.   Which was May 27th?

11   A.   That's correct.

12   Q.   And the crime happened on April the 11th?

13   A.   Yes, sir.

14       THE COURT:  Okay.  Anything further,

15   Ms. Williams?

16       MS. WILLIAMS:  No, ma'am.

17       THE COURT:  Okay.  May Officer Belcher be

18   excused?  Does anyone need to recall him?

19       MR. BAILEY:  No.

20       THE COURT:  Are y'all going to?

21       MS. WILLIAMS:  Judge, no.

22       THE COURT:  Okay.  Thank you, Officer

23   Belcher.  You can be excused.

24       Okay.  Next witness, gentlemen.

25       MR. BAILEY:  Your Honor, at this time the

175

```
 1            State would call Christopher McKinnes.

 2                 THE COURT:  Okay.

 3                      CHRISTOPHER McKINNES,

 4       a witness, after having first been duly sworn to

 5       speak the truth, the whole truth, and nothing but

 6       the truth, took the stand and testified as

 7       follows:

 8                      DIRECT EXAMINATION

 9       BY MR. BAILEY:

10    Q.   Good morning, sir.

11    A.   Good morning.

12    Q.   Can you please introduce yourself to the ladies

13         and gentlemen of the jury?

14    A.   My name is Christopher McKinnes.

15    Q.   And, Mr. McKinnes, let me get right to the point

16         and ask you if you know a couple of people.  Do

17         you know a Carla Parker?

18    A.   Yes, I do.

19    Q.   And how do you know her?

20    A.   She's been my girlfriend for about ten years.

21    Q.   Do you guys have any children together?

22    A.   Yes.  We have a seven-year-old son.

23    Q.   Do you know a person by the name of Albert

24         Lockwood?

25    A.   Yes, I do.
```

176

| | | |
|---|---|---|
| 1 | Q. | How do you know him? |
| 2 | A. | When I was a supervisor at this poultry plant, he |
| 3 | | was a work release inmate, and that's when I |
| 4 | | first came across him. |
| 5 | Q. | Let me ask you this.  I want to direct your |
| 6 | | attention back to April -- April of last year and |
| 7 | | specifically April the 11th of last year.  Did an |
| 8 | | incident happen to you on that particular day? |
| 9 | A. | Yes, it did. |
| 10 | Q. | And where was that at? |
| 11 | A. | Are you talking about the incident at my house or |
| 12 | | the incident at Steris Corporation? |
| 13 | Q. | I'm talking about did you have an occasion to be |
| 14 | | at the workplace of Carla Parker and -- |
| 15 | A. | Yes, sir, I was. |
| 16 | Q. | Okay.  And was that at Steris Corporation, what |
| 17 | | you've already said? |
| 18 | A. | Yes, sir. |
| 19 | Q. | Now I want to back you up just a little bit and |
| 20 | | talk to you about the day before, which would |
| 21 | | have been the 10th of -- I may have had my dates |
| 22 | | confused.  That's my fault.  The day before that |
| 23 | | incident took place.  Did something unusual |
| 24 | | happen to you on that particular day? |
| 25 | A. | Yes, sir, it did. |

177

| | | |
|---|---|---|
| 1 | Q. | Okay.  Can you tell us what happened? |
| 2 | A. | On that day I was off work because my schedule |
| 3 | | kind of rotates around. |
| 4 | Q. | Yes. |
| 5 | A. | And, evidently, that -- on that particular day |
| 6 | | Ms. Parker didn't know that I was off of work |
| 7 | | that day, and I guess her and Mr. Lockwood was |
| 8 | | planning to get together or meet or whatever they |
| 9 | | was going to do.  And she called my grandmother's |
| 10 | | house, which is where my son catched the bus |
| 11 | | every evening, and said -- well, she didn't talk |
| 12 | | to me.  She talked to my grandmother.  She said |
| 13 | | she think me and her don't need to talk anymore. |
| 14 | | But before she left that day about 12:00 -- well, |
| 15 | | I'm going to say one o'clock that afternoon, me |
| 16 | | and her was -- everything was okay between me and |
| 17 | | her as far as I knew. |
| 18 | Q. | Where were you at again that day? |
| 19 | A. | I was at my grandmother's house earlier that day. |
| 20 | | But before then, about 11:00 or say -- I'm going |
| 21 | | to say 12:00, she came -- she usually gets home |
| 22 | | about 12:30, 1 o'clock.  She came to the house. |
| 23 | Q. | When you say the house, are you talking about |
| 24 | | your grandmother's house or are you talking about |
| 25 | | your house? |

178

| | | |
|---|---|---|
| 1 | A. | No.  The house where me and her live together at. |
| 2 | Q. | And where was that at? |
| 3 | A. | 1490 County Road 42 in Union Springs. |
| 4 | Q. | And when she came to the house -- did you say |
| 5 | | around lunchtime? |
| 6 | A. | Yes, sir.  It's usually around about 12:30. |
| 7 | Q. | Was she by herself? |
| 8 | A. | Yes, sir, she was. |
| 9 | Q. | Did you and her have a conversation at that |
| 10 | | particular time? |
| 11 | A. | Yes, sir, we -- yes, sir, we did.  The only thing |
| 12 | | she said she was going to Troy to take back a |
| 13 | | tape that they had said she had late. |
| 14 | Q. | Okay.  And did she leave? |
| 15 | A. | Yes, sir, she did. |
| 16 | Q. | Did you see her again that particular day? |
| 17 | A. | Yes, sir, I did, probably about -- I can't say |
| 18 | | the exact time.  It was later on in the |
| 19 | | afternoon.  It had to be after 4:00. |
| 20 | Q. | Did she come back to the house? |
| 21 | A. | Yes, sir, she did. |
| 22 | Q. | Was she by herself? |
| 23 | A. | No, sir, she wasn't. |
| 24 | Q. | Do you recall who she was with? |
| 25 | A. | At the time she was with her -- she was in the |

|     |     |                                                        |
| --- | --- | ------------------------------------------------------ |
| 1   |     | car riding with her brother and the defendant,         |
| 2   |     | Albert Lockwood.                                       |
| 3   | Q.  | At some point in time did you figure out what was      |
| 4   |     | going on?                                              |
| 5   | A.  | Actually, until later on that day when the             |
| 6   |     | incident happened, I didn't.  I just -- you know,      |
| 7   |     | she just assumed -- she just told me they was         |
| 8   |     | just riding together; he was just riding with          |
| 9   |     | them.  Because I questioned her about it.  She         |
| 10  |     | said he was just riding with them.  But until he       |
| 11  |     | actually came and attacked me, then I kind of          |
| 12  |     | figured out something was going on with them.          |
| 13  | Q.  | And I want to ask you about that.  When did that       |
| 14  |     | take place?                                            |
| 15  | A.  | That was April the 10th.                               |
| 16  | Q.  | Well, I understand, but I'm talking about this         |
| 17  |     | particular day.  Was --                                |
| 18  | A.  | Yes.  That -- that was the afternoon.  It was          |
| 19  |     | sometime after 4:00.                                   |
| 20  | Q.  | Okay.  When she had come back to the house the         |
| 21  |     | second time?                                           |
| 22  | A.  | Yes, sir.  When she -- she came back to the house      |
| 23  |     | because she said that -- she stated yesterday          |
| 24  |     | that I was on -- she had told them that I was          |
| 25  |     | going to take my son and leave, which is -- where      |

| | | |
|---|---|---|
| 1 | | was I going anyway when all of my family lives in |
| 2 | | Union Springs? |
| 3 | Q. | And did -- was there an incident that occurred |
| 4 | | between you and the defendant in this case on |
| 5 | | that particular day? |
| 6 | A. | Yes, sir, it was. |
| 7 | Q. | Can you tell us about that? |
| 8 | A. | On the afternoon me and my son was in the house, |
| 9 | | and him and her and her brother came up, and he |
| 10 | | attempted to just walk in my house and through |
| 11 | | the back door. And I tried to shut the door to |
| 12 | | keep him from coming in because I knew he was |
| 13 | | coming in with some trouble. And at the time I |
| 14 | | was on the phone with my grandmother, and so I |
| 15 | | told my grandma she done brought somebody here to |
| 16 | | jump on me. And so I laid the phone down, and he |
| 17 | | -- some kind of way, he got my son out of the |
| 18 | | house, and my son ran around -- he took my son |
| 19 | | around to the car where she was at. And after |
| 20 | | that, he attacked me, and so I defended myself |
| 21 | | on -- |
| 22 | Q. | When you say he, you're talking about Albert |
| 23 | | Lockwood? |
| 24 | A. | Albert Lockwood, yes, sir. |
| 25 | Q. | Okay. And what happened? How did he attack you? |

```
 1   A.   He just ran and kind of like tackled me, and we

 2        was kind of rolling around in -- it was wet in

 3        the backyard, real wet.  And when -- after all it

 4        was over, my clothes was soaking wet.  You can

 5        talk to Detective Ralph Johnson, Union Springs

 6        Police Department.  He could testify that I was

 7        soaking, muddy wet.

 8   Q.   Let me ask you this.  Prior to him tackling you

 9        as you've testified, did he say anything to you?

10   A.   Yes, he did.  He said, you're going to leave

11        here, motherfucker; this is my house; this is my

12        house now.

13   Q.   And that's when the physical altercation took

14        place?

15   A.   Yes, sir.

16   Q.   Okay.  You stated that he tackled you?

17   A.   Yes, sir.

18   Q.   You were on the ground, and your clothes got wet.

19        What happened next?

20   A.   After he got on the ground, he got -- he went

21        around the house.  He walked around the far side

22        -- the short side of the house right there.  And

23        he walked back to the road because they was --

24        they was parked like in the driveway where a -- a

25        trailer was there, but it was moving.  They was
```

```
 1          parked in the driveway waiting for him to come up

 2          the road.  And he grabbed a brick or a ball -- I

 3          can't be for sure -- and took it and hit my car

 4          with it, because I was coming up the road; I was

 5          going on up the road.  I was going back to town

 6          and go to the police station.  And he was

 7          standing in the middle of the road directly on

 8          the yellow line, and as I came up the road, he

 9          took it and fired whatever he had at my car.

10  Q.      Did you see him do that?

11  A.      Yes, sir, I did.  If I wanted to, I could have

12          hit him, but I didn't.  I didn't try to hit him.

13  Q.      Did it cause -- you're talking about with your

14          car?

15  A.      Yes, sir.

16  Q.      Did that cause damage to your car?

17  A.      Yes, sir, it did.

18  Q.      Later on that particular day, did you do anything

19          about these incidents?

20  A.      Yes, sir, I did.  I went to the police station.

21          As I said, I called my sister that afternoon

22          because I was kind of up -- really upset.  I was

23          kind of nervous, and I didn't want to drive to

24          town.  So I called my sister, and she came and

25          picked me up, and I went to the police station.
```

183

1           But before then, I did go to his wife's house and

2           ask her did she know what was going on between

3           him and Carla.  That was before I called my

4           sister to come and take me to town.

5    Q.   Did you let his wife know what was going on?

6    A.   Yes, sir, I did.  And she said -- this was her

7           statement to me.  I knew he was talking to that

8           bitch because he leave home every night about

9           one o'clock walking up the road.

10   Q.   Now, you stated that you went to the police

11          department; is that correct?

12   A.   Yes, sir, I did.

13   Q.   Did you make a report on these two -- these two

14          incidents?  I'm talking about the tackling of

15          you, the physical altercation --

16   A.   Yes, sir.

17   Q.   -- and your car?

18   A.   Yes, sir.  At the time I don't know -- because it

19          was him and her brother there, and her brother

20          kept -- every time I could get on top of him, her

21          brother would pull me off of him.  And so it kind

22          of was like -- it was kind of like fighting two

23          people.  And so I kind of had like a bruise on my

24          face.  I did have bruised ribs.  I went to the

25          emergency room.

184

| | | |
|---|---|---|
| 1 | Q. | But my question is -- and I understand that you |
| 2 | | received injuries.  My question is, did you make |
| 3 | | a report to the -- |
| 4 | A. | Yes, sir, I did. |
| 5 | Q. | Okay.  And did you actually sign warrants against |
| 6 | | the defendant for that on that particular night? |
| 7 | A. | They wouldn't allow me to sign the warrants that |
| 8 | | day because Union Springs is a small town and the |
| 9 | | courthouse was already closed.  So I signed a |
| 10 | | police report, and they's the ones that told me |
| 11 | | to be there as soon as the courthouse opened the |
| 12 | | next morning to sign the warrant.  But he said |
| 13 | | that was good enough for right then.  And they |
| 14 | | went looking for him, but they couldn't find him. |
| 15 | Q. | Did you go ahead and sign the warrants the next |
| 16 | | morning? |
| 17 | A. | Yes, sir, I did. |
| 18 | Q. | And what warrants did you sign on the defendant? |
| 19 | A. | An assault warrant and a criminal mischief |
| 20 | | warrant. |
| 21 | Q. | And the criminal mischief being for your car; is |
| 22 | | that right? |
| 23 | A. | Yes, sir, it was. |
| 24 | Q. | Okay.  Did you see him at all again after that -- |
| 25 | | after he did the damage to your car, did you see |

|   |    |                                                          |
|---|----|----------------------------------------------------------|
| 1 |    | him again that night?                                    |
| 2 | A. | No, sir, I didn't.  As I went back to the house,         |
| 3 |    | I was accompanied by a sheriff's deputy.                 |
| 4 | Q. | Okay.  I want to ask you about the next day which        |
| 5 |    | you've already briefly testified to.  You told us        |
| 6 |    | that there was an incident which occurred at the         |
| 7 |    | Steris Corporation; is that correct?                     |
| 8 | A. | Yes, sir.                                                |
| 9 | Q. | If you could start from the beginning and kind of        |
| 10 |   | walk us through how you got to the Steris               |
| 11 |   | Corporation, why you were going to the Steris           |
| 12 |   | Corporation.                                            |
| 13 | A. | Yes, sir.  Okay.  On that afternoon of April the       |
| 14 |   | 12th, I had been in Montgomery most of the day.         |
| 15 |   | And it was prom, and my brother was a senior in         |
| 16 |   | high school.  I went with him on the -- to rent a       |
| 17 |   | car.  I went --                                         |
| 18 | Q. | You said you called Ms. Parker?                          |
| 19 | A. | I called Ms. Parker to ask her what was going on        |
| 20 |   | and asked her why she was doing all of these            |
| 21 |   | things.  And so I talked to her maybe forty-five        |
| 22 |   | minutes to an hour.  That was from my                   |
| 23 |   | grandmother's house.  And so she said, okay, I've       |
| 24 |   | got to go, and so she hung up.  And I didn't talk       |
| 25 |   | to her no more until about nine -- I'm going to         |

1    say nine o'clock that night I called and I tell

2    her I'm going to bring Taqueris and drop him off.

3    She said okay.

4              And so on the way up there, me and him,

5    we stopped at Liberty Service Station.  I got --

6    put gas in my car.  And I think we stopped at

7    Wal-Mart.  I'm not really sure.  I think we

8    stopped at Wal-Mart.  We really was just kind of

9    like killing time until getting there because

10   every -- I normally go over there on my off-days.

11   Like on a Friday night, I always go over there

12   and kind of like talk to her because my work

13   schedule is so difficult that we don't spend a

14   lot of time together.  So I always go over there

15   on a Friday night anyway and sit down and talk to

16   her.  That was not the first time that I went to

17   her job and just sit down over there.

18   Q.   Sure.  But you had your son with you?

19   A.   Yes, sir.

20   Q.   And how old was your son?

21   A.   At the time he was six.  He's seven now.

22   Q.   And did you guys eventually arrive at the Steris

23        Corporation?

24   A.   Yes, sir.

25   Q.   Okay.  And what did she do for Steris?

| | | |
|---|---|---|
| 1 | A. | She was a security guard. |
| 2 | Q. | And where was she located when you arrived? |
| 3 | A. | In the guard shack. |
| 4 | Q. | And that's at the front of the business? |
| 5 | A. | Yes, sir. |
| 6 | Q. | And it's my understanding that the guard shack is |
| 7 | | there at the main road; is that correct? |
| 8 | A. | Yes, sir.  It's right -- there's a gate, a main |
| 9 | | gate, right out front of the guard shack, but |
| 10 | | they keep it open all the time while the business |
| 11 | | is open. |
| 12 | Q. | All right.  And it's also my understanding from |
| 13 | | seeing that, there's a long driveway which leads |
| 14 | | up to the big factory? |
| 15 | A. | Yes, sir, there is. |
| 16 | Q. | And the guard shack is there at the beginning of |
| 17 | | that driveway? |
| 18 | A. | Yes, sir. |
| 19 | Q. | Now, did you and your son go in to see |
| 20 | | Ms. Parker? |
| 21 | A. | No.  Once I arrived, I told her that I had to go |
| 22 | | back and get something for my tooth because I had |
| 23 | | a toothache that day.  And so I left for maybe |
| 24 | | twenty or thirty minutes and then I returned. |
| 25 | | When I returned, I sat in my car and read the USA |

```
 1              Today sports page.  I parked, I'm going to say,

 2              directly across from the guard shack on the

 3              grass, and I just sit in my car and read the USA

 4              Today.

 5                      But then I got tired, and I was ready

 6              to go home.  So I went and told my son I was

 7              going to leave.  And at the time he kept asking

 8              his mother was it all right if I stayed, and I

 9              told him, no, I'm going to go ahead and leave.

10              So he said, okay, I'm going to go with you then.

11      Q.      Were you letting your son spend time with his

12              mother or --

13      A.      What I was doing was drop him off so she could

14              take him on home.  I was going to go back home to

15              my grandmother's house.

16      Q.      Okay.  Was she about to get off or was she

17              scheduled to get off --

18      A.      She was scheduled to get off at twelve o'clock.

19              During that time, it's probably about 10:30.  I

20              can't be exact on the time.

21      Q.      Sure.  That's fine.  When you said that you left

22              to go get you some toothache medicine, did you

23              leave your son with her?

24      A.      Yes, sir, I did.

25      Q.      You came back and you testified that you were
```

189

```
 1              reading the paper, you got tired, and you went

 2              back into the guard shack?

 3      A.      I went into the guard shack to check -- to tell

 4              my son I was going to go home.  And she was -- he

 5              was asking her was it all right if I stayed with

 6              him.  And I told him, no, I'm going to go ahead

 7              and go home.  And while we was having that

 8              discussion --

 9      Q.      Where were you at in the guard shack having this

10              discussion?

11      A.      In the bathroom.  She was standing in the

12              bathroom, and I was standing in the doorway, like

13              in the doorway of the bathroom.  They was in

14              there cleaning something in the bathroom.

15      Q.      The bathroom, my understanding from viewing the

16              scene, is inside the guard shack all the way to

17              the -- if you're going in the door, it's all the

18              way to the far wall; is that correct?

19      A.      Yes, it is.  You walk straight in.  You can see

20              the bathroom when you walked in.  The bathroom

21              actually is the length of the building.  It might

22              -- it may not look as big when you walk in, but

23              it's -- actually, it's the same length as -- of

24              the building.

25      Q.      It's a pretty long bathroom?
```

```
1    A.    Yes, sir, it is.

2    Q.    Narrow, but long?

3    A.    Yes.  Narrow, but it's long.

4    Q.    You guys are in there having this conversation.

5          What happened?

6    A.    While we're having this conversation, I walk -- I

7          look up, and I say, Carla, he's got a gun.  I saw

8          the defendant, Albert Lockwood, running with a

9          gun like this in his hand.  I said, Carla, he's

10         got a gun.  And she tried to close the door.  We

11         tried to close the door.  At first, I tried to

12         lock the front door, but I couldn't.  I was so

13         nervous, I couldn't lock the front door.  So I --

14   Q.    The front door of the guard shack?

15   A.    Yes.  I ran into the bathroom, and she tried to

16         close the door, and he just snatched the door

17         open.

18   Q.    And at that time you and your son and Ms. Parker

19         were all in the bathroom?

20   A.    Yes, sir.

21   Q.    And the door you're talking about he snatches

22         open is the bathroom door?

23   A.    The bathroom door, yes, sir.

24   Q.    What occurred at that point?

25   A.    At that point he came in the bathroom and said
```

191

```
 1            get out of the door, motherfucker, bitch-ass

 2            niggers, get out of the door, get out of the

 3            door; I'm going to kill your ass; I'm going to

 4            kill you.

 5     Q.     First of all, I've asked you to say exactly what

 6            he has advised you?

 7     A.     Yes, sir.

 8     Q.     The language and everything?

 9     A.     Yes, sir.

10     Q.     At that point what did you do?

11     A.     Okay.  I said, please don't hurt me; don't hurt

12            me, man; I ain't did nothing to you; I haven't

13            did nothing to you.  Then I -- once I said that,

14            I said, don't hurt me; my son's in here; my son's

15            here; don't hurt my son neither.  And so at the

16            time, he said, get out the door, get out the

17            door.  So I said, okay, I'm going to go out the

18            door.  I get like this.  I said, okay, I'm going

19            to go out the door.  And so I walked towards the

20            door, but my son was in front of me.  He was

21            scared to let me go.  So I was trying to tell my

22            son to go ahead and go to the car.  And we both

23            went out of the door.  And as we went out the

24            door -- my car was still parked directly across

25            from Steris at the time.  He -- once we went out
```

192

```
 1          the door, he fired a shot that I don't know

 2          exactly where it went.  It had to go in between

 3          me and my son.  I don't know if he was trying to

 4          scare me into just falling down on the ground.

 5          But it didn't hit neither one of us.  And my son

 6          ran on to the car, and so he got in the car, and

 7          I guess he locked the door.  I don't know

 8          what happened.  And I ran up the road towards

 9          Steris.

10     Q.   Okay.  Hold on.  Let me ask you just so I can get

11          my bearings.  Did you run in the same direction

12          as your son?

13     A.   No, sir, I didn't.

14     Q.   My understanding again from viewing the scene is

15          there's a parking place kind of across the street

16          from the guard shack; is that correct?

17     A.   Yes, sir.

18     Q.   Is that where your car was?

19     A.   Okay.  This is the guard shack right here.

20     Q.   Right.

21     A.   At that time my car is parked -- now, I ain't

22          going to say directly in front of the guard

23          shack.  It may have been just a little bit up the

24          hill.  I can't say for sure because I can't

25          remember.  It's been a year.  And it was parked
```

193

```
 1              over across that street.  It's just like a little
 2              grass area right in front of Steris.
 3        Q.    I'm looking -- and I'm actually looking at
 4              Defendant's Exhibit 1.  I think we have a
 5              correspondence --
 6        A.    Okay.  It's right across the street in front of
 7              that doorway.
 8        Q.    Would it be on what is not pictured here on this
 9              side --
10        A.    On the other side of the grass.  Yes, sir, it
11              would've been.
12        Q.    So it's on the same street as the guard shack?
13        A.    Yes, sir.
14        Q.    Your son ran towards the car.  Did you run the
15              same direction as your son?
16        A.    No, sir, I didn't.
17        Q.    Is there a reason that you didn't do that?
18        A.    Because it wouldn't make too much sense for both
19              of us to run the same direction, because if he --
20              he wasn't really -- I don't think he was trying
21              to hurt him.  He was trying to kill me.
22        Q.    Were you trying to direct him away from your son?
23        A.    Yes, sir, I was.
24        Q.    What happened?
25        A.    Okay.  Once I went up the road, I guess I --
```

1    either I tripped or he tripped me, and he said,

2    open -- and I fell down on the ground, and he

3    said, open your mouth, motherfucker; I'm going to

4    kill you; open your mouth. He had the gun, and

5    he told me to open my mouth. But I wouldn't open

6    my mouth because I knew if I opened my mouth he

7    was probably going to blow my brains out my head.

8    So I didn't do it. And he -- when I was on the

9    ground, he was hitting me. He hit me several

10    times in the temple part of my head with the

11    pistol. And then he -- after that happened, he

12    laid that gun -- I can't say how it was laying.

13    I can't really describe to you how it was laying

14    because I don't really remember. And he put the

15    gun aside my head some kind of way. I don't

16    remember exactly how it was. And he shot -- he

17    fired the weapon. And then after he did that, he

18    kicked me. Before he left, he kicked me one more

19    time in the side of my face.

20    Q.    Did he leave?

21    A.    I assume he did. I was -- to make him think he

22    had did killed me or whatever, I didn't move for

23    a while. I just laid there for a few seconds

24    until I realized he was not out there again.

25    Q.    Okay. So you played dead for lack of a better --

| | | |
|---|---|---|
| 1 | A. | Yes, sir, I did. |
| 2 | Q. | Did -- let's talk about injuries that you |
| 3 | | received.  You've already testified that you had |
| 4 | | some injuries.  I'm going to ask you about that. |
| 5 | | What type of injuries did you receive |
| 6 | | that particular night? |
| 7 | A. | Okay.  I had several -- I had some -- it looked |
| 8 | | like puncture marks in my head.  I had one here |
| 9 | | and one here and I think another one back there. |
| 10 | | I'm not sure. |
| 11 | Q. | Do you know if those were caused by the gun or |
| 12 | | not? |
| 13 | A. | Yes, they were. |
| 14 | Q. | Okay.  Do you know if bullets actually went into |
| 15 | | your head? |
| 16 | A. | No, sir, I can't sit here and say I do. |
| 17 | Q. | Okay.  I want to show you what's been marked as |
| 18 | | State's Exhibit Number 7.  I'm going to ask you |
| 19 | | if you can identify this particular document. |
| 20 | A. | Yes, sir, I can.  It's a picture of my head. |
| 21 | Q. | And can you tell us what's unusual about your |
| 22 | | head on that particular picture? |
| 23 | A. | It looks like two holes that you can see.  It's |
| 24 | | bloody, and the two spots are bleeding. |
| 25 | Q. | Okay.  Again, we're talking about State's Exhibit |

196

```
 1          Number 7.  Do you still have scars from that?
 2    A.    Yes, sir, I do.  I have three scars on my head.
 3              MR. BAILEY:  Judge, if I could, I'd like for
 4          him to step down and let's show the jury the
 5          scars.
 6              THE COURT:  Sure.  That's fine,
 7          Mr. McKinnes.
 8    Q.    Mr. McKinnes, if you'll step down, let's just
 9          kind of go -- start from here and let's -- well,
10          we'll walk down this way so everybody can see.
11    A.    There's one right here, one on the back of my
12          head, and there's one up here.  Now, this one
13          right here, you can see because, normally, as my
14          hair grows, it swells up right here.  This one
15          here, it swells up all the time.
16    Q.    Okay.  If you could kind of go to the middle and
17          show the jurors.
18    A.    And I've got one back here and one right here.
19    Q.    And then come towards the end.  Show them again.
20    A.    There's one here, and there's one right here,
21          back here.  There's one up here somewhere.
22    Q.    And did you receive -- and I'm pointing right
23          here.  Is that the --
24    A.    That's the area --
25    Q.    I'm pointing right here.  Is that the area --
```

197

```
 1    A.    Yes, sir.

 2    Q.    -- that you're talking about is one of the scars?

 3    A.    Okay.  Yes.  That's the area where he had the gun

 4          laying.

 5    Q.    All right.

 6    A.    And then the back part of my head right here.

 7    Q.    You can have a seat.

 8              Were all of those as a result of that

 9          incident that occurred that night?

10    A.    Yes, sir, they were.

11    Q.    After -- you've already testified that you played

12          dead for a little while, and then what happened

13          next?

14    A.    Then I got up, and I ran to the guard shack.  And

15          I told Ms. Parker, look what you did, look what

16          you did, look what you caused to happen.  I said,

17          he could have killed me; he tried to kill me; he

18          could have killed my son.  And after that, a guy

19          came -- folks started coming from -- I guess the

20          shift was ending at Steris, and I tried to stop

21          two cars.  The first car didn't stop, and the

22          second car stopped.  And the guy stopped, and he

23          got out, and he went in the guard shack.  He

24          asked me -- I don't know who he called.  He may

25          have called the on-shift supervisor.  And he
```

198

```
 1              said, okay, we're going to get the police out

 2              here.

 3                    MS. TOLES:  Objection, Your Honor.

 4                    MR. BAILEY:  That's fine.

 5                    MS. TOLES:  Hearsay.

 6    Q.        That's fine.  You don't -- you don't have to

 7              testify --

 8                    THE COURT:  Ask him something else.

 9    A.        Okay.

10    Q.        That's fine.  I want to ask you, did you

11              eventually leave that scene?

12    A.        Yes, sir, I did.

13    Q.        And how did you leave the scene?

14    A.        By ambulance.

15    Q.        Okay.  And were you taken to the hospital?

16    A.        Yes, sir, I were.

17    Q.        Were you treated at the hospital?

18    A.        Yes, sir.

19    Q.        Were you released the same -- the same -- within

20              a few --

21    A.        A few hours.

22    Q.        From the time that you arrived at the hospital?

23    A.        Yes, sir.

24    Q.        Okay.  There wasn't any -- you didn't have to

25              have surgery or anything like that?
```

·199

```
 1    A.    No, sir.  But I did have a CAT scan, I think.
 2          I'm not sure what it was.  It was something like
 3          that.
 4    Q.    You had some type of procedure done?
 5    A.    Yes, sir.
 6    Q.    After leaving the hospital, did you go to the
 7          police department?
 8    A.    Yes, sir, I did.
 9    Q.    Okay.  Did they take some photographs of you at
10          the police department?
11    A.    Yes, sir, they did.
12    Q.    I want to show you what's been marked as State's
13          Exhibit 8.  This looks like a head shot of you;
14          is that correct?
15    A.    Yes, sir, it is.
16    Q.    Is there anything unusual in this particular
17          picture about you?
18    A.    Yes.  My lip is swoll (sic) enormously large, and
19          you can see swelling around my eye.  And you
20          can't really depict it on that picture, but I did
21          have a black eye.  And my nose looked like it was
22          swoll (sic).
23    Q.    And I want to show you what's been marked -- and
24          we were referring to State's Exhibit Number 8.
25                I want to show you what's been marked as
```

200

```
 1              State's Exhibit Number 12.  Is that also a
 2              picture of you?
 3       A.     Yes, sir.
 4       Q.     And what does that depict?
 5       A.     The side of my head right here.
 6       Q.     Okay.  And is there anything unusual?
 7       A.     Yes, sir.  It's -- you can depict an open scar.
 8       Q.     Okay.  And, again, those injuries, were they
 9              received that night by the defendant?
10       A.     (No response.)
11       Q.     Did you tell the police what happened?
12       A.     Yes, sir.
13       Q.     And did they -- or did they allow you or did they
14              on their own on your behalf sign a warrant
15              against the defendant?
16       A.     Well, they let me went in front of a magistrate
17              and to sign the warrant that night.  It was -- I
18              don't know exactly what time -- after they got
19              through questioning me, he sent me to down -- I
20              don't know if it was downstairs or what.  They
21              had a magistrate in there, and I signed a warrant
22              that night.
23       Q.     And you signed that warrant for what charge?
24       A.     Attempted murder.
25       Q.     Being that you signed the charge of attempted
```

# VOLUME 3 OF 4

COURT OF CRIMINAL APPEALS NO._____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF Montgomery COUNTY, ALABAMA

CIRCUIT COURT NO. CC 03-957

CIRCUIT JUDGE McCooey

Type of Conviction / Order Appealed From: Attempted Murder

Sentence Imposed: Life w/out Parole

Defendant Indigent: ☒ YES ☐ NO

Albert Lockwood

**NAME OF APPELLANT**

Tom Azar                263-5363
(Appellant's Attorney)              (Telephone No.)
609 S. McDonough St.
(Address)
Montgomery   AL.   36104
(City)           (State)        (Zip Code)

V.

## STATE OF ALABAMA

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

**NAME OF APPELLEE**

_____

_____

(For Court of Criminal Appeals Use Only)

```
 1              murder, do you believe the defendant that night

 2              was trying to kill you?

 3      A.      Yes, sir.

 4      Q.      And how do you know that?

 5      A.      He told me he was going to kill me.

 6      Q.      After this took place -- you've been to the

 7              police department; you've signed the warrants --

 8              did you hear from the defendant again?

 9      A.      Yes, sir.  The next day, he was calling my house

10              making threats that he was going to kill me.  And

11              he told -- he kept calling there that day, and

12              every time he'd say -- he spoke with Ms. Parker.

13              Then he also spoke with me.  He's saying, what

14              you doing there, motherfucker; I'm going to kill

15              you; I'm going to kill you.

16      Q.      Did you do anything about that?

17      A.      Yes.  I did notify -- I notified the District

18              Attorney's office in Montgomery, and I also

19              notified the Circuit Clerk's office in Union

20              Springs.

21      Q.      Did anything happen as a result of that?

22      A.      No.  They was -- they never did anything about it

23              because they couldn't find -- they just was

24              steadily looking for him, trying to find where he

25              was at.
```

```
 1    Q.    And did you hear from him at any other time?

 2    A.    That went on for about two or three days, and

 3          after that, I didn't hear anything from him.

 4          Because over that weekend, I didn't stay at home.

 5          I got my son, and we went to Auburn and stayed

 6          overnight for -- may have stayed two days in case

 7          he tried to come back and do something else to me

 8          again.

 9    Q.    Did anything happen as a result of the threats he

10          made to you?

11    A.    No, sir.

12    Q.    The person that you've said committed this

13          offense against you, these events that you've

14          taken us through, is that person in the courtroom

15          today?

16    A.    Yes, sir.

17    Q.    Can you please point him out for the jury?

18    A.    The guy, Albert Lockwood, over there with the

19          blue shirt on and the blue jeans.

20              MR. BAILEY:  Let the Record reflect that

21          this victim has pointed to and identified the

22          defendant in this case, Albert Lockwood.

23    Q.    The place that this took place, was that located

24          in Montgomery?

25    A.    Yes, sir.
```

1    Q.    Steris Corporation?

2    A.    Yes, sir, it was.

3          MR. BAILEY:  Judge, one last thing I would

4    like to do is I'd like to offer at this time what

5    I have previously marked as State's Exhibit

6    Number 15, which is going to be a certified copy

7    of his medical records.  I don't necessarily need

8    this witness for that because they're

9    self-authenticating.

10         THE COURT:  Sure.

11         MR. BAILEY:  But I think it would be timely.

12         THE COURT:  Sure.  Any objection on those?

13         MS. TOLES:  No, Your Honor.

14         THE COURT:  Okay.  They're admitted.

15            (At which time State's Exhibit

16            Number 15 was admitted into

17            evidence.)

18         THE COURT:  Okay.  Before we do the cross,

19    we're just going to take a five-minute break.

20    Remember, when you're on break, again, please

21    don't discuss the case with each other or with

22    anyone else.  And if we could be back in five

23    minutes.  Thank you.

24           (Brief recess was held.)

25           (The following proceedings were held

```
 1                    in the presence and hearing of the

 2                    jury:)

 3              THE COURT:  Okay.  Thank you.  You can have

 4         a seat.

 5                    All right.  Ms. Toles, did you have any

 6         questions for Mr. McKinnes?

 7              MS. TOLES:  I do, Your Honor.

 8              THE COURT:  All right.

 9                         CROSS EXAMINATION

10         BY MS. TOLES:

11    Q.   Mr. McKinnes, I'm going to ask you some

12         questions.  On the night of the incident, at some

13         point, did you go to the police department and

14         give the officer a statement there?

15    A.   Yes, I did.

16    Q.   And at some point do you know whether or not that

17         tape was -- that statement was actually

18         transcribed?

19    A.   No, I don't.  I don't know police procedures.

20    Q.   Okay.  At some point did you see a tape recorder

21         there?

22    A.   I can't recall.

23    Q.   You can't recall.  At some point -- let me show

24         you what's been previously marked as Defendant's

25         Exhibit Number 4 and ask you if you recognize
```

```
 1           this.
 2   A.      Yes.  It's -- I guess it's a copy of my
 3           statement.
 4   Q.      Have you had an opportunity to previously see
 5           that statement prior to me giving it to you?
 6   A.      Yes.
 7   Q.      Do you want to take a moment to make sure that it
 8           accurately reflects what you said to the officer
 9           on the day in question?
10   A.      (Witness reviews document.)  I really don't need
11           to look at it.
12   Q.      So you think it reflects what you said to them on
13           the day in question?
14              MR. BAILEY:  If I could see it, I could
15           probably stipulate that that's his statement, if
16           I could see what you've got.
17              MS. TOLES:  That's not a problem.
18              MR. BAILEY:  We'd stipulate that is a copy
19           of his statement.
20   Q.      And from what -- when you glanced over it, do
21           those things accurately reflect what you told the
22           officer on the day that your statement was taken?
23   A.      Well, there were -- there were some errors in
24           there.
25   Q.      Would you like to tell us what those errors were
```

1       before we get started?

2   A.   No.  I probably would have to go read through the

3       whole thing to tell you.  Well, it was just

4       little minor things.

5   Q.   Okay.  Fair enough then.  Well, when you get to

6       one of the areas when we're talking about it, you

7       just let me know what part.  How about that?

8   A.   That'll be fine.

9   Q.   That sounds good.

10       MS. TOLES:  At this time the defendant would

11       move to enter into evidence Defendant's Exhibit

12       Number 4.

13       THE COURT:  Any objection?

14       MR. BAILEY:  No objection.

15       THE COURT:  All right.  It's admitted.

16            (At which time Defendant's Exhibit

17            Number 4 was admitted into

18            evidence.)

19   (BY MS. TOLES:)

20   Q.   Now, Mr. McKinnes, I want to take you back for a

21       moment, and, first of all, we'll start out

22       talking about the day at the guard shack and for

23       you to tell me exactly when you noticed

24       Mr. Lockwood, where were you standing at at that

25       point?

```
 1    A.    I was standing in the -- in the doorway of the
 2          bathroom.
 3    Q.    Okay.  In the doorway of the bathroom.  What did
 4          you do -- once you saw him, what did you do next?
 5    A.    I ran to -- I said, Carla, he has a gun.  I ran
 6          and tried to lock the front door.
 7    Q.    Okay.  You were able to see the gun at that
 8          point?
 9    A.    I saw him running with the gun in his hand.
10    Q.    What did the gun look like?
11    A.    Well, I couldn't see that far, but I knew he had
12          a gun in his hand.  By the holding of the hand,
13          you can assume they have a gun.
14    Q.    So did you actually see that he had a gun or --
15    A.    Yes, I did.
16    Q.    -- did you presume that he had a gun?
17    A.    I saw it.
18    Q.    Okay.  So he's got his hand down like that, and
19          you said that was a gun there?
20    A.    Yes, it was.
21    Q.    What did you do next after that?
22    A.    After I tried to lock the door, I -- Ms. Parker
23          tried to push us all in the bathroom.  And she --
24          I don't know if she was able to lock the door.  I
25          don't even know if the door had a lock on it.
```

```
 1              But he pulled the door open and came on in.
 2    Q.   Okay.  So at some point all four of you are in
 3         the bathroom?
 4    A.   Look, like I said before, I said earlier, the
 5         bathroom goes the length of the building.  So all
 6         four of us were in the bathroom.
 7    Q.   Mr. McKinnes, this will go so much easier if --
 8         I'll usually ask you direct questions if you'll
 9         answer my questions directly, I assure you.  And
10         if you don't understand something I ask you, just
11         say, Ms. Toles, I don't understand that, and I'll
12         be more than happy to ask you again.  Okay?
13    A.   That'll be fine.
14    Q.   All right.  At some point were all four of you in
15         the bathroom?
16    A.   Yes.  Yes, we were.
17    Q.   Okay.  Now, at the point that all four of you
18         were in the bathroom, where was Mr. Lockwood
19         standing?
20    A.   He either was standing -- I don't recall exactly
21         where each -- every person was standing at at
22         that time.  But he was in the area where he -- he
23         wasn't directly in front of me where he was
24         trying to get to me with the gun.
25    Q.   And so when you went on into the bathroom, where
```

|     |     |                                                           |
|-----|-----|-----------------------------------------------------------|
| 1   |     | did -- where did you go?  When you went into the          |
| 2   |     | bathroom, where did you go?                                |
| 3   | A.  | In the bathroom.                                          |
| 4   | Q.  | Did you go over near the sink?  Did you go near            |
| 5   |     | the commode?  Did you go in a corner?  Where did           |
| 6   |     | you go?                                                   |
| 7   | A.  | Okay.  You just asked me to give you direct               |
| 8   |     | answers.  I told you I went in the bathroom.              |
| 9   |     | Once you're in the bathroom -- it's only so big           |
| 10  |     | -- you're going to be either by the sink or the           |
| 11  |     | wall.                                                     |
| 12  | Q.  | Okay.  So were you by the sink or the wall?               |
| 13  | A.  | I was in the -- in the back -- in between                 |
| 14  |     | Ms. Parker and my son and Mr. Lockwood.                   |
| 15  | Q.  | Okay.  So were you on the back wall farthest away         |
| 16  |     | from Mr. Lockwood?                                        |
| 17  | A.  | I don't understand what you're asking.                   |
| 18  | Q.  | Were Ms. Parker and your son in between you and           |
| 19  |     | Mr. Lockwood?                                             |
| 20  | A.  | Yes, they were.                                          |
| 21  | Q.  | Okay.  Now, at some point -- how many entrances           |
| 22  |     | are there into this bathroom?                             |
| 23  | A.  | It's one.                                                |
| 24  | Q.  | All right.  Was Mr. Lockwood standing at the              |
| 25  |     | entrance door?                                           |

```
 1   A.   No, he wasn't.

 2   Q.   Okay.  Where was Mr. Lockwood standing then?

 3   A.   Presumably, he was -- he was next to the sink.

 4   Q.   Is the sink next to the door?

 5   A.   I don't know where the sink is located in that

 6        bathroom because that was my first time ever

 7        going in that bathroom.

 8   Q.   Okay.  All right.  So at some point you attempt

 9        to get to the doorway?

10   A.   At some point I -- I went out the doorway.

11   Q.   Okay.  You go out the doorway.  Where is

12        Mr. Lockwood when you go out the door?

13   A.   To my recollection, Ms. Parker is kind of like

14        trying to keep him from getting out, trying to

15        stop him from getting out, out of the bathroom.

16        Well, I -- I didn't really look back because me

17        and my son just went on out.

18   Q.   Did you pass Mr. Lockwood going --

19   A.   No, I didn't.

20   Q.   -- out the bathroom?

21   A.   No, I didn't.

22   Q.   You did not pass Mr. Lockwood.  At some point did

23        Mr. Lockwood strike you while you were in the

24        bathroom?

25   A.   Yes, he did.  He struck me when he first came
```

```
 1              into the bathroom.
 2    Q.        Okay.  So you were close enough at some point to
 3              Mr. Lockwood to be struck?
 4    A.        Well, you just asked me a question . . .
 5                    MS. TOLES:  Your Honor, would you please
 6              instruct the witness to --
 7                    THE COURT:  Yes.  Make sure, Mr. McKinnes,
 8              just answer Ms. Toles' questions --
 9                    THE WITNESS:  Yes, ma'am.
10                    THE COURT:  -- that she asks.
11                    THE WITNESS:  Yes, ma'am.
12                    THE COURT:  Okay.  Go ahead, Ms. Toles.
13    Q.        At some point you were struck by Mr. Lockwood?
14    A.        Yes, I were.
15    Q.        Where were you when you got struck by
16              Mr. Lockwood?
17    A.        Standing in the bathroom.
18    Q.        Were you standing at the doorway in the bathroom?
19              Were you trying to leave out of the door when he
20              struck you?
21    A.        No.  I -- no.  I was just in there.  Ms. Parker
22              was trying to keep him from coming in.  Once he
23              entered the bathroom, he struck me with the gun.
24    Q.        Okay.  So were Ms. Parker and the child in
25              between you then at that point?
```

```
 1    A.    Yes.

 2    Q.    All right.  After you were struck by the gun and

 3          you're in the restroom, what happens after that?

 4          Where do you go after that?

 5    A.    After he struck me with the gun and he said the

 6          things he said, I -- that's when I tried to leave

 7          out of the bathroom to go out the guard shack.

 8    Q.    Okay.  So you make it out.  Now, how is it that

 9          your son gets in front of you?

10    A.    Once we got ready to go out of the bathroom, I

11          pushed my son and told him to run to the car.

12    Q.    Okay.  What happens after that?

13    A.    Okay.  Once we're on our way out the doorway,

14          that's when he fired his first shot and

15          everything.  And it didn't -- it didn't hit

16          anybody.  I don't know if he -- I don't know if

17          he fired it to the ground or whatever.  He fired

18          the first shot, and my son ran on to the car and

19          got in the car and locked the door.  And I ran

20          towards Steris Corporation.

21    Q.    Okay.  Once you ran toward Steris, you went up --

22          which side of the road did you go to first?

23    A.    It would be the right side, the side that's going

24          up toward the plant, because once you -- I ran

25          directly out, and I just ran up like toward the
```

```
 1              yellow line.  And I -- but I was on the right

 2              side of the road that's going toward the plant.

 3    Q.        Okay.  Now, is that where this incident occurred

 4              with the gun and all of that was on the right

 5              side of the road?

 6    A.        Honestly, I can't remember exactly where -- which

 7              side of the road it occurred on.

 8    Q.        At some point were you on both sides of the road?

 9    A.        I'm not sure.

10    Q.        You're not sure.  Okay.  Now, when you were -- at

11              some point, did you get a good look at the gun?

12    A.        Yes, I did.

13    Q.        Can you describe the gun for us then?

14    A.        The only thing I could really see of it, I'm

15              going to say I seen the handle because he was

16              hitting me in my face with the handle.  And I

17              could see the barrel.  Now, as far as anything

18              else, I can't explain it to you.

19    Q.        Okay.  Did you notice anything else about the

20              gun?  Did you notice the color of it?

21    A.        It was black.

22    Q.        Did you notice anything else as to how it looked

23              at that point?

24    A.        No, not that I can remember.

25    Q.        Now, on the -- at the time that you gave the
```

1         officer the statement, do you recall telling the

2         officer that it looked like it had round

3         cylinders or something?

4   A.   Yes.  Yes, ma'am, I do.

5   Q.   Was that something that was corrected in the

6         statement that you gave to the officer?

7   A.   Yes, ma'am, I think it was.  Like I said, I don't

8         quite remember because when you're in -- kind of

9         like in a panic state, you can't really remember

10        something like that.

11   Q.   Mr. McKinnes, would you go to Page 8 of your --

12        Page 4 of your statement, please?

13   A.   I don't have a Page 4.  I have an 83, 84, 85.

14   Q.   It would be Page 86 of that section then.

15   A.   Thank you.

16   Q.   If you'll look at the center of the pages, Page 4

17        of 8.  It would be right there on the center

18        page.

19   A.   Okay.

20   Q.   Now, the sixth line down, you were talking with

21        the officer about the gun.  The officer asked you

22        the question, it was an automatic.  You said, no,

23        it was one of those revolvers.  Is that what you

24        call with the little round thing?  Do you

25        remember making that statement to the officer?

```
 1    A.    This is not the correct statement that I gave

 2          him.  He asked me did I know the difference in a

 3          gun, and I said yes.  He said, was it -- did it

 4          have little round things on it or was it one that

 5          you pull back or something.  I said, no, I think

 6          it had -- I said, I think it had little round

 7          things on it.  And he said that's a revolver.  I

 8          said, yeah, I guess that's what it was.  That's

 9          what my statement was.  I don't know what this

10          paper have on it, but that was my statement to

11          him.

12    Q.    So where the next time he says -- the officer's

13          question -- you said, yeah, revolver; you answer,

14          revolver?

15    A.    Yes.  That's after he explained to me what a

16          revolver were -- was, that's what I said, yeah, a

17          revolver.  I guess that's what it was.

18    Q.    So did you see little round things on the gun at

19          the time?

20    A.    As far as to my recollection, I remember seeing

21          like a circle.  I can't really explain a gun.  A

22          circle of things around it.

23    Q.    Okay.  So you were able to actually see the

24          circle of things on the gun?

25    A.    Well, he was striking me in the face with the
```

```
 1              gun.  Ain't that what I said?
 2    Q.        Okay.  Fair enough then.
 3                    All right.  Now, once you -- you got
 4              finished and he struck you in the face -- do you
 5              recall if you were laying down when these
 6              gunshots were fired or if you were on your knees?
 7              Do you remember?
 8    A.        Like I said, the first time he fired when we was
 9              coming out the guard shack, we was running -- I
10              was running, and I made my son go to the car.
11              See, because I know he wasn't really trying to
12              hurt my son.  He was at me.
13    Q.        Okay.  So when you all got up to the -- since you
14              don't remember the left side or the right side of
15              the road, when you got up there, which -- were
16              you on your knees at -- or were you laying down
17              at the time?
18    A.        Like I said, either I fell or I tripped.  And,
19              once again, he told me I -- he told me get on
20              your knees and then said open your mouth,
21              motherfucker; I'm going to kill you.  And so I
22              wouldn't open -- I did get on my knees and opened
23              my mouth.  Then he -- then he -- I don't -- if I
24              can remember right, he struck me again and then
25              told me to lay down.  And I laid down, and I
```

```
 1            don't know exactly how my head was laying.  I

 2            can't even say I know exactly how my head was

 3            laying.  I -- which I don't remember.  But I was

 4            laying -- I was laying on the ground.

 5   Q.       Mr. Lockwood told you to lay on the ground?

 6   A.       Yes, ma'am, he did.

 7   Q.       Okay.  Where was he standing at in respect to

 8            where you were at that point then?

 9   A.       It would have to be like kind of over me or

10            either behind me.  He was -- he was standing like

11            -- I'm going to say a little bit toward my

12            sideways -- my side area because I was laying

13            straight across like that, just laying straight.

14   Q.       And he was down towards your side where your hand

15            would reach down towards your side?

16   A.       I don't remember.  I can't say exactly where he

17            was at.

18   Q.       Okay.  So where did he place the gun into your

19            head?  I guess I should ask that then.

20   A.       He placed it to the back part of my head.  See,

21            you would have to know how I was laying in order

22            to say -- show where the gun was placed on my

23            head.

24   Q.       Well, why don't you tell us how you were laying

25            then?  Then all of us can get an idea --
```

```
 1   A.   Well, that's what I'm trying to do.

 2   Q.   Okay.  Well, go ahead and tell us.

 3   A.   Like I said, I don't remember exactly how I was

 4        laying.  But he did put that gun to the back of

 5        my head, and he fired on -- and I don't know if

 6        it hit my head or ricochetted off the ground, but

 7        he fired the gun toward -- down -- he fired it

 8        when it was against my head.

 9   Q.   So he fired the gun against your head?

10   A.   Yes, ma'am, he did.  I didn't say he fired it

11        directly into my head.  I said he fired while the

12        gun was against my head.

13   Q.   Okay.  At some point while you were out there

14        with your head on the ground, were you laying

15        down flat with your head on the ground?

16   A.   I just told you I don't remember how I was

17        laying.

18   Q.   And you don't remember whether or not you were on

19        your side or not either?

20   A.   No, ma'am, I don't.

21   Q.   Okay.  Now, Mr. McKinnes, at some point you were

22        in here when Ms. Parker testified?

23   A.   Yes, ma'am, I was.

24   Q.   And at any point when you came back from dropping

25        -- going to get the medicine for your
```

| | | |
|---|---|---|
| 1 | | toothache -- |
| 2 | A. | Yes, ma'am. |
| 3 | Q. | -- when you got back at that point, did you see |
| 4 | | Ms. Parker on the telephone? |
| 5 | A. | Yes, ma'am.  Like I said, I was sitting in the |
| 6 | | car reading the newspaper, and I saw her talking |
| 7 | | to somebody on the phone. |
| 8 | Q. | Did you ask her when you got in the building who |
| 9 | | it was that she was talking to? |
| 10 | A. | Yes, ma'am, I did. |
| 11 | Q. | And what did she tell you? |
| 12 | A. | It was somebody calling for somebody in the |
| 13 | | plant, something like that.  I can't recall what |
| 14 | | she told me, but she didn't say it was him. |
| 15 | Q. | Okay.  But she just -- |
| 16 | A. | She didn't tell me who it was. |
| 17 | Q. | Okay.  Now, I want to ask you, Page 8, which |
| 18 | | would be 90 if you're referring to of your |
| 19 | | statement, the officer asked you is there |
| 20 | | anything else that you can think of.  It would be |
| 21 | | the very three lines up from the -- three |
| 22 | | question and answer sessions up from the bottom |
| 23 | | of the statement. |
| 24 | A. | (Witness reviews document.) |
| 25 | Q. | It starts out, okay, all right, is there anything |

```
 1              else you can think of, sir.

 2      A.      Okay.  I see it.

 3      Q.      Would you read your response back to us, please?

 4      A.      Yes, ma'am.  It says, question, okay, all right,

 5              is there anything else you can think of, sir.

 6              And my answer was, yes, I am almost sure if she

 7              -- if she leaves -- well, you can find her, you

 8              could probably find him.  If somebody go wait

 9              till maybe 2:30 or 3 o'clock or go to County Road

10              42, that's probably where you can find him at or

11              in 1490 County Road 42.  There is three trailers

12              on the road.  It's going to be the one in the

13              middle, a single-wide trailer, like a blue and

14              white one.

15      Q.      And go ahead and read the next question and

16              answer for me, please.

17      A.      Okay.  Does he live there?  No.  That's where I

18              live.

19      Q.      Now, at the -- why would you think that

20              Mr. Lockwood would have gone to your home?

21      A.      At that time I didn't know what was going on.

22      Q.      But you would think to tell the police to go to

23              your house to look --

24      A.      That's where he was the day before.

25      Q.      Okay.  Speaking of the day before, at some point
```

Vicki H. Clark
Official Court Reporter
(334) 832-1365

```
 1              you -- during your testimony, you said that you

 2              didn't go back to your house on the day before

 3              that night?

 4    A.        I didn't tell you that.  That's not what I told

 5              you.  I said the day before, that's the day --

 6              the first -- that's the first incident, when the

 7              first incident happened.  What's your question?

 8    Q.        On direct and you wouldn't have told me that.

 9              You would have told Mr. Bailey that when he asked

10              you.

11                        But they asked you if you saw

12              Mr. Lockwood again at all that evening, and you

13              said you didn't see him that night at all.  The

14              sheriff deputy accompanied you.  That --

15    A.        No, that's -- that's not what he asked me.  He

16              asked me did -- when did the next time did I see

17              him.

18    Q.        That sounds good then, Mr. McKinnes.

19              Mr. McKinnes, at some point on the day of the

20              10th after the fight had ensued, did you see

21              Mr. Lockwood?

22    A.        Yes, ma'am, I did.

23    Q.        Where did you see him at?

24    A.        At my house.

25    Q.        What was he doing at your house?
```

```
1    A.    I don't know.

2    Q.    Okay.  When you got in the house, did you see him

3          doing anything in particular?

4    A.    Just standing there.

5    Q.    Just standing there.  Was Ms. Parker there?

6    A.    Yes, ma'am, she was.

7    Q.    Were you -- was your son there at that point?

8    A.    No, not that I remember.

9    Q.    How about the other child?

10   A.    No, she wasn't.

11   Q.    Okay.  Now, when you all got there, did something

12         -- at some point did Ms. Parker ask you to leave

13         the home at that point?

14   A.    She did.

15   Q.    And, earlier, I think you testified that at

16         12 o'clock or 12:30 that day, everything was

17         going fine for you all?

18   A.    As far as that -- earlier that day, like I said,

19         she came home from work.  There was no problem --

20         because she didn't know I was off work.

21   Q.    Okay.  So to your knowledge, nothing was going

22         wrong?

23   A.    No.

24   Q.    All right.  Now, you said that on this night --

25         did you all have an altercation that night in the
```

|    |    |                                                            |
|----|----|------------------------------------------------------------|
| 1  |    | trailer?                                                   |
| 2  | A. | Me and him?                                                |
| 3  | Q. | Yes.                                                       |
| 4  | A. | No, ma'am, not after that.                                 |
| 5  | Q. | How long did you stay in the --                            |
| 6  | A. | I stayed -- because that's my house.  That's               |
| 7  |    | where I pay bills.  I didn't leave.                        |
| 8  | Q. | Did Mr. Lockwood leave?                                    |
| 9  | A. | Yes, he did.                                               |
| 10 | Q. | What time did he leave?                                    |
| 11 | A. | I don't know.  I didn't keep up -- I wasn't                |
| 12 |    | keeping up with the time.                                  |
| 13 | Q. | Were you afraid of Mr. Lockwood?                           |
| 14 | A. | No, ma'am, I wasn't, because I know in a physical          |
| 15 |    | fight, he couldn't beat me.                                |
| 16 | Q. | Okay.  But you were comfortable being in a house           |
| 17 |    | with a man that you had just signed an arrest              |
| 18 |    | warrant on earlier that day?                               |
| 19 | A. | Yes, ma'am, because he -- that -- honestly --              |
| 20 |    | actually, he was trespassing on private property.          |
| 21 | Q. | Well, I think trespassing usually requires that            |
| 22 |    | you not be invited in.  If Ms. Parker had                  |
| 23 |    | actually invited him in, he wouldn't --                    |
| 24 | A. | It doesn't matter what Ms. Parker do.  I pay the           |
| 25 |    | bills there.                                               |

```
 1   Q.   Okay.  Yes, sir.  Mr. McKinnes, after Ms. Parker
 2        asked you to leave the premises and you didn't
 3        leave the premises, the next morning, when you
 4        got up, was Mr. Lockwood still there?
 5   A.   No, ma'am, he wasn't.  I didn't -- I never went
 6        to sleep that night.  I never went to sleep that
 7        night.
 8   Q.   But you don't know what time Mr. Lockwood left
 9        the premises?
10   A.   I was in the back room, and as far as I know, he
11        was just sitting in the bathroom with his hands
12        like this by -- beside the toilet.  Who knows
13        what he had in his hand.  He was sitting down on
14        the toilet in our bedroom in the back of the
15        house with his hands down like this.
16   Q.   And you weren't -- and you decided to stay there
17        all night not worried about anything?
18   A.   No, I wasn't.
19   Q.   Okay.  That sounds -- that's fair enough.  Now,
20        during the afternoon hours when you all were out
21        there on the day in Union Springs, who was with
22        Mr. Lockwood?
23   A.   You talking about when they came to the house
24        that afternoon?
25   Q.   Yes.
```

|    |    |                                                        |
|----|----|--------------------------------------------------------|
| 1  | A. | Ms. Parker and her brother.                            |
| 2  | Q. | What's her brother's name?                             |
| 3  | A. | Terrence Franklin.                                     |
| 4  | Q. | Terrence Franklin. Okay. Did you sign a warrant        |
| 5  |    | against Mr. Franklin as well?                          |
| 6  | A. | I -- I don't -- no, because Mr. Franklin didn't        |
| 7  |    | do nothing to me.                                      |
| 8  | Q. | But you testified earlier that he was out there        |
| 9  |    | with Mr. Lockwood pulling Mr. Lockwood off --          |
| 10 | A. | No. He -- I said he was pulling him -- pulling         |
| 11 |    | me off of him to keep me from getting on top of        |
| 12 |    | him. But he didn't physically hit me or               |
| 13 |    | anything.                                              |
| 14 | Q. | But they were both there together and they both        |
| 15 |    | jumped --                                              |
| 16 | A. | No. He -- he -- no, that's not what I said. I          |
| 17 |    | didn't say he attacked me. I said Mr. Lockwood         |
| 18 |    | attacked me.                                           |
| 19 | Q. | He just prevented Mr. Lockwood from getting the        |
| 20 |    | best of you?                                           |
| 21 | A. | He prevented me from getting the best of him.          |
| 22 | Q. | Oh, okay. How many times have you threatened to        |
| 23 |    | take Ms. Parker's -- you all's child and leave?        |
| 24 | A. | That don't have anything to do with that. I'll         |
| 25 |    | answer your question. On that particular --            |

```
 1              THE COURT:  Make sure you -- Mr. McKinnes,
 2         make sure you just answer the question.
 3    A.   On that particular day, I did tell her I was
 4         going to take him back to town; he wasn't coming
 5         back down there.  That's what I told her.  That
 6         was my statement to her.
 7    Q.   How many times have you threatened to take the
 8         child from her?
 9    A.   I don't know.
10    Q.   Okay.  Have you guys been arrested for domestic
11         violence?
12    A.   No, we haven't.  We wasn't fighting.
13    Q.   Have you ever taken the child and left with the
14         child before?
15    A.   No, I haven't.
16    Q.   You testified earlier that you were talking with
17         your grandmother on the telephone and said that
18         she had brought someone to jump on you?
19    A.   I was talking to my grandmother like you would be
20         talking to yours, just having a normal
21         conversation, and that came up.  And that's what
22         -- that was my statement to my grandmother.
23    Q.   Okay.  And has she brought someone to jump on you
24         before?
25    A.   Evidently, she -- no, she -- no.  Okay.  She
```

```
 1        didn't.

 2   Q.   Okay.  Well, Mr. McKinnes, what -- was this the

 3        first time you had ever heard that Ms. Parker had

 4        ever cheated on you?

 5   A.   That was the first to my knowledge.

 6   Q.   You were very upset when this happened?

 7   A.   Yes.  Yes, I was.

 8   Q.   Okay.  You were so upset that you actually went

 9        over to Mr. Lockwood's home at that point?

10   A.   No, I didn't.  I'm going to tell you exactly how

11        it happened.

12   Q.   Okay.

13   A.   This was -- after he came to my house and

14        assaulted me and took my son away from that

15        house, that's when I went to his house.

16   Q.   Now, you're saying he took your son away.  Was

17        Ms. Parker with him and her brother Terrence?

18   A.   Ms. Parker didn't take my son.  Ms. Parker didn't

19        put her hands on him.  He put his hands on him.

20   Q.   Did all of them get back in the same car?

21   A.   They never got out of the car.  Ms. Parker --

22        Ms. Parker never got out of the car.

23   Q.   So she just sent the men in to do the work and

24        she stayed in the car?

25   A.   I guess so.
```

```
 1   Q.   All right.  So you were very upset?  In fact, you
 2        were so upset, you went over to Mr. Lockwood's
 3        home at that point?
 4   A.   And that's right.
 5   Q.   Where did you go to?
 6   A.   I went to his wife's house, and I knocked on the
 7        door, and I asked her did she know what was going
 8        on between Mr. Lockwood and Ms. Parker.  And she
 9        said, no, what's going on?  That was her
10        statement to me.
11   Q.   Okay.  So at that point did you indulge her and
12        tell her what was going on?
13   A.   Yes, ma'am, I did.  And at that point she said --
14        this was her statement to me.  Oh, that's why he
15        be leaving home every night at one o'clock
16        walking up the road.
17   Q.   Okay.  What else -- did anything else happen at
18        that point?
19   A.   After that, I stayed there for a little while.  I
20        tried to call -- I guess I called my sister again
21        from there and told her to meet me up the road --
22        up that road because -- up that road.  I met my
23        sister up the road.
24   Q.   Did you call from Mrs. Lockwood's house?
25   A.   No.  I called from Mrs. -- I know her as
```

```
 1              Ms. Harmon.  I called from her mother's house.
 2    Q.    And why didn't you call from Ms. Lockwood's
 3          house?
 4    A.    Because she didn't have a phone.
 5    Q.    She didn't have a phone?
 6    A.    That's what she told me.
 7    Q.    Okay.  So she didn't have a phone.  Now, did you
 8          ask Ms. Lockwood to go with you to file charges
 9          against Mr. Lockwood?
10    A.    Yes, I did.
11    Q.    Why did you ask her to go with you?
12    A.    I asked her to ride up -- would she ride up there
13          with me.  At that time I was muddied all up and
14          really upset.  I didn't really want to drive
15          myself up there.
16    Q.    You were so upset at that point that, in fact,
17          you said that you would do -- that you were going
18          to kill Mr. Lockwood?
19    A.    No, I never said I was going to kill anybody.
20          And I didn't even have a weapon.
21    Q.    As a matter of fact, when you went over to
22          Ms. Harmon's house, you picked up her kitchen
23          knife at that point and said that you were going
24          to kill Mr. Lockwood, didn't you?
25    A.    But I didn't have a weapon.
```

```
 1   Q.   You don't call a knife a weapon?

 2   A.   I -- when I left her house, I had nothing in my

 3        hand.

 4   Q.   Was that because Ms. Harmon made you put her

 5        kitchen knife back?

 6   A.   No.  If I just wanted to walk out of my house

 7        with that knife, I would have just walked on out

 8        with it.

 9   Q.   Well, can you tell us why you picked the knife up

10        out of the kitchen in the first place?

11   A.   I don't recall picking up a knife.  That's

12        hearsay.

13   Q.   It won't be.  Ms. Harmon will be in in a few

14        minutes.

15             Now, Mr. McKinnes, after you left there,

16        at that point, did you go on back and --

17   A.   After I left her house, I went to the police

18        station and filed a police report.

19   Q.   Okay.  Was Ms. Lockwood present at her mother's

20        house at that time?

21   A.   When I left there, she was there.

22   Q.   Okay.  And prior to that, you had actually been

23        at Ms. Lockwood's house?

24   A.   I never went in her house.  I knocked on her

25        door.  She came to her door.
```

| | | |
|---|---|---|
| 1 | Q. | At that point did you tell -- did you put |
| 2 | | Ms. Lockwood on notice that you intended to do |
| 3 | | whatever you needed to do to get Mr. Lockwood -- |
| 4 | A. | No, I didn't. |
| 5 | Q. | -- locked back up?  You never said that |
| 6 | | statement? |
| 7 | A. | No, I didn't. |
| 8 | Q. | You never said that statement in front of |
| 9 | | Ms. Harmon -- |
| 10 | A. | No, I didn't. |
| 11 | Q. | -- either? |
| 12 | A. | No, I didn't. |
| 13 | Q. | Okay.  Now, Mr. McKinnes, when you got to the -- |
| 14 | | after the incident on the 11th with the shooting, |
| 15 | | the alleged shooting that you described, you were |
| 16 | | taken to the hospital by ambulance? |
| 17 | A. | Yes, I was. |
| 18 | Q. | Okay.  Mr. McKinnes, I apologize for doubling |
| 19 | | back on you here, but I've got to go back because |
| 20 | | I just thought of two things I needed to ask you |
| 21 | | about. |
| 22 | | At some point while you were on Steris' |
| 23 | | property, your car was parked over here in the |
| 24 | | grass? |
| 25 | A. | Yes.  And I know -- well, are you asking me when |

```
 1              did I move my car?

 2     Q.      I'll get to that.  That's where I'm headed

 3              though.

 4                    Your car was over here on Steris'

 5              property.  I guess my first question would be why

 6              did you move your car?

 7     A.      Because they asked me to move my car.  The guy

 8              come from in the plant and asked me -- told me I

 9              needed to move my car from right there.

10     Q.      There was a guy who came in from the plant?

11     A.      Like I said, when they was leaving, I was trying

12              to stop two cars as I already said.  And the

13              second car stopped, and the guy went in to call

14              the shift supervisor, call somebody back in the

15              plant.  That guy told me you need to move your

16              car from right there.  So I took my car and

17              parked it across the street as you can see in

18              this -- in one of these pictures.

19     Q.      Had you been shot at that point?

20     A.      To my knowledge, I had.  Because somebody had

21              fired a gun at me and attempted to shoot me if

22              they didn't shoot me.

23     Q.      But they had asked you to take your car --

24     A.      I was conscious.

25     Q.      As a matter of fact, after you claimed that you
```

```
 1              had been shot, you said that you got up and ran

 2              back to the guard shack?  You said --

 3    A.        No, I didn't say I ran.  I said I went back to

 4              the guard shack.  And like I just said, I was

 5              conscious.

 6    Q.        And I think on -- you used -- on direct, you

 7              stated you ran back to the guard shack.  But

 8              that's neither here nor there.  You went back to

 9              the guard shack to say to Ms. Parker look what

10              you've done?

11    A.        Yes, I did.

12    Q.        Okay.  Now, once you were taken -- taken back, as

13              far as the Steris employee, did they say anything

14              else to you at all?

15    A.        That's the only thing that guy said to me,

16              telling me you need -- somebody needs to move

17              that car from right there.  So I didn't -- I

18              didn't let her get in my car.

19    Q.        Now, Mr. McKinnes, had Ms. Parker put you on

20              notice that Mr. Lockwood was coming by there?

21    A.        No, she hadn't.

22    Q.        Earlier, you testified that you were dropping

23              your son off there.  Why were you waiting?

24    A.        Because, like I said earlier when you was

25              questioning me, that's something like on a day
```

```
 1              when I be off, I normally always go up there on a

 2              Friday and sit down and talk about -- spend a

 3              little time with her because my schedule is kind

 4              of conflicting.

 5    Q.        But at that point she had already told you the

 6              Thursday, the day before, that y'all were

 7              finished?

 8    A.        And at that point I told you earlier I had talked

 9              to her earlier in the day twice.  I told you I

10              called her about sometime after 4:00 that

11              evening, and then I called her again at

12              nine o'clock.

13    Q.        So had you all made up at that point?

14    A.        Like I said, I talked to her.  I didn't say we

15              was broken up or whatever.  I said I talked to

16              her.

17    Q.        You just talked to her, but y'all hadn't made up

18              at that point.

19                       Now, let me ask you about your trip to

20              the hospital.  You're at the -- which hospital

21              did you go to?

22    A.        Jackson Hospital.

23    Q.        And do you remember about what time you got

24              there?

25    A.        No.
```

| | | |
|---|---|---|
| 1 | Q. | When you were -- you were conscious at that |
| 2 | | point; is that correct? |
| 3 | A. | That's what I said. |
| 4 | Q. | Okay.  And did you have an opportunity to talk |
| 5 | | with the nurse and the doctor there then? |
| 6 | A. | I don't recall who I talked to when I was in |
| 7 | | there, but they just took me in a room, and my |
| 8 | | son was with me. |
| 9 | Q. | Did you tell them at that point what was wrong |
| 10 | | with you? |
| 11 | A. | Well, I guess the EMT's told them.  I don't |
| 12 | | remember what I -- I don't even remember talking |
| 13 | | to anyone there. |
| 14 | Q. | You were just conscious?  You don't remember |
| 15 | | anything; you was just conscious? |
| 16 | A. | I remember talking to them.  I didn't say I |
| 17 | | remembered anything. |
| 18 | Q. | Okay.  But you don't remember what you told them? |
| 19 | A. | No.  I don't remember telling them anything.  He |
| 20 | | just asked me what had -- I'm going to say he |
| 21 | | probably asked me where I had been wounded at, |
| 22 | | and I told him in my head.  And so he did a CAT |
| 23 | | scan or whatever it is they do, an MRI, CAT scan, |
| 24 | | whichever one it is. |
| 25 | Q. | At any point do you remember telling him that you |

```
 1              had a gunshot wound to the head?

 2    A.    I didn't tell him that.  He told me that.  That

 3          was his statement -- at that time that doctor --

 4          that was the doctor's statement; you're a lucky

 5          young man.

 6    Q.    The doctor told you that --

 7    A.    Yes, ma'am, he did.

 8    Q.    Dr. Norman Garrison --

 9    A.    I don't know what's the doctor's name.

10    Q.    Mr. McKinnes, she's attempting to get down the

11          information.  Usually, I'll finish my questions,

12          and then I'll allow you an opportunity to answer,

13          and then I'll start my next question.  Okay?

14                Approximately how long did you say you

15          were at the ER?

16    A.    Just like I said, I wasn't keeping up with the

17          time.

18    Q.    So you don't remember what time it was?

19    A.    No, I don't.

20    Q.    If I said to you that it was -- you were there

21          maybe an hour, an hour and ten minutes, would

22          that sound reasonable to you?

23    A.    I can't say.  If somebody just beat your brains

24          out, would you remember what time it was?

25    Q.    Mr. McKinnes --
```

1        THE COURT:  Mr. McKinnes, make sure you just

2    answer her questions.  Okay.  Go ahead,

3    Ms. Toles.

4        MS. TOLES:  Your Honor, I think I've heard

5    enough at this point.

6        THE COURT:  Okay.  Any more questions,

7    Mr. Bailey?

8        MR. BAILEY:  No further questions, Your

9    Honor.

10        THE COURT:  Okay.  Thank you, Mr. McKinnes.

11    You can step down.

12        All right.  Ladies and gentlemen, what

13    we're -- Mr. Bailey, are y'all going to have any

14    more witnesses?

15        MR. BAILEY:  No, ma'am.

16        THE COURT:  Okay.  Is the State going to

17    rest?

18        MR. BAILEY:  Yes, ma'am.

19        THE COURT:  Okay.  What we're going to do at

20    this point, ladies and gentlemen, is we're going

21    to break for lunch.  We're actually going to have

22    a pretty long lunch break because we've got other

23    things we've got to do.

24        I'm going to need everyone to be back in

25    the jury assembly room at three o'clock.  And,

```
 1        like I said, we'll be done with this case this

 2        afternoon.  Yes?

 3             MS. TOLES:  Your Honor, before we release

 4        them, we brought in the doctor, and he is -- we

 5        called him because we thought we were going to go

 6        on straight through.  Is there any way we could

 7        possibly take the doctor's testimony?

 8             THE COURT:  How long is he going to take?

 9             MS. TOLES:  It shouldn't be long, Your

10        Honor.

11             THE COURT:  Okay.  Come here for a second.

12                       (An off-the-Record discussion was

13                        held at the bench outside the hearing

14                        of the court reporter and jury.)

15             THE COURT:  Okay.  Ladies and gentlemen,

16        what we're going to do, we're going to let the

17        doctor testify because they have to get back to

18        work.  Doctors always get special treatment in

19        court.  They luck out because they've got to go

20        help take care of people.  So we're going to go

21        ahead and get the doctor.  All right.  Ms. Toles,

22        who is the doctor?

23             MS. TOLES:  It's Dr. Norman Garrison, and

24        Ms. Williams is grabbing him right this moment.

25             THE COURT:  All right.
```

1            NORMAN A. GARRISON, JR., M.D.,

2       a witness, after having first been duly sworn to

3       speak the truth, the whole truth, and nothing but

4       the truth, took the stand and testified as

5       follows:

6                    **DIRECT EXAMINATION**

7       **BY MS. TOLES:**

8   Q.   I'm going to put that there, Dr. Garrison. State

9        your name for the Record, please.

10  A.   Norman A. Garrison, Jr.

11  Q.   And where do you work?

12  A.   Jackson Hospital.

13  Q.   And I'm -- if it's okay, I'll identify you as --

14       I'll call you Dr. Garrison because --

15  A.   That's fine.

16  Q.   Okay. Thank you. Dr. Garrison, were you working

17       with Jackson Hospital back on April the 11th,

18       2003?

19  A.   Let me look at this. Yes.

20  Q.   And what shift would you have been working on

21       that day, Dr. Garrison?

22  A.   The 6-P to 6-A shift.

23  Q.   So that's 6:00 p.m. until 6:00 a.m.?

24  A.   Yes.

25  Q.   Dr. Garrison, I've given you a document which has

1       previously been admitted as State's Exhibit

2       Number 15.  I'll ask you just to look at the

3       document and see if you recognize that document.

4   A.  Yes.

5   Q.  Okay.  Dr. Garrison, do you recall -- or from

6       looking at the documents, can you tell who it was

7       that you were actually seeing on the day in

8       question on that particular date?

9   A.  Christopher McKinnes.

10  Q.  Okay.  And what was it that the person was coming

11      in complaining of?

12  A.  Let's see.  Patient arrived in an ambulance

13      complaining of a gunshot wound to the head.

14  Q.  And at some point did you have an opportunity to

15      examine the patient?

16  A.  Yes, I did.

17  Q.  And upon your examination, what did you find?

18  A.  A gunshot wound to the head, an entrance and exit

19      wound, a top of the head entrance and exited

20      above the left ear.

21  Q.  Is that what you actually found upon your

22      examination of the patient?

23  A.  Yes, ma'am.  It was an entrance and exit wound.

24      He said he had a gunshot wound that caused an

25      entrance and exit wound.

```
 1    Q.    And that was -- at some point did you have him

 2          sent over to have him examined for CT scans and

 3          things of that nature?

 4    A.    Yes, ma'am.

 5    Q.    And you had that with you as well?

 6    A.    Yes, ma'am, I got the reports.  Yes.

 7    Q.    Do those reports reflect that he had actually had

 8          some -- a gunshot wound?

 9    A.    No, they do not.  Well, let me -- can I qualify

10          that statement?

11    Q.    Yes.

12    A.    There's no -- this is a normal CAT scan.

13          Usually, if a bullet enters the body, it leaves

14          some flecks of metal, and you can see the track.

15          And this wasn't present on the CAT scan.

16    Q.    Okay.  And if it had have been a gunshot wound,

17          would you have seen some flecks of metal

18          somewhere?

19    A.    Usually.

20    Q.    Usually?

21    A.    Yes.

22    Q.    Can you explain why you wouldn't have seen any in

23          this particular case?

24    A.    No, ma'am, I can't.

25    Q.    Okay.  The -- when you said that there was a
```

```
 1            gunshot wound -- when you examined him, what was

 2            it that led you to believe that there was a

 3            gunshot wound to his head?

 4     A.     He told me.

 5     Q.     So was there anything else that gave you any

 6            inclination that it was a gunshot wound to the

 7            head?

 8     A.     Well, it was an entrance and exit wound.

 9     Q.     So let me -- let me show you what's being -- what

10            has previously been marked as State's Exhibit

11            Number 7.

12     A.     Yes.

13     Q.     And ask you would those be consistent with an

14            entrance and an exit wound?

15     A.     Yes.

16     Q.     Okay.  What about -- do you have two holes where

17            this entrance and exit wound would be?

18     A.     I -- I drew them on my sheet here, and I -- I

19            can't really tell where this is on the head.

20            But on my diagram here, I drew it as the entrance

21            wound was on top of the head and the exit was

22            above the left ear.

23     Q.     Now, would an entrance and an exit wound going

24            above the left ear, would that not cause some

25            harm to somebody if they had a bullet wound from
```

```
 1            the top of their head to the --

 2   A.      It's possible and probable.  I'm having to

 3           qualify this because I've seen gunshot wounds

 4           that I didn't think hurt anybody and it was in

 5           the head.  And I've seen gunshot wounds that

 6           looked like it should have killed them and it was

 7           superficial.  So I -- I can't really state that

 8           this should have hurt him.

 9   Q.      Now, Dr. Garrison, I guess I'll have to ask you

10           about this.  Do you remember talking with me

11           previously about this case?

12   A.      Yes, I do.

13   Q.      Do you recall telling me that an exit -- an

14           entrance wound and an exit wound of that nature

15           would have killed him before?

16   A.      It could have, yes.  Yes, it could have.  Like I

17           said, some superficial wounds are significant

18           injuries and some that looked like they should

19           have killed them didn't.  So I -- I've seen a lot

20           of them.

21   Q.      Okay.  And on this particular one, based on the

22           medical -- the scientific evidence with the CT

23           scan, did you see any indication that it was a

24           gunshot wound?

25   A.      Other than an entrance and exit wound, no.
```

```
 1   Q.   And on the other one that you're -- which one did

 2        you -- you see -- the picture that you have,

 3        State's Exhibit Number 7 --

 4   A.   Yes.

 5   Q.   -- actually has two places on it there.

 6   A.   Okay.  I'm looking.

 7   Q.   And --

 8   A.   And I don't see -- I guess you're talking about

 9        this and this?

10   Q.   Yes.

11   A.   Okay.

12   Q.   Now, I'm going to show you what's State's Exhibit

13        Number 12 as well.

14   A.   Okay.  I'm not -- okay.  I don't -- I see some

15        scratches here, it looks like.

16   Q.   Would you consider that to be --

17   A.   Wait, wait.  I'm sorry.  Okay.  I've got it now.

18   Q.   Now, what would you -- would you --

19            MR. GREEN:  Judge, before the doctor

20        answers, I'm going to ask that Ms. Toles lay a

21        little better predicate than that.

22            THE COURT:  Go ahead, Ms. Toles.

23   Q.   Would you consider that to be an exit wound

24        there?

25   A.   That's consistent with an exit wound.  But it's
```

```
 1              -- I mean, it looks like an entrance and exit
 2              wound, yes.
 3    Q.        Based on the scientific evidence that you
 4              actually had when you actually sent in for the CT
 5              scan, did he have any -- were there any metal
 6              fragments there?
 7    A.        No.
 8    Q.        Did you --
 9    A.        On the CT scan, there was no metal fragments.
10    Q.        When he came in, did you see any gun powder
11              residue?
12    A.        No, no.
13    Q.        Once you got -- finished -- and you didn't see
14              the gun powder and there was no -- nothing else
15              there on -- as far as metal fragments?
16    A.        No fragments, no, ma'am.
17    Q.        No metal fragments?
18    A.        No, ma'am.
19    Q.        The gunshot to the wound -- the documentation
20              that you made, that would have been what he told
21              you was a gunshot to the head?
22    A.        That's correct.
23    Q.        And how long was he at the hospital?
24    A.        You asked me that the other -- fifty-five minutes
25              which is unbelievable.  But it was midnight, so
```

```
 1              he got in and out quick, fast.
 2    Q.        He was at the hospital for fifty-five minutes?
 3    A.        Right.
 4    Q.        Is that what you usually do when you treat
 5              somebody who has a gunshot wound to the head?
 6    A.        Not unless it's superficial, no.
 7    Q.        So you had a CT scan and get him in and out of
 8              there in fifty-five minutes?
 9    A.        I don't know how that's possible, but it was.  We
10              did it.
11                   THE COURT:  Anything further?
12                   MS. TOLES:  That's it.
13                   THE COURT:  Any questions?
14                   MR. BAILEY:  Judge, the only thing that we
15              would offer is -- I believe Ms. Toles meant to
16              and maybe neglected to do it.  I believe she was
17              offering him as an expert.  We would stipulate to
18              his qualifications and that he is a medical
19              doctor and I believe is actually a surgeon --
20                   THE WITNESS:  Yes.
21                   MR. BAILEY:  -- in the emergency room.  And
22              we'd stipulate to his qualifications and that he
23              is an expert.
24                   THE COURT:  Okay.  And the Court accepts
25              Dr. Garrison as an expert.
```

1                    Anything further?

2              MR. BAILEY:  No, ma'am.

3              THE COURT:  Okay.  Anything else, Vicky?

4              MS. TOLES:  No, Your Honor.

5              THE COURT:  Okay.  Thank you, Dr. Garrison.

6        We appreciate it.

7              THE WITNESS:  Yes, ma'am.  Do I leave these

8        up here?

9              THE COURT:  Yes, sir.  Thank you.

10                   All right.  Ladies and gentlemen, we are

11       going to break here.  Again, I'm going to need

12       everyone to be back at three o'clock in the jury

13       assembly room.  Remember, when you're at lunch,

14       again, do not discuss the case with each other or

15       with anyone else.  And I will see everyone back

16       at three o'clock.  Thank you.

17                        (The following proceedings were held

18                         outside the presence and hearing of

19                         the jury:)

20             THE COURT:  The Court noted for the Record

21       that at the conclusion of the State's case --

22       when they rested, the Court stated that it would

23       allow the defense to make any motions that they

24       had and that those would be considered timely.

25       So at this time does the defense have any motions

1    that they wish to make at the conclusion of the

2    State's case?

3        MS. TOLES:  Your Honor, we would.  We would,

4    first of all, move for a motion for judgment of

5    acquittal asking the Court -- saying that the

6    State has not proved beyond a reasonable doubt

7    their case in chief.  And the second one, Your

8    Honor, we started out with a motion to suppress

9    earlier on concerning the statement.  And after

10   having that testimony, we would still ask the

11   Court to go back and reconsider that motion to

12   suppress on the taped statement that was given by

13   Mr. Lockwood, to have it excluded from going back

14   to the jury.

15       THE COURT:  Okay.  And I'm going to deny

16   that motion, and the defense can put on their

17   case, which we've had one witness, Dr. Garrison.

18   And how many more are y'all going to have, Vicky?

19       MS. TOLES:  Your Honor, there will be at

20   least two, and we're still not sure about

21   Mr. Lockwood at this point.  If it's going to be

22   anything, it won't be very much.

23       THE COURT:  Okay.  I'll see y'all at

24   three o'clock.

25           (Lunch recess.)

1      (The rest of the trial proceedings

2      were reported by Dub Harris, Official

3      Court Reporter.)

4

5

6

7

8     * * * * * * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          IN THE FIFTEENTH JUDICIAL CIRCUIT
            IN AND FOR MONTGOMERY COUNTY
2                MONTGOMERY, ALABAMA

3

        STATE OF ALABAMA,
4
                    PLAINTIFF,
5
        vs.                          CRIMINAL ACTION
6                                    CASE NO. CC-03-957

7       ALBERT JEROME LOCKWOOD,

8                    DEFENDANT.

9

10      _____/

11        COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS
                    MARCH 18, 2004
12
            MONTGOMERY COUNTY COURTHOUSE
13                  COURTROOM 3-B

14

15      BEFORE:  THE HONORABLE TRACY S. McCOOEY
                 CIRCUIT JUDGE

16
                    APPEARANCES
17
        ON BEHALF OF THE STATE:
18
        DARYL BAILEY, ESQUIRE
19      SCOTT GREEN, ESQUIRE
        DEPUTY DISTRICT ATTORNEY
20      FIFTEENTH JUDICIAL CIRCUIT
        MONTGOMERY, ALABAMA
21
        ON BEHALF OF THE DEFENDANT:
22
        TRINA WILLIAMS, ESQUIRE
23      MONTGOMERY, ALABAMA

24

25

                    Vicki H. Clark
                 Official Court Reporter
                    (334) 832-1365

PROCEEDINGS

1

2      THE COURT:  Mr. Lockwood, how are you?

3      THE DEFENDANT:  I'm doing fine.

4      THE COURT:  Okay.  Ms. Williams, I

5  understand we're here to sentence Mr. Lockwood --

6      MS. WILLIAMS:  Yes, Your Honor.

7      THE COURT:  -- on an attempted murder

8  conviction.  Is that correct?

9      MS. WILLIAMS:  Yes, Your Honor.

10      THE COURT:  And does Mr. Lockwood wish to

11  have a formal sentencing hearing?

12      MS. WILLIAMS:  Yes, Your Honor.  He has

13  here with him today his mother, his

14  mother-in-law, and his father-in-law and his

15  sister.

16      THE COURT:  Okay.  I'll be happy to hear

17  from whomever would like to speak.

18      MS. WILLIAMS:  Okay.

19      MR. HARMON:  May I speak?

20      THE COURT:  Yes, sir.  Go ahead.  If you

21  could just identify yourself for the Record.

22      MR. HARMON:  Ma'am?

23      THE COURT:  If you could just identify

24  yourself so we can get it for the Record.  Just

25  state your name.

1          MR. HARMON:  My name?

2          THE COURT:  Yes.

3          MR. HARMON:  Eddie L. Harmon.

4          THE COURT:  Okay.  Thank you.  Go ahead,

5     Mr. Harmon.

6          MR. HARMON:  Well, as far as I know, he's a

7     good person, and I hate that -- I hate to see him

8     have to do something that, you know, he's not

9     guilty of.  It really hurts me.

10          THE COURT:  Are you related to him or --

11          MR. HARMON:  Ma'am?

12          THE COURT:  Are you related to him?

13          MR. HARMON:  I'm his father-in-law.

14          THE COURT:  Father-in-law.  Okay.  All

15     right.  Thank you, sir.

16          MS. WILLIAMS:  I'll let his sister go next.

17          THE COURT:  Yes, ma'am, if you could just

18     state your name for the Record.

19          MS. THOMAS:  Cindy Thomas.

20          THE COURT:  Okay.  Ms. Thomas.

21          MS. THOMAS:  Yeah, that's my baby brother

22     and, you know, kind of spare his sentence, you

23     know, because he have a child that -- and that

24     boy, he really loves him, you know, and his

25     nieces and nephews love him, too.  And there's

1    other children that love him, too, and I love

2    him.  And I don't want to see him do no really

3    hard time, you know.  I don't know what the

4    situation is, you know, with this case, you know,

5    but, Albert, he's -- he's not no bad person.

6    And, you know, he, you know, don't do things like

7    that, you know, and stuff.  That's all I have to

8    say.

9         THE COURT:  All right.  Thank you, ma'am.

10   Yes, ma'am, if you can just state your name for

11   the Record.

12        MS. HARMON:  Vessie Harmon.

13        THE COURT:  Okay.  Yes, ma'am.

14        MS. HARMON:  Well, he's my son-in-law, and,

15   as far as I know, he's a good person.  His little

16   boy asks about him every day.  He cries sometimes

17   at night for him.

18        THE COURT:  Okay.  Thank you, ma'am.

19        MS. LOCKWOOD:  My name is Fannie Lockwood.

20   I'm Albert Lockwood's wife.  Your Honor, I do not

21   believe to my heart that my husband did what

22   Mr. McKinnes said.  Mr. McKinnes has said to me

23   out of his own mouth that he was going to do

24   whatever he had to do -- he didn't care what it

25   was -- to have him sent to prison.

1    We have a five-year-old son.  My son was

2    four when my husband got locked up.  He turned

3    himself in.  The police did not pick him up.  I

4    truly believe if he had did what Mr. McKinnes

5    said he had did, he would not have turned himself

6    in.

7    My son has turned five since my husband

8    was locked up.  He has not seen his father since

9    the last of May since he turned hisself in.  And

10   he asks about his daddy day and night.  He has

11   dreams.  He wakes up crying with dreams.  And he

12   tells me all the time, every day, that I miss

13   daddy; mama, I want daddy to come home.

14   THE COURT:  Well, Ms. Lockwood, let me ask

15   you a question.  Mr. Lockwood, he isn't this

16   nice, great person.  He had an affair with --

17   MS. LOCKWOOD:  Yeah, he had an affair.

18   THE COURT:  I mean, I'm sorry.  If my

19   husband had an affair, bye, bye, he'd be out the

20   door in two seconds.  There's no man that has an

21   affair that's a good husband because that is --

22   you talk about the Ten Commandments, thou shalt

23   not commit adultery, that is a sin.

24   MS. LOCKWOOD:  It is.

25   THE COURT:  I'm sorry.  I mean, that doesn't

```
 1      have anything to do with his sentence, but I'm

 2      just saying I don't know why y'all are sitting

 3      here saying what a great person.  Anyone who has

 4      an affair, that's not a nice person.

 5           MS. LOCKWOOD:  I don't --

 6           THE COURT:  I don't agree with that at all.

 7           MS. LOCKWOOD:  We have to learn how to

 8      forgive.  The Lord will heal us.

 9           THE COURT:  Yes, we've got to forgive

10      everyone.  You're right.  That's exactly right.

11      But he did not need to be having an affair.  And

12      that affair, the reason I bring it up, is what

13      got us here.

14           MS. LOCKWOOD:  Yes.

15           THE COURT:  Being involved with this woman

16      is how he got here.

17           MS. LOCKWOOD:  Yes.

18           THE COURT:  And you're right.  The people

19      he's harming is all of y'all and your child who

20      doesn't see him.  That's the people that get

21      harmed.

22           MS. LOCKWOOD:  Yes.

23           THE COURT:  But this didn't need to be

24      because we didn't need to be having an affair.

25           MS. LOCKWOOD:  That's right.
```

1          THE COURT:  You know?

2          MS. LOCKWOOD:  That's right.

3          THE COURT:  And we wouldn't be in this

4    situation.  There's no excuse for that at all.

5          MR. HARMON:  May I speak?

6          THE COURT:  Yes.

7          MR. HARMON:  I just -- you know, I believe

8    in Christianity, but --

9          THE COURT:  Yes, I do, too.  Thou shalt not

10   commit adultery.  Everyone wants to harp on the

11   Ten Commandments.  Let's live them, man.  Okay?

12   Let's not worry about looking at them.  Let's

13   live them in our heart.  And that's one of them.

14         MR. HARMON:  Yes, ma'am.

15         THE COURT:  If we want to talk about

16   Christianity --

17         MR. HARMON:  Well, what I -- what I was

18   trying to say, excuse me, well, we -- we -- as

19   humans, we're going to make mistakes and so

20   forth.  But I hate to see -- I mean, if I --

21         THE COURT:  That's not a mistake.

22         MR. HARMON:  If I cause something that -- if

23   I cause you to have to go through some things

24   that you're not guilty of, then it's the same on

25   me on down through life because God is going to

1      suffer for you.

2            THE COURT:  But you understand, Mr. Harmon,

3      the only reason we're here is because of this

4      affair.

5            MR. HARMON:  Yes.

6            THE COURT:  We wouldn't be in this

7      situation.  There would not have been any guns or

8      any altercations but for this affair.  You know,

9      that's what got us all here.  And it's

10     unacceptable.

11           MR. HARMON:  Yes.  But was it a gun involved

12     in it?

13           THE COURT:  Sir?

14           MR. HARMON:  Was it a gun involved in it?

15           THE COURT:  Well, the evidence at trial

16     showed there was, I mean, which I've got to just

17     take what a jury said.  I'm not the one who tried

18     the case.  It was a jury of twelve people.

19           MR. HARMON:  Well, Your Honor, the way I

20     understood, they didn't come up with no gun, just

21     possible shells to a gun.  But anybody could have

22     planted the hulls.

23           THE COURT:  Well, I'm just saying the jury

24     said there was a gun.  But we wouldn't be in this

25     situation if we weren't having an affair.

1        THE DEFENDANT:  Yes, ma'am.

2        THE COURT:  Now, that is just unacceptable.

3    That has nothing to do with the sentence.  I

4    mean, I don't care.  That's your business if you

5    have an affair.  But I'm just saying that's what

6    got us in this situation.  We'd never be in it,

7    you know, never be in it.

8            All right.  I appreciate y'all speaking.

9        MR. HARMON:  Thank you.

10        THE COURT:  All right.

11        MS. WILLIAMS:  Judge --

12        THE COURT:  I'm sorry.  Before -- Mr.

13    Bailey, does anyone over here have anything to

14    say?

15        MR. BAILEY:  Yes, Your Honor.

16        THE COURT:  All right.

17        MR. BAILEY:  And before we do, if I could

18    just get the technicalities out of the way.

19        THE COURT:  Sure.  Any priors we're

20    invoking?

21        MR. BAILEY:  He does have priors, at least

22    three priors, which I have here certified copies

23    that we would move to invoke.

24        THE COURT:  With three, we're looking at

25    life or life without parole?

1          MR. BAILEY:  Yes, ma'am, that's correct.

2          THE COURT:  Those are the only two options.

3          MR. BAILEY:  The first certified conviction

4     I have is CC-82 -- and I have either provided

5     these to Ms. Williams or she has copies of them.

6          THE COURT:  Okay.

7          MR. BAILEY:  We've gone over them.

8     CC-82-225 in which Mr. Lockwood was convicted of

9     burglary in the third degree.  I'll present that

10    to the Court.

11         THE COURT:  Thank you.

12         MR. BAILEY:  CC-88-625 in which the

13    defendant was convicted of theft of property in

14    the second degree.  We've got CC-89-1214 in which

15    the defendant was convicted of theft of property

16    in the second degree.  I've got CC-90-1391 in

17    which the defendant was convicted of escape in

18    the second degree.

19         THE COURT:  Okay.

20         MR. BAILEY:  All of those certifieds are

21    bound together right here.

22         THE COURT:  All right.  Thank you.

23         Okay.  Mr. Bailey, anyone have anything

24    they would like to say to the Court?

25         MR. BAILEY:  Judge, a couple of things.

1    One, it does list a couple of things in his PSI.

2    One -- we do agree with the recommendation made

3    by the probation officer in this case.  But one

4    of the things I do want to point out is that

5    there is a robbery third that shows up on this

6    report, and that is one of the thefts that was

7    pled down to theft instead of robbery.  But I do

8    also want to point out to the Court this is not

9    the first time that Mr. Lockwood has been charged

10   with attempted murder.  He was charged back in

11   1986 with attempted murder, and that was pled

12   down to a lesser offense of assault.

13        Judge, I've been doing this for a while,

14   and I -- what I've been doing over the last few

15   days, thinking about this sentencing coming up,

16   is trying to put myself in the position of the

17   Court, what I would do if I were in your

18   position.  And the things that bother me are

19   things that you've already pointed out.  One that

20   really jumps out at me this morning is the fact

21   that there has been no remorse shown.  There has

22   been just he's not guilty.  Even if you look in

23   the PSI, his statement to the probation officer

24   is that the victim was trying to set him up.  And

25   I -- I know that Your Honor sat through the same

1    trial that I sat through and listened to all the

2    evidence, the overwhelming evidence in this case,

3    and that the jury listened, too, and, of course,

4    came back and convicted Mr. Lockwood in a very

5    short amount of time based on that evidence.

6           But I think what makes me more upset

7    than any of that -- well, no.  It just downright

8    ticks me off, Your Honor, if I could say so --

9    and excuse me for that -- is that that day there

10   was a five-year-old little boy named Taqueris

11   that's the son of this victim.  You know, and the

12   family over here -- and I certainly understand

13   their position.  They're victims in this, too.

14   But, you know, they mentioned his little boy

15   wakes up crying wanting their daddy.  Well, this

16   man right here has a five-year-old little boy who

17   wakes up every night with nightmares because he

18   saw his daddy get shot in the head.  And he's

19   wondering if this man is going to come back and

20   kill his daddy again.  And, you know, if you

21   sentence Mr. Lockwood to life, which you

22   certainly have the option of doing, you've got

23   that five-year-old little boy who is going to

24   have to live the rest of his entire life with the

25   events that occurred on that day.  And, you know,

1    you take everything else out of this case and

2    what was going on and who was wrong and who was

3    right and you've got a man who shot another man

4    in the head.  And, you know, another fraction of

5    an inch, another, you know, twist of an arm and

6    we could be sitting here on a murder case, Your

7    Honor, and being sentenced for that.

8            THE COURT:  Yes.

9            MR. BAILEY:  And by the grace of God, Mr.

10   McKinnes is alive.  But -- and he obviously --

11   and not to take anything away from him, he has to

12   live with what happened that day, too.  But what

13   really makes me mad is that that five-year-old

14   little boy is going to live with this for his

15   entire life knowing that his daddy got shot in

16   the head and seeing it happen.  And I think that

17   just weighs on my mind, and I know you, and I

18   know it probably weighs on your mind.

19           But other than invoking those priors for

20   habitual offender purposes and also the weapon

21   enhancement, which really does not apply since

22   his maximum is going to be higher, I'll leave it

23   in the Court's hands.  And I know Mr. McKinnes

24   would like to address the Court.

25           THE COURT:  Okay.  Thanks, Mr. Bailey.

1    Mr. McKinnes, do you have anything you would like

2    to say, sir?  If you could just state your name

3    for the Record.

4         MR. McKINNES:  Yes, ma'am.  My name is

5    Christopher McKinnes.  What I would like to say

6    is I ask that you punish him the maximum

7    punishment as possible because my son -- me as

8    well as my family and my son -- my son'll have to

9    spend the rest of his life with that thought in

10   his head, always being scared.  My son is scared

11   to stay in the house with me by hisself now.  He

12   always -- for months, he asked me is that man

13   going to come back and get us, daddy; is he going

14   to come back and try to kill us again?  And after

15   he did it, he hid out for a month, and he

16   repeatedly called my house and told me if I went

17   to the police or I showed up in court, he would

18   kill me.

19        But all I ask is that you give him the

20   maximum punishment under the law.

21        THE COURT:  And, Mr. McKinnes, this is your

22   wife -- your wife is here?

23        MR. McKINNES:  No, ma'am.  No, Your Honor.

24   My aunt is here.

25        THE COURT:  All right.  And I'm going to get

Vicki H. Clark
Official Court Reporter
(334) 832-1365

1    onto you, too.  You were obviously having an

2    affair on your wife.

3         MR. McKINNES:  No, ma'am.  It was him and

4    her.  I -- I -- I didn't know anything about it.

5    No, ma'am, I was not in no affair.

6         THE COURT:  Were you involved with

7    Ms. Parker at all?

8         MR. McKINNES:  I was supposed to be her

9    boyfriend.  Him and her was having the affair.  I

10   was the innocent person in it.

11        THE COURT:  No.  I'm just saying you were

12   involved with --

13        MR. McKINNES:  No.

14        THE COURT:  -- Ms. Parker, too.

15        MR. McKINNES:  No.  I was --

16        THE COURT:  You were the boyfriend.

17        MR. McKINNES:  I was the boyfriend, yeah,

18   for ten years.

19        THE COURT:  Weren't you married at the time

20   though?

21        MR. McKINNES:  No.  Me and her have been

22   together for ten years.

23        THE COURT:  No.  Weren't you married to

24   someone else?

25        MR. McKINNES:  No, ma'am.

1        THE COURT:  Okay.  Good.

2        MR. BAILEY:  The child was with them.

3        THE COURT:  All right.  Good.  I mean, I'm

4  just sitting here -- because I'm serious, y'all,

5  and I am going to preach.  It's unacceptable,

6  these affairs.  I mean, when you take your

7  wedding vows, let's take them seriously.  I don't

8  even know why we have wedding vows anymore.  Just

9  forget it, you know, till death do us part, to

10  honor and respect.  I mean, let's just pitch them

11  all out, because, obviously, people aren't living

12  them.  And that's what got us in this situation.

13        And Mr. McKinnes is right and Mr. Bailey

14  is right.  There was a little child involved in

15  this whole thing.  And there has been no remorse,

16  Mr. Lockwood.  I mean, do you want to address the

17  Court?

18        THE DEFENDANT:  Yes, ma'am.

19        THE COURT:  Sure.  Go ahead.

20        THE DEFENDANT:  I'd like to say that since

21  1989, 1990, when I appeared in this Court,

22  okay --

23        THE COURT:  With Judge Gordon.

24        THE DEFENDANT:  Yes, ma'am.  After I --

25  Judge Gordon ordered -- sentenced me to do time

1    in prison, okay, after I left the courtroom, when

2    I went down the road, I swore that I would never

3    set foot back in this courtroom again.

4            Okay.  I found -- while I was in prison,

5    I found the Lord Jesus Christ.  I got on the

6    right path.  I asked the Lord to bless me with

7    someone who I can love and could love me.

8            Okay.  Before I got out, that's when he

9    blessed me in meeting my wife.  We got married.

10   We got married.  We had a child.  The best I

11   know, it was a blessing from God.  Okay.

12        THE COURT:  You haven't blessed her very

13   much.

14        THE DEFENDANT:  Yes, ma'am.

15        THE COURT:  Cheating on her.

16        THE DEFENDANT:  I understand that.

17        THE COURT:  That's horrible, and that's

18   unacceptable.

19        THE DEFENDANT:  Yes, ma'am.

20        THE COURT:  Because you know what,

21   Mr. Lockwood?  You've got one thing in marriage.

22   And do you know what it is?  It's called trust.

23   That's all you've got in a marriage.  And when

24   the trust is gone, the marriage is gone.  And

25   people can stay married and say I forgive them

1    and get beyond it, but I'm going to tell you

2    something.  The only thing there is in a marriage

3    is trust.  That's it, my friend.  And when you

4    break that, you don't have a marriage.  And you

5    broke that with your wife, and that's about the

6    worst thing you can do.  And you haven't even

7    apologized to her.

8        THE DEFENDANT:  Yes, ma'am.  As soon as --

9        THE COURT:  My gosh.

10        THE DEFENDANT:  I've got to wait until the

11    honorable judge -- you finish your say.

12        THE COURT:  What about Mr. McKinnes?  See,

13    you still don't even think you did it.

14        THE DEFENDANT:  Yes, ma'am.  Yes, ma'am.

15    Can I finish talking to you?

16        THE COURT:  Yes.

17        THE DEFENDANT:  Okay.  As I said, a point

18    that God blessed me with her and blessed me with

19    a child.

20        Okay.  I was on the right path, but some

21    way, I got off that path.  You know, I feel as

22    though as long -- as long as I stayed on that

23    path with God, I -- like you said, I wouldn't be

24    here.  I was being faithful with my wife, which I

25    do apologize to her.  I love her, and which I

1    apologize to Mr. McKinnes.  In the Lord Jesus

2    Christ's name, I apologize to him.  I love him.

3    I have changed, Your Honor.  I meant -- I meant

4    to do no harm to Mr. McKinnes.  I admit that I

5    was there --

6        THE COURT:  Mr. Lockwood, you tried to kill

7    someone before.  You've got an attempted murder

8    in the past, in your history.  This isn't the

9    first time that you've been violent like this.

10        THE DEFENDANT:  I'm not -- I'm not -- Your

11    Honor, I'm not --

12        THE COURT:  You're not what, man?

13        THE DEFENDANT:  I'm not happy with my past.

14    But the only thing I can say now, Your Honor,

15    is --

16        THE COURT:  Yes.  You live with your past.

17    And you know what?  We all live with the choices

18    we make.

19        THE DEFENDANT:  Yes, ma'am.

20        THE COURT:  We're all responsible.  And you

21    made those choices, and you're going to live with

22    them.

23        THE DEFENDANT:  I made a wrong choice.

24        THE COURT:  Because it's your fault.  Nobody

25    else's.  It's not Mr. McKinnes.  It's not your

1    wife, your mother-in-law, your father-in-law,

2    your sister.  You're the one who made those

3    choices, and you're the one who is going to live

4    with them.

5         THE DEFENDANT:  Yes, ma'am.  And, as I say,

6    I apologize to my wife and to Mr. McKinnes.  And,

7    also, I'd ask God to forgive me for the sin that

8    I -- that I did against my wife.

9              Now, that's my wife.  I ask my wife --

10        THE COURT:  And God is the only one that can

11   forgive you, and you're lucky because we do have

12   a forgiving God.

13        THE DEFENDANT:  Yes, ma'am, we do.

14        THE COURT:  And it doesn't matter what you

15   do.  God can always forgive you.  That's the

16   great thing about God.

17        THE DEFENDANT:  In the blood of Jesus

18   Christ, he --

19        THE COURT:  That's right.  God can always

20   forgive you.

21        THE DEFENDANT:  Yes, ma'am.  Okay.  And my

22   life -- my life has changed.  I've got -- I have

23   got back on the right path.  You know, I once --

24   I was dark, in the dark, committing adultery,

25   cheating on my wife, which --

1      THE COURT:  Uh-huh, and trying to kill

2    somebody.

3      THE DEFENDANT:  It was totally wrong, Your

4    Honor.

5      THE COURT:  Yes.  And now you've got to face

6    the music.  You know?

7      THE DEFENDANT:  Yes, ma'am.  It ain't --

8    it's not the fact that I don't have -- I don't

9    have no remorse, Your Honor.  I have a heart,

10   Your Honor.  And, you know, my heart is not -- is

11   not of what I -- my heart is not cold.  I have a

12   good heart, Your Honor.  And the same -- due to

13   the same fact, when Mr. McKinnes came to my wife

14   on that day in Union Springs and said that I came

15   there to try to take his son, well, why should I

16   try to take his son or get his son and give to

17   his mother and then come back around and try to

18   harm his son?

19     THE COURT:  Mr. Lockwood, you know, the sad

20   thing is you can sit here and say you've changed.

21     THE DEFENDANT:  Yes, ma'am.

22     THE COURT:  But your record indicates you

23   haven't changed.  And we're here today on a very

24   serious case, which tells the Court you haven't

25   changed.  Okay?  And you can stand in front of a

1    judge and say I've changed all day long.

2            THE DEFENDANT:  Yes, ma'am.

3            THE COURT:  But actions speak louder than

4    words.

5            THE DEFENDANT:  True.

6            THE COURT:  I'm looking at your actions, and

7    you have not changed.

8            THE DEFENDANT:  Yes, ma'am.

9            THE COURT:  At all.

10            THE DEFENDANT:  Yes, ma'am.

11            THE COURT:  And, Mr. Lockwood, you know, to

12    be honest with you, you're someone who doesn't

13    need to be out in society with the rest of us.

14            THE DEFENDANT:  Yes, ma'am.

15            THE COURT:  You don't deserve to and don't

16    need to be.  So, like I said, you know, what

17    happens with you and God is your business.

18            THE DEFENDANT:  Yes, ma'am.

19            THE COURT:  And that's another place.  But

20    what happens in this courtroom is you don't need

21    to be in society with the rest of us.

22            THE DEFENDANT:  Yes, ma'am.

23            THE COURT:  And I am going to sentence you

24    to life without parole, Mr. Lockwood.

25            MS. WILLIAMS:  Judge, before you sentence

1    him, may I say something, please?

2         THE COURT:  Yes.

3         MS. WILLIAMS:  Judge, in looking back to the

4    presentence investigation report, I agree with

5    Mr. Bailey that there is an error as far as the

6    robbery third is concerned.  I would also like to

7    point out to the Court that the bail jumping

8    charge that's listed on the very first page, that

9    that charge was actually nolle prossed.

10        And going back to what Mr. Bailey has

11   just previously said about the attempted murder

12   charge, Judge, apparently, there was something

13   there for the District Attorney's office to

14   reduce that offense to an assault third.  I know

15   the original charge was attempted murder, but

16   they did reduce that charge to assault third.

17   And I'd like to point that out to the Court

18   before I go any further.

19        Judge, Mr. Lockwood does have a record.

20   He has not had any criminal offenses in about

21   fourteen years.  He's been clean since that time.

22   He's had a job since that time.  He's pretty much

23   had steady employment.  And from my

24   understanding, I'm -- that job is still there.  I

25   understand he can't get back to it, but the job

1    is still there.  He was a good employee.

2          THE COURT:  And I'll be honest with you,

3    Mr. Lockwood.  Even if I gave you life, you'd

4    have to do eighty percent of it.  You'd probably

5    do what?  Thirty years.  You'd be like seventy

6    years old by the time you got out.  And I'll be

7    honest with you, Mr. Lockwood.  You just don't

8    need to get out.  I mean, you just -- your

9    actions just do not indicate that you can do

10   right.  And this is serious, what you did.  I

11   mean, we're talking about you almost killed

12   somebody.  Okay?

13         THE DEFENDANT:  Yes, ma'am.

14         THE COURT:  We're not talking about you went

15   and stole a TV at K-Mart or you slipped up and

16   got on drugs.  I mean, we're talking about

17   someone's life could have been gone.

18         THE DEFENDANT:  Yes, ma'am.

19         THE COURT:  I'm sorry.  It does not warrant

20   it, Ms. Williams.

21         MS. WILLIAMS:  Judge, I would just ask you

22   to reconsider life without and consider life with

23   the possibility of parole.  He does have a

24   five-year-old son, Judge.  Even at seventy, he

25   could still spend some time with his son outside

1    of being inside the penitentiary.  And, Judge, we

2    would just ask that you would just please

3    consider that.

4            I would also like to point out that, you

5    know -- and I know this has nothing to do with

6    the sentencing, but since it's been brought up, I

7    would like to at least point it out, that

8    Mr. McKinnes and Ms. Parker were not married.

9        THE COURT:  Right.

10        MR. WILLIAMS:  And as well as the conflict

11    in testimony that actually came out at trial

12    about the issues with the son, I would like to

13    bring that to the Court's attention.

14        THE COURT:  Sure.  And I remember that.

15    Like I said, this whole situation, Mr. Lockwood,

16    was so avoidable, so avoidable.  But you made

17    really, really bad choices, very bad choices.

18    And you don't need to be out here with the rest

19    of us.  And, like I said, the forgiveness part,

20    that's between you and God, and that's for

21    another place and another day.  Okay?

22        THE DEFENDANT:  Yes, ma'am.

23        THE COURT:  But here in this court of law,

24    it warrants a life without parole.  And that's

25    what I'm giving him, life without parole.

1          Mr. Bailey, is there any restitution in

2     this case?

3          MR. BAILEY:  There's restitution in the

4     amount of $2911.71.

5          THE COURT:  I'm going to order restitution

6     in the amount of $2911.71, court costs, fifty

7     dollars to the Crime Victim's Compensation

8     Commission.  I'm going to order that half of all

9     monies received while in the Department of

10     Corrections go towards these court-ordered

11     monies.

12          Mr. Lockwood, you have a right to appeal

13     this conviction and sentence.  If you cannot

14     afford an attorney, one will be appointed for you

15     and a copy of the transcript will be provided to

16     you.  All right.  Thank you.

17          Yes, ma'am?

18          MS. WILLIAMS:  Judge, can I please put just

19     one last thing on the Record?

20          THE COURT:  Yes.

21          MS. WILLIAMS:  Judge, I would like to put

22     the Court on notice that Ms. Toles will be filing

23     a motion for a new trial in this case and,

24     therefore, he would not be invoking his right to

25     appeal at this time.  But I'd like to just put

1          the Court on notice that she will be filing that.

2                  THE COURT:  All right.  Thank you.

3                  THE DEFENDANT:  Your Honor, may -- I would

4          like to say before I go, may God bless you.  May

5          God bless everyone.  You know, I did wrong, and I

6          -- I'm sorry.  I'm sorry.

7                  THE COURT:  Well, like I said, Mr. Lockwood,

8          you know, the good thing about God is we do have

9          a loving God.

10                 THE DEFENDANT:  Yes, ma'am.

11                 THE COURT:  And God forgives us no matter

12         what we do if in our heart we're truly

13         remorseful.

14                 THE DEFENDANT:  Yes, ma'am.

15                 THE COURT:  But that's for you to take up

16         with God.  And I hope you find peace, and I hope

17         you truly are remorseful and you ask for

18         forgiveness.  Because if you do, God does forgive

19         you, and we know that.

20                 THE DEFENDANT:  Yes, ma'am.

21                 THE COURT:  But that's, you know, between

22         you and God.  Okay?

23                 THE DEFENDANT:  Yes, ma'am.

24                 THE COURT:  All right.  Thank you.

25                 MR. BAILEY:  Thank you, Your Honor.

<u>CERTIFICATE</u>

STATE OF ALABAMA        )

COUNTY OF MONTGOMERY    )


I, VICKI H. CLARK, OFFICIAL COURT REPORTER IN AND

FOR THE FIFTEENTH JUDICIAL CIRCUIT, MONTGOMERY

COUNTY, ALABAMA, DO HEREBY CERTIFY THAT I

REPORTED IN MACHINE SHORTHAND THE FOREGOING

HEARING AS STATED IN THE CAPTION HEREOF; THAT MY

SHORTHAND NOTES WERE LATER TRANSCRIBED BY ME OR

UNDER MY SUPERVISION, AND THAT THE FOREGOING

PAGES NUMBERED 5 THROUGH 275, BOTH INCLUSIVE,

REPRESENT A FULL, TRUE AND CORRECT TRANSCRIPT OF

SAID PROCEEDINGS; THAT I AM NEITHER KIN NOR OF

COUNSEL TO ANY PARTIES IN THIS PROCEEDING NOR IN

ANY WAY INTERESTED IN THE RESULTS THEREOF.


DATED THIS THE 23RD DAY OF JUNE, 2004.


*Vicki H Clark*

VICKI H. CLARK
OFFICIAL COURT REPORTER

# VOLUME 4 OF 4

COURT OF CRIMINAL APPEALS NO._____

## APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _Montgomery_ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC 03-957_

CIRCUIT JUDGE _McCooey_

Type of Conviction / Order Appealed From: _Attempted Murder_

Sentence Imposed: _Life w/out Parole_

Defendant Indigent:   ☒ YES   ☐ NO

_Albert Lockwood_
NAME OF APPELLANT

_Tom Azar_          _263-5363_
(Appellant's Attorney)        (Telephone No.)
_609 S. McDonough St._
(Address)
_Montgomery        AL.        36104_
(City)            (State)        (Zip Code)

V.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

1

```
1                      IN THE CIRCUIT COURT

2                 OF MONTGOMERY COUNTY, ALABAMA

3        STATE OF ALABAMA,

4                    Plaintiff,

5        VS.                              X     CC-03-957

6

7        ALBERT LOCKWOOD,

8                    Defendant.

9        _____/

10                CONTINUATION OF JURY TRIAL

11            The above-styled cause came on to be heard before

12       the Hon. Tracy McCooey, Circuit Judge for the 15th Judicial

13       Circuit of Alabama, and a jury, at the Montgomery County

14       Courthouse, Montgomery, Alabama, commencing on the

15       24th day of February of 2003.

16                     *    *    *    *    *

17                A P P E A R A N C E S

18                   FOR THE STATE:

19              Daryl Bailey; Scott Green.

20                FOR THE DEFENDANT:

21        Vickie Toles; Trina Williams; Rick McLelland.

22                     *    *    *    *    *

23        COURT REPORTER FOR THESE PROCEEDINGS:   DUB HARRIS

24                     *    *    *    *    *

25
```

1                           I N D E X

2

3

4                   FANNIE BELL LOCKWOOD

5          DIRECT ---------------------   3

6          CROSS ----------------------   7

7

8

9                      VESSIE HARMON

10         DIRECT ----------------------   9

11

12         COURT'S ORAL CHARGE --------- 39

13

14         REPORTER'S CERTIFICATE ------ 53

15

16

17

18

19

20

21

22

23

24

25

```
 1                         PROCEEDINGS
 2              BY THE COURT:  All right, bring out the jury.
 3                              (Jury returned)
 4              BY THE COURT:  All right, have a seat.  Hope
 5    everyone had a good lunch.  Mr. Harris is helping us out
 6    now.  My court reporter is pregnant, y'all could probably
 7    tell.  My sister is actually her OB/GYN -- we keep it all in
 8    the family.  But anyway, Mr. Harris going to finish out the
 9    trial with us.
10              I think we're ready for our next witness, Ms.
11    Toles.
12              BY MS. TOLES:  Yes, Your Honor.
13                    FANNIE BELL LOCKWOOD,
14         The witness, after having first been duly sworn to
15    speak the truth, the whole truth, and nothing but the truth,
16    testified as follows:
17                    DIRECT EXAMINATION
18    BY MS. TOLES:
19         Q.    State your name for the record, please?
20         A.    Fannie Bell Lockwood.
21         Q.    Ms. Lockwood, what's your address?
22         A.    Union Springs, Alabama.
23         Q.    Okay.  And Ms. Lockwood, are you married?
24         A.    Yes.
25         Q.    Who are you married to?
```

1        A.    Albert Lockwood.

2        Q.    Is that the Mr. Lockwood here on trial today?

3        A.    Yes.

4        Q.    I'm going to ask you some questions, I will

5    just apologize ahead of time for having to delve into your

6    personal life.

7              Ms. Lockwood, at some point back in April,

8    2003, was there something that came to your attention that

9    disturbed you concerning your marriage?

10       A.    Yes.

11       Q.    What was it?

12       A.    Chris McInnes came to my home.  I got off

13   work, I heard a disturbance out in the yard.  I looked out

14   the window and I saw his car.  I heard him talking, I guess

15   he was talking to my mom.  So by the time I got to my back

16   door, he was coming up.  He was telling me -- I opened the

17   door, said what's the matter.  He said Lock is -- do you

18   want me to say the words?

19       Q.    Yes, ma'am, if you would?

20       A.    Said Lock is fucking Carla, and it's been

21   going on for a long time.  I said I kind of halfway figured

22   that.  So he wanted to use the phone so he could call his

23   niece, his auntie, one, for her to come get him.  I told him

24   I didn't have a phone, that he had to use my mother's phone.

25   He wanted me to drive him to the police station to issue a

1    warrant because he said my husband and Carla's

2    brother Terrance had jumped on him when he tried to take his

3    son to her.

4         Q.    And when that happened, did you go with him

5    to the police department?

6         A.    No.  He walked to my door, going to my

7    mother's house to use the telephone.  He told me when he

8    find him, he going to kill him.  He told me he was going to

9    do whatever it take to have him sent back to prison.  He

10   didn't care what he had to do.

11        Q.    Where were you at when he made that statement

12   to you?

13        A.    In the yard.

14        Q.    In the yard?

15        A.    Yes.

16        Q.    Where was your mother at, at that time?

17        A.    She was in the house.

18        Q.    And did he make any other statement to you at

19   that point?

20        A.    He told me that she had a bad disease.

21        Q.    Now, the person that you described as Chris,

22   is that person in court today?

23        A.    Yes.

24        Q.    Point him out for us, please.

25        A.    Right there (indicating).

1      Q.    Let the record reflect she was talking about

2    the victim in this case, Mr. Chris McInnes.

3           Ms. Lockwood, did anything else happen while

4    Mr. McInnes was there at that time?

5      A.    At my house?

6      Q.    Yes.

7      A.    We went to my mother's house.

8      Q.    Did you enter into your mother's house with

9    him?

10      A.    Yes.

11      Q.    Did something happen while you were in your

12    mother's house?

13      A.    She had a knife laying on the table, he

14    picked up the knife on the table.  She told him don't do

15    that, don't mess with that.  So he grinned a little bit, and

16    he told me, he said I could call his house because he was

17    over there, Carla and Lock -- I call him Lock.  And I told

18    him I wasn't going to call his house.  They probably

19    wouldn't answer the phone no way.  So he calls his auntie to

20    come meet him.  He told me wanted to go to the police

21    station to issue a warrant.

22      Q.    Did he make any statements while he was in

23    your mother's house, while you were present?

24      A.    No, no more than what he had already told me.

25           BY MS. TOLES:  Thank you.

1          BY THE COURT:  Any questions?

2          BY MR. GREEN:  Yes, ma'am.

3                    CROSS EXAMINATION

4    BY MR. GREEN:

5          Q.    Ms. Lockwood, are you still married to the

6    defendant?

7          A.    Yes.

8          Q.    Now, let me ask you, how do you know this

9    gentlemen right here?

10         A.    I work with him.  Used to.

11         Q.    You worked with him?

12         A.    Yes.

13         Q.    How long did you work with him?

14         A.    It was years back.

15         Q.    And then how long has it been since you had

16   seen him before April 10th of last year?

17         A.    I used to see him off and on.

18         Q.    This is the first time you have seen him in a

19   while?

20         A.    Yes.

21         Q.    Now, you said he was going to do whatever it

22   took to send him back to prison; is that what you said?

23         A.    Yes.

24         Q.    Did you tell anybody else about that?

25         A.    Anybody else?

| | | |
|---|---|---|
| 1 | Q. | Yeah? |
| 2 | A. | Yes. |
| 3 | Q. | Who did you tell? |
| 4 | A. | My auntie. |
| 5 | Q. | And who is she? |
| 6 | A. | She stays -- all of us stay right there |

7    together.  It's my uncle's wife.  She came out there later
8    on.

| | | |
|---|---|---|
| 9 | Q. | You said he came into the house and he kind |

10   of looked over like he was going to pick up a knife?

| | | |
|---|---|---|
| 11 | A. | It was laying on the table. |
| 12 | Q. | But did he ever actually pick up the knife? |
| 13 | A. | Yeah, he picked it up. |
| 14 | Q. | Then what did he do? |
| 15 | A. | My mama told him to put it back down, don't |

16   mess with that.

| | | |
|---|---|---|
| 17 | Q. | So then he set it back down? |
| 18 | A. | Yes. |
| 19 | Q. | Then what did he do? |
| 20 | A. | He used the phone. |
| 21 | Q. | Then what happened? |
| 22 | A. | He called his auntie, and then he told me he |

23   was -- he told me he was going to call me back, let me know
24   when he got to the police station, that he would issue a
25   warrant.

1          Q.      Did he do that?

2          A.      Yes.

3                  BY MR. GREEN:  That's all the questions I

4     have.

5                  BY THE COURT:  Anything further?

6                  BY MS. TOLES:  No, Your Honor.

7                  BY THE COURT:  Okay, thank you, Ms. Lockwood,

8     you can step down.  Next witness.

9                  BY MS. TOLES:  Ms. Harmon, and unfortunately

10    I don't know her first name.  She'll have to spell it for

11    us.

12                 BY THE COURT:  Okay.

13                      VESSIE HARMON,

14        The witness, after having first been duly sworn to

15    speak the truth, the whole truth, and nothing but the truth,

16    testified as follows:

17                    DIRECT EXAMINATION

18    BY MS. TOLES:

19         Q.      State your name for the record, please?

20         A.      Vessie Harmon, V-e-s-s-i-e.  H-a-r-m-o-n,

21    Harmon.

22         Q.      The first name one more time.

23         A.      V-e-s-s-i-e.

24         Q.      Yes, ma'am, I got you now.  Ms. Harmon,

25    what's your address?

1          A.      Highway 26, 323.

2          Q.      Do you live in Union Springs?

3          A.      Yes.

4          Q.      I am going to ask you some questions about an

5     incident that would have occurred on or about April 11th,

6     2003.  Would you have been at home on that particular day?

7          A.      Yes.

8          Q.      Did something happen that was unusual for you

9     at your home on that day?

10         A.      Yes.

11         Q.      Can you tell us what happened?

12         A.      That man right there, he come to my house.

13    He was just a-cussing.  He said he was going to --.

14                 BY MR. GREEN:  Judge, I object to what he

15    said.

16                 BY THE COURT:  Yeah, don't tell us what

17    anyone else said, Ms. Harmon, just what you said or what you

18    did.  But don't tell us what anyone else said.

19                 BY MS. TOLES:  May we approach, Your Honor?

20                 BY THE COURT:  Yeah.

21                         (Bench conference)

22                 BY THE COURT:  All right, go ahead.

23    BY MS. TOLES:

24         Q.      Ms. Harmon, was there something said while

25    you were there in your presence on that day?

```
 1         A.      Yes.

 2         Q.      Can you tell us what was said?

 3         A.      He said he was going to kill Lock, and said

 4   if he don't kill him, that he was going to send him back to

 5   prison.

 6         Q.      You actually heard that yourself?

 7         A.      Yes.

 8         Q.      At some point, did Mr. McInnes come in your

 9   home?

10         A.      That was the first time.

11         Q.      Did something happen in your home while he

12   was in there?

13         A.      Yes, he went to my daughter's house, then he

14   come back to use the phone, and he grabbed my knife off the

15   table, and he say he was going to kill him.

16         Q.      I'm sorry?

17         A.      He said he was going to kill him with it.

18         Q.      And what happened after that?

19         A.      I told him to put my knife down, he wasn't

20   going to cut nobody with my knife, wasn't taking my knife.

21         Q.      What did he do?

22         A.      He give it to me in my hand.

23                 BY MS. TOLES:  Thank you, nothing further.

24                 BY THE COURT:  Okay, Mr. Green, any

25   questions?
```

1          BY MR. GREEN:  Judge, we don't have any

2     questions for this witness.

3          BY THE COURT:  Thank you, Ms. Harmon, you can

4     step down.  Next witness, Ms. Toles.

5          BY MS. TOLES:  Your Honor, that was the last

6     witness for the defense.

7          BY THE COURT:  Okay, defense rests?

8          BY MS. TOLES:  Yes, Your Honor.

9          BY THE COURT:  Okay.  Ladies and gentlemen,

10    now that everybody has rested, I have to take up a few

11    things outside of your presence with them.  If y'all would

12    step right in there for a minute, then we'll be ready for

13    closing arguments.

14                    (Jury out)

15          BY THE COURT:  All right, does the defense

16    have a motion?

17          BY MS. TOLES:  Your Honor, we would renew the

18    same motion that we had, that we did earlier concerning the

19    judgement of acquittal, and ask that the statement of the

20    police officer be suppressed from the hearing of the jury.

21          BY THE COURT:  Okay, and I'm going to deny

22    that.  I'm just going to instruct -- does anyone have any

23    special instructions?

24          BY MR. BAILEY:  We would just ask for your

25    standard on flight, then we have another one that we would

1  ask for that we give in these cases that -- I don't want to

2  misquote it, I've got the case here, but that you can infer

3  intent by the use of a deadly weapon, intent to kill.

4         Burgess versus state which is an August of

5  2000 case, the Supreme Court of State of Alabama.  Actually,

6  the court is stating that the judge gave an improper

7  instruction because the judge said that intent to commit

8  murder may be presumed from the defendant's act of using a

9  deadly weapon, and they said the correct charge which is the

10  charge we're asking for, intent to kill may be inferred from

11  the defendant using a deadly weapon.

12         BY THE COURT:  Y'all want to comment on that?

13  Anybody?  I mean, I don't mind giving it.

14         BY MS. TOLES:  Your Honor, we would just

15  object to the charge.  Based on what we have seen here, we

16  would ask that the court not give that particular charge.

17         BY THE COURT:  I believe it's a correct

18  statement of law.  Let me see that case.  Okay, what I'll

19  read to them, I will read to them that -- I will define

20  intent, then I will just tell them that intent to commit

21  murder can be presumed from the defendant's act of using a

22  deadly weapon.

23         BY MR. BAILEY:  Judge, I think the proper

24  language is -- presumed I think is what they said was

25  incorrect.  Correct me if I'm wrong.

1            BY THE COURT:  I was trying to figure out --.

2            BY MR. GREEN:  We would rather have presumed,

3    but I don't think that's going to be proper.

4            BY MR. BAILEY:  I'll show you, judge.  I

5    think that's what they said was the improper charge.

6            BY THE COURT:  Yeah, just a minute.  Let me

7    read it.  Do y'all have one written out?

8            BY MR. GREEN:  I can write one out.

9            BY THE COURT:  Yeah, write one out.  I'll give

10    it, just write it out for me, and I'll give it.  I don't

11    have a problem with it.  What else did y'all want?

12        BY MR. BAILEY:  Judge, just those two is all we're.

13    asking for.

14            BY THE COURT:  What are you guys asking for?

15            BY MS. TOLES:  Your Honor, we're not familiar

16    enough with what you normally give, so we prepared a

17    packet.  The main one that I know of for sure that we would

18    request is concerning the assault third charge.

19            BY THE COURT:  Hold on a second, I'll tell

20    you.  Again, presumption of innocence, I'll give that.  You

21    guys have -- let's go through these.  Do y'all have theirs?

22            BY MR. BAILEY:  Yes, ma'am.

23            BY THE COURT:  Evidence of prior bad acts,

24    I'll give that.  That's not part of my standard.

25            Look at their one on suspicion.

1          BY MR. BAILEY:  Judge, I think that you cover

2    that in your reasonable doubt charge.

3          BY THE COURT:  I give a reasonable doubt

4    charge.

5          BY MR. BAILEY:  Is that not covered in your

6    reasonable doubt?

7          BY THE COURT:  Not specifically.  It's in

8    there, but it's not like they have written here, but I'll

9    give mine.  I won't give that one, Vickie.

10          I give credibility of witnesses, eventually I

11    tell them about -- reasonable doubt, burden of proof.  I

12    give all the reasonable doubt ones.  Okay, let's talk about

13    assault third.  State?

14          BY MR. BAILEY:  Judge, we would object to

15    that charge.  We don't feel there's any evidence that would

16    coincide with that charge.

17          BY THE COURT:  Well, there's evidence that he

18    had injuries to him, that there was some kind of fight.

19          BY MR. BAILEY:  Judge, it's whatever you want

20    to do.

21          BY THE COURT:  Vickie?

22          BY MS. TOLES:  Your Honor, we would go back

23    to assault third.

24          BY THE COURT:  Tell me why you want this one.

25          BY MS. TOLES:  Your Honor, I think it goes

1   back to -- at the time, that there was some physical damage,

2   but not serious physical damage, is what our argument would

3   be.

4                    BY THE COURT:  The evidence was that he did

5   suffer some injury, the police officer said he saw it.  He

6   testified himself that he had some -- I'll give it, on

7   assault third.

8                    BY MS. TOLES:  Thank you.

9                    BY THE COURT:  Obviously I'll give

10  intentional -- are you writing that up, Scott?

11                   BY MR. GREEN:  Yes, ma'am.

12                   BY THE COURT:  Let me see it, and I'll give

13  it.  Intent to kill -- intent to kill may be inferred from

14  the fact the defendant used a deadly weapon.  Anything else?

15                   BY MR. BAILEY:  If you're going to give

16  assault three, then I think necessarily you have to give

17  assault second as well, just physical injury as well, except

18  there was a deadly weapon involved.

19                   BY THE COURT:  Yeah.

20                   BY MR. BAILEY:  If there is no weapon, it

21  requires assault three.

22                   BY THE COURT:  All right.  I'll give assault

23  two and three, and attempted murder.  All right.

24                   BY MS. TOLES:  Your Honor, did you rule on

25  the mere presence one?

1          BY THE COURT:  Yeah, I'm going to give that

2    one.

3          BY MS. TOLES:  Okay.

4          BY THE COURT:  All right.  Bring the jury

5    back.

6               (Jury returned)

7          BY THE COURT:  All right, thank you, have a

8    seat.  Ladies and gentlemen, we have now finished the

9    evidence in this case, and it's now time for the lawyers to

10   do their closing arguments.  State, Mr. Green, y'all are up

11   first.

12               CLOSING ARGUMENTS

13          BY MR. GREEN:  Thank you.  Counsel, ladies

14   and gentlemen, we're here for one thing and only one thing.

15   This is an attempted murder charge.  What I would like you

16   to consider, the judge will explain to you what the law is

17   in just a moment, but I would like for to you consider as

18   you're deliberating what the elements are, and it's very

19   simple.  And in lay terms, attempted murder, it's an attempt

20   to kill someone.  It's an attempt to unlawfully take

21   someone's life.  What you have to ask yourself is on April

22   11th of last year, did that man intend to kill that man.

23   That's all you have to consider.

24          Ms. Toles will get up, she's going to say,

25   now look at reasonable doubt.  I would like to take just a

1    second to tell you exactly what that is.  It's exactly what

2    Mr. Bailey said in voir dire.  If you recall, it's not

3    beyond all doubt, it's not to a hundred percent certainty,

4    it's not a mathematical conclusion of one hundred percent

5    guilt.  It is beyond a reasonable doubt.  It is beyond a

6    doubt for which you can assign a reason to.  Ladies and

7    gentlemen, it's not a magic word.  You don't have to take

8    the evidence and wave a magic wand over It.  This jail house

9    behind me is filled with folks that are convicted by the

10    very same standard.  It's the highest standard we have in

11    this country.  But it is the standard and it's beyond a

12    reasonable doubt.  And I'd like for you folks to consider

13    that as you're deliberating on the evidence.   Consider

14    that, and consider the issue of what we're doing, and

15    consider the elements of attempted murder, which is simply

16    the attempt to kill somebody.  Injury is not required.

17    Wounds are not required.  We have -- it's what you folks

18    consider to be the attempt to murder someone and I feel

19    confident as you apply these elements that you apply the law

20    and the facts of this case, you will come back with a

21    verdict of guilty.  Thank you.

22              BY THE COURT:  Thank you.  Ms. Toles.

23              BY MS. TOLES:  Ladies and gentlemen of the

24    jury, I just want to take a few moments on behalf of Mr.

25    Lockwood to thank each and every one of you for your

1    attentiveness in this case.  This is a very serious charge

2    Mr. Lockwood is looking at, and we appreciate you taking the

3    time to make sure you're paying attention to what was going

4    on in the case.

5                    Now, there was quite a bit of information

6    that went forth here yesterday and today.  Mr. Green told

7    you I would say something about reasonable doubt, and I

8    will, because that is the standard that here they're held

9    to.  They're going to have to prove beyond a reasonable

10   doubt that Mr. Lockwood was out there and intended to kill

11   Mr. McInnes.  I'm just going to -- one question, and he

12   asked the question, did he intend to kill him?  I want you

13   to think back to the testimony where they were talking about

14   being in the bathroom, and at some point both he and Ms.

15   Parker admitted that all of them were in the bathroom.

16                   Now, Ms. Parker at one time said the bathroom

17   is a long bathroom, because it's the entire length of that

18   guard shed.  The only thing it has in it is a wall and a

19   commode.  Now, if they're all in the bathroom, and if he had

20   any intention of killing him, wouldn't you have thought that

21   was the best place to get him?  If he was going kill him, he

22   would have killed him right there in the bathroom.

23   Intention, he was as close as he was ever going to get to

24   him at that point, and he could have killed him right there.

25                   Going on through some of the things, there

1   are many, many discrepancies in this case, but I wanted to
2   get to what this case was really about. This was a lovers
3   triangle. These folks, all of them, somebody cheating on
4   somebody else, somebody cheating on their wife. All of them
5   out there involved in things they had no business doing. I
6   started out telling you you would not like Mr. Lockwood,
7   morally if you thought cheating was wrong, on your spouse.
8   I'll go ahead and tell you all, I had to get to that point
9   with Mr. Lockwood. Plus, when I first started doing this
10  case with Mr. Lockwood, I didn't like him as a person, but I
11  had to get past that. That's what I'm asking you to do is
12  get past the moral issues, then look at the facts of what's
13  behind this case, and then lay everything out as to exactly
14  what happened out there, and what happened on the scene out
15  there on the day, and ask yourself is this reasonable that
16  somebody would do this? One of the things that I would ask
17  you to go to immediately would be, if your child was on the
18  scene, you got your baby out there, how many folks would
19  push your baby out the door when you know somebody just hit
20  you two times with a gun? Do you push your baby out there
21  in harm's way? How many people would push their child out
22  first? When you go back and you deliberate, I want you to
23  look, Mr. McInnes said the child ran out the door first.
24  Now Ms. Lockwood -- not Ms. Lockwood, Ms. Parker, would say
25  back in April when she gave her initial statement, and when

1    you read through her statement -- you will have an

2    opportunity to look at it --  during her initial statement,

3    she never mentioned that her child went out the door first.

4    On page eighteen, they asked her about the incident, not

5    once did she mention her child went out the door, but

6    conveniently today, almost a year later, conveniently

7    yesterday, she made the statement that the child went out

8    the door first.  That's just another setup in this lovers

9    triangle to get us thrown off of what the real issue is.

10            Ms. Parker, from the beginning, y'all, played

11    both of them.  She dangled her carrot in front of whoever

12    needed their carrot dangled at that point, to get what she

13    needed.  She started out on the day, that Thursday out in

14    Union Springs.  She brings another man to the house where

15    Mr. McInnes says he pays the bills, and he says what goes

16    on, she brings another man to their home, and sends him

17    around -- what does Mr. McInnes say?  She never got out of

18    the car.  She sent Mr. McInnes and her brother in to get the

19    child after he had threatened he was going to take the child

20    away from her.  Then, she keeps on dangling her carrot in

21    front of them.  So here we go on this end, the next day,

22    when Mr. McInnes is saying that you set me up, you set me

23    up.  Conveniently, she comes up with a story that coincides

24    with his.  So you ask the question, when did they have time?

25    They were alone at the scene, after this whole incident took

1    place.  Mr. Lockwood was no longer there.  No police
2    officers were there.  911 hadn't made it there yet.  At that
3    time, Mr. McInnes runs -- after he allegedly had been shot,
4    he runs to the station and says look what you did, Carla,
5    look what you did.
6              Now, one of the other things, we've been
7    talking about somebody saying a gun was out there, somebody
8    said a gun wasn't out there.  You heard both of them get on
9    the stand, I questioned them, I asked them so you could hear
10   what their testimony was concerning the gun.  I asked
11   specific questions, asked them what did the gun look like?
12   You remember Ms. Parker said she really couldn't tell.  All
13   she could tell, it was black and had a round thing from the
14   front.  Mr. McInnes comes back and says it has a round thing
15   on the front, it was a revolver.  Now, that's significant in
16   this case, because you got one person who can't see the gun
17   at all, only thing they can see is the front part of the
18   barrel of the gun.  Then somebody else sees a round thing.
19   It leaves you wondering was there really a gun out there?
20   Was that one of this things she made sure they had a clear
21   understanding before they talked to the police?  Because
22   they were not sure what the gun looked like.  I submit to
23   you that there was no gun out there at all, that they
24   fabricated this story, because they're aware that, depending
25   on the charge that he was charged with, that just like Mr.

1  McInnes had planned to do, just like what he said to Mr.

2  McInnes -- Mr. Lockwood's family, he would do whatever he

3  needed to do to get rid of him.  He wanted to get him out of

4  his life.  He wanted to get rid of him out his wife's life,

5  or his girlfriend, live-in girlfriend of ten years.  He

6  wanted to get him out of the picture so they could put their

7  relationship back together.

8            There were a lot of other things that leave

9  you with some doubt in in case.   One other thing that

10 caught my attention in this case was concerning the police

11 department, and there were a lot of things that were left

12 undone with the police department.  First thing that struck

13 me as being the most ironic was, if you had a six year old

14 child out there and you believed that some gunshots had been

15 fired and possibly almost hit him, wouldn't your attempted

16 murder charge be against the innocent child, the six year

17 old that has nobody to defend for him?  But instead, they

18 make the charges against Mr. McInnes, who has all these

19 other things going on?  But you have a six year old child

20 out on the scene, isn't that the person we need to be

21 protecting?  We go on from there, then we go to the police

22 department.  They're out there.  You got Detective Davis who

23 was at that time a robbery/homocide person.  He's on the

24 scene, he goes out to the scene.  It's dark out there.  It's

25 11:00 o'clock at night.  He was aware that it was going to

1    be difficult because his pictures came back black.  The next
2    day he never went back to the scene to see what else was out
3    there.  He finished what he could out there with his
4    flashlight, and he left the scene, never went back.
5            The next thing is, he never talked with
6    anyone at the STERIS Corporation to ask the people who were
7    getting off work at that time, if anyone had seen anything
8    out there, if anyone had heard anything.  He never talked
9    with the surrounding businesses to ask if they had heard
10   anything, if they had seen anything.  There was nothing --
11   they didn't check after that to see what else.
12           Let me get down to where we get to the
13   wounds.  And we get to where we're talking about whether or
14   not these woulds were actually inflicted.  Ms. Parker who
15   becomes Superwoman, all of a sudden, she says that she sees
16   that Mr. -- mind you the child that they have -- nobody has
17   checked on, nobody ever testified anything about going to
18   the car, she said she goes up to see what's going on, two
19   grown men, never checked to see if her child is harmed,
20   never checked to see if her child was okay.  She goes up to
21   the scene, she says Mr. Lockwood is standing with a gun to
22   Mr. McInnes' head, and she somehow comes around, hits the
23   gun and it backfires, and it shoots at that point.  Now, for
24   somebody that's never been in an incident dealing with a
25   gun, she's awfully courageous at that point.  At that point

1   she becomes faster than Superman, because she's faster than

2   a speeding bullet at that point.  That's what you've got to

3   look at in this case.  You've got to look at things like

4   that and ask yourself does that make sense.

5            We get to Mr. McInnes, he doesn't even

6   remember when he was shot.  He's not even sure if he was

7   shot.  I asked him, how were you, he didn't remember how he

8   was laying.  He didn't know if he was on his knees, if he

9   was laying down, he didn't know the gun was put -- he

10  doesn't even remember, he just knows the gun was put to his

11  head.  Now I've never been shot, I don't know how many of

12  you y'all have ever been shot.  I just think that if I mash

13  my finger in a doorway, I know when I mash my finger, and I

14  would suspect that if somebody had been shot, they would

15  know when they had gotten shot as well.

16           We go on from the gunshot -- from the alleged

17  gunshot wound, and then we go on into whether or not how.

18  much, whether or not he had been harmed or how much harm was

19  done to him.  We're out there on the scene, and can you

20  imagine having a gunshot wound and getting from up the

21  gunshot wound and running back to the station to tell Carla?

22  And mind you so that you all get this here, this is the same

23  Carla that was standing out there on the scene had pushed

24  his hand away, why did he need to go back to the station if

25  she was out there on the scene with him?  She was up the

1    hill, supposedly with him.  Why did he have to get to the

2    station where she was?  All of a sudden, she decides to

3    leave him alone on the ground, and leave him out there to

4    fend for himself after she had been protecting him all this

5    other time?  I submit to you that's not what happened.

6    That's not what happened out there.  We're talking about the

7    wound, Mr. McInnes gets up from this, runs over to the

8    station, he flags down some cars coming out of STERIS, of

9    people getting off work.  What do people from STERIS say?

10   Move your vehicle.  Somebody with a gunshot wound, with a

11   response from somebody else, says move your vehicle?  They

12   didn't think he was hurt.  Apparently Mr. McInnes didn't

13   think he was hurt, either, because he got in his vehicle and

14   moved it across.  So the the STERIS people don't realize he

15   is that hurt.  Mr. McInnes, and neither does Ms. Parker,

16   because she's somewhere else doing something else at that

17   time.

18   She left him on the ground to fend for himself while he was

19   over in the station at that point.

20               Then we go on, we get to the hospital.

21   Fifty-five minutes.  The doctor said, yeah, there's an

22   entrance and exit wound.  Fifty-five minutes.  How do you

23   get into the emergency room, have a CT scan and get out all

24   in fifty-five minutes?  If you're harmed, if there is any

25   tremendous amount of harm or significant harm to you?  I

1    think as the doctor was testifying and as he was finishing

2    up his testimony, he went on to call it a superficial

3    wound, and because I was not sure what the word was, I had

4    to go back to the office and look up the definition, because

5    I didn't know myself.  I just tell you up front, I didn't

6    know the definition.  So I would know what it meant,

7    superficial as defined by American Heritage Dictionary said

8    affecting or being on or near the surface, a superficial

9    wound concerned only with what is apparent or obvious,

10    shallow, apparent rather than actual or substantial,

11    trivial, or insignificant.  And I submit to you that that

12    was what that was, that was the type wound that he had.  It

13    was a minor wound and you know what's minor, because he was

14    in there all of fifty-five minutes at the emergency wound.

15    I've never been in the ER that it didn't take me four hours

16    to get out of.  Not once.  And that's with minor stuff.

17    I've never gone in with a gunshot wound.

18           I would just say to the ladies and gentlemen

19    of the jury today, the state is going to get an opportunity

20    to come back, and will address you all one more time, and

21    they will address some of the issues I have talked about,

22    and when they're going through those, I just want you all to

23    start thinking about what's going on in this case, and

24    remember, and the judge will instruct you on it, give you

25    the jury instructions as to what you can look at and what

1    you cannot look at, and what one of the things that she told
2    you initially coming out here was that Mr. Lockwood was
3    presumed innocent, and he's presumed innocent until you
4    actually walk through those doors and start deliberating and
5    say something otherwise in there.  He didn't take the stand,
6    that's his right, he didn't have to.
7              Now, they're going to come back out here, but
8    I submit to you that the assault third degree charge that
9    the judge will give you, that's the appropriate charge, that
10   Mr. Lockwood did in fact, during a fight, cause physical
11   injury to Mr. McInnes.  It wasn't serious physical injury,
12   and we have already gone through that with the doctor's
13   report, and with the things.  It was not serious physical
14   injury, and it was because of a fight.  The information and
15   the testimony about the gun?  There was never a gun out
16   there.  Mr. McInnes and Ms. Parker in their attempt -- Ms.
17   Parker in her attempt to keep dangling this carrot, it was
18   convenient for her.  If you remember me asking her
19   questions, why did she say it was a set-up in her statement?
20   The very last thing you say to the police officer, this was
21   not a set-up.  Why would anybody be thinking about a set-up
22   out there at that time of night, after somebody had been
23   shot?  And that's the first thing she said, she was making
24   sure she was protected in that, so now, it was convenient
25   for her to switch sides and go back to Mr. McInnes at that

1    point, because she needed to be sure he didn't implicate her

2    in any way, and she was willing to say any and everything he

3    told her, because she was afraid that he was going to run

4    off with their child.  She didn't want him to do that.  She

5    would have stuck close to him and done whatever she needed

6    to do.

7              Just as you're going back, the physical

8    evidence is what I would ask you to look at, looking at the

9    fact Mr. McInnes did have some injuries, but they were minor

10   injuries.  There was nothing substantial about them.

11   There's nothing life-threatening about them.  And based on

12   that, we would ask you to come back and find him not guilty

13   of attempted murder.  If you're going to find him guilty of

14   anything, assault third what is he should be found guilty

15   of.  Thank you.

16             BY THE COURT:  All right, thank you, Ms.

17   Toles.

18             BY MR. GREEN:  Judge, may I approach briefly?

19             BY THE COURT:  Sure.

20                        (Bench conference)

21             BY THE COURT:  All right, go ahead.

22             BY MR. BAILEY:  Ladies and gentlemen, I began

23   talking with you yesterday morning when you were in the

24   group, and I explained to you what attempted murder was,

25   under the laws of the state of Alabama, what the legislature

1    of our great state said that attempted murder was. And if

2    you remember, one of the biggest things that I told you

3    about attempted murder was, what Mr. Green told you just a

4    few minutes ago, was with attempted murder, you don't have

5    to prove injury. Not only do you not have to prove someone

6    was injured, you don't have to prove someone was seriously

7    injured. I asked y'all if that was a problem with you, all

8    of you remained silent. None of you raised your hand. And

9    I said by your silence, I said everyone is okay with this

10    attempted murder law in the state of Alabama.

11                    But ladies and gentlemen, there are injuries

12    in this case, and I won't get up here and tell you he had

13    life-threatening injuries. No, he did not have

14    life-threatening injuries. But what do the injuries in this

15    case tell us? The injuries in this case tell us, one, he

16    was attacked. There was an incident that occurred back on

17    April 11th of 2003 at the STERIS corporation. You have

18    heard a lot of evidence. You have heard a lot of what I

19    would say is distraction by the defense. What I mean by

20    that is, you have heard a lot about this lovers triangle.

21    And yes, there was obviously a woman who was in between

22    these two men. But I think by applying your common sense,

23    you can kind of see what was going on here. Who was the

24    victim of all of this? Well, you pretty much can assume

25    that Mr. McInnes here was the victim of the attempted

1    murder.  That's why we're here.  But also looking at the

2    evidence that was presented from the witness stand, you can

3 .  see that Mr. McInnes was also the victim, not knowing what

4    this lady that he had been with for ten years and who he had

5    a child with, was doing behind his back.  Was he mad about

6    it?  Well, absolutely he was mad about it.  He found out

7    that his girlfriend who he shared a child with was cheating

8    on him.  Sure he's mad.  He's upset.  His girlfriend who

9    brings this defendant over to their home, their marital

10   home, if you will, and pretty much says it's my house now,

11   get out, Bud.  Should he be upset?  Sure he should be upset

12   about it.

13           Let's stop talking about the distractions in

14   the case as far as what was going on with the extramarital

15   affair.  Let's talk about the evidence in the case, because

16   that's why we're here.  What evidence in this case was

17   there, or is there, that was presented to you that there was

18   an attempted murder in the case?  Well, the defense just

19   told you, suggested to you that there was not even a gun

20   used in this offense.  Well, ladies and gentlemen, we've got

21   severe problems with that defense.  Why do we have severe

22   problems?  First of all, why would they suggest that to

23   you?  Well, the main reason they're going to suggest that to

24   you is, one, that that's going to take away the attempted

25   murder charge.  But two, they're stuck with that defense,

1    quite frankly, because the defendant, in his own words in

2    his statement says, hey, I wasn't there. I was out of town

3    on work. I have no idea what you're talking about. I

4    encourage you to read every page of that statement. I think

5    you would be doing a disservice to the case if you didn't

6    read it to find out what all he told the police, because I

7    highlighted it for you, but you need to read it.

8            You would find in the first thirty pages,

9    he's sitting there telling Officer Belser from the

10    Montgomery Police Department, man, I don't have any idea

11    what you're talking about. I was out of town. I wasn't

12    even there. I know Ms. Parker, I was involved with her, but

13    you can frame this on somebody else. You can name somebody

14    else that looked like me, but I wasn't there. Then all of a

15    sudden the next thirty some-odd pages, well, yeah, I was

16    there, but I didn't have no gun. Locked. The defense is

17    locked right there. They have no choice but to get up here

18    and argue that. If they get up here and argue otherwise,

19    then they're saying he's a liar. But if you think about it,

20    that defense doesn't make sense. And why does that defense

21    not make sense, ladies and gentlemen? Well, one of the main

22    reasons it doesn't make sense is because you've got

23    Detective Davis who has gone out there and has collected

24    bullets. One right there in front of the guard station.

25    Where did these bullets come from? All of the same caliber.

1   Where did they come from?  I don't know if the defense is

2   wanting to you say well, they were planted.  By whom?  I

3   don't know.  But how many people carry around spent bullets

4   and just throw them, plant them somewhere?  There's your

5   evidence, ladies and gentlemen, that there was a gun

6   involved.

7                 That's not necessarily all the evidence.  You

8   look at the medical records.  What do the medical records

9   tell you?  You can look at the medical records, but better

10  yet, what did the doctor tell us?  Despite the attempts,

11  numerous attempts I would say, by the defense, the doctor

12  kept saying, to me as a medical professional, this looked

13  like an entrance wound and an exit wound.  That is a medical

14  professional telling you that.  Somebody that has absolute

15  zero interest in this case.  Probably I would dare to say,

16  aside from the police officers who you might argue have an

17  interest, aside from them, he's the only one that doesn't

18  have an interest in this case.  As a medical professional,

19  that looks like an entrance wound and exit wound.

20                Well, there was a lot of talk about, well,

21  the victim didn't even know he was shot.  How many you

22  remember when President Reagan was shot?  What's one of the

23  first things he said after he recovered in the hospital?  I

24  didn't even know I was shot.  How many times have you heard

25  people say I didn't know what happened, I didn't even know I

1     was shot.  Call this a superficial wound?  Maybe it is.

2     Maybe it isn't.  But that's not the point, because again,

3     ladies and gentlemen, for an attempted murder, you don't

4     have to die, you don't have to have serious physical

5     injury.  Again, the whole point of this is, this is the law.

6     But what you do have is, you have a guy, an angry man and

7     we'll talk about motive in a minute, because I think motive

8     is important in this case, but you have a very angry man

9     that comes in that guard station and he says I am going to

10    kill you.  I'm going to kill you.  And you have Mr. McInnes

11    running one way and the defendant chasing him, making him

12    beg for his life.  Then as Mr. McInnes says, puts the gun on

13    his head, which the evidence shows two spots on his head,

14    but before he even does that, he pistol whips him.  Look at

15    the picture.  See the busted lip.  If you look close, you

16    can see his lip and his eye, real swollen.  It's obvious

17    he's been beat up.

18                    And I dare to say to you ladies and

19    gentlemen, that if you take a gun and you point it at

20    somebody, even in the general direction, much less point it

21    at their head and you discharge that weapon, you're

22    intending to kill someone.  And the judge is going to

23    instruct you a little later that you can infer intent by the

24    use of a deadly weapon.  You as jurors can infer because a

25    deadly weapon was used, that the intent to kill was there.

1    That's the law.

2              Let's talk about motive.  What are the

3    motives in this case?  Well, I say motives because I think

4    there's several.  I think this is almost like a building

5    thing with this offense.  But the first motive is, this guy

6    hasn't left yet.  There's a new person in town.  There's a

7    new sheriff in town.  You need to get out of her life.  He

8    hasn't done it.  He's still sticking around.  He calls the

9    guard station, I believe to come get his clothes, cell

10   phone, whatever, and finds out from Ms. Parker, hey, don't

11   come over here because Chris is here -- let's back up a

12   little bit.

13             What happened the day before when he comes

14   storming in to her life or comes storming in as far as what

15   Mr. McInnes sees?  He attacks him there and throws a brick

16   at his car.  And what does Mr. McInnes do?  He does two

17   things that provides further motive in this case; one, he

18   goes out and he signs warrants on this defendant.  He signs

19   a criminal mischief warrant and an assault warrant in

20   Bullock County.  Well, obviously that's going to make this

21   defendant mad.  You know, he did what he had to do or

22   thought he had to do, wanted to do whatever.  Now this guy

23   is over there signing a warrant.

24             Well, there's something else, though, that I

25   hope you didn't miss, that didn't really occur to me until

1    the defense brought it out, and I'm glad they did, but what

2    I think may be the biggest motive in this case, the biggest

3    thing that set this ticking time bomb off, what did Mr.

4    McInnes do?  He went and told the defendant's wife what he

5    had been doing.  How many men do you think in the United

6    States right now that are having affairs on their wives want

7    their wives to find out about it?  If someone rats them out,

8    they don't like that.  And I suggest to you ladies and

9    gentlemen, that's what set him off.

10              Ladies and gentlemen, you have heard Ms.

11   Toles mention to you that -- first of all, you had this

12   also; the defense, the victim was trying to send the

13   defendant back to prison.  Well, yeah, he was trying to send

14   him back to prison because he signed a warrant on him, and

15   that's what happens when you sign warrants on assault and

16   criminal mischief.  You get in trouble.  That's where you

17   go.  So that's insignificant.

18              Ms. Toles mentioned to you in her closing

19   that the judge is going to instruct you, because she's

20   required to by law, on what they call lesser included

21   offenses, one being assault second degree, and she's going

22   to define to you that's where someone shoots someone with a

23   deadly weapon and causes physical injury, but has intent to

24   kill.

25              So basically what you're doing, you're taking

1    intent to kill out of it, and if you, as the conscience of

2    our community, citizens of our community, don't think

3    putting a gun to someone's head and telling them that you're

4    going to kill them, then firing that weapon multiple times,

5    if you don't believe that that rises to the level of intent

6    to kill, then you ought to consider that next lesser

7    included which is assault in the second degree.

8            She's also going to instruct you on a lesser

9    included of that, which is assault in the third degree.  And

10    what is that?  That's where someone causes physical injury

11    with no weapon involved.  Not serious physical injuries,

12    just causes physical injury.  I suggest to you that, ladies

13    and gentlemen, we can look at their defense and what they're

14    trying to sell you, and you look -- I agree with Ms. Toles

15    totally, look at the physical evidence.  Look at the bullets

16    that we have.  You look at the doctor's testimony.  You look

17    at the medical records.  Look at the pictures of the victim.

18    When you do that, you will come to the verdict of attempted

19    murder.

20            You know, Ms. Toles wanted to talk to you

21    about what Ms. Parker was doing when all this was going on.

22    Why did Mr. McInnes have to go back to the guard station to

23    get her?  Well, it's obvious, she just saw either Mr.

24    McInnes being shot at, at the head, or actually being shot

25    in the head, she's going to call for help at that time.  Why

1    -- sure Ms. Toles is trying to say that's not normal for a

2    person to just stand by and try to break up two men

3    fighting, with one of them who has a gun.  I suggest to you

4    that's not normal.  If I walked out here and I saw two men

5    fighting, one of them has a gun, you're going to see me go

6    back here in the back room, and I will use my cell phone and

7    call 911.  But what happens when that person is involved,

8    has a relationship with both men, who is at her job, mind

9    you, and knows that if something happens at her job, whether

10   they just get into a fistfight or whatever, she's probably

11   going to be fired, or reprimanded -- you got two people

12   fighting over you, which is just what happened.  Yeah, she's

13   going to try to break it up.  You see it all the time in

14   domestic violence cases.  And that's what happened in this

15   case, ladies and gentlemen.  She didn't want them fighting.

16                Again, I'm not going to belabor the point,

17   ladies and gentlemen.  I told you when I stood up and read

18   the indictment to you, which I won't do again, I told you

19   there was some important words I wanted you to remember in

20   this particular case, and ladies and gentlemen, you might

21   not like this victim.  He was mad up here on the stand.  I

22   could tell.  And he was real abrasive to Ms. Toles.  But

23   look at what that man has been through, and can you blame

24   him?  And Ms. Toles already told you she doesn't like the

25   defendant, and you wouldn't like him.  But I think you need

1     to get past all of that and look at the law in this case.

2     Look at the evidence in this case, and determine what

3     happened out there that night.  And I think once you do

4     that, who is clearly lying in this case?  Well, there's no

5     doubt.  There's no doubt who is lying in this case, and

6     that's this defendant.  You can read his own statement.

7     It's obvious he's lying.  He says he was out of town for the

8     first thirty pages.  Once you do that, ladies and gentlemen,

9     those words that I was talking about at the bottom of that

10    indictment, "Against the peace and dignity of the State of

11    Alabama".  That's what we're here today.  It doesn't

12    matter what kind of person Chris McInnes is.  It doesn't

13    matter anything about this defendant.  And the reason I say

14    that is because on that day, the breach of the peace and

15    dignity of the State of Alabama occurred.

16           Now it's up to you as the conscience of our

17    community to determine what happened and to do something

18    about it.  As a representative of the State of Alabama,

19    that's what I'm asking you to do. I'm asking you to hold

20    this defendant accountable for the actions that he took on

21    that particular day, and uphold the law in our country.

22    That's what I'm asking you to do.  Thank you.

23           COURT'S ORAL CHARGE TO THE JURY

24           BY THE COURT:  Ladies and gentlemen, it's now

25    my time as the judge to instruct you on the law in this

1    case.  I'm going to give you the law as it is in Alabama,

2    you are to take back the facts as you have found them to be,

3    apply them to the law, and come up with a true and just

4    verdict in this case.

5            As I told you at the beginning of this trial,

6    the state of Alabama has the burden of proof.  They have to

7    prove the defendant's guilt beyond a reasonable doubt.

8    Reasonable doubt is a relative term that is not always easy

9    to define.  It is a fair doubt, based upon reason and common

10   sense.  Reasonable doubt may arise from all of the evidence,

11   some of the evidence, or lack of evidence.  In short, it is

12   a doubt for which you can assign a reason which comes from

13   the evidence.  The law tells us that reasonable doubt is not

14   just a mere possible doubt.  In other words, it is not a

15   mere guess or surmise or capricous doubt.  Evidence which

16   merely gives rise to a suspicion of guilt is insufficient to

17   convict the defendant.

18           The burden, again, is on the State of Alabama

19   to prove the defendant's guilt beyond a reasonable doubt.

20   The State of Alabama does not have to prove the defendant's

21   guilt beyond all doubt or to a mathematical certainty, but

22   simply beyond a reasonable doubt.

23           Now, let's talk again, ladies and gentlemen,

24   about what is evidence in this case and what is not

25   evidence.

1          First let's talk about what is not evidence
2    in this case.  As I told you at the beginning of the trial,
3    what these lawyers said in their opening and closing
4    arguments is not evidence in this case.

5          If I've done anything during the course of
6    this trial to indicate that I have an opinion one way or the
7    other, you are to completely disregard that.  I don't have
8    any opinion, and it would be totally improper for me to have
9    any opinion.  It's my job as the judge to make sure we have
10   a fair and orderly trial and to instruct you on the law in
11   this case.

12         Now, let's talk about what is evidence in
13   this case.  As I told you at the beginning of the trial, you
14   have one piece of evidence, and that is the fact that the
15   defendant, Mr. Lockwood, sits there presumed to be innocent,
16   and he's cloaked with that presumption of innocence, as long
17   as, and until and only if the State of Alabama proves his
18   guilt beyond a reasonable doubt.

19         Your second piece of evidence.  There have
20   been a number of witnesses who have come in here and have
21   testified.  All of them have raised their right hand, sworn
22   to tell you the truth, and as I told you at the beginning of
23   the trial it's your job as the jury to decide what is the
24   truth in this case.  Well, how do you do that?  You have had
25   a chance to observe and listen to these witnesses.  Ask

1    yourself, were they candid, were they forthright, what

2    opportunity did they have to see or hear what they told you.

3    Ask yourself what interest or bias they had in what they

4    told you.  All of those things I want to you use when

5    remembering the testimony of these witnesses.

6            Now, if you believe that any witness has

7    testified falsely as to any material fact, that is a fact

8    which can affect the outcome of this case, you can disregard

9    all that witness's testimony, some of that witness's

10   testimony, or none of that witness's testimony.  It's up to

11   you to decide what testimony to accept and what testimony to

12   reject.

13           Now, in this case, ladies and gentlemen, the

14   defendant, Mr. Lockwood, has chosen not to take the stand

15   and testify.  And as I have already told you, he sits there

16   presumed innocent, and he's not required to prove his

17   innocence or to take the stand and testify.

18           Again, the burden is on the State of Alabama

19   to prove his guilt beyond a reasonable doubt.  He's cloaked

20   with the presumption of innocence, and he has a

21   constitutional right not to testify, and you should not

22   infer anything prejudicial because he has chosen not to take

23   the stand and testify.

24           Your third piece of evidence.  There have

25   been a number exhibits that this court has entered into

1    evidence, and those will go back with you at the conclusion
2    of my instructions, so that you can examine them more
3    closely for yourself.  So that's your third piece of
4    evidence in this case.

5              Now, let's talk, ladies and gentlemen, about
6    what specifically the State of Alabama has indicted and
7    charged the defendant with.  As you know, the State of
8    Alabama has indicted the defendant with attempted murder,
9    and I'm going to read to you first the charge of attempted
10   murder.

11             A person commits the crime of attempted
12   murder if with intent to commit the offense attempted, he
13   does any overt act towards the commission of that offense.
14   To convict, the state must prove beyond a reasonable doubt
15   each of the following elements of the offense of attempted
16   murder;

17             Number one, that the defendant, Mr. Lockwood,
18   intended to commit the crime, in this case, of murder, and,

19             Number two, that acting with the intent to
20   commit the crime of murder, the defendant did an overt act
21   towards the commission of such offense.

22             Now, I'm going to read to you what the
23   definition of murder is, because again, it is alleged that
24   he attempted to commit the crime of murder.

25             To convict for murder, the state must prove,

1    number one, that the victim is dead.

2              Number two, that the defendant caused the

3    death of the deceased, i.e. by shooting him.

4              And number three, that in committing the act

5    which caused the death of the deceased, the defendant acted

6    with intent.

7              A person acts intentionally with respect to a

8    result or to conduct when his purpose is to cause that

9    result or to engage in that conduct.

10             What constitutes commission of an overt act

11    towards the commission of the offense of murder is for the

12    jury to decide under the circumstances.  It requires that

13    the defendant do some act directed towards the eventual

14    effecuation of the crime.  However, mere remote preparatory

15    acts which are not reasonably in the chain of causation

16    leading to effectuation of the crime are not sufficient.

17             Again you have to look and you have to ask

18    yourself whether or not the State of Alabama has proven to

19    you each of those elements of attempted murder.

20             Number one, again, that the defendant Mr.

21    Lockwood, intended to commit the crime of murder.

22             And, number two, that acting with the intent

23    to commit the crime of murder, he did so with an overt act

24    towards the commission of that offense.

25             Now, a person, again, acts intentionally with

1    respect to a result or to conduct when his or her purpose is

2    to cause that result or to engage in that conduct.

3                Intent to kill may be inferred from the

4    defendant's act of using a deadly weapon.

5                Evidence of prior acts does not prove that

6    the defendant is guilty of the crime charged.

7                The mere presence of a person at the time and

8    place of a crime is not sufficient to justify his conviction

9    for the commission of the crime.

10             Now, in this case, ladies and gentlemen, I am

11    also going to instruct you on what we call lesser included

12    offenses, and I have two of those; the first one is assault

13    in the second degree, and the second one is assault in the

14    third degree.  You are also to consider these along with

15    your deliberations back there.

16             A person commits the offense of assault in

17    the second degree if he causes physical injury to any person

18    by means of a deadly weapon or a dangerous instrument, with

19    the intent to cause the physical injury to another person.

20             To convict, the state must prove beyond a

21    reasonable doubt each of the following elements of assault

22    in the second degree;

23             Number one, that the defendant, Mr. Lockwood,

24    caused physical injury to any person, namely Mr. McInnes.

25             Number two, that the defendant caused the

1    injury by means of a deadly weapon or a dangerous

2    instrument, in this case, the gun.

3                And, number three, that the defendant acted

4    with the intent to cause physical injury to another person.

5                Again, a person acts intentionally with

6    respect to a result or to conduct when his or her purpose is

7    to cause that result or to engage in that conduct.

8                Physical injury means impairment of physical

9    condition or substantial pain.

10               Deadly weapon does include a firearm.

11          So again you have to ask yourself, has the State of

12   Alabama proven each and every one of those elements to you

13   beyond a reasonable doubt, or have they not proven each and

14   every one of those elements to you beyond a reasonable

15   doubt.

16               The last offense that I'm going to give you

17   to consider is assault in the third degree.  A person

18   commits the offense of assault in the third degree if he

19   causes physical injury to any person with the intent to

20   cause any injury to another person.

21               To convict, the state must prove beyond a

22   reasonable doubt each of the following elements of assault

23   in the third degree;

24               Number one, that the defendant caused any

25   injury to any person, namely Mr. McInnes.

1    And number two, that in doing so, the

2    defendant acted with the intent to cause physical injury to

3    another person.

4    Again, physical injury means impairment of

5    physical condition or substantial pain.

6    A person acts intentionally with respect to a

7    result or to conduct, when his or her purpose is to cause

8    that result or to engage in that conduct.

9    Again, you have to look and decide whether or

10   not the State of Alabama has proven each and every one of

11   those elements to you beyond a reasonable doubt, or whether

12   or not they have not proven each and every one of those

13   elements to you beyond a reasonable doubt.

14   Your jury verdict, ladies and gentlemen, has

15   three counts on it.  The first count that you have to

16   consider is whether or not the defendant is guilty of

17   attempted murder.

18   Again, you have to remember my instructions,

19   apply the law to them.  If you believe the State of Alabama

20   has proven each and every element of attempted murder to

21   you, then you would find the defendant guilty of attempted

22   murder.

23   Now, if you do not believe the State of

24   Alabama has proven each and every one of those elements to

25   you beyond a reasonable doubt, you would find the defendant

1    not guilty of attempted murder.  And you would go to your

2    next charge, which is assault in the second degree.  You

3    would look at assault in the second degree.

4                    If you believe the State of Alabama has

5    proven each and every one of those elements of assault in

6    the second degree, you would find the defendant guilty of

7    assault in the second degree.

8                    If you do not believe the State of Alabama

9    has proven each and every one of those elements of assault

10   in the second degree, you would find the defendant not

11   guilty of assault in the second degree.

12                   And your last charge that you would look at

13   is assault in the third degree.  And again, you would look

14   at that, and if you believe the State of Alabama has proven

15   each and every one of those elements to you beyond a

16   reasonable doubt, you would find the defendant guilty of

17   assault in the third degree.

18                   If on the other hand you do not believe the

19   State of Alabama has proven each and every one of those

20   elements to you beyond a reasonable doubt, you would find

21   the defendant not guilty of assault in the third degree.

22                   So, your choices here are, after you have

23   looked at each one of these, you can find the defendant

24   guilty or not guilty of everything.  You could find the

25   defendant guilty or not guilty of attempted murder.  You

1    could find the defendant guilty or not guilty of assault in

2    the second degree, or guilty or not guilty of assault in the

3    third degree.  But you have to look at all of these when

4    you're back there looking at them.

5              Your verdict in this case, ladies and

6    gentlemen, has got to be unanimous.  In other words, all

7    twelve of you have got to agree.  And I'm sure you may have

8    noticed that there's been thirteen of you sitting here

9    instead of twelve of you.  We always get an alternate,

10   ladies and gentlemen, just because sometimes something could

11   happen when you have a case going overnight.  My alternate

12   in this case is Ms. White-James.  Ms. White-James, you would

13   not be going back with the rest of the jury.  However, I

14   always tell the alternate, gosh, I have sat here two days,

15   what a waste of time.  I don't even get to decide the case.

16   You're just as important as the rest of the jury, but you

17   won't be going back there to decide the case.  Please call

18   the code-a-phone this this evening to find out if you are

19   needed any more for the rest of the week.

20             For the rest of you, I want you to go back in

21   the jury room.  Do not begin deliberating until I send back

22   the verdict form and the exhibits.  The only thing I want

23   you to do when you get back there is to elect a foreperson.

24   That's someone to make sure you have fair and orderly

25   deliberations while you're back there.  There's coffee for

1    you when you get back there, and we will send this back to

2    you in just a moment.

3                    BY MR. GREEN:   Judge, can we approach before

4    you release the jury?

5                    BY THE COURT:   Yeah.

6                             (Bench conference)

7                    BY THE COURT:   A couple of things, ladies and

8    gentlemen.   First of all, when you get the statement back

9    there, there are some redacted portions to the statement,

10   and the court has redacted those, so, you're not to concern

11   yourself about what has been redacted.   The court has taken

12   those out.

13                   The last instruction I need to give you, I

14   also charge that you flight from the scene can be inferred

15   by you as a guilty state of mind.   Okay.

16                   I think y'all are ready.   If you will head

17   back this way, and again, just select your foreperson, don't

18   start deliberating until I send back the verdict form.

19                       (Jury out; time 5:49 P.M.)

20                   BY THE COURT:   State?

21                   BY MR. BAILEY:   State is satisfied.

22                   BY THE COURT:   Defense?

23                   BY MS. TOLES:   Defense is satisfied.

24                   BY THE COURT:   All right, y'all make sure the

25   exhibits are correct.

1                    (Verdict; time 5:42 P.M.)

2                    BY THE COURT:  All right, y'all can have a

3    seat.  Has the jury reached a verdict in this case?

4                    BY THE FOREPERSON:  Yes, Your Honor.

5                    BY THE COURT:  Could you give that to Mr.

6    Harris?  Is it the verdict of the jury, We, the Jury, find

7    the defendant guilty of attempted murder?

8                    BY THE FOREPERSON:  Yes, Your Honor.

9                    BY THE COURT:  Does anyone want the jury

10   polled?

11                   BY MS. WILLIAMS:  Yes, Your Honor.

12                   (Jury polled affirmatively)

13                   BY THE COURT:  All right, I want to thank

14   y'all for your service with me.  I appreciate it.  This

15   evening, I would ask you to call the code-a-phone to see if

16   your services are needed any more during the week.  I know I

17   have more trials, I don't know about the rest of the judges,

18   but for tonight you're excused.  Y'all drive safely, and

19   y'all all walk out together.  It's kind of dark out there.

20   Thank you again, and have a nice evening.

21                   (Jury out)

22                   BY THE COURT:  Okay, Mr. Lockwood, as the

23   jury has found you guilty of attempted murder, so also does

24   this court, and do we need to set a sentencing date, or can

25   we waive it -- or do we need one?

1          BY MR. BAILEY:  Judge, we probably need a

2    PSI, because it's in your discretion.  It's either life

3    without parole or life, so we need a PSI.

4          BY THE COURT:  All right.  We're going to do

5    sentencing on March 8th -- March 18, excuse me, at 9:00

6    o'cLock -- 8:00 o'clock in the morning, excuse me.  Mr.

7    Lockwood, we'll get you applied for a presentence report,

8    and I will see you back on that date to sentence you.

9

10          BY THE DEFENDANT:  Yes, ma'am.

11          BY THE COURT:  Okay, thank you.

12

13                    (Court adjourned)

14               *   *   *   *   *

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4    STATE OF ALABAMA              X

5    MONTGOMERY COUNTY             X

6

7                I, DUB HARRIS, Special Roving Court Reporter

8    of the 15th Judicial Circuit for the State of Alabama,

9    Montgomery, Alabama, do hereby certify as follows:

10               THAT I reported in shorthand the foregoing

11   proceedings in the foregoing styled cause at the time and

12   place stated heretofore;

13               THAT I later reduced my shorthand notes to

14   computer-aided transcription, and the foregoing pages

15   contain a full, true and correct transcript of the

16   proceedings and testimony as herein set out;

17               THAT I am neither of kin nor of counsel to

18   the parties to said cause, nor in any manner interested in

19   the results thereof.

20               DONE this 5th day of May, 2004.

21

22

23                    _____

24                    DUB HARRIS, REPORTER

25

# VOLUME 1 OF 1

COURT OF CRIMINAL APPEALS NO. _CR-03-1253_

## APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _Montgomery_ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC 03-957_

CIRCUIT JUDGE _McCooey_

Type of Conviction / Order Appealed From: _____ _Supplemental_

Sentence Imposed: _____

Defendant Indigent: ■ YES ☐ NO

_Albert Lockwood_
NAME OF APPELLANT

_Tom Azar_     _263-5363_
(Appellant's Attorney)     (Telephone No.)
_609 S. McDonough St._
(Address)
_Montgomery_   _AL_    _36104_
(City)     (State)     (Zip Code)

V.

## STATE OF ALABAMA
NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____ _Supplemental_

(For Court of Criminal Appeals Use Only)

# INDEX
## CLERK'S RECORD

EXHIBIT LIST...................................................................... 1

STATE'S EXHIBITS............................................................ 2-85

DEFENDANT'S EXHIBITS.................................................... 86-119

CERTIFICATE OF COMPLETION....................................... 120

IN THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR MONTGOMERY COUNTY
MONTGOMERY, ALABAMA

ALBERT JEROME LOCKWOOD,

APPELLANT,

vs.

STATE OF ALABAMA,

APPELLEE.

CRIMINAL ACTION
CASE NO. CC-03-957

_____/

EXHIBIT INDEX TO REPORTER'S TRANSCRIPT ON APPEAL

(The following exhibits were filed by supplement
on July 7, 2004:)

EXHIBITS                                          ADMITTED

SX 1-8 - (Photographs)                            117

SX 9-11 - (Shell casings, live rounds)            122

SX 12 - (Photograph)                              117

SX 13 - (Rights form)                             148

SX 14 - (Statement)                               160

SX 15 - (McKinnes Medical Records)                203

DX 1 - (Photograph)                                87

DX 2 - (Statement)                                126

DX 3 - (Photograph)                               101

DX 4 - (McKinnes Statement)                       206



3



STATE'S
EXHIBIT

2





3







STATE'S
EXHIBIT

S



STATE'S
EXHIBIT

6



STATE'S
EXHIBIT

7

STATE'S
EXHIBIT
8



10



STATE'S
EXHIBIT

9



STATE'S
EXHIBIT

10



STATE'S
EXHIBIT



STATE'S EXHIBIT

**14**

## City of Montgomery, Alabama
## Montgomery Police Department

ALBERT, LOCKWOOD
### NAME

12th grade Graduate
### EDUCATION

ROBBERY/HOMICIDE
### PLACE

05/27/03    *1234 hrs*
### DATE @ TIME

ATTEMPTED MURDER
### CHARGE

Before asking you any questions, I must explain that you can remain silent.  Anything you say can be used against you in court.  You may talk to a lawyer first, and you have the right to the advice and presence of a lawyer even though you cannot afford to hire one.  If you cannot afford to hire a lawyer and want to have one present during interrogation the Court will appoint one before we question you.  If you want to answer questions now, you can do so, but you can stop at any time.

_____
### OFFICER

I fully understand the foregoing statement and do willing agree to answer questions.  I understand and know what I am doing.  No promises or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.

*Albert Lockwood*

WITNESSES:

_____

_____

STATE'S EXHIBIT

*13*

**STATE'S EXHIBIT 14**

15

### VOLUNTARY STATEMENT FORM
### MONTGOMERY POLICE DEPARTMENT

DIV: Detective          BUREAU: Robbery/Homicide          DATE: 5/27/03

NAME: Albert Lockwood                    AGE: 40 SEX/RACE: M/B
ADDRESS: 9629 Highway 223, Union Springs, AL.      PHONE: 474-3735

CONCERNING: Attempted Murder of Christopher McKinnes

LOCATION OF INTERVIEW     PAB: YES NO (SPECIFY):

STATEMENT TAKEN BY: Detective D. J. Belcher, #844

---

Beginning time 1237 Hours.

Q:    State your name for me please?
A:    Albert Jerome Lockwood.

Q:    Okay, and you, your date of birth?
A:    August 24, 1962.

Q:    Social?
A:    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.

Q:    Alright, and your address?
A:    9629 Highway 223, Union Springs, Alabama.

Q:    Phone number?
A:    Area code 334-474-3735.

Q:    Okay, before we start here I must read you this again, which we have
      already signed at 1234 Hours, on the date of 5/27/03.  Right here is the
      City of Montgomery Police Department Rights Form and on here it says,
      right here it, it says before asking you any questions, I must explain to
      you that you have, that you can remain silent.  Do you understand?
A:    I understand.

rm/E3835

---

*l·l  l·r  l l·844*
Detective Signature                          Witness Signature

Signature of Person Giving Statement:   I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

---

Q: Anything you, you say can be used against you in court. Do you understand?
I understand.

Q: You may talk to a lawyer first and you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. Understood?
A: Understood.

Q: Okay, if you can afford, if you cannot afford to hire a lawyer and want to have one present during interrogation, the court will appoint one before we question you. You understand?
A: I understand.

Q: Okay, if you want to answer questions now you can do so, but you can stop at any time. You understand?
A: I understand.

Q: Okay, I have already signed this and right here you can read and you can write this, is that correct?
A: Correct.

Q: Okay, could you read that aloud for me?
A: I fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone or no pressure of any kind has been made against, against me by anyone.

Q: Okay, so no pressure or any threats have been made?
A: No.

Q: Okay, and you did sign this, correct?
A: Correct.

Q: Okay, alright, before we start could you, I wanna take you back to the date of 4/11/03 at a time of 11, 1110, its gone be on the address of 1490 County Road 42, Unions Springs, Ala, correction. Its gone take place on 2720 East Gunter Park Drive. Alright, do you know what I'm talking?
A:    _____inaudible_____

rm/E3835

_____          _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, .ues and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.



Q:   You don't know what I'm talking about?
     What, I'm saying what supposed to been took place?

Q:   That's, that's what I want you to tell me about.  I want, I want you to
     tell me about the time you went over there on Northern Boulevard?
A:   Northern Boulevard?

Q:   Yes, yes, sir.
A:   inaudible

Q:   To Northern Boulevard at Gunter Park to talk to Ms. Carla Parker.  You
     know her?
A:   Yes, I do.

Q:   Okay, I want you to tell me about the time, what happened when you went?
A:   I wasn't there.

Q:   You wasn't there?
A:   No, sir.

Q:   Okay, you go on, you telling me you did not go to, to that location where
     Ms. Carla Parker worked at, you haven't been to that location before...
A:   Yes, sir.

Q:   ...have you been there before?
A:   Yes, I have been, been in that location, yes.

Q:   You have been there before?
A:   Yes, I have.

Q:   Okay, you, so you honestly, honestly can say, you honestly can say that
     you never got in a altercation...
A:   Naw, what I'm...

Q:   ...of, at that job before?
A:   No, I never.

Q:   You never have got in a altercation at that job?
A:   No.

rm/E3835

_____

_jes Jit Jebbis_
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 3 of 61   Time:

18

Q:    So no one has seen you fuss or come up there being in a dispute or angry? No, but what I meant about I have been there, the last job, you know the job I have now, I work four months and off, in between I have to get another job. So at the time the job I had was delivery, Robert Delivery Wor, Mill worker, so that's where I have to make deliveries out there. That's, that's the only time I ever, that's the only time I been out there.

Q:    That's the only time you been out there.  You never been inside the guard shack?
A:    Yes.

Q:    What were you doing inside the guard shack?
A:    Asking directions.

Q:    You know who works in the guard shack?
A:    ~~what shift~~

Q:    Do you know who works in a guard shack, is not a question of what shift. Do you know who works in the guard shack?
A:    Yes, I know who work in the guard shack but...

Q:    Okay, name, name the people that you know of that's close to you that works in the guard shack.
A:    ~~no,no~~ no, no one is...

Q:    No one is close?
A:    No, sir.

Q:    You don't have a girlfriend that works at the guard shack?
A:    No.

Q:    You never had known anyone to work that you know, of a good friend that works up there?
A:    A friend.

Q:    And what's, I'm talking about a female, what would be her name?
A:    Carla Parker.


rm/E3835

_____

_____          _____
Detective Signature              Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts, ues and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____          Page 4 of 61   Time:

24

Q:   Carla Parker?
A:   Yeah.

Q:   How long have you known Ms. Carla Parker?
A:   Not that long.

Q:   Not that long.  How long is not that long?
A:   From a distance, I'd say...

Q:   Not from a distance.  How long have you known her?
A:   Not, not long.

Q:   Okay.
A:   On, on and off.  Seeing her, don't see her.

Q:   So she would not really have a reason to say that ya'll was in a
     relationship or ya'll had anything to do with each other, would she?
A:   Let me tell you like this...

Q:   Now, just tell me...
A:   I'm a, I'm...

Q:   ...tell me the truth...
A:   ...can I get...

Q:   ...tell me what, what happened, then tell me?
A:   I'm a, I'm a tell you.

Q:   Okay.
A:   She fully of game.

Q:   She full of game.
A:   Both of 'em.  Her and, her and him, her husband or, or whatever she claim
     Mr. McKinnes is.  They full of game.  They bout money.

Q:   Okay, they about money?
A:   Yeah.


rm/E3835

_____
  74  15  17  844
Detective Signature                     Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:  Okay, well if she's full of game, how would you know this and not really
    know her?
A.  Huh, half of Union Spring know.

Q:  I'm asking you.
A:  I'm telling you, half of Union Springs know it and, and, and word travel.

Q:  How do you know if she's full of game?
A:  Well, they...

Q:  That's not something that somebody's ordinary to say.
A:  Its more, its, its, its more than somebody.

Q:  No, I'm talking bout you...
A:  It's a group.

Q:  ...your, me and you are talking.
A:  Sure.

Q:  Me and you are talking.
A:  Sure.

Q:  Its just us.  We're not concerned about nobody else.  What I'm asking you
    is how do you know her to be full of game?
A:  For one we used to work together at Wayne Farm.

Q:  Ya'll used to work...
A:  Yeah.

Q:  ...together at Wayne Farm?
A:  Yeah.

Q:  And you telling me she is not gonna have a, she has not said or said that
    you and her had a relationship together?
A:  No.

Q:  You never kissed her?
A:  Never kissed her.


rm/E3835

_____

_____          _____
Detective Signature                       Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
 ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:    Never had a type of relationship, sexual relationship?
      Yeah.

Q:    No nothing?
A:    Yeah.

Q:    You ain't never said nothing to her?
A:    Yeah, yeah, I'm a hit it, yeah.  Yeah.

Q:    So that's how you know her, right?
A:    ___no response_____So me and...

Q:    So had, so, wait a minute.  I, I'm not, I'm not concerned about that.
A:    I know you, I know you're not concerned about it....

Q:    I'm not concerned about it.  What I'm concerned...
A:    ...but what I'm saying...

Q:    ...about is that you have and that you know this woman...
A:    Not...

Q:    ...and we have, no, we have, we have witnesses.  We have witnesses like
      I, like I told you before.
A:    Uh-huh.

Q:    It's a point in, in time that you need to tell the truth.
A:    I understand.

Q:    Okay, but right now you trying to dodge and I can tell that you dodging?
A:    How?

Q:    I can tell...
A:    See...

Q:    ...that you dodging and also I have, we have paperwork saying you
      dodging.  I'm not gone sit here and call you up here for nothing.  Okay,
      cause you get what I'm saying?
A:    Yeah.


rm/E3835

_____

_/i.t_/_l.r_/_._x4/_____                _____
Detective Signature                         Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____           Page 7 of 61    Time:

27

Q: There's no use to calling you up here for nothing.  We, we don't do that
   up here.
   Apparently...

Q: I don't...
A: ...apparently it, it is...

Q: Okay, so why did...
A: no response

Q: ...you come back?
A: Come back here?

Q: Uh-huh.
A: I figured do I, I need to come back and clarify things.

Q: Clarify what?  What did you have to come back and clarify?
A: Huh?

Q: What would you...
A: My...

Q: ...have to come back and clarify?
A: ...hey, detective, my, my picture is all...

Q: Why?
A: ...is on the news.

Q: Why, why would your picture be on the news?
A: Falsely accused.

Q: Falsely accused about what?
A: Of doing something that, Attempted Murder.

Q: Attempted Murder of who?
A: How, I don't know.  That's what I'm coming here to find out.

Q: So who you been around, you been in argument?
A: Can we start, can we start from the beginning?

rm/E3835

_____

_jd_ _ls_ _ll_ _844_____              _____
Detective Signature                     Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   ...ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____      Page 8 of 61    Time:

28

```
Q:   Yeah.
     Let me how this, how this thing go?

Q:   Okay, well see you, you, you trying to dodge...
A:   Unh-unh.

Q:   ...inaudible
A:   Unh-unh. Unh-unh.  I wanna tell you how this, how it really went.

Q:   Okay.
A:   I had came back to town from Ohio.

Q:   Uh-huh.
A:   For a couple of days, okay?

Q:   Uh-huh.
A:   Okay, upon me coming back I ran into a brother.

Q:   A brother named who?
A:   Terrance.

Q:   Terrance who?  You know his na, if you know him you know him, you...
A:   Yeah, but I don't...

Q:   Terrance who?
A:   I don't know his...

Q:   This, this is not the time to hold out now.  You're on...
A:   Hey, man...

Q:   ...I can't, I can't...
A:   ...I ain't holding...

Q:   ...I am trying to help you out.
A:   ...I ain't holding out nothing man.

Q:   I'm trying to help you out.  I'm trying to help you out.
A:   Hey, hey, hey detective...
```

rm/E3835

_____          _____

_J.J.S. debbil_

Detective Signature                    Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 9 of 61   Time:

29

Q:    Don't...
      ...I'm not trying to hold out.

Q:    Okay, don't, don't mess up your record by coming, coming back in good
      faith.
A:    Unh-unh.

Q:    Don't mess all that up.
A:    Unh-unh.

Q:    Because this tape is gone be heard by everything, everybody, okay.
A:    That...

Q:    Don't mess that up...
A:    ...that tape, that tape there gone hear the truth.

Q:    Okay.
A:    Understand.

Q:    Alright, alright, well let me ask you this question right here.  What
      would be the reason for you to come back down, first of all, if nothing
      has happened?
A:    Come back to Alabama?

Q:    Yeah, what would, what would even be the reason for anybody to look for
      you because if you hadn't done nothing and nothing is, and nothing,
      nobody would have any reason to look for you.
A:    You're right.

Q:    So its something had to go on for somebody to look at you.  We both grown
      men, we understand this and we know this.
A:    That's right.

Q:    You get what I'm saying?
A:    I understand.

Q:    So its something in your mind to say well look, I better go take care of
      this before it get out of hand.
A:    Yeah.

rm/E3835

_____          _____
Detective Signature                         Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
 .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 10 of 61   Time: _____

30

Q:    That's what you come down here for...
A:    That's right.

Q:    ...right?
A:    Yeah.

Q:    You come down here for to get stuff taken care of so stuff wouldn't get
      out of hand.
A:    That's right.

Q:    Well what was the situation that happened that got out of hand?
A:    I don't know.

Q:    Now if it was a mistake, call it a mistake...
A:    I know.

Q:    ...and go on with it...
A:    I don't...

Q:    ...but don't sit there and push everything off as, as if it didn't never
      happen.
A:    If...

Q:    You get what I'm saying?
A:    ...if I don't know nothing about it...

Q:    Okay.
A:    ...it never happened.

Q:    So you was...
A:    Tell the...

Q:    ...you never...
A:    ...so the reason why I come back...

Q:    Okay, so now, you was never at that plant, you was never at that plant or
      on Gunter Park East Drive...
A:    When?

rm/E3835

_____

_ _ _ _ _ _ _ _ _
Detective Signature                          Witness Signature

Signature of Person Giving Statement:   I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 11 of 61   Time:              31

Q:    ...on the date of 4, its gone be on a Friday.   It took place Friday, 4/11/03.
      On a Friday?

Q:    On a Friday.   Yes, sir.   Yes, sir.
A:    Unh-unh.

Q:    Friday.
A:    No.

Q:    4/11/03...
A:    Unh-unh.

Q:    ...at 23, you never was?
A:    Unh-unh.   It wasn't me.

Q:    Okay, so it wasn't you?
A:    It wasn't me.

Q:    So it was somebody that looked like you?
A:    I don't know how, you can put that anyway you wanna, detective, it wasn't me.   It wasn't me.

Q:    It wasn't you?
A:    It wasn't.   You can put it on somebody that look like me or this and that but it wasn't me.

Q:    When you did what?
A:    Whatever, whatever I'm here for.

Q:    Whatever you here for?
A:    Whatever I'm here for.

Q:    So you just come back and you'll get in cuffs and everything and you'll turn yourself in to the Police Department and put cuffs on you, let 'em put cuffs on you and stuff like that...
A:    Yeah.


rm/E3835

_____          _____

_Jad J.T Melchel 844_
Detective Signature                                     Witness Signature


Signature of Person Giving Statement:   I hereby affirm that the facts,
   ...ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

```
Q:    ...and come on down...
 ?    Cause...

Q:    ...for nothing?
A:    ...because I don't know what's going...

Q:    You don't...
A:    I'm innocent.

Q:    At, at one point in time did you even ask us what we wanted you for?
A:    Didn't have to because I already knew.

Q:    You already knew?  What is...
A:    If, if, if that was...

Q:    ...everybody else saying?
A:    ...if...

Q:    What is, what is, what is the talk around town gotten you?
A:    Well I had time to talk to nobody.

Q:    Well just...
A:    Cause I...

Q:    ...whoa, wait a minute...
A:    ...just, I just came into town.

Q:    See there.  Wait a minute.
A:    I just came back to town.

Q:    Awhile ago you just sit there and told me that you came back.
A:    You said what...

Q:    No.
A:    ...the talk around town is.

Q:    No, I said what the talk around town...
A:    Yeah.
```

rm/E3835

---

_____ Ja  il5 il  84kl _____
Detective Signature

_____
Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
  .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

Q:    ...you said it's a small town, Union Springs, talk get around, right?
      So how can I, how...

Q:    Okay, but you just...
A:    ...like I said...

Q:    ...come back...
A:    ...I just came back to town.

Q:    Okay, so when you came back...
A:    So I don't know...

Q:    ...didn't you say you had...
A:    ...what the talk...

Q:    ...they saw you...
A:    ...around town is.

Q:    ...on MPD, D?
A:    I said I called my people.

Q:    Aw, okay.
A:    Detective...

Q:    See that's what I'm talking about...
A:    ...I called my people...

Q:    ...right there.
A:    ...then they told me...

Q:    _____INAUDIBLE_____
A:    ...they seen me on MPD, to come and turn myself in.   They got me
      Attempted Murder, Armed and Dangerous, Do Not Approach.

Q:    Yeah, I, I done came one with you...
A:    Come on now Detective.

Q:    ...but you sitting there...
A:    No, I'm not...

rm/E3835

_____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
    ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____        Page 14 of 61   Time:

34

Q:    ...what you sit there and heard...
      ...sitting...

Q:    ...I just asked you what was the talk.  That's part of the talk right
      there.  Why would they even have that on you?
A:    Naw, I'm not talking bout, I'm talking bout my people but...

Q:    That's still people man.  I mean quit trying to, quit trying to go to the
      specifics cause that's still people. See you got, what you doing man is
      dodging, alright.
A:    I'm not dodging ____INAUDIBLE____

Q:    You are dodging.
A:    ...detective...

Q:    You are dodging.
A:    I'm not dodging anything.

Q:    Its, its dodging and you know you dodging.
A:    Naw, I'm telling you...

Q:    Naw, you're not telling me...
A:    ...I'm not telling...

Q:    ...look, well look at me in my face and tell me, cause you're not...
A:    I'm constantly...

Q:    ...you're not looking...
A:    ...looking in...

Q:    ...at me in my face.
A:    ...I'm constantly...

Q:    What you're doing you're looking over to the side and you looking up in
      the air.
A:    Come on, come on now don't even...

Q:    You looking at...
A:    ...don't even go there, Detective.

rm/E3835

_____

_/_J _I,T_ _&_ _844_____                _____
Detective Signature                         Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
.ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                Page 15 of 61  Time:              35

```
Q:   Don't go where?
     I'm looking at you eye to eye man.

Q:   Okay, but I'm trying to tell you...
A:   I'm looking at you...

Q:   ...you telling one...
A:   ...eye to eye.

Q:   ...you telling a good one.  So you never...
A:   How?

Q:   ...been out there?
A:   Yes, I've been...

Q:   _____You_____  never been out there?
A:   ...out there.

Q:   And you, and you, and you stating your...
A:   Not on, not on...

Q:   ...your, no...
A:   ...Saturday night.

Q:   ...no, no, no...
A:   Not on Saturday night or day.

Q:   I...
A:   Naw.

Q:   ...I ain't say Saturday night I said Friday night.
A:   Well whatever.

Q:   Okay.
A:   I never been out there.
```

rm/E3835

_____

_Detective Signature_ _____          _Witness Signature_ _____

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 16 of 61  Time:

36

Q:    Okay, so you basically say that this whole testimony is right here based on you being out there, so if they sit there and prove that you went out here, you can be gone out these cuffs today, huh?
A:    You would have to let me go, let me go.

Q:    So why would he wanna, wanna lie you on you then, man?
A:    I told you they full of game, man.

Q:    They full of game?
A:    They full of game.

Q:    Full of game?
A:    They gaming.  Both of 'em.

Q:    Both of 'em?
A:    They gaming.

Q:    Who is both of 'em?
A:    Her, her and, and McKenzie, whatever his name is.  They game, man.

Q:    Whatever his name is.  How do you know him then?
A:    Come on Detective, man.

Q:    How do you know him?  Just answer the question...
A:    Hey man.

Q:    ...how do you know him?
A:    Listen here.  I done, I...

Q:    How do you know him?  That's the direct question?
A:    I done been, I done been...

Q:    How do you know him?
A:    Come on now.

Q:    How do you know him?
A:    That, that, this the part where...


rm/E3835

_____

_Jd f Fguy_____                    _____
Detective Signature                        Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
   lues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.


_____          Page 17 of 61  Time:          _37_

Q:  How do you, no, this ain't the part that you answer the question...
    Naw, this part...

Q:  ...so we can get out of here.
A:  ...this...

Q:  How do you know him?
A:  This the part when...

Q:  How do you know him?
A:  ...when, when you read me that, you said I can...

Q:  How do you know him?
A:  ...stop answering questions any time...

Q:  How do you know him?
A:  ...right? Right?

Q:  How do you know him?
A:  Right?

Q:  How do you know him?
A:  He used to work in, at, at Wayne Farm, too.

Q:  At Wayne Farm too?
A:  Yeah.

Q:  So what do you know about him?
A:  I don't know nothing about him.

Q:  So why, if you don't know nothing about him, then how can you sit there
    and say he full of game?
A:  Man, I ain't...

Q:  How, how can you sit there and say that? You just sit there and told me
    you knew...
A:  Uh-huh.

rm/E3835

_____        _____

_Ju .jT .j 844_
Detective Signature                                      Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
  .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

```
Q:    ...nothing about him.
 *    Listen...

Q:    Now you sitting there...
A:    ...listen here...

Q:    ...telling me you know something about him.
A:    ...Detective...

Q:    How...
A:    Let me talk, man.

Q:    ...do you know him?  I'm telling, I'm letting you talk...
A:    No-unh, let me...

Q:    ...if you got the answer to my questions.
A:    ...talk.  Naw.

Q:    Then you can talk.
A:    Let me...

Q:    Answer my questions...
A:    ...let me...

Q:    ...and then you can talk.
A:    ...talk.  Let me talk.

Q:    I can listen to you long as you sit there and answer my questions.  You
      answer a question for me then you can start talking.
A:    I answered questions.  He used to work at Wayne Farm.

Q:    What was my next question after that then, since you answering?
A:    I, I didn't follow it.

Q:    You didn't follow my question?
A:    Unh-unh.  What was your question, sir?

Q:    My question, look back at me now.
A:    Unh-unh.
```

rm/E3835

_____
Detective Signature

_____
Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
  .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:   You said you was looking in my face.
     What, what was your question, Detective?

Q:   My question was to you, was there any, how, if you didn't know him, now
     how do you know him?
A:   I say...

Q:   How is it he...
A:   ...he's the one...

Q:   ...how is he, how is he full of this and full of that now but a few
     minutes ago you didn't know him?
A:   ___NO RESPONSE___          You know what Detective, the same thing you
     trying to try on me out, I done tried on my, my 5 year old son.

Q:   Well that's good, sir, but the same thing that you trying on yourself...
A:   But see...

Q:   ...this lying, is gone get you in...
A:   I'm not lying.

Q:   ...trouble.
A:   I'm not lying.

Q:   Its gone get you in trouble.  See...
A:   Its good...

Q:   ...the first thing you got to start doing right now is both of us, both
     of us, I'm respecting you as a man and you got to respect me as a man. It
     don't matter bout the age right now.
A:   Uh-huh.

Q:   The only thing that you got to do is tell the truth but one thing, when
     you tell the truth, you have everything in order but when you trying to
     miss this and miss that, lying can be perceived as two things, telling
     direct bold face lying or by deception, telling half the truth.
A:   I'm telling you the whole truth.


rm/E3835

_____

_/s/ JT Kebbel_____          _____
Detective Signature                  Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
   ...ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:    Okay, if you...
      Nothing but the truth.

Q:    ...if you told me the whole truth.
A:    Uh-huh.

Q:    ...then you would've told me that you knew him from the first beginning
      and the other...
A:    Naw.

Q:    ...people and the female that he was going with.
A:    Check, check this out...

Q:    You told...
A:    Unh-unh.

Q:    Sir, you told me...
A:    Naw, you, what you did...

Q:    Sir?
A:    Detective, what you did you ca...

Q:    Calm on down, calm down and...
A:    Calm down.

      ...lay and lay back in your seat.
A:    I'm cool.

Q:    Lay back.
A:    I'm cool.

Q:    Okay, but you told me at first that you didn't know.  You didn't know.
A:    Naw.

Q:    At first you was hesitant about telling me why you was here.
A:    Why I was what, here?

Q:    Why you was here?
A:    Its obvious...

rm/E3835

_____         _____

_Jd  d5  d  844_
Detective Signature                              Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____         Page 21 of 61  Time:

41

```
Q:    At first you was...
      ...its obvious.

Q:    ...you was hesitant...
A:    Yeah.

Q:    ...and then I asked you who did you know in the guard shack and then you
      gone give me the run around when you knew the person I was sitting there
      talking about that brung you down here.  Then you didn't wanna tell me
      that.  I know a whole bunch of people.
A:    I know...

Q:    So right now, right now the same thing you was fixing to chastise me and
      tell me that you done played on your own son, then I know the same thing
      too cause I had a dad too.
A:    Don't, okay then.

Q:    Okay, and when you gone sit there and tell the truth, you gone bust out
      the tooth, truth from the beginning.
A:    Naw.

Q:    You not gone sit here and wait.
A:    If you...

Q:    What you trying to do is turn the story...
      Unh-unh.

Q:    ...back around.
A:    Naw, I ain't trying to do...

Q:    Okay, so...
A:    ...I'm not.

Q:    Alright, then.
A:    I'm not.

Q:    Well how do you know him?
A:    I...
```

rm/E3835

_____

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _         _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
Detective Signature                      Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
  ...ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _          Page 22 of 61  Time:                42

```
Q:   So we got...
     ...like I say, he used to work at Wayne Farm also.

Q:   Okay, so why is he full of shit?
A:   Full of game.

Q:   Full of game as you say?
A:   Excuse, excuse that language...

Q:   Okay.
A:   ...for you.  Full of game.

Q:   Why is he full game?
A:   Like I say I just give up, I just give up, get up witness too, to satisfy
     why is they so full of game.

Q:   Why is he full of game?  Why is that full of game that you've seen of
     them, not by only those too, by, by more people?
A:   I don't believe 'em.

Q:   Okay, I'm not asking you to believe it.
A:   I don't...

Q:   I'm asking you...
A:   Unh-unh.

Q:   ...why...
A:   I wasn't there.

Q:   Okay, why?
A:   I wasn't there.

Q:   Why?
A:   That...

Q:   Why is he...
A:   I wasn't there.
```

rm/E3835

_____

_Det. 7.5. 17 244_
Detective Signature

_____
Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

```
Q:    ...full of game?
      I'm just telling you I wasn't there.

Q:    You wasn't there?
A:    I wasn't there.

Q:    Where was you at?
A:    I wasn't there.

Q:    Where were you at?
A:    I wasn't there.

Q:    Oh, see how you can, that's,  INAUDIBLE              can't tell me.
A:    I wasn't there.

Q:    Where were you at?
A:    Man, I was working, man.

Q:    Working where?
A:    Out of town.

Q:    You was working out of town?
A:    I was working out of town.

Q:    And drive what?
      A truck.

Q:    You drive a truck?
A:    Uh-huh.

Q:    You got a gas receipt.  I, I can pull up a gas receipt to that couldn't
      I?
A:    No, because...

Q:    No, I couldn't pull up...
A:    ...the guy, the guy who I work with, use gas cards.

Q:    Ya'll use gas, okay, if you use a gas card...
A:    But, but, but...
```

rm/E3835

_____          _____
Detective Signature                      Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
issues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

```
Q:    ...that's still...
      ...but, but I...

Q:    ...that still shows where you was at.
A:    ...but I can tell...

Q:    Where did you get gas at?
A:    Naw, naw.

Q:    Where did you get gas at?  That's a, where was the last...
A:    I'm a, hey...

Q:    ...place you got gas?
A:    Sir?

Q:    Where was the last place you got gas at?
A:    I wanna end this right now.

Q:    Where did you get gas at?
A:    You might as well turn that off, Detective.  You might as well turn that
      off, Detective.  Now I thought you was for the truth, man.

Q:    I was.
A:    Excuse me.

      No, sit...
A.    Unh-unh.

Q:    ...no.
A:    Unh-unh. I'm show you something.

Q:    Sit down, sit down, sir.
A:    Let me show you something.

Q:    No, that's, that's...
A:    O, open that, open that.

Q:    That was, that was...
A:    I'm a show you something.
```

rm/E3835

_____

_____                    _____
Detective Signature                                Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   ...ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

40

```
Q:    Sir, sit down.
      I'm a show you something.

Q:    Sit down.  It'll be alright.  I was for the truth.
A:    Unh-unh.

Q:    I'm always for the truth.
A:    No, Detective.

Q:    The truth gone stand all the time.  The truth will stand all the time.
A:    I thought you was for the truth.  Here I'm trying to tell you...

Q:    No, sir.
A:    ...something and you trying to cross...

Q:    No, no, sir.  You...
A:    ...up my...

Q:    ...you...
A:    ...what I'm trying to tell you.

Q:    No, I'm not.
A:    I told you I did not...

Q:    Are, are you...
      ...lay a hand on that...

Q:    ...talk, are you, are you...
A:    ...on that guy.

Q:    ...are you talking to me or are you not talking to me?
A:    I'm talking in the tap, tape recorder.

Q:    The tape recorder, you talking to me.
A:    I did not lay a...

Q:    Well then are you talking to me or are you not talking to me?
A:    I did not lay a hand on that guy...
```

rm/E3835

_____

_/l  _/r  _/l_l_l_i___
Detective Signature

_____
Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____        Page 26 of 61  Time: _____

46

Q:    Are you talking to me or are...
      I did not do nothing.

Q:    ...you not?  Are you talking to me or are you not?  Are you talking to me
      or are you not?
A:    I'm trying to, I'm trying to tell you truth and make...

Q:    State are you talking to me or you not?
A:    Detective?

Q:    Are you talking, answer the question first.
A:    I'm through with it Detective.

Q:    Are you, okay...


Ending time 1259 Hours.


TAPE WAS CONTINUED.


Beginning time 1455 Hours.


      Mr. Albert Lockwood would you go head and tell us, say to us what you
      wanna tell us?
A:    First of all this, this happened way before the incident that took place
      at the Steris...

Q:    Uh-huh.
A:    ...Corporation.  It happened at the house, at the house of Carla Parker.
      Me, me and Carla Parker brother, Terrance, her brother name Terrance, I
      think Terrance Parker, we was riding and we was riding, we go over to
      his, to his mother house and then he got a call and we went over to her
      house.  He said hey, man, I need to go over to my sister house for a
      minute.


rm/E3835

_____        _____

_~d  d,s  d  844_
Detective Signature                             Witness Signature

Signature of Person Giving Statement:   I hereby affirm that the facts,
   ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.


_____

Q:    Uh-huh.
      So we went over to his sister house.  So, so once we arrived to her, to
      Ms. Parker house, Chris McKinnes was, was, was in the house.  So I got
      out the car and time, her brother got out the car, time I got out the
      car, he see me get out the car, he yells oh, you fuck him, you fucking
      him, you know, but the Ms. Parker ain't said nann time, that she was, me
      and her was dealing.  So he kept, kept, that I was fucking her, we was
      fucking each other.  So he hit me in my mouth and broke my teeth, bust my
      lip, broke my teeth. So that's, that's how it began.  Me and him tussling
      and fighting.  So therefore after I get the best of him he gone go tell,
      he gone tell me that he gone make sure I go back to prison.  The only
      thing he gotta do is go up, go up town, Union Springs to his auntie,
      whatever and I'm going back to prison.  So I didn't pay no attention to
      that.  So I left the, the next thing I know the incident took place at
      Steris.

Q:    Tell me bout what, that incident.
A:    Well I was going to talk to Ms. Parker.

Q:    Uh-huh.
A:    Okay, and he was there and we get, we got in a confrontation and we
      start, we start fighting...

Q:    Started fighting?
A:    Yeah, me and him started fighting.

Q:    Okay, and who is he?
A:    Chris McKinnes.

Q:    Alright, so he was there?
A:    Yes, he was there.

Q:    You was at the guard shack?
A:    He, he was outside the guard shack.

Q:    And who was he talking to?
A:    He was talking to Ms. Parker.

rm/E3835

_____     _____
Detective Signature                   Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:    Talking to Ms. Parker?
      Yes, sir.

Q:    Alright, so and what happened then?
A:    We got to, we got to scuffling.

Q:    Uh-huh.
A:    We got to, we got to fighting.

Q:    Who brought you to the or what made...
A:    Uh-huh.

Q:    ...what was the reason that you came?
A:    To get my clothes cause I was fixing to get ready to go back out of town.
      She had my clothes in her car.

Q:    Okay, who brung you?
A:    A friend, he live in Riverside.

Q:    And you don't know his name?
A:    NAW

Q:    Are you...
A:    INAUDIBLE

      What's he go by?
A:    Huh?

Q:    What's he go by?  I'm, I'm sorry. Corporal W. D. Crisler, I'll be
      assisting  on  this  interview.   What,  the  guy  that  brought  you
      INAUDIBLE               you know if goes by a nickname or anything?
A:    No.

Q:    Okay
Q:    No address?
A:    No address.


rm/E3835


_____                    _____
Detective Signature                        Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
 ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.


_____          Page 29 of 51   Time:                49

44

Q:    Alright.
      What, what...
      No, sir.

Q:    ...kind of car...
A:    I been...

Q:    ...what kind of car were you in?
A:    Drive a dark, I believe it was a black Maxima.

Q:    Okay, now let me, let talk to you for just a second.  You and I talked
      for a little while and you gave me some stuff to check out and I checked
      it out for you, didn't I?
A:    Yes, sir.

Q:    Okay, you're talking to us now, did I hit you or beat or swing anything
      at you or...
A:    Naw.

Q:    Okay, so you're talking to us cause you want to?
A:    Yeah.

Q:    Okay, just wanna make sure.
Q:    Okay, so you say he drives a bl, black Maxima?
A:    Max...

Q:    He, he brought you up there?
A:    Yes..

Q:    Okay, did you know that he was up there talking to her?
A:    No, I did not know.

Q:    You did not know and by the time you got over there to talk to him then
      what happened?  Tell...
A:    And, and we...

Q:    ...me what happened?
A:    ...me, him and I, we got in a confrontation.


rm/E3835

_____

_ _jw_ 4,5 _Belchel_____        _____
Detective Signature                   Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____        Page 30 of 61  Time:

50

Q: What was the words exchanged?
Righteously wasn't no words, words exchanged. We just, we just, some like locked up.

Q: Okay.
A: And you know throwing blows, hitting each other and that, that's how it went.

Q: That's how it went. Alright, so is that all that happened? That's...
A: That's, that's it, that told all that happened.

Q: Did you hit him in the head a couple of times?
A: Yeah, I hit, I hit him.

Q: So you...
A: Soon as I hit him in the face he hit me. We, we were hitting each other.

Q: So bare hands...
A: Bare hands.

Q: ...you didn't use no, no weapons was used?
A: No weapons was used at all.

Q: And did you see his little son that was there?
A: No, sir. I didn't' see his son.

Q: You didn't see his son.
A: But like I say he was standing on the outside His son might've been on, on the inside but we was on the outside.

Q: You, you never mentioned or told anyone about his incident have you?
A: No, I haven't.

Q: What happened?
Q: You, you hadn't told anybody about it?
A: No. Yes, I told Richard Bush.


rm/E3835

_____

_Jei 1,5 d 844_
Detective Signature

_____
Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts,
.ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:    What'd you tell him?
A:    I told him that, that me, me, Carla and we had got into it.  Her, me and her boyfreind got into it.

Q:    Okay, now you, you met him to go back to home...
A:    Yeah.

Q:    ...where you were working, right?
A:    Yes, sir.

Q:    What day was that, can you remember?
A:    Sun, it was Sunday morning.

Q:    Okay, that was like Palm Sunday?
A:    Yes, sir.

Q:    Okay, about what time did you leave then?
A:    About 7.

Q:    Okay.
A:    After 7.

Q:    And before you told me a little before 7 you met him to, a the truck stop, right?
A:    Yes, yes, sir.

Q:    Okay, did you mention to him anything about shooting anybody or stabbing anybody or anything that involves a weapon?
A:    The only thing I said is me, me, went to toe to toe, wasn't no, wasn't no guns involved or nothing.  Its just, we was fighting.

Q:    When you left there do you recall if the other guy was bleeding or anything?
A:    We both was bleeding.

Q:    Okay, where were you bleeding from?
A:    Sir, I was bleeding from, from the lip.


rm/E3835

---

_del 1.5 1 341_
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, .ues and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

---



Q:    Okay, do you remember where he was bleeding from?
      Like I said it could've been from the face, whatever.    Cause we was
      through blows.

Q:    Okay, do you remember what was said that started the whole thing? I mean
      not, you totally explained to us that you already had a history with this
      guy.
A:    Do you know what...

Q:    When you got there, you got there and you said to get your clothes,
      right?
A:    Yeah.

Q:    And something was said and I mean you, you don't just walk up and smack
      somebody in the head, something was said.  He said something to you...
A:    Well...

Q:    ...or you said something to him...
A:    ...well...

Q:    ...and ya'll started mouthing at each other and the next thing, you
      know...
A:    Yeah, we...

Q:    ...somebody's swinging?
      ...we both said something to each other.

Q:    Do you remember what was said?
A:    It happened, it happened so fast.

Q:    Did you run up there?
A:    No, did not run.

Q:    NO RESPONSE_____    You walked?
A:    I walked and I did not run.

Q:    Okay, and at that point you did not even go in the guard shack or tell
      him to step outside the guard shack?
A:    No, sir.  He was already out the guard shack.  He wasn't even in it.

rm/E3835

_____          _____
Detective Signature                      Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
.ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 33 of 61  Time:

53

Q:  Okay, so...
    In it...

Q:  ...when you was hitting him, at one point in time when you was hitting
    him and he was on the, on the, on his knees, on the ground and he was
    asking you to stop, why didn't you stop?
A:  No, he didn't, he didn't, I did not hear him say nann time stop.

Q:  You didn't hear him say not one time, don't stab me or don't shoot me?
A:  Naw, I didn't hear him say nann time because shoot him with what, stab
    him, I didn't have nothing.

Q:  Did you, do you have any contact with either him or his woman after this,
    called her house or?
A:  Lets see.  Yeah, I called cause I asked her about, what, what how, how
    can I get my clothes.

Q:  Okay.
A:  I called her.

Q:  You remember how many times you called?
A:  Well she also called me too on, on, on Richard ___INAUDIBLE___ phone.

Q:  Okay.
A:  She called me also.

Q.  First time this was, ya'll ___INAUDIBLE___
A:  Yeah.

Q:  How many times?
A:  Well I, the only thing I told her to, to send my clothes.  She said when
    you want me to meet you.  I said we ain't got nothing to talk about just
    send my, just send my clothes.  Don't want you to meet me nowhere, just
    send my clothes and Mr. McKinnes got on the phone also and said that I'm
    a get you, you, you did this to me.  You shot me, say what.  I ain't say
    nothing.  I didn't say nothing because I know the only thing he did
    ___INAUDIBLE___

rm/E3835

_____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____        Page 34 of 61  Time:            54

Q:  Okay.
    That's the only thing that ya'll did was fight?
    Me, fight, that's all.

Q:      HEAD  TO  HEAD
A:  So, but like I said he, he, he hit me and busted my lip and broke, broke
    my teeth.

Q:  Did it, so that, that...
A:  Uh-huh.

Q:  ...chipped tooth right there?
A:  Yeah.

Q:  INAUDIBLE
A:  He broke my teeth.  I didn't, it just a clean fight to me.

Q:  Okay, just so, you know, we're on tape, people can't see, you're pointing
    to that...
A:  Yes.

Q:  ...that, right there in the middle on the top.
A:  Yes...


  ﹍ OF SIDE A AND START OF SIDE B


Q:  It'll be side 2 continuation of the statement with Mr. Lockwood.
A:  But like I said after, after, after we had that little altercation at Ms.
    Parker house, he broke my tooth, you know...

Q:  So he broke your teeth the day at the guard shack or at her house?
A:  At her house.

Q:  Okay, so he had, that, that didn't happen the day ya'll fought at the
    guard shack?
A:  Unh-unh.


rm/E3835


_____

_____
Detective Signature                        Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

Q:   Okay.
     So like I say I left that alone.  He broke my tooth.  So I, its just,
     it's a clean, its, if you whip me I'm gone, say way but see he the, he
     one of them ones that take it to the naked extreme.

Q:   Do you, did, the guy that you was riding with, did he know what you was
     going to the, to that...
A:   No.

Q:   He didn't know?
A:   No.  No.

Q:   He didn't know nothing.
A:   No.

Q:   What did you tell him?
A:   I just told him I needed a ride, get a ride out here by Gunter Park.

Q:   Did he stick around or...
A:   Naw, he didn't...

Q:   ...did he leave you there?
A:   ...he didn't stick around.

Q:   How'd you leave there?
     Well to be honest with you I ran.

Q:   Okay.  Who you run to?
A:   I ran up to the Fire Station.

Q:   Okay.
A:   You know across the Fire Stat...

Q:   Like, like you had heading over toward Lagoon Park?
A:   Yes.

Q:   Okay.
A:   And I...


rm/E3835

_____
Detective Signature                        Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
.ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 36 of 61   Time:

56

Q:    You called somebody from there?
A:    Well, no, no I didn't.

Q:    Well what'd you do then?
A:    After, after I seen, after I seen the Police come, came and everything
      and they left, I walked down there by the, by Petro. The, the service
      station on the corner.

Q:    Right down there by the Boulevard?
A:    Yeah.

Q:    All the way down the hill, past the park, right?
A:    Yeah.

Q:    Okay.
A:    On, on, what the name of it?

Q:    Right there at Plantation and...
A:    Right.

Q:    ...Northern Boulevard?
A:    Right.

Q:    Okay.
A:    So I walked down that way and it was a phone booth and it was a bar
      there, you know the bar?

Q:    Right.
A:    So I got, I got a ride from, from someone at that bar on Bell Street.

Q:    Okay, back over to Riverside or what?
A:    Yes, sir.

Q:    Okay.
Q:    So why did he leave, your friend leave you?
A:    Why, beg your pardon?

Q:    Why did your friend leave you?
A:    Who...

rm/E3835

_____          _____
Detective Signature                      Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 37 of 61  Time:          51

Q:    The one that brought you over there?
      Like I said he didn't know what I, what I was gonna do.

Q:    So, so...
A:    I just told him to drop me off, take me over here and he, he left.

Q:    How was you supposed to get back home?
A:    That was, that was on me.  The only thing, only thing I wanted, okay, I didn't know, I didn't know Ms. McKinnes was gone be there now.  So if I would've went over there and got my clothes and sheets me and her, we would've went on, went on to...

Q:    Ms. McKinnes was gone be at work.  She can not get off work at that time.
A:    Mr. McKinnes.

Q:    Mr. McKinnes.  You didn't know he was gone be there, right?
A:    Naw.

Q:    And you came, you went over there to see who?
A:    Ms. Parker about...

Q:    Okay.
A:    ...getting my clothes.

Q:    So Ms. Parker wasn't fixing to get off.....
      Bout 12.

Q:    Uh-huh.  She wasn't fixing to get off though by the time you got there.  You knew ya'll had done, ya'll have got into it and you was going over there to get your clothes, right?
A:    Yes, sir.

Q:    Alright, so while you was getting your clothes, I meant, while you was over there getting your clothes, you knew that she wasn't gone take you back because ya'll, you know, the little incident that ya'll got into previously before that day?
A:    Well if Mr. McKinnes wasn't there she would.

rm/E3835

_____          _____
Detective Signature                       Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, ues and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____          Page 38 of 61   Time:

Q:    She would've took you back?
      Me and her...

Q:    Okay.
A:    ...would've rode back to, to...

Q:    So, so when you...
A:    ...Mr...

Q:    ...told us you drove up, when you and your friend drove up and you seen
      Mr. McKinnes out there why didn't you tell your friend to leave when you
      seen Mr., Mr. McKinnes?
A:    Okay, like I said the only thing I wanted him, I told him man, drop me
      off.

Q:    Okay, but I'm saying, I'm saying from what you said previously...
A:    But see I...

Q:    ...you said...
A:    ...don't ___INAUDIBLE___

Q:    Okay, okay.
A:    I...

Q:    Wait a minute, wait a minute now.  Sir, I don't wanted to get you...
      Okay.

Q:    ...I don't wanna get you confused or nothing.
A:    I understand that.

Q:    Okay, from what you said last time, you said as you and your friend drove
      you, you seen Mr. McKinnes out there talking...
A:    Uh-huh.

Q:    ...and that's when you knew he was there.  Okay, you got on out the car.
      You got out the car and then that's when you started proceeding over
      there to the guard shack...
A:    Okay.


rm/E3835

_____

_____
Detective Signature                    _____
                                       Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____              Page 39 of 61  Time:            59

Q:  ...so why did your friend leave...
    Okay.

Q:  ...when he knew and you told him that, that was...
A:  I should've straightened, I should've straightened, the guard shack, from the street is, is a distance.

Q:  Uh-huh.
A:  It's a distance.

Q:  Uh-huh.
A:  So when we drove up I got, I got out the car. Now me, the guard shack, it's a distan, distance from the road.

Q:  Uh-huh.
A:  I got, I got out the car and walked up and me and when I, Mr. McKinnes was there. I didn't know, I didn't know he was there.

Q:  So you saying you don't know who was driving the car, you never seen 'em before, man?
A:  I been seeing him but I don't, I don't know him personally.

Q:  What kind of car was it?
A:  It was a black, I think it was black/blue Maxima. It was black, it was at, it was at night.

Q:  A black/blue Maxima. Okay, so you, you telling me somebody that you don't know even a nickname to give you a ride?
A:  ___NO RESPONSE___ that the same way ___NO RESPONSE___

Q:  No. I'm, I'm just...
A:  Okay.

Q:  ...asking, I'm just asking a question but I'm, I'm really saying...
A:  Well the money...

Q:  ...and, and now, now you're at night.
A:  But...


rm/E3835

_____

_____/c  JT gibb. 8¾_____               _____
Detective Signature                         Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____
                                                                                    60

Q:   Now you saying at night.
     Yes.

Q:   So I know its even more now, you know, somebody might have something to
     do, you know, if you ain't gonna wanna fool with nobody, you don't wanna
     fool with them?
A:   Well I'll put it to you like this I paid him...

Q:   How much did you, you pay him?
A:   $10.

Q:   $10.  So...
A:   That ain't...

Q:   ...he...
A:   ...I'm quite sure...

Q:   Okay, if we say we had the tag, I mean like I said I was gonna keep him
     out of it as much as possible, so if I had I said I had the tag now and
     I'm asking how much did you pay him and he gone sit there and say that
     you paid him $10.  He's, he's gone confirm that, right?  I mean we
     already started getting information like this.  So I mean don't...
A:   Okay.

Q:   ...don't make us dig no more than we, we have to.
     Okay.

Q:   So that, that's gone be true?
A:   It, it gone have to be cause...

Q:   Naw.
A:   ...cause you see...

Q:   Let me, let me ask you this real quick, you, you say it's a black or blue
     Maxima.  I understand its 11:00 at night or something like that, right.
     Do you remember, I mean you say you've seen him around, you've seen him
     around Riverside, does he hang out in Riverside, does he live there?
A:   He hang around Riverside.


rm/E3835

_____

_____                    _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
 ...ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                    Page 41 of 61  Time:              61

Q:    Okay, but you don't remember what they call him?
      Unh-unh.

Q:    Okay, I ain't, ___INAUDIBLE_____ real name, I mean...
A:    But see that, understand I been I, I been, I been FOR SOME YEARS

Q:    Alright, well the thing is...
A:    And, and to keep, and, and, and what I, before I got locked down the kids
      that I know they done growed up.

Q:    Okay, so he was just...
A:    So...

Q:    ...some, somebody that you knew from around there a long time ago and
      you...
A:    Yeah.

Q:    ...hey I'll give you 10 bucks if you give me a ride over to Gunter Park?
      Okay, that, that, that's fine. Can you give us anything to help us out?
N     __NO RESPONSE_____ rims, does it have tint...
A:    No.

Q:    ..._____
A:    No, damage it, it was the old, old model...

      What a boxy one?
A.    Yeah. Old, old model Maxima.

Q:    Okay, do you remember who it was that gave you a ride back, it was
      somebody that lives out there or did you say can you give me a ride out
      to...
A:    I would say hey...

Q:    ...INAUDIBLE_____
A:    ...can I, can I get, catch a ride out there.

Q:    Do you remember what kind of car he was in?
A:    Unh-unh.


rm/E3835


_____/J 4J J JYY_____            _____
Detective Signature              Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
.ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____            Page 42 of 61  Time:

                                                          62

Q:    Black guy or white guy?
      It was a white guy.

Q:    And he gave you a ride to Riverside or he gave you...
A:    Yeah.

Q:    ...a ride, somebody dropped you off at Salvation Army, where you, where
      he dropped you off?
A:    Yeah.  On Bell Street, up over the bridge  NO RESPONSE

Q:    So he gave you a ride to Bell Street, right?
A:    Yes, sir.

Q:    Alright, and this the first time you ever said, said you know him for a
      little kid, right?
A:    Who?

Q:    You know him from a little kid?  The guy who gave you a ride or you
      didn't?  You said he grew up.
A:    Guy gave...

Q:    Did I hear you right?
A:    ...gave me a ride...

Q:    Yeah.
      ...where?

Q:    Over there to Lagoon Park?
A:    No, I didn't, like I said...

Q:    He was, he was little right?
A:    Yeah, he was bout...

Q:    So whose family does he belong to?
A:    Sutton family.

Q:    Sutton family.  So he belongs to the Sutton family.  So what's his mom
      name then?
A:    I don't know his mom but his auntie, his cousin, Lamar Sutton.

rm/E3835

_____
Detective Signature                           _____
                                              Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
.ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                Page 43 of 61  Time:          63

Q:  Lamar Sutton?
    Yeah.

Q:  ~~████████████████████████████~~
    ~~████████████~~
A:  ~~████████~~ ars.

Q:  ~~████████~~
Q:  ~~████████~~
A:  ~~████~~

Q:  ~~████████~~
Q:  ~~████████████~~
A:  ~~████████~~

Q:  ~~████████████████████████~~
A:  ~~████████████~~

Q:  ~~████~~
A:  ~~████████████~~

Q:  ~~████~~
A:  ~~████████~~

~~█.~~  ~~████~~

Q:  ~~████████████████~~
A:  ~~████~~

Q:  ~~██████████████████████████~~
A:  ~~████████████~~

Q:  ~~████████████~~
A:  ~~████~~

rm/E383S

_____
Detective Signature                    Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____        Page 44 of 61   Time:

64



Q:
A:

Q:
A:

Q:
A:

Q:
Q:
A:

Q:
A:

Q:    ...they get...
Q:    What, what about it this time.  Now you said you didn't see him, ya'll
      just fought.
A:    What, Mr. McKinnes?

      Yeah.
      That's it.

Q:    I got a couple of people saying that you had a gun with you?
A:    No, sir.  I did not.

Q:
A:    It was no gun.

Q:    So some little kid don't get it or something.
A:    It was no gun.


rm/E3835

_____                    _____
Detective Signature                            Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
    ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

65

Q:    Okay.
      Like I say, I, I am concerned about the kids too like but it was no gun.

Q:    But you got kids don't you?
A:    Yes, sir.  I do.  It wasn't, it wasn't no gun.  It was a good clean fist fight.  Now see if I would've got, got whipped I would've left it low like, like I said he broke my teeth...

Q:    Uh-huh.
A:    ...but my lip.  I didn't go sign no warrant on him or nothing like that. So due to the fact they, you made me that, he knowed I'd been to prison he gone do what he can to send me back to prison.

Q:    Send you back to prison.  Okay, and who do said, you said you did or you didn't talk to nobody?
A:    Concerning what?

Q:    You, you said you talked to the guy you rode to Ohio with, anybody else was out there?
A:    Oh, Mr. Bushman.

Q:    Uh-huh.
A:    Naw, that's just it.

Q:    Okay, alright, what'd you, I mean you ain't, Richard Bush, you didn't tell him nothing?
A:    The only thing I told him that me, me and this girl boyfreind...

Q:    Uh-huh.
A:    ...had got in a confrontation.

Q:    You ain't tell him you, you dragged somebody or you beat him?
A:    Yeah, yeah, that what I'm saying but that couldn't of...

Q:    You told him you dragged him?
A:    Yeah.

Q:    Okay, and...
A:    A good, a good...

rm/E3835

_____          _____
Detective Signature                       Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 46 of 61  Time:



Q:    ...yeah, I'm saying...
      ...clean fight.

Q:    ...did you, I'm saying did you say you dragged him then you made him get
      on his knees and stuff?
A:    No, no.

Q:    You ain't do none of that?
A:    No.

Q:    Alright.
A:    It was a good clean fight.  We, we, we was fighting ___INAUDIBLE___
      I, I might've hit him and, and stunged him...

Q:    Uh-huh.
A:    ...but he hit me and stung me.

Q:    Were you bu, going up there planning on scraping with this guy?
A:    I, when I went out there to Ms. Parker, where she worked at, I went out
      there to get my clothes out, out of her trunk.

Q:    You weren't going out there to hurt him?
A:    No.  I went out there to get my clothes out the trunk of her car.

Q:    And, and you can't tell me, see here's my problem.  I, I need to know the
      guy that took you out there to, so I'll know that you didn't actually
      going out there trying to kill him?
A:    No, unh-unh.  I told, when I went up to the guy I said ___NO RESPONSE___
      I'll give you $10 to take me out to Gunter Park.

Q:    What'd you tell him about why you needed to go out there?
A:    To get my clothes.  I was gone, getting ready to leave, go out of town.

Q:    And that was...
A:    I gave him the $10.  He took me out there and when I got out the car he
      drove off.

Q:    So you gave him $10 just to take you out there...
A:    Yeah.

rm/E3835

_____                    _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                    Page 47 of 61   Time:

Q:  ...and not even to bring you back?
A:  No-unh.

Q:  Now how were you planning on getting back with your clothes...
A:  Ms. Park...

Q:  ...if you ain't...
A:  ...Ms. Parker.

Q:  Okay.
A:  If Mr. McKinnes wasn't out there me and Ms. Parker would've rode home together.

Q:  Okay, now previously...
A:  That what, that was our plan.

Q:  Okay, previously in the first, in the first tape I think it was noted, I think it was noted on, no, it was stated that you and her weren't on good terms or some, good terms so you wouldn't, you know, ya'll didn't ask, ya'll, you just wanted to be through with her. Remember?
A:  Yeah.

Q:  And you, you said, you remember that?
A:  Yeah.

    That ya'll weren't on good terms. You didn't wanna say nothing to her and she was full of...
A:  Yeah.

Q:  ...full of...
A:  Game.

Q:  ...game. Yeah.
A:  Yeah.

Q:  And you didn't wanna have nothing to do with her?
A:  Yeah.


rm/E3835

_____

_____                    _____
Detective Signature                              Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, .ues and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____            Page 48 of 61   Time:

68

Q:    So why would you...
A:    Well that's, that's, that's afterwards.    What I'm saying, I'm not changing, I'm not changing what I said.    I'm not changing it.    I'm talking bout, I'm, after, after I found out that, that this right here came about.

Q:    Last time I was talking to you about, you know, telling the truth...
A:    Yeah.

Q:    ...and making everything right.
A:    Correct.

Q:    Okay, and you feel that you're being truthful?
A:    I feel as though I'm...

Q:    A 100% truthful with everything you telling us?
A:    Yes.  I'm being truthful.

Q:    You're not leaving out nothing? Not even, not even the stabbing or, did you, did you even stab him?
A:    I didn't even stab, I didn't...

Q:    You didn't have, you didn't stab him?
A:    I didn't have no way...

Q:    Did you, did you have a gun?
A:    No, sir.

Q:    Did you shoot a gun?
A:    No.

Q:    Okay, did you hit somebody with a knife or gun?
A:    No, sir.  None of that.

Q:    What would you think of a person that hit somebody with a gun or knife should do or hold him up while their little kid is around?  What, what you think kind of punishment?
A:    I would, I, hey, if, if, if that...

rm/E3835

_____                    _____
Detective Signature                                Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

64

Q:    I'm, I just, I just asked a question...
      Hypothetically?

Q:    ...what kind, what kind of punishment would you...
A:    Hypothetically?

Q:    Yeah.
A:    If, if, if...

Q:    What...
A:    ...if that was me and, and...

Q:    Somebody did you that way?
A:    ...if, if my son was around...

Q:    And somebody had a gun...
A:    ...I would do...

Q:    ...or knife on, on you and...
A:    ...I would do whatever...

Q:    ...made you...

A:    ...it takes.

      No, I ain't saying what, what, what it would take.  I'm just talking bout
      how do you think the courts or the judge or what the judge should do?
A:    What...

Q:    I just, I just asked...
A:    I, I know...

Q:    ...a question.
A:    ...I understand.  I understand.  I understand but before I'm a get,
      IN AUDIBLE                          I, I...

Q:    Just a question, its just a question.
A:    But see the kids was around when we was fighting the first
      time   IN AUDIBLE

rm/E3835

_____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
  ...ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____        Page 50 of 61  Time:

70

Q:    I just, I just asked a question.
      I can't, I can't answer that.  I don't know how, I don't know how...

Q:    You don't know how to answer that?
A:    I don't know how to answer that.

Q:    What would it make, what would it make you, not, not fighting him, but
      how would that make you feel to watch your son or have your son see you
      getting beat up with some type of weapon, how would that make you feel?
A:    I, I can't, I can't really answer that.

Q:    Why, why you can't really answer that?
A:    Cause I never would, I righteously never been in that situation.    I
      can't, I can't answer it.

Q:    You never been in that situation?
A:    Unh-unh.

Q:    So you never was, alright, you say you never been in that situation but
      you, awhile ago you stated that you were charged with this before.  So
      you've been in that situation before...
A:    No, not, not...

Q:    ...but you was just the aggressor, right?
A:    ...not, not in a situation where my son is...

Q:    Okay.
A:    ...is, is, is there...

Q:    Okay, but you were the aggressor then, right?
A:    Both of us was because he had a gun...

Q:    He had a gun?
A:    Yeah.

Q:    Okay, did this guy have a gun?
A:    Who?  Mr. McKinnes?


rm/E3835

_____

_~_~_~_~_~_~_~_~_____          _____
Detective Signature                     Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 51 of 61  Time:              71

Q:    Yeah.
A.    I don't know.  I...

Q:    Did he try to pull a gun on you?
A:    I don't know.

Q:    You don't know?
A:    He went to his car.

Q:    Did he...
A:    I caught him...

Q:    ...he went to his...
A:    ...before he went to his car.

Q:    You caught him?
A:    So I don't know.

Q:    So you saying you caught him, so then you had to run behind him, didn't
      you?  Cause you said he left running and then now you just...
A:    Naw, he, he didn't leave running.  Me and him both was...

Q:    No.
A:    ...running.

      No.  Okay.
...   Me and him both was running.

Q:    Okay.
A:    As we were...

Q:    But you said you...
A:    ...fighting.

Q:    ...you said you walked.
A:    Naw, I said I walked to the guard shack.

Q:    Yes, but I had asked a question after that...
A:    But...

rm/E3835

_____          _____
Detective Signature                       Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 52 of 61   Time:

72

67

Q:    ...and then you said...
      ...once, once we, once we identified he, then we started...

Q:    Okay.
A:    ...fighting.

Q:    So Mr. McKinnes, if you had to catch up to him...
A:    I didn't...

Q:    ...if he was running...
A:    But he wasn't running.

Q:    ...NO VERBAL RESPONSE    okay.
A:    He wasn't running.

Q:    NO VERBAL RESPONSE
A:    He was not running, sir.

Q:    Okay.
A:    See you trying to...

Q:    No.
A:    ...you trying to force my...

Q:    NO VERBAL RESPONSE
      ...words, sir.

Q:    I stopped.  I stopped.  I stopped.
A:    I said when I walked up I seen Mr. McKinnes at the guard shack.

Q:    Okay.
A:    Outside.

Q:    Okay.  So how, why, how did you catch up to him then, if he's walking and
      you walking, so how did you catch up to him...
A:    I didn't.

Q:    ...if he had his back on you?
A:    I didn't catch up with him.

rm/E3835

_____            _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____            Page 53 of 61   Time:

73

```
Q:   Okay, so how did you, what did you just say then?
A:   We just start, we just started going at it.

Q:   You said he...
A:   Saying words.

Q:   Sir, if I could, if I could rewind, I can not rewind but if I could
     rewind, what you said to me, sir, in all honesty is that you had to catch
     up to him.
A:   No, I did not.

Q:   That's, yes, sir.  In words, you said you had to catch up to him.
A:   No, I did not.

Q:   You said he was running.
A:   No, I did not.

Q:   He...
A:   I said we...

Q:   ...he left...
A:   ...we, we...

Q:   ...  NO VERBAL RESPONSE
A:   ...locked up...

     Okay, but when, okay, I understand you locked up.
A:   ——INAUDIBLE——————     we're locked up.

Q:   Okay, but, but first he was walking away.
A:   From what?

Q:   From you.
A:   No he wasn't.

Q:   Who was he walking away from then, sir?
A:   He wasn't, me and him was, me and him...
```

rm/E3835

_____

_____                    _____
Detective Signature                      Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
   ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 54 of 61  Time:            74



```
Q:   So it was just...
     ...we was fighting.

Q:   Okay, so came up to where he was at, so what did he say to you to make
     you start fighting him?
A:   Sir, I'm, we both started fighting.

Q:   Sir, what did he say to you...
A:   We, that's what I'm saying...

Q:   Okay, sir...
A:   ...I'm trying to explain to you.

Q:   ...sir, sir...
A:   Me and him...

Q:   Sir.
A:   ...when we seen each other we just, we locked up.

Q:   When ya'll was fixing...
A:   We locked up.

Q:   First time ya'll seen each other ya'll, ya'll just locked up?
A:   We locked up.

     Okay, then...
     We locked up.

Q:   ...who came to who?  Who came to who?
A:   We came to each other.

Q:   Okay, at what point in time could you have walked away from it?
A:   At one, what point in time could I've walked?

Q:   Yeah, you, at, at no point in time could you have walked away?  When you
     seen him there you could not have walked away...
A:   Ms. Parker...
```

rm/E3835

_____          _____
Detective Signature              Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 55 of 61  Time:

*75*

Q:    ...or when you...
A:    ...I was asking Ms. Parker can I get my clothes out the car.

Q:    Uh-huh.
A:    I...

Q:    That's what you asked?
A:    Ms. Parker can I get my clothes out the car.

Q:    That's what you asked?
A:    And, and he go, he go, he was the aggressor.

Q:    Oh, he was the aggressor.  Okay, so what did he do, when you asked for the...
A:    We locked up.

Q:    ...can I get the...
A:    We locked up.

Q:    Okay, so you asked for the clothes and he just and he just, where was he at when you asked for, could you get your...
A:    We was outside.

Q:    Ya'll was outside of what?
A:    Of the guard shack.

      Out of the guard shack and you came and you walked up and you asked and you seen him and you said Ms. Parker can I get my clothes?  That's what you said...
A:    I just...

Q:    ...right?
A:    ...come at my clothes.

Q:    Yeah, just come at your...
A:    ~~INAUDIBLE~~          ...

Q:    ...clothes.
A:    ...my clothes.

rm/E3835

_____

_____                    _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, ..ues and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____                    Page 56 of 61   Time:

76



Q: And then at that point in time he, he, he rushed towards you, right?
A: When he, oh, oh, you got his clothes and oh, he been driving your car.

Q: Okay, and then what point...
A: You...

Q: ...did he turn to you?
A: He never did turn, we was face to face.

Q: So he was talking, saying oh, he drive your car and he was face to face with you...
A: Right.

Q: ...the whole time and then at what, and then what point did he, what did he do to turn, to become the aggressor?
A: He something that, he said something.

Q: What did he say, sir? I'm just trying to help you out. I'm doing my job...
A: I don't, I don't...

Q: ...but I'm trying to help you out.
A: ...I don't wanna, hey, I don't wanna relive it    INAUDIBLE

Q: Sir, you got, you have...
A: Its...

Q: ...    INAUDIBLE
A: ...okay, okay. I'm a tell you. You know I was down here once before. My sister live in Riverside, she got murdered, somebody killed her.

Q: Okay.
A: Okay, someone told, told the arresting officer then that they seen me with, it came out to, not to be true.

Q: Okay.
A: Okay, what he goes, okay, that night, what he scream to me is, yeah, I sell, I sell, I sell, I sell drugs, that, I, I gave sister some, that what killed her.

rm/E3835

_____
Detective Signature                    Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts,
...ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

```
Q:   That's what he said?
A:   And that, and that's when...

Q:   That's when you hit him?
A:   That's when, that's when we locked up.

Q:   So he said that...
A:   He said that, that, that, that's when we locked up.

Q:   He said that and then ya'll locked up?
A:   Yes.

Q:   So when he said that he hit you?
A:   When he, he hit me and I hit him.

Q:   So he said that to you and then he hit you?
A:   Well when he said that, like I said we locked up.

Q:   No, sir.  Okay, I under...
A:   We locked, we locked up.

Q:   Okay, so...
A:   You asked, you asked a question, what words was said to make us lock up.

Q:   Okay, but I, I'm...
A:   But that, that what he said.

Q:   ...I'm asking, I'm asking you..
A:   That what he said.

Q:   He said that.
A:   He said that.

Q:   Okay, and then who stepped first?  Who stepped first or who locked up
     first?  Did he, did he say that and...
A:   We both, yeah.

Q:   ...   INAUDIBLE
A:   We both locked up.
```

rm/E3835

---

*Detective Signature*

*Witness Signature*

Signature of Person Giving Statement:  I hereby affirm that the facts,
ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

Q:   ...did he say that and then he went towards you and hit you?
A:   Naw, when, when he said that...

Q:   So what, okay.
A:   ...we both came together.

Q:   Sir, I know he said the words but words, words are what they are, words.
A:   Correct.

Q:   Okay, so at that point in time when he said that to you, to strike, when he said that to you about your sister...
A:   _____

Q:   ...what made him, what made him step to you, meaning what made him be the aggressor then?
A:   Because he knowed the only thing I wanna do is get my clothes so I can leave.

Q:   So he became...
A:   I want, I wasn't thinking.

Q:   You wasn't thinking.
A:   Ms. Parker, I just want my clothes...

Q:   Uh-huh.
A:   ...and I'm gone.

Q:   So when he said that to you and it put you in a rage and then that's when...
A:   Sir, it ain't...

Q:   ...you went at him, right?
A:   ...put me in a rage.  It, it, it doesn't, it, it...

Q:   It just made you angry, didn't it?
A:   And when it did me and him both locked up.

Q:   It just made you upset, right?
A:   We both...

rm/E3835

_____          _____
Detective Signature                       Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 59 of 61   Time:            79

Q:  It made you upset?  And...
A:  Naw, it didn't make me upset.

Q:  Did he get you out your mind for a second...
A:  Naw.

Q:  ...and that's what happened?
A:  Unh-unh.  The only thing we did, we...

Q:  So you remembered that, you remembered...
A:  We locked up.

Q:  ...when both of ya'll locked up?
A:  Yeah.

Q:  But you can't remember or tell me what the guy name was that you rode
    with or that grew up, up under you and the family member or of the
    mother, of the mother but...
A:  Unh-unh.

Q:  ...but you remember that e, event?
A:  Okay.

Q:  I'm, I'm asking, is that, is that true?  I'm just asking is that true?
    Is it or is it not true?
    Okay.

Q:  I'm, I'm just as calm with you.
A:  But see...

Q:  I'm, I'm calm, sir.  I'm, this, like I said like what did you tell me
    before?  You told me that I had to do my job, right and you understood
    that, is that what you said?
A:  Yeah, I understand.

Q:  Okay, I got to ask a whole lot of questions.
A:  I understand that.


rm/E3835

_____          _____

*Detective Signature*                                     *Witness Signature*

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 60 of 61   Time:                    80

Q:    Okay, now I'm asking questions all you have to do is answer 'em.  Its either a yes or no question.  This is in, this is in reference to you.  I understand.

Q:    Is there anything else you can tell us that'll, that'll help us out and kind of figure out what's going on here?
A:    Like I, like I, like I was telling the Detective, when we locked up we...

Q:    What'd you mean locked up, when ya'll were tied up scraping, right?
A:    Scraping...

Q:    Is that what you mean?
A:    ...right.

Q:    Okay.
A:    Excuse me.

Q:    No, I'm, I just wanna make sure I understand you.
A:    When we were tied, locked up, when we came together    INAUDIBLE we was scraping and all of a sudden I take him down and we, we starts fighting on the, in the middle of the street.

Q:    Okay.
A:    And that what, it wasn't no gun involved, it wasn't no knife involved.

      Alright, sir, that's all you got to add to this, that you wanna say?
      Yes, sir.

Ending time 1528 Hours.

rm/E3835

_____          _____
Detective Signature                      Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, ues and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____          Page 61 of 61  Time:          81



**JACKSON HOSPITAL**

## <u>CERTIFICATION</u>

I hereby certify that the attached is a true and complete copy of the requested medical records pertaining to **Christopher McKinnes** for visits to Jackson Hospital and Clinic, Inc. for the following dates of admission:

4/12/03  Account 10539256          9/4/00  Account 10289707          9/3/00  Account 10289472

I further certify that said records were made in the regular course of business of this office and that it was in the regular course of business for such records to be made at the time of the events, transactions or occurrences to which they refer, or within a reasonable time thereafter.

Signed this 31st day of July, 2003.

_____
Medical Record Custodian

SWORN AND SUBSCRIBED to before me on the 31st day of July, 2003.

_____
Notary Public

My Commission Expires: 7-12-06

JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street   Montgomery, AL  36106  (334) 293-8000

**STATE'S EXHIBIT**

15

# EMERGENCY DEPARTMENT



**JACKSON HOSPITAL**
1725 PINE ST
MONTGOMERY, AL 36106-1117

ACCOUNT 10538256   M/R # 27-32-51
MCKINNES, CHRISTOPHER
SEX - M   BORN 05/25/1973   F/C P ED
GARRISON, NORMAN A.

| DATE 4-11-03 | ARRIVED BY Weynes | AMBULANCE | VALUABLES WITH PATIENT / SEE FLOW SHEET | DISC CURRENT YES NO | LMP male |

TIME 2350   AGE 29   INITIAL VITAL SIGNS   TEMP   ORAL RECTAL 18-7   PUL 96   RESP 96   B/P 159/102   SAO2 98%   WEIGHT   INITIAL PAIN LEVEL 10/10

ALLERGIES NKDA
HOME MEDICATIONS none

LATEX ALLERGY YES/NO

CHIEF COMPLAINT

ASSESSMENT/HISTORY BY NURSE

2350 pt arrived via
Ems c/o GSW to
head entrance noted
to top of head
exit noted to @ parietal
area no decrepits noted
pt A+O x 3 no acute
distress @ this time — cw

87 30
95909
E8654
E844.1

99.2 #
90 79   c/s

**SEE NURSING FLOW SHEET**   REPEAT VITAL SIGNS   TIME.   TEMP   PULSE   RESP   B/P   SAO2   PAIN LEVEL (SCALE 0-10)

| MEDICATIONS / PROCEDURES | TIME | INITIAL & RESPONSE | PAIN SCORE | MEDICATIONS / PROCEDURES | TIME | INITIAL & RESPONSE | PAIN SCORE |
| 1 gm ancef | | 0000 | CR | | | | |

Response Codes: (A) NA   (B) At Discharge   (C) Response with Pain Score   (D) No Response

**ALLIED DEPARTMENT ORDERS**

XRAYS
CXR

CT
Brain S

| | CBC | PT | CARDIAC PROFILE | EKG |
| | DX | PTT | TRAUMA PROFILE | ABG |
| | CHEM7 | MG | TYPE & SCREEN | |
| | AMYLASE | CK | TYPE & CROSS ___ UNITS | |
| | LIPASE | UA | OTHER LABS ___ | |
| | ETOH | UCG | | ISTAT |
| | CE | UDS | | ISTAT EX |

RESP   US

| T | P | B/P | SAO2 | PAIN LEVEL (SCALE 0-10) | TRANSFER | HOME | ADMITTED | EXPIRED | AMA | DATE 4-1203 | TIME 0055 |

SIGNATURE NURSE

SEE AFTERCARE INSTRUCTIONS
CONDITION ON DISCHARGE
CERTIFIED MEDICAL EMERGENCY YES/NO

SIGNATURE OF PHYSICIAN
SIGNATURE OF PHYSICIAN
SIGNATURE OF NP

SEQ NO 241 (Rev 10-02)
Emergency Department Record   Medical Record #

ACCOUNT# 10539256   M/H = 27-32-51
MCKINNES,CHRISTOPHER
SEX - M  BORN 05/25/1973 F/C P ED
GARRISON,NORMAN A.

# JACKSON HOSPITAL
## EMERGENCY DEPARTMENT RECORD

NAME _4/11/05_
DATE _____ MR# _____
Check mark √ =normal; (circle) = abnormal, back slash = negative
Time Seen ___ Room# _4_ EMS arrival PMD _____

History from: *patient *spouse *family *friend *caretaker *EMS
        History limited due to _____

CC: (nature & time) ___ GSW to head

HPI: ___ Gsw to top of head
___ entrance → exit
___ alert x3 ___
___ swelling no LOC

☐ Continues on general notes if checked.
Pain: Max prior to arrival: __5__ now _____

ROS: √ negative or noncontributory unless circled or written below
Not obtainable due to ☐ dementia, ☐ altered mental status ☐ intoxicated
☐ Const:*fave *chills *anorexia *sweats/day-nighttime *fatigue *tired
    *general weakness
☐ Eyes: *eye pain R/L *blurred vision R/L *discharge R/L *photophobia
☐ ENT: *congestion *sinus pain *earache R/L *hoarseness *sore throat
☐ Neck: *pain *stiffness *enlarged lymph nodes
☐ Resp:*SOB *cough *prod.sputum color ___
    *pleuritic chest pain *hemoptysis *wheezing
☐ CV: *chest pain *diaphoresis *DOE *PND/orthopnea *edema
    *palpitations *calf pain R/L
☐ GI: *abd. pain *constipation *nausea *vomiting x ___ *diarrhea x ___
    *bloat.ng/constipation *black stools *blood in stools *last BM ___
☐ GU:*dysuria *hematuria *increased frequency/urgency*urinary
    hesitancy*urinary retention
☐ Gyn: Abnl bleed *discharge *dyspareunia*LMP ___
☐ M/skel: *back pain/upper&lower flank pain R/L *joint pain *extremity
    pain *generalized muscle aches* fall/injury
☐ Derm:*hives *itching *rash
☐ Neuro: *headache location __(R)__ *dizziness *vertigo
    *numbness/tingling location ___ *confusion *slurred
    speech *ataxia *seizure *faint feeling *LOC *LOM
    *localized weakness L/R
☐ Psych: *anxiety *depression *hallucinations *visual/auditory *paranoia
    *suicidal ideation/thoughts or action *stress
☐ Hematologic: *easy bruising *prolonged bleeding *swollen glands
☐ Endocrine:*polyuria *thirsty *hot/cold intolerance *at least 10 lbs. of
    weight gain/loss in last 1-2 mos.

PAST MEDICAL HX: √ negative unless circled or written below
*MI *CAD *CHF *HTN *IDDM/NIDDM *High Cholesterol *CVA/TIA *PE/DVT
*Gout *Senile Dementia *Alzheimer's *Cancer *Depression *Migraines
*Arthritis *Diverticulitis *Diverticulosis *PUD *SBO *Asthma *COPD
*Seizures *ESRD *HIV _____

PAST SURGICAL HX: √ negative except as circled or written below
*Angioplasty *CABG *Pacemaker *Internal Defib, *Tonsils *Thyroid
*Mastectomy L/R *Cholecystectomy *Appendectomy *SBO *BTL
*C-Section *Hysterectomy *Prostatectomy/TURP _____

SOCIAL HX: √ neg. except as circled or written
*Alcohol: ___ sporadically ___ socially (<2 drinks/day) or excessive
*Drugs *Smoker (Former)
Lives: ___ alone; ___ w/ spouse; ___ w/ family; ___ in ALF;
    ___ in NH, no fixed address; Acute similar illness in the family at present
FAMILY HX: √ neg. except as circled or written
*Early MI/CAD *CVA *HTN *DM *PE *Cancer *GBD *migraine *epilepsy
*depression *gout *kidney stones

MEDICATIONS: √ None ___ See nurses notes _____
ALLERGIES: √ NKDA ___ See nurses note _____



T-SHEET

000002

137

ACCOUNT* 10538258    M/R * 27-32-51
MCKINNES,CHRISTOPHER
SEX - M  BORN 05/25/1973 F/C P ED
GARRISON,NORMAN A.    ROOM

___ Nursing Assessment Reviewed * BP,HR,RR,Temp,___ reviewed & nl
BP____ HR____ R____ Temp___ Pox___

**PHYSICAL EXAM – Normal ( ✓ as pertinent)**
Adults: ___alert & awake___ sleepy but easily arousable ___oriented x 3
___ oriented to person & place only
Agitated *anxious *confused *lethargic *unresponsive to: verbal/noxious stimuli
Children ___ up & about ___ with good eye contact ___ cranky
Distress: none apparent *mild *moderate *severe
HEAD ___see fig. A    *laceration *swelling *tenderness *traumatic
___ nml inspection
___ non tender at all ___atraumatic___

NECK ___see fig. A/B    *meningismus *palpable nodes R/L *tenderness
___ nml inspection    *JVD *carotid bruit R/L *thyromegaly___
___ non-tender at all
EYES ___see fig. A    *Conj. injected R/L *Discharge R/L *Sub Conj
___ lids/conj. Nml    hemorrhage R/L *icterus *nystagmus
                      *horizontal/vertical___
___ PERRL EOMI = 4 mm

ENT ___see fig.A    *phar. Erythema *phar. Exudates * TM erythema
___ nml inspection    R/L *TM dullness R/L *TM bulging R/L *uvula
___ nml. pharynx    swollen/shifted to R/L Poor dental/oral hygiene
___ normal midline uvula
RESP ___see fig. B    *chest wall tenderness *rales *rhonchi *wheezing
                      *dullness___
___ no distress
___ breath sounds nml
___ chest non-tender at all
CVS    *bradycardia *tachycardia *irregular rhythm
___ regular rate, rhythm    *murmur *gallop: syst____ /VI diast____ /VI
___ no murmur, no gallop
ABD ___see fig B    ___ tenderness *rebound *guarding *mass *hernia
___ non-tender at all    distention ascites___
___ soft/flat
___ normal bowel sounds
___ no pulsatile mass

PELVIC
___ normal inspection    *bleeding *os opened *discharge *tenderness R/L
___ bimanual exam nml    adnexa *cervical motion tenderness___
___ speculum exam nml
GENITALS    *testicular tenderness R/L *urethral discharge
                      *swelling
___ normal
___ testicles nml
RECTAL    *heme-positive *hemorrhoids *prostate
___ register dry    tenderness *mass
___ heme-negative
BACK ___see fig. A/B    *CVA tenderness R/L *decreased ROM *spinal
                      tenderness *paraspinal muscle spasm/tenderness
___ normal    * moves/sits guarding the back___
SKIN ___see fig. A/B    *rash *erythema *warmth *fluctuance *hives
                      *lymphangitis
___ nml
___ warm dry, no rash
EXT ___see fig. B    *bony tenderness *pretibial edema *pain on weight
___ cap. refill < 2 sec    bearing *palpable cord *calf or thigh tenderness
___ non-tender    SLR: R___ L___
___ full ROM
___ no to trace edema
NCH ___see A/B
___ oriented X 3    *disoriented to: person/place/time *unsteady gait*
___ CN nml as tested    *weakness___
___ motor/sensory nml
___ neg. romberg w/ normal gait
PSYCH
___ mood, affect normal    *anxious *depressed *paranoid *suicidal
___ judgment normal    *uncooperative

**PROCEDURES**
☐ Splint: type___ location___
   ___ applied by ED Physician /Orthopedist /NP
   ___ examined post splint application/___ neuro-vascularly intact
   ___ good alignment
☐ Laceration Repair: length___ cm location: see picture
   ___ anesthesia: lidocaine 1% / 2% w/ epi/wo epi marcaine *TAC*
   digital block
   ___ irrigated w/ normal saline ___ explored for FB/ tendon injury
   ___ single layer ___suture type: nylon /prolene /dermabond/ staples/
   steri-strips
   ___multiple layers SQ / muscle / tendon ___ suture type vicryl / other
   repaired by ED Physician / NP / Surgeon___
☐ Critical Care: in addition to the usual time ___30-74 min
   ___ 75-104 min ___ not including procedure time
☐ Other Procedures:___

ECG Monitor ___NSR ___Abnormal Rhythm ___No acute changes Rate___
ECG ___Normal ___Unchanged from___
Findings:___ ___Abnormal

X-rays___ CXR

Scans/US___ CT brain & mandibular

CBC ___nl except    Chemistries ___nl/except    UA ___nl/except
WBC___ NA___ Glu___ Ca___ Spec Gravity___
HgB___ K___ AST___ ALT___ ph___ Prot___
Hct___ CL___ AlkP___ Amyl___ Gluc___ Ketones___
Plts___ CO2___ Bili/(T)___ Lipase___ Bili___ Blood___
Segs___ BUN___ Album___ Mg___ Nit___ Leuk___
Bands___ Cr___ T.Pro___ ___ WBC___ RBC___
Lymphs___
PT___ INR___ PTT___ CPK___ MB___ Trop___ Pulse OX___
ABG: pH___ pCO2___ pO2___ Hco3___ Sat___ % on Rm Air/ %O2___
HCG neg/pos: Quant HCG___ Rapid Strep___ Mono___ D-Dimer___
Tox screen___ ETOH___ ASA___ Acetaminophen___
Other Labs:___

☐ General Notes:___

Charts reviewed from the: ☐ Nursing home record ☐ EMS ☐ MR
Discussed with Dr___ Will follow up in
___ days or one week with___ PMD or___
Disposition: home/admitted (time:___) transferred /morgue/AMA
Condition: unchanged / improved / stable / unstable / critical / deceased
Differential Diagnoses___

Clinical Impression & Diagnoses:___ See Face Sheet
Primary Diagnosis___
Secondary Diagnoses___

MD___ ___NP
Chart complete when checked ☐



000003    T-SHEET

# EMERGENCY DEPARTMENT NURSING RECORD

**JACKSON HOSPITAL**

DATE: 6-11-03
TIME: 2350

ACCOUNT# 10639256   MR# 27-32-51
McKINNES, CHRISTOPHER
SEX - M   BORN 05/25/1973   F/C P ED
GARRISON, NORMAN A.   ROOM

## PRETX
- ☐ N/A
- IV 18g no KVO @ ...
- SITE ...
- ☐ PCR
- ☐ CPR
- ☐ O2 @
- ☐ ETT SIZE
- ☐ CPA
- ☐ BACKBOARD
- ☐ COLAR
- ☐ SANDBAGS
- ☐ SPLINT
- ☐ BANDAGES
- ☐ FOLEY SIZE
- ☐ Other

## MEDICAL HX

**MEDICAL**
- ☐ ASTHMA
- ☐ CANCER
- ☐ CARDIAC
- ☐ COPD
- ☐ CVA
- ☐ DIABETES
- ☐ FAMILY CARDIAC HISTORY
- ☐ HTN
- ☐ RENAL DISEASE
- ☐ NONE

**MUSCULOSKELETAL**
States no problems / arthritic disease / decrease in strength / diminished mobility

**PSYCHIATRIC:**
Previous psychiatric history / bipolar disorder / depression / suicidal / lives alone / family support

**SCREENINGS:**
Nutritional:
States no problems / normal nutrition / recent weight loss / weight gain / appears well nourished / Appears under nourished

**SOCIAL:**
- ☐ ALCOHOL
- ☐ DRUGS
- ☐ SMOKES

## ASSESSMENT

RHYTHM ☐ YES ☐ NO

**SKIN CONDITION**
- ☐ INTACT
- ☐ WARM
- ☐ HOT
- ☐ MOIST
- ☐ DIAPHORETIC
- ☐ RASH
- ☐ BROKEN
- ☐ COOL
- ☐ CLAMMY
- ☐ DRY
- ☐ DECUBITUS

**SKIN COLOR**
- ☐ NORMAL
- ☐ FLUSHED
- ☐ PALE
- ☐ PINK
- ☐ CYANOTIC
- ☐ JAUNDICED

**CAPILLARY REFILL**
< 3 SEC / > 3 SEC

**EDEMA**
- ☐ LEGS
- ☐ OTHER
- ☐ ANKLES
- ☐ FEET

**PULSES**   R   L
PEDAL
POST TIBIAL
RADIAL

ABSENT - PRESENT

**SKIN TURGOR**
- ☐ GOOD
- ☐ POOR
- ☐ DECREASED
- ☐ OTHER

**AFFECTED AREA**
1. N/A
2. ABRASIONS
3. BURNS
4. CONTUSION
5. DECUBITUS
6. LACERATION
7. PAIN
8. PUNCTURE
9. RASH
10. OTHER

**COUGH**
- ☐ NONE
- ☐ NON-PRODUCTIVE
- ☐ PRODUCTIVE
- ☐ HIGH RISK TB

**BREATH SOUNDS**
  R   L
- ☐ CLEAR/EQUAL
- ☐ WHEEZES
- ☐ DIMINISHED
  R   L
- ☐ ABSENT
- ☐ RALES/CRACKLES
- ☐ RHONCHI

**HYPERVENTILATION**

**LOC**
- ☐ RESPONSIVE

**SPEECH**
- ☐ CLEAR
- ☐ SLURRED
- ☐ OTHER

**RESPONSE TO STIMULI**
- ☐ VERBAL
- ☐ PAIN
- ☐ UNRESPONSIVE

**MOTOR/SENSORY**
  RIGHT / LEFT
- ☐ GOOD
- ☐ DECREASED
- ☐ ABSENT

**PUPILS**
2 3 4 5 6 7 8 9

**ABDOMEN**
- ☐ SOFT
- ☐ FIRM
- ☐ DISTENDED
- ☐ TENDER
- ☐ NON-TENDER

**BOWEL ACTIVITY**
- ☐ DENIES COMPLAINT
- ☐ DIARRHEA
- ☐ CONSTIPATION

**GU / URINATION**
- ☐ DENIES COMPLAINT
- ☐ BURNING
- ☐ FREQUENCY
- ☐ HEMATURIA
- ☐ INCONTINENCE

**GENITAL**
- ☐ DENIES COMPLAINT
- ☐ DISCHARGE
- ☐ LESION

### GLASGOW COMA SCALE

| Areas of Response | Points |
|---|---|
| **Eye Opening** | |
| Eyes open spontaneously | 4 |
| Eyes open in response to voice | 3 |
| Eyes open in response to pain | 2 |
| No eye opening | 1 |
| **Best verbal response** | |
| Oriented, e.g. to person, place, time | 5 |
| Confused, speaks but is disoriented | 4 |
| Inappropriate, but comprehensible words | 3 |
| Incomprehensible sounds but no words are spoken | 2 |
| None | 1 |
| **Best Motor Response** | |
| Obeys command to move | 6 |
| Localizes painful stimuli | 5 |
| Flexes/withdraws from painful stimuli | 4 |
| Flexion, abnormal decorticate posturing | 3 |
| Extension, abnormal decerebrate posturing | 2 |
| No movement or posturing | 1 |
| **Total Possible Points** | 3-15 |
| Major Head Injury | ≤8 |
| Moderate Head Injury | 9-12 |
| Minor Head Injury | ≥13 |

### OCS
TIME 2355   SCORE 15
☐ N/A   TIME ___ SCORE ___
  TIME ___ SCORE ___

### MENTAL STATUS
- ☐ ALERT
- ☐ ORIENTED
- ☐ CALM
- ☐ CONFUSED
- ☐ SEDATED
- ☐ ANXIOUS
- ☐ INCOOPERATIVE
- ☐ COMBATIVE
- ☐ OTHER

### SAFETY
- ☐ SIDERAILS
- ☐ RESTRAINTS. See how chart
- ☐ BED POSITION LOW
- ☐ FAMILY AT BEDSIDE
- ☐ OTHER

**EMERGENCY DEPARTMENT**
**NURSING RECORD**



JACKSON HOSPITAL

ACCOUNT# 10539256    M/R # 27-32-51
MCKINNES,CHRISTOPHER
SEX - M  BORN 05/25/1973 F/C P ED
GARRISON,NORMAN A.

| ONGOING VITAL SIGNS | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TIME | BP | PULSE | RESP | SaO₂ | BY | TIME | BP | PULSE | RESP | SaO₂ | BY | TIME | BP | PULSE | RESP | SaO₂ | BY |

NURSING NOTES

2000 pt A+0x3 on arrival conversing x staff no slurred speech noted
equal bilat grips bleeding controlled ptto CT via stretcher no acute
0010 Dc instructions given no change in mental status pt A+0x3

| IV FLUID | CATH # | TIME | SITE | RATE | RN | LIB | INTAKE | | OUTPUT |
|---|---|---|---|---|---|---|---|---|---|
| SC | LScg | PTA | @ AC | KVO | CN | | IV | | URINE |
| | | | | | | | BLOOD | | NG |
| | | | | | | | PO | | CHEST |

VALUABLES SENT:
WITH FAMILY    MONEY
WITH FRIEND    AMOUNT
WITH POLICE    MEDICATION
TO FLOOR       CLOTHING
TO SAFE        OTHER

TUBE                    INITIALS

RN SIGNATURE

RN SIGNATURE  C Rankin    INITIALS CN

RN SIGNATURE              INITIALS

RN SIGNATURE              INITIALS



# JACKSON HOSPITAL & CLINIC, INC.

### 1725 PINE STREET
### MONTGOMERY, ALABAMA 36106

**Name:** MCKINNES, CHRISTOPHER .
**Physician:** GARRISON, NORMAN
MR#: 273251          X-RAY#: 453699
Order ID: 1153017       Result ID: 1042270

DOB: 05/25/1973      Age: 29 YEARS
Patient Location: ED
  Account#: 10539256
  Addendum Number: 0

---

**Clinical Data:** GSW TO HEAD
**Procedure:** CT BRAIN W/O CONTRAST   **Date of Exam:** 04/12/2003

**HISTORY:**
The patient is a 29 year old male status post gun shot wound to head and trauma to the left side of the face.

**TECHNIQUE:**
Serial axial tomograms from the skull base to the vertex have been obtained.   Both bone windows and soft tissue windows have been filmed.

**FINDINGS:**
No abnormal mass effect is noted on the midline structures of the brain.  The ventricular system, basilar cisterns, and sulci are within normal limits for the patient's stated age. No abnormal extra axial collection of fluid is present.

On the obtained bone windows of the calvarium, no evidence of fracture is present.

**IMPRESSION:**
NORMAL CT OF THE BRAIN FOR AGE.

Dictated by: ROBERT BALLARD
Verified by: ROBERT BALLARD

Transcriptionist: EE

**X-RAY REPORT**

Page Number 1

141

**83**

# JACKSON HOSPITAL & CLINIC, INC.
### 1725 PINE STREET
### MONTGOMERY, ALABAMA 36106

**Name: MCKINNES, CHRISTOPHER .**          DOB: 05/25/1973    Age: 29 YEARS
**Physician: GARRISON, NORMAN**          Patient Location: ED
MR#: 273251          X-RAY#: 453699          Account#: 10539256
Order ID: 1153020          Result ID: 1042271          Addendum Number: 0

Clinical Data: GSW,ASSAULT
**Procedure: CT SINUS AND FACIAL**          **Date of Exam: 04/12/2003**

**HISTORY:**
The patient is a 29 year old male with a history of gun shot wound and trauma to the head and face.

**TECHNIQUE:**
Serial axial and direct coronal tomograms through the paranasal sinuses and facial bones have been obtained.

**FINDINGS:**
The lamina papyracea, and orbital floors are intact.  No air/fluid level is identified in the paranasal sinuses.  The osteomeatal complexes are bilaterally patent in the maxillary sinuses.

The visualized floor of the anterior fossa appears intact.

The pterygoid plates are unremarkable.

The visualized zygomatic arches are within normal limits.

**IMPRESSION:**
NO SIGNIFICANT ABNORMALITY IS PRESENT.  NO EVIDENCE OF FRACTURE OF THE VISUALIZED FACIAL BONES IS PRESENT.

Dictated by: ROBERT BALLARD
Verified by: ROBERT BALLARD

Transcriptionist: EE

JACKSON HO...
Jackson Hospital & Clinic, Inc.
1725 P...
Montgomery, ...
A Non Pro...

C 2 (2/99)

000007

**X-RAY REPORT**



Page Number 2

*142*

84

# JACKSON HOSPITAL & CLINIC, INC.
### 1725 PINE STREET
## MONTGOMERY, ALABAMA 36106

Name: MCKINNES, CHRISTOPHER .
Physician: GARRISON, NORMAN
MR#: 273251
Order ID: 1153018        X-RAY#: 453699
                         Result ID: 1042322

DOB: 05/25/1973    Age: 29 YEARS
Patient Location: ED
    Account#: 10539256
    Addendum Number: 0

Clinical Data: CSW TO CHEST
Procedure: PORTABLE CHEST        Date of Exam: 04/12/2003

AP portable view of the chest dated 04/12/2003 at 2258 is submitted for interpretation. No prior films for comparison.    The lungs are well aerated with no confluent pulmonary infiltrate or pleural effusions. The cardiac silhouette and pulmonary vascularity are unremarkable for CHF. No pneumothorax is identified. The visualized osseous structures are unremarkable.

IMPRESSION:
NO RADIOGRAPHIC EVIDENCE FOR AN ACUTE PROCESS IN THE CHEST.

Dictated by: THERESE WEBER
Verified by: THERESE WEBER

Transcriptionist: EE

JACKSON HOSPITAL
Jackson Hospital & Clinic, Inc.
1725 Pine
Montgomery, AL 36106-1117
A Non Profit Organization

X-2 (2/99)

000008

**X-RAY REPORT**

Page Number 3

143

Emergency Department
JACKSON HOSPITAL & CLINIC, INC.
1725 Pine Street
Montgomery, Alabama 36106

DATE: _____

YOUR DIAGNOSIS / CARE NOTES
1.) _____
2.) _____
3.) _____

Treatment Rendered:

X X-Ray      EKG      X Medication      □ Tetanus

□ Sutured    Lab Test    X Exam

□ Hypertet

☐ You were given a medication which may make you sleepy or less alert. You should not drive, operate heavy machinery or drink alcohol for 24 hours.

☐ NO DRIVING TODAY

☐ You were given a prescription for an antibiotic. You are to take it until gone unless otherwise instructed. Continue taking even if symptoms disappear.

If your pain is not adequately relieved or you are having persistent nausea or vomiting or excessive drowsiness please call your physician or return to the Emergency Department.

IMPORTANT NOTICE: Your x-ray has been read and reviewed. Final review by the radiologist is pending. Follow up with your Primary care doctor for final interpretation.

Specific Instructions: _____

_____

_____

_____

_____ MD

---

☐ Follow-up with

- Your Doctor: _____

- Return to Jackson ER on _____

We Are Referring You To:

Dr _____     Call

for an appointment on _____

If you become worse or do not get better in 1 - 2 days see the doctor treating you or return to the emergency department.

Instructions Received By: _____

relationship to patient _____

☑ Voiced understanding of instructions

Patient Left:

X Ambulatory         Crutches          Stretcher

☐ Wheelchair    With Driver          Carried

_____ RN

Certificate for Return
to Work or School

**Jackson Hospital**
Emergency Department

ACCOUNT# 10539256   M/R # 27-32-51
MCKINNES, CHRISTOPHER
SEX - M   BORN 05/25/1973 F/C P ED
GARRISON, NORMAN A    ROOM

NA

Has been under my care on _____ and is able to return to work / School on _____ The Patient's work limitations are: _____

_____ MD

---

Emergency Department

**JACKSON HOSPITAL & CLINIC, INC.**
1725 Pine Street
Montgomery, Alabama 36106

Check Box If ☒ NKDA

MEDICINES PRESCRIBED        If none , check this box ☐

VOID IF NOT PRINTED WITH CRANBERRY BACKGROUND

| Name/ Strength | Number | Schedule / Duration | No Refills | Refills |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | ☐ | |
| 3 | | | ☑ | |
| 4 | | | ☐ | |

Dispense as written · Signature _____ MD

Substitution allowed Signature _____ MD

Print Name _____ MD
DEA#

090009

Page Number 1

144

87

VOLUNTARY STATEMENT FORM
MONTGOMERY POLICE DEPARTMENT

DIV: Detective          BUREAU: Persons          DATE: 4/12/03

NAME: Karla Parker                               AGE: 33 SEX/RACE: F/B
ADDRESS: 1490 Old County Road, Union Springs     PHONE: 474-3025

CONCERNING: Shooting Investigation

LOCATION OF INTERVIEW     PAB: YES NO (SPECIFY):

STATEMENT TAKEN BY: Detective J. L. Davis, #052

Beginning time 0145 Hours.

Q:  Alright, could you state your name for me please?
A:  Karla Parker.

Q:  And your address?
A:  1490 Old County Road 42, Union Springs, Alabama.

Q:  And your home phone number?
A:  334-474-3025.

Q:  Okay, and you're an employee with DSI Securities?
A:  Yes, sir.

Q:  Okay, where are you, where do you do your security duties at?
A:  At Steris in Gunter Park.

Q:  Okay, do you know a Christopher McInnis?
A:  Yes, sir.

Q:  Okay, and, and he had, this evening he was the victim of a gunshot to
    the head, is that correct?
A:  Yes, sir.

Rm/E2488

_____                    **DEFENDANT'S EXHIBIT**

_____                    2
Detective Signature                          _____
                                             Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
 lues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____        Page 1 of 24    Time:            92

Q:  Okay, were you on duty last night on the 11th?
    Yes, sir.

Q:  Okay, an altercation happened at your work place today, but the
    altercation happened the day before, is that gone be on the 10th?
A:  Yes, sir.

Q:  It was on a Thursday?
A:  Yes, sir.

Q:  Okay, and that was at your house in Union Springs?
A:  Yes, sir.

Q:  Okay, well lets start there.  Can you tell me about what time yesterday
    the altercation between Christopher and a subject by the name of Albert
    Lockwood occurred?
A:  It was about 5, I think it was about 5:30.

Q:  5:30 in the afternoon?
A:  Yes, sir.

Q:  Okay, well who was you with?
A:  I was with my brother-in-law.

Q:  Brother-in-law?
    Yes, sir.

Q:  Who's your, what's your brother's name?
A:  Terrance Franklin.

Q:  Was anybody else in the vehicle with you, son or anything like that?
A:  No, sir.

Q:  Okay, so you guys were in your vehicle?
A:  My brother's.

Q:  Your brother's vehicle and where were you going?
A:  To my house to pick up my little boy.

Rm/E2488

_____          _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
  lues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 2 of 24   Time:          93

Q:    Okay, do you, who lives at that house with you?
      Me, my little boy and my little daughter and Chris was living there.

Q:    Okay, so when you went to the house was Chris there?
A:    Yes, sir.

Q:    Okay, what happened when you got there?
A:    Chris was in the backyard, had my clothes in a nice little pile, fixing
      to burn 'em up and he saw Terrance and Lock come around the, he was in
      the back of the house, he saw Terrance and Lock come around to the back
      of the house and Terrance went in the house and got my little, my little
      boy and brought him to, put him in the car and Lock went in the house,
      Chris was standing in the door, Lock went in the house and just pushed
      Chris out, out the door and they got to fighting in the backyard.

Q:    Chris and Albert got to fighting in the backyard?
A:    Uh-huh.

Q:    Okay, I'm gone show you a picture of Albert and you said you've known
      him for how long?
A:    Five years.

Q:    Is that him?
A:    Yes, sir.

      Okay, okay, just show this is going to Albert Lockwood, date of birth
      8/24/62 and we'll write the time at 0147 Hours.  Okay, so Chris and
      Albert got to fighting. Was it a physical fight?
A:    It was just, they was just fighting.

Q:    Just fighting?
A:    Uh-huh.

Q:    Okay, I mean was it phy, physical, were they punching or wrestling or
      what?
A:    They was just wrestling.


Rm/E2488

_____                    _____
Detective Signature                                  Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
  ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 3 of 24    Time:          94

Q:  Wrestling.  Okay, so what happened then?
    And when they got through fighting I told, told Ch, told 'em to come on
    lets go, lets go, lets go, just leave it alone, just leave it alone,
    leave it alone and so we got in the car and we left Chris down there.

Q:  Okay, so who left at this point?
A:  Me, my little boy and Lock and Terrance.

Q:  Okay, so you guys left.  Where did you go?
A:  To my momma house.

Q:  Your momma's house?
A:  Yes, sir.

Q:  Okay, and when you got to your momma's house what happened there?
A:  After we got out the car and went on in the house...

Q:  Uh-huh.
A:  ...and then Lock left.

Q:  Okay.
A:  And then he left, he stayed gone until...

Q:  Would he have a vehicle of his own?
A:  He was driving my car.

Q.  He was driving your car.  So he left in your car?
A:  Uh-huh.

Q:  Okay, what happened then?
A:  He left and he came back and I asked him, I said what happened.  I said
    where you been in my car.  He said, I said I'm ready to go home so I can
    cleanup.

Q:  Okay.
A:  So he, I said and then I said come on ya'll by that time my daughter had
    made it to my momma house...

Rm/E2488

_____          _____
Detective Signature                       Witness Signature

ignature of Person Giving Statement:  I hereby affirm that the facts,
   Lues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 4 of 24   Time:          95

Q: Okay.
   ...and I said ya'll come on lets go and (inaudible) hollered, he said momma I don't wanna go home.  I don't wanna go home.  I said come on Tequarius lets go home cause you got a big test to take tomorrow.  I said put your shoes and stuff on so we can go and so he said okay momma.
   So he put his shoes on, he put his jacket on and I put my shoes and I put my jacket on and I got my pocketbook and me, Tequarius Shenique and Lock, we left...

Q: Okay.
A: ...and went to my house.  So when we got in the house, we got in the house and the house was just a mess and so I put Tequarius in his bed...

Q: Was Chris there?
A: No, sir.

Q: Okay.
A: He wasn't there at the time.

Q: Okay.
A: I put Tequarius in his bed and Shenique went and got in her bed and I told him to gone to sleep cause we gone have, ya'll got a big test to take tomorrow like that and so me and Lock, we just started cleaning, trying to straighten the house up a little bit and so by that time I was in the back bedroom back there, I was in the back bedroom back there and Lock was in my bedroom trying to fix my window, trying to fix my, put my, fix my window.

Q: Okay.
A: So by that time I heard the door open and Chris was just talking and then Chris say, he asked, I don't know what he said then, then all I know I, I came up the hall, him and Lock was having words.

Q: Okay, did you hear what they were saying?
A: When I came, when I came up the hall?

Q: Uh-huh.
A: Unh-unh.

Rm/E2488

_____                    _____
Detective Signature                                Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, lues and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____            Page 5 of 24   Time:            96



Q:   Okay.
     I came up the hall they were having words and then Chris said Karla what
     he doing here, Karla.  I said Chris please leave, just leave, just go
     head on and leave.  I said just go head on leave, everything gone be
     alright if you go head on and leave, like that and Chris said I ain't
     going nowhere.  I ain't going nowhere cause this my house, this my
     house.  I pay bills here too.  I ain't going no, Lock said man, go head
     on and leave now, go head on and leave now man, go head on and leave.
     She don't want you, go head on and leave, like that and so Chris left.
     He said when I get back you better be gone.

Q:   Talking to who?
A:   Lock.

Q:   Okay.
A:   So I went back there and I got Tequarius and Shenique up and I sent 'em
     to my momma house.  I told 'em to get 'em some school clothes together
     and go to, I'm a take 'em to my momma house cause I knew Chris was gone
     come back.

Q:   Uh-huh.
A:   And so that what I did and I stayed to my momma house about, bout a good
     30 minutes cause I put 'em in the bed and I told 'em everything'll be
     alright and everything'll be alright by tomorrow and Tequarius said
     momma you gone fix it.  I said momma gone fix it baby and I was talking
     to my little girl and she was so upset.  I said don't, don't be upset
     everything gone be alright.

Q:   Okay.
A:   Like that and so I left, me and Lock left together and went back down to
     the house and went back there and started cleaning up again.

Q:   Okay.
A:   And then Chris came back. . I sa, and then Chris came back...

Q:   Uh-huh.
A:   ...but it wasn't really too many words said but Chris said I'm not
     leaving and Lock not gone stay here with you tonight.  I said Chris
     please don't do this.  I said please, please just go head on and leave.
     I said please, I said cause I don't want nobody to get hurt.
Rm/E2488

_____                    _____
Detective Signature                                Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
 Iues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____           Page 6 of 24   Time:              97

Q:  Did Chris call him Lock?
    Uh-huh.

Q:  Okay.
A:  I said Chris please cause I don't want nobody to get hurt.

Q:  Okay.
A:  So Chris was just walking around the house, he was just fussing.  Lock, Lock didn't say nothing cause Lock was back there in my bedroom, sitting in my bathroom, cause I got a bathroom in my bedroom...

Q:  Uh-huh.
A:  ...and back there in my bedroom, bedroom sitting on the commode. He ain't say nothing cause I was telling him don't, I told him not to say nothing.  I, don't you saying nothing, I said cause if you say something, something gone happen and somebody gone get hurt and I don't want nobody to get hurt.

Q:  Okay.
A:  So he was just fussing, just fussing, just fussing, just fussing.  He said Karla why doing this.  I said Chris please just leave, please leave.  I said Tequarius is not here, please just leave, please leave, please leave and so Chris wouldn't never leave.

Q:  Okay.
    So I was back, I had went back there in my daughter room and I laid down cross the bed and Chris came back there he was just talking.  He said Karla why you doing this.  I said Chris its not gone work between me and you, please just leave.  I said I don't want nobody to get hurt.  Please leave.

Q:  Uh-huh.
A:  Like that.  He said I ain't going nowhere, this my house.  So I just, I no, dozed off to sleep cause they was still there and they ain't have no physical contact.  They ain't fight and Lock never did say nothing.  So I think it was about 2:00, the door opened and then Lock left and Baby, my dog, ran out behind him.


Rm/E2488


_____                    _____
Detective Signature                                 Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   lues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.


_____            Page 7 of 24    Time:            98

Q:  Okay.
    And about 2:45 I saw Baby outside and I went outside and I got him, I
    came back in the house.

Q:  Okay.
A:  And then Chris was still there, he was still fussing, still fussing,
    still fussing.  I conten, I made my bed, I put my bed back, you know
    made my bed up...

Q:  Uh-huh.
A:  ...and I laid down across my bed and I went to sleep.

Q:  Okay.
A:  I haven't seen Lock, today, when he came up to the Steris was my first
    time seeing him since yesterday.

Q:  Okay, so and then this coming back into, on to the eleventh, and so you
    came into work...
A:  At 4:00.

Q:  ...at Steris in the East Gunter Park at 4, what time?
A:  4:00.

Q:  And you were by yourself?
A:  Uh-huh.

Q:  Did you drive yourself...
A:  Uh-huh.

Q:  ...with your car?
A:  Uh-huh.

Q:  Okay, what was your contact, who, who was the next person you had
    contact with?
A:  The per, the next person I called, Vanessa called me.

Q:  Who's Vanessa?
A:  Vanessa, the girl that work out there.

Rm/E2488

_____                    _____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
Iues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                    Page 8 of 24   Time:

99

Q:  Okay.
    That's a, she work on day shift.

Q:  Okay.
A:  She called me and you know, she, we talk every night anyway.

Q:  Okay.
A:  We was talking about the schedule and how this girl named Gina wanted
    Monday off and she was telling Melvin, Gina, she, how did, Gina wanted
    Monday, okay.

Q:  Okay.  So Vanessa, who after Vanessa did you talk to?
A:  After Vanessa...

Q:  Uh-huh.
A:  ...I talked to, I think it was Chris.

Q:  Chris, who called, Chris or did you call him?
A:  Chris called me.

Q:  He called you...
A:  Uh-huh.

Q:  ...at the guard shack?
A:  Uh-huh.

Q.  How long did ya'll talk?
A:  We didn't, we talked about a, I think about a hour.

Q:  What'd ya'll talk about?
A:  The relationship.  I, I kept telling him that it wasn't gone work.

Q:  Did you break up with him?
A:  Yeah.

Q:  Okay, what did he, what else did he tell you?
A:  He talking bout we been together 10 whole years, Karla, you gone let
    this little stuff come between us.  There is more to it, I said Chris
    there is not nothing else, I said just, I just want it to be over and
    done with.  I said cause you, it, it not gone work.
Rm/E2488

_____          _____
Detective Signature                                Witness Signature

ignature of Person Giving Statement:  I hereby affirm that the facts,
.ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 9 of 24    Time:

100

Q:  Okay, did he tell you he was coming out to see you...
A:  Yeah.

Q:  ...at any time?
A:  He said he was gone bring the baby out there to me.

Q:  Your son?
A:  Uh-huh.

Q:  Okay, did he tell you what time he was coming out there?
A:  No, sir.

Q:  Okay, did you talk anything, about anything else that, that would be relevant to this?
A:  No, sir.

Q:  Alright, so who was the next person you talked to?
A:  Then Lock called me.

Q:  Lock called you?
A:  Uh-huh.

Q:  Okay, Lock or did Keith call you?
A:  I think it was Lock.

Q:  Lock called you?
A:  Uh-huh.

Q:  Okay, what did he say?
A:  He asked me how I was doing and he said you know my cell phone in the car. I said it's on the front seat, I'm a come get it. I don't know what time I'm coming. I said...

Q:  Did he say where he was?
A:  No.

Q:  Okay, but he, he, did he tell you what time he was coming to get it?
A:  No, sir.

Rm/E2488

_____          _____
Detective Signature                        Witness Signature

ignature of Person Giving Statement: I hereby affirm that the facts,
.ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 10 of 24   Time:        /0/

Q:    Alright.
      And then the next person I talked to was Keith.

Q:    Keith?
A:    From Tuskegee.

Q:    Okay.
A:    And I was asking Keith why he don't work...

Q:    Did you tell Lock that Chris was gonna come?
A:    Yeah, I told him I said wait a minute cause I don't know what time Chris
      gone bring Tequarius out here to me like that.

Q:    Alright, so did he say anything about that when you told him Chris was
      coming?
A:    He said, he said well I'll wait, I'll wait a minute before he come.

Q:    Okay.
A:    I said cause this is my, I was explaining to him this was my job and I
      don't wanna loose my job and don't want nobody to get hurt.

Q:    Okay, so how long did you talk to Lock?
A:    I ain't talk to him long.

Q:    How long?
      Bout, bout a good, bout a good 30 minutes cause his sister was telling
      him get the hell off her phone.

Q:    Okay, at, at, at this point in your, in your life with Lock, have you
      ever seen him armed with a gun before?
A:    Unh-unh.

Q:    Never?
A:    Unh-unh.

Q:    Do you know him to own a gun?
A:    Unh-unh.

Rm/E2488

_____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
  ...ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 11 of 24   Time:

102

Q: Okay, lets go back to the story. Did Lock say anything on the phone that he was gone do anything to Chris, make any threats?
(NO VERBAL RESPONSE)

Q: Okay, so what happened when you hung the phone up with Lock?
A: Then...

Q: You said your friend Keith called you...
A: Uh-huh.

Q: ...from Tuskegee?
A: Uh-huh.

Q: Did you talk, did you talk to him about this incident?
A: I was telling him about me and Chris.

Q: Okay.
A: That was just bout me and Chris (inaudible) and I was asking him why he don't work (inaudible) he was talking about his girlfriend.

Q: Okay.
A: And then by that time Chris had pulled up I said, I said I'll talk to you later here come my baby.

Q: Well what time did Chris come up?
He got there bout, I'd say bout 10, I think about 10:45 or 10:50 around that time.

Q: And what did he pull up in?
A: In a Cavalier, 2000, gray.

Q: Where did he park it at?
A: He park right in front of the guard shack and my little boy got out and came in.

Q: Okay, did he come in too?
A: Not at that time.

Rm/E2488

_____

Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
 .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

103

Q:  What did he do?
A:  He told my little boy to tell me he was going to get something for his
    teeth and he would be back.

Q:  For his teeth?
A:  Uh-huh.

Q:  Okay, so he left...
A:  Uh-huh, he left...

Q:  And what happened then?
A:  And then my little boy, he talking bout momma I'm mad.  I said
    everything gone be alright like that.  Then he asked for something to
    drink. So I called to the plant.  I said Angela I wanna walk to the
    snack machine and get me a soda.  She said fine.  I closed the gate.  I
    got the key out the drawer and I closed the gate, I locked it.  I
    forward the phone and me and my little boy walked to the plant to get
    something to drink.

Q:  Okay.
A:  When we got in the plant he got a Coca Cola out the Coke machine and...

Q:  ...a Hershey candy bar out the snack machine.

Q:  Okay.
    We was walking back down the hill.  We was just talking, talking and I
    picked him up cause he said his foot was hot.  I picked him up and I
    picked him up and totted him ha...

Q:  His foot was hurting?
A:  Uh-huh.

Q:  Okay.
A:  I picked him up and I totted him down the hill.

Q:  Uh-huh.
A:  And I put him in, in front of the guard shack and I said go in there and
    sit down and by that time I opened the gate up and bout 11, I think
    about 11, bout, bout 10:50 something bout 10, I think it was 10:57 or
    10:58, Chris pulled back up.  I said well baby...

Rm/E2488

_____                    _____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 13 of 24  Time:          104

Q:    Where did he pull the car to?
A:    In front of the guard shack, once again.

Q:    Okay.
A:    Then I said I'll see you later, like that.  I said you gone stay with
      me.  He said naw, I'm fixing to go with daddy.  I said okay.  I said
      tell daddy I'm a pick you up over you grandmomma house, like that.  He
      say okay momma, like that and Chris went up there, he turned around and
      he came back and he parked on the side.  Tequarius said I'm not ready to
      go yet, like that.  He said I'll wait for you...

Q:    Where'd he park the car at?
A:    In front of the guard shack.

Q:    Okay.
A:    And then he said I'll wait till he get ready to go and bout 10:53 Lock
      called.  He said I'm...

Q:    10 what?
A:    53.

Q:    You're going backwards now.  You said 10:57 when Chris came back.
A:    It must've been 10:58.

Q:    Okay.
A:    10:58 Lock called.  He said I'm on my way.  I hold up a minute.  I say
      cause Chris out here and this my job and I don't want nobody to get
      hurt.  I...

Q:    Do you know where Chris was calling from?
A:    I don't know where Lock was calling from.

Q:    He was calling from a cell phone, could you tell that?
A:    I don't, it wasn't, I don't think it was from no cell phone.  I think it
      was a pay phone somewhere.

Q:    Okay.
A:    Like that and I said hold up before you come over here cause Chris here.
      I don't want no, nothing to happen cause this my job and I need my job.

Rm/E2488

_____
Detective Signature                          Witness Signature

ignature of Person Giving Statement:  I hereby affirm that the facts,
   .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

Q:    Uh-huh.
      He say okay.  Then next thing I know bam, Lock out there.

Q:    How did Chris' car get across the street?
A:    He pulled it over there.

Q:    When?
A:    When, after everything had happened.  The guy, he was in, he was, Chris
      was pulling out the guard, out the, out the gate and he just parked over
      cross the street.

Q:    After he was shot?
A:    Uh-huh.

Q:    Chris moved his own car?
A:    Uh-huh.

Q:    Okay, anyways lets go back to before he got shot.  So Chris was there,
      was he inside the guard shack?
A:    He got out the car...

Q:    Okay.
A:    ...and brought my little boy bag, book bag in there.

Q:    Okay.
      Then he was talking about you want Lock, you can have him.  I said, I
      said Chris it ain't like that, like that.  I said now, I said it ain't
      like that and I put Teq gloves on him cause he asked to help me cleanup.
      I was putting the gloves on Tequarius hand.  He was like well, Tequarius
      don't need to be working with them chemicals, Karla.  Tequarius went on
      in the bathroom.  I went in the bathroom behind Tequarius.  I got, I
      tried to get me some gloves, put me some gloves on my hand and so I can
      clean the bathroom up and by that time Chris holler oh, Karla he got a
      gun, he got a gun.  All us was in the bathroom. . .   . .       . .  . .

Q:    Who, okay, who was saying that...
A:    Chris.

Q:    ...he got a gun?
A:    Chris said he got a gun, he got a gun, he got a gun.
Rm/E2488

_____                    _____
Detective Signature                                Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
  lues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 15 of 24   Time:

                                                                    106

Q: Chris was inside the guard shack?
A: Uh-huh.

Q: Okay.
A: He tried to lock the door but he couldn't lock the door before, before Lock got there.

Q: Okay.
A: He...

Q: You're saying lock, right...
A: Uh-huh.

Q: ...L-O-C-K?
A: Like you lock...

Q: Okay.
A: ...the door.

Q: Okay.
A: And then by that time he said Karla he got a gun, he got a gun. I, you know, how you...

Q: Uh-huh.
A: ...and I pushed Tequarius back in the corner so he wouldn't get hurt...

Q: Uh-huh.
A: ...and...

Q: Did you see Lock at this time?
A: Naw, I didn't see him until he got in the bathroom.

Q: Okay, once he got, or is, did he force his way into the shack?
A: He pulled, he snatched the door out of Chris hand and Chris ran back in the bathroom behind me.

Q: What was Lock wearing?
A: He was wearing a green shirt...

Rm/E2488

_____          _____
Detective Signature                         Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, issues and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____          Page 16 of 24   Time: _____

107

Q:  Uh-huh.
    ...some jeans.

Q:  Green shirt and some jeans, t-shirt or long sleeve?
A:  A green jacket.  It was a green jacket.

Q:  Green jacket?
A:  Uh-huh.

Q:  Did he have a shirt on under it?
A:  I don't know.

Q:  Did you see a weapon in his hand?
A:  At that, when we was in the bathroom I didn't.

Q:  Okay, so when he got in the bathroom what was he doing then?
A:  He was telling Chris to come on out, come on out, come on out, come on
    out mutherfucker, come on out.  I said Lock please leave.  This my job.
    Please Lock, please leave, this my job like that and then when he got in
    the area where the desk was that's when he pulled the gun out.

Q:  Who pulled the gun?
A:  Lock.

Q:  Lock?
    Uh-huh.

Q:  From where?
A:  I guess he had it behind his back.

Q:  What color was it?
A:  Black.

Q:  Black?
A:  Uh-huh.

Q:  Small, big?
A:  It was, I think it was a small, I don't too much, I don't know too much
    about guns.

Rm/E2488

_____                    _____
Detective Signature                         Witness Signature


 ignature of Person Giving Statement:  I hereby affirm that the facts,
  .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____            Page 17 of 24   Time:            108

Q:  Okay.
    Cause I ain't never had to use, (inaudible).

Q:  Okay, so what did he do with the gun when he pulled it out?
A:  When he pulled the gun out...

Q:  Okay, he pulled the gun out?
A:  Uh-huh.  When he pulled gun out Chris took off running up the hill.  He
    just, he shot one time at Chris.

Q:  As he...
A:  I'd say...

Q:  ...was running, were they both running or was it just Chris..
A:  Both of 'em...

Q:  ...running?
A:  ...both of 'em was running and Lock was running and shooting.

Q:  Was...
A:  I said oh...

Q:  ...was he pointing the gun?
A:  He was pointing it.

    And he shot one time?
A:  One time.  I said oh, Lock, please don't shoot him, please don't shoot
    him but before Lock shot the gun, Tequarius ran and he got in the car.

Q:  Okay.
A:  I said oh, Lock please don't shoot him, please don't hurt him, please
    don't hurt him, please don't hurt him...

Q:  Were you outside this ti, this time?
A:  We was, we was outside.

Q:  Alright.
A:  And then Lock some kind of way, Lock caught up to Chris and grabbed him
    and throwed him down.

Rm/E2488

_____
Detective Signature                                    Witness Signature

ignature of Person Giving Statement:  I hereby affirm that the facts,
   lues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 18 of 24  Time:            109



Q:  What side of the road were they on...
    They was on...

Q:  ...when he threw him down?  Tell me?
A:  The right side.

Q:  On the right side of the road?
A:  Uh-huh.

Q:  Okay.
A:  Uh-huh, they was on the right side of the road.

Q:  So Chris caught, I mean Lock caught Chris?
A:  Uh-huh, and throwed him down.

Q:  Okay, once he, he threw him down what happened then?  Was he saying
    anything?
A:  He said get down mutherfucker, get down, get down mutherfucker get down.
    I said oh, Lock please don't shoot him, please don't shoot him, please,
    don't and bout...

Q:  Okay.  Alright.
A:  ...and bout that time I had got, then I said oh, Lock please don't shoot
    him, please lock, please, please Lock, please don't shoot him, please,
    please don't shoot him, like that and then he kicked Chris and then he
    shot him...

Q:  Where'd he, where'd he kick Chris at?
A:  He kicked Chris on the knee and Chris just fell, I think he kicked Chris
    on the knee and Chris just fell down on the ground and he just, Chris
    just balled up in a knot and then slapped...

Q:  So Chris was laying on the ground?
A:  Uh-huh, and then Lock hit him while....

Q:  What...
A:  ...he was on the ground.  I don't know whether he hit him with the
    gun...

Rm/E2488

_____                    _____
Detective Signature                            Witness Signature

ignature of Person Giving Statement:  I hereby affirm that the facts,
 iues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 19 of 24   Time:

Q:  Which hand?
    The right hand.

Q:  Is that the same gun he had the gun in?
A:  Uh-huh.

Q:  Okay.
A:  I don't know whether he hit him with the gun or with his fists.  He was
    just hitting him, just hitting him.

Q:  How many times?
A:  A lot of times.  Bout 4, 5 times.

Q:  He hit him where at?
A:  All on his head.

Q:  In his head?
A:  Uh-huh.

Q:  Okay.
A:  Then he start kicking Chris.  He start kicking Chris, start kicking...

Q:  Where at?
A:  In his stomach.

    Okay.
    I said Lock please stop, please, please, please stop and then he shot
    and the fire sparked off the ground.

Q:  Okay.
A:  And he shot again and a fire sparked off the ground again.   Then I
    looked around and a guy said man, what the fuck going on, what the fuck
    wrong with you. The guy...

Q:  What'd that guy look like?
A:  He was, he was like say, he was tall, he was wearing jeans and a
    t-shirt.

Q:  How old did he look?
A:  I don't know.
Rm/E2488

_____



Detective Signature                           Witness Signature

.gnature of Person Giving Statement:  I hereby affirm that the facts,
  .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

Q:  How tall?
    He was taller than me, bout, I think about 5'9" or 5, 5, 5'5", I think.

Q:  How much he weigh?
A:  I don't know bout (inaudible).

Q:  He weigh more than me?
A:  Unh-unh.

Q:  No?
A:  Unh-unh, say bout, round bout, say bout two something.

Q:  Okay.
A:  And so I said please leave, please leave, please leave, please leave,
    please leave, please leave, I begged him to leave.  He said man, come on
    here, come on here, come on here man, come on here.

Q:  Who?
A:  The guy that was with Lock.

Q:  Okay.
A:  And they went and got in the car and they pulled off and Chris said look
    Karla, look what, look what you done done look...

Q:  So they pulled off, what'd they pull off in?
    In a little, I think it was a little black car.

Q:  Where was it parked at?
A:  It was parked at the end of the road.

Q:  Okay.
A:  Right in front of the...

Q:  Which way did they go when they left?
A:  They backed up...

Q:  Okay.
A:  ... (inaudible) backed up all the way down the street.


Rm/E2488

_____
Detective Signature

_____
Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
  lues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____
                                        Page 21 of 24   Time:

112

Q:   Backed up all, which way though?
A:   Towards Rheem's.

Q:   Towards Rheem?
A:   Uh-huh.

Q:   Okay.
A:   They backed...

Q:   They backed up all that way?
A:   Uh-huh.

Q:   Alright.
A:   And then I said (makes sound) and then Chris say look Karla, look what he
     done done to me.  He done shot me in my head be talking about L-said,
     talking bout call the Police, call the Police.  So at that time I picked
     the phone up...

Q:   Uh-huh.
A:   ...and I dropped the phone.  Then I picked the phone up again and I
     dialed the number that Mattie Boyd had gave me for the Police.

Q:   Where was Chris at this time?
A:   He was standing right there.

     Did he move his car yet?
     He hadn't moved his car yet.

Q:   Okay, so, okay, continue.
A:   Then, wait, yes he had, he, he got in the car.

Q:   Okay.
A:   He got in the car and he backed up and he said I'm fixing to stop one of
     these folks so they can call the Police like that but I was already in
     the, in the guard shack.

Q:   Uh-huh.
A:   And so he stopped this white guy in a blue truck.


Rm/E2488

_____
Detective Signature                              _____
                                                 Witness Signature

Signature of Person Giving Statement:   I hereby affirm that the facts,
   lues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                        Page 22 of 24   Time:

113

Q:   Okay.
     He stopped this white guy in a blue truck.  He said call the Police,
     call the Police cause I done got shot and the white guy in the blue
     truck came to the guard shack.  He said you need to call the Police but
     at that time I was calling the number that Mattie had gave me.

Q:   Uh-huh.
A:   For the Police.

Q:   What number?
A:   It was a, I think it was a 27, phone number.  I don't know the number by
     heart.

Q:   Okay.
A:   And so I couldn't get nothing but a recording.  So I hung up, I dialed 9
     and I mashed 91411, information...

Q:   Okay.
A:   ...for the Police number and then I, I got the Police, the number from
     information and I got connected.

Q:   Okay.
A:   They connected me automatically and I told 'em, told 'em I needed a, a
     unit to come out to Steris.

     Okay.
     And they say what's the problem.  I said someone has been shot.  He said
     does they work there.  I say no.

Q:   Alright, has Lock, did Lock call you at any point after that?
A:   No.

Q:   Did he get his cell phone?
A:   No.

Q:   You still got it in your car?
A:   Yes, sir.

Q:   Okay, alright, you have anything else you can add to this statement?
A:   I didn't mean for it to happen like this.
Rm/E2488

_____                    _____
Detective Signature                            Witness Signature


ignature of Person Giving Statement:  I hereby affirm that the facts,
  ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

Q:     Alright.
       I didn't mean for nobody to get hurt.

Q:     Alright, anything else?
A:     And it was not a setup.

Q:     Okay, is everything you told me the truth?
A:     Everything is the truth.

Ending time 0206 Hours.

Rm/E2488

_____                    _____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   lues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                    Page 24 of 24   Time:              115



**DEFENDANT'S EXHIBIT**

3

VOLUNTARY STATEMENT FORM
MONTGOMERY POLICE DEPARTMENT

J: Detective          BUREAU: Property          DATE: 4/12/03

NAME: Christopher McKinnes                    AGE: 29 SEX/RACE: M/B
ADDRESS: 1490 County Road 42, Union Springs, AL    PHONE: 474-3025

CONCERNING: Attempted Murder

LOCATION OF INTERVIEW    PAB: YES NO (SPECIFY): Jackson Hospital E.R.

STATEMENT TAKEN BY: Detective S. E. Thompkins, #1025

Beginning time 0040 Hours.

Q:   Sir could you state your name for me please?
A:   Christopher McKinnes.

Q:   Mr. McKinnes, earlier tonight you were the victim of a gunshot wound to
     the head, is that correct?
A:   Yes, sir.

Q:   Okay, this happened at Rheem Manufacturing at...
A:   Steels Corporation.

Q:   Steels Corporation?
A:   Yes, sir.

Q:   Up there in Gunter Park Industrial Park?
A:   Yes, sir.

Q:   Could you tell me what happened?
A:   Me and my son was in the guard shack talking to the guard and a...

Q:   What was the name of the guard?
A:   Karla Parker.

Q:   Okay, is that a black female or a white female?
A:   It's a black female.

DB/E2472

**DEFENDANT'S EXHIBIT**

4

_____ /1025
Detective Signature                    Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
 .ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                    Page 1 of 8    Time: _____

83

Q:  Okay, and how, how do you know her?
A:  She's my girlfriend, we've lived together for the last ten years.

    Okay.
A:  Nine to ten years.

Q:  And she's employed...
A:  By D, DSI Security.

Q:  Okay, and she's a security guard for Steel Corp?
A:  Yes, sir.

Q:  Okay, you went out there to visit her for this evening?
A:  Yes, sir.

Q:  And what happened after that?
A:  We was standing there talking and my son said ready to go home so I said
    okay, we fixing to go.  And all the sudden, she must a looked up and saw
    him and right before I got in my car, she was on the phone with somebody
    and I, I walked into the guard shack she hung up the phone and a, and I
    asked her I say, I asked her who she was on the phone with and she said
    nobody so me and my son we was just talking, all of us just standing
    there talking and I told my son come on, let's get ready to go and it,
    by the time he was getting ready to take his hands, she must a looked up
    and saw the guy running to the guard shack and he came on in the guard
    shack, she told him to get out of there and he came on in anyway and he
    told me get outside bitch ass nigger, I said man don't kill me man,
    don't kill my son, man, I said don't shoot me man, I ain't did nothing
    to you and he, as I was getting outside, he hit me with a pistol two
    times up side my face while we was inside there, I don't know if he hit
    her or not because she was kinda like in the way, but she was trying to
    keep him from hitting anybody and she was trying to block him like that
    and he hit me two times and he kinda, I was like okay man, I'm gonna go
    on outside, just don't kill my son and I told my son go, go outside and
    get in my car.  And okay, as me and my son was going outside he shot and
    he kinda shot in-between the two of us and down towards like, down
    toward our legs and I though maybe he had shot my son and I kinda looked
    back and he kinda, he pushed me down to the road and he talking about
    get on the ground, get on the ground, I said okay man, I got on my knees
    and I got, he put, he had the gun up to my head, I said man don't kill
    me, man I ain't did nothing to you.  He said get on the ground, get on

DB/E2472

_____     _____
Detective Signature                            Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
_ues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

the ground, then he talking about open your mouth, he struck me with the
pistol two, maybe one time then, I can't quite remember, and then he
made me lay on the ground and he shot and I remember the shot, he shot
right like my head was laying down and he shot and then he kicked me in
my face and I tried rolling, he kicked me twice, kicked me in my side
too.

Q: Okay.
A: And then...

Q: While, while you were in the guard shack when he first approached you,
   did you recognize the guy?
A: I knew him already.

Q: Okay, what was his name?
A: Albert Lockwood.

Q: How old is he?
A: I'm not sure.

Q: Can you guess, twenties, thirties?
A: Maybe forty.

Q: Maybe forty?
A: Yes, sir.

Q: Is he a black male, white male?
   Black male.

Q: Okay, and how do you know him?
A: He lives in Bullard County, I know him, I used to work at poultry plant,
   I used to be a supervisor at a poultry plant and he was a ▮▮▮▮▮▮▮
   there, ▮▮▮▮▮▮▮, but I hadn't, up until yesterday I hadn't seen him
   for like maybe six months.

Q: Okay, so you recognized him right away as he approached you?
A: Yes, sir. When she screamed I looked up and I saw his face. You know,
   I kinda backed up and I, I was gonna close the bathroom door, I think
   she even tried to close the bathroom door.

DB/E2472

_Detective Signature_           _Witness Signature_

Signature of Person Giving Statement:  I hereby affirm that the facts,
issues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.



Q: Okay.
A: I, I don't know if he shot in that guard shack or not, but he reached like he was fixing to shoot me, she told him don't shoot in here, don't shoot in here.

Q: Okay, how many times did he fire total?
A: I know he fired three times.

Q: Three rounds, okay. And only struck you once.
A: The last time he shot was when he had me on the ground by my head.

Q: Okay, and what, did he have the barrel to your head?
A: Yes.

Q: Okay, could you tell what kind of gun it was?
A: It was a small gun, maybe like, I don't know if that's a small gun, maybe a .38 or .25, or .22, something like that, it was small.

Q: It was an automatic?
A: No, it was one of those revolvers, is that what you call with the little round thing?

Q: Yeah, a revolver.
A: Revolver.

Q: Okay.
A: It was black.

Q: Okay, black.
A: Yes, sir.

Q: Okay, after he shot you what happened?
A: After he shot me I laid down on the ground for a minute and I got up and tried to, to see was my son okay, and I tried, saw a car, the first car went by and I saw somebody and they came, I said somebody please call the police or somebody, call somebody to help me. Okay, they told me just to calm down, I tried to go to the guard shack, they wouldn't let me go in there to use the phone to call the police, they told me I gotta go outside the gate so I took my son outside the gate and walked him back across the street to the car and I kinda like walked back but I kinda like fell over when I walked back over there and so I just kinda

DB/E2472

_____

_Detective Signature_                          _Witness Signature_

Signature of Person Giving Statement: I hereby affirm that the facts, ~~iss~~ues and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.



laid down on the ground and I, and I waited for the police to come and , and once they came the, the ambulance guy took me back to the guard shack.

Q: Okay. You stated earlier before we started this statement that you and this guy, you had signed a couple warrants on this guy.

A: Yes, today, this morning, maybe 10 o'clock, I ,I went to the circuit clerk, warrant clerk office and signed two warrants, assault 1, I don't know I think it was Assault 1st Degree Warrant and a Criminal Mischief Warrant.

Q: Okay. I'm sorry, what did you say this guys name was again?
A: Albert Lockwood.

Q: Okay, and you said you signed an Assault and a Criminal Mischief Warrant on him...
A: Yes.

Q: ...this morning.
A: Yes.

Q: When, when did the assault occur?
A: Yesterday.

Q: Okay, how did he assault you?
A: He came to my house yesterday and me and my son was in the house and he just pulled the back door open and kinda pulled me out the house and was kinda like tussling around with me and it kinda got like a, he hit me a couple, cause my wrist was a little bruised and another guy was kinda like grabbing me but I was trying to get over on top of him to keep him from getting on top of me and hitting me, another guy was, every time I could like get him off, off of me enough, somebody else would else would grab me and hold me.

Q: Okay, so there was actually two guys...
A: Yes.

Q: That assaulted you, okay. And what was the Criminal Mischief for, was that when he broke into the house?
A: He took, I didn't, they didn't even say nothing about that, he broke my, he, on the glass, you can see it now, there's two cracks on, there's a

DB/E2472

_____

Detective Signature                              Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, ..ues and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____    Page 5 of 8   Time:                87

crack going all the way that way and all the way that way, he dented the door and busted the right signal light.

Okay, so the, oh, on your vehicle?
Yes.

Q:  Okay, and that happened before the assault or after the assault?
A:  After the assault.

Q:  Okay.
A:  It, it, it totaled like, they got an estimate, there's one for like $726 worth of damage.

Q:  Okay, alright.  And you filed a report with the Bullard County Sheriff's Department?
A:  Yes, sir.  I filed the report yesterday because I had to get the Sheriff to come down with, I got the, well I, I went to town I called my sister she acme and picked me up cause I was so nervous, I couldn't, I was scared to drive and they took me on to, uptown to the police department but he still had to call the Deputy, a Deputy Sheriff because I live out the city limits and, and there, that's how they do it.  And the Deputy, the Deputy lived down the road from me, he came cause I know him, he, me and him used to be in the same reserve unit.  He came, went on to the hospital, they check me, they said I have bruised ribs and I have a mild, little swelling in my face yesterday.

Q:  Okay, and you did the report and then on Friday, first thing Friday morning you have...
A:  Yeah cause the courthouse was already closed yesterday...

Q:  Okay.
A:  ...and this morning I went to the courthouse and signed the warrant for the Circuit Clerk Wilbert Jernigan.

Q:  Okay, so Friday morning was when you signed the two warrants?
A:  Yes, sir.

DB/E2472

_____
Detective Signature

_____
Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, ...ues and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

Q:  Okay.  Did they, okay, after you signed the warrants you stayed in Union
    Springs that day and you said you were at your grandma's house...

A:  All today I been in Union Springs, I was at my grandma house all day
    until about 1, I came to my grandma, my mom, she got a rental car and
    we, and my brother and my son right there, we went to the mall, he
    picked, my brother picked up a tuxedo for the prom tonight, we went back
    home and we been at my grandmamma house ever since.  We, we went not
    maybe about 9 o'clock, a little bit after nine, I said well come on
    Troy, you wanna go to Montgomery and so he said yeah, we, we came to
    Montgomery, we stopped at Liberty, is that _inaudible_ ,...

Q:  It didn't go in.
A:  ...it didn't go in?

Q:  Unh-unh.
A:  Thank you.

Q:  You're a lucky young man.
A:  I'm blessed.

Q:  Yes you are.

TAPE STOPPED

TAPE RESTARTED

Q:  Okay, so you came to Montgomery around 4 or 5 o'clock and you called
    Karla and told her you were gonna come see her.
A:  I called, I came to Montgomery at 9 o'clock tonight, I had called Karla
    at 4, maybe 4 something, maybe 5 something this afternoon...

Q:  And told her you were coming to Montgomery?
A:  Yes.

Q:  Okay, and you come, you came into Montgomery about 9 o'clock this
    evening?
A:  Yeah, she probably figured I would come cause usually if I come to see
    her its about maybe 9, 10 o'clock, when me and my son been in Montgomery
    to see a movie or something.

DB/E2472

_____                    _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
   lues and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____            Page 7 of 8    Time:              89

119

Q:  Okay.
A:  And as soon as I was over there somebody called on the phone and I could
    see her, looked like she was arguing with somebody on the phone.  And so
    I was going in there to get my son out, to tell him to come on let's go,
    when as I walked to the guard shack, before I could get there she hung
    up the phone and, and it wasn't even five minutes later that man was
    there shooting.

Q:  Okay, did you see any kind of vehicle that he may have got into or
    anything like that?
A:  A, a, it looked like a, it looked like a blue Toyota Corolla, maybe a
    '96 or '97.

Q:  Okay.
A:  Or either a, like a teal green.

Q:  Alright, is that the kind of car he owns?
A:  He don't own a car.  I'm suspecting the car, whoever it was, was
    probably from Union Springs.

Q:  Okay. Alright.  Is there anything else you can think of sir?
A:  Yes, I'm almost sure if she, if, if she leaves, well you can find her,
    you could probably find him, if somebody go, wait till maybe 2:30 or
    3:00 and go to County Road 42, that's probably where they can find him
    at, at 1490 County Road 42, there's three trailers on that road, it's
    gonna be the middle one, a single wide trailer, like a blue and white.

    Okay, does he live there?
A:  No, that's where I live at.

Q:  Okay.  Alright.  Okay, alright, is there anything else sir?
A:  No, that's all I can remember.

Ending time 0051 Hours.

DB/E2472

_____
Detective Signature

_____
Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
  values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____          Page 8 of 8    Time:

90

| State of Alabama | CERTIFICATE OF COMPLETION AND TRANSMITTAL OF RECORD ON APPEAL BY TRIAL CLERK | Appellate Case Number |
|---|---|---|
| Form ARAP-14         Rev. 11/91 | | |

| TO: THE CLERK OF<br>THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL: 04/29/04 |
|---|---|

APPELLANT

Albert J. Lockwood

v.   STATE OF ALABAMA

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this ___8th___ day of ___July___, 2004.

_Melissa Rittenour_
Circuit Clerk

*Porter*
*aa630*
*8/27/04*
*①*

# IN THE ALABAMA COURT OF CRIMINAL APPEALS

## CASE NO. CR-03-1253


ALBERT JEROME LOCKWOOD,

    APPELLANT,

vs.

STATE OF ALABAMA,

    APPELLEE.


### APPEAL FROM THE CIRCUIT COURT

### OF MONTGOMERY COUNTY, ALABAMA

### CASE NO. CC-2003-957

---

### BRIEF OF APPELLANT

---

THOMAS J. AZAR, JR. (AZA006)
609 SOUTH McDONOUGH STREET
Montgomery, Alabama 36104
Office    (334) 262-5363
Fax    (334) 263-3988
Email    tjazar@al-lawyers.com



EXHIBIT
B

## STATEMENT REGARDING ORAL ARGUMENT

The Brief of the Appellant is sufficient to explain the basis of this appeal, and therefore, Oral argument is not requested.

## **EXPLANATION OF THE RECORD ON APPEAL**

The record on appeal is comprised of five (5) volumes. Volumes one (1) through four (4) include pleadings, orders of the trial court, and the transcript of the trial and sentencing stages. Volume one (1) of one (1) is a copy of all the exhibits that were admitted at trial and given to the jury for review.

Volumes one (1) through four (4) will be denoted by CR followed by "vol" for Volume, the volume number, and "p" for page number in the respective volume followed by the page number.

The volume containing the exhibits will be identified by CR followed by "Ex" for Exhibit and  p# for the page number in the respective volume followed by the page number.

# TABLE OF CONTENTS

<u>STATEMENT REGARDING ORAL ARGUMENT</u> . . . . . . . . . . . . i

<u>EXPLANATION OF THE RECORD ON APPEAL</u> . . . . . . . . . . . ii

<u>TABLE OF CONTENTS</u> . . . . . . . . . . . . . . . . . . . . iii

<u>TABLE OF CASES, STATUTES, AND OTHER AUTHORITIES</u> . . . . . iv

<u>STATEMENT OF THE CASE</u> . . . . . . . . . . . . . . . . . . 1

<u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u> . . . . . . . 3

<u>STATEMENT OF THE FACTS</u> . . . . . . . . . . . . . . . . . . 4

<u>STATEMENT OF STANDARD OF REVIEW</u> . . . . . . . . . . . . . 10

<u>SUMMARY OF ARGUMENT</u> . . . . . . . . . . . . . . . . . . . 14

<u>ARGUMENT</u> . . . . . . . . . . . . . . . . . . . . . . . . .16

<u>CONCLUSION</u> . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>LIST OF RULINGS AND ACTIONS ADVERSE TO APPELLANT</u> . . . . 33

## TABLE OF CASES, STATUTES, AND OTHER AUTHORITIES

### FEDERAL CASES

Arizona v. Youngblood  488 U.S. 51, *57, 109 S.Ct. 333, 337 (U.S.Ariz.,1988) . . . . . . . . . . . . . . . . . . . . -19-

Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967) . . . . . . . . . . . . . . . . . . . . -10-

Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139- 40, 22 L.Ed.2d 433 (1969) . . . . . . . . . . . . . . . . . . . . -10-

Brady v. Maryland 373 U.S. 83, 83 S.Ct. 1194 (U.S.Md. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897) . . . . . . . . . . . . . . . . . . . . . . . . -9-

Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) . . . . . . . . . . . . . . . . . . . . . . . . -12-

Culombe v. Connecticut  367 U.S. 568, 81 S.Ct. 1860 (U.S. 1961) . . . . . . . . . . . . . . . . . . . . . -17-, -18-

Edwards v. Arizona, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1884- 85, 68 L.Ed.2d 378 (1981)
. . . . . . . . . . . . . . . . . . . . -11-, -23-, -24-
Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968) . . . . . . . . . . . . . . . -10-

Lightbourne v. Dugger, 829 F.2d 1012 . . . . . . . . . -22-

Martin v. Wainwright, 770 F.2d 918, 923 (11th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . -22-, -25-

Martin v. Wainwright  781 F.2d 185, *186 (C.A.11(Fla.),1986) . . . . . . . . . . . . . . . . . . . . . . . . -28-

Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975) . . . . . . . . . . . . . . . . . . . . -22-

Minnick v. Mississippi, [498 U.S. 146, 111 S.Ct. 486, 112

iv

L.Ed.2d 489 (1990) . . . . . . . . . . . . . . . . -25-

Miranda v. Arizona  384 U.S. 436, 86 S.Ct. 1602 (U.S.Ariz.
1966) . . . . . . . . . . . . . . . . . . . . . . . -13-

Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3
L.Ed.2d 1217 (1959) . . . . . . . . . . . . . . . . -17-

Thompson v. Wainwright, 601 F.2d 768, 771 (5th Cir.1979)
. . . . . . . . . . . . . . . . . . . . . . -17-, -22-

United States v. Hernandez, 574 F.2d 1362, 1369 (5th Cir.1978)
. . . . . . . . . . . . . . . . . . . . . . . . . . -22-

Thompson v. Wainwright, 601 F.2d 768, 771 (5th Cir.1979 -17-

**STATE CASES**

Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978), -10-

Flowers    v.    State    799    So.2d    966,    985    -986
(Ala.Crim.App.,1999) . . . . . . . . . . . . . -22-, -25-

Ex parte Gingo, 605 So.2d 1237, 1241 (Ala.1992). .-10-, -15-

Griffin v. State  2003 WL 1411321 . . . . . . . . -23-, -25-

Hampshire v. State  484 So.2d 1140, 1142 (Ala.Cr.App.,1985)

. . . . . . . . . . . . . . . . . . . . . . . . . . -10-

Hawkins v. State  443 So.2d 1312 (Ala.Cr.App.,1983) . . -22-

Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990)
. . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)  . -9-

Ex parte Matthews  601 So.2d 52 (Ala.,1992) . . . . . . -12-

Morrison v. State, 398 So.2d 730, 743 (Ala.Crim.App.1979),
rev. on other grounds, 398 So.2d 751 (Ala.1981 -1-, -23-, -24-

Payne v. State, 424 So.2d 722 (Ala.Crim.App.1982) . . . -10-

Schaut v. State, 551 So.2d 1135, 1137 (Ala.Crim.App.1989)
. . . . . . . . . . . . . . . . . . . . . . . . -23-, -25-

Seawright v. State, 479 So.2d 1362, 1366 (Ala.Crim.App.1985)
. . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

Ex parte Singleton  465 So.2d 443 (Ala.,1985) . . -22-, -25-

Slaton v. State  680 So.2d 879, 886 (Ala.Cr.App.,1995)
. . . . . . . . . . . . . . . . . . . . . . . . -17-, -18-

Slaton v. State  2003 WL 22220752, 3 (Ala.Crim.App.,2003)
. . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

Snyder v. State  2003 WL 22463403 . . . . . . . -12-, -18-

Voudrie v. State, 387 So.2d 248, 256 (Ala.Cr.App.), cert.
denied, 387 So.2d 256 (Ala.1980)
. . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

## FEDERAL STATUTES

U.S.C.A.Const. Amend. 14 . . . . . . . . . . . . . . -13-

## FEDERAL RULES

Wayne R. LaFave et al., Criminal Procedure § 6.9(f) (2d
ed.1999) . . . . . . . . . . . . . . . . . . . . . -28-

## OTHER AUTHORITIES

Annot., 58 A.L.R.2d 1024, 1027-28 (1958) . . . . -12-, -18-

CASE NO. CC-2003-957 . . . . . . . . . . . . . . . -22-

## STATEMENT OF THE CASE

This cause of action began after the July 2003 Term of the Grand Jury of Montgomery County, Alabama returned a true bill indicting the Defendant Albert Jerome Lockwood on a charge of Attempted Murder, in violation of § 13A-4-2, Code of Alabama, (1975).

On February 23, 2004 the Defendant, by and through counsel, was tried before a Jury. Both the State and the Defense put witnesses on to testify in this matter. The trail concluded February 23, 2004 with the jury finding the Defendant guilty of the Attempted Murder of Christopher McKinnes. The matter was then set for sentencing March 18, 2004.

The Defendant appeared for sentencing by the trial court, March 18, 2004, and was sentenced to a term of life without parole. Trial Counsel made an Oral Motion for a New Trial. The Defendant was taken into custody and court was adjourned.

April 14, 2004 counsel for the Defendant filed a written Motion for a New Trial or in the Alternative Motion to Set Aside the Verdict in this matter. June 11, 2004, the trial court heard arguments from the Defendant's trial counsel and the Chief Deputy District Attorney who tried the State's case.

-1-

The Defendant's presence was waived for this hearing.  The trial court denied the Defendant's Motion for a New Trial, or in the Alternative Motion to Set Aside the Verdict in this matter.

The Defendant by and through his trial counsel then appealed this matter.

## ISSUES PRESENTED FOR REVIEW

1.  THE WRITTEN TRANSCRIPT OF THE APPELLANT'S TAPED INTERROGATION BY MEMBERS OF THE MONTGOMERY POLICE DEPARTMENT SHOULD HAVE BEEN SUPPRESSED AND NOT ALLOWED TO BE ADMITTED BECAUSE THE TAPE FROM WHICH THE TRANSCRIPT WAS MADE WAS LOST OR DESTROYED BY THE MONTGOMERY POLICE DEPARTMENT AND NOT PROVIDED FOR EXAMINATION OR CONTENT TO THE DEFENDANT PRIOR TO TRIAL.

2.  THE APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO REMAIN SILENT AND TO SPEAK TO AN ATTORNEY BEFORE ANSWERING THE QUESTIONS OF THE MONTGOMERY POLICE DETECTIVE INVESTIGATING THE COMPLAINT.

3.  THE TRIAL COURT'S INSTRUCTION ON FLIGHT WAS GIVEN IN A MANNER LIKELY TO INDUCE PREJUDICE TO THE DEFENDANT BY THE JURY BECAUSE THE JURY WAS ABOUT TO BE RELEASED FOR DELIBERATION AND WAS STOPPED BY MOTION OF THE STATE, AND THEN GIVEN THE INSTRUCTION ON FLIGHT.

### STATEMENT OF THE FACTS

The Appellant and the victim in this matter, Christopher McKinnes, were both intimately involved with the same woman, Carla Parker.  Parker had been dating McKinnes for 10 years and had been living with the parties 7 year old son and McKinnes for an unspecified period of time prior to this incident.  At sometime during Parker's relationship with McKinnes she began to be involved in an affair with the Appellant (a married man) while she continued to live with McKinnes.

Parker was the first witness the State called to testify. She testified that on April 10, 2003 Parker had traveled with the Appellant from her home in Union Springs, Alabama to Troy, Alabama to return a rented videotape.  Parker testified that she thought McKinnes was at work on that day. (CR Vol 2 of 4, p. 56)

Parker testified that prior to her arrival home, she called McKinnes and told him she did not want to talk to him any more.  (CR Vol 2 of 4, p. 57) McKinnes was then alleged by Parker to have told her that he was going to take the parties 7 year old son away and not let Parker see her son anymore. (CR Vol 2 of 4, p. 57) The Appellant, Parker, and Parker's

-4-

brother then drove to the parties home in an attempt to retrieve Parker's son from McKinnes.

Upon their arrival at Parker & McKinnes home in Union Springs, the Appellant found McKinnes and confronted McKinnes about returning Parker's son to her. A brief altercation took place and in the front yard of McKinnes' & Parker's home between the Appellant McKinnes before the Appellant left the home. (CR Vol 2 of 4, p. 59)

The following evening Parker went to work at Steris Corporation in Montgomery in her position as a Security Guard. While she was at work, McKinnes brought Parker's 7 year old son to her work for her to visit with the son. At some time prior to midnight on April 11, 2003, the Appellant is alleged to have come to Steris Corporation to retrieve a cellular phone that belonged to the Appellant and that Parker had in her possession. As the Appellant approached the guard house where Parker, McKinnes and their 7 year old son were talking, McKinnes alleges the Appellant had a hand gun visible in his possession. (CR Vol 2 of 4, p. 64)

An altercation is alleged to have occurred again between the Appellant and McKinnes in the presence of Parker and her 7 year old son. The Appellant is alleged to have discharged

-5-

the handgun in the direction of McKinnes on 2 occasions, neither occasion striking McKinnes. (CR Vol 2 of 4, p. 65) The Appellant is then alleged to have then chased McKinnes on foot, and alleged to have tripped McKinnes knocking him to the ground. The Appellant is then alleged to have instructed McKinnes to get on his knees because the Appellant intended to kill McKinnes. (CR Vol 2 of 4, p. 66) The Appellant is then alleged to have held the handgun next to McKinnes head and discharged the handgun. (CR Vol 2 of 4, p. 66)

An unknown black male is then alleged to have come to where the Appellant and McKinnes were, and the black male is alleged to have screamed at the Appellant to stop and leave. (CR Vol 2 of 4, p. 67) The Appellant then leaves Steris Corporation with the unknown black male. The Police are summoned and McKinnes is taken to the emergency room for treatment of superficial injuries.

The Appellant was taken into custody with a warrant for attempted murder by the Montgomery Police Department on or about May 27, 2003. Detective D. J. Belcher of the Montgomery Police Department testified that he took an audio recorded statement from the Appellant regarding the events of April 11, 2003 while at the Montgomery Police Department and

-6-

before booking the Appellant into Jail.(CR Vol 2 of 4, p. 149)

During the interrogation of the Appellant, the Appellant invokes his right to stop answering questions. (CR Vol 2 of 4, p. 168) Detective Belcher testified he and Detective Crisler (another detective present for the interrogation) stopped questioning the Appellant at 12:59 PM when the Appellant refused to answer any more questions.    Detective Belcher testified at 2:55 PM they decided to resume interrogating the Appellant. (CR Vol 2 of 4, p. 168)

Detective Belcher then testified that although the Appellant had invoked his right to stop answering questions, "stop doesn't mean stop," (CR Vol 2 of 4, p. 170) so the detectives resumed questioning the Appellant approximately 2 hours after the Appellant had invoked his right to stop answering questions.

The audio tape of the interrogation is allegedly taken to a word processing center at the Montgomery Police Department where the tape is alleged to have been transcribed.  Detective Belcher then testified he reviewed the transcript and placed it with the audio tape in some kind of box.   (CR Vol 2 of 4, p. 150) Detective Belcher then testified the audio tape was subsequently lost by the Montgomery Police Department (CR Vol

-7-

2 of 4, p. 151).  Thus breaking the chain of custody for the only documentation of the Appellant's statement and denying the Appellant his <u>Brady</u> right to discovery through examination of said evidence.

Prior to the trial of this matter, Appellant's trial attorney argued a Motion in Limine to prevent the State from using the transcript of the interrogation, citing that the tape had been lost or destroyed before the Defense was given an opportunity to listen or review it.  The State confirmed the tape had been lost or destroyed by the Montgomery Police Department.  (CR Vol 2 of 4, p. 29).  The trial court ruled against the trial attorney's Motion in Limine.  (CR Vol 2 of 4, p. 30).

In her Motion to Set Aside the Verdict, or in the Alterative Motion for a New Trail, Appellant's trial counsel renewed her objection to the use and admission of the transcript of the interrogation, citing that the tape had been lost or destroyed before the Defense was given an opportunity to listen or review it.  Defense counsel also contended that the tape had contained the Appellant's invocation of his right to counsel and right to stop answering questions. The trial court overruled the Defense's Oral Motion to Suppress prior to

-8-

the trial of this matter.(CR Vol 1 of 4, p. 38, 39).    A
hearing was held before the trial court June 11, 2004, and the
Motions were denied by the trial court.

## STATEMENT OF STANDARD OF REVIEW

### Use of Confessions or Statements:

"For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court's determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984).... "....

"It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

In Culombe [v. Connecticut], 367 U.S. [568] at 602, 81 S.Ct. [1860] at 1879, 6 L.Ed.2d 1037 [(1961)], the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, 'if his will has been overborne' by coercion or inducement, then the confession is involuntary and

-10-

cannot be admitted into evidence. Id. (emphasis added).

"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the 'totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139- 40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88, S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967).

Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is 'whether the defendant's will was overborne at the time he

confessed') (emphasis added)....." (Emphasis in original; footnote omitted.)

**Right to Counsel:**

As we stated in Seawright v. State, 479 So.2d 1362, 1366 (Ala.Crim.App.1985): " '[A]n accused ... having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him unless the accused himself initiates further communication, exchanges or conversations with the police.' Edwards v. Arizona, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1884- 85, 68 L.Ed.2d 378 (1981) (emphasis added [in Seawright]). See also Payne v. State, 424 So.2d 722 (Ala.Crim.App.1982).

As has been stated in this jurisdiction, '[a]ny person arrested who asserts his right to counsel may later change his mind and voluntarily submit to questioning.' Morrison v. State, 398 So.2d 730, 743 (Ala.Crim.App.1979), rev. on other grounds, 398 So.2d 751 (Ala.1981) (citations omitted; see also Sales v. State, 432 So.2d 560 (Ala.Crim.App.1983)). Flowers v. State, 799 So.2d 966, 985 -986 (Ala.Crim.App.,1999)

-12-

**<u>Use of Transcription of Tape Recorded Statement:</u>**

Once the State attempted to prove the contents of the confession by the use of the typewritten transcript of the lost tape recording, the best evidence rule became applicable and the authenticity of the transcript became the pivotal question. <u>Hawkins v. State</u>, 443 So.2d 1312, 1314 (Ala.Cr.App.,1983)

**<u>Harmless Error</u>**

"The standard for determining whether error is harmless is whether the evidence in error was 'harmless beyond a reasonable doubt.' <u>Schaut v. State</u>, 551 So.2d 1135, 1137 (Ala.Crim.App.1989), citing <u>Chapman v. California</u>, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." <u>Snyder v. State</u> 2003 WL 22463403, 35 (Ala.Crim.App.) (Ala.Crim.App.,2003)

## SUMMARY OF ARGUMENT

The interrogation of the Appellant by members of the Montgomery Police Department violated the Appellant's right to stop answering questions pursuant to <u>Miranda</u>[1] as well as violating the Appellant's Fifth and Fourteenth Amendment rights. After the Appellant invoked his right to speak with an attorney, the continued interrogation of the Appellant violated his constitutionally guaranteed right to counsel.

The Montgomery Police Detective in charge of the investigation testified he knew that once a suspect invokes his right to remain silent, to stop answering questions, or to speak to an attorney, all further interrogation must cease immediately.

The loss and/or destruction of the audio tape recording of the Appellant's interrogation and statement to the Montgomery Police Department prejudiced the Appellant since it would have proven the Appellant's request for an attorney. The loss and/or destruction of the audio tape by the Montgomery Police Department is *prima facie* proof that the Montgomery Police Department acted in bad faith, and the loss

---

[1] <u>Miranda v. Arizona</u>  384 U.S. 436, 86 S.Ct. 1602 (U.S.Ariz. 1966)

-14-

or destruction of the audio tape evidence was so critical to the defense as to make the use of the transcript fundamentally unfair. Especially due to the fact that the transcript is incomplete with gaps in the audio that had to be transcribed as "inaudible."

The State, in a manner inconsistent with jury instruction, stopped the trial court from sending the Jury to deliberate, and requested that the trial court give an instruction on flight, which ultimately prejudiced the Appellant to the Jury.

## ARGUMENT

1) _ THE WRITTEN TRANSCRIPT OF THE APPELLANT'S TAPED INTERROGATION BY MEMBERS OF THE MONTGOMERY POLICE DEPARTMENT SHOULD HAVE BEEN SUPPRESSED AND NOT ALLOWED TO BE ADMITTED SINCE THE TAPE FROM WHICH THE TRANSCRIPT WAS MADE WAS LOST OR DESTROYED BY THE MONTGOMERY POLICE DEPARTMENT AND NOT PROVIDED TO THE DEFENDANT PRIOR TO TRIAL.

Detective Belcher, the case agent assigned to the assault that makes the basis of this case and appeal, testified that he compared the tape to the transcript for errors. (CR 2 of 4 pg 151) Detective Belcher implied through his testimony that the transcript was a complete and accurate copy of the taped statement. However, there were many "inaudible" portions and blank lines that if, in fact, Detective Belcher had reviewed the transcript with the tape he would have been able to fill in the inaudible and blank lines with the statements made to him by the Appellant.

> "The Alabama Supreme Court distinguished the facts giving rise to the appeal in <u>Gingo</u>[2] from the facts in <u>Youngblood</u>[3] and concluded: " 'Although to show bad faith, for the purpose of showing [a] due process violation, the defendant must show that the State had knowledge of the exculpatory value of the destroyed evidence, "there may

---

[2] <u>Ex parte Gingo</u>, 605 So.2d 1237, 1241 (Ala.1992)

[3] <u>Arizona v. Youngblood</u>, 109 S.Ct. 333 at 339 (U.S. Ariz. 1988)

-16-

well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." <u>Snyder v. State</u> WL 22463403, 27 -28 (Ala.Crim.App.,2003)

The loss and/or destruction of the audio tape of the Appellant's interrogation by Detective Belcher had a direct and negative impact on the Appellant's defense. The audio tape is alleged to have contained the Appellant's invocation of his right to remain silent and his right to speak to an attorney before continuing the custodial interrogation. Detective Belcher in his testimony does not dispute the fact that the Appellant invoked a right to stop answering questions.

The Montgomery Police Department, and Detective Belcher knew of the potential importance of the audio tape to the defense. In addition, the Montgomery Police Department, and Detective Belcher knew of the potential damage that production of the audio tape would pose to a successful prosecution of the Appellant. If the tape were lost or accidently destroyed, the transcript and Detective Belcher's testimony would be the only record of the custodial interview that took place. There would be no specific request for an attorney by the Appellant to negate the use of the custodial statement made at the

-17-

Police Department. Detective Belcher testified that the tape and transcript went from him to a box that was not a secure box for items of evidence, and does not protect them from being tampered with, and then he "tried to turn it over to which is now Sergeant Jeff Davis." (CR 2 of 4 pg 150) A reasonable person must now ask what did Detective Belcher mean by his statement "I tried to turn it over to which is now Sergeant Jeff Davis," and in fact, the tape never made it to Sergeant Jeff Davis. A trained Police detective tried unsuccessfully to turn over a tape and transcript to a supervisor. This detective was apparently only successful at turning over the partially completed transcript to Sergeant Davis.

It is not reasonable to believe that the transcript Detective Belcher testified from and about would survive being accidently lost or misplaced, and the audio tape would be mysteriously lost or destroyed. It is even more unreasonable since both items were alleged to be placed into some type container for safe keeping that one would be preserved while the other is lost.[4]

---

[4] "...the tape and the transcript was placed in a box." (CR 2 of 4 pg 150)

-18-

' "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." <u>Youngblood</u>, 488 U.S. at 58, 109 S.Ct. at 337. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." <u>Youngblood</u>, 488 U.S. at 57, 109 S.Ct. 333 (footnote), 109 S.Ct. at 337, 109 S.Ct. 333 (footnote), citing <u>Napue v. Illinois</u>, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).' "605 So.2d at 1240-41. <u>Gingo</u> additionally recognized that a defendant's right to due process can be violated when the loss or destruction is of evidence so critical to the defense that its loss or destruction makes the trial fundamentally unfair. <u>Id.</u> (citing <u>Youngblood</u>, 488 U.S. at 67, 109 S.Ct. at 342). <u>Snyder v. State</u>  2003 WL 22463403, 26 (Ala.Crim.App.) (Ala.Crim.App.,2003)

Detective Belcher also testified he knew that once a suspect invokes his right to remain silent, to stop answering questions, or to speak to an attorney, all further interrogation must cease immediately.  (CR 2 of 4 pg 165) The loss or destruction of the tape recording of the Appellant's statement to Police is *prima facie* evidence to show bad faith on the part of Detective Belcher (or another Police Officer known or unknown to Belcher).  The review of the transcript by Detective Belcher obviously made him or his supervisor realize that the invocation by the Appellant of his <u>Miranda</u> rights would negate the majority of the statement given to Detective Belcher.

-19-

This Court cannot apply the harmless error doctrine pursuant to A.R.A.P., Rule 45 because, although the Prosecutor did attempt to establish a foundation for the admission of the transcript, the transcript was highly inculpatory and prejudicial and contained far too many "inaudible" and blank lines. Harmless error would not exits in this circumstance because the State knew or should have known that the "inaudible" and blank lines throughout the statement because on it's face there is no foundation establishing its accuracy and authenticity.

> The Montana Court adopted the requirements found in Annot., 58 A.L.R.2d 1024, 1027-28 (1958), as a proper foundation for the admission of a second recording:
>
> "(1) a showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, (7) a showing that the testimony elicited was voluntarily made without any kind of inducement." State v. Warwick, 158 Mont. at 542-543, 494 P.2d at 633. These same foundational requirements were adopted by this Court in Voudrie v. State, 387 So.2d 248, 256 (Ala.Cr.App.), cert. denied, 387 So.2d 256 (Ala.1980). Hampshire v. State 484 So.2d 1140, 1142 (Ala.Cr.App.,1985)

Judicial equity and fairness would require that the transcript used at trial be suppressed since there was no testimony or showing by the State that the transcript was the

best evidence available and was a complete and accurate recording of the taped statement given by the Appellant to Detective Belcher. Furthermore, the trial court's refusal to grant the Appellant's Motion to Suppress the transcript prior to the beginning of the trial was plain error since the State failed and/or refused to provide the Appellant's trial counsel with a copy of the tape prior to trial, in violation of the Appellant's due process and <u>Brady</u> rights.

> Suppression by prosecution of evidence favorable to an accused upon request violates due process where evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of prosecution. <u>U.S.C.A.Const. Amend. 14.</u> <u>Brady v. Maryland</u> 373 U.S. 83, 83 S.Ct. 1194 (U.S.Md. 1963)

The failure of the Prosecutor to establish a proper foundation for the admission of the transcript should have precluded the admission of the transcript and the viewing of the transcript by the Jury. The Prosecutor failed to adequately establish that Detective Belcher remembered the contents of the interview, whether or not Detective Belcher made a page by page comparison between the tape and the transcript, and whether or not the transcript was a complete and accurate accounting of the statements made by the Appellant.

Where the use in evidence of typewritten transcripts of

-21-

sound recordings has been objected to as in violation of the best evidence rule, the general rule is that the typewritten transcripts are admissible if their accuracy and reliability is clearly established. <u>Hawkins v. State</u> 443 So.2d 1312 (Ala.Cr.App.,1983)

2)  **THE APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO REMAIN SILENT AND TO SPEAK TO AN ATTORNEY BEFORE ANSWERING THE QUESTIONS OF THE MONTGOMERY POLICE DETECTIVE INVESTIGATING THE COMPLAINT.**

The <u>Miranda</u> rights are premised upon the theory that a criminal defendant cannot be compelled to talk to police, and that he has the right to speak to an attorney before talking to police. In the case at bar, the Appellant had both his right to remain silent and his right to talk counsel denied, and as a result of that denial a taped statement was taken by the Police. The transcript of the Appellant's statement to Police was highly inculpatory and prejudicial and should never have been admitted as a State's exhibit. By allowing the Jury to read the transcript, the Jury was able to draw conclusions that were likely incorrect, or at a minimum, incomplete because the statement itself is incomplete, riddled with "inaudible" and blank lines.

The Appellant invoked his right to remain silent approximately thirty (30) minutes after the interrogation by Detective Belcher began. (CR 2 of 4 p. 165) However,

-22-

Detective Belcher testified that a defendant saying "stop doesn't mean stop." (CR 2 of 4 p. 170) This belief on the part of Detective Belcher is in direct opposition to <u>Miranda</u> and a myriad of State and Federal cases to the contrary.

> As this court has acknowledged, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." <u>Martin v. Wainwright</u>, 770 F.2d 918, 923 (11th Cir.1985) modified on other grounds, 781 F.2d 185 (11th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986) (emphasis in original) (quoting <u>Miranda</u>, 384 U.S. at 473-74, 86 S.Ct. at 1627). Nevertheless, when a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of "clarifying [the] equivocal request." <u>Martin</u>, 770 F.2d at 924 (quoting <u>Thompson v. Wainwright</u>, 601 F.2d 768, 771 (5th Cir.1979). Once it is clear that an accused wishes to remain silent, the desire to discontinue the interrogation must be "scrupulously honored." <u>Michigan v. Mosley</u>, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975); see <u>United States v. Hernandez</u>, 574 F.2d 1362, 1369 (5th Cir.1978). <u>Lightbourne v. Dugger</u>, 829 F.2d 1012 C.A.11 (Fla.),1987.

Common sense should dictate that the Appellant no longer wished to talk with Detective Belcher when he invoked his right to remain silent. In fact, there was approximately a two(2) hour gap in the taped interview that Detective Belcher took from the Appellant. Detective Belcher readily admits the gap was a result of the Appellant invoking his right to remain silent. "...at that point in time during the investigation, he didn't want to say anything, refused to answer any more

questions." (CR 2 of 4 p. 168) In addition to the galong gap in the taped statement, Detective Belcher testified that he only read the Appellant his rights one time, and that was prior to the statement being taken.

> "... [T]he mere passage of time between the time defendant invoked his right to counsel and the next interrogation does *not* make <u>Edwards</u>[5] inapplicable." 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.9(f) (2d ed.1999) (footnotes omitted). <u>Griffin v. State</u> 2003 WL 1411321, 3 (Ala.Crim.App.) (Ala.Crim.App.,2003)

The Appellant's fundamental rights were violated by the Montgomery Police Department when they held the Appellant in an office for more than four hours and refused to allow him to talk with an attorney, all the while conducting a custodial interrogation. Detective Belcher testified that even though the Appellant had invoked his right to remain silent, detectives at the Montgomery Police Department routinely allow custodial suspects to sit for a period of time after the suspect invokes their right to remain silent, and they (Police) would later begin asking additional questions. (CR 2 of 4 p. 169)

> "<u>Edwards</u> is best viewed as a *per se* rule proscribing any interrogation of a person held in custody who has invoked his right to counsel absent the individual's subsequent

---

[5] <u>Edwards v. Arizona</u>, 451 U.S. 477, 101 S.Ct. 1880 (U.S. Ariz.1981)

-24-

> initiation of conversation....<u>Griffin v. State</u>  2003 WL
> 1411321, 3 (Ala.Crim.App.) (Ala.Crim.App.,2003)

The continued interrogation of the Appellant after his
invocation of his right to remain silent should have resulted
in the trial court granting the Appellant's Motion for a
Judgment of Acquittal and renewed Motion to Suppress the
transcript of the Appellant's taped statement at the
conclusion of the State's case in chief.  However, the trial
court denied both defense motions, and told the defense
counsel she could begin her case.  (CR 3 of 4 p. 248)

> The use of petitioner's confession against him at his
> trial violated his right under the Fifth and Fourteenth
> Amendments to have counsel present during custodial
> interrogation, as declared in <u>Miranda</u>.  <u>Edwards v.</u>
> <u>Arizona</u>, 451 U.S. 477,  101 S.Ct. 1880 (U.S. Ariz.1981)

<u>Miranda</u> also stands for the proposition that any coerced
statement is inadmissable against the declarant.  However,
this does not seem to be the policy of the Montgomery Police
Department.  During the cross examination of Detective
Belcher, defense counsel asked the following "So it's your
testimony today that nothing was said to coerce Mr. Lockwood
to resume questions, to answer questions again..." and
Detective Belcher answered "Nothing out of an ordinary
question."  (CR 2 of 4 pg 171)

If Detective Belcher had any inkling that the Appellant

-25-

did not want to continue talking, (and based upon his prior statements Detective Belcher did have such an inkling)[6] then he was under a duty to ascertain what the intentions of the custodial suspect was regarding continued cooperation.

> Nevertheless, when a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of "clarifying [the] equivocal request." Martin[7], 770 F.2d at 924 (quoting Thompson v. Wainwright, 601 F.2d 768, 771 (5th Cir.1979).

Although Detective Belcher readily admits that the Appellant invoked his right to remain silent, he also admits that he didn't really do anything, aside from reinitiating the custodial interrogation, that could be considered coercing the Appellant. However, sitting a custodial suspect in a Detective's Office for two hours during which time the custodial suspect is alleged to have demanded an attorney, is in no uncertain terms a coercion of the custodial suspect.

> Thus the defendant's confession in Edwards was inadmissible, for the police had visited the defendant in his cell and obtaining [sic] a waiver of Miranda rights

---

[6] "...at that point in time during the investigation, he didn't want to say anything, refused to answer any more questions." (CR 2 of 4 p. 168)

[7] Martin v. Wainwright, 770 F.2d 918, 923 (11th Cir.1985) modified on other grounds, 781 F.2d 185 (11th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986)

the morning after defendant had declared he wanted an attorney. In <u>Minnick v. Mississippi</u>, [498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990),] <u>Griffin v. State</u> 2003 WL 1411321, 2 (Ala.Crim.App.) (Ala.Crim.App.,2003)

When a confession or statement to law enforcement is premised upon coercion or the violation of the custodial suspect's right to remain silent or right to speak with counsel then that statement is inadmissible against the declarant and for trial purposes.

The failure of the trial court to grant the defense motion to suppress is reversible error. The law in Alabama and throughout the United States is consistent on this point and requires the suppression of illegally obtained confessions, particularly when the custodial suspect is not again appraised of his <u>Miranda</u> rights.

3)    **THE TRIAL COURT'S INSTRUCTION ON FLIGHT WAS GIVEN IN A MANNER LIKELY TO INDUCE PREJUDICE TO THE DEFENDANT BY THE JURY SINCE THE JURY WAS ABOUT TO BE RELEASED TO DELIBERATE AND WAS STOPPED BY MOTION OF THE STATE, AND GIVEN THE INSTRUCTION ON FLIGHT.**

The State and the Defense had both put on their cases in chief. Both had rested and post trial motions were made by the defense counsel for a Judgment of Acquittal and renewed Motion to Suppress the transcript. The trail court again denied the defense motions. The trial court gave the State's

-27-

requested charges, the defense's requested charge, and had completed the instructions and court's charges to the Jury. The trial Judge was in the process of releasing the Jury to deliberate when the Deputy Assistant District Attorney stopped the court and asked for permission to speak to the judge outside the presence of the Jury. A side bar with both State and Defense took place, and then the Judge charged the Jury with a charge on flight. The court stated, "The last instruction I need to give you, I also charge you that flight from the scene can be inferred by you as a guilty state of mind. Okay." (CR 4 of 4 p.50)

The instruction to the jury on flight was deliberately requested by the State as a last effort to ring a bell in the Jury's mind and as a means to subliminally suggest to the Jury that they should convict the Appellant because he was alleged to have fled the scene of the alleged crime. The timing was intentional and made to inflict the maximum amount of impact on the Jury. The net result was that the Appellant was prejudiced by the charge at the time it was requested by the State.

The trial court erred in not instructing the Jury on acquittal of the Appellant. The trial court never told the

Jury it had the option to find the Appellant not guilty of any of the alleged crimes. The trial court erred in not instructing the Jury that if there was reasonable doubt about the statement taken by the Police that they could disregard the statement. The trial court erred in not instructing the Jury if there was reasonable doubt, they could acquit the defendant of the charges, and/or find him not guilty.

> That the trial court erred in not instructing the jury that it could reject Slaton's statement to police as involuntary. See Slaton v. State, 680 So.2d at 887–88; Ex parte Slaton, 680 So.2d at 914. Slaton v. State 2003 WL 22220752, 3 (Ala.Crim.App.,2003)

## CONCLUSION

The State of Alabama has failed to prove a prima facie case of attempted murder against the Appellant. Furthermore, the transcript that was used against the Appellant was highly prejudicial and should have been suppressed before the State offered it as an exhibit for the Jury to review. Furthermore, the Appellant's constitutional due process rights were denied him as he attempted to invoke his right to remain silent and his right to talk with an attorney. Both of these invocations were denied the Appellant by the Montgomery Police Department. Furthermore, the Judge's instructions to the Jury were such

that the only choices given to the Jury were choices that required them to find the Appellant guilty of some crime.

WHEREFORE, PREMISES CONSIDERED, Defendant respectfully prays that this Honorable Court suppress the transcript used in the trial of this Appellant. That this Honorable Court suppress the transcript used against the Appellant as violative of his due process rights, Miranda rights, and right to counsel. Finally, remand the matter to the trial court for a determination of the Appellant's rights that were violated, and grant a new trial in this matter.

Respectfully submitted on this ___6th___ day of August 2004.


_____
THOMAS J. AZAR, JR. (AZA006)
Attorney for Appellant


**Of Counsel:**
Azar & Tasheiko, LLC
609 South McDonough Street
Montgomery, AL 36104
Phone      (334) 263-5363
Fax        (334) 263-3988
Email      tjazar@al-lawyers.com

-30-

## Certificate of Service

I certify that on the ___6th___ day of August 2004, that I have mailed a true and correct copy of the same postage prepaid and properly addressed to the Office of the Attorney General for the State of Alabama at the address below.

Troy King, Esq.
Alabama Attorney General
Alabama State House
11 S. Union Street
Montgomery, Alabama   36130


THOMAS J. AZAR, JR. (AZA006)
Attorney for Appellant

-31-

## LIST OF RULINGS AND ACTIONS ADVERSE TO APPELLANT

RECORD PAGE NO.                            SUMMARY


CR 2 of 4 pp/ 26-30        Motion in Limine to suppress the use
                           of    a    transcript    of    a    taped
                           interrogation of the Appellant by the
                           Montgomery Police Department where the
                           tape was lost or destroyed, Denied,
                           transcript admitted.

CR 3 of 4 p. 248           Conclusion of State's case in chief,
                           defense  moves  court  with  Motion  for
                           Judgment  of  Acquittal  and  Motion  to
                           Suppress  Transcript.     Both  motions
                           denied.

CR 4 of 4 p, 12            Conclusion of Defense's case in chief,
                           defense renews Motion for Judgment of
                           Acquittal   and   Motion   to   Suppress
                           Transcript.  Both motions denied.

CR 3 of 4 p. 275           Oral Motion for a New Trial.   Denied
                           at hearing June 11, 2004.

No. CR-03-1253

In the COURT of CRIMINAL APPEALS
of ALABAMA

ALBERT LOCKWOOD,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

On Appeal From the Circuit Court of
Montgomery County (CC-03-957)

**BRIEF OF APPELLEE**

Troy King
*Attorney General*

Robin Blevins Scales
Assistant Attorney General

John Porter
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama 36130
(334) 242-7300*

September 3, 2004

EXHIBIT
C

PENGAD 800-631-6889

## STATEMENT REGARDING ORAL ARGUMENT

The State of Alabama does not request oral argument.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.......................... i

TABLE OF CONTENTS........................................ ii

TABLE OF CASES AND AUTHORITIES........................... iii

STATEMENT OF THE CASE..................................... 1

STATEMENT OF THE ISSUES.................................. 2

STATEMENT OF THE FACTS................................... 2

STANDARD OF REVIEW....................................... 9

SUMMARY OF THE ARGUMENT................................. 10

ARGUMENTS............................................... 13

I.     Lockwood's Argument That The Written Transcript Of
       His Statement To Police Should Have Been Suppressed
       Because The Audiotape Of The Statement Had Been Lost
       Is Not Preserved For Review And, Even If Preserved,
       Is Without Merit.................................. 13

II.    Lockwood's Argument That His Rights To Remain Silent
       And To Request An Attorney Were Violated Is Not
       Preserved For Review And, Even If Preserved, Is
       Without Merit..................................... 19

III.   Lockwood's Argument That The Timing Of The Trial
       Court's Instruction on Flight Prejudiced The Jury
       Was Not Timely Raised Before The Trial Court And
       Is, Therefore, Waived............................. 24

CONCLUSION.............................................. 25

CERTIFICATE OF SERVICE.................................. 26

# TABLE OF CASES AND AUTHORITIES

**Cases**

Arizona v. Youngblood, 488 U.S. 51, 58 (1988) . . . . . . . . . . . . 17

Battle v. State, 645 So. 2d 344, 346 (Ala. Crim.
   App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Davidson v. State, 792 So. 2d 1153, 1155 (Ala. Crim.
   App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Dennis v. State, 584 So. 2d 548, 552 (Ala. Crim.
   App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) . . . . . . . . . 22

Ex parte Fuller, 620 So. 2d 675, 678 (Ala. 1993) . . . . . . . . . 16

Siler v. State, 705 So. 2d 552, 558 (Ala. Crim.
   App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## STATEMENT OF THE CASE

This is the direct appeal from a conviction for attempted murder.  The Honorable Tracy S. McCooey presided.

On July 11, 2003, the appellant, Albert Jerome Lockwood, was indicted by the Montgomery County Grand Jury on one count of attempted murder.  (C. 9-10)  On July 29, 2003, Lockwood pleaded not guilty to this charge.  (C. 1)

Lockwood was tried before a jury on February 24, 2004. (R. 1-277, R1.[1] 1-52)  Before trial, Judge McCooey overruled Lockwood's objection to the admission into evidence of a transcript of a statement given by Lockwood to law enforcement.  (R. 30-31)  The audio tape to this statement had been lost.  (R. 30-31)

On February 24, 2004, Lockwood was found guilty by the jury of attempted murder as charged in the indictment.  (C. 2; R1. 51)  On March 18, 2004, Judge McCooey sentenced Lockwood to life imprisonment without the chance of parole and ordered him to pay $2,911,71 in restitution, $50 to the Alabama Crime Victim's Compensation Commission, and court costs.  (C. 3; R. 274-275)

---

[1] The transcript of the conclusion of Lockwood's trial, which was transcribed by a different court reporter than the rest of the trial, is designated by "R1".

Lockwood filed a "Motion to Set Aside Verdict Or, In
the Alternative, Motion for New Trial" on April 14, 2004.
(C. 38-41)  Judge McCooey denied this motion on July 1,
2004.  (C. 5)  Lockwood timely filed notice of appeal on
April 29, 2004.  (C. 42)  This appeal follows.

## STATEMENT OF THE ISSUES

1.   Is Lockwood's argument that the written transcript
of his statement to police should have been suppressed
because the audiotape of the statement had been lost
preserved for review and, if preserved, does it have merit?

2.   Is Lockwood's argument that his rights to remain
silent and to request an attorney were violated preserved
for review and, if preserved, does it have merit?

3.   Did Lockwood waive his argument that the timing of
the trial court's instruction on flight prejudiced the jury
by not timely raising it before the trial court?

## STATEMENT OF THE FACTS

Christopher McInnes testified that Carla Parker had
been his girlfriend for approximately the last ten years
and was the mother of his seven-year-old son.  (R. 175)  On

2

April 11, 2003, McInnes was off work because of the rotation in his schedule. Parker, who apparently did not realize that McInnes was off work, returned to the house in Union Springs in which she and McInnes lived at about 4:00 P.M. with her brother and the appellant, Albert Lockwood. (R. 178-179) Parker told McInnes that Lockwood was "just riding with them," and McInnes at first did not suspect that Parker and Lockwood were having an affair. (R. 178-179) When Lockwood attempted to walk through the back door while Parker waited in the car, however, McInnes "knew he was coming in with some trouble." (R. 180) Although McInnes tried to shut the door to keep him from coming in, Lockwood somehow grabbed McInnes's son and took him to Parker who was in the car. (R. 180) Lockwood then told McInnes, "You're going to leave here, motherfucker; this is my house; this is my house now," before tackling him in the backyard. (R. 181) After the two men rolled around in the wet grass, McInnes got in his car and began driving to the police station. (R. 182) Lockwood, however, stood in the middle of the road and threw an object at McInnes's car, causing damage. (R. 182) McInnes went to Lockwood's house and told his wife what was going on between Parker

3

and Lockwood.  (R. 183)  Later that day, because he was
upset, McInnes called his sister who drove him to the Union
Springs police station.  (R. 182)  McInnes signed a police
report that evening, and the following morning signed an
assault warrant and a criminal mischief warrant against
Lockwood.  (R. 184)

At about 9:00 p.m. on the evening of April 12, 2003,
McInnes called Parker at Steris Corporation in Montgomery,
where she worked as a security guard, to tell her that he
was coming to drop their son off.  (R. 185-187)  After
dropping his son off at the guard shack where Parker
worked, McInnes left to get some medicine for his toothache
and, when he returned, sat in his car and read the
newspaper.  (R. 187-188)  When he got ready to leave, he
went to the guard shack and told his son he was going to
leave.  (R. 188)  When his son asked his mother if McInnes
could stay, McInnes said he was going to go to his
grandmother's house.  (R. 188)  As they were having this
discussion, Parker and her son were cleaning the bathroom
and McInnes was standing in the door to the bathroom.  (R.
189)

McInnes then saw Lockwood running toward the guard shack and holding a gun. (R. 190) McInnes yelled, "Carla, he's got a gun," and unsuccessfully tried to lock the front door to the guard station. (R. 190) He then ran into the bathroom and Parker tried to close the door, but Lockwood "snatched" the door open. (R. 190) Lockwood ran into the bathroom, yelling, "Get out of the door, motherfucker, bitch-ass niggers, get out of the door, get out of the door; I'm going to kill your ass; I'm going to kill you." (R. 190-191) McInnes pleaded for Lockwood not to hurt him or his son and said, "Okay, I'm going to get out the door." (R. 191) He went out the door with his son clinging in front of him. (R. 191) To direct Lockwood away from his son, McInnes told his son to run to the car while he ran up the road toward Steris. (R. 191-193) He heard a shot pass between himself and his son. (R. 192) McInnes either tripped or was tripped by Lockwood, who told him to open his mouth. (R. 194) When McInnes refused, Lockwood began hitting him in the head with the pistol. (R. 194) Lockwood then put the gun to the side of McInnes's head, firing a shot, before kicking him in the side of the face. (R. 194) McInnes remained still for a few seconds until

5

Lockwood was no longer at the scene. (R. 194) He then ran into the guard shack telling Parker, "Look what you caused to happen[ . . . ;] he could have killed me; he tried to kill me; he could have killed my son." (R. 197)

After the police and ambulance arrived, McInnes was taken to and treated at the hospital. (R. 198) He received a gunshot wound to the head, as indicated by an entrance wound on the top of his head and an exit wound just above his left ear. (R. 240, 242) His lip, eye, and nose were swollen and he received a black eye. (R. 199) Miraculously, McInnes's injuries were not serious and he was able to leave the hospital after only 55 minutes and to sign a warrant that night against Lockwood for attempted murder. (R. 200, 245)

D.J. Belcher, a patrol officer with the Montgomery Police Department, testified that, after Lockwood turned himself in on May 27, 2003, he picked him up from Union Springs and brought him back to the Montgomery Police Department. (R. 143-144, 173) After Officer Belcher read Lockwood his rights, including his right to remain silent and his right to an attorney, Lockwood signed a waiver of his rights and voluntarily gave an audiotaped statement.

6

(CS.[2] 15-75; R. 144-148)  At first, Lockwood denied that he was at Parker's place of employment on Friday, April 11, 2003, and maintained that he "did not lay a hand on [McInnes"]. (CS. 30, 37-40; R. 154-157)  Shortly after this denial, Lockwood stated, "I'm through with it Detective." (CS. 41)  Officer Belcher then stopped the tape and ceased the interrogation. (CS. 41)

Nearly two hours later, however, Belcher resumed the tape and asked, "Mr. Albert Lockwood, would you go head [sic.] and tell us, say to us what you wanna tell us?" (CS. 41)  Lockwood then told Belcher about the day before the incident at Steris Corporation, admitting that he went to Parker's house with her and her brother. (CS. 41-42)  Lockwood, however, stated that as soon as he got out of the car, McInnes began yelling that Parker and Lockwood were "fucking each other" and hit him in the mouth, breaking his teeth and busting his lip. (CS. 42)  They began "tussling and fighting" and, after Lockwood "g[o]t the best of him," McInnes stated that he would do whatever it took to get Lockwood back in prison. (CS. 42)

---

[2] Citations to the supplemental record are designated by "CS".

Lockwood then told Belcher about the following day, in which he started fighting with McInnes at Steris Corporation. (CS. 42) According to Lockwood, he was only going to Steris to get his clothes out of Parker's car. (CS. 43) A man from Riverside drove Lockwood to Steris. (CS. 43) Although Lockwood described him as a "friend," he could not remember his name or even if he went by a nickname. (CS. 43) Lockwood maintained that, although he hit McInnes, McInnes met him outside of the guard shack, the two were hitting each other, and no weapons were used. (CS. 45, 47) Lockwood stated that McInnes was the aggressor, but characterized the incident as "a good clean fight." (CS. 60-61, 70)

Officer Belcher put the audiotape of Lockwood's statement in an envelope and sent it to data processing. (R. 149) After the statement was transcribed, Belcher received a copy of the transcription and the audiotape. (R. 149) He then read over the transcript while listening to the tape, correcting any mistakes. (R. 149-150) He put the transcript and audiotape in a box in an effort to send them to [now Sergeant] Jeff Davis. (R. 150) Although Davis received the transcript, he apparently did not

8

receive the audiotape.  (R. 150)  Even after a diligent search, Belcher was still unable to locate the audiotape. (R. 150)

## STANDARD OF REVIEW

1-2.  In <u>Dennis v. State</u>, 584 So. 2d 548, 552 (Ala. Crim. App. 1991, this Court held that an issue concerning the admission of allegedly illegal evidence must be preserved either through pretrial motion to suppress or through timely objection when evidence is admitted; a motion for new trial is insufficient to preserve such issue for appellate review.

A trial court's determination as to the admissibility of evidence "will not be reversed except upon a clear showing of abuse of discretion."  <u>Ex parte Loggins</u>, 771 So. 2d 1093, 1103 (Ala. 2000).

3.  To preserve for appellate review an issue concerning allegedly improper jury instructions, a defendant must object before the jury retires for deliberation.  Siler v. State, 705 So. 2d 552, 558 (Ala. Crim. App. 1997).

## SUMMARY OF THE ARGUMENT

1.    Lockwood's argument that the written transcript of his statement to police was erroneously admitted into evidence does not appear to be preserved for review. Lockwood's attorney specifically limited her objection to the transcript to what she characterized as "noticeable gaps." Accordingly, all arguments not specified were waived.

Even if preserved, the argument is without merit. The audiotape from which the written transcript had been transcribed had been accidentally lost; contrary to Lockwood's implication, there is no indication in the record that the police department intentionally misplaced the audiotape to hide portions of the statement that would benefit his case. Furthermore, the officer who taped the statement testified that he reviewed the transcript along with the audiotape and that the transcript accurately reflected the conversation. Accordingly, the transcript was properly admitted into evidence.

2.    Lockwood's argument that his rights to remain silent and to request an attorney are not preserved for review. As discussed above, Lockwood's attorney limited

10

the scope of the pretrial motion to suppress to a concern over the alleged "noticeable gaps" in the statement, waiving all other arguments. Because Lockwood likewise did not raise this issue when the evidence was admitted at trial, the issue is waived for appellate purposes.

Even if preserved, the issue concerning the alleged violation of Lockwood's right to remain silent and to request an attorney is without merit. The transcript of the statement shows that, although Lockwood did request to cease interrogation at one point, that his Sixth Amendment rights were carefully guarded. The officer taking his statement immediately ceased questioning and turned off the tape. He only resumed the tape when it became clear that Lockwood wished to volunteer information. Because his statement was completely voluntary, his rights to remain silent and to request counsel were not violated.

3.   Lockwood failed to preserve for appellate review his argument that the timing of the trial court's instruction on flight prejudiced the jury. He did not raise this argument before the jury retired for deliberations. He likewise waived his arguments concerning instructions on acquittal and reasonable doubt.

11

## ARGUMENTS

I.  **Lockwood's Argument That The Written Transcript Of His Statement To Police Should Have Been Suppressed Because The Audiotape Of The Statement Had Been Lost Is Not Preserved For Review And, Even If Preserved, Is Without Merit.**

Lockwood argues that the written transcript of his statement to police should have been suppressed because the audiotape of the statement was lost by the Montgomery Police Department. Brief of the Appellant, pp. 16-22. Lockwood, however, neither adequately raised this specific objection when making a motion to suppress before trial nor objected when the transcript was admitted at trial. (R. 30-31, 160) Accordingly, this issue is not preserved for appellate review. Even if the issue is preserved, furthermore, it is without merit because the transcript was properly admitted into evidence.

Although Lockwood raised concerns before trial about the written transcript of his statement to police, the specific issue that he now raises on appeal was neither adequately raised before nor ruled upon by the trial court. Lockwood's attorney requested that the written transcript be suppressed because the defense had not been provided with the audiotape of the statement and Lockwood had

13

allegedly asked for an attorney three times during the interrogation. (R. 26-27) Because this motion to suppress was made simultaneously with a motion in limine to keep out evidence of Lockwood's prior charges, however, the trial court, rather than making an immediate ruling on either motion, stated, "Well, let's take them separately. What about the priors?" (R. 26-27) After the parties discussed the issue concerning evidence of Lockwood's priors and the trial court made a ruling on that issue, the prosecutor stated that there was indeed an audiotape of Lockwood's statement but that the Montgomery Police Department had lost it and was unable to retrieve it despite a diligent search. (R. 29-30) The trial court stated, "And I was going to let it in. Ms. Toles, I was just going to tell you that's just something to cross-examine him on. You know, you can pick on him about that he lost it. But it's coming in." (R. 30) Lockwood's attorney then replied, "The only problem I had with the tape was that when you're reading through the audio statement, there's noticeable gaps there. And that was the problem and we just needed to put it on the Record concerning the taped statement." (R. 31) Because Lockwood's attorney specifically limited her

14

objection to the written transcript to the "gaps" in the statement, all other objections were waived.  See <u>Davidson</u> <u>v. State</u>, 792 So. 2d 1153, 1155 (Ala. Crim. App. 1998)("Specific objections waive all others not specified.").  Therefore, Lockwood's motion to suppress raised before trial did not preserve the issue concerning the suppression of the written transcript because the audiotape was lost.

Lockwood likewise failed to preserve the issue he now raises when the transcript was admitted at trial.  During the State's case-in-chief, the prosecutor questioned Officer D.J. Belcher about the written transcript, asking him to read portions of the statement to the jury.  (R. 152-160)  No objection was lodged to this line of questioning.  (R. 152-160)  Likewise, the written transcript was admitted into evidence without objection. (R. 160)  Accordingly, the issue is not preserved for review.  See <u>Dennis v. State</u>, 584 So. 2d 548, 552 (Ala. Crim. App. 1991)(issue concerning admission of allegedly illegal evidence must be preserved either through pretrial motion to suppress or through timely objection when evidence is admitted; motion for new trial is insufficient

to preserve such issue for appellate review).  Lockwood

also did not make any objections related to lack of

foundation or the best evidence rule.  Accordingly, any

arguments related to these issues are likewise unpreserved.

Even if any issue related to the misplacement of the

audiotape and admission of the transcript into evidence is

preserved for review, it is without merit because the trial

court properly admitted the written transcript into

evidence.  This Court stated in Battle v. State, 645 So. 2d

344, 346 (Ala. Crim. App. 1994):

> Where the tape-recorded statement or conversation is
> missing or unavailable, '[a] typewritten transcript of
> [the recording] is admissible where the officer who
> listened to the conversation at the time of the
> recording testifies that the transcript accurately
> reflect[s] the conversation.  Hawkins [v. State], 443
> So.2d [1312], 13141-15 [(Ala. Crim. App. 1983)].

D.J. Belcher, the officer who taped Lockwood's statement,

testified that he reviewed the transcript while listening

to the tape and confirmed that the transcript accurately

reflected the conversation.  (R. 149-152)  Officer Belcher

used the same procedures as did Chief Hudson in Battle

which this Court found sufficient to satisfy the "reliable

representation standard" set out in Ex parte Fuller, 620

So. 2d 675, 678 (Ala. 1993).  Battle, 645 So. 2d at 347.

16

This Court further held in Battle, 645 So. 2d at 346, that the transcript was admissible even "where the tape recording was inaudible in places." Therefore, the mere fact that it indicated that there were inaudible "gaps" in the audiotape did not render the transcript inadmissible. Accordingly, the transcript was properly admitted.

Lockwood's reliance on the rule established in Arizona v. Youngblood, 488 U.S. 51, 58 (1988), furthermore, is misplaced. Brief of the Appellant, p. 19. In Youngblood, the United States Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." Lockwood argues that "the loss or destruction of the tape recording of the Appellant's statement to Police is prima facie evidence to show bad faith." Brief of the Appellant, p. 19.

In Youngblood, 488 U.S. at 58, however, the Court held that there was no evidence of bad faith on the part of the police who failed to refrigerate clothing that could have been tested and possibly could have exonerated the defendant. The Court characterized the police's failure to

17

refrigerate the clothing as "at worst . . . negligent." <u>Id.</u>
The Court also noted that the State disclosed all of the
evidence "such as it was" to the defense.  <u>Id.</u>
Furthermore, the defense was able to argue before the jury
that the police were possibly negligent, but such possible
negligence did not create any due process violation.  <u>Id.</u>
at 58-59.

In this case, likewise, the police were at most
negligent.  Any suggestion by Lockwood that the
misplacement of the audiotape was intentional is based upon
pure speculation, as there was no evidence contradicting
Belcher's testimony that it was accidentally lost and could
not be found after a diligent search.  Brief of the
Appellant, p. 18; (R. 150-151)   As the trial court told
Lockwood's attorney, the matter presented an issue for
cross-examination and did not require the exclusion of the
transcript from evidence.  (R. 30)  Furthermore, the notion
that the inaudible portions of the audiotape would provide
exculpatory evidence is based upon pure speculation.  The
transcript showed that Lockwood, although initially denying
he was at the scene of the crime, changed his mind and
decided to describe a narrative in which, while he was at

the scene, he only engaged in weaponless, mutual combat

with the victim, Christopher McInnes.  While his change in

story as revealed in the transcript was damaging to his

credibility, Lockwood has failed to indicate how the effect

of the audiotape itself would have been any different.

There is no indication that the inaudible portions of the

tape would have affected the outcome of his trial.

Accordingly, Lockwood has failed to show that any bad faith

led to the misplacement of the audiotape and his due

process rights were not violated.


II.  **Lockwood's Argument That His Rights To Remain Silent
     And To Request An Attorney Were Violated Is Not
     Preserved For Review And, Even If Preserved, Is Without
     Merit.**

     Lockwood argues that the trial court erred by allowing

into evidence the written transcript of his statement to

police because the officer taking the statement violated

his right to remain silent and right to request an

attorney.  Brief of the Appellant, pp. 22-27.  This issue

is not preserved for appellate review because Lockwood did

not raise this specific objection before the trial court.

Furthermore, even if preserved, the issue is without merit

because the record shows that Lockwood gave his statement
voluntarily.

As discussed above, Lockwood did not raise any
objection to the admission of the transcript when it was
admitted into evidence and raised a different issue in his
pretrial motion to suppress. Although Lockwood's attorney
stated before trial that the defense requested that
Lockwood's statement be suppressed because Lockwood alleged
to have requested an attorney on three separate occasions,
the trial court made no ruling. (R. 26-27) As discussed
above, when the trial court did rule upon Lockwood's motion
to suppress, Lockwood's attorney limited the objection to
the "noticeable gaps" in the statement. (R. 31)
Furthermore, when denying the motion, the trial court
appeared to be focused on the argument that the transcript
should be suppressed because the audiotape was lost and did
not appear to consider the argument that Lockwood's right
to remain silent or to request an attorney had been
violated. (R. 30) The trial court stated that the fact
that the audiotape was lost was a subject for cross-
examination rather than a reason to exclude the transcript
from evidence. (R. 30) Regardless of the trial court's

focus at this point, however, it appears that Lockwood's attorney specifically limited the issue by stating that the "only problem I had with the tape was that when you're reading through the audio statement, there's noticeable gaps there." (R. 31)  Therefore, all other arguments not specified, including the present one, were waived. Davidson, 792 So. 2d at 1155.

Even if preserved, Lockwood's argument that his rights to remain silent and to request an attorney were violated is without merit because he has failed to point to any part of his statement that was involuntary.  Lockwood bases this argument primarily upon the portion of his statement following his invocation of his right to remain silent. Brief of the Appellant, p. 23.  Shortly after denying that he was at the scene of the crime or that he "laid a hand" on McInnes, Lockwood declared, "I'm through with it Detective," indicating that he wanted the interrogation to cease.  (CS. 41)   Consistent with Lockwood's Fifth Amendment right to remain silent, Officer Belcher turned off the tape.  (CS. 41)

Although Belcher started the tape again two hours later, the record clearly reflects that the resumption of

the interrogation was at Lockwood's own behest.  Officer
Belcher's only "question" leading to Lockwood's confession
that he was at the scene of the crime and did, in fact,
engage in a fight with McInnes was "Mr. Albert Lockwood
would you go head [sic.] and tell us, say to us what you
wanna tell us?" (CS. 41)  Belcher's open-ended follow-up
questions did nothing to induce Lockwood to speak but were
more designed to insure that he understood Lockwood's
statement. (CS. 41-44)  After Lockwood went over his
version of the events, Belcher asked him if he was "talking
to us because [he] want[ed] to?" (CS. 44)  Lockwood not
only replied that he was, but also denied that Belcher had
physically abused him to get him to speak. (CS. 44)
Lockwood's implication that he was somehow coerced into
resuming the interrogation after invoking his right to
remain silent is belied by the record.

Lockwood relies upon Edwards v. Arizona, 451 U.S. 477,
484-85 (1981), in which the United States Supreme Court
held that, once an accused has invoked his right to
counsel, he is not subject to any further interrogation
until counsel has been made available.  It does not appear
in the record, however, that Lockwood ever made a request

22

for counsel. Furthermore, even assuming Lockwood's request to remain silent had the same effect as a request for counsel, this case is distinguishable from Edwards because Lockwood himself initiated the resumption of conversation with police. The Court in Edwards stated that an exception to the general rule that, once an accused has requested counsel, he is not subject to further questioning exists when "the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85. In fact, the Court stated, "Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." Id. at 485. The record in this case shows that Officer Belcher, after stopping the tape when Lockwood so requested, resumed the tape merely to listen to Lockwood's "voluntary, volunteered statements." Although Lockwood attempts to claim that having him sit in the Detective's office for nearly two hours was coercive, he cites nothing for this proposition and this argument merely reveals that no coercion actually took place. Brief of the Appellant, p. 26. Accordingly,

23

his rights to remain silent and to request an attorney were not violated.

### III. Lockwood's Argument That The Timing Of The Trial Court's Instruction on Flight Prejudiced The Jury Was Not Timely Raised Before The Trial Court And Is, Therefore, Waived.

Lockwood argues that the trial court's instruction on flight unduly prejudiced his case because it was given immediately before the jury was released for deliberation. Brief of the Appellant, pp. 27-28. According to Lockwood, the timing of this instruction was the result of the State's deliberate attempt to "ring a bell in the Jury's mind." Brief of the Appellant, p. 28. This argument, however, is not preserved for appellate review because Lockwood did not raise it before the trial court before the jury retired for deliberations. See *Siler v. State,* 705 So. 2d 552, 558 (Ala. Crim. App. 1997) ("Failure to object to the trial court's instruction to the jury before the jury retires to deliberate waives any alleged error for review."). Lockwood likewise waived his further arguments related to the failure to instruct the jury on the

24

acquittal of the defendant and on reasonable doubt[3] by failing to timely raise the issue before the trial court.

## CONCLUSION

Based on the foregoing, Lockwood's conviction is due to be affirmed.

Respectfully submitted,

Troy King
*Attorney General*

John M. Porter
*Assistant Attorney General*

---

[3] Brief of the Appellant, pp. 28-29.

25

## CERTIFICATE OF SERVICE

I hereby certify on this 3rd day of September, 2004, I served a copy of the foregoing on the attorney for Lockwood, by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:

> Thomas J. Azar, Jr.
> 609 South McDonough Street
> Montgomery, Alabama  36104

_John M. Porter_
John M. Porter
Assistant Attorney General

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300

162350/66630-001

26



Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d),
states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or
briefs and shall not be used by any court within this state, except for the purpose of establishing the application
of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama

Judicial Building, 300 Dexter Avenue

**P. O. Box 301555**

**Montgomery, AL 36130-1555**

> **RELEASED**
>
> **SEP 2 4 2004**
>
> CLERK
> ALA COURT CRIMINAL APPEALS

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Sonja McKnight
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

### MEMORANDUM

CR-03-1253                    Montgomery Circuit Court CC-03-957

Albert Lockwood, alias v. State of Alabama

SHAW, Judge.

Albert Lockwood, alias, was convicted of attempted murder, a violation of §§ 13A-4-2 and 13A-6-2(a)(1), Ala. Code 1975. He was sentenced, pursuant to the Habitual Felony Offender Act, to life imprisonment without the possibility of parole. See §§ 13A-4-2(d)(1) and 13A-5-9(c)(3), Ala Code 1975.

Because Lockwood does not challenge the sufficiency of the State's evidence, a brief rendition of the facts will suffice. The evidence adduced at trial indicated that in April of 2003, Chris McKinnes and Carla Parker had been dating for approximately 10 years and that they lived together and

EXHIBIT

D

PENGAD 800-631-6989

had a 7-year-old son.   The evidence further indicated that Parker and Lockwood had been romantically involved for several months.[1]  On April 10, 2003, Lockwood and McKinnes got into a fight at Parker and McKinnes's residence; McKinnes went to Lockwood's house and informed Lockwood's wife that Parker and Lockwood were having an affair; and McKinnes went to the Union Springs Police Department later that evening and swore out warrants against Lockwood for the fight.  The evidence further indicated that on April 11, 2003, McKinnes went to Parker's place of employment in Gunter Park to take their son to Parker; Lockwood called while McKinnes was there and then came to Parker's workplace armed with a pistol; McKinnes and his son ran out of the building; and Lockwood fired the gun at McKinnes and then chased him.  The evidence further indicated that Lockwood caught McKinnes; that McKinnes fell down and that Lockwood stood over him kicking him and hitting him with the gun; that he told McKinnes that he was going to kill him; that he placed the gun to McKinnes's head and pulled the trigger, but that the bullet only grazed McKinnes's head; and that the gun jammed and that a man who was with Lockwood called out to him and that they got back in their automobile and drove away.

I.

To the extent that Lockwood makes the general argument that the trial court erred in allowing into evidence a transcript of a statement he made to the police, despite the fact that the audiotape recording of that statement had been lost by law enforcement, that argument is meritless.

In Battle v. State, 645 So. 2d 344 (Ala. Crim. App. 1994), this Court stated:

> "'Where the tape-recorded statement or conversation is missing or unavailable, "[a] typewritten transcript of [the recording] is admissible where the officer who listened to the conversation at the time of the recording testifies that the transcript accurately reflect[s] the conversation." Hawkins [v. State], 443 So. 2d [1312, 1314-15 (Ala. Crim.

---

[1]Lockwood was married to another woman at the time.

2

App. 1983)].  We have also permitted the admission
of a transcript where the tape recording was
inaudible in places.  <u>Thornton v. State</u>, 570 So. 2d
762 (Ala.Cr.App. 1990); <u>Hill v. State</u>, 516 So. 2d
876 (Ala.Cr.App. 1987); <u>Dawkins v. State</u>, 455 So. 2d
220 (Ala.Cr.App. 1984).'"

645 So. 2d at 346-347, quoting <u>Jackson v. State</u>, 594 So. 2d
1289, 1297 (Ala. Crim. App. 1991).  Similarly, in <u>Hawkins v.
State</u>, 443 So. 2d 1312 (Ala. Crim. App. 1983), this Court,
faced with a situation where the police had lost the audiotape
of the appellant's confession, but had presented a transcript
of the statement and the testimony of the officer who was
present during the statement who testified that he had
listened to the audiotape and read the transcript and that the
transcript was accurate, stated:

"[T]he State could have proved the contents of
Hawkins' statement without the tape recording or the
typewritten transcript.  Any person who was present
and heard the statement could have testified to its
content.  <u>Gordon v. State</u>, 34 Ala.App. 278, 280, 41
So. 2d 608, affirmed, 252 Ala. 492, 41 So.2d 610
(1949).  The unavailability of a tape recording of
a confession does not preclude the admission of the
oral testimony of a witness to the inculpatory
statement.  <u>Fleming v. State</u>, 57 Ala.App. 556, 329
So. 2d 616 (1976)."

443 So. 2d at 1314.  Finally, "'[a] typewritten transcript of
a recorded conversation is admissible where the officer who
listened to the conversation at the time of the recording
testifies that the transcript accurately reflected the
conversation.'"  <u>Self v. State</u>, 512 So. 2d 811, 816 (Ala.
Crim. App. 1987), quoting <u>Hawkins v. State</u>, supra, at 1314-15.

Here, Officer D.J. Belcher testified that he was present
during the interview with Lockwood, that he had reviewed the
audiotape before it had been lost and had compared it to the
transcript, and that the transcript was an accurate
representation of the conversation.  Thus, the prosecution
adequately satisfied the "reliable representation standard" in
establishing the predicate for the admission of the tape
recording and the transcript.  See <u>Ex parte Fuller</u>, 620 So. 2d

675, 678 (Ala. 1993). Questions concerning the "inaudible" portions of the transcript went to the weight that the jury should afford the transcript and statements, not the admissibility of that evidence; similarly, questions about law enforcement's handling and subsequent loss of the audiotape of the conversation went to Officer Belcher's credibility and the weight that the jury should afford his testimony.

As for Lockwood's argument that the evidence should have been suppressed because, he claims, law enforcement acted in bad faith and that he was prejudiced as a result, that claim is being raised for the first time on appeal, and, therefore, is not properly before this Court. "The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Ex parte Frith, 526 So. 2d 880, 882 (Ala. 1987).

For these reasons, Lockwood is not entitled to any relief on this claim.

II.

Lockwood also argues that the trial court erred in allowing into evidence his statement to the police and a transcript of that statement because, he claims, he was denied his right to remain silent and his right to an attorney during questioning. The State argues that this claim was not preserved for appellate review. We agree with the State.

Prior to trial, Lockwood orally moved to suppress the statement and transcript on the grounds that the audiotape had not been provided in discovery for the defense to review. The State conceded that there had been an audiotape made of the statement but that members of the Montgomery Police Department had been unable to locate the audiotape after the transcript of the statement had been prepared. In response to inquiries from the trial court, the prosecutor stated that Detective Belcher had taken the statement and that he would be there to testify; the prosecutor further stated that there was caselaw providing that the transcript could still be admitted even in the absence of an audiotape if the detective testified that he had reviewed and compared the audiotape and transcript to each other and that the transcript was accurate. The trial court advised the defense that the transcript and statement would be

allowed into evidence, and that questions regarding the police
procedures as far as the loss of the audiotape were proper
territory to cover in cross-examination of the detective,
stating "you can pick on him about that he lost it." (R. 30.)
Defense counsel then stated:

> "The only problem I had with the tape was that
> when you're reading through the audio statement,
> there's noticeable gaps there. And that was the
> problem and we just needed to put it on the Record
> concerning the taped statement."

(R. 30-31.) The trial court reminded defense counsel that
that was a matter on which to cross-examine the detective.

"In order for this court to review an alleged erroneous
admission of evidence, a timely objection must be made to the
introduction of the evidence, specific grounds for the
objection should be stated and a ruling on the objection must
be made by the trial court." Goodson v. State, 540 So. 2d
789, 791 (Ala. Crim. App. 1988), abrogation on other grounds
recognized by Craig v. State, 719 So. 2d 274 (Ala. Crim. App.
1998). "When a timely objection at the time of the admission
of the evidence is not made, the issue is not preserved for
this Court's review." Ziglar v. State, 629 So. 2d 43, 47
(Ala. Crim. App. 1993). "The statement of specific grounds of
objection waives all grounds not specified, and the trial
court will not be put in error on grounds not assigned at
trial." Ex parte Frith, 526 So. 2d 880, 882 (Ala. 1987).
"Even constitutional claims may be waived on appeal if not
specifically presented to the trial court." Brown v. State,
705 So. 2d 871, 875 (Ala. Crim. App. 1997). "Review on appeal
is limited to review of questions properly and timely raised
at trial." Newsome v. State, 570 So. 2d 703, 716 (Ala. Crim.
App. 1989).

Although at one point defense counsel did state that
Lockwood had told her that he had asked for his attorney on
three occasions during the recorded conversation with the
police, it is clear from a reading of the exchange that
nothing in this exchange was sufficient to draw the trial
court's attention to a challenge to the alleged deprivation of
the constitutional right to remain silent or the

constitutional right to have an attorney present during questioning.

Finally, although Lockwood did raise these claims in his motion for a new trial, he did not object on any grounds to the evidence at the time that it was introduced at trial.

> "'"[A] motion for a new trial or a motion for a judgment of acquittal is not sufficient to preserve the issue where no timely objection was made at the time the evidence was offered and admitted."' <u>Greenhill v. State</u>, 746 So. 2d 1064, 1068-69 (Ala.Crim.App. 1999), quoting <u>Newsome v. State</u>, 570 So. 2d 703, 717 (Ala. Crim. App. 1989) (citations omitted in <u>Newsome</u>)."

<u>Roberson v. State</u>, 864 So. 2d 379, 386 (Ala. Crim. App. 2002).

Here, because nothing in Lockwood's pretrial motion to suppress was sufficient to draw the trial court's attention to the specific claims that Lockwood now attempts to raise on appeal, and because he did not argue those claims at the time that the evidence was introduced, Lockwood is not entitled to any relief on this claim because he failed to preserve this claim for appellate review.

### III.

Finally, Lockwood challenges the trial court's oral instructions to the jury. More specifically, he argues that (1) the State did not request an instruction on evidence of flight until after the trial court had finished the other oral instructions but before the jury retired to deliberate in order to give undue weight to the evidence of flight and, further, that he was prejudiced by the timing of the flight instruction, which was the last instruction given to the jury; and (2) the court erred in not instructing the jury that it had the option to disregard the statement he gave to the police or the option to find him not guilty of any crime. The State correctly notes that Lockwood failed to preserve these claims for appellate review.

"No party may assign as error the court's ... failing to give a written instruction ... unless the party objects

6

thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection." Rule 21.3, Ala.R.Crim.P. See also Greenhill v. State, 746 So. 2d 1064 (Ala. Crim. App. 1999); and Sanders v. State, 683 So. 2d 14 (Ala. Crim. App. 1996).

Lockwood did not raise a timely objection to the instructions he now challenges on appeal, either at the charge conference or at the conclusion of the trial court's oral instructions before the jury retired to deliberate. Thus, this issue is not preserved for appellate review.[2]

Based on the foregoing, the judgment of the trial court is affirmed.

Affirmed by Memorandum.

McMillan, P.J., and Cobb, Baschab, and Wise, JJ., concur.

---

[2]Further, we note that to the extent Lockwood is complaining that the State deliberately waited until the trial court had finished instructing the jury to request the instruction on evidence of flight, the record does not support that assertion. The State, during the charge conference, asked for the trial court to give its standard instruction on flight. Thus, it appears from a review of the record that the State, in calling for a bench conference after the trial court instructed the jury, was not attempting to surprise Lockwood, but, rather, was seeking to have the trial court instruct the jury on evidence of flight as had been discussed in the charge conference. In any event, as there was no objection to the instructions, either during the charge conference or after the instructions were given but before the jury retired to deliberate, Lockwood's claim is not preserved for appellate review.



IN THE ALABAMA COURT OF CRIMINAL APPEALS

CASE NO. CR-03-1253


ALBERT JEROME LOCKWOOD,

    APPELLANT,

vs.

STATE OF ALABAMA,

    APPELLEE.


APPEAL FROM THE CIRCUIT COURT

OF MONTGOMERY COUNTY, ALABAMA

CASE NO. CC-2003-957

---

## MOTION FOR REHEARING
### &
## BRIEF IN SUPPORT OF MOTION FOR REHEARING

---

THOMAS J. AZAR, JR.  (AZA006)
609 SOUTH McDONOUGH STREET
Montgomery, Alabama 36104
Office    (334) 262-5363
Fax       (334) 263-3988
Email     tjazar@al-lawyers.com



EXHIBIT

E

PENGAD 800-631-6989

IN THE ALABAMA COURT OF CRIMINAL APPEALS

ALBERT JEROME LOCKWOOD      *

      APPELLANT,         *

vs.                      *        CASE NO. CR-03-1253

STATE OF ALABAMA,        *

      APPELLEE.          *

## MOTION FOR REHEARING

COMES NOW the Appellant, ALBERT JEROME LOCKWOOD, by and through the undersigned counsel and pursuant to Rule 40 Alabama Rules of Appellate Procedure, and moves this Honorable Court to Reconsider the ruling in this matter, and grant a rehearing of the arguments herein filed.

The Appellant proffers that denying his appeal is manifestly unjust to a fair consideration of the matters complained about in the defendant's appeal brief. The Appellant understands that his trial counsel may have failed to preserve the issues he complained about in the appellate brief. The Appellant proffers that the reason for allowing appeals is to ensure a fair hearing on the merits of the appealed issues and to protect the right of an accused person to a fair trial.[1]

---

[1] "[The rules] shall be construed so as to assure the just, speedy, and inexpensive determination of every appellate proceeding on its merits." This principle echoes

The Appellant prays this Honorable Court grant the Motion to Reconsider, and allow the Appellant to argue the merits of his appeal.

Respectfully submitted this the 1st day of October 2004.

_____
THOMAS J. AZAR, JR. (AZA006)
Attorney for Appellant

**Of Counsel:**

609 South McDonough Street
Montgomery, AL 36104
Phone      (334) 262-2719
Fax        (334) 263-3988

## Certificate of Service

I hereby certify that I have mailed a true and correct copy of the same postage prepaid and properly addressed to the Office of the Attorney General Troy King, Alabama State House, 11 S. Union Street, Montgomery, Alabama  36130, this 1st day of October 2004.

_____
THOMAS J. AZAR, JR.  (AZA006)

_____

throughout the rules: Procedural traps will not deprive a litigant of his right to have a determination on the relative merits of the appeal. Such a polestar does not diminish or compromise the professional standards to which counsel should ascribe; indeed, any substandard performance may require second effort on counsel's part at additional expense and delay.  AL R RAP App. 4

IN THE ALABAMA COURT OF CRIMINAL APPEALS

ALBERT JEROME LOCKWOOD          *

     APPELLANT,          *

vs.          *          CASE NO. CR-03-1253

STATE OF ALABAMA,          *

     APPELLEE.          *

### BRIEF IN SUPPORT OF
### APPELLANT'S MOTION FOR REHEARING

COMES NOW the Appellant, ALBERT JEROME LOCKWOOD, by and through the undersigned counsel and pursuant to Rule 40 Alabama Rules of Appellate Procedure, and moves this Honorable Court to Reconsider the ruling in this matter, and grant a rehearing of the arguments herein filed, and would show as follows:

### ISSUES FOR RECONSIDERATION

I.   Does the barring of his appeal for failure of trial counsel to preserve those issues deny the Appellant a fair trial and appeal?

### ARGUMENT

**I.   Does the barring of his appeal for failure of trial counsel to preserve those issues deny the Appellant a fair trial and appeal?**

The barring of this appeal for the failure of trial counsel to preserve appealed issues denies the Appellant a fair trial and appeal. The Alabama Court of Criminal Appeals

has ruled in previous matters that the failure of trial counsel to object should not always act as a bar to issued complained of in subsequent appeals.

"While the failure to object will not bar this Court's review of this issue, it will weigh against McGriff's claim of prejudice." <u>Kuenzel v. State</u>, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). <u>McGriff v. State</u> 2000 WL 1455196, at 14 (Ala.Crim.App.,2000)

Justice would be seriously affected if the rules changed on a case by case basis. The Appellant's failure to object and preserve the issues previously presented to this Court which are now procedurally barred, causes confusion to the Appellant based upon other rulings by this Court in other matters. Although the cases seem to indicate that the Appellant's claims will be viewed in a different light, the cases also state that the Appellant's failure to object do not operate as a bar to the appeal of those issues.

"While the failure to object does not bar our review in a death penalty case, it weighs against any claim of prejudice." <u>Ex parte Kennedy</u>, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).

<u>Smith v. State</u> 2000 WL 1868432, at 4 (Ala.Crim.App.,2000).

"Where defendant was sentenced to death for capital murder, his failure to object at trial did not bar the Court of Criminal Appeals' review of issues not presented to trial court; however, the failure to object at trial weighed against any claim of prejudice raised on appeal." <u>McGowan v. State</u> 2003 WL 22928607 (Ala.Crim.App.,2003).

## CONCLUSION

The failure to object to issues at trial cannot be considered an absolute bar to appeal in all situations. Most particularly in this case where it is obvious that the Appellant's constitutional due process rights were denied him as he attempted to invoke his right to remain silent and his right to talk with an attorney.

Wherefore, premises considered, the Appellant prays this Honorable Court grant a rehearing of this matter.

Respectfully submitted this the 1st day of October 2004.


_____
THOMAS J. AZAR, JR. (AZA006)
Attorney for Appellant


Page 3 of 4

**Of Counsel:**
Azar & Tasheiko, LLC
609 South McDonough Street
Montgomery, AL 36104
Phone      (334) 263-5363
Fax        (334) 263-3988
Email      tjazar@al-lawyers.com


## Certificate of Service

I certify that on the 1st day of October, 2004, that I have mailed a true and correct copy of the same postage prepaid and properly addressed to the Office of the Attorney General for the State of Alabama at the address below.

Troy King, Esq.
Alabama Attorney General
Alabama State House
11 S. Union Street
Montgomery, Alabama  36130


THOMAS J. AZAR, JR. (AZA006)
Attorney for Appellant

Page 4 of 4

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

*Porter*
*666 30*

Lane W. Mann
  Clerk
Sonja McKnight
  Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

October 15, 2004

**CR-03-1253**

Albert Lockwood, alias v. State of Alabama  (Appeal from Montgomery  Circuit Court:
CC03-957)

## NOTICE

You are hereby notified that on October 15, 2004 the following action was taken in the
above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

cc: Hon. Melissa Rittenour, Circuit Clerk
    Thomas J. Azar, Jr., Attorney
    Vicky Underwood Toles, Attorney
    John M. Porter, Asst. Atty. Gen.

EXHIBIT
F
PENGAD 800-631-6989

*Porter*
*6630*

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
# THE ALABAMA COURT OF CRIMINAL APPEALS

**CR-03-1253**

Albert Lockwood, alias v. State of Alabama  (Appeal from Montgomery  Circuit Court: CC03-957)

# CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on September 24th 2004:

## Affirmed by Memorandum.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate Procedure, it is hereby certified that the aforesaid judgment is final.

**Witness. Lane W. Mann, Clerk**
**Court of Criminal Appeals, on this**
**the 3rd day of November, 2004.**

**Clerk**
**Court of Criminal Appeals**
**State of Alabama**

cc: Hon. Tracy S. McCooey, Circuit Judge
Hon. Melissa Rittenour, Circuit Clerk
Thomas J. Azar, Jr., Attorney
John M. Porter, Asst. Atty. Gen.

EXHIBIT
G

COURT OF CRIMINAL APPEALS NO. _____ CR 06-562

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _____ MONTGOMERY _____ COUNTY, ALABAMA

CIRCUIT COURT NO _____ CC 03-957.60

CIRCUIT JUDGE _____ TRACY MCCOOEY

Type of Conviction/ Order Appealed From: _____ RULE 32

Sentence Imposed: _____

Defendant Indigent: ☑ YES ☐ NO

### ALBERT LOCKWOOD

NAME OF APPELLANT

PROSE  AIS#134376

(Appellant's Attorney)                          (Telephone No.)

1000 ST.CLAIR ROAD

(Address)

SPRINGVILLE, AL. 35146-5582

(City)                    (State)                    (Zip Code)

v.

### STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)

NOTE:  If municipal appeal, Indicate above, and enter

name and address of municipal attorney below.

df

(For Court of Criminal Appeals Use Only)

EXHIBIT

*H*

PENGAD 800-631-6989

## INDEX
## CLERK'S RECORD

CASE ACTION SUMMARY........................................................... 1-2

RULE 32 PETITION................................................................. 3-25

ORDER FOR STATE TO RESPOND DATED 2/14/05......................... 26

MOTION TO DISMISS OR IN THE ALTERNATIVE ANSWER TO     27-29
PETITIONER'S PETITION FOR RELIEF FROM CONVICTION OR
SENTENCE.............................................................................

ORDER FOR STATE TO RESPOND DATED 4/05/05......................... 30

ORDER DISMISSING RULE 32 PETITION.................................... 31-32

NOTICE OF APPEAL............................................................... 33

REPORTER'S TRANSCRIPT ORDER............................................ 34

DOCKETING STATEMENT....................................................... 35-36

CLERK'S NOTICE OF APPEAL.................................................. 37

CRIMINAL APPEALS ORDER REMANDING THE CASE BACK TO THE     38
CIRCUIT COURT....................................................................

ORDER THAT THE APPELLANT DID NOT PAY FILING FEE WHEN     39
FILING HIS RULE 32..............................................................

CERTIFICATE OF JUDGMENT OF DISMISSAL............................. 40

CRIMINAL APPEALS ORDER THAT APPELLANT'S RULE 32     41
PETITION STILL STAND FILED IN THE CIRCUIT COURT WITH THEIR
ORIGINAL FILING DATES AND AWAIT DISPOSITION..................

LETTER FROM APPELLANT REGARDING THE STATUS OF RULE 32     42
PETITION.............................................................................

PETITION FOR WRIT OF MANDAMUS......................................... 43-53

ORDER GRANTING APPELLANT'S REQUEST TO PROCEED IN     54
FORMA PAUPERIS..................................................................

ORDER DISMISSING WRIT OF MANDAMUS................................. 55

RESPONSE TO PETITION FOR WRIT OF MANDAMUS.................... 56-60

MOTION FOR REIMBURSEMENT.............................................. 61-62

LETTER FROM APPELLANT REGARDING STATUS OF RULE 32 PETITION................................................................................ 63

DOCUMENTS SENT TO THE COURT BY APPELLANT REGARDING HIS RULE 32 PETITION.......................................................... 64-89

PETITION FOR WRIT OF MANDAMUS.......................................... 90-98

ORDER FOR THE STATE TO RESPOND.......................................... 99

CRIMINAL APPEALS ORDER DISMISSING PETITION FOR WRIT OF MANDAMUS.................................................................... 100

STATE'S ANSWER TO PETITION FOR RELIEF FROM CONVICTION OR SENTENCE.................................................................. 101-104

PETITIONER'S RESPONSE TO THE STATE'S ANSWER TO PETITION FOR RELIEF FROM CONVICTION OR SENTENCE........................... 105-107

NOTICE OF APPEAL.................................................................. 108

REPORTER'S TRANSCRIPT ORDER.............................................. 109

DOCKETING STATEMENT........................................................... 110-111

CLERK'S NOTICE OF APPEAL..................................................... 112

CERTIFICATE OF COMPLETION.................................................. 113

```
ACRO370                    ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2003 000957.60
OPER: TOR                        CASE ACTION SUMMARY                RUN DATE: 02/09/2005
 E:    1                         CIRCUIT   CRIMINAL
                                                                   JUDGE: TSM
IN THE CIRCUIT COURT OF MONTGOMERY

STATE  OF  ALABAMA                    VS      LOCKWOOD ALBERT JEROME
                                              1000 ST.CLAIR ROAD
CASE: CC 2003 000957.60                       G3-B-213
                                              SPRINGVILLE, AL  35146 5582

DOB: 08/24/1962          SEX: M  RACE: B  HT: 5 05  WT: 159   HR: BLK EYES: BRO
SSN: 419980499  ALIAS NAMES: MARTIN JEROME

CHARGE01: RULE 32-FELONY     CODE01: RULE  LIT: RULE 32-FELONY TYP: F #: 001
OFFENSE DATE: 04/11/2003            AGENCY/OFFICER: 0030100

DATE WAR/CAP ISS:                        DATE ARRESTED: 05/27/2003
DATE    INDICTED:                        DATE   FILED: 01/26/2005
DATE   RELEASED:                         DATE HEARING:
       BOND AMOUNT:          $.00           SURETIES:

DATE 1:              DESC:                TIME: 0000
DATE 2:              DESC:                TIME: 0000

TRACKING NOS: CC 2003 000957 00  /                    /

   DEF/ATY:                         TYPE:                        TYPE:

                               00000                        00000

PROSECUTOR:

================================================================================
CHK CSE: CC200300095700 CHK/TICKET NO:              GRAND JURY:
 RT REPORTER:            SID NO:       000753726                OPER: TOR
   STATUS: PRISON         DEMAND:                                  OPE
TRANS DATE   ACTIONS, JUDGEMENTS, AND NOTES
```

| TRANS DATE | ACTIONS, JUDGEMENTS, AND NOTES | | |
|---|---|---|---|
| 02/09/2005 | ASSIGNED TO: (TSM) TRACEY S MCCOOEY | (AR01) | TOR |
| 02/09/2005 | DEFENDANT ARRESTED ON: 05/27/2003 | (AR01) | TOR |
| 02/09/2005 | INITIAL STATUS SET TO: "P" - PRISON | (AR01) | TOR |
| 02/09/2005 | CHARGE 01: RULE 32-FELONY/#CNTS: 001 | (AR01) | TOR |
| 02/09/2005 | FILED ON: 01/26/2005 | (AR01) | TOR |
| 02/09/2005 | CASE ACTION SUMMARY PRINTED | (AR08) | TOR |
| 02/09/2005 | CAS ATTACHMENT PRINTED | (AR08) | TOR |

2/09/05 Copy of Rule 32 Sent to DA

4-5-05 Order Signed 3-28-05 Dismissing Rule 32

3-14-05 Order - State given Order to respond

02/05 Notice of Appeal w/ forms

05/05/05 Appl transmittal to Crim Appls, AG, DA & Def.

ACRO369 A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2003 000957.60
JUDGE ID: TSM

STATE OF ALABAMA                    VS        LOCKWOOD ALBERT JEROME

DATE          ACTION, JUDGMENTS, CASE NOTES

06|22|05   Transcript To Crim Appls, AG & Def

10-12-05   Order from Crim App for Circuit Court to
           Rule on s/m Forma Pauperes

12|02|05 √ Cert. of Final Judgment of Dismissal

11-28-05   Order - Court did not Rule on Hardship & Def did
           not pay filing fee.

10-4-06    Order For State to Respond to Rule 32

11-15-06   Order dismissing Rule 32 petition

12-13-06   notice of appeal w/forms

1|02|06    clerk's notice of appeal to Crim. Appls,
           DA, AG & Def.

1|08|07    CR# 06-562

3

**Case Number**

*CC 03-957 .60*

ID   YR   NUMBER   TSM

(To be completed
by Court Clerk)

# IN FORMA PAUPERIS DECLARATION

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

[Insert appropriate court]

ALBERT LOCKWOOD
_____
(Petitioner)

vs.

STATE OF ALABAMA
_____
(Respondent(s)

## DECLARATION IN SUPPORT OF REQUEST TO PROCEED
## IN FORMA PAUPERIS

I, _____Albert Lockwood_____, declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs, or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1. Are you presently employed?   Yes _____   No __XX__

   a. If the answer is "yes", state the amount of your salary or wages per month, and give the name and address of your employer.

   _____Not applicable._____

   b. If the answer is "no", state the date of last employment and the amount of the salary and wages per month which you received.

   _____Not available._____

2. Have you received within the past twelve months any money from any of the following sources?

   a. Business, profession, or other form of self-employment?

   Yes _____        No __XX__

   b. Rent payments, interest, or dividends?

   Yes _____        No __XX__

   c. Pensions, annuities, or life insurance payments?

   Yes _____        No __XX__

   d. Gifts or inheritances?

   Yes _____        No __XX__

   e. Any other sources?

   Yes _____        No __XX__

2

If the answer to any of the above is "yes", describe each source of money and state the amount received from each during the past twelve months.

Not applicable.

3. Do you own cash, or do you have money in a checking or savings account?

Yes __XX__    No _____

(Include any funds in prison accounts.)

If the answer is "yes", state the total value of the items owned.

(See Certified Statement Below)

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?

Yes _____    No __XX__

If the answer is "yes", describe the property and state its approximate value.

Not applicable.

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

NONE

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on __January 19, 2005__
                      (Date)

_Albert Lockwood_
Signature of Petitioner    AIS #134376

## CERTIFICATE

I hereby certify that the petitioner herein has the sum of $ _.04¢_ on account to his credit at the institution where he is confined. I further certify that petitioner likewise has the foregoing securities to his credit according to the records of said _St. Clair C.F._ institution:

_1/20/06_
DATE

_[signature]_
AUTHORIZED OFFICER OF INSTITUTION

Rule 32

3

# PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

**(Pursuant to Rule 32,
Alabama Rules of Criminal Procedure)**

**Case Number**

| CC | 03 | 957 |
|----|----|-----|
| **ID** | **YR** | **NUMBER** |

IN THE _____CIRCUIT_____ COURT OF __MONTGOMERY__, ALABAMA

__ALBERT JEROME LOCKWOOD__ vs. __STATE OF ALABAMA__

Petitioner (Full Name)                    Respondent

[Indicate either the "State" or, if filed in municipal court, the name of the "Municipality"]

Prison Number __(AIS) 134376__  Place of Confinement __St. Clair Corr. Fac.__

County of conviction __Montgomery County.__

**NOTICE: BEFORE COMPLETING THIS FORM, READ CAREFULLY THE ACCOMPANYING INSTRUCTIONS.**

1. Name and location (city and county) of court which entered the judgment of conviction or sentence under attack __The Circuit Court of Montgomery County, Alabama in Montgomery.__

2. Date of judgment of conviction __February 24, 2004.__

3. Length of sentence __Life imprisonment without the possibility of parole.__

4. Nature of offense involved (all counts) __Attempted Murder.__

_____

_____

_____

5. What was your plea? (Check one)

   (a) Guilty _____

   (b) Not guilty __XX__

   (c) Not guilty by reason of mental disease or defect _____

   (d) Not guilty and not guilty by reason of mental disease or defect _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

Yes _____          No _XX_

11. If your answer to Question 10 was "yes", then give the following information in regard to the first such petition, application, or motion you filed:

(a) (1) Name of court _____ Not applicable. _____

(2) Nature of proceeding ____ Not applicable. ____

(3) Grounds raised _____ Not applicable. _____

_____

_____

_____

_____

(attach additional sheets if necessary)

(4) Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____          No _____

(5) Result _____ Not applicable. _____

(6) Date of result _____ Not applicable. _____

(b) As to any second petition, application, or motion, give the same information:

(1) Name of court _____ Not applicable. _____

(2) Nature of proceeding ____ Not applicable. ____

(3) Grounds raised _____ Not applicable. _____

_____

_____

_____

(attach additional sheets if necessary)

(4) Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____          No _____

(5) Result _____ Not applicable. _____

(6) Date of result _____ Not applicable. _____

(c) As to any third petition, application, or motion, give the same information (attach additional sheets giving the same information for any subsequent petitions, applications, or motions):

(1) Name of court _____ Not applicable. _____

3

(2)  Nature of proce _____ Not applicable

(3)  Grounds raised _____ Not applicable.

_____

_____

_____

_____

(attach additional sheets if necessary)

(4)  Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____          No _____

(5)  Result _____ Not applicable. _____

(6)  Date of result _____ Not applicable. _____

(d)  Did you appeal to any appellate court the result of the action taken on any petition, application, or motion?

(1)  First petition, etc.        Yes _____          No _____

(2)  Second petition, etc.     Yes _____          No _____

(2)  Third petition, etc.       Yes _____          No _____

**ATTACH ADDITIONAL SHEETS GIVING THE SAME INFORMATION
FOR ANY SUBSEQUENT PETITIONS, APPLICATIONS, OR MOTIONS.**

(e)  If you did not appeal when you lost on any petition, application, or motion, explain briefly why you did not:

Not applicable.

_____

_____

_____

12.  Specify every ground on which you claim that you are being held unlawfully, by placing a check mark on the appropriate line(s) below and providing the required information. Include all facts. If necessary, you may attach pages stating additional grounds and the facts supporting them.

# GROUNDS OF PETITION

**Listed below are the possible grounds for relief under Rule 32. Check the ground(s) that apply in your case, and follow the instruction under the ground(s):**

_XX_    A.  The Constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.

For your information, the following is a list of the most frequently raised claims of constitutional violation:.

4

(1)   Conviction obtained by plea of guilty which was unlawful induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(2)   Conviction obtained by use of coerced confession.

(3)   Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(4)   Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(5)   Conviction obtained by a violation of the privilege against self-incrimination.

(6)   Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(7)   Conviction obtained by a violation of the protection against double jeopardy.

(8)   Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(9)   Denial of effective assistance of counsel.

**This list is not a complete listing of all possible constitutional violations.**

**If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each constitutional violation that you claim, whether or not it is one of the nine listed above, and include under it each and every fact you feel supports this claim. Be specific and give details.**

_____ B.   **The court was without jurisdiction to render the judgment or to impose the sentence.**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____ C.   **The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law.**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____ D.   **Petitioner is being held in custody after his sentence has expired.**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____ E.   **Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:**

**The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to rule 24, or in time to be included in any previous collateral proceeding, and could not have been discovered by any of those times through the exercise of reasonable diligence; and**

**The facts are not merely cumulative to other facts that were known; and**

The facts do not merely am███ to impeachment evidence; and

If the facts had been known at the time of trial or sentencing, the result would probably have been different; and

The facts establish that petitioner is innocent of the crime for which he was convicted or should not have received the sentence that he did.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____ F.   The petitioner failed to appeal within the prescribed time and that failure was without fault on petitioner's part.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

13.  **IMPORTANT NOTICE REGARDING ADDITIONAL PETITIONS RULE 32.2(b) LIMITS YOU TO ONLY ONE PETITION IN MOST CIRCUMSTANCES. IT PROVIDES:**

"**Successive Petitions.**  The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner. A second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exist why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."

A.  Other than an appeal to the Alabama Court of Criminal Appeals or the Alabama Supreme Court, have you filed in state court any petition attacking this conviction or sentence?

Yes _____          No __XX__

B.  If you checked "Yes," give the following information as to earlier petition attacking this conviction or sentence:

(a)  Name of court _____Not applicable._____

(b)  Result _____Not applicable._____

(c)  Date of result _____Not applicable._____
     (attach additional sheets if necessary)

C.  If you checked the "Yes" line in 13A, above, and this petition contains a different ground or grounds of relief from an earlier petition or petitions you filed, attach a separate sheet or sheets labeled: "EXPLANATION FOR NEW GROUND(S) OF RELIEF."

On the separate sheet(s) explain why "good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and [why the] failure to entertain [this] petition will result in a miscarriage of justice."

14.  Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes _____          No __XX__

15. Give the name and address, if known, of each attorney who represented you at the following stages of the case that resulted in the judgment under attack:

(a) At preliminary hearing ___Vickie Toles; Trina Williams; Rick McLelland.___

(b) At arraignment and plea ___(Same Above)___

(c) At trial ___(Same Above)___

(d) At sentencing ___Trina Williams.___

(e) On appeal ___Thomas J. Azar, Jr., 609 South McDonough Street, Montgomery, AL 36104.___

(f) In any post-conviction proceeding ___Not applicable.___

(g) On appeal from adverse ruling in a post-conviction proceeding ___Not applicable.___

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes _____    No __XX__

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes _____    No __XX__

(a) If so, give name and location of court which imposed sentence to be served in the future: _____
   ___Not applicable.___

(b) And give date and length of sentence to be served in the future: _____
   ___Not applicable.___

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes _____    No _____

18. What date is this petition being mailed?

   ___January 24, 2005.___

   Wherefore, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

# PETITIONER'S VERIFICATION UNDER OATH
## SUBJECT TO PENALTY FOR PERJURY

I swear (or affirm) under penalty of perjury that the foregoing is true and correct.

Executed on _____1 - 22 - 05_____
(Date)

x _Albert Rockwood_
Signature of Petitioner

SWORN TO AND SUBSCRIBED before me this the _22_ day of _____Jan_____ _2005_

_JH Cty_

Notary Public

## OR *

## ATTORNEY'S VERIFICATION UNDER OATH
## SUBJECT TO PENALTY FOR PERJURY

I Swear (or affirm) under penalty of perjury that, upon information and belief, the foregoing is true

and correct. Executed on _____
(Date)

_____
Signature of Petitioner's Attorney

SWORN TO AND SUBSCRIBED before me this the ____ day of _____

_____
Notary Public

Name and address of attorney representing petitioner
in this proceeding (if any)

_____

_____

_____

_____

* If petitioner is represented by counsel, Rule 32.6(a) permits either petitioner or counsel to verify the
petition.

12

Albert Lockwood
AIS #134376, G3-B-213
1000 St. Clair Road
Springville, AL 35146-5582

January 26, 2005

Honorable Melissa Ritenour
Circuit Clerk, Montgomery County
Montgomery County Courthouse
P.O. Box 1667
Montgomery, Alabama 36102-1667

　　　　Re: CC-03-957
　　　　　　Albert Jerome Lockwood v. State of Alabama

Dear Ms. Ritenour:

　　　Please find enclosed the original of the Petitioner's Rule
32 petition, in which he is challenging his 2004 conviction and
sentence in the above referenced cause, including a memorandum
in support of his request for relief from conviction or sentence,
and such other instruments as have been completed and included
herein.

　　　In addition, the Petitioner respectfully requests for leave
as an indigent pary to be allowed to file its original petition in
lieu of additional copies thereof upon the Court's determination
whether he is indigent, and he is allowed to proceed in forma
pauperis. Petitioner had been denied free photocopies by the law
library supervisor where he is presently confined at St. Clair
Correctional Facility, although it's the institutional policy to
do so pursuant to SOP #213.

　　　　　　Thank you for your time and consideration.

　　　　　　　　　　Very truly yours,

　　　　　　　　　　*Albert Lockwood*
　　　　　　　　　　Albert Lockwood

Enclosure

13

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

ALBERT JEROME LOCKWOOD,          )
                                 )
           Petitioner,           )
                                 )
vs.                              )     CASE NO. CC-2003-957.60
                                 )
STATE OF ALABAMA,                )
                                 )
           Respondent.           )

MEMORANDUM IN SUPPORT OF PETITION FOR
RELIEF FROM CONVICTION OR SENTENCE FILED UNDER
RULE 32 OF THE ALABAMA RULES OF CRIMINAL PROCEDURE

Comes now the Petitioner in this matter and submits the
following in support of his request for relief from conviction
or sentence.

### GROUNDS OF PETITION

A.   The Constitution of the United States or the State of
Alabama requires a new trial, a new sentencing proceeding, or
other relief.

### FACTS

This cause of action began after the July 2003 Term of the
Grand Jury of Montgomery County, Alabama returned a true bill
indicting the Petitioner Albert Jerome Lockwood on a charge of
Attempted Murder, in violation of Section 13A-4-2, Code of Alabama,
(1975).

On February 23, 2004 the Petitioner, by and through counsel,
was tried before a Jury.  Both the State and the Defense put
witnesses on to testify in this matter.  The trial concluded
February 23, 2004 with the jury finding the Petitioner guilty of

the Attempted Murder of Christopher McKinnes. The matter was
then set for sentencing March 18, 2004.

The Petitioner appeared for sentencing by the trial court,
March 18, 2004, and was sentenced to a term of life without
parole. Trial Counsel made an Oral Motion for a New Trial. The
Petitioner was taken into custody and court was adjourned.

April 14, 2004 counsel for the Petitioner filed a written
Motion for a New Trial or in the Alternative Motion to Set Aside
the Verdict in this matter. June 11, 2004, the trial court heard
arguments from the Petitioner's trial counsel and the Chief Deputy
District Attorney who tried the State's case. The Petitioner's
presence was waived for this hearing. The trial court denied the
Petitioner's Motion for a New Trial, or in the Alternative Motion
to Set Aside the Verdict in this matter.

The Petitioner by and through his trial counsel then appealed
this matter. On September 24, 2004, the Alabama Court of Criminal
Appeals affirmed the conviction in a memorandum opinion.

STATEMENT OF FACTS

The Statement of Facts of this case are stated in the
memorandum opinion of the Court of Criminal Appeals in Albert
Lockwood, alias v. State of Alabama, CR-03-1253 as follows:

The evidence adduced at trial indicated that in April of
2003, Chris McKinnes and Carla Parker had been dating for appro-
ximately 10 years and that they lived together and had a 7-year-
old son. The evidence further indicated that Parker and Lockwood

-2-

had been romantically involved for several months.  On April
10, 2003, Lockwood and McKinnes got into a fight at Parker and
McKinnes's residence; McKinnes went to Lockwood's house and
informed Lockwood's wife that Parker and Lockwood were having
an affair; and McKinnes went to the Union Springs Police Department
later that evening and swore out warrants against Lockwood for
the fight.  The evidence further indicated that on April 11, 2003,
McKinnes went to Parker's place of employment in Gunter Park to
take their son to Parker; Lockwood called while McKinnes was there
and then came to Parker's workplace armed with a pistol; McKinnes
and his son ran out of the building; and Lockwood fired the gun
at McKinnes and then chased him.  The evidence further indicated
that Lockwood caught McKinnes; that McKinnes fell down and that
Lockwood stood over him kicking him and hitting him with the gun;
that he told McKinnes that he was going to kill him; that he placed
the gun to McKinnes's head and pulled the trigger, but that the
bullet only grazed McKinnes's head; and that the gun jammed and
that a man who was with Lockwood called out to him and that they
got back in their authmobile and drove away.

<u>GROUNDS SUPPORTING THE PETITION FOR RELIEF</u>

Albert Jerome Lockwood was denied effective assistance of
counsel at trial.  This denial of effective counsel violated
Lockwood's rights under the Sixth and Fourteenth Amendments of
the United States Constitution, and Alabama's Constitution, including
Article I, Section 6, and Alabama law.  <u>Strickland v. Washington</u>,

-3-

466 U.S. 663 (1984).  Albert Jerome Lockwood alleges that not
**only** has his counsel's representation fallen below an objective
standard of reasonableness, but that this deficient performance
prejudiced his defense based upon the following issues:

1.  The trial court erred in allowing into evidence a
transcript of a statement the Petitioner made to the police due
to the fact that the evidence should have been suppressed because
the law enforcement acted in bad faith and that he was prejudiced
as a result.  In support of this contention.  The trial court's
refusal to grant the Petitioner's Motion to Suppress the transcript
prior to the beginning of the trial was plain error since the State
failed and/or refused to provide the Petitioner's trial counsel
with a copy of the tape prior to trial, in violation of the
Petitioner's due process and Brady rights.

> Suppression by prosecution of evidence favorable to an
> accused upon request violates due process where evidence
> is material either to guilt or to punishment, irrespective
> of good faith or bad faith of prosection.  U.S.C.A.Const.
> Amend. 14.  Brady v. Maryland 373 U.S. 83, 83 S.Ct. 1194
> (U.S.Md. 1963)

The failure of the Prosecutor to establish a proper foundation
for the admission of the transcript should have precluded the
admission of the transcript and the viewing of the transcript by
the Jury.  The Prosecutor failed to adequately establish that
Detective Belcher remembered the contents of the interview, whether
or not Detective Belcher made a page by page comparison between
the tape and the transcript, and whether or not the transcript
was a complete and accurate accounting of the statements made by

-4-

the Petitioner.

> Where the use in evidence of typewritten transcripts of sound recordings has been objected to as in violation of the best evidence rule, the general rule is that the typewritten transcripts are **admissible** if their accuracy and reliability is clearly established. Hawkins v. State 443 So.2d 1312 (Ala.Cr.App., 1933)

(The Alabama Court of Criminal Appeals held that claim is being raised for the first time on appeal, and, therefore, is not properly before this Court. "The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Therefore, Lockwood's attorney was ineffective for failing to timely raise a specific objection and preserve this claim).

2. The trial court erred in allowing into evidence the Petitioner's statement to the police and a transcript of that statement because he was denied his right to remain silent and his right to an attorney during questioning. In support of this contention. The Miranda rights are premised upon the theory that a criminal defendant cannot be compelled to talk to police, and that he has the right to speak to an attorney before talking to police. In the case at bar, the Petitioner had both his right to remain silent and his right to talk counsel denied, and as a result of that denial a taped statement was taken by the Police. The transcript of the Petitioner's statement to Police was highly inculpatory and prejudicial and should never have been admitted as a State's exhibit. By allowing the Jury to read the transcript,

-5-

the Jury was able to draw conclusions that were likely incorrect, or at a minimum, incomplete because the statement itself is incomplete, riddled with "inaudible" and blank lines.

The Petitioner invoked his right to remain silent approximately thirty (30) minutes after the interrogation by Detective Belcher began. (CR 2 of 4 p. 165) However, Detective Belcher testified that a defendant saying "stop doesn't mean stop." (CR 2 of 4 p. 170) This belief on the part of Detective Belcher is in direct opposition to <u>Miranda</u> and a myriad of State and Federal cases to the contrary.

> As the court has acknowledged, "(i)f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." <u>Martin v. Wainwright</u>, 770 F.2d 918, 923 (11th Cir.1985) modified on other grounds, 781 F.2d 185 (11th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986) (emphasis in original) (quoting <u>Miranda</u>, 384 U.S. at 473-74, 86 S.Ct. at 1627). Nevertheless, when a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of "clarifying (the) equivocal request." <u>Martin</u>, 770 F.2d at 924 (quoting <u>Thompson v. Wainwright</u>, 601 F.2d 768, 771 (5th Cir.1979). Once it is clear that an accused wishes to remain silent, the desire to discontinue the interrogation must be "scrupulously honored." <u>Michigan v. Mosley</u>, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975); see <u>United States v. Hernandez</u>, 574 F.2d 1362, 1369 (5th Cir.1978). <u>Lightbourne v. Dugger</u>, 829 F.2d 1012 C.A.11 (Fla.), 1987.

Common sense should dictate that the Petitioner no longer wished to talk with Detective Belcher when he invoked his right to remain silent. In fact, there was approximately a two(2) hour gap in the taped interview that Detective Belcher took from the Petitioner. Detective Belcher readily admits the gap was a result

-6-

of the Petitioner invoking his right to remain silent. "...at that point in time during the investigation, he didn't want to say anything, refused to answer any more questions." (CR 2 of 4 p. 168)  In addition to the galong gap in the taped statement, Detective Belcher testified that he only read the Petitioner his rights one time, and that eas prior to the statement being taken.

> "... (T)he mere passage of time between the time
> defendant invoked his right to counsel and the next
> interrogation does not make Edwards[1] inapplicable." 2
> Wayne R. LaFave et al., Criminal **Procedure** Section 6.9(f)
> (2d ed.1999) (footnotes omitted). Griffin v. State, 2003
> WL 1411321, 3 (Ala.Crim.App.) (Ala.Crim.App.,2003)

The Petitioner's fundamental rights were violated by the Montgomery Police Department when they held the Petitioner in an office for more than four hours and refused to allow him to talk with an attorney, all the while conducting a custodial interrogation. Detective Belcher testified that even though the Petitioner had invoked his right to remain silent, detectives at the Montgomery Police Department routinely allow custodial suspects to sit for a period of time after the suspect invokes their right to remain silent, and they (Police) would later begin asking additional questions. (CR 2 of 4 p. 169)

> "Edwards is best viewed as a per se rule proscribing any
> interrogation of a person held in custody who has invoked
> his right to counsel absent the individual's subsequent

---

[1]Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880
(U.S. Ariz.1981)

initiation of conversation....<u>Griffin v. State</u> 2003 VL 1411321, 3 (Ala.Crim.App.) (Ala.Crim.App.,2003)

The continued interrogation of the Petitioner after his invocation of his right to remain silent should have resulted in the trial court granting the Petitioner's Motion for a Judgment of Acquittal and renewed Motion to Suppress the transcript of the Petitioner's taped statement at the conclusion of the State's case in chief. However, the trial court denied both defense motions, and told the defense counsel she could begin her case. (CR 3 of 4 p. 248)

> The use of petitioner's confession against him at his trial violated his right under the Fifth and Fourteenth Amendments to have counsel present during custodial interrogation, as declared in <u>Miranda</u>. <u>Edwards v. Arizona</u>, 451 U.S. 477, 101 S.Ct. 1880 (U.S. Ariz.1981)

<u>Miranda</u> also stands for the proposition that any coerced statement is inadmissable against the declarant. However, this does not seem to be the policy of the Montgomery Police Department. During the cross examination of Detective Belcher, defense counsel asked the following "So its' your testimony today that nothing was said to coerce Mr. Lockwood to resume questions, to answer questions again..." and Detective Belcher answered "Nothing out of an ordinary question." (CR 2 of 4 pg 171)

If Detective Belcher had any inkling that the Petitioner did not want to continue talking, (and based upon his prior statements Detective Belcher did have such an inkling)[2] then he

---

[2]"...at that point in time during the investigation, he didn't want to say anything, refused to answer any more questions." (CR 2 of 4 p. 168)

-8-

was under a duty to ascertain what the intentions of the custodial suspect was regarding continued cooperation.

> Nevertheless, when a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of "clarifying (the) equivocal request." Martin[3], 770 F.2d at 924 (quoting Thompson v. Wainwright, 601 F.2d 768, 771 (5th Cir.1979)

Although Detective Belcher readily admits that the Petitioner invoked his right to remain silent, he also admits that he didn't really do anything, aside from reinitiating the custodial interrogation, that could be considered coercing the Petitioner. However, sitting a custodial suspect in a Detective's Office for two hours during which time the custodial suspect is alleged to have demanded an attorney, is in no uncertain terms a coercion of the custodial suspect.

> Thus the defendant's confession in Edwards was inadmissible, for the police had visited the defendant in his cell and obtaining (sic) a waiver of Miranda rights the morning after defendant had declared he wanted an attorney. In Minnick v. Mississippi, (498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 439 (1990),) Griffin v. State, 2003 WL 1411321, 2 (Ala.Crim.App.) (Ala.Crim.App.,2003)

When a confession or statement to law enforcement is premised upon coercion or the violation of the custodial suspect's right to remain silent or right to speak with counsel then that statement is inadmissible against the declarant and for trial purposes.

---

[3]Martin v. Wainwright, 770 F.2d 918, 923 (11th Cir.1985) modified on other grounds, 781 F.2d 185 (11th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986)

The failure of the trial court to grant the defense motion
to supress is reversible error. The law in Alabama and throughout
the United States is consistent on this point and requires the
suppression of illegally obtained confessions, particularly
when the custodial suspect is not again appraised of his Miranda
rights. (The Alabama Court of Criminal Appeals held that because
nothing in Lockwood's pretrial motion to suppress was sufficient
to draw the trial court's attention to the specific claims that
Lockwood now attempts to raise on appeal, and because he did not
argue those claims at the time that the evidence was introduced,
Lockwood is not entitled to any relief on this claim because he
failed to preserve this claim for appellate review. Therefore,
Lockwood's attorney was ineffective for failing to preserve this
claim for appellate review).

    3. The trial court's oral instructions to the jury. More
specifically, Lockwood argues that (1) the State did not request
an instruction on evidence of flight until after the trial court
had finished the other oral instructions but before the jury
retired to deliberate in order to give undue weight to the
evidence of flight and, further, that he was prejudiced by the
timing of the flight instruction, which was the last instruction
given to the jury; and (2) the court erred in not instructing the
jury that it had the option to disregard the statement he gave to
the police or the option to find him not guilty of any crime. In
support of this contention. The State and the Defense had both

-10-

put on their cases in chief. Both had rested and post trial
motions were made by the defense counsel for a Judgment of Acquittal
and renewed Motion to Suppress the transcript. The trial court
again denied the defense motions. The trial court gave the State's
requested charges, the defense's requested charge, and had
completed the instructions and court's charges to the Jury. The
trial Judge was in the process of releasing the Jury to deliberate
when the Deputy Assistant District Attorney **stopped** the court
and asked for permission to speak to the judge outside the presence
of the Jury. A side bar with both State and Defense took place,
and then the Judge charged the Jury with a charge on flight. The
court stated, "The last instruction I need to give you, I also
charge you that flight from the scene can be inferred by you as
a guilty state of mind. Okay." (CR 4 of 4 p.50)

The instruction to the jury on flight was deliberately
requested by the State as a last effort to ring a bell in the
Jury's mind and as a means to subliminally suggest to the Jury
that they should convict the Petitioner because he was alleged
to have fled the scene of the alleged crime. The timing was
intentional and made to inflict the maximum amount of impact on
the Jury. The net result was that the Petitioner was prejudiced
by the charge at the time it was requested by the State.

The trial court erred in not instructing the Jury on acquittal
of the Petitioner. The trial court never told the Jury it had the
option to find the Petitioner not guilty of any of the alleged

-11-

crimes. The trial court erred in not instructing the Jury that if there was reasonable doubt about the statement taken by the Police that they could disregard the statement. The trial court erred in not instructing the Jury if there was reasonable doubt, they could acquit the defendant of the charges, and/or find him not guilty.

> That the trial court erred in not instructing the jury that it could reject <u>Slaton's</u> statement to police as involuntary. See <u>Slaton v. State</u>, 680 So.2d at 887-98; <u>Ex parte Slaton</u>, 680 So.2d at 914. <u>Slaton v. State</u> 2003 WL 22220752, 3 (Ala.Crim.App.,2003)

(The Alabama Court of Criminal Appeals held that Lockwood did not raise a timely objection to the instructions he now challenges on appeal, either at the charge conference or at the conclusion of the trial court's oral instructions before the jury retired to deliberate. Thus, this issue is not preserved for appellate review. Therefore, Lockwood's attorney was ineffective for failing to timely raise an objection and preserve this issue for appellate review).

Albert Lockwood's trial counsel did not render reasonably effective assistance of counsel before, during or after his trial and conviction. It is widely recognized that a criminal defendant is entitled to effective legal representation. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) and <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963). Indeed, the adversarial system of justice depends on effective defense counsel. <u>United States v. Cronic</u>, 466 U.S. 648 (1984). Counsel for Albert Lockwood was completely ineffective at

-12-

the trial proceedings.  The attorney representing Albert Lockwood
at the trial abdicated his constitutionally mandated responsibility
to subject the prosecution's case to meaningful adversarial testing,
the errors of Albert Lockwood's counsel "was so serious as to
deprive the defendant of a fair trial, a trial whose result is
liable" and Albert Lockwood now seeks relief from his unconstitut-
ionally obtained conviction and sentence.  Lockhart v. Fretwell,
506 U.S. 364, 369 (1993).  Indeed, performance of Lockwood's
counsel fell below "an objective standard of reasonableness"
and failed "to make the adversarial testing process work."
Strickland v. Washington, 466 U.S. at 688, 690.  None of the
numerous errors of defense counsel could be construed as part of
a "sound trial strategy."  Id. at 691.

### PRAYER FOR RELIEF

For the above stated reasons of this petition and a full
evidentiary hearing.  Petitioner, Albert Lockwood, respectfully
asks this Honorable Court to grant him the following relief:

(a)  conduct a full and fair evidentiary hearing that is
recorded and transcribed, at which proof may be offered concerning
the allegations in this petition;

(b)  issue an order relieving Lockwood of his unconstitut-
ionally obtained conviction and sentence following a full and
complete hearing;  and

(c)  grant Lockwood any such additional relief as is just,
equitable, and proper under federal and state law.

-13-

26



FIFTEENTH JUDICIAL CIRCUIT
CIRCUIT COURT
CASE NO.  CC-03-957.60


STATE OF ALABAMA,

    Plaintiff

V.                                     ORDER

ALBERT LOCKWOOD,

    Defendant

_____

    This cause is before the Court upon a Rule 32 Petition filed by the above named defendant, and upon consideration of the same, it is

    ORDERED that the State of Alabama shall file its response thereto in the time designated by law.

    DONE and ORDERED this the 14th day of February, 2005.

                                  _____
                                  TRACY S. McCOOEY
                                  CIRCUIT JUDGE

CC:  Michael Dean, DDA

     Albert Lockwood - AIS #134376
     St. Clair Correctional Facility
     1000 St. Clair Road
     Springville, AL  35146-5582

RECEIVED
2-14-05
CIRCUIT COURT CLERK

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA          )
                          )
        v.                )          CC 2003-957.60 TSM
                          )
ALBERT LOCKWOOD           )

## MOTION TO DISMISS OR IN THE ALTERNATIVE ANSWER TO PETITIONER'S PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

Comes now the State of Alabama by and through its District Attorney for the Fifteenth Judicial Circuit, Eleanor I. Brooks, and requests that this Honorable Court DISMISS Petitioner's Petition for Relief from Conviction or Sentence and as grounds would state as follows:

1. Petitioner alleges that his trial counsel was ineffective for allowing the trial Court to enter a transcript of a statement he gave to police into evidence. Petitioner alleges that the transcript was not properly admitted.

    a. This allegation is without merit. Petitioner has failed to meet his burden of proof regarding ineffective assistance of counsel. Petitioner failed to show that but for counsels' alleged error that the outcome of his trial or appeal would have been different in accordance with <u>Strickland v. Washington</u> 466 U.S. 668.

    b. Petitioner also failed to prove beyond a preponderance of the evidence the facts necessary to entitle him to relief in accordance with Rule 32.3 of the AL R. Cr. P.

2. Petitioner alleges that his trial counsel was ineffective for allowing his statement to be entered into evidence because he was denied his right to remain silent and his right to an attorney.

    a. This allegation is without merit. Petitioner has failed to meet his burden of proof regarding ineffective assistance of counsel. Petitioner failed to show that but for counsels' alleged error that the outcome of his trial or

MAR 2005
FILED
Melissa Rittenour
Circuit Clerk

appeal would have been different in accordance with <u>Strickland v. Washington</u> 466 U.S. 668.

    b. Petitioner also failed to prove beyond a preponderance of the evidence the facts necessary to entitle him to relief in accordance with Rule 32.3 of the AL R. Cr. P.

3. Petitioner alleges that his trial counsel was ineffective because of the trial court's instructions to the jury.

    a. This allegation is without merit. Petitioner has failed to meet his burden of proof regarding ineffective assistance of counsel. Petitioner failed to show that but for counsels' alleged error that the outcome of his trial or appeal would have been different in accordance with <u>Strickland v. Washington</u> 466 U.S. 668.

    b. The instruction of flight that Petitioner writes about was requested by the State of Alabama during a charge conference. The Court agreed to give that instruction but simply forgot to until reminded by the State of Alabama.

4. Petitioner alleges that his trial counsel was ineffective for failing to have the Court instruct the jury on reasonable doubt and for failing to instruct the jury that they had the option of finding the Petitioner not guilty.

    a. Petitioner's argument is without merit. This allegation is without merit. Petitioner has failed to meet his burden of proof regarding ineffective assistance of counsel. Petitioner failed to show that but for counsels' alleged error that the outcome of his trial or appeal would have been different in accordance with <u>Strickland v. Washington</u> 466 U.S. 668.

    b. Petitioner also failed to prove beyond a preponderance of the evidence the facts necessary to entitle him to relief in accordance with Rule 32.3 of the AL R. Cr. P.

5. All other allegations and /or issues raised by Petitioner are due to be denied. Petitioner failed to prove beyond a preponderance of the evidence the necessary facts that would entitle him to relief and failed to make a clear and specific statement of the grounds upon which relief is sought, including a full disclosure of

the factual basis for those grounds.  Petitioner simply made a bare allegation that a constitutional right had been violated.

Accordingly, as Petitioner's instant petition is precluded or is otherwise without merit, it is due to be summarily dismissed without an evidentiary hearing in accordance with Rule 32.7(d), Ala. R. Crim. P.  The State of Alabama also petitions this Court to assess all costs associated with the filing of this Petition against Petitioner.

Respectfully submitted this the 28th day of February, 2005.

Eleanor I. Brooks
District Attorney

By: _Daryl D. Bailey_
    Daryl D. Bailey
    Chief Deputy District Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon the Petitioner by placing a copy in the United States Mail, postage properly paid, addressed to:  Albert Lockwood, AIS 134376, St. Clair Correctional Facility.

Eleanor I. Brooks
District Attorney

By: _Daryl D. Bailey_
    Daryl D. Bailey
    Chief Deputy District Attorney

FIFTEENTH JUDICIAL CIRCUIT
CIRCUIT COURT
CASE NO. CC-03-957.60

STATE OF ALABAMA,

    Plaintiff

V.                                   ORDER

ALBERT LOCKWOOD,

    Defendant

This cause is before the Court upon a Rule 32 Petition filed by the above named defendant, and upon consideration of the same, it is

ORDERED that the State of Alabama shall file its response thereto in the time designated by law.

DONE and ORDERED this the 14th day of February, 2005.



TRACY S. McCOOEY
CIRCUIT JUDGE

CC:  Michael Dean, DDA

      Albert Lockwood - AIS #134376
      St. Clair Correctional Facility
      1000 St. Clair Road
      Springville, AL  35146-5582

RECEIVED
4-5-05
CIRCUIT COURT CLERK

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | |
| v. | ) | CC 2003-957.60 TSM |
| | ) | |
| ALBERT LOCKWOOD | ) | |

## ORDER

This matter is before the court on the Petitioners Petition for Post Conviction Relief filed pursuant to Rule 32 of The *Alabama Rules of Criminal Procedure* and the State of Alabama's subsequent Answer and Motion to Dismiss. Having considered the pleadings, this Court's own records, and a review of the original proceedings this Court makes the following specific findings of fact and conclusions of law:

1. Petitioner's allegation that his trial counsel was ineffective for allowing the trial Court to enter a transcript of the statement he gave to police into evidence is without merit. Petitioner's allegation that his trial Counsel was ineffective for allowing his statement to be entered into evidence because he was denied his right to remain silent and his right to an attorney is likewise without merit. This Court made a specific ruling that the transcript of the Defendant's statement could be admitted only after considering argument from counsel on each side and considering the relevant and controlling law of the State of Alabama.
This Court specifically finds that Petitioner was advised of his constitutional rights and that he waived those rights and gave a knowing and voluntary statement to the police.
Petitioner has failed to meet his burden of proof regarding ineffective assistance of counsel. Petitioner failed to show that but for counsels' alleged error that the outcome of his trial or appeal would have been different in accordance with Strickland v. Washington 466 U.S. 668. Petitioner also failed to prove beyond a preponderance of the evidence the facts necessary to entitle him to relief in accordance with Rule 32.3 of the AL R. Cr. P.

RECEIVED
4-5-05
CIRCUIT COURT CLERK

2. Petitioner's allegation that his trial counsel was ineffective because of this Court's instructions to the jury is without merit. Petitioner's further allegation that his trial Counsel was ineffective for failing to have the Court instruct the jury on reasonable doubt and for failing to instruct the jury that they had the option to find the Petitioner not guilty is absurd and totally without merit. This Court carefully instructed the jury on the law governing this case and gave instructions that were correct statements of the law. Petitioner has failed to meet his burden of proof regarding ineffective assistance of counsel. Petitioner failed to show that but for counsels' alleged error that the outcome of his trial or appeal would have been different in accordance with <u>Strickland v. Washington</u> 466 U.S. 668. Petitioner also failed to prove beyond a preponderance of the evidence the facts necessary to entitle him to relief in accordance with Rule 32.3 of the AL R. Cr. P.

3. All other allegations and/or issues raised by Petitioner are denied. Petitioner also failed to prove beyond a preponderance of the evidence the facts necessary to entitle him to relief in accordance with Rule 32.3 of the AL R. Cr. P.

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that, as Petitioner's instant Petition is precluded by Rules 32.2(a)(3), 32.3, and 32.6(b), Ala. R. Crim. P., and is otherwise without merit, it is summarily dismissed in accordance with Rule 32.7(d), Ala. R. Crim. P. and all costs associated with this proceeding SHALL BE TAXED AGAINST PETITIONER.

Done this the ____ day of _____, 2005.

Tracy McCooey
Circuit Court Judge

Cc:

Petitioner
Daryl D. Bailey, Chief Deputy District Attorney

33

COPY TO CRIMINAL APPEALS ON 05-05-05

ALBERT LOCKWOOD,

      Appellant,

vs.

STATE OF ALABAMA,

      Appellee.



)
)
)
)
)
)
)
)

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

CASE NO. CC-03-957.60TSM

### NOTICE OF APPEAL TO
### THE COURT OF CRIMINAL APPEALS OF ALABAMA

    Notice is hereby given that Albert Lockwood appeals to the above named court from this Court's dismissal (denial) of his Petition for Relief from Conviction or Sentence entered on March 28, 2005.

    In addition, Albert Lockwood requests that his appeal be in forma pauperis, and notes that he is incarcerated in the State Penal System and that the Court has determined that he is indigent, and he was allowed to proceed in forma pauperis.

    Respectfully submitted this the 2nd day of May, 2005.


          *Albert Lockwood*
          Albert Lockwood
          Pro Se, Appellant
          AIS #134376, G3-B-213
          1000 St. Clair Road
          Springville, AL 35146-5582


### CERTIFICATE OF SERVICE

    Comes now the Appellant and hereby certifies he has served a copy of the foregoing document upon the District Attorney on this the 2nd day of May, 2005.


          *Albert Lockwood*
          Albert Lockwood
          Pro Se, Appellant

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C     8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number |
|---|---|---|

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT    ☐ DISTRICT COURT    ☐ JUVENILE COURT OF      MONTGOMERY
           COUNTY

ALBERT LOCKWOOD
, Appellant

v.    ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF

| Case Number<br>CC-03-957.60 TSM | Date of Judgment/Sentence/Order<br>03/28/2005(Order) |
|---|---|
| Date of Notice of Appeal<br>Oral:      Written:   05/02/2005 | Indigent Status Granted:<br>☒ Yes    ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, and §12-12-72, CODE OF ALABAMA 1975).

*Albert Lockwood*      05/02/2005      Albert Lockwood
Signature                Date                Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED:** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                      COURT REPORTER(S)

A. ☐ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

B. ☐ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

ADDITIONAL PROCEEDINGS REQUESTED          DATE          COURT REPORTER(S)

D.

E.

F.

G.

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified above in order to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

Signature                Date                Print or Type Name

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to: (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

COPY TO CRIMINAL APPEALS ON 05-05-05

| State of Alabama Unified Judicial System Form ARAP- 26 (front)    8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT | Criminal Appeal Number |
|---|---|---|

**A. GENERAL INFORMATION:**

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF _____ MONTGOMERY _____ COUNTY

ALBERT LOCKWOOD , Appellant

V.  ☒ STATE OF ALABAMA   ☐ MUNICIPALITY OF _____

| Case Number CC-03-957.60 TSM | Date of Complaint or Indictment 01/24/2005 (Complaint) | Date of Judgment/Sentence/Order 03/28/2005 (Order) |
|---|---|---|
| Number of Days of Trial/Hearing "0" Days | Date of Notice of Appeal Oral: | 05/02/2005 Written: |

Indigent Status Requested: ☒ Yes  ☐ No          Indigent Status Granted: ☒ Yes  ☐ No

**B. REPRESENTATION:**

Is Attorney Appointed or Retained?  ☐ Appointed  ☐ Retained.    If no attorney, will appellant represent self?  ☒ Yes  ☐ No

| Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary) Albert Lockwood (Pro Se) | Telephone Number (205) 467-6111 |
|---|---|
| Address 1000 St. Clair Rd. | City Springville | State Alabama | Zip Code 35146-5582 |

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
|---|---|
| Codefendant    NONE | Case Number |
| Codefendant | Case Number |

**D. TYPE OF APPEAL:** Please check the applicable block.

1 ☐ State Conviction      4 ☐ Pretrial Order         7 ☐ Juvenile Transfer Order    10 ☐ Other (Specify)
2 ☒ Post-Conviction Remedy  5 ☐ Contempt Adjudication   8 ☐ Juvenile Delinquency
3 ☐ Probation Revocation    6 ☐ Municipal Conviction    9 ☐ Habeas Corpus Petition

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____       6 ☐ Trafficking in Drugs - § _____    11 ☐ Fraudulent Practices - § _____
2 ☐ Homicide - § _____             7 ☐ Theft - § _____                  12 ☐ Offense Against Family - § _____
3 ☐ Assault - § _____              8 ☐ Damage or Intrusion                13 ☐ Traffic - DUI - § _____
4 ☐ Kidnapping/Unlawful                  to Property - § _____            14 ☐ Traffic - Other - § _____
    Imprisonment - § _____         9 ☐ Escape - § _____                 15 ☒ Miscellaneous (Specify) Attempted
5 ☐ Drug Possession - § _____      10 ☐ Weapons/Firearms - § _____          Murder     § 13A-4-2(d)(1)

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed?    ☐ Yes  ☒ No

**G. TRANSCRIPT:**

1. Will the record on appeal have a reporter's transcript?    ☐ Yes  ☒ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. _____ (Date)
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes  ☒ No    If not, will the trial court certify the questions?  ☐ Yes  ☒ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  ☐ Yes  ☒ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

COPY TO CRIMINAL APPEALS ON 05-05-05

| Form ARAP-26 (back)   8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT |

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.1 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| | | | | | | |
| | | | Not applicable. | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

Appellant was denied of Petition for Relief from Conviction or Sentence filed pursuant to Rule 32, Alabama Rules of Criminal Procedure. Appellant asserts that he was denied effective assistance of counsel at trial.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. (Attach additional pages if necessary.)

The trial court's dismissal of the Appellant's Rule 32 petition.

**K. SIGNATURE:**

05/02/2005
_____
Date

*Albert Rockwood*
Signature of Attorney/ Party Filing this Form

37

ACR371                    ALABAMA JUDICIAL DATA CENTER
          NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                        BY THE TRIAL COURT CLERK
               IN THE CIRCUIT COURT  OF MONTGOMERY COUNTY
STATE OF ALABAMA VS LOCKWOOD ALBERT JEROME    JUDGE: TRACEY S MCCOOEY

APPEAL DATE: 05/02/2005

INDIGENCY STATUS:
    GRANTED INDIGENCY STATUS AT TRIAL COURT:           __X__ YES  _____ NO
    APP. TRIAL  COUNSEL PERMITTED TO W/D ON APPEAL:    _____ YES  __X__ NO NA
    INDIGENT STATUS REVOKED ON APPEAL:                 _____ YES  __X__ NO
    INDIGENT STATUS GRANTED ON APPEAL:                 __X__ YES  _____ NO

DEATH PENALTY: NO

APPEAL TYPE: RULE 32 PETITION

THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E., RULE 32 PETITION,
WRIT OF HABEAS CORPUS, ETC) OR FROM ANY OTHER ISSUED BY THE TRIAL JUDGE.

CO/CASE NUMBER: 03/CC 2003 000957.60

ORDER ENTERED(DATE): 03282005 PETITION: X DISMISSED  __DENIED  __GRANTED

POST-JUDGMENT MOTIONS FILED:    DT FILED       DT DENIED     CON BY AGREE
___ MOTION FOR NEW TRIAL       _____     _____     _____ _____
___ MOTION FOR JUDG. OF ACQUIT _____     _____     _____ _____
___ MOTION TO W/D GUILTY PLEA  _____     _____     _____ _____
___ MOTION FOR ATTY TO W/DRAW  _____     _____     _____ _____
___ OTHER _____ _____     _____     _____ _____

COURT REPORTER(S):             _____
ADDRESS:                       _____

APPELLATE COUNSEL #1:          PRO SE
ADDRESS:                       _____
                                                    ,          00000
PHONE NUMBER:                  000-000-0000

APPELLATE COUNSEL #2:          _____
ADDRESS:                       _____
                               _____
                               _____
PHONE NUMBER:                  _____

APPELLANT (PRO SE):            LOCKWOOD ALBERT JEROME
ADDRESS:                       1000 ST.CLAIR ROAD
                               SPRINGVILLE   ,  AL  351465582
AIS #:                         000134376

APPELLEE (IF CITY APPEAL):     _____
ADDRESS:                       _____

I CERTIFY THAT THE INFORMATION PROVIDED                OPERATOR: DBH
ABOVE IS ACCURATE TO THE BEST OF MY          PREPARED: 05/05/2005
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO      _Melissa Bittenour_
THIS ACTION ON THIS 5th DAY OF May , 2005      CIRCUIT COURT CLERK

38



THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT

THE ALABAMA COURT OF CRIMINAL APPEALS

CR-04-1545

Albert Jerome Lockwood, Appellant

vs.

State of Alabama, Appellee

Appeal from Montgomery Circuit Court No. CC-02-957.60

## ORDER

This case is before this Court on appeal from the denial of Albert Jerome Lockwood's petition for postconviction relief filed pursuant to Rule 32, Ala.R.Crim.P. We have reviewed the record on appeal and are unable to ascertain from the record whether the circuit court had jurisdiction to rule on this petition because the record does not affirmatively show either that the circuit court granted Lockwood's request to proceed in forma pauperis or that Lockwood paid the required filing fee.

Therefore, we remand this case to the circuit court for that court to make specific, written findings as to whether it actually granted Lockwood's request to proceed in forma pauperis or whether Lockwood paid the filing fee. See Whitson v. State, 891 So. 2d 421 (Ala. Crim. App. 2004); Maxwell v. State, 897 So. 2d 426 (Ala. Crim. App. 2004); Broadway v. State, 881 So. 2d 1068 (Ala. Crim. App. 2003), and Jackson v. State, 854 So. 2d 157 (Ala. Crim. App. 2002) and Jackson v. State, 854 So. 2d 157 (Ala. Crim. App. 2002). On remand, the circuit court shall take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible time and within 21 days from the date of this order.

Done this 12th day of October, 2005.

H. W. "BUCKY" McMILLAN, PRESIDING JUDGE

cca/

cc:    Hon. Tracy S. McCooey, Judge
       Hon. Melissa Rittenour, Clerk
       Albert Jerome Lockwood, pro se
       John M. Porter, Office of the Attorney General

FIFTEENTH JUDICIAL CIRCUIT
CIRCUIT COURT
CASE NO. CC-02-957.60
03

ALBERT JEROME LOCKWOOD,

     Appellant

V.                                ORDER

STATE OF ALABAMA,

     Appellee

---

This cause is before the Court upon Order from the Alabama Court of Criminal Appeals remanding this case to the Circuit Court for this Court to make specific, written findings as to whether it actually granted Appellant Lockwood's request to proceed in forma pauperis or whether Lockwood paid the filing fee. Upon review of the pleadings and documents in its file, the Court determines that, in fact, it did not rule on the appellant's request to proceed in forma pauperis. This Court has also verified with the Circuit Clerk's Office that the appellant did not pay the necessary filing fee when filing his Rule 32 Petition.

DONE and ORDERED this the 28th day of November, 2005.

TRACY S. McCOOEY
CIRCUIT JUDGE

CC:    Alabama Court of Criminal Appeals
       Hon. Melissa Rittenour, Circuit Clerk
       John M. Porter, Assistant Atty. General
       Albert Jerome Lockwood, pro se

RECEIVED
12-2-05
CIRCUIT COURT CLERK

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
## THE ALABAMA COURT OF CRIMINAL APPEALS

CR-04-1545

Albert Jerome Lockwood v. State of Alabama  (Appeal from Montgomery  Circuit Court:
CC02-957.60)

## CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and
considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on December
2nd 2005:

### Dismissed.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate
Procedure, it is hereby certified that the aforesaid judgment is final.

Witness. Lane W. Mann, Clerk
Court of Criminal Appeals, on this
the 2nd day of December, 2005.

**Clerk
Court of Criminal Appeals
State of Alabama**

cc: Hon. Tracy S. McCooey, Circuit Judge
    Hon. Melissa Rittenour, Circuit Clerk
    Albert Jerome Lockwood, Pro Se
    John M. Porter, Asst. Atty. Gen.



41

THE STATE OF ALABAMA -- JUDICIAL DEPARTMENT

THE ALABAMA COURT OF CRIMINAL APPEALS

CR-04-1545

Albert Jerome Lockwood, Appellant

vs.

State of Alabama, Appellee

Appeal from Montgomery Circuit Court No. CC-02-957.60

## ORDER

This case is before this Court as a result of Lockwood's petition for post-conviction relief, filed pursuant to Rule 32, Ala.R.Crim.P. On October 12, 2005, this Court remanded Lockwood's case to the circuit court for that court to make specific, written findings regarding whether it actually granted Lockwood's request to proceed in forma pauperis prior to ruling on Lockwood's Rule 32 petition.

On November 28, 2005, on return to remand, the circuit court entered an order informing this Court that the circuit court did not grant Lockwood's in forma pauperis request nor had Lockwood paid a filing fee.

"'[A]bsent the payment of a filing fee [required by § 12-19-70, Ala.Code 1975,] or the granting of a request to proceed in forma pauperis the trial court fails to obtain subject matter jurisdiction to consider a postconviction petition.' Carpenter v. State, 782 So.2d 848, 849 (Ala.Crim.App. 2000) (citing Goldsmith v. State, 709 So.2d 1352, 1352-53 (Ala.Crim.App. 1997))."

Ex parte McWilliams, 812 So.2d 318, 322 (Ala. 2001). Because the court's order purporting to deny Lockwood's Rule 32 petition was void, Lockwood had no right to an appeal from that order. A void judgment will not support an appeal. See Underwood v. State, 439 So.2d 125 (Ala. 1983); Hamilton v. State, 828 So.2d 957 (Ala.Crim.App. 2002); Carpenter v. State, 782 So.2d 848 (Ala.Crim.App. 2000). Therefore, Lockwood's appeal from the denial of his Rule 32 petition is due to be dismissed.

In dismissing this appeal, we point out that Lockwood's in forma pauperis petition and his Rule 32 petition still stand filed in the circuit court with their original filing dates and await disposition. In the event the circuit court denies relief, Lockwood should then file a new notice of appeal to this Court.

For the foregoing reasons, it is hereby ordered that this appeal be, and it is hereby, dismissed. The Certificate of Judgment in this case shall issue forthwith.

Done this 2nd day of December, 2005.

H. W. "BUCKY" McMILLAN, PRESIDING JUDGE

cca/

cc:    Hon. Tracy S. McCooey, Judge
       Hon. Melissa Rittenour, Clerk
       Albert Jerome Lockwood, pro se
       John M. Porter, Office of the Attorney General

42

A/C
E

CC 03-957.60

Albert Jerome Lockwood
AIS #134376, G3-B-213
1000 St. Clair Road
Springville, AL 35146-5582

March 14, 2006

Honorable Melissa Ritenour
Circuit Clerk, Montgomery County
Montgomery County Courthouse
P.O. Box 1667
Montgomery, AL 36102-1667



MAR 2006
Filed
Melissa Ritenour
Circuit Clerk

          Re:  Albert Jerome Lockwood v. State of Alabama
               Montgomery County Cir. Ct. No. CC-02-957.60
               Rule 32 Petition                    03

Dear Ms. Ritenour:

     I am writing this letter to you regarding the status of my
Rule 32 petition in the above referenced cause, especially considering
the Court of Criminal Appeals remanded the trial court's denial of my
petition October 12, 2005.

     Thank you for your time and consideration.

                         Sincerely yours,


                         /s/ Albert J. Lockwood


3/21/06
    mr. Lockwood, your Rule 32 was dismissed
on 3/28/05. Your appeal was dismissed on
12/02/05. Thank you. MR/tr
copy sent to def.

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

ALBERT JEROME LOCKWOOD,          )
                                 )
          Petitioner,            )
                                 )
vs.                              )     Montgomery County Circuit Court
                                 )     Case No. CC02-957.60
STATE OF ALABAMA,                )
                                 )
          Respondent.            )

PETITION FOR A WRIT OF MANDAMUS

Comes now petitioner and petitions the Alabama Court of Criminal Appeals for a Writ of Mandamus to issue to Montgomery Circuit Court.

In support of the petition, petitioner states as follows: Albert Jerome Lockwood, presently an inmate in St. Clair County Correctional Facility, petitions for a writ of mandamus directing Judge Tracy S. McCooey to: (1) grant him permission to proceed in forma pauperis on his Rule 32, Ala.R.Crim.P., petition, and (2) rescind her order compelling the Department of Corrections to withhold $201.00, from Lockwood's prison account to pay the filing fee for his Rule 32 petition. See Ex parte Carter, 807 So.2d 534 (Ala. 2001)(holding that petition for writ of mandamus is proper method by which to compel circuit court to proceed on in forma pauperis petition); see also Goldsmith v. State, 709 So.2d 1352 (Ala.Crim.App. 1997)(holding that mandamus, and not appeal, is proper method by which to compel circuit court to proceed on

request to proceed in forma pauperis).

Petitioner respectfully requests that this Court grant the Writ of Mandamus and order that an answer to the petition be filed by respondents.

I certify that, on the date indicated below, I have served copies of this petition and all documents attached on the respondent judge and on all other parties to the action in the trial court.

Respectfully submitted, this the 17th, day of May, 2006.

Albert J. Lockwood
Pro Se, petitioner
AIS #134376, G4-B-215
1000 St. Clair Road
Springville, AL 35146-5582

-2-

Case Number
*CC 03-957 2 60*
ID    YR    NUMBER
(To be completed    *TSM*
by Court Clerk)

# IN FORMA PAUPERIS DECLARATION

### IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA
[Insert appropriate court]

ALBERT LOCKWOOD
_____
(Petitioner)

vs.

STATE OF ALABAMA
_____
(Respondent(s)

## DECLARATION IN SUPPORT OF REQUEST TO PROCEED
## IN FORMA PAUPERIS

I, _____Albert Lockwood_____, declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs, or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1.  Are you presently employed?    Yes _____    No __XX__

    a.  If the answer is "yes", state the amount of your salary or wages per month, and give the name and address of your employer.

    _____Not applicable._____

    b.  If the answer is "no", state the date of last employment and the amount of the salary and wages per month which you received.

    _____Not available._____

2.  Have you received within the past twelve months any money from any of the following sources?

    a.  Business, profession, or other form of self-employment?
        Yes _____        No __XX__

    b.  Rent payments, interest, or dividends?
        Yes _____        No __XX__

    c.  Pensions, annuities, or life insurance payments?
        Yes _____        No __XX__

    d.  Gifts or inheritances?
        Yes _____        No __XX__

    e.  Any other sources?
        Yes _____        No __XX__

2

If the answer to any of th ~~above~~ is "yes", describe each source ~~of~~ money and state the amount received from each during the past twelve months.

**3**

_____ Not applicable. _____

_____

_____

3.  Do you own cash, or do you have money in a checking or savings account?

    Yes __XX__          No _____

    (Include any funds in prison accounts.)

    If the answer is "yes", state the total value of the items owned.

    _____ (See Certified Statement Below) _____

    _____

4.  Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?

    Yes _____          No __XX__

    If the answer is "yes", describe the property and state its approximate value.

    _____ Not applicable. _____

    _____

5.  List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

    _____ NONE _____

    I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

    Executed on __January 19, 2005__
    (Date)

                              _Albert Lockwood_
                              Signature of Petitioner    AIS #134376

### CERTIFICATE

I hereby certify that the petitioner herein has the sum of $ __.04¢__ on account to his credit at the institution where he is confined. I further certify that petitioner likewise has the foregoing securities to his credit according to the records of said __St. Clair C.F.__ institution:

_____

_____

__1/20/05__
DATE

                              _____
                              AUTHORIZED OFFICER OF INSTITUTION

Rule 32                                    3

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA            )
                            )
        v.                  )        CC 2003-957.60 TSM
                            )
ALBERT LOCKWOOD             )

<u>ORDER</u>

This matter is before the court on the Petitioners Petition for Post Conviction
Relief filed pursuant to Rule 32 of The *Alabama Rules of Criminal Procedure* and the
State of Alabama's subsequent Answer and Motion to Dismiss. Having considered the
pleadings, this Court's own records, and a review of the original proceedings this Court
makes the following specific findings of fact and conclusions of law:

1.  Petitioner's allegation that his trial counsel was ineffective for allowing the trial
    Court to enter a transcript of the statement he gave to police into evidence is
    without merit. Petitioner's allegation that his trial Counsel was ineffective for
    allowing his statement to be entered into evidence because he was denied his right
    to remain silent and his right to an attorney is likewise without merit. This Court
    made a specific ruling that the transcript of the Defendant's statement could be
    admitted only after considering argument from counsel on each side and
    considering the relevant and controlling law of the State of Alabama.

    This Court specifically finds that Petitioner was advised of his constitutional
    rights and that he waived those rights and gave a knowing and voluntary
    statement to the police.

    Petitioner has failed to meet his burden of proof regarding ineffective assistance
    of counsel. Petitioner failed to show that but for counsels' alleged error that the
    outcome of his trial or appeal would have been different in accordance with
    <u>Strickland v. Washington</u> 466 U.S. 668. Petitioner also failed to prove beyond a
    preponderance of the evidence the facts necessary to entitle him to relief in
    accordance with Rule 32.3 of the AL R. Cr. P.

RECEIVED
4-5-05
CIRCUIT COURT CLERK

2. Petitioner's allegation that his trial counsel was ineffective because of this Court's instructions to the jury is without merit. Petitioner's further allegation that his trial Counsel was ineffective for failing to have the Court instruct the jury on reasonable doubt and for failing to instruct the jury that they had the option to find the Petitioner not guilty is absurd and totally without merit. This Court carefully instructed the jury on the law governing this case and gave instructions that were correct statements of the law. Petitioner has failed to meet his burden of proof regarding ineffective assistance of counsel. Petitioner failed to show that but for counsels' alleged error that the outcome of his trial or appeal would have been different in accordance with Strickland v. Washington 466 U.S. 668. Petitioner also failed to prove beyond a preponderance of the evidence the facts necessary to entitle him to relief in accordance with Rule 32.3 of the AL R. Cr. P.

3. All other allegations and/or issues raised by Petitioner are denied. Petitioner also failed to prove beyond a preponderance of the evidence the facts necessary to entitle him to relief in accordance with Rule 32.3 of the AL R. Cr. P.

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that, as Petitioner's instant Petition is precluded by Rules 32.2(a)(3), 32.3, and 32.6(b), Ala. R. Crim. P., and is otherwise without merit, it is summarily dismissed in accordance with Rule 32.7(d), Ala. R. Crim. P. and all costs associated with this proceeding SHALL BE TAXED AGAINST PETITIONER.

Done this the _____ day of _____

Tracy McCooty
Circuit Court Judge

Cc:

Petitioner
Daryl D. Bailey, Chief Deputy District Attorney

STATE OF ALABAMA
MONTGOMERY COUNTY
I, Melissa Rittenour, Clerk of the Circuit Court of Montgomery County, hereby certify that the within is a true and correct copy of the Order on file in said office. Witness my hand and the seal of said Court is hereto affixed, this the ____ day of _____ 05
Melissa Rittenour
Clerk Circuit Court

$201.00
Albert Lockwood AIS 134376
1000 St. Clair Blvd.
Springville, AL 35146

# NOTICE OF INTENT TO WITHHOLD
## COURT ORDERED WITHHOLDING FROM PMOD FUNDS

TO:         ALBERT LOCKWOOD, AIS #134376

FROM:       LISA TUCKER
            Business Manager

SUBJECT:    Court Ordered Withholding

This is to advise you that an Order from MONTGOMERY COUNTY Court, case #CC-2003-957.60 TSM, has been received directing the Alabama Department of Corrections to withhold $201.00, from your PMOD account. A copy of the Order is attached to this notice.

You are entitled to a Fair Hearing prior to assessment of these charges. Your PMOD account has been frozen pending the outcome of this hearing. The hearing is scheduled for the date of _May 13_ at _10:00_ (a.m.) (p.m.) in my office or other convenient place to be determined. At that time, you may produce any evidence you have to show why compliance with the Order should not be had. In the alternative, you may waive this hearing by completing the attached Fair Hearing Waiver, ADOC Form 112-B.

Received: _Albert Lockwood #134576_

Date: _4/28/05_

Distribution: Original to Business Office
              Copy to inmate

ADOC Form 112-A

1 of 3

AR112 – July 26, 2004

3

50

## FAIR HEARING WAIVER
### COURT ORDERED WITHHOLDING FROM PMOD FUNDS

I  ALBERT LOCKWOOD, AIS Number 134376, having been informed of the Court Order to withhold funds in the amount of $201.00 from my PMOD funds/account balance, Case No. CC-2003-957.60 TSM, do hereby waive my right to a Fair Hearing on the issue and agree to the withholding without a Fair Hearing.

_Albert Lockwood #134376_
INMATE SIGNATURE

Date _4/28/05_

Sworn to and subscribed before me this _28_ day of, _April_ , _2005_

_Lisa C Zucher_
Notary Public
My Commission Expires _9-13-05_

Distribution: Original to Business Office
Copy to inmate

ADOC Form 112-B

2 of 3

AR112 – June 26, 2004

51

THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT

THE ALABAMA COURT OF CRIMINAL APPEALS

CR-04-1545

Albert Jerome Lockwood, Appellant

vs.

State of Alabama, Appellee

Appeal from Montgomery Circuit Court No. CC-02-957.60

**ORDER**

This case is before this Court as a result of Lockwood's petition for post-conviction relief, filed pursuant to Rule 32, Ala.R.Crim.P.  On October 12, 2005, this Court remanded Lockwood's case to the circuit court for that court to make specific, written findings regarding whether it actually granted Lockwood's request to proceed in forma pauperis prior to ruling on Lockwood's Rule 32 petition.

On November 28, 2005, on return to remand, the circuit court entered an order informing this Court that the circuit court did not grant Lockwood's in forma pauperis request nor had Lockwood paid a filing fee.

"'[A]bsent the payment of a filing fee [required by § 12-19-70, Ala.Code 1975,] or the granting of a request to proceed in forma pauperis the trial court fails to obtain subject matter jurisdiction to consider a postconviction petition.' Carpenter v. State, 782 So.2d 848, 849 (Ala.Crim.App. 2000) (citing Goldsmith v. State, 709 So.2d 1352, 1352-53 (Ala.Crim.App. 1997))."

Ex parte McWilliams, 812 So.2d 318, 322 (Ala. 2001).  Because the court's order purporting to deny Lockwood's Rule 32 petition was void, Lockwood had no right to an appeal from that order.  A void judgment will not support an appeal. See Underwood v. State, 439 So.2d 125 (Ala. 1983); Hamilton v. State, 828 So.2d 957 (Ala.Crim.App. 2002); Carpenter v. State, 782 So.2d 848 (Ala.Crim.App. 2000).  Therefore, Lockwood's appeal from the denial of his Rule 32 petition is due to be dismissed.

In dismissing this appeal, we point out that Lockwood's in forma pauperis petition and his Rule 32 petition still stand filed in the circuit court with their original filing dates and await disposition. In the event the circuit court denies relief, Lockwood should then file a new notice of appeal to this Court.

For the foregoing reasons, it is hereby ordered that this appeal be, and it is hereby, dismissed. The Certificate of Judgment in this case shall issue forthwith.

Done this 2nd day of December, 2005.

H. W. "BUCKY" McMILLAN, PRESIDING JUDGE

cca/

cc:      Hon. Tracy S. McCooey, Judge
         Hon. Melissa Rittenour, Clerk
         Albert Jerome Lockwood, pro se
         John M. Porter, Office of the Attorney General

52

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
## THE ALABAMA COURT OF CRIMINAL APPEALS

CR-04-1545

Albert Jerome Lockwood v. State of Alabama  (Appeal from Montgomery  Circuit Court:
CC02-957.60)

## CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on December 2nd 2005:

### Dismissed.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate Procedure, it is hereby certified that the aforesaid judgment is final.

Witness. Lane W. Mann, Clerk
Court of Criminal Appeals, on this
the 2nd day of December, 2005.

Clerk
Court of Criminal Appeals
State of Alabama

cc: Hon. Tracy S. McCooey, Circuit Judge
Hon. Melissa Rittenour, Circuit Clerk
Albert Jerome Lockwood, Pro Se
John M. Porter, Asst. Atty. Gen.

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the following persons on the _____ day of May, 2006.

Honorable Tracy S. McCooey
Circuit Judge
15th Judicial Circuit of Alabama
251 S. Lawrence Street
Montgomery, AL 36104

Honorable Melissa Rittenour
Circuit Clerk, Montgomery County
Montgomery County Courthouse
P.O. Box 1667
Montgomery, AL 36102-1667

Honorable John M. Porter
Assistant Attorney General
Office of the Attorney General
Criminal Appeals Division
Alabama State House
II South Union Street
Montgomery, AL 36130-0152

Albert J. Lockwood
Pro Se, petitioner

-3-

54

FIFTEENTH JUDICIAL CIRCUIT
CIRCUIT COURT
CASE NO. CC-03-957.60

ALBERT JEROME LOCKWOOD,

     Appellant

V.                              ORDER

STATE OF ALABAMA,

     Appellee

     Comes the Court, ex mero motu, and does hereby Order that the request to proceed

in forma pauperis filed by Albert Lockwood is due to be, and the same is hereby

GRANTED. It is ORDERED that Mr. Lockwood is hereby allowed to file his Rule 32

Petition without the prepayment of court costs.

     DONE and ORDERED this the 12th day of June, 2006.

                               TRACY S. McCOOEY
                               CIRCUIT JUDGE

CC:    Alabama Court of Criminal Appeals
       Hon. Melissa Rittenour, Circuit Clerk
       John M. Porter, Assistant Atty. General
       Albert Jerome Lockwood, pro se



RECEIVED
6-12-06
CIRCUIT COURT CLERK

# COURT OF CRIMINAL APPEALS
# STATE OF ALABAMA



H. W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## CR-05-1510

Ex parte Albert Jerome Lockwood   (In re: State of Alabama vs. Albert Jerome Lockwood)   (Montgomery  Circuit Court: CC03-957.60)

## ORDER

Upon consideration of the above referenced Petition for Writ of Mandamus, the Court of Criminal Appeals ORDERS that said petition be and the same is hereby DISMISSED.

Done this the 16th day of June, 2006.

H. W. "Bucky" McMillan, Presiding Judge
Court of Criminal Appeals

cc: Hon. Melissa Rittenour, Circuit Clerk
Albert Jerome Lockwood, Pro Se
Hon. Tracy S. McCooey, Circuit Judge
Hon. Troy King, Attorney General
John M. Porter, Asst. Atty. Gen.
Hon. Eleanor Idelle Brooks, District Attorney
Hon. Randy Helms, Director, AOC



IN THE STATE OF ALABAMA COURT OF CRIMINAL APPEALS

03-957.60

| | |
|---|---|
| EX PARTE: Albert Jerome Lockwood. | ) |
| | ) |
| | ) |
| IN RE: STATE OF ALABAMA, | ) |
| | ) CR-05-1510 |
| vs. | ) Montgomery County Circuit |
| | ) CC-02-957.60 |
| ALBERT JEROME LOCKWOOD. | ) |
| | ) |

**RESPONSE TO PETITION FOR WRIT OF MANDAMUS**

Comes now the Respondent in the above-styled cause, by and through the Attorney General of the State of Alabama, and submits this response to Petitioner Albert Jerome Lockwood's petition for writ of mandamus.

1.    On May 17, 2006, Petitioner Lockwood filed a petition for writ of mandamus in this Court requesting that the Circuit Court of Montgomery County grant him in forma pauperis ("IFP") status and rescind its order compelling the Department of Corrections to withhold $201.00 from his prison account. (*See* Petition for Writ of Mandamus) This Court issued an order on May 25, 2006, granting the Respondent 21 days in which to respond to Lockwood's petition.

6-22-06

CIRCUIT COURT CLERK

57

2.   On June 12, 2006, the Honorable Tracy S. McCooey issued an order granting Lockwood's request to proceed in forma pauperis.  See Exhibit A.  Furthermore, on December 2, 2005, this Court issued an order holding that the order purporting to rule on Lockwood's Rule 32 petition which taxed costs against him - the very order he now asks to be rescinded - was void.  See attachments to petition. Accordingly, Lockwood has received the relief he requests.

3.   Therefore, his petition is moot and is due to be dismissed.  See Ex parte Talladega Little League, Inc., 556 So. 2d 386, 387 (Ala. 1990)(" . . . [M]andamus will not issue in a case where the underlying issue has become moot.").

2

58

**CONCLUSION**

The Respondent respectfully requests that this Court

dismiss Lockwood's petition for writ of mandamus as moot.

Respectfully submitted,

Troy King
Attorney General
By

John M. Porter
Assistant Attorney General

3

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of June, 2006, I served a copy of the foregoing on the *pro se* petitioner, by placing the same in the United States Mail, first-class postage prepaid and addressed as follows:

>       Albert Jerome Lockwood
>       AIS #134376 - G4-B-215
>       St. Clair Correctional Facility
>       1000 St. Clair Rd.
>       Springville, Alabama 35146-5582


John M. Porter
Assistant Attorney General

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, AL  36130
(334) 242-7300

144238

4

60

FIFTEENTH JUDICIAL CIRCUIT
CIRCUIT COURT
CASE NO. CC-03-957.60

ALBERT JEROME LOCKWOOD,

    Appellant

V.                                          ORDER

STATE OF ALABAMA,

    Appellee

    Comes the Court, ex mero motu, and does hereby Order that the request to proceed

in forma pauperis filed by Albert Lockwood is due to be, and the same is hereby

GRANTED.   It is ORDERED that Mr. Lockwood is hereby allowed to file his Rule 32

Petition without the prepayment of court costs.

    DONE and ORDERED this the 12th day of June, 2006.

                      TRACY S. McCOOEY
                      CIRCUIT JUDGE

CC:    Alabama Court of Criminal Appeals
       Hon. Melissa Rittenour, Circuit Clerk
       John M. Porter, Assistant Atty. General
       Albert Jerome Lockwood, pro se

EXHIBIT

A

61



IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

| | | |
|---|---|---|
| ALBERT JEROME LOCKWOOD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | CASE NO. CC-02-957.60 |
| | ) | |
| STATE OF ALABAMA, | ) | |
| | ) | |
| Respondent. | ) | |

## MOTION FOR REIMBURSEMENT

Comes now the Petitioner, proceeding pro se, and respectfully requests that this Honorable Court to enter an Order providing that the Department of Corrections reimburse any or all monies withhold from his prison account and as grounds therefore states the following:

1. That the Alabama Court of Criminal Appeals issued an order holding that the order purporting to rule on the Petitioner's Rule 32 petition which taxed costs against him was void on the 2nd day of December, 2005.

WHEREFORE, PREMISES CONSIDERED, the Petitioner prays that this Honorable Court will grant this motion.

Respectfully submitted,

*Albert Lockwood*

Albert J. Lockwood
Pro Se, Petitioner
AIS #134376, G4-B-215
1000 St. Clair Road
Springville, AL 35146-5582

## CERTIFICATE OF SERVICE

I, Albert Jerome Lockwood, hereby certify that I have served a copy of the foregoing on all parties and counsel of records by placing the same in the United States Mail, postage pre-paid and properly addressed on this the  3rd day of July, 2006.

Albert J. Lockwood
Pro Se, Petitioner

Alabama Court of Criminal Appeals
300 Dexter Avenue
P.O. Box 301555
Montgomery, AL 36130-1555


Honorable John M. Porter
Assistant Attorney General
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, AL 36130

-2-

63

Albert Jerome Lockwood
AIS #134376, G4-B-215
1000 St. Clair Road
Springville, AL 35146-5582

August 7, 2006

Honorable Melissa Ritenour
Circuit Clerk, Montgomery County
Montgomery County Courthouse
P.O. Box 1667
Montgomery, AL 36102-1667

        Re:  <u>Albert Jerome Lockwood v. State of Alabama</u>
            Montgomery County Cir. Ct. No. CC-07-957.60
                                  03

Dear Mrs. Ritenour:

    I am writing to you regarding the staus of my Rule 32 petition pending in the above referenced cause, especially considering that the Court has determined that I am indigent, and I am allowed to proceed in forma pauperis.

    Thank you for your time and consideration.

                        Sincerely,

                        *Albert Lockwood*
                        Albert J. Lockwood

*8/09/06*
*Mr. Lockwood, the circuit clerk's office does not show a pending Rule 32 on your case. Please submit you Rule 32 paperwork to the circuit clerk's office, and we will be glad to file your Rule 32. MR/TR*

*AUG 2006*
*Melissa Ritenour*
*Circuit Clerk*

Albert Jerome Lockwood
AIS #134376, G4-B-215
1000 St. Clair Road
Springville, AL 35146-5582

August 15, 2006

Honorable Melissa Rittenour
Circuit Clerk, Montgomery County
Montgomery County Courthouse
P.O. Box 1667
Montgomery, AL 36102-1667



Re:  <u>Albert Jerome Lockwood v. State of Alabama</u>
     Montgomery Circuit Court No. CC-02-957.60

Dear Ms. Rittenour:

    Please find enclosed a copy of my Rule 32 petition, along
with a document I received concerning my case.  I am providing
this to you to point out that my in forma pauperis petition and
my Rule 32 petition still stand filed in this Court with their
original filing dates and await disposition pursuant to an Order
of the Alabama Court of Criminal Appeals dated December 2, 2005,
dismissing my appeal from the denial of my Rule 32 petition.

    Thank you for your time and consideration.

                              Sincerely,

                              Albert J. Lockwood

THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT

THE ALABAMA COURT OF CRIMINAL APPEALS

CR-04-1545

Albert Jerome Lockwood, Appellant

vs.

State of Alabama, Appellee

Appeal from Montgomery Circuit Court No. CC-02-957.60

## ORDER

This case is before this Court as a result of Lockwood's petition for post-conviction relief, filed pursuant to Rule 32, Ala.R.Crim.P. On October 12, 2005, this Court remanded Lockwood's case to the circuit court for that court to make specific, written findings regarding whether it actually granted Lockwood's request to proceed in forma pauperis prior to ruling on Lockwood's Rule 32 petition.

On November 28, 2005, on return to remand, the circuit court entered an order informing this Court that the circuit court did not grant Lockwood's in forma pauperis request nor had Lockwood paid a filing fee.

"'[A]bsent the payment of a filing fee [required by § 12-19-70, Ala.Code 1975,] or the granting of a request to proceed in forma pauperis the trial court fails to obtain subject matter jurisdiction to consider a postconviction petition.' Carpenter v. State, 782 So.2d 848, 849 (Ala.Crim.App. 2000) (citing Goldsmith v. State, 709 So.2d 1352, 1352-53 (Ala.Crim.App. 1997))."

Ex parte McWilliams, 812 So.2d 318, 322 (Ala. 2001). Because the court's order purporting to deny Lockwood's Rule 32 petition was void, Lockwood had no right to an appeal from that order. A void judgment will not support an appeal. See Underwood v. State, 439 So.2d 125 (Ala. 1983); Hamilton v. State, 828 So.2d 957 (Ala.Crim.App. 2002); Carpenter v. State, 782 So.2d 848 (Ala.Crim.App. 2000). Therefore, Lockwood's appeal from the denial of his Rule 32 petition is due to be dismissed.

In dismissing this appeal, we point out that Lockwood's in forma pauperis petition and his Rule 32 petition still stand filed in the circuit court with their original filing dates and await disposition. In the event the circuit court denies relief, Lockwood should then file a new notice of appeal to this Court.

For the foregoing reasons, it is hereby ordered that this appeal be, and it is hereby, dismissed. The Certificate of Judgment in this case shall issue forthwith.

Done this 2nd day of December, 2005.

H. W. "BUCKY" McMILLAN, PRESIDING JUDGE

cca/

cc:    Hon. Tracy S. McCooey, Judge
       Hon. Melissa Rittenour, Clerk
       Albert Jerome Lockwood, pro se
       John M. Porter, Office of the Attorney General

Albert Jerome Lockwood
AIS #134376, G4-B-215
1000 St. Clair Road
Springville, AL 35146-5582

August 7, 2006

Honorable Melissa Ritenour
Circuit Clerk, Montgomery County
Montgomery County Courthouse
P.O. Box 1667
Montgomery, AL 36102-1667

      Re: <u>Albert Jerome Lockwood v. State of Alabama</u>
           <u>Montgomery County Cir. Ct. No. CC-02-957.60</u>

Dear Mrs. Ritenour:

    I am writing to you regarding the staus of my Rule 32 petition
pending in the above referenced cause, especially considering that
the Court has determined that I am indigent, and I am allowed to
proceed in forma pauperis.

    Thank you for your time and consideration.

                Sincerely,

                *Albert Lockwood*
                Albert J. Lockwood

*8/09/06*
*Mr. Lockwood, the circuit clerk's office does not show a pending Rule 32 on your case. Please submit you Rule 32 paperwork to the circuit clerk's office, and we will be glad to file your Rule 32. MR/TR*

# PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

### (Pursuant to Rule 32,
### Alabama Rules of Criminal Procedure)

**4**

Case Number

| CC | 03 | 957 . 60 |
|----|----|----------|
| ID | YR | NUMBER |

IN THE _____ CIRCUIT _____ COURT OF __MONTGOMERY__ ALABAMA

ALBERT JEROME LOCKWOOD _____ vs. ___ STATE OF ALABAMA ___

Petitioner (Full Name)                    Respondent

[Indicate either the "State" or, if filed in municipal court, the name of the "Municipality"]

Prison Number ___(AIS) 134376___ Place of Confinement __St. Clair Corr. Fac.__

County of conviction __Montgomery County.__

**NOTICE:    BEFORE COMPLETING THIS FORM, READ CAREFULLY THE ACCOMPANYING INSTRUCTIONS.**

1.  Name and location (city and county) of court which entered the judgment of conviction or sentence under attack __The Circuit Court of Montgomery County, Alabama in Montgomery.__

2.  Date of judgment of conviction __February 24, 2004.__

3.  Length of sentence __Life imprisonment without the possibility of parole.__

4.  Nature of offense involved (all counts) __Attempted Murder.__

   _____

   _____

5.  What was your plea?   (Check one)

   (a)  Guilty _____

   (b)  Not guilty __XX__

   (c)  Not guilty by reason of mental disease or defect _____

   (d)  Not guilty and not guilty by reason of mental disease or defect _____

6. Kind of trial: (Check one)

(a)  Jury __XX__          (b)  Judge only _____

7. Did you testify at the trial?

Yes _____          No __XX__

8. Did you appeal from the judgment of conviction?

Yes __XX__          No _____

9. If you did appeal, answer the following:

(a)  As to the state court to which you first appealed, give the following information:

(1)  Name of court __The Alabama Court of Criminal Appeals.__

(2)  Result __Conviction Affirmed.__

(3)  Date of result __Conviction Affirmed on September 24, 2004, and__
__Application for Rehearing Overruled on October 15, 2004.__

(b)  If you appealed to any other court, then as to the second court to which you appealed, give the following information:

(1)  Name of court __Not applicable.__

(2)  Result __Not applicable.__

(3)  Date of result __Not applicable.__

(c)  If you appealed to any other court, then as to the third court to which you appealed, give the following information:

(1)  Name of court __Not applicable.__

(2)  Result __Not applicable.__

(3)  Date of result __Not applicable.__

2

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

Yes _____          No __XX__

11. If your answer to Question 10 was "yes", then give the following information in regard to the first such petition, application, or motion you filed:

   (a)  (1)  Name of court _____ Not applicable. _____

        (2)  Nature of proceeding _____ Not applicable. _____

        (3)  Grounds raised _____ Not applicable. _____

_____

_____

_____

(attach additional sheets if necessary)

        (4)  Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____          No _____

        (5)  Result _____ Not applicable. _____

        (6)  Date of result _____ Not applicable. _____

   (b)  As to any second petition, application, or motion, give the same information:

        (1)  Name of court _____ Not applicable. _____

        (2)  Nature of proceeding _____ Not applicable. _____

        (3)  Grounds raised _____ Not applicable. _____

_____

_____

_____

(attach additional sheets if necessary)

        (4)  Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____          No _____

        (5)  Result _____ Not applicable. _____

        (6)  Date of result _____ Not applicable. _____

   (c)  As to any third petition, application, or motion, give the same information (attach additional sheets giving the same information for any subsequent petitions, applications, or motions):

        (1)  Name of court _____ Not applicable. _____

3

   (2)  Nature of proce   )     Not applicable

   (3)  Grounds raised      Not applicable.

   (attach additional sheets if necessary)

   (4)  Did you receive an evidentiary hearing on your petition, application, or motion?

       Yes _____           No _____

   (5)  Result _____      Not applicable.

   (6)  Date of result _____      Not applicable.

(d)  Did you appeal to any appellate court the result of the action taken on any petition, application, or motion?

   (1)  First petition, etc.     Yes _____           No _____

   (2)  Second petition, etc.    Yes _____           No _____

   (2)  Third petition, etc.     Yes _____           No _____

**ATTACH ADDITIONAL SHEETS GIVING THE SAME INFORMATION
FOR ANY SUBSEQUENT PETITIONS, APPLICATIONS, OR MOTIONS.**

(e)  If you did not appeal when you lost on any petition, application, or motion, explain briefly why you did not:

                        Not applicable.

12.  Specify every ground on which you claim that you are being held unlawfully, by placing a check mark on the appropriate line(s) below and providing the required information. Include all facts. If necessary, you may attach pages stating additional grounds and the facts supporting them.

# GROUNDS OF PETITION

Listed below are the possible grounds for relief under Rule 32. Check the ground(s) that apply in your case, and follow the instruction under the ground(s):

__XX__   A.   The Constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.

       For your information, the following is a list of the most frequently raised claims of constitutional violation:.

(1) Conviction ob____ ed by plea of guilty which was unlawful ____ duced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(2) Conviction obtained by use of coerced confession.

(3) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(4) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(5) Conviction obtained by a violation of the privilege against self-incrimination.

(6) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(7) Conviction obtained by a violation of the protection against double jeopardy.

(8) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(9) Denial of effective assistance of counsel.

This list is not a complete listing of all possible constitutional violations.

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each constitutional violation that you claim, whether or not it is one of the nine listed above, and include under it each and every fact you feel supports this claim. Be specific and give details.

——— B.  **The court was without jurisdiction to render the judgment or to impose the sentence.**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

——— C.  **The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law,**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

——— D.  **Petitioner is being held in custody after his sentence has expired.**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

——— E.  **Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:**

**The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to rule 24, or in time to be included in any previous collateral proceeding, and could not have been discovered by any of those times through the exercise of reasonable diligence; and**

**The facts are not merely cumulative to other facts that were known; and**

5

The facts do not merely amo        ) to impeachment evidence; and        )

If the facts had been known at the time of trial or sentencing, the result would probably have been different; and

The facts establish that petitioner is innocent of the crime for which he was convicted or should not have received the sentence that he did.

> If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

____ F. **The petitioner failed to appeal within the prescribed time and that failure was without fault on petitioner's part.**

> If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

13. **IMPORTANT NOTICE REGARDING ADDITIONAL PETITIONS RULE 32.2(b) LIMITS YOU TO ONLY ONE PETITION IN MOST CIRCUMSTANCES. IT PROVIDES:**

> "Successive Petitions. The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner. A second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exist why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."

A. Other than an appeal to the Alabama Court of Criminal Appeals or the Alabama Supreme Court, have you filed in state court any petition attacking this conviction or sentence?

Yes _____        No __XX__

B. If you checked "Yes," give the following information as to earlier petition attacking this conviction or sentence:

    (a) Name of court _____ Not applicable.

    (b) Result _____ Not applicable.

    (c) Date of result _____ Not applicable.
    (attach additional sheets if necessary)

C. If you checked the "Yes" line in 13A, above, and this petition contains a different ground or grounds of relief from an earlier petition or petitions you filed, attach a separate sheet or sheets labeled: "EXPLANATION FOR NEW GROUND(S) OF RELIEF."

> On the separate sheet(s) explain why "good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and [why the] failure to entertain [this] petition will result in a miscarriage of justice."

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes _____        No __XX__

6

15. Give the name and address )known, of each attorney who represe )f you at the following stages of the case that resulted in the judgment under attack:

(a) At preliminary hearing _Vickie Toles; Trina Williams; Rick McLelland._

(b) At arraignment and plea ___(Same Above)___

(c) At trial ___(Same Above)___

(d) At sentencing _Trina Williams._

(e) On appeal _Thomas J. Azar, Jr., 609 South McDonough Street, Montgomery, AL 36104._

(f) In any post-conviction proceeding ___Not applicable.___

(g) On appeal from adverse ruling in a post-conviction proceeding ___Not applicable.___

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes _____     No _XX_

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes _____     No _XX_

(a) If so, give name and location of court which imposed sentence to be served in the future: ___Not applicable.___

(b) And give date and length of sentence to be served in the future: ___Not applicable.___

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes _____     No _____

18. What date is this petition being mailed?

_January 24, 2005._

Wherefore, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

7

# PETITIONER'S VERIFICATION UNDER OATH
## SUBJECT TO PENALTY FOR PERJURY

I swear (or affirm) under penalty of perjury that the foregoing is true and correct.

Executed on _____ 1-22-05 _____.
(Date)

x _Albert Lockwood_
Signature of Petitioner

SWORN TO AND SUBSCRIBED before me this the 22 day of _____ Jan _____ 2005

JH CAT

Notary Public

### OR *

### ATTORNEY'S VERIFICATION UNDER OATH
### SUBJECT TO PENALTY FOR PERJURY

I Swear (or affirm) under penalty of perjury that, upon information and belief, the foregoing is true

and correct. Executed on _____.
(Date)

_____
Signature of Petitioner's Attorney

SWORN TO AND SUBSCRIBED before me this the _____ day of _____,

_____
Notary Public

Name and address of attorney representing petitioner
in this proceeding (if any)

_____

_____

_____

_____

* If petitioner is represented by counsel, Rule 32.6(a) permits either petitioner or counsel to verify the petition.

75

12

Albert Lockwood
AIS #134376, G3-B-213
1000 St. Clair Road
Springville, AL 35146-5582

January 26, 2005

Honorable Melissa Ritenour
Circuit Clerk, Montgomery County
Montgomery County Courthouse
P.O. Box 1667
Montgomery, Alabama 36102-1667

   Re: CC-03-957
    Albert Jerome Lockwood v. State of Alabama

Dear Ms. Ritenour:

  Please find enclosed the original of the Petitioner's Rule 32 petition, in which he is challenging his 2004 conviction and sentence in the above referenced cause, including a memorandum in support of his request for relief from conviction or sentence, and such other instruments as have been completed and included herein.

  In addition, the Petitioner respectfully requests for leave as an indigent pary to be allowed to file its original petition in lieu of additional copies thereof upon the Court's determination whether he is indigent, and he is allowed to proceed in forma pauperis. Petitioner had been denied free photocopies by the law library supervisor where he is presently confined at St. Clair Correctional Facility, although it's the institutional policy to do so pursuant to SOP #218.

  Thank you for your time and consideration.

       Very truly yours,

       *Albert Lockwood*
       Albert Lockwood

Enclosure

**13**

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

ALBERT JEROME LOCKWOOD,  )
   Petitioner,  )
        )
vs.  )  CASE NO. CC-2003-957.
        )
STATE OF ALABAMA,  )
   Respondent.  )

MEMORANDUM IN SUPPORT OF PETITION FOR
RELIEF FROM CONVICTION OR SENTENCE FILED UNDER
RULE 32 OF THE ALABAMA RULES OF CRIMINAL PROCEDURE

Comes now the Petitioner in this matter and submits the following in support of his request for relief from conviction or sentence.

GROUNDS OF PETITION

A. The Constitution of the United States or the State of Alabama requires a new trial, a new sentencing proceeding, or other relief.

FACTS

This cause of action began after the July 2003 Term of the Grand Jury of Montgomery County, Alabama returned a true bill indicting the Petitioner Albert Jerome Lockwood on a charge of Attempted Murder, in violation of Section 13A-4-2, Code of Alabama, (1975).

On February 23, 2004 the Petitioner, by and through counsel, was tried before a Jury. Both the State and the Defense put witnesses on to testify in this matter. The trial concluded February 23, 2004 with the jury finding the Petitioner guilty of

14

the Attempted Murder of Christopher McKinnes.  The matter was then set for sentencing March 18, 2004.

The Petitioner appeared for sentencing by the trial court, March 18, 2004, and was sentenced to a term of life without parole.  Trial Counsel made an Oral Motion for a New Trial.  The Petitioner was taken into custody and court was adjourned.

April 14, 2004 counsel for the Petitioner filed a written Motion for a New Trial or in the Alternative Motion to Set Aside the Verdict in this matter.  June 11, 2004, the trial court heard arguments from the Petitioner's trial counsel and the Chief Deputy District Attorney who tried the State's case.  The Petitioner's presence was waived for this hearing.  The trial court denied the Petitioner's Motion for a New Trial, or in the Alternative Motion to Set Aside the Verdict in this matter.

The Petitioner by and through his trial counsel then appealed this matter.  On September 24, 2004, the Alabama Court of Criminal Appeals affirmed the conviction in a memorandum opinion.

### STATEMENT OF FACTS

The Statement of Facts of this case are stated in the memorandum opinion of the Court of Criminal Appeals in Albert Lockwood, alias v. State of Alabama, CR-03-1253 as follows:

The evidence adduced at trial indicated that in April of 2003, Chris McKinnes and Carla Parker had been dating for approximately 10 years and that they lived together and had a 7-year-old son.  The evidence further indicated that Parker and Lockwood

-2-

15

had been romantically involved for several months. On April
10, 2003, Lockwood and McKinnes got into a fight at Parker and
McKinnes's residence; McKinnes went to Lockwood's house and
informed Lockwood's wife that Parker and Lockwood were having
an affair; and McKinnes went to the Union Springs Police Department
later that evening and swore out warrants against Lockwood for
the fight. The evidence further indicated that on April 11, 2003,
McKinnes went to Parker's place of employment in Gunter Park to
take their son to Parker; Lockwood called while McKinnes was there
and then came to Parker's workplace armed with a pistol; McKinnes
and his son ran out of the building; and Lockwood fired the gun
at McKinnes and then chased him. The evidence further indicated
that Lockwood caught McKinnes; that McKinnes fell down and that
Lockwood stood over him kicking him and hitting him with the gun;
that he told McKinnes that he was going to kill him; that he placed
the gun to McKinnes's head and pulled the trigger, but that the
bullet only grazed McKinnes's head; and that the gun jammed and
that a man who was with Lockwood called out to him and that they
got back in their authomobile and drove away.

                GROUNDS SUPPORTING THE PETITION FOR RELIEF

Albert Jerome Lockwood was denied effective assistance of
counsel at trial. This denial of effective counsel violated
Lockwood's rights under the Sixth and Fourteenth Amendments of
the United States Constitution, and Alabama's Constitution, including
Article I, Section 6, and Alabama law. Strickland v. Washington,

                                -3-

466 U.S. 668 (1984).  Albert Jerome Lockwood alleges that not only has his counsel's representation fallen below an objective standard of reasonableness, but that this deficient performance prejudiced his defense based upon the following issues:

1.  The trial court erred in allowing into evidence a transcript of a statement the Petitioner made to the police due to the fact that the evidence should have been suppressed because the law enforcement acted in bad faith and that he was prejudiced as a result.  In support of this contention.  The trial court's refusal to grant the Petitioner's Motion to Suppress the transcript prior to the beginning of the trial was plain error since the State failed and/or refused to provide the Petitioner's trial counsel with a copy of the tape prior to trial, in violation of the Petitioner's due process and Brady rights.

> Suppression by prosecution of evidence favorable to an accused upon request violates due process where evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of prosection.  U.S.C.A.Const. Amend. 14.  Brady v. Maryland 373 U.S. 83, 83 S.Ct. 1194 (U.S.Md. 1963)

The failure of the Prosecutor to establish a proper foundation for the admission of the transcript should have precluded the admission of the transcript and the viewing of the transcript by the Jury.  The Prosecutor failed to adequately establish that Detective Belcher remembered the contents of the interview, whether or not Detective Belcher made a page by page comparison between the tape and the transcript, and whether or not the transcript was a complete and accurate accounting of the statements made by

-4-

17

the Petitioner.

Where the use in evidence of typewritten transcripts of

sound recordings has been objected to as in violation of
the best evidence rule, the general rule is that the
typewritten transcripts are admissible if their accuracy
and reliability is clearly established. <u>Hawkins v. State</u>
443 So.2d 1312 (Ala.Cr.App., 1983)

(The Alabama Court of Criminal Appeals held that claim is being

raised for the first time on appeal, and, therefore, is not

properly before this Court. "The statement of specific grounds

of objection waives all grounds not specified, and the trial

court will not be put in error on grounds not assigned at trial."

Therefore, Lockwood's attorney was ineffective for failing to

timely raise a specific objection and preserve this claim).

2. The trial court erred in allowing into evidence the

Petitioner's statement to the police and a transcript of that

statement because he was denied his right to remain silent and

his right to an attorney during questioning. In support of this

contention. The <u>Miranda</u> rights are premised upon the theory that

a criminal defendant cannot be compelled to talk to police, and

that he has the right to speak to an attorney before talking to

police. In the case at bar, the Petitioner had both his right to

remain silent and his right to talk counsel denied, and as a result

of that denial a taped statement was taken by the Police. The

transcript of the Petitioner's statement to Police was highly

inculpatory and prejudicial and should never have been admitted

as a State's exhibit. By allowing the Jury to read the transcript,

-5-

18

the Jury was able to draw conclusions that were likely incorrect, or at a minimum, incomplete because the statement itself is incomplete, riddled with "inaudible" and blank lines.

The Petitioner invoked his right to remain silent approximately thirty (30) minutes after the interrogation by Detective Belcher began. (CR 2 of 4 p. 165) However, Detective Belcher testified that a defendant saying "stop doesn't mean stop." (CR 2 of 4 p. 170) This belief on the part of Detective Belcher is in direct opposition to Miranda and a myriad of State and Federal cases to the contrary.

> As the court has acknowledged, "(i)f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Martin v. Wainwright, 770 F.2d 918, 923 (11th Cir.1985) modified on other grounds, 781 F.2d 185 (11th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986) (emphasis in original) (quoting Miranda, 384 U.S. at 473-74, 86 S.Ct. at 1627). Nevertheless, when a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of "clarifying (the) equivocal request." Martin, 770 F.2d at 924 (quoting Thompson v. Wainwright, 601 F.2d 768, 771 (5th Cir.1979). Once it is clear that an accused wishes to remain silent, the desire to discontinue the interrogation must be "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975); see United States v. Hernandez, 574 F.2d 1362, 1369 (5th Cir.1978). Lightbourne v. Dugger, 829 F.2d 1012 C.A.11 (Fla.), 1987.

Common sense should dictate that the Petitioner no longer wished to talk with Detective Belcher when he invoked his right to remain silent. In fact, there was approximately a two(2) hour gap in the taped interview that Detective Belcher took from the Petitioner. Detective Belcher readily admits the gap was a result

-6-

82

19

of the Petitioner invoking his right to remain silent. "...at that point in time during the investigation, he didn't want to say anything, refused to answer any more questions." (CR 2 of 4 p. 168)  In addition to the galong gap in the taped statement, Detective Belcher testified that he only read the Petitioner his rights one time, and that eas prior to the statement being taken.

> "... (T)he mere passage of time between the time defendant invoked his right to counsel and the next interrogation does not make Edwards inapplicable." 2 Wayne R. LaFave et al., Criminal Procedure Section 6.9(f) (2d ed.1999) (footnetes omitted). Griffin v. State, 2003 WL 1411321, 3 (Ala.Crim.App.) (Ala.Crim.App.,2003)

The Petitioner's fundamental rights were violated by the Montgomery Police Department when they held the Petitioner in an office for more than four hours and refused to allow him to talk with an attorney, all the while conducting a custodial interrogation. Detective Belcher testified that even though the Petitioner had invoked his right to remain silent, detectives at the Montgomery Police Department routinely allow custodial suspects to sit for a period of time after the suspect invokes their right to remain silent, and they (Police) would later begin asking additional questions. (CR 2 of 4 p. 169.)

> "Edwards is best viewed as a per se rule proscribing any interrogation of a person held in custody who has invoked his right to counsel absent the individual's subsequent

---
[1] Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880 (U.S. Ariz.1981)

-7-

20

initiation of conversation....<u>Griffin v. State</u>  2003 WL 1411321, 3 (Ala.Crim.App.) (Ala.Crim.App.,2003)

The continued interrogation of the Petitioner after his invocation of his right to remain silent should have resulted in the trial court granting the Petitioner's Motion for a Judgment of Acquittal and renewed Motion to Suppress the transcript of the Petitioner's taped statement at the conclusion of the State's case in chief.  However, the trial court denied both defense motions, and told the defense counsel she could begin her case.  (CR 3 of 4 p. 248)

> The use of petitioner's confession against him at his trial violated his right under the Fifth and Fourteenth Amendments to have counsel present during custodial interrogation, as declared in <u>Miranda</u>.  <u>Edwards v. Arizona</u>, 451 U.S. 477, 101 S.Ct. 1880 (U.S. Ariz.1981)

<u>Miranda</u> also stands for the proposition that any coerced statement is inadmissable against the declarant.  However, this does not seem to be the policy of the Montgomery Police Department. During the cross examination of Detective Belcher, defense counsel asked the following "So its' your testimony today that nothing was said to coerce Mr. Lockwood to resume questions, to answer questions again..." and Detective Belcher answered "Nothing out of an ordinary question." (CR 2 of 4 pg 171)

If Detective Belcher had any inkling that the Petitioner did not want to continue talking, (and based upon his prior statements Detective Belcher did have such an inkling)[2] then he

---

[2] "...at that point in time during the investigation, he didn't want to say anything, refused to answer any more questions." (CR 2 of 4 p. 168)

-8-

**21**

was under a duty to ascertain what the intentions of the custodial suspect was regarding continued cooperation.

> Nevertheless, when a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of "clarifying (the) equivocal request." Martin, 770 F.2d at 924 (quoting Thompson v. Wainwright, 601 F.2d 768, 771 (5th Cir.1979).

Although Detective Belcher readily admits that the Petitioner invoked his right to remain silent, he also admits that he didn't really do anything, aside from reinitiating the custodial interrogation, that could be considered coercing the Petitioner. However, sitting a custodial suspect in a Detective's Office for two hours during which time the custodial suspect is alleged to have demanded an attorney, is in no uncertain terms a coercion of the custodial suspect.

> Thus the defendant's confession in Edwards was inadmissible, for the police had visited the defendant in his cell and obtaining (sic) a waiver of Miranda rights the morning after defendant had declared he wanted an attorney. In Minnick v. Mississippi, (498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990),) Griffin v. State, 2003 WL 1411321, 2 (Ala.Crim.App.) (Ala.Crim.App.,2003)

When a confession or statement to law enforcement is premised upon coercion or the violation of the custodial suspect's right to remain silent or right to speak with counsel then that statement is inadmissible against the declarant and for trial purposes.

---

[3] Martin v. Wainwright, 770 F.2d 918, 923 (11th Cir.1985) modified on other grounds, 781 F.2d 185 (11th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986)

**22**

The failure of the trial court to grant the defense motion to supress is reversible error. The law in Alabama and throughout the United States is consistent on this point and requires the suppression of illegally obtained confessions, particularly when the custodial suspect is not again appraised of his _Miranda_ rights. (The Alabama Court of Criminal Appeals held that because nothing in Lockwood's pretrial motion to suppress was sufficient to draw the trial court's attention to the specific claims that Lockwood now attempts to raise on appeal, and because he did not argue those claims at the time that the evidence was introduced, Lockwood is not entitled to any relief on this claim because he failed to preserve this claim for appellate review. Therefore, Lockwood's attorney was ineffective for failing to preserve this claim for appellate review).

3. The trial court's oral instructions to the jury. More specifically, Lockwood argues that (1) the State did not request an instruction on evidence of flight until after the trial court had finished the other oral instructions but before the jury retired to deliberate in order to give undue weight to the evidence of flight and, further, that he was prejudiced by the timing of the flight instruction, which was the last instruction given to the jury; and (2) the court erred in not instructing the jury that it had the option to disregard the statement he gave to the police or the option to find him not guilty of any crime. In support of this contention. The State and the Defense had both

-10-

86

**23**

put on their cases in chief. Both had rested and post trial motions were made by the defense counsel for a Judgment of Acquittal and renewed Motion to Suppress the transcript. The trial court again denied the defense motions. The trial court gave the State's requested charges, the defense's requested charge, and had completed the instructions and court's charges to the Jury. The trial Judge was in the process of releasing the Jury to deliberate when the Deputy Assistant District Attorney ~~stopped~~ the court and asked for permission to speak to the judge outside the presence of the Jury. A side bar with both State and Defense took place, and then the Judge charged the Jury with a charge on flight. The court stated, "The last instruction I need to give you, I also charge you that flight from the scene can be inferred by you as a guilty state of mind. Okay." (CR 4 of 4 p.50)

The instruction to the jury on flight was deliberately requested by the State as a last effort to ring a bell in the Jury's mind and as a means to subliminally suggest to the Jury that they should convict the Petitioner because he was alleged to have fled the scene of the alleged crime. The timing was intentional and made to inflict the maximum amount of impact on the Jury. The net result was that the Petitioner was prejudiced by the charge at the time it was requested by the State.

The trial court erred in not instructing the Jury on acquittal of the Petitioner. The trial court never told the Jury it had the option to find the Petitioner not guilty of any of the alleged

-11-

**24**

crimes.  The trial court erred in not instructing the Jury that if there was reasonable doubt about the statement taken by the Police that they could disregard the statement.  The trial court erred in not instructing the Jury if there was reasonable doubt, they could acquit the defendant of the charges, and/or find him not guilty.

> That the trial court erred in not instructing the jury that it could reject Slaton's statement to police as involuntary.  See Slaton v. State, 680 So.2d at 887-88; Ex parte Slaton, 680 So.2d at 914.  Slaton v. State 2003 WL 22220752, 3 (Ala.Crim.App.,2003)

(The Alabama Court of Criminal Appeals held that Lockwood did not raise a timely objection to the instructions he now challenges on appeal, either at the charge conference or at the conclusion of the trial court's oral instructions before the jury retired to deliberate.  Thus, this issue is not preserved for appellate review.  Therefore, Lockwood's attorney was ineffective for failing to timely raise an objection and preserve this issue for appellate review).

Albert Lockwood's trial counsel did not render reasonably effective assistance of counsel before, during or after his trial and conviction.  It is widely recognized that a criminal defendant is entitled to effective legal representation.  Strickland v. Washington, 466 U.S. 668 (1984) and Gideon v. Wainwright, 372 U.S. 335 (1963).  Indeed, the adversarial system of justice depends on effective defense counsel.  United States v. Cronic, 466 U.S. 648 (1984).  Counsel for Albert Lockwood was completely ineffective at

-12-

**25**

the trial proceedings. The attorney representing Albert Lockwood at the trial abdicated his constitutionally mandated responsibility to subject the prosecution's case to meaningful adversarial testing, the errors of Albert Lockwood's counsel "was so serious as to deprive the defendant of a fair trial, a trial whose result is liable" and Albert Lockwood now seeks relief from his unconstitutionally obtained conviction and sentence. Lockhart v. Fretwell, 506 U.S. 364, 369 (1993). Indeed, performance of Lockwood's counsel fell below "an objective standard of reasonableness" and failed "to make the adversarial testing process work." Strickland v. Washington, 466 U.S. at 688, 690. None of the numerous errors of defense counsel could be construed as part of a "sound trial strategy." Id. at 691.

### PRAYER FOR RELIEF

For the above stated reasons of this petition and a full evidentiary hearing. Petitioner, Albert Lockwood, respectfully asks this Honorable Court to grant him the following relief:

(a) conduct a full and fair evidentiary hearing that is recorded and transcribed, at which proof may be offered concerning the allegations in this petition;

(b) issue an order relieving Lockwood of his unconstitutionally obtained conviction and sentence following a full and complete hearing; and

(c) grant Lockwood any such additional relief as is just, equitable, and proper under federal and state law.

-13-

```
Session - PASSPORT                              September 05, 2006, 13:35:55
AR10      SETTING AND DISPOSITION              COUNTY: 03 MONTGOMERY   ACRAR10
ACTION:    CASE: CC 2003 000957 60    JID: TSM DEFSTS: P PRISON      CONFID: N
  NAME: LOCKWOOD ALBERT JEROME              FLAG: Y   DOCKET: Y EST: N PST: H
PROS:              FLG: N   ATTY1:          FLAG: Y   ATTY2:            FLG:

FCHG1: RULE      RULE 32-FELONY      RULE 32            F OT CNTS: 001
  DATE1: 00000000   QUE: 000   TIME: 0000   DESC:
  DATE2: 00000000   QUE: 000   TIME: 0000   DESC:
  DATE3: 00000000   QUE: 000   TIME: 0000   DESC:
  DATE4: 00000000   QUE: 000   TIME: 0000   DESC:
WARISS: 00000000   WARACT: 00000000   WARLOC: 00000000
BP ISS: 00000000   BP RTN: 00000000   # CONV: 00
CRTACT: D DISMISSED        CADATE: 03282005 JRY:   MORE: N UPD: N T/CAT: F O
CHG1: RULE      RULE 32-FELONY      RULE 32      F OT CNT: 001 CA: D 03282005
CHG2:                                           CNT: 000 CA:   00000000
CHG3:                                           CNT: 000 CA:   00000000
  DJID: TSM ADMIN: 00000000 WHY:   TBNV1: 00000000 TBNV2: 00000000 DOMVIO: N
CA-APP: 05022005 CAPP:                 TYPE: R   GJCA:   LA-APP: 00000000
CONTDT: 00000000   WHY:                 CONT#: 00
COMM: APPEAL DISMISSED 12-02-05
CMP: N SPRO: Y DUE: 0000007400 WARR 000 SUBP 000      UPDATED: 07062006 BY: REG
*** HERE IS THE REQUESTED RECORD ***
01=MNU 02=ACS 03=NDX 04=PTY 05=CLR 06=OCS 07=DKT 08=ENF 09=APL 10=FEE 11=SNT
12=FIL      14=NXC 15=NXN 16=NXS 17=FRM 18=CHG 19=PRT 20=OFF 22=PFM 24=HLP
```

Mr. Lockwood,               9/05/06.

Your Rule 32 was dismissed on 3/28/05. you appealed this decision on 5/02/05. the court of Crm. Appeals dismissed your appeal on 12-02-05. All this information is pertaining to your .60 Rule 32. If you need to file a new Rule 32 petition, it would have to go up to the Judge to Rule on the In forma pauperis declaration first, then it would come to the clerk's office to be filed.

Thank you.

9/05/06 Copy sent to Atg. of first 4 pgs.

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

ALBERT JEROME LOCKWOOD,          )
                                 )
        Petitioner,              )
                                 )
vs.                              )    Case No. CC-03-957.60
                                 )
STATE OF ALABAMA,                )
                                 )
        Respondent.              )



## PETITION FOR A WRIT OF MANDAMUS

Albert Jerome Lockwood, pro se, petitioner, petitions
the Alabama Court of Criminal Appeals for a Writ of Mandamus
to issue to Montgomery Circuit Court.

In support of the petition, petitioner states as follows:
Albert Jerome Lockwood, presently an inmate in St. Clair County
Correctional Facility, petitions for a writ of mandamus directing
Judge Tracy S. McCooey to: (1) rule on his Rule 32, Ala.R.Crim.
P., petition originally filed with that court, and (2) enter
an order informing the Department of Corrections to reimburse
funds that was withheld from the petitioner's prison account
to pay the filing fee for his Rule 32 petition before granting
the petitioner's in forma pauperis request. (See Documents
Attached).

Petitioner respectfully requests that this Court grant
the Writ of Mandamus and order that an answer to the petition
be filed by respondents.

I certify that, on the date indicated below, I have served
copies of this petition and all documents attached on the

respondent judge and on all other parties to the action in the trial court.

Date: September 13, 2006


Albert J. Lockwood
Pro Se, Petitioner
AIS #134376, G4-B-215
1000 St. Clair Road
Springville, AL 35146-5582

-2-

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the following persons on the 13th day of September, 2006:

Honorable Tracy S. McCooey
Circuit Judge
15th Judicial Circuit of Alabama
251 S. Lawrence Street
Montgomery, AL 36104

Honorable Melissa Rittenour
Circuit Clerk, Montgomery County
Montgomery County Courthouse
P.O. Box 1667
Montgomery, AL 36102-1667

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, AL 36130-0152

Albert J. Lockwood
Pro Se, Petitioner

-3-

THE STATE OF ALABAMA -- JUDICIAL DEPARTMENT

THE ALABAMA COURT OF CRIMINAL APPEALS

CR-04-1545

Albert Jerome Lockwood, Appellant

vs.

State of Alabama, Appellee

Appeal from Montgomery Circuit Court No. CC-02-957.60

### ORDER

This case is before this Court as a result of Lockwood's petition for post-conviction relief, filed pursuant to Rule 32, Ala.R.Crim.P.  On October 12, 2005, this Court remanded Lockwood's case to the circuit court for that court to make specific, written findings regarding whether it actually granted Lockwood's request to proceed in forma pauperis prior to ruling on Lockwood's Rule 32 petition.

On November 28, 2005, on return to remand, the circuit court entered an order informing this Court that the circuit court did not grant Lockwood's in forma pauperis request nor had Lockwood paid a filing fee.

"'[A]bsent the payment of a filing fee [required by § 12-19-70, Ala.Code 1975,] or the granting of a request to proceed in forma pauperis the trial court fails to obtain subject matter jurisdiction to consider a postconviction petition.' Carpenter v. State, 782 So.2d 848, 849 (Ala.Crim.App. 2000) (citing Goldsmith v. State, 709 So.2d 1352, 1352-53 (Ala.Crim.App. 1997))."

Ex parte McWilliams, 812 So.2d 318, 322 (Ala. 2001).  Because the court's order purporting to deny Lockwood's Rule 32 petition was void, Lockwood had no right to an appeal from that order.  A void judgment will not support an appeal. See Underwood v. State, 439 So.2d 125 (Ala. 1983); Hamilton v. State, 828 So.2d 957 (Ala.Crim.App. 2002); Carpenter v. State, 782 So.2d 848 (Ala.Crim.App. 2000).  Therefore, Lockwood's appeal from the denial of his Rule 32 petition is due to be dismissed.

In dismissing this appeal, we point out that Lockwood's in forma pauperis petition and his Rule 32 petition still stand filed in the circuit court with their original filing dates and await disposition. In the event the circuit court denies relief, Lockwood should then file a new notice of appeal to this Court.

For the foregoing reasons, it is hereby ordered that this appeal be, and it is hereby, dismissed. The Certificate of Judgment in this case shall issue forthwith.

Done this 2nd day of December, 2005.

H. W. "BUCKY" McMILLAN, PRESIDING JUDGE

cca/

cc:     Hon. Tracy S. McCooey, Judge
        Hon. Melissa Rittenour, Clerk
        Albert Jerome Lockwood, pro se
        John M. Porter, Office of the Attorney General

FROM :                    FAX NO. :              Jun. 13 2006 02:38AM P2

FIFTEENTH JUDICIAL CIRCUIT
CIRCUIT COURT
CASE NO. CC-03-957.60

ALBERT JEROME LOCKWOOD.

    Appellant

V.                                                ORDER

STATE OF ALABAMA.

    Appellee

    Comes the Court, ex mero motu, and does hereby Order that the request to proceed

in forma pauperis filed by Albert Lockwood is due to be, and the same is hereby

GRANTED.  It is ORDERED that Mr. Lockwood is hereby allowed to file his Rule 32

Petition without the prepayment of court costs.

    DONE and ORDERED this the 12th day of June, 2006.

                            TRACY S. McCOOEY
                            CIRCUIT JUDGE

CC:   Alabama Court of Criminal Appeals ✓
      Hon. Melissa Rittenour, Circuit Clerk ✓
      John M. Porter, Assistant Atty. General ✓
      Albert Jerome Lockwood, pro se ✓


EXHIBIT
A

Albert,

I have been advised
that you still are
required to pay the
filing fee. Filing fee
is still required but

filing fee proceed in
forma pauperis allow
you to proceed without
any funds. circuit clerk
confirmed    warden (both
this.

96

Albert Jerome Lockwood
AIS #134376, G4-B-215
1000 St. Clair Road
Springville, AL 35146-5582

August 7, 2006

Honorable Melissa Rittenour
Circuit Clerk, Montgomery County
Montgomery County Courthouse
P.O. Box 1667
Montgomery, AL 36102-1667

Re:  Albert Jerome Lockwood v. State of Alabama
     Montgomery County Cir. Ct. No. CC-02-927.60

Dear Mrs. Rittenour:

     I am writing to you regarding the status of my Rule 32 petition
pending in the above referenced cause, especially considering that
the Court has determined that I am indigent, and I am allowed to
proceed in forma pauperis.

     Thank you for your time and consideration.

                              Sincerely,

                              *Albert Lockwood*
                              Albert J. Lockwood

8/09/06
Mr. Lockwood, the circuit clerk's
office does not show a pending
Rule 32 on your case. Please
submit your Rule 32 petition
to the circuit clerk's office,
and we will be glad to file
your Rule 32.  MR/TR

97

Albert Jerome Lockwood
AIS #134376, G4-B-215
1000 St. Clair Road
Springville, AL 35146-5582

August 15, 2006

Honorable Melissa Rittenour
Circuit Clerk, Montgomery County
Montgomery County Courthouse
P.O. Box 1667
Montgomery, AL 36102-1667



Re:  Albert Jerome Lockwood v. State of Alabama
     Montgomery Circuit Court No. CC-02-957.60

Dear Ms. Rittenour:

     Please find enclosed a copy of my Rule 32 petition, along
with a document I received concerning my case.  I am providing
this to you to point out that my in forma pauperis petition and
my Rule 32 petition still stand filed in this Court with their
original filing dates and await disposition pursuant to an Order
of the Alabama Court of Criminal Appeals dated December 2, 2005,
dismissing my appeal from the denial of my Rule 32 petition.

     Thank you for your time and consideration.

                                        Sincerely,

                                        Albert Lockwood
                                        Albert J. Lockwood

Session - PASSPORT                                    September 05, 2006, 13:35:55

AR10      SETTING AND DISPOSITION          COUNTY: 03 MONTGOMERY    ACKAR10
ACTION:    CASE: CC 2003 000957 60      JID: TSM DEFSTS: P PRISON   CONFID: N
  NAME: LOCKWOOD ALBERT JEROME             FLAG: Y   DOCKET: Y EST: N PST: H
PROS:           FLG: N    ATTY1:          FLAG: Y   ATTY2:              FLG:

FCHG1: RULE     RULE 32-FELONY       RULE 32               F OT CNTS: 001
  DATE1: 00000000  QUE: 000  TIME: 0000    DESC:
  DATE2: 00000000  QUE: 000  TIME: 0000    DESC:
  DATE3: 00000000  QUE: 000  TIME: 0000    DESC:
  DATE4: 00000000  QUE: 000  TIME: 0000    DESC:
WARISS: 00000000    WARACT: 00000000   WARLOC: 00000000
BP ISS: 00000000    BP RTN: 00000000   # CONV: 00
CRTACT: D DISMISSED           CADATE: 03282005 JRY:   MORE: N UPD: N T/CAT: F O
CHG1: RULE     RULE 32-FELONY       RULE 32        F OT CNT: 001 CA: D 03282005
CHG2:                                              CNT: 000 CA:    00000000
CHG3:                                              CNT: 000 CA:    00000000
  DJID: TSM ADMIN: 00000000 WHY:   TBNV1: 00000000 TBNV2: 00000000 DOMVIO: N
CA-APP: 05022005 CAPP:                     TYPE: R   GJCA:     LA-APP: 00000000
CONTDT: 00000000  WHY:                        CONT#: 00
COMM: APPEAL DISMISSED 12-02-05
CMP: N SPRO: Y DUE: 0000007400 WARR 000 SUBP 000      UPDATED: 07062006 BY: REG
*** HERE IS THE REQUESTED RECORD ***
01=MNU 02=ACS 03=NDX 04=PTY 05=CLR 06=OCS 07=DKT 08=ENF 09=APL 10=FEE 11=SNT
12=FIL        14=NXC 15=NXN 16=NXS 17=PRM 18=CHG 19=PRT 20=OFF 22=PRM 24=HLP

Mr. Lockwood,          9/05/06.

your Rule 32 was dismissed on 3/28/05.
you appealed this decision on 5/02/05.
the court of crm. Appeals dismissed your
appeal on 12-2-05. All this information
is pertaining to your 60 Rule 32.
If you need to file a new Rule 32
petition, it would have to go up to
the Judge to Rule on the In forma
pauperis declaration first, then it
would comes to the clerk's office
to be filed.

                    Thank you.

99

FIFTEENTH JUDICIAL CIRCUIT
CIRCUIT COURT
CASE NO. CC-03-957 .60

STATE OF ALABAMA,

    Plaintiff

V.                                 ORDER

ALBERT LOCKWOOD,

    Defendant

_____

    This cause is before the Court upon Motion for Writ of Mandamus asking that the Court direct the Department of Corrections to not take any money out of the inmate's account to pay for these proceedings. The Court notes that this Writ of Mandamus is premature as the State has not yet answered the defendant's Rule 32. The Court hereby

    ORDERS that the State of Alabama answer the Rule 32 within 30 days of this Order.

    DONE and ORDERED this the 4th day of October, 2006.

                                    TRACY S. McCOOEY
                                    CIRCUIT JUDGE

CC:    Darryl Bailey, Deputy District Atty. ✓
       Vicki Toles, Esq. ✓
       Court of Criminal Appeals ✓
       John Porterfield, Attorney General's Office ✓

10-4-06

CIRCUIT COURT CLERK

# COURT OF CRIMINAL APPEALS
# STATE OF ALABAMA



H. W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## CR-05-2317

Ex parte Albert Jerome Lockwood   (In re: State of Alabama vs. Albert Jerome Lockwood)   (Montgomery Circuit Court: CC03-957.60)

## ORDER

    Upon consideration of the above referenced Petition for Writ of Mandamus, the Court of Criminal Appeals ORDERS that said petition be and the same is hereby DISMISSED. This Court has been notified that the Montgomery County Circuit Clerk's Office has informed Albert J. Lockwood that his Rule 32 petition is still pending. Also, the circuit court has issued an order directing the State to respond to the Rule 32 petition.

Done this the 16th day of October, 2006.

H. W. "Bucky" McMillan, Presiding Judge
Court of Criminal Appeals

cc: Hon. Melissa Rittenour, Circuit Clerk
    Albert Jerome Lockwood, Pro Se
    Hon. Tracy S. McCooey, Circuit Judge
    Hon. Troy King, Attorney General
    Hon. Eleanor Idelle Brooks, District Attorney
    Hon. Randy Helms, Director, AOC



101

## IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
## MONTGOMERY COUNTY, ALABAMA

| | |
|---|---|
| **ALBERT LOCKWOOD,**<br>Petitioner, | )<br>)<br>) |
| **v.** | )<br>) Case No.:  CC–03–957 |
| **STATE OF ALABAMA,**<br>Respondent. | )<br>)<br>) |

### STATE'S ANSWER TO PETITION FOR
### RELIEF FROM CONVICTION OR SENTENCE

    **COMES NOW** the State of Alabama, by and through its District Attorney for the Fifteenth Judicial Circuit, Eleanor I. Brooks, and moves this Honorable Court to dismiss the Petition for Post Conviction Relief pursuant to Rule 32, Alabama Rules of Criminal Procedure, and as grounds states the following:

### PROCEDURAL HISTORY

    Albert Lockwood was indicted by the Montgomery County Grand Jury on July 11, 2003 for the offenses of Attempted Murder, in violation of, § 13A-6-2, Code of Alabama 1975. The Honorable Vicki Toles was retained to represent Mr. Lockwood in this matter.

    On February 24, 2004 the Defendant was found guilty as charged by a jury of his peers. The Court conducted a sentencing hearing on March 18, 2004. The Court granted the State's motion to invoke three (3) prior felonies for habitual offender purposes. The Court sentenced the Petitioner to life without parole.

    The Court of Criminal Appeals affirmed the Petitioner's conviction on September 24, 2004. The Petitioner's application for rehearing was overruled on October 15, 2004. The Petitioner filed his first Rule 32 Petition for Relief from Conviction or Sentence on August 17, 2006.

### ALLEGED GROUNDS FOR RELIEF

As a basis for this Petition, Mr. Lockwood alleges the following grounds in support of his claims:

1. Petitioner was denied effective assistance of trial counsel.

The State contends that all averments made by Petitioner are baseless and are due to be denied.

### ARGUMENT

### I. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. STANDARD OF REVIEW

To prevail on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that he was prejudiced by that deficient performance. <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052 (1984). This Court must avoid using the benefit of hindsight and must evaluate counsel's conduct as of the time of trial. <u>Ex parte Lawley</u>, 512 So. 2d 1370 (Ala. 1987). When the Court is reviewing a claim of ineffective assistance of counsel, it must indulge a strong presumption that counsel's conduct was appropriate and reasonable. The Court stated:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act, or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct fall within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action

> 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). "Counsel's conduct must be considered within the context of the facts of the particular case and as of the time of the alleged misconduct." Ex parte Baldwin, 456 So. 2d 129, 134 (Ala. 1984), aff'd, 472 U.S. 373, 105 S.Ct. 2727 (1985).

Even if deficient performance is proved, a showing of prejudice is also required. A claimant must show that "but for" counsel's deficient performance the results of the proceedings would have been different. Howard v. State, 551 So. 2d 1155, 1158 (Ala.Crim.App. 1989). Prejudice is proved only when there "exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Burnett v. State, 651 So. 2d 57, 58 (Ala.Crim.App. 1994); citing Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial." Id. To prove prejudice, the alleged errors of counsel must "so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." Lockhart v. Fretwell, 506 U.S. 364, 369 (1993); citing Kimmelan v. Morrison, 477 U.S. 365, 374 (1986).

## B. APPLICATION OF STANDARD TO PETITION

The State contends that Petitioner's allegations are without merit. Petitioner was represented in this matter by extremely able and experienced counsel who at all times acted competently and professionally. Ms. Toles, defense counsel, represented Petitioner at the time Petitioner was found guilty. Apart from bare allegations by Petitioner, there is no evidence whatsoever to support Petitioner's claim of ineffective assistance of counsel. Furthermore, Strickland requires this Court to examine defense counsel's conduct with a strong presumption that counsel's conduct was appropriate and reasonable. Strickland, 466 U.S. at 689. When defense counsel's conduct is examined in such a light, it becomes evident that Petitioner's argument is unfounded. Where the petitioner failed to allege

facts sufficient to support his allegations of ineffective assistance of counsel, summary dismissal of the petition was proper. <u>Boles v. State</u>, 717 So.2d 877 (Ala.Crim.App.1998).

## CONCLUSION

For the above stated reasons, Petitioner is not entitled to relief on any of his claims, and his conviction and sentence are due to be upheld. There is sufficient evidence to support Petitioner's conviction and sentence; thus, Mr. Lockwood's petition is due to be denied. Therefore, the Respondent, the State of Alabama, moves this Honorable Court to dismiss, with prejudice, Mr. Lockwood's Petition For Relief From Conviction and Sentence.

Respectfully submitted on this the ___3___ day of November, 2006.

ELEANOR I. BROOKS
DISTRICT ATTORNEY

By:

RICHARD FOREMAN (FOR053)
Deputy District Attorney

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on the Petitioner, Albert Lockwood, by hand delivery, or by placing same in the appropriate Courthouse Box, or by placing the same in the U. S. Mail, postage prepaid and properly addressed this the ___3___ day of ___Nov___, 2006.

Albert Lockwood
AIS# 134376
100 St. Clair Road
Springville, Alabama 35146-5582

ELEANOR I. BROOKS
DISTRICT ATTORNEY

RICHARD FOREMAN (FOR053)
Deputy District Attorney

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

ALBERT LOCKWOOD,                    )
                                    )
            Petitioner,             )
                                    )
vs.                                 )      CASE NO. CC03-957.60
                                    )
STATE OF ALABAMA,                   )
                                    )
            Respondent.             )

PETITIONER'S RESPONSE TO THE
STATE'S ANSWER TO PETITION FOR
RELIEF FROM CONVICTION OR SENTENCE

COME NOW the Petitioner, proceeding pro se, and move this
Honorable Court to deny the State's Answer to Petition for Relief
from Conviction or Sentence. As reasons therefore, the
Petitioner state as follows:

1. 'rule 32.7(d), Ala.R.Crim.P., permits the trial court
to dismiss the petition 'if the court determines that the
petition is not sufficiently specific, or is precluded, or fails
to state a claim, or that no material issue of fact or law exists
which would entitle the petitioner to relief under this rule
and that no purpose would be served by any further proceedings.''

2. in Rice v. State, 682 So.2d 484 (Ala.Crim.App. 1995),
the court held that "defendant's allegations in his petition
for postconviction relief must be accepted as true where State
failed to properly address merit of arguments in defendant's
petition."

3.  In Monroe v. State, 659 So.2d 975 (Ala.Crim.App. 1994), the court held that "because state's response to petition for postconviction relief did not specifically address grounds supporting petitioner's claim, petition was meritorious on its face, thus warranting evidentiary hearing."

WHEREFORE, Petitioner respectfully request that this Honorable Court deny the State's Answer to Petition for Relief from Conviction or Sentence.

Respectfully submitted,

*Albert Lockwood*

Albert Lockwood
Pro Se, Petitioner
AIS #134376, G4-B-215
St. Clair Correctional Facility
1000 St. Clair Road
Springville, AL 35146-5582

-2-

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Response on the Honorable Richard Foreman, Deputy District Attorney for the Fifteenth Judicial Circuit, by placing a copy in the United States Mail, postage prepaid, done this 15th day of November, 2006.

Albert Lockwood

Albert Lockwood
Pro Se, Petitioner

-3-

| | |
|---|---|
| ALBERT LOCKWOOD, | ) IN THE CIRCUIT COURT OF |
| Appellant, | ) MONTGOMERY COUNTY, ALABAMA |
| vs. | ) |
| STATE OF ALABAMA, | ) CASE NO. CC-03-957TSM  . 60 |
| Appellee. | ) |

### NOTICE OF APPEAL TO
### THE COURT OF CRIMINAL APPEALS OF ALABAMA

Notice is hereby given that Albert Lockwood appeals to the above named court from this Court's dismissal of his Petition for Relief from Conviction or Sentenc on November 10, 2006.

In addition, Albert Lockwood requests that his appeal be in forma pauperis, and notes that he is incarcerated in the State Penal System and that the Court has determined that Petitioner is indigent, and he was allowed to proceed in forma pauperis.

Respectfully submitted this the 13th day of December, 2006.

*Albert Lockwood*
Albert Lockwood
Pro Se, Appellant
AIS #134376, G4-B-215
1000 St. Clair Road
Springville, AL 35146-5582

### CERTIFICATE OF SERVICE

Comes now the Petitioner and hereby certifies he has served a copy of the foregoing document upon the District Attorney on this the 13th day of December, 2006.

*Albert Lockwood*
Albert Lockwood
Pro Se, Appellant

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C    8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br><br>_____ |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT    ☐ DISTRICT COURT    ☐ JUVENILE COURT OF    **MONTGOMERY**
_____ COUNTY

**ALBERT LOCKWOOD**
, Appellant

v.    ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number<br>**CC-03-957TSM .60** | Date of Judgment/Sentence/Order<br>**11/10/2006 (Order)** |
| Date of Notice of Appeal<br>Oral: | Written: **12/13/2006** | Indigent Status Granted:<br>☒ Yes    ☐ No |

**PART 1.** TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975).

*Albert Lockwood*                    **12/13/2006**                    Albert Lockwood
Signature                                Date                                Print or Type Name

**PART 2.** DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED. Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                                        COURT REPORTER(S)

A. ☐ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

B. ☐ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

ADDITIONAL PROCEEDINGS REQUESTED                    DATE                    COURT REPORTER(S)

D. _____    _____    _____

E. _____    _____    _____

F. _____    _____    _____

G. _____    _____    _____

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on the form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. See Rule 10(c)(2), A.R.App.P.)

**PART 3.** MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

_____    _____    _____
Signature                                Date                                Print or Type Name

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to: (1) Clerk of the Court of Criminal Appeals. (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

State of Alabama
Unified Judicial System
Form ARAP- 26 (front)    8/91.

# COURT OF CRIMINAL APPEALS
## DOCKETING STATEMENT

Criminal Appeal Number

**A. GENERAL INFORMATION:**

[X] CIRCUIT COURT  [ ] DISTRICT COURT  [ ] JUVENILE COURT OF _____ **MONTGOMERY** _____ COUNTY

**ALBERT LOCKWOOD** , Appellant

V.   [X] STATE OF ALABAMA    [ ] MUNICIPALITY OF _____

| | | |
|---|---|---|
| Case Number CC-03-957 TSM .60 | Date of Complaint or Indictment 01/24/2005 (Complaint) | Date of Judgment/Sentence/Order 11/10/2006 (Order) |
| Number of Days of Trial/Hearing "0" Days | Date of Notice of Appeal Oral: | Written: 12/13/2006 |
| Indigent Status Requested: [X] Yes [ ] No | | Indigent Status Granted: [X] Yes [ ] No |

**B. REPRESENTATION:**

Is Attorney Appointed or Retained?  [ ] Appointed  [ ] Retained.    If no attorney, will appellant represent self?  [X] Yes  [ ] No

Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)

**Albert Lockwood (Pro Se)**

Telephone Number **(205) 467-6111**

Address **1000 St. Clair Road**    City **Springville**    State **AL**    Zip Code **35146-5582**

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
|---|---|
| NONE | |
| NONE | |
| NONE | |

**D. TYPE OF APPEAL:** Please check the applicable block.

1 [ ] State Conviction     4 [ ] Pretrial Order          7 [ ] Juvenile Transfer Order    10 [ ] Other (Specify)
2 [X] Post-Conviction Remedy  5 [ ] Contempt Adjudication   8 [ ] Juvenile Delinquency       _____
3 [ ] Probation Revocation  6 [ ] Municipal Conviction    9 [ ] Habeas Corpus Petition

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 [ ] Capital Offense - §          6 [ ] Trafficking in Drugs - §        11 [ ] Fraudulent Practices - §
2 [ ] Homicide - §               7 [ ] Theft - §                      12 [ ] Offense Against Family - §
3 [ ] Assault - §                8 [ ] Damage or Intrusion             13 [ ] Traffic - DUI - §
4 [ ] Kidnapping/Unlawful            to Property - §                  14 [ ] Traffic - Other - §
   Imprisonment - §            9 [ ] Escape - §                      15 [X] Miscellaneous ... Attempted
5 [ ] Drug Possession - § 2      10 [ ] Weapons/Firearms - §                Murder

**F. DEATH PENALTY:**
Does this appeal involve a case where the death penalty has been imposed?  [ ] Yes  [X] No

**G. TRANSCRIPT:**
1. Will the record on appeal have a reporter's transcript?  [ ] Yes  [X] No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. _____
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk?  [ ] Yes  [X] No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  [ ] Yes  [ ] No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

Form ARAP- 26 (back)    8/91    COURT OF CRIMINAL APPEALS DOCKETING STATEMENT

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| | | | Not applicable. | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

Appellant was denied of Petition for Relief from Conviction or Sentence filed pursuant to Rule 32, Alabama Rules of Criminal Procedure. Appellant asserts that he was denied effective assistance of counsel at trial.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. (Attach additional pages if necessary.)

The trial court's dismissal of the Appellant's Rule 32 petition.

**K. SIGNATURE:**

12/13/2006
_____
Date

*Albert Lockwood*
_____
Signature of Attorney/ Party Filing this Form

REV. 4/1/97

**NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
BY THE TRIAL COURT CLERK**

ALBERT LOCKWOOD     V.     STATE OF ALABAMA

**APPELLANT'S NAME**     **APPELLEE**
(as it appears on the Indictment)

[✓] CIRCUIT [ ] DISTRICT [ ] JUVENILE COURT OF   MONTGOMERY   COUNTY

CIRCUIT/DISTRICT/JUVENILE JUDGE:   TRACY MCCOOEY

| DATE OF NOTICE OF APPEAL: | 12/13/06 |
|---|---|

(NOTE: If the appellant is incarcerated and files notice of appeal, this date should be the date on the certificate of service, or if there was no certificate of service, use the postmark date on the envelope.)

**INDIGENCY STATUS:**
Granted Indigency Status at Trial Court    [✓] Yes [ ] No
Appointed Trial Counsel Permitted to Withdraw on Appeal:   [ ] Yes [ ] No   N/A
Indigent Status Revoked on Appeal:   [ ] Yes [✓] No.

**DEATH PENALTY:**
Does the appeal involve a case where the death penalty has been imposed? [ ] Yes [✓] No.

**TYPE OF APPEAL:** (Please check the appropriate block)
[ ] State Conviction   [ ] Pretrial Appeal by State   [ ] Juvenile Transfer Order
[✓] Rule 32 Petition   [ ] Contempt Adjudication   [ ] Juvenile Delinquency
[ ] Probation Revocation   [ ] Municipal Conviction   [ ] Habeas Corpus Petition
[ ] Mandamus Petition   [ ] Writ of Certiorari   [ ] Other (Specify)

IF THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E. RULE 32 PETITION, WRIT OF HABEAS CORPUS, ETC.) OR FROM ANY OTHER ORDER ISSUED BY THE TRIAL JUDGE, COMPLETE THE FOLLOWING:
TRIAL COURT CASE NO.: CC 03-957.60
DATE ORDER WAS ENTERED: 11/15/06    PETITION: [✓] Dismissed [ ] Denied [ ] Granted

IF THIS IS AN APPEAL FROM A CONVICTION, COMPLETE THE FOLLOWING:
DATE OF CONVICTION: _____ DATE OF SENTENCE: _____
YOUTHFUL OFFENDER STATUS:
Requested: [ ]Yes [ ]No    Granted: [ ]Yes [ ]No
LIST EACH CONVICTION BELOW: (attach additional page if necessary)
1. Trial Court Case No. _____ CONVICTION: _____ Sentence: _____
2. Trial Court Case No. _____ CONVICTION: _____ Sentence: _____
3. Trial Court Case No. _____ CONVICTION: _____ Sentence: _____

| POST-JUDGMENT MOTIONS FILED: (complete as appropriate) | Date Filed | Date Denied | Continued by Agreement To(Date) |
|---|---|---|---|
| [ ] Motion for New Trial | | | |
| [ ] Motion for Judgment of Acquittal | | | |
| [ ] Motion to Withdraw Guilty Plea | | | |
| [ ] Motion in Arrest of Judgment | | | |
| [ ] Other | | | |

COURT REPORTER (S): N/A
ADDRESS:

APPELLATE COUNSEL: N/A
ADDRESS:

APPELLANT: (IF PRO SE): AIS# 134376 ALBERT LOCKWOOD
ADDRESS: 1000 ST.CLAIR ROAD
SPRINGVILLE, AL. 35146-5582
APPELLEE (IF CITY APPEAL): N/A
ADDRESS:

I certify that the information provided above is accurate and to the best of my knowledge and I have served a copy of this Notice of Appeal on all parties to this action on this 2ND day of JANUARY, 2007.

_Melissa Rittenour_
CIRCUIT COURT CLERK

| State of Alabama<br>Unified Judicial System<br><br>From ARAP - 14  Rev. 11 / 91 | **CERTIFICATE OF COMPLETION AND TRANSMITTAL OF RECORD ON APPEAL BY TRIAL CLERK** | Appellate Case Number<br><br>CR 06-562 |
|---|---|---|

| TO: THE CLERK OF<br>   THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL: | 12/13/06 |
|---|---|---|

APPELLANT

ALBERT LOCKWOOD

v. STATE OF ALABAMA

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in ( a single volume of ___113___ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of brief.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this___9TH___ day of ___JANUARY___, 2007.

_Melissa R. Henson_
Circuit Clerk

COURT OF CRIMINAL APPEALS NO.     CR 06-0562

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

**CIRCUIT COURT OF** ___MONTGOMERY___ **COUNTY, ALABAMA**

CIRCUIT COURT NO     CC 03-957.60

CIRCUIT JUDGE     TRACY MCCOOEY

Type of Conviction/ Order Appealed From:     SUPPLEMENT

Sentence Imposed:

Defendant Indigent:    ☑ YES   ☐ NO

## ALBERT LOCKWOOD

**NAME OF APPELLANT**

PROSE  AIS#134376

(Appellant's Attorney)            (Telephone No.)

1000 ST.CLAIR ROAD

(Address)

SPRINGVILLE, AL. 35146-5582

(City)       (State)       (Zip Code)

### V.

## STATE OF ALABAMA

**NAME OF APPELLEE**

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

df

(For Court of Criminal Appeals Use Only)

EXHIBIT

H

PENGAD 800-631-6989

**INDEX**
**CLERK'S RECORD**

CASE ACTION SUMMARY……………………………………….……     1-2

ORDER FROM CRIMINAL APPEALS THAT THE MONTGOMERY     3
CIRCUIT CLERKS OFFICE SUPPLEMENT THE RECORD ON APPEAL
WITH A COPY OF THE CIRCUIT COURT'S NOVEMBER 10,2006
ORDER SUMMARILY DISMISSING THE APPELLANT'S RULE 32
PETITION……………………………………………………………..

NOVEMBER 10, 2006 ORDER SUMMARILY DISMISSING THE     4-5
APPELLANT'S RULE 32 PETITION……………………………………..

CERTIFICATE OF COMPLETION…………………………………….     6

ACRO370  ALABAMA JUDICIAL INFORMATION SYSTEM CASE# CC 2003 000957.60
OPER: TOR    CASE ACTION SUMMARY
E: 1    CIRCUIT CRIMINAL   RUN DATE: 02/09/2005
========================================================================
IN THE CIRCUIT COURT OF MONTGOMERY      JUDGE: TSM

STATE OF ALABAMA    VS  LOCKWOOD ALBERT JEROME
CASE: CC 2003 000957.60     1000 ST.CLAIR ROAD
             G3-B-213
             SPRINGVILLE, AL 35146 5582

DOB: 08/24/1962  SEX: M  RACE: B  HT: 5 05  WT: 159  HR: BLK EYES: BRO
SSN: 419980499  ALIAS NAMES: MARTIN JEROME
========================================================================
CHARGE01: RULE 32-FELONY  CODE01: RULE  LIT: RULE 32-FELONY TYP: F #: 001
OFFENSE DATE: 04/11/2003   AGENCY/OFFICER: 0030100

DATE WAR/CAP ISS:      DATE ARRESTED: 05/27/2003
DATE INDICTED:      DATE FILED: 01/26/2005
DATE RELEASED:      DATE HEARING:
  BOND AMOUNT:  $.00   SURETIES:

DATE 1:   DESC:    TIME: 0000
DATE 2:   DESC:    TIME: 0000

TRACKING NOS: CC 2003 000957 00  /      /

 DEF/ATY:      TYPE:      TYPE:

      00000      00000

PROSECUTOR:

========================================================================
OTH CSE: CC200300095700 CHK/TICKET NO:   GRAND JURY:
RT REPORTER:     SID NO:  000753726
STATUS: PRISON    DEMAND:     OPER: TOR
------------------------------------------------------------------------
TRANS DATE  ACTIONS, JUDGEMENTS, AND NOTES    OPE

| TRANS DATE | ACTIONS, JUDGEMENTS, AND NOTES | | OPE |
|---|---|---|---|
| 02/09/2005 | ASSIGNED TO: (TSM) TRACEY S MCCOOEY | (AR01) | TOR |
| 02/09/2005 | DEFENDANT ARRESTED ON: 05/27/2003 | (AR01) | TOR |
| 02/09/2005 | INITIAL STATUS SET TO: "P" – PRISON | (AR01) | TOR |
| 02/09/2005 | CHARGE 01: RULE 32-FELONY/#CNTS: 001 | (AR01) | TOR |
| 02/09/2005 | FILED ON: 01/26/2005 | (AR01) | TOR |
| 02/09/2005 | CASE ACTION SUMMARY PRINTED | (AR08) | TOR |
| 02/09/2005 | CAS ATTACHMENT PRINTED | (AR08) | TOR |
| 2/09/05 | Copy of Rule 32 Sent to DA | | |
| 4-5-05 | Order Signed 3-28-05 Dismissing Rule 32 | | |
| 2-14-05 | Order - State given Order to respond | | |
| 02/05 | Notice of appeal w/ forms | | |
| 05/05/05 | Appl. transmittal to Crm Appls, AG, DA & Def. | | |



ACRO369    A L A B A M A    J U D I C I A L    I N F O R M A T I O N    C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2003 000957.60
JUDGE ID:   TSM

STATE  OF  ALABAMA                    VS    LOCKWOOD ALBERT JEROME

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 06|22|05 | Transcript To Crm Appls, AG & Def. |
| 10-12-05 | Order from Crim App for Circuit Court to Rule on 1/m Forma Pauperes |
| 12|02|05 ✓ | Cert. of Final Judgment of Dismissal |
| 11-28-05 | Order - Court did not Rule on Hardship & Def did not pay filing fee. |
| 10-4-06 | Order For State To Respond To Rule 32 |
| 11-15-06 | Order dismissing Rule 32 petition |
| 12-13-06 | notice of appeal w/forms |
| 1/02/06 | clerk's notice of appeal to Crm. Appls, DA, AG & Def. |
| 1/08/07 | CR# 06-562 |
| 1/09/07 | Transcript to Crm. Appls, AG & Def. pgs: 2 jép + 39K |
| 1/12/07 | notice that appellants brief is due |
| 3/01/07 | Order from Crm Appls that this case be and the same is hereby remanded to the ntgy Circuit Court w/ directions that it supplement the record on Appeal with a copy of the Circuit Courts Nov 10, 2006 Order Summarily dismissing the appellants Rule 32 petition |

THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT

THE ALABAMA COURT OF CRIMINAL APPEALS

CR-06-0562

Albert Jerome Lockwood, Appellant

vs.

State of Alabama, Appellee

Appeal from Montgomery Circuit Court No. CC-03-957.60

## ORDER

Albert Jerome Lockwood appeals from the dismissal of his petition seeking post-conviction relief filed pursuant to Rule 32, Ala.R.Crim.P. The record on appeal does not contain a copy of the circuit court's order dismissing the appellant's Rule 32 petition.

Accordingly, pursuant to Rule 10(g), Ala.R.App.P., the Court of Criminal Appeals **ORDERS** that this cause be and the same is hereby remanded to the Montgomery Circuit Court with directions that it supplement the record on appeal with a copy of the circuit court's November 10, 2006 order summarily dismissing the appellant's Rule 32 petition. The supplemental record should be certified and transmitted to this Court at the earliest possible date and by no later than 7 days from the date of this order.

Done this 28th day of February, 2007.

_Pamela W. Baschab_
PAMELA W. BASCHAB, PRESIDING JUDGE

cca/

cc:    Hon. Tracy S. McCooey, Judge
       Hon. Melissa Rittenour, Clerk
       Albert Jerome Lockwood, pro se
       Office of the Attorney General

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY, ALABAMA

| | | |
|---|---|---|
| ALBERT LOCKWOOD, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No.: CC-03-957-TSM · 60 |
| | ) | |
| STATE OF ALABAMA, | ) | |
| Respondent. | ). | |

## ORDER

This matter is before the Court on Petitioner's Petition For Relief From Conviction Or Sentence, filed pursuant to Rule 32, A.R.CR.P., and the State's Answer to Petition for Relief and Motion to Dismiss.

Albert Lockwood was indicted by the Montgomery County Grand Jury on July 11, 2003 for the offenses of Attempted Murder, in violation of, § 13A-6-2, Code of Alabama 1975. The Honorable Vicki Toles was retained to represent Mr. Lockwood in this matter.

On February 24, 2004 the Defendant was found guilty as charged by a jury of his peers. The Court conducted a sentencing hearing on March 18, 2004. The Court granted the State's motion to invoke three (3) prior felonies for habitual offender purposes. The Court sentenced the Petitioner to life without parole.

The Court of Criminal Appeals affirmed the Petitioner's conviction on September 24, 2004. The Petitioner's application for rehearing was overruled on October 15, 2004. The Petitioner filed his first Rule 32 Petition for Relief from Conviction or Sentence on August 17, 2006.

Petitioner alleges that he was denied effective assistance of trial counsel. Apart from bare allegations by Petitioner, there is no evidence whatsoever to support Petitioner's claim of ineffective assistance of counsel. Where the petitioner failed to allege facts sufficient to support his allegations of ineffective assistance of counsel,

summary dismissal of the petition was proper. Boles v. State, 717 So.2d 877 (Ala.Crim.App.1998).

It is the finding of this Court that there is no evidence to support the Petitioner's claim of ineffective assistance of Counsel. Therefore, upon consideration thereof, and having taken judicial notice of the Court's own records, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Petitioner's Rule 32 Petition for Post Conviction Relief is hereby **SUMMARILY DISMISSED** without an evidentiary hearing pursuant to Rule 32.7(d) of the Alabama Rules of Criminal Procedure.

**DONE** this ___ day of _____ 2006.

HONORABLE TRACY S.MCCOOEY
Circuit Judge
Fifteenth Judicial Circuit

cc: R. Foreman Dist. Atty. Off.
Def.

| State of Alabama<br>Unified Judicial System<br><br>From ARAP - 14  Rev. 11 / 91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number<br><br>CR 06-0562 |
|---|---|---|

| TO: THE CLERK OF<br>  THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL:   12/13/06 |
|---|---|

APPELLANT                  ALBERT LOCKWOOD

v. STATE OF ALABAMA

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in ( a single volume of ___6___ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of brief.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this___14TH___ day of ___MARCH___, __2007__.


_Melissa R. Hensarin_
Circuit Clerk



IN THE ALABAMA COURT OF CRIMINAL APPEALS

<u>CR-06-0562</u>

ALBERT JEROME LOCKWOOD,

APPELLANT

VS

STATE OF ALABAMA,

APPELLEE

ON APPEAL FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY

CASE NUMBER: <u>CC-03-957.60</u>

BRIEF AND ARGUMENT OF APPELLANT
Albert Jerome Lockwood, Pro se

Albert Jerome Lockwood
AIS # 134376
SCCF
1000 St. Clair Road
Springville, Alabama 35146-5582



## STATEMENT REGARDING ORAL ARGUMENT

Appellant avers that oral argument is not available to him in this cause on appeal where he is a *pro se litigant*, and currently incarcerated at the St. Clair Correctional Facility.

## **TABLE OF CONTENTS**

Page No.

TABLE OF CONTENTS . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . .  ii

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . .  1

STATEMENT OF THE STANDARD OF REVIEW . . . . . . . .  4

STATEMENT OF THE ISSUE . . . . . . . . . . . . . . .  4

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . .  5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . .  6

CONCLUSION . . . . . . . . . . . . . . . . . . . . .  13

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . .  14

i

## TABLE OF AUTHORITIES

Page No.

**Albert Lockwood, alias  v. State of Alabama,** CR-03-1253, Sept 24, 2004 . .  6

**Ex Parte Boatwright**, 471 So.2d 1257, 1258 (Ala. 1985) . . . . . . . . .  13

**Brown v. State**, --So.2d--, 2004 Ala.Crim.App. LEXIS 75 . . . . . . . .  6

**Ford v State**, 831 So.2d 641, 644 (Ala.Crim.App. 2001) . . . . . . . .  11

**Hull v State**, 607 So.2d 369, 371 n. 1 (Ala.Cr.App. 1992) . . . . . . .  6

**Johnson v State**, 835 So.2d 1077 (Ala.Crim.App. 2001) . . . . . . . .  11

**Smith v State,** 581 So.2d 1283, 1284 (Ala.Crim.App. 1991) . . . . . . .  11

**Strickland v Washington**, 80 L.Ed.2d 674 (1984) . . . . . . . . . .  12

**V.R. v. State**, 852 So.2d 194, (Ala.Crim.App. 2002) . . . . . . . . . .  6


RULE 24.1(b), Alabama Rules of Criminal Procedure . . . . . . . . .  7

RULE 32.2(a) (3), Alabama Rules Of Criminal Procedure . . . . . . .  6

RULE 32.3, Alabama Rules of Criminal Procedure . . . . . . . . . .  11

RULE 32.6(b), Alabama Rules of Criminal Procedure . . . . . . . . .  8

RULE 32.7(d), Alabama Rules of Criminal Procedure . . . . . . . . .  11

## STATEMENT OF THE CASE AND FACTS

On February 24, 2004, in the Montgomery Circuit Court, after a trial by jury, the Appellant, Albert Jerome Lockwood (hereinafter, Lockwood), was convicted of the offense of attempted murder, a violation of Section(s) 13A-4-2 and 13A-6-2(a)(1), Alabama Code 1975.

Appellant appealed his conviction to the Court of Criminal Appeals, and on September 24, 2004, the Court affirmed the conviction by unpublished memorandum. Albert Lockwood, alias v. State of Alabama, CR-03-1253.

On or about January 26, 2005, Lockwood filed a Rule 32 Petition for post-conviction relief in the Circuit Court of Montgomery County, challenging his conviction for attempted murder.

As grounds for post-conviction relief, Lockwood averred that trial counsel rendered ineffective assistance, in a violation of the 6th Amendment of the United States Constitution. (Cr. 3-25)

On April 5, 2005, the Honorable Tracey McCooey denied the petition without an evidentiary hearing. (Cr. 31-32)

On May 2, 2005, Lockwood filed a timely *'notice of appeal'* to the Alabama Court of Criminal Appeals.

On October 12, 2005, this Honorable Court remanded the case back to the Montgomery Circuit Court, because the Court was unable to ascertain from the record on appeal whether the circuit court had jurisdiction to rule on the petition because the record

1

did not affirmatively show that either the circuit court granted Lockwood's request to proceed *in forma pauperis*, or that Lockwood paid the required filing fee. (Cr. 38)

On the November 28, 2005, the Circuit Court made specific, written findings of fact that it did not rule on Lockwood's motion to proceed *informa pauperis*, nor had Lockwood paid a filing fee. (Cr. 39)

On December 2, 2005, this Honorable Court issued a Certificate of Judgment in the case pursuant to Rule 41, Alabama Rules of Appellate Procedure, (Cr. 40).

Further, the Court held that, *"in dismissing the appeal, Lockwood's in forma pauperis petition and his Rule 32 petition still [stood] filed in the circuit court with their original filing dates and await[ed] disposition by the trial court."* (Cr. 41)

After an unreasonable delay by the trial court, Lockwood filed a petition for writ of mandamus on May 17, 2006, directing the trial court to rule upon his motion to proceed in forma pauperis, and to dispose of the Rule 32 petition, (Cr. 43-44).

On June 12, 2006, [purportedly] *ex mero motu*, the trial court entered an Order granting Lockwood's motion to proceed in forma pauperis, (CR. 54). On June 16, 2006, the Court of Appeals dismissed the petition for writ of mandamus, (Cr. 55).

The Rule 32 petition then proceeded through the trial court, and on November 3, 2006, the State filed [another] Answer To Petition, addressing Lockwood's ineffective assistance of counsel claims. (Cr. 101-104)

Lockwood filed a response to the State's answer on November 15, 2006, (Cr. 105-106). However, the trial court [had] dismissed the petition on November 10, 2006.

2

A copy of the trial courts Order is appended hereto where the record on appeal does not include the trial courts Order dismissing the petition.

On December 13, 2006, Lockwood filed 'Notice to the Court of Criminal Appeals', and accordingly, this appellant brief raises the question(s) of whether or not the trial court abused its discretion in dismissing the petition.

3

## STATEMENT OF THE STANDARD OF REVIEW

Appellant avers that the Standard of Review applicable on appeal in a post-conviction proceeding is whether the trial court abused its discretion when it denied the petition. <u>Payne v State</u>, 791So.2d 383 (Ala.Crim.App. 1999); <u>Elliot v State</u>, 601 So.2d 1118 (Ala.Crim.App. 1992)

## STATEMENT OF THE ISSUE(S)

**Whether** The Trial Court Erred, and/or Otherwise Abused Its Discretion By Dismissing The Rule 32 Petition On Procedural Grounds Under Rule(s) 32.2(a)(3), 32.6(b), and 32.7(d), Alabama Rules of Criminal Procedure.

**Whether** The Trial Court Erred, and/or Otherwise Abused Its Discretion By Dismissing The Rule 32 Petition Without An Evidentiary Hearing On The Merits Of Lockwood's Ineffective Assistance Of Counsel Claim.

## SUMMARY OF THE ARGUMENT

In the foregoing cause, Lockwood argues that the trial court erred, and/or otherwise abused its discretion in dismissing the Rule 32 petition under Rule(s) 32.2(a)(3), 32.6(b), and 32.7(d), Alabama Rules of Criminal Procedure.

Further, Lockwood avers that, the trial court erred in dismissing the Rule 32 petition for post-conviction relief without holding an evidentiary hearing on the ineffective assistance of counsel claim(s) raised for post-conviction relief.

# ARGUMENT.

The appellant contends that the trial court erred, and/or otherwise abused its discretion by summarily dismissing his Rule 32 petition without an evidentiary hearing on the ineffective assistance of counsel grounds alleged for post-conviction relief where:[1]

**I.** The trial court decreed that the petition was precluded by Rule 32.2(a)(3), Ala.R.Crim.P., "*that the issue(s) could have been but was not raised at trial.*"

In addressing the trial courts error in dismissing the petition under Rule 32.2(a)(3), Ala.R.Crim.P., appellant avers that this Honorable Court has consistently held that:

"*[A] defendant is not precluded by Ala.R.Crim.P. 32.2(a)(3) or (5) from raising an ineffective assistance of trial counsel claim for the first time in an Ala. R. Crim. P. 32 petition if the trial transcript was not prepared in time for appellate counsel to have reviewed the transcript and ascertain whether such a claim was viable and to present the claim in a timely filed motion for a new trial; it is neither reasonable nor practical to expect newly appointed appellate counsel to raise an ineffective assistance of trial counsel claim without the benefit of a trial transcript to document and support a defendant's allegations as to what occurred during trial.*" See; **V.R. v. State**, 852 So.2d 194, (Ala.Crim.App. 2002); **Brown v. State**, --So.2d--, 2004 Ala.Crim.App. LEXIS 75

Appellant moves this Honorable Court to take judicial notice of its own records in **[Albert Lockwood, alias v. State of Alabama, CR-03-1253]** under the caselaw precedent of; **Hull v State**, 607 So.2d 369, 371 n. 1 (Ala.Cr.App. 1992).

---

[1] The record on appeal contains a copy of the trial courts original Order dismissing the Rule 32 Petition on April 5, 2005, (Cr. 31-32). It is that Order, in conjunction with the Courts Order entered on November 10, 2006, (appended hereto) that appellant addresses in this appeal.

6

Accordingly, this Honorable Court will note that, the thirty (30) day period allowed by Rule 24.1(b), Ala.R.Crim.Pro., *for newly appointed appellate counsel* to file a 'motion for new trial' [and raise a claim of ineffective assistance of trial counsel] had elapsed. Appellant was convicted on February 24, 2004, and the completion of the record on direct appeal occurred on July 8, 2004. In reviewing the record on direct appeal, this Honorable Court will note that the record reflects that:

*(1) On February 24, 2004, the jury returned a verdict of guilty for the offense of attempted murder. Appellant was sentenced by the trial court on March 23, 2004.* **(Cr. 2)**

*(2) On April 29, 2004, Ms. Toles, appellants trial counsel filed 'Notice of Appeal' on behalf of appellant* **(Cr. 42)**, *along with a "Petition For Transcript And Appointment of [appellate] Counsel"* **(Cr. 45-46)**.

*(3) On May 3, 2004, Ms. Toles filed a "Motion To Set Aside Verdict Or In The Alternative Motion For New Trial."* **(Cr. 38-41)**

*(4) On May 4, 2004, the trial court entered an Order "authorizing preparation and filing of transcript, and appointed Mr. Thomas J. Azar as appellate counsel."* **(Cr. 47-48)**

*(5) The "Certificate Of Completion And Transmittal Of Record On Appeal By Trial Clerk" certified by Montgomery, County Circuit Court Clerk Melissa Rittenour shows a date of July 8, 2004.* **(Cr. 120)**

Further, appellant moves this Honorable Court to take judicial notice that, *"appellant's trial counsel filed the notice of appeal in the case, not [newly] appointed appellate counsel."* The trial court record on direct appeal reflects that Ms. Vickie Toles represented the appellant at trial. On direct appeal, Mr. Thomas J. Azar, Jr. was appointed to represent appellant.

7

Thus, under caselaw precedent rendered by this Honorable Court, it was error for the trial court to summarily dismiss the petition under Rule 32.2(a)(3) or (5), where appellants *first* Rule 32 petition, was the *first opportunity* he had in which to properly raise the issue of ineffective assistance of trial counsel.

**II.** Appellant avers that the trial court erred, and/or otherwise abused its discretion by arbitrarily dismissing the Rule 32 petition on the grounds that; *"the petition did not contain a clear and specific statement of the grounds upon which relief is sought"* in accordance with Rule 32.6(b), Ala.R.Crim.P.

Appellant avers that he duly met his ***"burden of pleading"*** by presenting "a clear and specific statement of the grounds upon which relief was sought" where he succinctly averred in the Rule 32 petition that:

(1) *He* was denied the effective assistance of counsel at trial where, counsel failed to object, and/or otherwise preserve for appellate review the issue that, "the trial court erred in allowing into evidence an [unauthenticated] transcript of a statement he made to police, due to the fact that the evidence should have been suppressed because law enforcement officer's acted in bad faith in obtaining the statement."

Appellant further averred sufficient pleadings of fact, tending to show that he was prejudiced by the statements admission at trial. (Cr. 16-17)

(2) *He* was denied the effective assistance of counsel at trial where, counsel failed to object, and/or otherwise to preserve for appellate review the issue that, "the trial court

8

erred in allowing into evidence [a] statement given to police, because he was denied his right to remain silent, and his right to an attorney during questioning by police."

Appellant further averred sufficient pleadings of fact, tending to show that he was prejudiced by the statements admission at trial. (Cr. 17-22)

(3) *He* was denied the effective assistance of counsel at trial where, counsel failed to object to the trial courts oral instructions to the jury concerning evidence of flight.

Appellant further averred sufficient pleadings, tending to show that he was prejudiced by the jury instruction concerning flight, and how the State deliberately requested the instruction at the last minute, in an effort to improperly influence the jury to convict him. (Cr. 22-23)

(4) *He* was denied the effective assistance of counsel at trial where, counsel failed to request that the trial court properly instruct the jury on 'reasonable doubt' and, for failing to request an instruction that the jury had the option of finding appellant not guilty. (Cr. 23-24)

In the cause for post-conviction relief, appellant avers that there is a reasonable probability that, *but for trial counsel's inadequate assistance*, the outcome of his trial and/or direct appeal, would have been different had counsel properly raised objection to the errors complained of, and/or otherwise properly preserved the issues so that appellate counsel could raise the issues on direct appeal.

Appellant avers that the trial courts finding that, *"the petition did not contain a clear and specific statement of the grounds upon which relief is sought"* in accordance

9

with Rule 32.6(b), Ala.R.Crim.P., was an arbitrary abuse of discretion, used to summarily dismiss the petition without an evidentiary hearing on the ineffective assistance of counsel claims.

As the record in this case reflects, the State had no problem understanding the 'specific statement of the grounds' and the basis of the ineffective assistance of counsel claims. The record conclusively shows that the State both *articulated*, and *addressed* each claim in its "Motion To Dismiss." (Cr. 27-29)

Appellant avers that the claims set-out herein and above, as raised in the Rule 32 petition, were previously raised [for the first time] by appellate counsel on direct appeal.

Appellant moves this Honorable Court [again] to take judicial notice of its own records, and the "Memorandum Opinion" rendered on direct appeal in; [Albert Lockwood, alias v. State of Alabama, CR-03-1253].

Accordingly, in reviewing the [same] issues, "*as raised by appellate counsel on direct appeal*" the State argued and this Honorable Court agreed, that the issues and/or claims were not properly before the Court for appellate review.

In disposing of the appeal, this Honorable Court held that, "the appellant was not entitled to any relief on the claims because [trial counsel] failed to preserve the claims for appellate review."

10

**III.** Appellant avers that the trial court erred, and/or otherwise abused its discretion by arbitrarily dismissing the Rule 32 petition on the grounds that; *"[appellant] failed to prove beyond a preponderance of the evidence the facts necessary to entitle him to relief"* in accordance with Rule 32.3, Ala.R.Crim.P., (CR. 31-32).

This Honorable Court has held that, *"[A]t the pleading stage of Rule 32 proceedings, a Rule 32 petitioner does not have the burden of proving his claims by a preponderance of the evidence. Rather, at the pleading stage, a petitioner must only provide 'a clear and specific statement of the grounds upon which relief is sought.' Rule 32.6(b), Ala.R.Crim.P.*

*Once a petitioner has met his burden of pleading so as to avoid summary disposition pursuant to Rule 32.7(d), Ala.R.Crim.P., he is then entitled to an opportunity to present evidence in order to satisfy his burden of proof."* **Johnson v State**, *835 So.2d 1077 (Ala.Crim.App. 2001), quoting* **Ford v State**, *831 So.2d 641, 644 (Ala.Crim.App. 2001)."*

*"A claim may not be summarily dismissed because the petitioner failed to meet his burden of proof at the initial pleading stage, a stage at which the petitioner has only a burden to plead."* See; **Smith v State**, 581 So.2d 1283, 1284 (Ala.Crim.App. 1991)

As duly shown herein and above, the pleadings enumerated under [Argument] **II.**, shows that appellant simply met his burden of pleading, *"at the pleadings stage of the Rule 32 process."*

11

Appellant is aware that, under the two-prong test articulated by the U.S. Supreme Court in **Strickland v Washington**, 80 L.Ed.2d 674 (1984), that he must establish both *cause* and *prejudice* in order to prevail upon an ineffective assistance of counsel claim. Accordingly, appellant contends that the two-prong test under *Strickland* supra, is "*a burden of proof*" under the requisites of Rule 32.3, Ala.R.Crim.P.

*However*, appellant argues that because the trial court dismissed the Rule 32 petition without an evidentiary hearing on the effective assistance of counsel claims, he was not afforded the opportunity to "meet his burden of proof by a preponderance of the evidence" as required by Rule 32.3, Ala.R.Crim.P.

Stated another way, appellant avers that the trial court did not afford him the opportunity to establish the *prejudice, and/or "proof" prong* of the *Strickland* test, and show that there was a reasonable probability, that but for trial counsel's errors, the result of the judicial proceedings [at trial, and/or on direct appeal] might have been different had counsel properly argued, and/or preserved [for appellate review] the issues complained of in the Rule 32 petition.

## **CONCLUSION**

Appellant avers that he met his burden of pleading [a] specific statement of the grounds upon which post-conviction relief is sought under the requisites of Rule 32.6(b), Ala.R.Crim.P.

Appellant specifically averred, [with attendant facts] that he was denied the effective assistance of trial counsel in a violation of the Sixth Amendment of the United States Constitution. However, the trial court did not afford him the opportunity to prove the claims.

This Honorable Court has held in **Ex Parte Boatwright**, 471 So.2d 1257, 1258 (Ala. 1985) that, *"when a petition contains matters which, if true, would entitle petitioner to relief, an evidentiary hearing must be held."*


WHEREFORE, pleadings and premises being duly considered, appellant respectfully moves this Honorable Court to reverse and remand this cause to the trial court, with an Order for the trial court to conduct an evidentiary hearing on the merits of the ineffective assistance of counsel claims raised for postconviction relief.

13

## CERTIFICATE OF SERVICE

I hereby certify on this, 31st day of January 2007, that I have served a true and correct copy of the foregoing Appellant Brief on the Attorney General for The State of Alabama by placing same in the U.S. Mail, first-class postage prepaid, and properly addressed as follows:

Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130

Albert Lockwood, Pro se
A.I.S. #134376
SCCF
1000 St. Clair Road
Springville, Ala. 35146-5582

14

# IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
## MONTGOMERY COUNTY, ALABAMA

| | |
|---|---|
| ALBERT LOCKWOOD,<br>    Petitioner, | )<br>)<br>) |
| v. | )    Case No.:  CC–03–957-TSM |
| | ) |
| STATE OF ALABAMA,<br>    Respondent. | )<br>) |

## ORDER

This matter is before the Court on Petitioner's Petition For Relief From Conviction Or Sentence, filed pursuant to Rule 32, A.R.CR.P., and the State's Answer to Petition for Relief and Motion to Dismiss.

Albert Lockwood was indicted by the Montgomery County Grand Jury on July 11, 2003 for the offenses of Attempted Murder, in violation of, § 13A-6-2, Code of Alabama 1975. The Honorable Vicki Toles was retained to represent Mr. Lockwood in this matter.

On February 24, 2004 the Defendant was found guilty as charged by a jury of his peers. The Court conducted a sentencing hearing on March 18, 2004. The Court granted the State's motion to invoke three (3) prior felonies for habitual offender purposes. The Court sentenced the Petitioner to life without parole.

The Court of Criminal Appeals affirmed the Petitioner's conviction on September 24, 2004. The Petitioner's application for rehearing was overruled on October 15, 2004. The Petitioner filed his first Rule 32 Petition for Relief from Conviction or Sentence on August 17, 2006.

Petitioner alleges that he was denied effective assistance of trial counsel. Apart from bare allegations by Petitioner, there is no evidence whatsoever to support Petitioner's claim of ineffective assistance of counsel. Where the petitioner failed to allege facts sufficient to support his allegations of ineffective assistance of counsel,

summary dismissal of the petition was proper. Boles v. State, 717 So.2d 877 (Ala.Crim.App.1998).

It is the finding of this Court that there is no evidence to support the Petitioner's claim of ineffective assistance of Counsel. Therefore, upon consideration thereof, and having taken judicial notice of the Court's own records, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Petitioner's Rule 32 Petition for Post Conviction Relief is hereby **SUMMARILY DISMISSED** without an evidentiary hearing pursuant to Rule 32.7(d) of the Alabama Rules of Criminal Procedure.

**DONE** this _10_ day of _Nov_ 2006.

HONORABLE TRACY S. MCCOOEY
Circuit Judge
Fifteenth Judicial Circuit

cc: R. Foreman Dist. Atty. Off. ✓
Def. ✓

No. CR-06-0562

In the COURT of CRIMINAL APPEALS
of ALABAMA

◆

ALBERT JEROME LOCKWOOD,

*Appellant,*

v.

STATE OF ALABAMA,

*Appellee.*

◆

*On Appeal From the Circuit Court of
Montgomery County (CC 03-957.60)*

**BRIEF OF APPELLEE**

Troy King
*Attorney General*

Robin D. Scales
*Assistant Attorney General*

John M. Porter
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama 36130
(334) 242-7300*

February 28, 2007



EXHIBIT
J

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary in this case.  According to Alabama Rule of Appellate Procedure 34(a)(3), oral argument should not be allowed if "[t]he facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument."

i

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT........................ i

TABLE OF CONTENTS....................................... ii

TABLE OF CASES AND AUTHORITIES......................... iii

STATEMENT OF THE CASE AND FACTS......................... 1

STATEMENT OF THE ISSUE................................. 3

STANDARD OF REVIEW..................................... 4

SUMMARY OF THE ARGUMENT................................ 5

ARGUMENT.............................................. 6

The Circuit Court Properly Denied Lockwood's Rule 32
Petition Without Holding An Evidentiary Hearing
Because Lockwood Failed To Allege Sufficient Facts
Showing That He Was Entitled To Relief.................. 6

CONCLUSION........................................... 14

CERTIFICATE OF SERVICE................................ 15

## TABLE OF CASES AND AUTHORITIES

**Cases**

Battle v. State, 645 So. 2d 344, 346 (Ala. Crim.
    App. 1994) ........................................... 7

Centobie v. State, 861 So.2d 1111, 1122-23 (Ala.
    Crim. App. 2001) ..................................... 10

Edwards v. Arizona, 451 U.S. 477 (1981).................. 9

Ex parte Fuller, 620 So. 2d 675, 678 (Ala. 1993).......... 8

Smith v. State, CR-97-1258, 2000 WL 1868419,
    at *62 (Ala. Crim. App. Dec. 22, 2000),
    *rev'd on other grounds*, Ex parte Smith,
    2003 WL 1145475 (Ala. Mar 14, 2003) .................. 11

Strickland v. Washington, 466 U.S. 668, 697 (1984)........ 6

**Rules**

Alabama Rules of Criminal Procedure,

    Rule 22.2 ........................................... 12

    Rules 32.3 and 32.6(b) .............................. 6

## STATEMENT OF THE CASE AND FACTS

This is an appeal from the trial court's denial of a petition for post-conviction relief filed pursuant to Rule 32 of the Alabama Rules of Criminal Procedure by the appellant, Albert Jerome Lockwood.  The Honorable Tracy S. McCooey presided.

On February 24, 2004, Lockwood was found guilty by a jury of attempted murder and was sentenced by Judge McCooey to life imprisonment without the possibility of parole. (C. 4)  In an unpublished memorandum issued on September 24, 2004,[1] this Court affirmed Lockwood's conviction and, on October 15, 2004, overruled his application for rehearing. (C. 5)

Lockwood filed a Rule 32 petition on January 28, 2005, arguing that he was denied effective assistance of counsel. (C. 5-25)  The State filed a "Motion to Dismiss or in the Alternative Answer to Petitioner's Petition for Relief from Conviction or Sentence" on March 1, 2005.  (C. 27-29) Judge McCooey denied Lockwood's petition on March 28, 2005, using her own recollection of the proceedings to determine

---

[1] Albert Lockwood v. State of Alabama, CR-03-1253, mem. op. (Ala. Crim. App. Sep. 24, 2004).

that Lockwood's ineffective assistance claims were without merit.  (C. 31-32)

On December 2, 2005, this Court dismissed Lockwood's appeal of the denial of his Rule 32 petition, holding that Judge McCooey's order purporting to deny his petition was void because Lockwood had not paid the filing fee or been granted in forma pauperis status and that Lockwood's Rule 32 petition and in forma pauperis application remained pending.  (C. 41)  On June 12, 2006, Judge McCooey granted Lockwood's request to proceed in forma pauperis.  (C. 60) On November 3, 2006, the State filed a "State's Answer to Petition for Relief from Conviction or Sentence," and, on November 15, 2006, Lockwood filed a "Petitioner's Response to the State's Answer to Petition for Relief from Conviction or Sentence."  (C. 101-107)  Judge McCooey summarily dismissed Lockwood's petition, issuing a written order on November 10, 2006.  (Brief of the Appellant, Exhibit)  Lockwood filed notice of appeal on December 13, 2006.  (C. 108)

2

## STATEMENT OF THE ISSUE

Did the circuit court properly deny Lockwood's Rule 32 petition without holding an evidentiary hearing because Lockwood failed to allege sufficient facts showing that he was entitled to relief?

## STANDARD OF REVIEW

This Court stated the standard of review to be applied

to a circuit court's denial of a Rule 32 petition in Reed

v. State, 748 So. 2d 231, 233 (Ala. Crim. App. 1999):

> We apply an abuse of discretion standard of review
> to the circuit court's denial of a Rule 32, Ala.
> R. Crim. P., petition for postconviction relief.
> See Elliott v. State, 601 So. 2d 1118 (Ala. Cr.
> App.1992). If the circuit court is correct for
> any reason, even though it may not be the stated
> reason, we will not reverse its denial of the
> petition. See Roberts v. State, 516 So. 2d 936
> (Ala. Cr. App. 1987).

This Court will review the denial of a Rule 32 petition

under a de novo standard "when the facts are undisputed and

[it] is presented with pure questions of law." Scroggins

v. State, 827 So. 2d 878, 880 (Ala. Crim. App. 2001).

4

## SUMMARY OF THE ARGUMENT

The circuit court's summary denial of Lockwood's petition should be affirmed. Lockwood failed to allege sufficient facts which, if proven true, would have shown that his trial counsel was ineffective. As this Court has already found during Lockwood's direct appeal, the trial court's admission into evidence of the transcript of Lockwood's statement to police was proper because the audiotape of the statement had been misplaced and because Lockwood's rights to remain silent and to request an attorney had not been violated. Accordingly, his trial counsel cannot be deemed ineffective for failing to object to the admission of the transcript or to the statement itself. Furthermore, because the record shows that the trial court's jury instructions were complete and proper, Lockwood's trial counsel cannot be deemed ineffective for failing to object to the instructions given or to request other instructions. Accordingly, the circuit court correctly deemed that Lockwood failed to sufficiently plead facts entitling him to an evidentiary hearing and properly dismissed his petition.

**ARGUMENT**

**The Circuit Court Properly Denied Lockwood's Rule 32
Petition Without Holding An Evidentiary Hearing Because
Lockwood Failed To Allege Sufficient Facts Showing That He
Was Entitled To Relief.**

Lockwood argues that the circuit court erred by
summarily denying his Rule 32 petition because, he says, he
is entitled to an evidentiary hearing after alleging facts
that, if proved true, would warrant relief on his
ineffective assistance of counsel claims.  Brief of the
Appellant, pp. 6-8.  Pursuant to Rules 32.3 and 32.6(b) of
the Alabama Rules of Criminal Procedure, Lockwood, to be
entitled to an evidentiary hearing, has the burden of
pleading specific facts which, if proved true, would
entitle him to relief.  According to Strickland v.
Washington, 466 U.S. 668, 697 (1984), to sufficiently plead
ineffective assistance of trial counsel, he must allege
facts showing that his trial counsel's performance was
deficient and that such deficiency prejudiced his case.
Because Lockwood failed to allege any facts uncontradicted
by the record which would show that he was entitled to
relief, however, the circuit court properly summarily
dismissed his petition.

6

According to Lockwood, his trial counsel was ineffective for failing to object to the admission into evidence of a transcript of his statement to police when the statement was not properly admitted and when he was denied his right to remain silent and to request an attorney. Brief of the Appellant, p.8; (C. 16-22) As this Court held in Lockwood's direct appeal,[2] however, the admission of the transcript into evidence was entirely proper. This Court stated in Battle v. State, 645 So. 2d 344, 346 (Ala. Crim. App. 1994):

> Where the tape-recorded statement or conversation is missing or unavailable, '[a] typewritten transcript of [the recording] is admissible where the officer who listened to the conversation at the time of the recording testifies that the transcript accurately reflect[s] the conversation. Hawkins [v. State], 443 So.2d [1312], 13141-15 [(Ala. Crim. App. 1983)].

D.J. Belcher, the officer who taped Lockwood's statement, testified without contradiction that the audiotape in question was accidentally misplaced and could not be located after a diligent search. (R. 151) Officer Belcher reviewed the transcript while listening to the tape and

---

[2] Albert Lockwood v. State of Alabama, CR-03-1253, mem. op. at *2-4 (Ala. Crim. App. Sep. 24, 2004).

7

confirmed that the transcript accurately reflected the conversation. (R. 149-152)[3] Indeed, Officer Belcher used the same procedures as did Chief Hudson in <u>Battle</u> which this Court found sufficient to satisfy the "reliable representation standard" set out in <u>Ex parte Fuller</u>, 620 So. 2d 675, 678 (Ala. 1993). <u>Battle</u>, 645 So. 2d at 347. This Court further held in <u>Battle</u>, 645 So. 2d at 346, that the transcript was admissible even "where the tape recording was inaudible in places." Therefore, the mere fact that it indicated that there were inaudible "gaps" in the audiotape did not render the transcript inadmissible. Accordingly, because the transcript was properly admitted, Lockwood's trial attorney was not ineffective for failing to object to its admission into evidence.

Lockwood next claims that his trial attorney was ineffective for failing to object to the admission of his statement into evidence after his right to remain silent and to request an attorney had been denied. Brief of the Appellant, pp. 8-9; (C. 17-22) He has failed to adequately plead sufficient facts, however, indicating how his

---

[3] References to Lockwood's trial transcript are designated by "R".

8

statement was involuntary or how the admission of his
statement prejudiced his case.    Officer Belcher testified
without contradiction that, although Lockwood invoked his
right to remain silent at one point after which Officer
Belcher turned off the tape, the questioning was resumed *at
Lockwood's behest*.    (R. 171)    Not only was there no
evidence at trial that Lockwood was coerced into resuming
the interrogation, the only circumstance articulated in his
Rule 32 petition showing any such coercion is that "sitting
a custodial suspect in a Detective's Office for two hours
during which time the custodial suspect is alleged to have
demanded an attorney, is in no uncertain terms a coercion
of the custodial suspect."    (C. 21)    This "claim" is lifted
verbatim from Lockwood's initial brief on direct appeal,
where it appears to have been a recount of the facts in
Edwards v. Arizona, 451 U.S. 477 (1981), rather than any
account of what happened while Lockwood was being
questioned.    See Albert Lockwood v. State of Alabama, CR-
03-1253 (Brief of Appellant, p. 26)[4]    Indeed, the record is
completely devoid of any indication that Lockwood ever

---

[4] See Hull v. State, 607 So.2d 369, 371 (Ala.Crim.App.1992)
(this Court may take judicial notice of its own records).

9

requested an attorney in or around the time he was being questioned.  (R. 142-175; CS. 15-110)[5]  Because Lockwood has failed to allege any facts showing that his trial attorney was aware or should have been aware that he was "alleged to have demanded an attorney," he has failed to sufficiently allege that his trial counsel's failure to challenge the admission of his statement on such grounds constituted deficient performance.

Lockwood further claims that his trial counsel was ineffective for failing to object to the trial court's jury instructions concerning evidence of flight.  Because this Court has held that evidence of flight is admissible to show consciousness of guilt, the instruction was proper. See Centobie v. State, 861 So.2d 1111, 1122-23 (Ala. Crim. App. 2001)(evidence of escape admissible to show attempt to avoid prosecution).  Lockwood's main concern, however, appears not to be with the substance of the instruction, but rather with its timing.  According to Lockwood, "[t]he instruction to the jury on flight was deliberately requested by the State as a last effort to ring a bell in

---

[5] Citations to the supplemental record in Lockwood's direct appeal are designated by "CS".

10

the jury's mind and as a means to subliminally suggest to the jury that they should convict the Petitioner because he was alleged to have fled the scene of the alleged crime." (C. 23)  This argument appears to be similar to the claim addressed by this Court in Smith v. State, CR-97-1258, 2000 WL 1868419, at *62 (Ala. Crim. App. Dec. 22, 2000), *rev'd on other grounds*, Ex parte Smith, 2003 WL 1145475 (Ala. Mar 14, 2003), in which Smith argued that "the order in which the trial court gave its instructions prevented the jury from considering his defenses of intoxication."  This Court held that trial court's instruction was proper, insisting that the instruction in question could not be read in isolation and must be read in the context of the instructions as a whole.  Id.  This Court also stated that the jury must be presumed to have not only followed the trial court's instructions, but to have considered the "entire charge."  Id.  Under these principles, it must be presumed that the trial court's flight instruction did not cause the jury to give undue weight to the evidence of flight in this case.  Furthermore, it should be noted that the flight instruction was given before the jury retired

11

for deliberations.  (R1. 50)[6]  Because Rule 22.2 of the
Alabama Rules of Criminal Procedure gives the trial court
discretion to give the jury additional instructions after
it has already retired to deliberate, the trial court
clearly has discretion to give additional instructions
immediately before deliberations – a juncture at which such
additional instruction would be less likely to cause the
jury to place undue emphasis on certain evidence.  Because
Lockwood has failed to allege how he was prejudiced by the
substance or timing of the flight instruction, he has
failed to sufficiently plead that his trial counsel was
ineffective for failing to object to the flight
instruction.

Lockwood finally claims that his trial attorney was
ineffective for failing to request proper reasonable doubt
and acquittal instructions.  (C. 22–25; Brief of the
Appellant, p. 9)  This claim is contradicted by the record,
however, which shows that the trial court instructed the
jury on reasonable doubt and on its duty to find Lockwood

---

[6]The transcript of the conclusion of Lockwood's trial, which
was transcribed by a different court reporter than the rest
of the trial, is designated by "R1".

12

not guilty if it did not believe that the State had proven each element of each crime. (R. 40, 47-48) Lockwood has failed to allege specifically how these instructions were insufficient or the substance of any other possible instructions. (C. 23-25) Accordingly, he has failed to sufficiently plead facts showing that his trial counsel was ineffective for failing to raise any objection to the trial court's instructions or failure to give reasonable doubt or acquittal instructions.

Because Lockwood failed to allege any facts showing that his trial counsel was ineffective under Strickland, the summary dismissal of Lockwood's Rule 32 petition is due to be affirmed.

## CONCLUSION

Based on the foregoing, the trial court's dismissal of Lockwood's Rule 32 petition is due to be affirmed.

Respectfully submitted,

Troy King
*Attorney General*

Robin D. Scales
*Assistant Attorney General*


John M. Porter
*Assistant Attorney General*

14

## CERTIFICATE OF SERVICE

I hereby certify on this 28th day of February 2007, I served a copy of the foregoing on Lockwood, by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:

> Albert J. Lockwood
> AIS #134376
> St. Clair Correctional Facility
> 1000 St. Clair Road
> Springville, Alabama 36146-5582

John M. Porter
Assistant Attorney General

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300

235985

15

REL: 04/20/2007 LOCKWOOD

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals
### State of Alabama
### Judicial Building, 300 Dexter Avenue
### P. O. Box 301555
### Montgomery, AL 36130-1555

PAMELA W. BASCHAB
Presiding Judge
H.W."BUCKY" McMILLAN
GREG SHAW
A. KELLI WISE
SAMUEL HENRY WELCH
Judges

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-06-0562                Montgomery Circuit Court CC-03-957.60

Albert Jerome Lockwood v. State of Alabama

WISE, Judge.

    The appellant, Albert Jerome Lockwood, appeals from the circuit court's dismissal of his petition for postconviction relief, filed pursuant to Rule 32, Ala.R.Crim.P., in which he attacked his February 24, 2004 guilty-plea conviction for attempted murder and his resulting sentence as an habitual felony offender to life imprisonment. On October 15, 2004, this Court affirmed Lockwood's conviction and sentence, by unpublished memorandum. Lockwood v. State (No. CR-03-1253), 923 So. 2d 350 (Ala.Crim.App. 2004) (table). A certificate of judgment was issued on November 3, 2004.

    On January 24, 2005, Lockwood filed this, his first, Rule

1



32 petition wherein he argued that he was denied effective assistance of counsel.[1] On March 1, 2005, the State filed its motion to dismiss Lockwood's petition wherein it argued that Lockwood's petition was both precluded from appellate review and without merit. On March 28, 2005, the trial court issued an order denying Lockwood's petition. On December 2, 2005, this Court dismissed Lockwood's petition as the filing fee had not been paid nor had the trial court allowed him to proceed in forma pauperis. On June 12, 2006, the trial court granted Lockwood's request to proceed in forma pauperis. On November 3, 2006, the State filed an answer wherein it argued that Lockwood's claims were without merit. On November 10, 2006, the trial court issued an order dismissing Lockwood's petition. This appeal followed.

On appeal, Lockwood reasserts the claims presented in his petition to the trial court and also argues that the trial court erred in summarily dismissing his petition without conducting an evidentiary hearing.

Lockwood raises several instances of ineffective assistance of counsel.

"[T]o prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged test set out by <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

"'First, the defendant must show that counsel's performance was deficient. This requires showing

---

[1]Lockwood claims that his trial counsel was ineffective because, he said: (1) trial counsel failed to object to the admission into evidence of a transcript of a statement that he made to the police that was allegedly obtained in bad faith, in violation of his right to remain silent, and after he was denied counsel; (2) trial counsel failed to object to the trial court's jury instructions concerning evidence of flight; and (3) trial counsel was ineffective for failing to have the Court instruct the jury on reasonable doubt and for failing to instruct the jury they had the option of finding Lockwood not guilty.

2

that counsel made errors so
serious that counsel was not
functioning as the "counsel"
guaranteed the defendant by the
Sixth Amendment. Second, the
defendant must show that the
deficient performance prejudiced
the defense. This requires
showing that counsel's errors
were so serious as to deprive the
defendant of a fair trial, a
trial whose result is unreliable.
Unless a defendant makes both
showings, it cannot be said that
the conviction or death sentence
resulted from a breakdown in the
adversary process that renders
the result unreliable.'

Id. at 687, 104 S. Ct. at 2064.

"'The performance component outlined in
Strickland is an objective one: that is, whether
counsel's assistance, judged under "prevailing
professional norms," was "reasonable considering all
the circumstances."' Daniels v. State, 650 So.2d
544, 552 (Ala.Cr.App.1994) (quoting Strickland, 466
U.S. at 688, 104 S.Ct. at 2065). Once a defendant
has identified the specific acts or omissions that
allegedly were not the result of reasonable
professional judgment on counsel's part, the court
must determine whether those acts or omissions fall
outside the wide range of professionally competent
assistance. Id.

"When reviewing a claim of ineffective assistance of
counsel, we indulge a strong presumption that
counsel's conduct was appropriate and reasonable.
Hallford v. State, 629 So.2d 6 (Ala.Cr.App.1992),
cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128
L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531
(Ala.Cr.App.1985).

"'Judicial    scrutiny    of    counsel's

3

performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'

"Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).

"And, even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless it is also established that "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.

"In an ineffective assistance of counsel claim,

4

the burden is on the claimant to show that his counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985)."

McNair v. State, 706 So. 2d 828, 839 (Ala.Crim.App. 1997).

Additionally, we have recently noted:

""[t]he purpose of ineffectiveness review is not to grade counsel's performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992)('We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.'). We recognize that '[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.' Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.' Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)."

Gaddy v. State [Ms. CR-02-2247, March 3, 2006], ____ So. 2d ____, ____ (Ala.Crim.App. 2006).

Here, Lockwood has failed to meet the two-prong test required by Strickland to prevail on an ineffective assistance of counsel claim. He has failed to prove that his counsel's performance was deficient as well as failing to prove how that alleged deficiency prejudiced his defense. Specifically, Lockwood raises the claims from his direct appeal and has simply added "ineffective assistant of counsel" to each. Moreover, Lockwood has failed to provide a "clear and specific statement of the grounds upon which relief is sought,

5

including full disclosure of the factual basis of those grounds," as required by Rule 32.6(b), Ala.R.Crim.P.; <u>Gilmore v. State</u>, 937 So. 2d 547, 550 (Ala.Crim.App. 2005). Pursuant to Rule 32.3, Ala.R.Crim.P., Lockwood has the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. <u>Marquette v. State</u>, 933 So. 2d 1110, 1112-13 (Ala.Crim.App. 2005). Lockwood's claims are nothing but bare allegations unsupported by any specific facts.

Rule 32.7(d), Ala.R.Crim.P., authorizes the trial court to summarily dismiss a petitioner's Rule 32 petition:

> "[i]f the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition."

See also <u>Hannon v. State</u>, 861 So. 2d 426, 427 (Ala.Crim.App. 2003); <u>Cogman v. State</u>, 852 So. 2d 191, 193 (Ala.Crim.App. 2002); <u>Tatum v. State</u>, 607 So. 2d 383, 384 (Ala.Crim.App. 1992). As discussed above, Lockwood's claims were without merit. Thus, summary disposition was appropriate.

Based on the foregoing, the judgment of the trial court is affirmed.

**AFFIRMED**.

Baschab, P.J., and McMillan and Welch, JJ., concur. Shaw, J., concurs in the result.

IN THE ALABAMA COURT OF CRIMINAL APPEALS

CR-06-0562

ALBERT JEROME LOCKWOOD,

APPELLANT

VS

STATE OF ALABAMA,

APPELLEE.

ON APPEAL FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY

CASE NUMBER: CC-03-957.60

APPLICATION FOR REHEARING

Albert Jerome Lockwood
A.I.S. #134376
SCCF
1000 St. Clair Road
Springville, Alabama
35146-

EXHIBIT

L

PENGAD 800-631-6989

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

ALBERT JEROME LOCKWOOD,
       Appellant,

   VS                               Case No. <u>CR-06-0562</u>

STATE OF ALABAMA,
       Appellee.

## APPLICATION FOR REHEARING

    COMES now the Appellant, Albert Jerome Lockwood, pro se in the above styled cause and moves this Honorable Court for an Order withdrawing the Memorandum rendered on April 20, 2007, wherein the judgment of the trial court was affirmed denying relief upon a Rule 32 petition for post-conviction relief.

    In support of the foregoing Application for Rehearing, Lockwood avers the following:

1. Appellant filed a Rule 32 Petition averring that he was denied the effective assistance of counsel in violation of the 6th Amendment of the United States Constitution.

    In support thereof, appellant presented a clear and specific statement of the grounds upon which relief was sought. In meeting his **"burden of pleading"** under the requisites of Rule 32.6(b), A.R.Cr.P., appellant articulated several instances of deficient performance by trail counsel which rendered his assistance ineffective as set out in the Rule 32 petition and the Appellant Brief on appeal.

2. On appeal, appellant averred that the trial court erred, and/or otherwise abused its discretion by summarily dismissing the Rule 32 petition without an evidentiary hearing.

CRITICAL

Thus, appellant argued that the trial court did not afford him the opportunity to meet his "burden of proof" of the ineffective assistance of counsel claims, in accordance with Rule 32.3, A.R.Cr.P.

Accordingly, this Honorable Court has consistently held that, "At the pleading stage of Rule 32 proceedings, a Rule 32 petitioner does not have the burden of proving his claims by a preponderance of the evidence. Rather, at the pleading stage, a petitioner must only provide a 'clear and specific statement of the grounds upon which relief is sought.' Rule 32.6(b), A.R.Cr.P."

"Once a petitioner has met his burden of pleading so as to avoid summary disposition pursuant to Rule 32.7(d), A.R.Cr.P., 'he is then entitled to an opportunity to present evidence in order to satisfy his burden of proof." Johnson v State, 835 So.2d 1077 (Ala.Crim.App. 2001); Ford v State, 831 So.2d 641, 644 (Ala.Crim.App.2001).

3. In reviewing the claims and the issues on appeal, this Honorable Court noted appellants ineffective assistance of counsel claims, and the burden of proof that a petitioner must meet under the requisites of Strickland v Washington, 80 L.Ed.2d 674 (1984), to prevail upon such a claim.

Accordingly, this Court held that petitioner did not meet his burden of proof, under the two-prong test required by Strickland, supra, where he failed to prove that his counsel's performance was deficient, as well as failing to prove how that alleged deficiency prejudiced his defense.

2

4. As averred herein and above, the appellants contention on appeal was that the trial court erred and/or otherwise abused its discretion where it didnot conduct an evidentiary hearing on the merits of the ineffective assistance of counsel claims, **and afford appellant the opportunity to meet his burden of proof.**

Thus, appellant avers that this Honorable Courts Memorandum opinion rendered in this cause is in error where the Court failed to recognize the basis of the appeal.

Stated another way, appellant avers that he could not meet the prejudice, and/or proof prong of Strickland, supra, where the trial court improperly dismissed the Rule 32 petition without an evidentiary hearing. Thus appellant was not afforded the opportunity to subpeona witnesses, and submit proof of counsels deficient performance, and establish that there is a reasonable probability, that for trial counsels errors, the result of the judicial proceeding might have been different.

**Appellant poses the question to this Honorable Court, how could he meet his burden of proof under Rule 32.7(d),A.R.Cr.P., and the requisites of Strickland v Washington, supra, if he was not afforded an evidentiary hearing?**
5. Appellant moves this Honorable Court to grant a rehearing in this cause, and thereupon to enter an Order remanding the case for an evidentiary hearing on the merits of the ineffective assistance of counsel claims, affording appellant an opportunity to prove the merits of the claims.

WHEREFORE, pleadings and premises beigg duly considered, Lockwood prays that this Honorable Court will grant the foregoing Application.

## CERTIFICATE OF SERVICE

I, Albert Lockwood, hereby certify on this <u>1st</u> day of May 2007,
that I have served a copy of the foregoing Application for Rehearing
on the Attorney General for the State of Alabama by placing same in
the U.S. mail, first-class postage pre-paid, and properly addressed
as follows:

Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Ala. 36130

*Albert Lockwood*
Albert J. Lockwood, pro se
A.I.S. #134376
SCCF
1000 St. Clair Road
Springville, Ala. 35146

4

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

Lane W. Mann
  Clerk
Gerri Robinson
  Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 229-0521

May 11, 2007

**CR-06-0562**

Albert Jerome Lockwood v. State of Alabama  (Appeal from Montgomery  Circuit Court: CC03-957.60)

## NOTICE

You are hereby notified that on May 11, 2007 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

**cc:** Hon. Melissa Rittenour, Circuit Clerk
Albert Jerome Lockwood, Pro Se
John M. Porter, Asst. Atty. Gen.



EXHIBIT

m

*Porter*
*1C 3844*

# IN THE SUPREME COURT OF ALABAMA

## ALBERT JEROME LOCKWOOD,

Appellant,

vs.

## STATE OF ALABAMA,

Appellee.

## PETITION FOR WRIT OF CERTIORARI

SUPREME COURT NO. _____

**Appealed from the Circuit Court
of Montgomery County, Alabama
Case No. CC-03-957**

**Court of Criminal Appeals
Case No. CR-06-0562**

Albert Jerome Lockwood
Pro Se, Appellant
AIS #134376, K-22-2A
1000 St. Clair Road
Springville, AL 35146-5582



EXHIBIT
N
PENGAD 800-631-6989

ALBERT JEROME LOCKWOOD,    )  IN THE CIRCUIT COURT OF

           Appellant,    )  MONTGOMERY COUNTY, ALABAMA

vs.    )

    )  CASE NO. CC-03-957

STATE OF ALABAMA,    )

           Appellee.    )  SUPREME COURT NO. _____

## PETITION FOR WRIT OF CERTIORARI

TO THE SUPREME COURT OF ALABAMA:

Comes your Petitioner, Albert Jerome Lockwood, and petitions this Court for a writ of Certiorari to issue to the Court of Criminal Appeals in the above-styled cause under Rule 39, ARAP, and shows the following:

1. Petitioner suffered a judgment in the Circuit Court of Montgomery County, Alabama, on November 10, 2006. The Court of Criminal Appeals affirmed the judgment on April 20, 2007. An application for rehearing was filed on April 30, 2007 and overruled on May 11, 2007.

2. A copy of the opinion of the appellate court is attached to this petition which shows the Court of Criminal Appeals case to be No. CR-06-0562.

3. Petitioner alleges as grounds for the issuance of the writ the following:

The basis of this petition for the writ is that the decision of the appellate court is in conflict with its prior decisions on the same point of law. In its present decision the appellate court held: Pursuant to Rule 32.3, Ala.R.Crim.P.,

Petitioner has the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. In the case of <u>Johnson v. State</u>, 835 So.2d 1077 (Ala.Crim.App. 2001), the appellate court held: At pleading stage of petition for post-conviction relief, petitioner does not have burden of proving his claims by preponderance of evidence; rather, petitioner must only provider clear and specific statement of grounds upon which relief is sought, and once petitioner has met his burden of pleading so as to avoid summary disposition, he is then entitled to opportunity to present evidence in order to satisfy his burden of proof. These statements of the law are in conflict and the issue is which holding should be followed on this principle of law.

Petitioner respectfully requests that after a preliminary examination, the writ of certiorari be granted and that this Court proceed under its rules to review the matters complained of, and to reverse the judgment of the Court of Criminal Appeals, and for such other relief as Petitioner may be entitled.

I certify that I have this day served copies of this petition on all other parties to the appeal in the court of appeals and the Court of Criminal Appeals.

Albert J. Lockwood
Pro Se, Petitioner
AIS #134376, K-22-2A
1000 St. Clair Road
Springville, AL 35146-5582

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing petition has been served upon the following individuals by mailing them a copy of same by U.S. Mail, postage prepaid, this 23rd day of May, 2007:

Office of the Attorney General
**Criminal Appeals Division**
Alabama State House
11 South Union Street
Montgomery, AL 36130-0152


Alabama Court of Criminal Appeals
300 Dexter Avenue
P.O. Box 301555
Montgomery, AL 36130-1555


Albert J. Lockwood

Albert Jerome Lockwood
AIS #13376, K-22-2A
1000 St. Clair Road
Springville, AL 35146-5582

This correspondence is forwarded
from an Alabama State Prison. The contents
have not been evaluated, and the Alabama
Department of Corrections is not responsible
for the substance or content of the enclosed
communication.

3613C82102 0050

FREE MAIL

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, AL 36130-0152

*Pcider*
*103844*

# IN THE SUPREME COURT OF ALABAMA



July 13, 2007

**1061192**

Ex parte Albert Jerome Lockwood.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: Albert Jerome Lockwood v. State of Alabama)   (Montgomery Circuit Court: CC03-957.60; Criminal Appeals : CR-06-0562).

## <u>CERTIFICATE OF JUDGMENT</u>

## <u>Writ Denied</u>

The above cause having been duly submitted, IT IS CONSIDERED AND ORDERED that the petition for writ of certiorari is denied.

LYONS, J. -  See, Stuart, Bolin, and Murdock, JJ., concur.  Cobb, C.J., recuses herself.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this _13th_ day of ___July,___ _2007_

*Robert G Esdale, Sr*

**Clerk, Supreme Court of Alabama**



EXHIBIT

O

/bb